```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION


 4
        PANCHENKO,                    )   CV-23-4965-EKL
 5                                    )
                      PLAINTIFF,      )   SAN JOSE, CALIFORNIA
 6                                    )
                 VS.                  )   AUGUST 13, 2025
 7                                    )
        BANK OF AMERICA, N.A., ET AL, )   PAGES 1-40
 8                                    )
                      DEFENDANTS.     )
 9                                    )
        _____)
10
                     TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE EUMI K. LEE
                  UNITED STATES DISTRICT JUDGE
12

13      A P P E A R A N C E S:

14      FOR THE PLAINTIFF:      LOKER LAW, APC
                                132 BRIDGE STREET
15                              ARROYO GRANDE, CA 93420
                           BY:  MATTHEW LOKER
16

17      FOR THE DEFENDANT:      WOMBLE BOND DICKINSON U.S., LLP
                                50 CALIFORNIA STREET, SUITE 2750
18                              SAN FRANCISCO, CA 94111
                           BY:  TOMIO NARITA
19

20

21

22

23      OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                                    CERTIFICATE NUMBER 13185
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1              SAN JOSE, CALIFORNIA                AUGUST 13, 2025

 2                          P R O C E E D I N G S

 3         (COURT CONVENED AT 10:10 A.M.)

 4              THE CLERK:  CALLING CASE 23-CV-04965-EKL.  PANCHENKO

 5       VERSUS BANK OF AMERICA N.A., ET AL.

 6              COUNSEL, PLEASE STATE YOUR APPEARANCES STARTING WITH THE

 7       PLAINTIFF FIRST.

 8              MR. LOKER:  GOOD MORNING, YOUR HONOR.

 9         MATT LOKER ON BEHALF OF THE PLAINTIFF.

10              THE COURT:  GOOD MORNING.

11              MR. NARITA:  HI, YOUR HONOR.  TOMIO NARITA FOR THE

12       DEFENDANT, COMENITY.

13              THE COURT:  GOOD MORNING.

14         ALL RIGHT.  SO WE ARE HERE TODAY ON THE MOTION FOR SUMMARY

15       JUDGEMENT BROUGHT BY COMENITY.  THE COURT SENT -- AS WELL AS

16       THE DAUBERT.  THE COURT SENT A LENGTHY TENTATIVE AS TO BOTH

17       YESTERDAY, AND BOTH COUNSEL RECEIVED THAT, I ASSUME?

18              MR. LOKER:  CORRECT, YOUR HONOR.

19              MR. NARITA:  YES.

20              THE COURT:  SO WITH THAT, I SET THE EXPECTATION OF

21        20 MINUTES, IT CAN ALWAYS BE LESS, BUT WE WILL BEGIN WITH THE

22        MOVING PARTY.

23              MR. NARITA:  THANK YOU, YOUR HONOR.

24         I WOULD LIKE TO START BRIEFLY WITH THE DAUBERT MOTION IF I

25       COULD.
```

1          SO THE SECOND OPINION THAT MR. ULZHEIMER, OUR EXPERT,

2     EXPRESSED WAS THAT COMENITY'S INVESTIGATIONS OF THESE DISPUTES

3     EITHER MET OR EVEN EXCEEDED THE INDUSTRY STANDARDS THAT ARE

4     USED BY FURNISHERS OF INFORMATION.

5          AND I WOULD SUBMIT THAT MR. HOLLON NEVER REBUTTED THAT

6     OPINION.  HE IS NOT A REBUTTAL EXPERT AS TO THAT OPINION.  THE

7     REASON IS THAT SORT OF -- TWO OVERLAPPING REASONS.

8          NUMBER ONE IS HE'S NOT QUALIFIED TO EXPRESS AN OPINION ON

9     HOW FURNISHERS OF INFORMATION INVESTIGATE DISPUTES.  FURNISHERS

10    ARE CREDITORS AND OTHER ENTITIES THAT SUPPLY INFORMATION TO

11    CONSUMER REPORTING AGENCIES AND THEN THEY HAVE A WHOLE SET OF

12    OBLIGATIONS IMPOSED UPON THEM THAT ARE DIFFERENT WHEN THEY

13    RECEIVE DISPUTES.

14         MR. HOLLON, ADMITTEDLY HE'S NEVER WORKED FOR A FURNISHER,

15    HE'S NEVER CONSULTED FOR A FURNISHER, HE'S NEVER HELPED A

16    FURNISHER DESIGN A PROGRAM FOR INVESTIGATING DISPUTES, HE'S

17    JUST NEVER DONE IT, HE HAS NO KNOWLEDGE OF HOW FURNISHERS

18    INVESTIGATE ANY TYPES OF CLAIMS, MUCH LESS THE IDENTITY THEFT

19    CLAIMS THAT ARE AT ISSUE HERE.

20         AND WE HAVE ALL THAT IN THE RECORD AS TO ONE OF THE

21    REASONS WHY WE OBJECTED TO HIM.  SO HE IS NOT BE REBUTTING AN

22    OPINION ON INDUSTRY STANDARDS ABOUT WHICH HE IS NECESSARILY NOT

23    FAMILIAR 6789.  HE HAS SOME BACKGROUND IN THE CONSUMER

24    REPORTING SIDE, HE WORKED FOR ONE OF THE MAJOR --

25              THE COURT:  EXPERIAN.

```
 1            MR. NARITA:  -- BUT HE NEVER DID ANYTHING FOR A

 2    FURNISHER.

 3            SO FOR THAT REASON, HE CANNOT BE REBUTTING WHAT

 4    MR. ULZHEIMER SAID.  MR. ULZHEIMER WHO DOES HAVE THE REQUISITE

 5    EXPERIENCE, SAID LOOK, THIS IS HOW FURNISHERS DO THINGS, I'VE

 6    LOOKED AT WHAT THIS FURNISHER DID AND I FIND THEM TO BE IN LINE

 7    WITH THAT.

 8            THE ONLY THING MR. HOLLON ULTIMATELY DID IS HE EXPRESSED

 9    AN OPINION ON SOMETHING THAT EVERYBODY NOW AGREES HE CAN'T,

10    WHICH IS HE JUST SAYS I LOOKED AT WHAT COMENITY DID AND I THINK

11    IT'S UNREASONABLE.  AND EVERYBODY REALLY AGREES HE CAN'T

12    EXPRESS THAT OPINION.

13                THE COURT:  IN TERMS OF IN THE LEGAL SENSE.

14                MR. NARITA:  RIGHT.

15                THE COURT:  HE NEEDS TO FIGURE OUT A DIFFERENT WAY TO

16    FRAME THAT.

17            LET'S GO BACK TO YOUR FIRST POINT.  SO YOUR ARGUMENT IS

18    BASICALLY BECAUSE HE WORKED FOR EXPERIAN RATHER THAN FOR THE

19    FURNISHER INSTEAD, AS YOU ARE TERMING IT, THAT HE DOESN'T HAVE

20    THAT EXPERTISE, SO THERE IS NOT A PERFECT MATCH IN TERMS OF WHO

21    RECEIVED IT AND WHO GAVE THE INFORMATION AND HIS EXPERTISE.

22            WHAT'S YOUR BEST CASE FOR THAT IN TERMS OF ANALOGY -- BY

23    WAY OF ANALOGY?

24                MR. NARITA:  WELL I DON'T KNOW IF I HAVE A CASE

25    THAT'S DIRECTLY ON POINT.
```

1            THE COURT:  IT DOESN'T HAVE TO BE A

2    CREDITOR/FURNISHER BUT SOMETHING IN WHICH -- I'M TRYING TO

3    THINK OF SOMETHING COMPARABLE OF SOMETHING OF, WHO WORKED ON

4    DIFFERENT PARTS OF A CAR.  I'M TRYING TO THINK OF SOME SORT OF

5    EXPERTISE FIT, IN TERMS OF SUBJECT MATTER, WHICH IS BASICALLY

6    THE ARGUMENT YOU ARE MAKING THAT DESPITE THE FACT THAT HE WAS

7    AWARE OF THE INDUSTRY, I.E. CREDIT REPORTING, THAT HE DOES NOT

8    HAVE EXPERTISE ON THAT SIDE OF EXCHANGE OF INFORMATION AND THAT

9    DISQUALIFIES HIM AS AN EXPERT.

10        SO WHAT WOULD BE YOUR BEST CASE ANALOGY FOR THAT?

11            MR. NARITA:  WELL I MEAN, I THINK JUST THE STANDARD

12    SUPREME COURT AUTHORITY ON WHAT AN EXPERT MUST KNOW IN ORDER TO

13    OPINE.  HE OR SHE HAS TO HAVE SOME FACTUAL BASIS UPON WHICH TO

14    RENDER AN OPINION, IT CAN'T JUST BE THERE IPSE DIXIT.

15            THE COURT:  LET'S BRING IN ONE OF MY FAVORITE MOVIES,

16    LEGAL MOVIES, SO MY COUSIN VINNY, RIGHT?

17            MR. NARITA:  A CLASSIC.

18            THE COURT:  A CLASSIC.  EVERYONE IS SMILING IN THE

19    COURTROOM, I WILL ASSUME THAT THAT MEANS THAT WE ALL KNOW WHERE

20    I'M GOING WITH THIS.

21            MR. NARITA:  SHE WON THE ACADEMY AWARD FOR THAT

22    MOVIE.

23            THE COURT:  SHE DID.  AND SHE'S UP THERE, AND IT'S

24    NOT NECESSARILY THAT SHE IS A WHEEL SPECIALIST, BUT HER GENERAL

25    KNOWLEDGE IN TERMS OF THE AUTOMOTIVE INDUSTRY, I CAN'T REMEMBER

1    EXACTLY HOW SHE FRAMED IT, IS ENOUGH TO COVER THAT EXPERTISE.

2        SO I'M GUESSING WHAT PLAINTIFF'S COUNSEL WILL SAY IS

3    BASICALLY, OKAY LOOK, OUR EXPERT WORKED WITHIN THIS INDUSTRY

4    WHICH IS AN INDUSTRY WITHIN CREDIT REPORTING, HIS KNOWLEDGE IS

5    SUFFICIENT, IN TERMS OF HAVING AN OVERALL KNOWLEDGE OF THE WAY

6    THE INDUSTRY WORKS, BOTH IN TERMS OF BOTH SIDES OF SOMEONE WHO

7    IS REPORTING IT AND SOMEONE WHO IS THE FURNISHER AND THE CREDIT

8    REPORTING.  SO YOU ARE ASKING ME TO DRAW A DISTINCTION BETWEEN

9    THE TWO AND SAY NO IT HAS TO BE SPECIALIZED DOWN TO THAT

10   DEGREE.

11       SO WHAT IS YOUR BEST EXAMPLE OF THAT IN TERMS OF FACTS OF

12   THE CASE?

13       MR. NARITA:  I'M NOT SURE IF I COULD ANALOGIZE IT TO

14   THE FACTS OF MY COUSIN VINNY AT THIS POINT, BUT I WISH I COULD

15   BECAUSE I LOVE MOVIE REFERENCES.

16       HOWEVER, YOUR HONOR, I THINK THE POINT IS THAT CREDIT

17   REPORTING AGENCIES AND FURNISHERS ARE COMPLETELY DIFFERENT

18   OPERATORS IN THIS DYNAMIC.

19       CREDIT REPORTING AGENCIES ARE THE BIG DATA WAREHOUSES THAT

20   JUST HOUSE INFORMATION HAS BEEN APPLIED TO THEM.  THEY DON'T

21   OWN ACCOUNTS, THEY DON'T ORIGINATE ACCOUNTS, THEY DON'T HAVE

22   ANY DATA THAT RELATES TO THE OPERATING ACCOUNT.  SO HE WORKED

23   THERE AND HE INVESTIGATED DISPUTES, I GUESS, FROM THEIR

24   PERSPECTIVE.  NEVER ONCE HAS HE EVER WORKED FOR A FURNISHER OR

25   EVEN CONSULTED WITH A FURNISHER NOR COULD HE POINT TO A SINGLE

1    FURNISHER OF INFORMATION WHO EVER DID ANY OF THE THINGS THAT HE

2    FAULTS COMENITY FOR NOT DOING.

3         HE SAYS, WELL YOU SHOULD HAVE CALLED THE CONSUMER.  BUT HE

4    DIDN'T, AND HE COULDN'T POINT TO ANY FURNISHER WHO HAS EVER

5    DONE THAT.  HE NEXT SAYS, YOU KNOW, YOU SHOULD HAVE DONE A FOIA

6    REQUEST TO THE U.S. BORDER PATROL.  HE DIDN'T DO IT AND HE

7    COULDN'T POINT TO ANY FURNISHER WHO HAS DONE THAT.  HE GAVE A

8    LITANY OF EXAMPLES OF THINGS THAT HE JUST THOUGHT OF, LIKE WOW,

9    YOU COULD HAVE DONE THAT, YOU COULD HAVE GONE TO THE POLICE

10   DEPARTMENT AND ASKED THEM, I KNOW YOU WOULDN'T GIVE MR.

11   PANCHENKO AN UNREDACTED COPY OF HIS OWN POLICE REPORT BUT YOU

12   SHOULD GIVE ONE TO ME.

13             THE COURT:  LET ME ASK YOU A QUESTION.

14             MR. NARITA:  I'M SORRY, YOUR HONOR.

15             THE COURT:  I HEAR WHAT YOU ARE SAYING BUT I STILL

16   THINK IT GOES TO MY SAME POINT OF HOW PERFECT DOES THE FIT NEED

17   TO BE IN TERMS OF THE EXPERTISE?  HOW SPECIFIC DOES IT HAVE TO

18   BE IN TERMS OF THE SUBJECT MATTER?

19        LET ME ASK ANOTHER QUESTION.  WOULD YOU AGREE WITH ME

20   THAT CREDIT REPORTING AGENCIES, THAT THE CRA'S HAVE, IN TERMS

21   OF THEIR INVESTIGATIVE RESPONSIBILITY, THAT THEIR

22   RESPONSIBILITY IS LESS SO THAN THE FURNISHERS?

23             MR. NARITA:  I WOULD AGREE WITH THAT.  I ACTUALLY

24   THINK THERE IS CASE LAW TO SUPPORT THAT, THAT THEY DO HAVE A

25   DUTY TO INVESTIGATE, THEY SHOULD INVESTIGATE WHAT'S PRESENTED

1     TO THEM INDEPENDENTLY OF A FURNISHER, BUT THERE IS PLENTY OF

2     CASE LAW THAT SUGGESTS THAT IF THERE IS GOING TO BE INFORMATION

3     THAT ONLY A FURNISHER WOULD HAVE ACCESS TO, THAT'S SOMETHING

4     THAT YOU CAN'T EXPECT THE CONSUMER REPORTING AGENCY TO LOOK AT.

5             THE COURT:  OKAY.  SO THEN LET'S TAKE IT TO THE NEXT

6     LEVEL.

7         SO ASSUMING THAT EVERYBODY AGREES WITH THAT, INCLUDING

8     NINTH CIRCUIT PRECEDENT AND ASSUMING THAT MR. HOLLON'S

9     EXPERTISE WAS -- INITIAL PERSONAL KNOWLEDGE EXPERIENCE HAVE

10    BEEN WITH CRA'S BUT THEN HAVE ALSO SEEN THIS WHOLE INDUSTRY AND

11    HE'S SAYING THAT IN HIS EXPERIENCE, A CRA WOULD HAVE DONE THIS

12    AND THE FURNISHER'S RESPONSIBILITY WAS GREATER, COULDN'T HE --

13    WOULDN'T HE HAVE SOME KNOWLEDGE OR EXPERTISE IN TERMS OF

14    WHETHER THOSE INVESTIGATIONS, THE BIAS LINE WOULD LOOK LIKE FOR

15    A CRA AND WHAT MIGHT BE GREATER?

16            MR. NARITA:  BUT HE'S NOT OPINING ON THAT, HE'S NOT

17    REBUTTING SOMEBODY WHO HAS OPINED ON THAT.  HE'S REBUTTING

18    SOMETHING SPECIFIC.

19        AGAIN, PART OF OUR OBJECTION WAS THE TIMING OF THIS, WE

20    WERE GIVEN THIS REPORT A MONTH AFTER YOUR HONOR SAID GIVE US

21    YOUR REPORTS.  AND IT'S OUR POSITION THAT IF MR. HOLLON WANTED

22    TO OPINE ON SOMETHING, THAT'S THE PLAINTIFF'S BURDEN OF PROOF

23    THAT HE SHOULD COME OUT WITH IT IN MARCH OF THIS YEAR AND THEN

24    WE COULD HAD SOMEBODY ANALYZE THAT AND REBUT IT.

25        SO WE MADE THAT POINT.  BUT I'M JUST TALKING ABOUT THE

1    SECOND POINT WHICH IS, IS HE IN FACT A REBUTTAL EXPERT OF OUR

2    EXPERT WHO HAS ONLY TESTIFIED IN A VERY NARROW THING, WHICH IS

3    I UNDERSTAND HOW FURNISHER'S OPERATE, I HAVE EXPERTISE IN THAT,

4    I'VE EXPLAINED TO YOU WHAT THAT EXPERTISE IS, I HAVE LOOKED AT

5    WHAT THIS FURNISHER DID WITH THIS DISPUTE, AND I BELIEVE THAT

6    IN MY OPINION THIS MEETS OR EXCEEDS WHAT OTHER FURNISHERS DO IN

7    THE INDUSTRY.  THAT'S WHAT MR. ULZHEIMER SAID.

8        NOW WHAT DOES MR. HOLLON SAY?  I HAVE NO IDEA WHAT

9    FURNISHERS DO, I HAVE NO FAMILIARITY WITH WHAT THE INDUSTRY

10   STANDARD WOULD BE BECAUSE I HAVE NEVER WORKED FOR ONE, I NEVER

11   TALKED TO ONE, I HAVE NO KNOWLEDGE OF IT WHATSOEVER, BUT I DO

12   HAVE OPINIONS, I AM GOING TO CLOAK MYSELF IN EXPERTISE, I DO

13   HAVE OPINIONS AND I'M GOING TO TELL THE JURY THEY SHOULD HAVE

14   DONE THIS, THEY SHOULD HAVE DONE THAT.  NONE OF WHICH, AGAIN,

15   IS REBUTTING INDUSTRY STANDARD, IT'S JUST HIS OPINION, HIS

16   PERSONAL IPSE DIXIT THAT HE WANTS TO SAY SHOULD HAVE BEEN DONE,

17   WHICH HE CANNOT TETHER, YOUR HONOR, TO ANY FURNISHER ANYWHERE

18   IN THE NATION, NO ONE.

19       THE COURT:  SO I'M INCLINED TO DISAGREE WITH YOU

20   BASED ON HIS 19 YEARS OF EXPERIENCE.  I MEAN, I THINK MANY OF

21   THE QUESTIONS YOU WERE RAISING CAN BE RAISED IN

22   CROSS-EXAMINATION, BUT ARE MORE APPROPRIATE FOR THOSE REASONS,

23   TO THAT END, BUT LESS SO IN TERMS OF DISQUALIFYING HIM.

24       MR. NARITA:  WELL I HAVE MADE MY POINT, YOUR HONOR,

25   AND I APPRECIATE THE COURT'S PATIENCE IN LISTENING TO ME.

1    TWO MORE TOPICS.  ONE IS THE INACCURACY POINT AND THEN THE

2    INVESTIGATION POINT ON THE FAIR CREDIT REPORTING ACT CLAIM.

3        SO THE FIRST POINT IS WHETHER THIS IS INACCURATE

4    INSPECTION OR NOT.  AND WE TOOK THE POSITION THAT THIS IS NOT

5    INACCURATE INFORMATION BECAUSE IT'S NOT THE KIND OF INFORMATION

6    THAT'S OBJECTIVELY AND READILY VERIFIABLE BY THE FURNISHER AS

7    INACCURATE OR MISLEADING.

8        IN OTHER WORDS, TAKEN AS A WHOLE, CAN COMENITY LOOK AT

9    WHAT ITS GOT BEFORE IT AND WHAT IT'S GOT ACCESS TO AND MAKE A

10   DETERMINATION BASED ON OBJECTIVELY AND READILY VERIFIABLE FACTS

11   THAT THIS IS INACCURATE.

12       WE THINK THE ANSWER IS NO, ALL OF THE RECORD -- EVERYTHING

13   IN THE RECORD THAT'S OBJECTIVELY AND READILY VERIFIABLE, THE

14   DOCUMENTARY EVIDENCE, THE PATTERN OF THIS ACCOUNT SAYS IT'S NOT

15   A FRAUD ACCOUNT, IT'S NOT A FRAUD ACCOUNT, IT'S OPENED IN

16   DECEMBER OF 2015, REGULAR PAYMENTS ARE MADE FOR A YEAR AND A

17   HALF ON THIS ACCOUNT, STATEMENTS ARE SENT MONTH AFTER MONTH,

18   NONE OF THEM ARE RETURNED, SMALL CHARGES ARE MADE, THERE IS A

19   $15,000 CREDIT LIMIT ON THIS ACCOUNT AND IT NEVER EVEN GETS

20   CLOSE TO BEING MAXED OUT, WHICH IS SOMETHING THAT FRAUDSTERS DO

21   RIGHT AWAY, RIGHT.

22       AND YOUR HONOR, NOT ONLY ARE PAYMENTS MADE FOR TWO AND A

23   HALF YEARS, AFTER COMENITY LOSES THE PRIVILEGE OF ISSUING THE

24   BRANDED CARD, IT HAS TO CLOSE THE ACCOUNT BECAUSE IT CAN'T

25   SERVICE THE ACCOUNTS ANYMORE.  AFTER THE CHARGING PRIVILEGES

1    ARE CLOSED ON THIS ACCOUNT, THE CARD HOLDER, SOMEBODY, CALLS IN

2    THREE TIMES VOLUNTARILY TO CONTINUE TO MAKE PAYMENTS EVEN

3    THOUGH THEY CAN'T CHARGE ANYMORE.

4        THERE IS NOTHING ABOUT THE OBJECTIVELY AND READILY

5    VERIFIABLE INFORMATION HERE THAT SUGGESTS FRAUD, SUGGESTS THE

6    EXACT OPPOSITE.  AND SO OUR POSITION IS THAT'S NOT SOMETHING

7    THAT REALLY CAN BE CONSIDERED TO BE INACCURATE UNDER THE CASE

8    LAW, NOT EVEN REACHING THE INVESTIGATION POINT.

9        AND YOUR HONOR POINTED OUT IN THE TENTATIVE RULING THAT WE

10   RELIED ON HOLDEN, WHICH IS 11TH CIRCUIT CASE, AND YOUR HONOR

11   SAYS IT'S FACTUALLY DISTINGUISHABLE.

12       I WILL TAKE RESPONSIBILITY FOR THIS, YOUR HONOR, THERE IS

13   ANOTHER CASE, IT'S JUST EARLIER THIS YEAR, WE SHOULD HAVE PUT

14   IT IN OUR PAPERS, IT'S A FOURTH CIRCUIT CASE, I WANT TO SHED

15   LIGHT TO TELL THE COURT ABOUT WHICH ALSO ADOPTS THIS SAME

16   STANDARD FOR FURNISHERS, AND IT'S CALLED ROBERTS V.

17   CARTER-YOUNG, INC.  THE CITE IS 131 F.4TH, 231.  THAT'S A

18   FOURTH CIRCUIT DECISION FROM -- I THINK IT WAS LATE MARCH, MID

19   TO LATE MARCH OF THIS YEAR, SO WE SHOULD HAVE PUT IT IN OUR

20   PAPERS AND WE DID NOT.

21           THE COURT:  DID YOU SHARE IT WITH MR. LOKER BEFORE

22    THE HEARING?

23           MR. NARITA:  I DID NOT SHARE IT WITH MR. LOKER BEFORE

24    THE HEARING, I SHOULD HAVE DONE THAT AS WELL.

25        BUT THE POINT I WOULD LIKE TO MAKE, YOUR HONOR, WITH THE

1    COURT'S INDULGENCE, THE <u>HOLDEN</u> CASE IS NOT SOME SORT OF OUTLIER

2    THAT ONLY DEALS WITH A CERTAIN FACTUAL SCENARIO, THE <u>ROBERTS</u>

3    CASE THAT I TALKED ABOUT I THINK REPRESENTS AN EMERGENT

4    CONSENSUS AMONGST THE CIRCUITS THAT FURNISHERS CAN ONLY REALLY

5    BE HELD TO THIS OBJECTIVELY AND READILY VERIFIABLE STANDARD.

6        AND THAT, THE CASE WAS -- IT DEALT WITH A TENANT WHO HAD

7    MOVED OUT OF THEIR APARTMENT AND THEN THE LANDLORD HAD, LIKE,

8    SLAMMED THEM WITH SOME CHARGE THAT THE TENANT THOUGHT WAS

9    RETALIATORY AND FRAUDULENT, AND THE TENANT WOULDN'T PAY IT SO

10   THE LANDLORD STARTS FURNISHING INFORMATION ABOUT THIS DISPUTED

11   CHARGE TO THE CRA'S, AND THE TENANT SUED AND SAYS, YOU KNOW,

12   THIS IS INACCURATE INFORMATION.

13       IT GOES TO THE FOURTH CIRCUIT, AND ON THIS INACCURACY

14   POINT, THIS IS WHAT THE FOURTH CIRCUIT SAYS ABOUT FURNISHERS,

15   IT SAYS -- FIRST IT ADOPTS THE OBJECTIVELY AND REASONABLY

16   VERIFIABLE STANDARD -- AND IT SAYS "FURNISHERS ARE NOT

17   TRIBUNALS, THEY HAVE NEITHER THE RESOURCES NOR THE EXPERTISE TO

18   CONDUCT THE LEVEL OF INVESTIGATION THAT TAKES PLACE IN JUDICIAL

19   PROCEEDINGS OR TO MAKE THE KIND OF DETERMINATIONS ABOUT

20   DISPUTES THAT COURTS MAKE."

21       IT GOES ON, "FOR INSTANCE, A DISPUTE THAT INVOLVES COMPLEX

22   FACT GATHERING AND IN-DEPTH LEGAL ANALYSIS OF THE SORT THAT

23   COURTS WOULD TYPICALLY PERFORM IS NOT OBJECTIVELY AND READILY

24   VERIFIABLE.  A DISPUTE THAT IMPLICATES UNSETTLED QUESTIONS OF

25   LAW AND REQUIRES CREDIBILITY DETERMINATIONS AND QUASI-DISCOVERY

1    ISN'T EITHER.  INACCURACIES THAT ARE OBJECTIVELY AND READILY

2    VERIFIABLE DO NOT INCLUDE CLAIMS OF TORTIOUS CONDUCT THAT

3    REQUIRE A FURNISHER TO EVALUATE THE SUBJECTIVE NATURE OF

4    PARTIES' ACTIONS, SUCH AS CLAIMS FOR FRAUD OR RETALIATION."

5         SO AGAIN, YOU CAN JUST -- IT JUST MAKES SENSE HERE.  ALL

6    YOU HAVE, YOU HAVE TWO SIDES OF A LEDGER, YOU'VE GOT EVERYTHING

7    IN THE BANK'S FILE, WHICH I ALREADY DISCUSSED, WHICH POINTS

8    THAT THIS IS NOT A FRAUD --

9              THE COURT:  TELL ME ABOUT THE CALL RECORDINGS.

10             MR. NARITA:  I WOULD BE HAPPY TO TELL YOU ABOUT THE

11   CALL RECORDINGS.

12             THE COURT:  BECAUSE A, I THINK THAT IS VERIFIABLE, AS

13   THE TENTATIVE RULING INDICATES.  B, IN TERMS OF THE ROBERTS

14   DECISION THAT YOU JUST DISCUSSED, WHICH AGAIN I WISH COUNSEL,

15   IF THEY ARE GOING TO PULL UP CASES, AT MINIMUM SHARE IT WITH

16   COUNSEL BEFOREHAND, THEY CAN PULL IT UP ONLINE SO WE CAN HAVE A

17   RICH DISCUSSION.  I WILL CONSIDER WHETHER OR NOT I WILL BE

18   CONSIDERING THAT DECISION OR WHETHER OR NOT IT CHANGES MY MIND,

19   IN WHICH I WILL GIVE PLAINTIFFS AN OPPORTUNITY TO RESPOND

20   BRIEFLY TO IT.

21        BUT EVEN IN TERMS OF WHAT I HEARD, IT SEEMED AS THOUGH

22   THEY WERE SAYING, FIRST OF ALL THE QUESTION IS THEY TALKED

23   ABOUT WHETHER OR NOT THERE IS THIS LEGAL ANALYSIS OF WHETHER OR

24   NOT THE SAME SORT OF SITUATION WHICH THEY DISCUSSED IN HOLDEN

25   WHICH THERE WAS AN OPEN LEGAL QUESTION.

1          AND THEN SECOND, IT WAS GOING TO LIKE, OKAY NOW WE ARE

2     REALLY WEIGHING EVIDENCE, THIS CREDIBILITY DETERMINATION,

3     VERSUS LISTENING TO RECORDINGS OR LISTENING TO -- HERE, A SET

4     OF RECORDINGS -- BUT WHERE THE INDIVIDUAL PRONOUNCED THE NAME

5     DIFFERENTLY, WHERE THE VOICE SOUNDS DIFFERENT, BUT FOR THE

6     ACCENT, AND EVEN THEN, I'M NOT A SPECIALIST, BUT MOST LIKELY

7     THOSE ACCENTS WERE DIFFERENT ACCENTS.

8          SO TELL ME ABOUT HOW THE COURT SHOULD CONSIDER THAT

9     ESPECIALLY WHERE I'M NOT THE TRIER OF FACT HERE, I'M JUST

10    SEEING WHETHER OR NOT THERE IS A GENUINE DISPUTE, AND I FIND

11    THAT THAT GIVES ME A GENUINE DISPUTE OR GIVES ME PAUSE TO THINK

12    THERE IS.

13             MR. NARITA:  AND YOUR HONOR, THAT'S A GREAT SEGUE FOR

14     ME TO MOVE TO THE REASONABLE INVESTIGATION PIECE.  THE

15     RECORDINGS WERE ACTUALLY NUMBER TWO ON MY LIST BUT I WILL MAKE

16     THEM NUMBER ONE.

17          SO THE COURT HAS POINTED OUT IN THE TENTATIVE AND JUST

18    POINTED OUT AGAIN THAT THE BANK HAD CALL RECORDINGS IN ITS

19    RECORDS FROM THE 2017 AND 2018 PERIOD OF SOMEBODY CALLING IN ON

20    THIS ACCOUNT.  AND THE COURT POINTS OUT IN THE TENTATIVE THAT

21    THE VOICE SOUNDED DEEPER AND THAT THE ACCENT SOUNDED DIFFERENT

22    THAN THE OTHER VOICE THAT CAME IN IN 2023 WHEN MR. PANCHENKO

23    WAS SAYING, HEY THIS ISN'T MINE, OKAY.

24          SO TWO THINGS.  FIRST, JUST AS A MATTER OF POLICY AND

25    MATTER OF LAW, I WOULD SAY I HAVEN'T READ EVERY FAIR CREDIT

1    REPORTING ACT CASE THAT'S OUT THERE.  I PROBABLY READ THOUSANDS

2    BUT NOT ALL OF THEM.  I'VE NEVER SEEN A DECISION WHICH WOULD

3    IMPOSE UPON A FURNISHER THE OBLIGATION TO REVIEW ALL OF THE

4    CALL RECORDINGS THAT IT HAS IN ITS POSSESSION, IN THE CONTEXT

5    OF EVALUATING THE DISPUTE WHERE I HAVE TO RESPOND IN 30 DAYS OR

6    LESS, CONDUCT A VOICE ANALYSIS OF SOME SORT ON ALL OF THOSE

7    RECORDINGS IN THE HISTORY OF THE ACCOUNT AND THEN REACH A

8    CONCLUSION AS TO WHETHER SOMEONE CALLING IN LATER WAS THE SAME

9    VOICE AS SOMEONE CALLING IN BEFORE.  I JUST THINK THAT WOULD BE

10   AN INCREDIBLY ONEROUS AND NOT A REASONABLE DUTY TO PUT ON

11   FURNISHERS, JUST GENERALLY SPEAKING.

12        THE COURT:  WASN'T THERE SOMETHING IN THE POLICY

13   REGARDING THIS?

14        MR. NARITA:  I CAN TALK ABOUT THE POLICIES AS WELL.

15        THE COURT:  BECAUSE I DON'T THINK THE COURT IS --

16   BECAUSE YOUR INFERENCE RIGHT NOW IS THE COURT IS PUTTING THIS

17   OBLIGATION ON CRA'S OR FURNISHERS, LIKE I AM ACTUALLY, I KNOW

18   IT WAS TYING BACK TO COMENITY'S POLICY, CORRECT?

19        MR. NARITA:  AND THAT'S MY POINT NUMBER FIVE WHICH I

20   CAN TALK ABOUT NOW WHICH IS COMENITY'S POLICY.

21        SO COMENITY HAS A LOT OF POLICIES, AS MANY FURNISHERS DO,

22   ABOUT WHAT IT EXPECTS OF ITSELF WHEN IT'S DISCHARGING ITS

23   OBLIGATIONS TO INVESTIGATE.

24        AND THAT'S GREAT.  WE DON'T WANT TO DISSUADE FURNISHERS

25   FROM HAVING ROBUST POLICIES THAT THEY PUT UPON THEMSELVES TO DO

1        A REASONABLE INVESTIGATION BUT THAT BUT WHETHER OR NOT COMENITY

2        DID OR DIDN'T FOLLOW ITS OWN INDIVIDUAL POLICIES IN A

3        PARTICULAR CASE, A PARTICULAR REVIEW.  THAT DOESN'T REALLY GO

4        TO THE ISSUE AS TO WHETHER A REASONABLE INVESTIGATION WAS

5        CONDUCTED FOR PURPOSES OF THE FAIR CREDIT REPORTING ACT

6        BECAUSE --

7                THE COURT:  SO MR. NARITA, IT SOUNDS AS THOUGH YOU

8        ARE ASKING THE COURT -- I FEEL LIKE I'M IN THE MIDDLE OF A

9        BENCH TRIAL, BECAUSE GOING BACK TO A TRIABLE ISSUE, WHETHER OR

10       NOT VIEWED IN THE LIGHT MOST FAVORABLE TO PLAINTIFF, I'M NOT --

11       I SEE YOUR POINT, I SEE THE ARGUMENTS ON BOTH SIDES IF THIS

12       WERE A BENCH TRIAL.  BUT IN TERMS OF WHERE WE ARE SITUATED

13       RIGHT NOW WHEN YOU ARE TALKING ABOUT -- BECAUSE I DO WANT TO

14       HEAR THE REST OF YOUR POINT, I DIDN'T WANT TO INTERRUPT RIGHT

15       THERE, BUT PUT IT IN TERMS OF WHERE WE ARE PROCEDURALLY RIGHT

16       NOW.

17                MR. NARITA:  SURE, OKAY.

18           AND IF I COULD, I WILL RETURN TO THE PROCEDURE POINT, BUT

19       MAY I RETURN TO THE RECORDINGS POINT?

20                THE COURT:  BUT THEY ARE ONE AND THE SAME, RIGHT?

21       YOU NEED TO BE TELLING ME HOW IT DOESN'T CREATE A GENUINE

22       ISSUE.

23                MR. NARITA:  UNDERSTOOD.

24           SO THE STANDARD THAT THE NINTH CIRCUIT HAS PUT DOWN IN THE

25       GORMAN CASE IS NOT DID THE FURNISHER FOLLOW ITS OWN POLICIES,

1  IT DOESN'T SAY THAT.  THE STANDARD IS DID THE FURNISHER CONDUCT

2  A REASONABLE INVESTIGATION.  IT'S REALLY TWO PARTS.  AND THEN

3  EVEN IF IT DIDN'T, EVEN IF IT DIDN'T CONDUCT, IN SOME

4  CIRCUMSTANCES A REASONABLE INVESTIGATION, CAN THE PLAINTIFF

5  POINT TO EVIDENCE THAT A REASONABLE INVESTIGATION WOULD HAVE

6  UNCOVERED THAT WOULD HAVE MADE A DIFFERENCE THAT WOULD HAVE

7  CHANGED THE OUTCOME.  THAT'S THE STANDARD THAT THE PLAINTIFF

8  HAS TO MEET HERE.

9      AND SO ON THE RECORDINGS YOUR HONOR, HERE'S WHAT I WOULD

10  SUBMIT, LET'S ASSUME THAT WE ARE GOING TO REQUIRE FURNISHERS TO

11  DO THIS ANALYSIS OF EVERY RECORDING, AND THERE'S JUST --

12  HERE --

13      THE COURT:  IT'S AGAIN, THE POLICY, IT'S AGAIN A

14  QUESTION OF REASONABLENESS, IT'S AGAIN THERE IS NO REQUIREMENT

15  THAT THE SUMMARY JUDGEMENT ORDER IS PLACING.  SO AGAIN, PUT IT

16  IN THE LIGHT IN THE STANDARDS.

17      MR. NARITA:  UNDERSTOOD, YOUR HONOR.

18  SO WHAT IF -- THE QUESTION IS NOBODY LISTENED TO THE

19  RECORDINGS, RIGHT.  WHAT IF SOMEONE HAD, WHAT IF SOMEONE HAD

20  LISTENED TO ALL THOSE RECORDINGS BEFORE REACHING THEIR RESULT?

21  WHAT WOULD THEY HAVE HEARD?

22  WHAT THEY WOULD HAVE HEARD, YOUR HONOR, IS A MALE VOICE

23  WITH AN EASTERN EUROPEAN ACCENT CALLING IN TO A CREDIT CARD

24  THAT HAD BEEN OPENED AND ACTIVE AND PERFORMING REGULARLY FOR A

25  YEAR AND A HALF OR MORE AND TRYING TO MAKE A PAYMENT ON THAT

1    ACCOUNT, NOT TRYING TO SAY WHY CAN'T I MAKE THIS CHARGE THAT

2    I'M TRYING TO RIP THE BANK OFF FROM, TRYING TO MAKE A PAYMENT

3    AS SOMEONE HAD DONE FOR MONTHS, AND MONTHS, AND MONTHS SINCE

4    THE ACCOUNT WAS OPENED.

5         SO THERE WERE A FEW OF THEM WHERE THEY ARE SAYING, LOOK,

6    I'M GOING TO MAKE A PAYMENT ON FRIDAY, OR SOMETHING LIKE THAT.

7    BUT THAT'S WHAT SOMEONE WOULD HAVE HEARD.  THEY WOULD HAVE SEEN

8    AN EASTERN EUROPEAN MAN'S NAME ON THIS ACCOUNT, PERFORMING

9    WELL, NO DISPUTES, LOTS OF PAYMENTS, NOT MAXED OUT, STATEMENTS

10   GETTING THERE AND RESULTING IN REGULAR ACTIVITY, AND THEN THEY

11   WOULD HAVE HEARD SOMEONE WHO CLEARLY WANTS THE ACCOUNT TO STAY

12   OPEN AND BE USED LIKE A NORMAL CONSUMER WOULD WHO HAS AN

13   EASTERN EUROPEAN ACCENT.

14        WAS IT THE SAME VOICE AS MR. PANCHENKO'S CALLING IN FOUR

15   YEARS LATER?  I DON'T KNOW, MAYBE IT WAS DIFFERENT, BUT HOW IS

16   THAT GOING TO CHANGE THE RESULT?  I WOULD SUBMIT TO YOU THAT IF

17   ALL OF THAT HAD BEEN CONSIDERED, IT WOULD HAVE CONFIRMED THE

18   BANK'S DECISION TO HOLD HIM RESPONSIBLE.

19            THE COURT:  AND THIS WILL BE A GOOD QUESTION FOR THE

20    JURY TO DECIDE.

21        I WOULD SUBMIT TO YOU THAT THIS WOULD BE -- ALL THESE

22   POINTS IS THE REASON THAT THE COURT IS NOT INCLINED TO GRANT

23   SUMMARY JUDGEMENT RIGHT NOW.

24            MR. NARITA:  ALL RIGHT.  AND I ACCEPT THAT,

25    YOUR HONOR, I JUST --

1    THE COURT:  SO MR. NARITA, THE COURT HAS GIVEN LEAVE

2    FOR AN ADDITIONAL SIX MINUTES AT THIS POINT, WHICH IS FINE,

3    THESE ARE IMPORTANT MOTIONS, BUT I FEEL LIKE YOU ARE ARGUING

4    YOUR CLOSING ARGUMENT WITH THIS ONE.  I THINK IT'S TIME TO MOVE

5    ON TO THE NEXT POINT.

6    MR. NARITA:  I APPRECIATE, YOUR HONOR, I'M JUST

7    TRYING TO ADDRESS THE ISSUES RAISED BY THE TENTATIVE RULING.

8    THE COURT:  ABSOLUTELY.

9    MR. NARITA:  AND SO THE OTHER POINTS RAISED IN THE

10    TENTATIVE RULING ABOUT WHY THE REASONABLENESS OF THE

11    INVESTIGATION FELL SHORT WAS IT'S POINTED OUT THAT ONE OF THE

12    INVESTIGATORS DID NOT REVIEW THE POLICE REPORT AND FTC REPORT

13    THAT HAD BEEN SUBMITTED.  AND SO ON THAT, I WOULD SAY LET'S

14    REMEMBER IN THE FIRST INSTANCE, WHAT IS THE DISPUTE WE ARE

15    TALKING ABOUT HERE?  IT'S AN IDENTITY THEFT DISPUTE.  SO AT ITS

16    CORE, WHAT THAT SAYS IS THE CONSUMER SAYS I DID NOT OPEN THIS

17    ACCOUNT, I DID NOT USE THIS ACCOUNT, I DID NOT GET BENEFIT FROM

18    THIS ACCOUNT.  THAT'S WHAT AN IDENTITY THEFT DISPUTE SAYS.

19    THE COURT:  I KNOW, I DID READ THIS QUITE WELL.

20    MR. NARITA:  SO HE THEN SUBMITS SOMETHING HE SAYS

21    BEARS ON THAT, WHICH IS A POLICE REPORT AND AN FTC REPORT THAT

22    SAY ABSOLUTELY NOTHING ABOUT HIS WHEREABOUTS WHEN THIS ACCOUNT

23    WAS OPENED OR WHEN IT WAS BEING USED REGULARLY, AND PAYMENTS

24    WERE BEING MADE ON IT ALL THE WAY THROUGH 2018.

25    THIS HIGHLY REDACTED DOCUMENT TELLS ABOUT TRAVEL HISTORY

1    BUT IT DOESN'T -- IT DOESN'T ACCOUNT FOR HIS TRAVEL DOCUMENTS,

2    DOESN'T ACCOUNT FOR HIS WHEREABOUTS IN THE 2015, '16, '17 AND

3    '18, PERIOD.  THAT'S WHAT REALLY MATTERS TO WHETHER THIS IS AN

4    ID DOCUMENT OR NOT -- EXCUSE ME, ACCOUNT.

5            THE COURT:  DID BANU, B-A-N-U, REVIEW THE POLICE

6    REPORT?

7            MR. NARITA:  MY UNDERSTANDING IS SHE DID NOT, THAT

8    SHE TESTIFIED THAT SHE HAD NO MEMORY OF REVIEWING THE POLICE

9    REPORT.

10            THE COURT:  THAT'S WHAT I THOUGHT.  SO IT MAKES IT A

11    LITTLE BIT -- THAT MAKES IT, IN TERMS OF THE REASONABLENESS OF

12    THE INVESTIGATION, A LITTLE BIT TRICKY, RIGHT, BECAUSE IF SHE

13    HASN'T REVIEWED IT TO SAY -- - WELL IF SHE HAD REVIEWED IT, SHE

14    WOULD HAVE SEEN THIS OR WOULD HAVE SEEN THAT OR REACHED THIS

15    CONCLUSION.

16            MR. NARITA:  RIGHT.

17            THE COURT:  BUT IF SHE DOESN'T REVIEW IT THEN TO SAY,

18    IN TERMS OF THIS ELEMENT, TO SAY THAT THAT'S REASONABLE SEEMS A

19    LITTLE --

20            MR. NARITA:  AND THAT'S WHAT -- AND SO GORMAN AND THE

21    OTHER CASES WE'VE CITED TEACH THAT IT'S NOT JUST THAT, IT'S

22    WOULD THAT HAVE MADE A DIFFERENCE?

23        SO IT'S EFFECTIVELY LIKE A CAUSATION ANALYSIS.  LIKE,

24    LET'S ASSUME THAT A REASONABLE INVESTIGATION REQUIRED REVIEW OF

25    THOSE DOCUMENTS, WOULD THAT HAVE TILTED THE NEEDLE -- POINTED

1    THE NEEDLE SOMEWHERE ELSE?  WOULD THAT HAVE CHANGED THE OUTCOME

2    OF THE INVESTIGATION TO SAY, NOW I THINK HE'S NOT RESPONSIBLE?

3    I CAN SEE WHY HE'S NOT RESPONSIBLE.  THE ANSWER IS NO, IN FACT

4    IT WOULD PROBABLY CONFIRM IT.  IT'S LIKE, WHY IS THIS PERSON

5    TELLING US THAT HE'S NOT RESPONSIBLE FOR AN ACCOUNT AND GIVING

6    US A REDACTED DOCUMENT THAT SAYS NOTHING ABOUT WHERE HE WAS

7    WHEN IT WAS OPENED AND WHERE HE WAS WHEN IT WAS USED?

8    EVERYTHING THAT WE HAVE SAYS THIS IS NOT A FRAUD ACCOUNT.

9         THE COURT:  DIDN'T BANU ALSO TESTIFY THAT IT WOULD

10   HAVE BEEN HELPFUL IN HER INVESTIGATION HAD SHE REVIEWED IT?

11        MR. NARITA:  IT COULD HAVE BEEN HELPFUL, BUT WOULD IT

12   CHANGE THE OUTCOME OF IT OR NOT, THAT'S A WHOLE DIFFERENT

13   THING.  IT'S NOT LIKE, WOW, IF I HAD SEEN THAT, I WOULD HAVE

14   MARKED IT DIFFERENTLY.

15     THE QUESTION IS REALLY AN OBJECTIVE ONE, AND IT CAN BE

16   DECIDED ON SUMMARY JUDGEMENT, YOUR HONOR.  GORMAN WAS MY CASE,

17   WE WON THE CASE AT THE DISTRICT COURT LEVEL ON THE

18   REASONABLENESS OF THE INVESTIGATION -- WE ACTUALLY WON THE CASE

19   IN THE NINTH CIRCUIT ON THE REASONABLENESS OF THE

20   INVESTIGATION.

21        THE COURT:  GORMAN?

22        MR. NARITA:  YES.  BUT THE WAY -- WHAT TRIPPED US UP

23   IN GORMAN WAS THAT NBNA JUST HAD A POLICY THAT IT WASN'T

24   MARKING ACCOUNTS AS DISPUTED EVEN THOUGH IT KNEW THAT THE

25   CONSUMER STILL DISPUTED.  SO THAT'S WHERE IT CAME BACK DOWN.

1          BUT THE <u>GORMAN</u> CASE SAYS IT'S NOT ENOUGH TO SAY IT'S

2     UNREASONABLE, IT HAS TO MAKE A DIFFERENCE IF THE INFORMATION

3     HAD BEEN CONSIDERED.

4          SO THAT'S MY POINT ON THE FTC REPORT.  THAT'S MY POINT ON

5     THE CALL RECORDINGS TOO.  SAME THING WITH -- I WILL BE VERY

6     QUICK, YOUR HONOR, THE LAST --

7               THE COURT:  YOU ARE AT 31 MINUTES NOW.  YOU ARE

8     11 MINUTES OVER.

9               MR. NARITA:  BECAUSE, YOU KNOW, THE COURT ALSO POINTS

10    OUT, HE SAYS, WELL I WAS A VICTIM OF THE EQUIFAX DATA BREACH,

11    BUT YOUR HONOR, THE DATA BREACH FROM EQUIFAX OCCURRED IN

12    MID-2017, THAT'S PUBLICLY AVAILABLE KNOWLEDGE.

13         SO THAT CAN'T HAVE ANYTHING TO DO WITH WHETHER

14    MR. PANCHENKO DID OR DIDN'T OPEN AN ACCOUNT IN LATE 2015, EVEN

15    IF HIS IDENTITY WAS COMPROMISED IN 2017, IT DOESN'T BEAR ON THE

16    ISSUE.

17         AND THEN THE VERY LAST THING, YOUR HONOR, WAS THE COURT

18    POINTS OUT THAT SOME OF THE SKIP TRACING DATA IN THE ACCOUNT

19    SHOWS THAT THE ADDRESS THAT WAS USED WAS A NEWSPAPER FACILITY

20    OR SOMETHING LIKE -- SOME SORT OF BUSINESS ADDRESS.

21         AND AGAIN THE ANSWER -- THE RESPONSE TO THAT IS, WELL SO

22    WHAT?  I MEAN, YOU CAN USE A BUSINESS ADDRESS FOR YOUR CREDIT

23    CARD STATEMENTS, AND MOST IMPORTANTLY YOUR HONOR, THAT'S THE

24    ADDRESS THAT WAS USED FOR THIS ACCOUNT, AND IT WORKED.  FOR TWO

25    AND A HALF YEARS, WE SENT STATEMENTS TO THIS ADDRESS, CHARGES

1  WERE MADE, PAYMENTS WERE MADE, CHARGES WERE MADE, PAYMENTS WERE

2  MADE.  THAT'S HOW A CREDIT CARD WORKS WHEN IT'S A NORMAL CREDIT

3  CARD.

4      SO THE FACT THAT THE ADDRESS -- SOMEONE LATER LOOKS AT IT

5  AND SAYS, WELL MAYBE THAT WAS A BUSINESS ADDRESS, THAT'S NOT A

6  RED FLAG FOR FRAUD, NOT WHEN YOU ADD IT INTO THE MIX OF

7  EVERYTHING THAT'S GOT TO BE CONSIDERED IN DETERMINING WHETHER

8  MR. PANCHENKO IS OR ISN'T RESPONSIBLE.

9      AND WE DON'T HAVE TO BE RIGHT, YOUR HONOR, WE JUST HAVE TO

10  HAVE A GOOD PROCESS.  AND EVEN IF WE COME TO THE WRONG ANSWER,

11  THAT DOESN'T MEAN THE INVESTIGATION WASN'T REASONABLE.

12      THE COURT:  AND SOME PEOPLE MIGHT ARGUE THAT THE

13  FURNISHERS SHOULD FOLLOW THEIR OWN POLICIES AND PROCEDURES IN

14  TERMS OF SAID INVESTIGATION, RIGHT?  NOT COMING DOWN ONE WAY OR

15  ANOTHER, BUT THIS IS ALL A QUESTION OF IS THERE A TRIABLE

16  ISSUE?

17      MR. NARITA:  AND MY ONLY RESPONSE TO THAT IS --

18      THE COURT:  YOU'VE RESPONDED.  THANK YOU.

19      MR. NARITA:  THANK YOU, YOUR HONOR.

20      MR. LOKER:  AND YOUR HONOR, ON BEHALF OF THE

21  PLAINTIFF, YOU MADE A LOT OF THE POINTS THAT I WAS INTENDING TO

22  MAKE, SO I DON'T WANT TO JUST REPEAT BACK TO YOU WHAT WAS

23  ALREADY DISCUSSED BUT I'M HAPPY TO ADDRESS ANY OF THE POINTS,

24  ANY ADDITIONAL QUESTIONS YOU MIGHT HAVE ABOUT WHAT MR. NARITA

25  SAID.

1      THE COURT:  SO YES, TALK TO ME ABOUT THE MATERIALITY.

2      IT SEEMS TO ME THAT HE'S -- THAT COMENITY IS BASICALLY

3   ARGUING THAT THERE SHOULD BE A MATERIALITY REQUIREMENT IN TERMS

4   OF THE POLICE REPORT AND THE COURT SHOULD MAKE A DETERMINATION

5   ABOUT WHETHER OR NOT WHAT THE POLICE REPORT WOULD SAY WOULD

6   MAKE A MATERIAL DIFFERENCE IN TERMS OF THE DECISION.

7          MR. LOKER:  OF COURSE.

8          THE COURT:  SO TALK ME THROUGH THAT.

9          MR. LOKER:  THE BIGGEST POINT I HAVE ABOUT THE POLICE

10   REPORT IS THAT THE OFFICER DID CONCLUDE THAT MR. PANCHENKO WAS

11    A VICTIM OF IDENTITY THEFT.

12      SO HAD ANYONE FROM COMENITY ACTUALLY LOOKED AT IT, WE FEEL

13   THAT THAT SHOULD SUPPORT MR. PANCHENKO'S DISPUTE, BECAUSE WHEN

14   THE DISPUTE COMES TO COMENITY, MR. PANCHENKO IS SAYING I AM NOT

15   RESPONSIBLE FOR THIS ACCOUNT, I AM NOT RESPONSIBLE FOR ANY OF

16   THE CHARGES BECAUSE I AM THE VICTIM OF IDENTITY THEFT, THEN YOU

17   GET THIS POLICE REPORT AND OFFICER, I DON'T KNOW HOW TO

18   PRONOUNCE HIS LAST NAME, I APOLOGIZE, I CAN'T EVEN TRY, IT'S

19   JASON, I CALL HIM JASON WHEN I TALK TO HIM.  SO OFFICER JASON

20   CONCLUDED ALONG THOSE LINES, HE SPECIFICALLY SAID HE'S THE

21   VICTIM.

22      SO OUR POSITION IS HAD COMENITY LOOKED AT THAT, THAT

23   SHOULD HAVE RESOLVED ANY ACCOUNT COMING OFF OF MR. PANCHENKO'S

24   CREDIT REPORT.

25          THE COURT:  SO IF ANYTHING, IT RAISES A TRIABLE

1    ISSUE.

2              MR. LOKER:  EXACTLY.

3              THE COURT:  AND THEN SO THE ARGUMENT WAS MADE, AND I

4    THINK THE SPECIFIC QUOTE WAS, "I'VE NEVER SEEN IN A DECISION,

5    AN OBLIGATION FOR A FURNISHER TO REVIEW THE CALL RECORDINGS."

6         SO WHY DON'T YOU DISCUSS THAT.

7              MR. LOKER:  OUR POSITION IS THE FURNISHER SHOULD

8    REVIEW EVERYTHING AT THEIR DISPOSAL.  EVERYTHING THAT IS WITHIN

9    THEIR RECORDS AS WELL AS ALL THE INFORMATION FROM THE CONSUMER

10   RECEIVED IN CONJUNCTION WITH THEIR DISPUTE.

11        THE FURNISHER HAS CALL RECORDINGS FOR CERTAIN REASONS.

12   INTERNALLY THEY WANT TO HAVE THOSE CALL RECORDINGS TO REVIEW

13   FOR QUALITY ASSURANCE.  THOSE CALL RECORDINGS ARE ALSO MADE

14   AVAILABLE TO THEIR FRAUD INVESTIGATION TEAM.  THOSE CALL

15   RECORDINGS ARE MADE AVAILABLE TO FRAUD FOR THIS EXACT PURPOSE.

16        HERE WE HAVE WHAT I WILL PRESENT TO THE JURY AS TWO

17   COMPLETELY DIFFERENT VOICES.  SPEAKING WITH MR. PANCHENKO, HE

18   HAS A MUCH HIGHER VOICE, HE HAS A DIFFERENT ACCENT, AND THE

19   PERSON THAT CALLED IN 2017, TO ME SOUNDED OLDER, HAD A MUCH

20   DEEPER VOICE, A DIFFERENT ACCENT FOR HOW THEY WERE SPEAKING

21   ENGLISH AS WELL.

22        SO IN MAKING --

23              THE COURT:  A DIFFERENT WAY OF PRONOUNCING THE NAME.

24              MR. LOKER:  EXACTLY.  CORRECT, YOUR HONOR.

25        AND THOSE CALL RECORDINGS ARE MADE AVAILABLE TO THE

1    COMENITY FRAUD INVESTIGATORS FOR A REASON, BECAUSE ON THE FLIP

2    SIDE, IF WE LISTEN TO THOSE CALL RECORDINGS, THE EXACT SAME

3    VOICE AS THE ONE WE HAVE IN 2023 WHEN MR. PANCHENKO DOES CALL

4    IN, IF THOSE TWO VOICES MATCH UP BETWEEN 2017 AND 2023, THAT'S

5    GOING TO CUT AGAINST MR. PANCHENKO IN HIS FRAUD DISPUTE.  BUT

6    HERE, THEY ARE DIFFERENT.

7         SO NOT REVIEWING THE CALL RECORDINGS, TO US, WHAT I WOULD

8    TELL THE JURY IS I THINK THAT WAS UNREASONABLE.

9              THE COURT:  THERE WAS JUST A POINT MADE REGARDING THE

10   EQUITY -- I MEAN THE EQUIFAX DATA BREACH HAPPENING IN 2017

11   VERSUS WHEN THIS ACCOUNT WAS OPENED IN 2015.  LET'S DISCUSS

12   THAT.

13             MR. LOKER:  CORRECT.

14        SO MR. PANCHENKO DOESN'T NEED TO PROVE HOW THE FRAUD

15   OCCURRED, HE DOESN'T NEED TO SHOW THIS IS WHERE MY INFORMATION

16   WAS STOLEN FROM.  SO MR. PANCHENKO, WHEN HE'S FILLING OUT

17   THESE -- THE FRAUD AFFIDAVIT, THE FRAUD AFFIDAVIT IS COMPLETED

18   UNDER PENALTY OF PERJURY, AND THE DOCUMENT ASKS IF HE HAS

19   INFORMATION THAT COULD BE HELPFUL IN PROVIDING TO THE

20   FURNISHER.

21        SO MR. PANCHENKO IS TRYING TO BE FORTHRIGHT WITH ALL THE

22   INFORMATION HE HAD AVAILABLE TO HIM.  AND HE LEARNED PRIOR TO

23   FILLING OUT THE FORM HAD THAT HIS INFORMATION WAS INCLUDED IN

24   THE EQUIFAX DATA BREACH.  THAT -- WHERE IT GOT HACKED, WE DON'T

25   KNOW.  PRETTY MUCH ALL OF OUR INFORMATION IS OUT THERE IN THE

1   DARK WEB.  SO HE WAS TRYING TO EXCLUDE AS MUCH INFORMATION AS

2   POSSIBLE BECAUSE HE WAS COMPLETING THIS FORM UNDER THE PENALTY

3   OF PERJURY.

4        SO CLEARLY, AS MR. NARITA WAS SAYING, IS THAT HIS

5   INFORMATION WAS STOLEN PRIOR TO THAT.  WE DON'T KNOW HOW, WE

6   DON'T KNOW WHO DID IT, MY BEST GUESS IS THAT THE PERSON WHO

7   STOLE HIS IDENTITY IS THE PERSON THAT'S LISTED ON THE

8   APPLICATION, ANTON, AND THEN THE LAST NAME I DON'T RECALL.

9        BUT IT DOESN'T REALLY MATTER WHO DID IT, FOR PURPOSES OF

10  THIS CASE ALL WE NEED TO SHOW IS THAT THIS WAS NOT

11  MR. PANCHENKO'S DEBT, NOT HIS ACCOUNT, AND AS A RESULT IT

12  SHOULD HAVE BEEN DELETED FROM HIS CREDIT REPORT.

13        THE COURT:  AND LET'S TURN BACK TO DAUBERTS -- THE

14  DAUBERT.  ANYTHING IN TERMS OF ADDRESSING THAT POINT OF -- THAT

15  THERE NEEDS TO BE A TYPE -- I'M JUST GOING TO SHORTHAND IT AND

16  SAY A TIGHTER FIT IN TERMS OF THE EXPERTISE OR SUBJECT MATTER

17  EXPERTISE?

18        MR. LOKER:  OF COURSE WE DISAGREE WITH THAT.

19        SO IN TERMS OF THAT, WE SEE THESE SORTS OF DAUBERT MOTIONS

20  VERY REGULARLY, SPECIFICALLY WITHIN THIS AREA OF THE LAW,

21  INVOLVING BOTH MR. HOLLON AS WELL AS ANOTHER EXPERT WHO IS

22  USUALLY USED ON A CONSUMER SIDE, EVAN HENDRICKS.  AND

23  MR. HENDRICKS, IN PARTICULAR, HAS A LOT OF DAUBERT ORDERS.  I

24  KNOW ONE -- I WAS TRYING TO THINK OF ONE BEFORE YOU THAT

25  SPECIFICALLY ADDRESSED IT, AND I BELIEVE THERE IS AN ORDER WE

1    GOT IN FLORIDA WHICH I KNOW IS FLORIDA, NOT IN THE

2    NINTH CIRCUIT, SHIPLEY V. HUNTER WARFIELD, INC.

3         I AM AWARE OF OTHER DAUBERT ORDERS FOR MR. HENDRICKS

4    WITHIN CALIFORNIA, I JUST COULDN'T COME UP WITH THEM WHILE WE

5    WERE STANDING HEAVE.

6         BUT IN ALL OF THOSE DAUBERT CHALLENGES TO MR. HOLLON AND

7    MR. HENDRICKS, THE DEFENSE COUNSEL IS CHALLENGING THIS EXACT

8    FACT, THEY DON'T WORK FOR THE FURNISHER.

9         BUT THE RESPONSES FROM THE COURTS THAT WE HAVE SEEN ARE IN

10   LINE WITH YOUR POINT, THEY HAVE BEEN IN THE INDUSTRY FOR

11   DECADES, MR. HOLLAND IN PARTICULAR, HE WAS A 30(B)(6) WITNESS

12   FOR EXPERIAN FOR A NUMBER OF YEARS.  IN PREPARING FOR HIS

13   30(B)(6) DEPOSITIONS, HE WOULD EITHER ATTEND THE 30(B)(6)

14   DEPOSITIONS FOR FURNISHERS, GETTING KNOWLEDGE OF ALL THE

15   PROCEDURES, HE WOULD REVIEW THOSE TRANSCRIPTS OF FURNISHERS AND

16   GET KNOWLEDGE OF ALL THOSE PROCEDURES, SO HIS INITIAL

17   EXPERIENCE IS WHERE HE STARTED TO GAIN KNOWLEDGE OF WHAT THE

18   FURNISHERS DO.

19        THEN WHEN MR. HOLLON DECIDED TO LEAVE EXPERIAN AND BECOME

20   AN EXPERT IN THIS AREA OF THE LAW, HE GAINED ACCESS TO EVEN

21   MORE INFORMATION FROM THE FURNISHERS, ALL UNDER PROTECTIVE

22   ORDERS WITH THE PROCEDURES BEING PRODUCED.

23        SO THROUGH HIS EXPERIENCE, BOTH AS AN EMPLOYEE FOR

24   EXPERIAN AS WELL AS EXPERIENCE AND THE KNOWLEDGE HE GAINED AS

25   AN EXPERT, THAT'S WHERE HE BECAME FAMILIAR WITH WHAT THE

1    FURNISHERS ARE DOING DAY IN AND DAY OUT.  AND THAT KNOWLEDGE,

2    BOTH INITIALLY AND NOW, IS WHAT HE'S BASING HIS EXPERT OPINIONS

3    ON.

4              THE COURT:  OKAY.

5         SO -- WELL LET ME ASK YOU THIS QUESTION, ARE THERE ANY

6    POINTS AFFIRMATIVELY THAT PLAINTIFF WANTED TO RAISE IN TERMS OF

7    HAVING REVIEWED THE TENTATIVE, SEPARATE AND APART FROM

8    RESPONDING TO COMENITY'S ARGUMENTS?

9              MR. LOKER:  JUST ONE POINT, YOUR HONOR.  THE

10    CALIFORNIA CONSUMER CREDIT REPORTING AGENCY'S ACT, THE CCCRAA,

11    THAT CAUSE OF ACTION WAS GRANTED BASED ON PREEMPTION.  AND OUR

12    ONLY CLAIM UNDER THE CCCRAA, IS 1785.25(A), WHICH IF YOU LOOK

13    AT PARAGRAPH 61 OF OUR COMPLAINT, THAT'S WHERE THAT COMPLAINT

14    IS LISTED.  AND THE NINTH CIRCUIT, AS IN CARVALHO, AND GORMAN,

15    SAID THAT 1785.25(A), THAT'S A SECTION THAT'S NOT PREEMPTED.

16         OUR POSITION IS THAT PARTICULAR STATUTE WAS VIOLATED EACH

17    TIME COMENITY COMPLETED THE ACDV'S, BECAUSE AT THAT POINT WHEN

18    COMENITY IS COMPLETING THOSE ACDV'S THEY EITHER KNEW OR SOME

19    HAVE KNOWN THAT MR. PANCHENKO WAS A VICTIM OF IDENTITY THEFT.

20    DESPITE THAT KNOWLEDGE, THEY WENT AHEAD AND COMPLETED THOSE

21    ACDV'S BY SUBMITTING INFORMATION TO THE CREDIT BUREAUS THAT

22    SAID THAT THIS IS A VALID ACCOUNT AND IT SHOULD REMAIN ON HIS

23    CREDIT REPORT.

24              THE COURT:  BUT WHAT ABOUT THE REST OF THE POINT MADE

25    IN THE TENTATIVE IN TERMS OF THE TIMING?

1          MR. LOKER:  RIGHT.  BECAUSE THE TENTATIVE, WHEN IT'S

2     LOOKING AT THE CCCRAA, THAT'S NOT OUR ALLEGATION.  SO WHERE IT

3     SAYS, BUT THIS THEORY OF LIABILITY SEEKS TO HOLD COMENITY

4     LIABLE UNDER THE CCCRAA FOR CONDUCT THAT IS REGULATED BY THE

5     FCRA.

6          THE COURT:  OH, BUT THE SENTENCE BEFORE THEN, OR TWO

7     SENTENCES BEFORE THEN GOING TO "THE COURT AGREES THAT PANCHENKO

8     DID NOT PRODUCE ANY EVIDENCE THAT COMENITY KNEW OR SHOULD HAVE

9     KNOWN THAT THE ACCOUNT WAS FRAUDULENT BEFORE PANCHENKO, I'M

10    TRYING TO REMEMBER THE PRONUNCIATION, FROM THE CALL RECORDINGS,

11    ALERTED COMENITY TO THE ALLEGED IDENTITY THEFT IN 2023.

12         MR. LOKER:  I UNDERSTAND YOUR POINT, YOUR HONOR, I

13    APOLOGIZE.

14         THE TIMING OF THE VIOLATION IS DIFFERENT THAN WHAT WE HAVE

15    HERE.  SO AT LINE 15, THE COURT REFERS TO INFORMATION BEING

16    REPORTED BETWEEN DECEMBER 21, 2015 AND MARCH 2ND, 2019, THAT'S

17    NOT WHAT OUR ALLEGATIONS REGARDING THE CCCRAA ARE BASED UPON.

18    WE ARE SAYING IT'S -- EVERY SINGLE TIME THE ACDV IS

19    SUBMITTED -- AND IF I COULD GRAB THAT REAL QUICK --

20         THE COURT:  SURE.

21         (PAUSE IN PROCEEDINGS.)

22         MR. LOKER:  WHEN THE EMPLOYEES COMPLETE AN ACDV --

23    I'M LOOKING AT DEFENDANT'S EXHIBIT I, DOCKET NUMBER 134-9.  ON

24    THE LAST PAGE OF THE ACDV, THERE IS ALWAYS AN AFFIRMATION THAT

25    THE EMPLOYEE MAKES.  AND HERE, SPECIFICALLY I'M LOOKING AT

```
1      COMENITY 12, PAVITHRA, SHE SAID "BY SUBMITTING THIS ACDV, THE

2      COMPANY WHICH REFERS TO COMENITY CERTIFIES THAT IT HAS REVIEWED

3      AND CONSIDERED ALL ASSOCIATED IMAGES AND RELEVANT INFORMATION,

4      VERIFIED THE COMPLETENESS AND ACCURACY OF THE INFORMATION IN

5      COMPLIANCE WITH ALL LEGAL REQUIREMENTS AND ADJUSTED COMPANY

6      RECORDS TO REFLECT THE DATA SUBMITTED."

7          SO OUR POSITION IS THAT THE CCCRAA -- SORRY, IT'S A

8      MOUTHFUL.

9              THE COURT:  I JUST CALL IT THE CALIFORNIA CREDIT

10     REPORTING AGENCY.

11             MR. LOKER:  I WILL GO WITH THAT, YOUR HONOR.

12         THANK YOU.

13             THE COURT:  OR CALIFORNIA CRA.

14             MR. LOKER:  SO OUR POSITION IS THAT THAT STATUTE,

15     WHATEVER YOU CALL IT, WAS VIOLATED NINE TIMES, EACH OF THESE

16     SUBMISSIONS.

17             THE COURT:  DO YOU HAVE CASE LAW WHICH GOES TO WHERE

18     COMPARABLE CRA'S ARE REPORTED AND ARE USED AS A BASIS FOR THIS

19     STATUTE'S VIOLATION?

20             MR. LOKER:  I DON'T BELIEVE IT EXISTS.

21         SO ALL THE STATUTE SAYS AND ALL THE CASE LAW, IT JUST SAYS

22     SUBMITTING INFORMATION.  AND THE REASON I LOOKED AT EXHIBIT I

23     PARTICULARLY, DOCKET NUMBER 134-9, IS THAT ON THE FIRST PAGE OF

24     IT, WHICH IS COMENITY 7, WE HAVE RESPONSE CODE 23.  AND

25     RESPONSE CODE --
```

1        THE COURT:  SLOW DOWN FOR ONE MOMENT, LET ME JUST

2    CATCH UP WITH YOU ON THE EXHIBIT.

3        WHAT PAGE OF THE EXHIBIT?

4        MR. LOKER:  IT'S THE FIRST PAGE, IT'S BATES STAMPED

5    COMENITY 7.

6        THE COURT:  OKAY.

7        MR. LOKER:  AND THE REASON I LOOK AT THIS PARTICULAR

8    ONE IS BECAUSE RESPONSE CODE 23 IS UTILIZED AS OPPOSED TO

9    RESPONSE CODE 1.  RESPONSE CODE 23 IS USED TO SHOW THAT NUMBER

10   ONE, THE DISPUTED INFORMATION IS ACCURATE, AND AS A RESULT, IT

11   NEEDS TO REMAIN ON THE CREDIT REPORT.  BUT TWO, AND THIS IS MY

12   POINT, UPDATED ACCOUNT INFORMATION UNRELATED TO THIS DISPUTE.

13       SO THROUGH THE ACDV PROCESS, WHAT'S HAPPENING IS COMENITY

14   IS CHANGING INFORMATION ASSOCIATED WITH THE TRADE LINE,

15   SPECIFICALLY THE COMENITY TRADE LINE.  AND IN ORDER TO DO SO,

16   WHAT THEY NEED TO DO IS SUBMIT INFORMATION TO THE CREDIT

17   BUREAUS.

18       SO THAT'S WHY WHEN COMENITY IS SUBMITTING INFORMATION TO

19   THE CREDIT BUREAUS REGARDING MR. PANCHENKO, OUR POSITION IS

20   THAT FOR EACH OF THESE NINE ACDV'S, THAT'S ILLEGAL CONDUCT

21   BECAUSE THEY KNEW OR SHOULD HAVE KNOWN THAT IT WAS INACCURATE.

22       THE COURT:  OKAY.

23       MR. LOKER:  AND JUST IN TERMS OF THE CCCRAA, SO THE

24   TIMING OF THE VIOLATION IS DIFFERENT THAN WHAT WE SAW IN THE

25   TENTATIVE AND THE SCOPE OF THE VIOLATION IS DIFFERENT THAN WHAT

1    WAS ADDRESSED IN THE TENTATIVE.  AND THAT WAS THE ONLY POINT I

2    WANTED TO MAKE, YOUR HONOR.

3          MR. NARITA:  COULD I RESPOND TO THAT LAST POINT,

4    YOUR HONOR?

5          THE COURT:  MR. NARITA, HE IS 13 MINUTES INTO HIS

6    ARGUMENT OF 31, YOU CAN COME BACK AND ASK FOR LEAVE FOR

7    REBUTTAL, BUT LET'S FINISH PLAINTIFF'S ARGUMENT.

8          MR. NARITA:  I APOLOGIZE.  I THOUGHT HE SAID HE WAS

9    DONE, BUT I MAY HAVE MISHEARD HIM.

10         THE COURT:  SO -- WELL, ANYTHING ELSE ABOUT THIS

11   POINT?  BECAUSE I HAVE ONE OR TWO OTHER QUESTIONS FOR YOU.

12         MR. LOKER:  NOTHING ELSE ON THAT POINT, YOUR HONOR.

13         THE COURT:  SO THE TENTATIVE ADMONISHES PLAINTIFF IN

14   TERMS OF THE CLAIMS.  ONE THING WHICH I -- BOTH IN TERMS OF THE

15   CITA CLAIM AS WELL AS THE FIRST CLAIM WHICH WAS THE FDCPA

16   CLAIM -- THE NUMBER OF ACRONYMS IN THIS AREA OF THE LAW HAVE

17   ALWAYS CONFOUNDED ME -- BUT REGARDING THE FDCPA CLAIM IN

18   PARTICULAR, THERE WASN'T EVEN AN ATTEMPT TO OPPOSE THIS IN THE

19   OPPOSITION BRIEF, WHY WASN'T THIS DROPPED BY STIPULATION?  WHY

20   WASN'T THIS WITHDRAWN BY STIPULATION OF THE PARTIES?

21         MR. LOKER:  JUST IN A COMPLETE OVERSIGHT ON MY

22   BEHALF, YOUR HONOR.  SO THE STATUTE THAT COULD APPLY TO

23   COMENITY IS THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT.

24   SO IT'S BASICALLY THE SAME ACRONYM.

25         WHEN DISCOVERY WAS RESPONDED TO, MY OFFICE MUST HAVE JUST

1    FLIPPED IT.  I TRIED TO TALK TO MR. PANCHENKO AND MY OFFICE AS

2    WE WERE GOING THROUGH IT, BUT WHAT WE DIDN'T DO IN TERMS OF THE

3    FDCPA, YOUR HONOR, IS WE DID NOT PROPOUND A SINGLE REQUEST FOR

4    PRODUCTION, NOT DIDN'T PROPOUND AN INTERROGATORY, DIDN'T ASK

5    FOR ANY WITNESSES FROM COMENITY WHO MAY HAVE VIOLATED THAT

6    STATUTE, DIDN'T DEPOSE ANYBODY.  SO WE MADE NO AFFIRMATIVE

7    CONDUCT TO LOOK INTO THIS STATUTE.  BECAUSE I KNOW IT DOESN'T

8    APPLY TO THE ORIGINAL CREDITOR, I'VE KNOWN MR. NARITA SINCE I

9    WAS AN INTERN AT MY PRIOR FIRM, MORE THAN 15 YEARS AGO.  SO

10    THIS IS A SETTLED QUESTION OF LAW, AND WE DIDN'T PURSUE THIS

11    AGAINST COMENITY.

12        SO YOU KNOW, WHY -- AND I WROTE THIS COMPLAINT, WHY IT

13    SAYS COMENITY, MY NOTES ARE THAT WE WANTED TO GO AFTER CALVARY

14    FOR THIS AND I MUST HAVE JUST GONE AFTER THE WRONG DEFENDANT

15    WITH A C.  SO IT WAS AN ERROR, AND I --

16            THE COURT:  DIDN'T MR. NARITA REACH OUT SEVERAL TIMES

17    REGARDING THIS?

18            MR. LOKER:  I RECALL ONE E-MAIL, AND AGAIN IT WAS

19    JUST AN OVERSIGHT.  I DON'T KNOW THE TIMING OF THE E-MAIL, IT

20    MIGHT HAVE BEEN WHEN WE WERE IN A JURY TRIAL OR ABOUT DONE WITH

21    A JURY TRIAL.  SO IT SHOULD HAVE BEEN DROPPED AND I DON'T HAVE

22    A GOOD EXCUSE FOR IT, YOUR HONOR.

23            THE COURT:  SO WE HAVE HEAVY DOCKETS AND HEAVY CASES

24    IN THIS DISTRICT, MY EXPECTATION IS THAT COUNSEL IS GOING TO

25    MAKE EVERY EFFORT TO SLIM DOWN THE CLAIMS IF SOMETHING DOESN'T

1    APPLY.  THERE ARE EFFORTS TO MEET AND CONFER IN GOOD FAITH AND

2    TO NOT HAVE THIS HAPPEN AGAIN.

3                MR. LOKER:  I UNDERSTAND, YOUR HONOR.

4                THE COURT:  ALL RIGHT.

5            ANYTHING ELSE, MR. LOKER?

6                MR. LOKER:  NO.  AND I APPRECIATE THE TENTATIVE AND

7    THE OPPORTUNITY TO BE HEARD.

8                THE COURT:  OKAY.

9            MR. NARITA, THE TIME DIFFERENCE IS MARKED BETWEEN THE TWO.

10   I WILL GIVE YOU TWO MINUTES FOR VERY BRIEF REBUTTAL AND THAT'S

11   IT.

12               MR. NARITA:  I APPRECIATE THAT, YOUR HONOR.

13           ON THE POINT ABOUT THE -- I CALL IT THE 178525(A) CLAIM,

14   THE CALIFORNIA CREDIT REPORTING STATUTE, I WOULD JUST REFER THE

15   COURT TO OUR REPLY BRIEF, PAGES 12 THROUGH 14.  THIS IS A

16   PREEMPTED CLAIM, WE EXPLAIN IT THERE VERY CLEARLY.  WHAT HE'S

17   DOING IS WHAT THE PLAINTIFFS DID TO ME IN THE WANG V. ASSET

18   ACCEPTANCE CASE, WHICH IS THEY ARE TRYING TO BACKDOOR A

19   PREEMPTED CLAIM IN THROUGH 178525 AND JUST RECAST IT AS A

20   178525(A) CLAIM.

21           BUT THERE IS A SPECIFIC SUBSECTION OF THE CALIFORNIA CIVIL

22   CODE, IT'S 178525(F), 178525(F) GOVERNS THE DUTIES OF A

23   FURNISHER TO RESPOND TO AN ACDV AND TO INVESTIGATE AND UPDATE

24   INCORRECT INFORMATION.

25           THAT SUBSECTION OF THE STATUTE IS PREEMPTED.  SO SAYS

```
1     CARVALHO, SO SAYS GORMAN, I MEAN THAT'S -- IT'S JUST -- IT JUST

2     IS.

3          AND SO THIS IS VERY SIMILAR TO WHAT HAPPENED IN CARVALHO,

4     VERY SIMILAR TO WHAT HAPPENED IN WANG WHERE THE PLAINTIFF

5     REALLY WANTS TO ASSERT THAT CAUSE OF ACTION BECAUSE THEY WANT

6     THE EXTRA STATUTORY DAMAGES, BUT IT'S REALLY -- THEY ARE JUST

7     RE-CHARACTERIZING A CLAIM UNDER A DIFFERENT SUBSECTION THAT'S

8     PREEMPTED.

9          SO THAT'S ALL I HAVE TO SAY ON THAT POINT.  AND THEN THE

10    FINAL SENTENCE I WILL SAY, YOUR HONOR, IS FOR ALL THE REASONS

11    WE HAVE TALKED ABOUT, I DON'T THINK THERE IS ENOUGH EVIDENCE IN

12    THIS RECORD TO SUPPORT A PUNITIVE DAMAGES CLAIM.

13         WE DEFINITELY INVESTIGATED ALL OF THESE DISPUTES, THERE IS

14    NOTHING SHOWING WILLFULNESS OR RECKLESS DISREGARD OF OUR

15    RESPONSIBILITIES.  THERE MAY BE REASONS TO DISAGREE, REASONS TO

16    HAVE THE JURY DECIDE SOMETHING, BUT THIS IS NOT A CASE WHERE

17    THERE WAS A RECKLESS DISREGARD FOR WHAT WE WERE SUPPOSED TO DO.

18         I BELIEVE THAT WE DISCHARGED OUR DUTIES BUT CERTAINLY WE

19    DIDN'T IGNORE THEM IN A RECKLESS WAY.

20         AND I WILL JUST LEAVE IT WITH THAT, YOUR HONOR, UNLESS THE

21    COURT HAS QUESTIONS.

22              THE COURT:  NO QUESTIONS.

23              MR. LOKER:  NOTHING FURTHER FOR THE PLAINTIFF,

24     YOUR HONOR.

25              THE COURT:  OKAY.  SO THE COURT WILL TAKE THIS UNDER
```

1    SUBMISSION.  I EXPECT TO BE ISSUING A DECISION QUICKLY.

2        LET ME JUST PULL UP -- LOOKING AT UPCOMING DATES WE HAVE

3    IN THIS CASE, THERE IS A SETTLEMENT CONFERENCE SCHEDULED, IT

4    LOOKS LIKE IT'S NOW OCTOBER 2ND.

5            MR. NARITA:  CORRECT.

6            THE COURT:  AND THEN THE PRETRIAL IS OCTOBER 8TH WITH

7    A JURY TRIAL NOVEMBER 3RD.

8            MR. LOKER:  YES, YOUR HONOR.

9            THE COURT:  AND THE TRIAL ESTIMATE I RECALL BEING

10   LESS THAN A WEEK.

11           MR. LOKER:  PROBABLY THREE DAYS, YOUR HONOR.

12           THE COURT:  OTHER THAN GETTING MY DECISION OUT

13   QUICKLY, WHICH I EXPECT TO DO ANYWAYS, IS THERE ANYTHING

14   FURTHER THAT WOULD BE HELPFUL TO THE PARTIES AS WE APPROACH THE

15   SETTLEMENT CONFERENCE?

16           MR. NARITA:  WELL I DO HAVE A POINT, A HOUSEKEEPING

17   POINT, YOUR HONOR, WHICH WE E-MAILED YOUR COURTROOM DEPUTY

18   ABOUT.

19       SO THERE IS -- THERE IS WHAT I THINK TO BE MAYBE PERHAPS A

20   SCHEDULING GAP IN THE CASE WHICH IS THAT WE HAVE A DEADLINE FOR

21   THE PRETRIAL CONFERENCE ITSELF, BUT NORMALLY WHAT I'VE SEEN IS

22   LOTS OF DATES THAT PRECEDE THOSE DATES WHERE THE PARTIES HAVE

23   TO MEET AND CONFER AND THEN A DATE WHERE THEY HAVE TO FILE

24   THEIR MOTIONS IN LIMINE OR THEIR PRETRIAL CONFERENCE STATEMENT

25   AND THINGS LIKE THAT.

1              THE COURT:  RIGHT.

2              MR. NARITA:  AND WE DON'T HAVE THAT HERE, WE WOULD BE

3       LEFT, I GUESS, TO WHATEVER FEDERAL RULES DEFAULT TO.  BUT THERE

4       IS A LOT TO THIS CASE IF THE CASE IS GOING TO GO FORWARD AND I

5       JUST THINK THE PARTIES WOULD PROBABLY BENEFIT FROM SOME SORT OF

6       PRE-PRECONFERENCE SCHEDULE, AND I SUBMITTED SOMETHING TO THAT

7       EFFECT.

8              THE COURT:  UNDERSTOOD.

9          SO I NEED TO UPDATE MY STANDING TRIAL ORDERS FROM STATE

10      COURT AND TURN TO WHERE WE ARE NOW AND THAT WILL HAPPEN

11      FORTHWITH.  AND SO IF WE GET TO THAT POINT AND THINGS ARE

12      LOOKING -- I INTEND TO SEND YOU -- I WAS PLANNING TO JUST SEND

13      YOU INSTRUCTIONS IN TERMS OF YOUR DEADLINES.

14         YOU ARE WELCOME TO, GIVEN YOU ARE IN AN UNUSUAL SITUATION

15      THAT FOR ONCE THE STANDING ORDER ISN'T UP, WHICH WILL BE

16      REMEDIATED SOON, BUT I WELCOME IF THE PARTIES WANT TO MEET AND

17      CONFER, COUNSEL YOU CLEARLY HAVE GONE TO TRIAL AGAINST EACH

18      OTHER A NUMBER OF TIMES, IF YOU HAVE THOUGHTS, I WELCOME YOU

19      ALL MEETING AND CONFERRING AND SENDING ME ANY SUGGESTED DATES.

20         OTHER CASES, HAVING DEALT WITH THEM IN A VERY DIFFERENT

21      PERSPECTIVE, BUT YOU ALL KNOW YOUR EXPERTS, YOU ALL KNOW

22      BASICALLY THE ARGUMENTS YOU PROBABLY WILL END UP MAKING AT

23      TRIAL, SO WHY DON'T -- LET'S DO THIS, COUNSEL WHY DON'T YOU

24      MEET AND CONFER REGARDING DEADLINES THAT YOU WOULD SUGGEST IN

25      LIGHT OF THE MOTIONS IN LIMINE AND EVERYTHING ELSE.

```
 1              I WILL SAY I USUALLY HAVE A LIMIT OF SOMEWHERE BETWEEN

 2      THREE TO FIVE MOTIONS IN LIMINE MAX, SO DEPENDING ON THE

 3      COMPLEXITY OF THE CASE AND THE NATURE OF -- AND SO YOU MAY ALSO

 4      WANT TO TALK ABOUT HOW MANY YOU ARE EXPECTING TO BRING, IF

 5      THERE ARE THINGS YOU CAN REACH RESOLUTION ON, WHEN YOU ARE

 6      GOING TO DO THAT, EXCHANGE THE WITNESS LISTS, ANY OTHER -- I

 7      USUALLY LIKE SOME SORT OF JOINT STATEMENT FROM THE PARTIES

 8      REGARDING THE CASE SO I HAVE A GOOD OVERVIEW.

 9              I HAVE A PRETTY GOOD SENSE OF YOUR CASE GIVEN WE JUST HAD

10      A SUMMARY JUDGEMENT MOTION, BUT ANYTHING ELSE YOU WANT TO

11      PRESENT TO THE COURT AND ANY OTHER DEADLINES YOU PROPOSE.

12              DOES COUNSEL HAVE TIME TO MEET AND CONFER AND SEND YOUR

13      PROPOSED DATES BACK TO ME IN A WEEK?

14              MR. LOKER:  OF COURSE.  SO THAT WOULD BE AUGUST 20TH,

15       YOUR HONOR?

16              THE COURT:  YES.

17              MR. NARITA:  WE CAN DO THAT, YOUR HONOR.

18          AND AS MR. LOKER SAID, WE HAVE WORKED TOGETHER FOR QUITE

19       SOME TIME AND WE WORK TOGETHER VERY COOPERATIVELY.

20              MR. LOKER:  WE HAVE TRIAL GOING ON RIGHT NOW FOR

21       MADERA.

22              THE COURT:  WELL IT SEEMS IT ME, I MEAN, I FEEL LIKE

23       THIS CASE IS RIPE FOR SETTLEMENT, BUT PERHAPS THAT'S MY OWN

24       TAKE ON IT, AGAIN COMING FROM A DIFFERENT PERSPECTIVE ON THESE

25       CASES.
```

1          SO TAKE THE OPPORTUNITY TO DISCUSS THAT.  IF THERE'S

2    ANYTHING I KNOW, THIS CASE HAS BEEN ON JUDGE VAN KEULEN'S

3    RADAR, SO IF THERE'S ANYTHING ELSE I CAN DO FROM A SETTLEMENT

4    PERSPECTIVE, LET ME KNOW, OTHER THAN TO ISSUE MY ORDER.

5          YOU ALL WILL SEND IN PROPOSED DATES AND DEADLINES WHICH

6    WILL ALL BE HELPFUL FOR YOU AS GUIDEPOSTS IN THE NEXT WEEK, AND

7    WE WILL TAKE IT FROM THERE.

8          AND SO IF I NEED TO SEE YOU ALL AND DISCUSS ANYTHING

9    PRE-PRETRIAL CONFERENCE, I WILL HAVE YOU COME IN FOR A STATUS.

10          MR. LOKER:  THANK YOU, YOUR HONOR.  I APPRECIATE YOUR

11     TIME.

12          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

13               (PROCEEDINGS ADJOURNED AT 11:09 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          __CERTIFICATE OF REPORTER__

4

5

6

7              I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11             THAT THE FOREGOING TRANSCRIPT, CERTIFICATE

12   INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF

13   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15

16

17

18

19

20

21

22             _____
               SUMMER A. FISHER, CSR, CRR
23             CERTIFICATE NUMBER 13185

24
               DATE:  8/15/25
25