Tomio B. Narita (SBN 156576)
Nathan A. Searles (SBN 234315)
Alisa Givental (SBN 273551)
Kristina B. Hovsepyan (SBN 340674)
**WOMBLE BOND DICKINSON (US) LLP**
50 California Street, Suite 2750
San Francisco, California 94111
Telephone:  (415) 433-1900
Facsimile:  (415) 433-5530

Attorneys for Defendant
Comenity Capital Bank

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OLEKSANDR PANCHENKO,<br><br>Plaintiff,<br><br>vs.<br><br>BANK OF AMERICA, N.A., et al.<br><br>Defendants. | CASE NO.: 5:23-cv-04965-EKL<br><br>**COMENITY CAPITAL BANK'S TRIAL BRIEF** |

**TABLE OF CONTENTS**

**I. INTRODUCTION** — 3

**II. STATEMENT OF FACTS** — 4

*A. Travel History* — 4

*B. Plaintiff's Credit History* — 4

*C. The Performance Of The Comenity Account* — 5

*D. Indirect Disputes To Other Creditors* — 6

*E. Indirect Disputes On The Comenity Accounts* — 6

*F. Trade Line Deletions* — 7

*G. Credit Denials* — 8

**III. ARGUMENT** — 8

*A  Plaintiff Will Not Prove That Comenity Violated Section 1681s-2(b) Of The Fair Credit Reporting Act* — 8

*B. Plaintiff Will Not Be Able To Establish a Negligent or Willful Violation* — 12

*C. There Will Be No Evidence Of Actual Damages Caused By Comenity* — 14

**IV.  CONCLUSION** — 17

## I. INTRODUCTION

In addition to Comenity Capital Bank ("Comenity"), Plaintiff Oleksandr Panchenko ("Plaintiff" or "Panchenko") has sued Bank of America, N.A., Cavalry Portfolio Services, LLC, JP Morgan Chase Bank, N.A., U.S. Bank, N.A., and three consumer reporting agencies ("CRAs")—Equifax Information Services LLC ("Equifax") and Trans Union LLC ("Trans Union") in this action, and Experian Information Solutions Inc. ("Experian") in a separate action—alleging that each defendant violated the Fair Credit Reporting Act ("FCRA") by failing to conduct a reasonable investigation into his disputes concerning allegedly unauthorized accounts discovered on his credit reports in May 2023.

Critical to the assessment of Plaintiff's claims is the fact that all of the disputed accounts were opened in Plaintiff's name and using his correct personally identifying information years earlier, between April 2015 and January 2018, used reasonably, in Comenity's case never maxed out, and maintained in good standing with timely payments (in most cases) for several years. In the Spring of 2018, the payments abruptly stopped and the accounts were reported delinquent and charged off. No one came forward claiming they were unauthorized for another five years.

By the time Comenity received its first dispute in May 2023—vaguely asserting identity theft—it had been over four years since Comenity sold its interest in the account, five years since the last payment, and eight years since the account was opened. To say this is an unusual timeline for a legitimate identity theft claim is an understatement. The extreme delay in asserting fraud, coupled with the skeletal nature of Plaintiff's disputes—most of which lacked any supporting documentation—rendered the claims inherently suspect.

Plaintiff's disputes were not only untimely and unsupported, but also consistently rejected by entities that reviewed them. Comenity, other creditors, and the CRAs all reached the same conclusion: the accounts appeared legitimate. This convergence of outcomes is not coincidental. It reflects the reality that Plaintiff's disputes failed to present objectively verifiable evidence of fraud, and that the accounts themselves bore no hallmarks of unauthorized use.

Plaintiff will attempt to make this case about the credibility of his claim that he is a victim of identity theft, that Comenity should have believed him, and that by failing to accept his

claim, Comenity acted unreasonably. But such framing misses the mark. The issue is not whether Plaintiff is telling the truth, but whether Comenity's investigation, conducted years after the account was opened, long after it was closed and sold, and based on sparse, conclusory disputes, was unreasonable under the FCRA. In a case where the facts are as atypical as they are here, and where eight other industry participants reached the same conclusion, Plaintiff cannot meet his burden of showing that Comenity negligently or willfully violated the FCRA.

Nor can Plaintiff establish that he suffered any actual damages as a result of Comenity's conduct. The credit denials he identifies occurred either before Comenity received the only dispute with attachments or were based on other trade lines entirely. His emotional distress claim is vague, unsupported by medical or documentary evidence, and untethered from any specific conduct by Comenity. The evidence will show that Comenity's reporting was not the cause of any adverse action, and Plaintiff's damages theory is speculative at best. Without proof of harm traceable to Comenity's investigations, Plaintiff's claim fails not only on liability, but for lack of available recovery as well.

## II. STATEMENT OF FACTS

### A. Travel History

Plaintiff alleges that he first visited the United States from the Ukraine in May 2009 on a J1 work visa for four months, and at that time he first obtained his current U.S. social security number and opened a Bank of America deposit account. According to Plaintiff, he thereafter travelled to the U.S. intermittently, including in 2010, 2018, and 2019.

Plaintiff produced what he describes as his I-94 Travel History for his current passport, issued March 27, 2018. If authentic, it corroborates entries into the U.S. in April 2018 and September 2019, as well as in April 2023 when he permanently relocated to the United States with his wife, Alla Odeianenko, in connection with her employment at Google. Plaintiff has never provided an I-94 Travel History that accounts for his movements prior to the issuance of his current passport in March 2018.

### B. Plaintiff's Credit History

During a period when Plaintiff supposedly was not in the United States, he obtained

significant credit here with numerous creditors. Beginning at least in February 2015, his Experian credit file shows he had an account with Sears/CNBA that was open since June 2006 with a credit limit of $12,000, and an account with Nordstrom/TD Bank that was open since 2007 with a credit limit of $15,000. Trial Exh. 238.

In April 2015, a Synchrony Bank/Lowes credit card appeared on Plaintiff's Experian and Trans Union credit files showing a credit limit of $20,000. Trial Exhs. 197, 238. In June 2015, a Synchrony Bank Home Design card was added to these files with a comparatively modest credit limit of $3,500. *Id.* In July 2015, a U.S. Bank account was added with a credit limit of $6,000 (later raised to $9,000). *Id.*

The account that is at the center of the upcoming trial is a Virgin America–branded Comenity account that was opened in December 2015 with a $15,000 credit limit. Trial Exh. 197. A Barclays account with a $16,000 credit limit was opened in February 2016. *See id.* A Chase account with $10,000 credit limit was opened in December 2016. *Id*. A Bank of America account with a $17,000 credit limit was opened in February 2017. Trial Exhs. 129, 197. A Banco Popular de Puerto Rico account was opened in May 2017 with a $15,000 credit limit. Trial Exh. 197. In January 2018, a second Chase account was opened with a credit limit of $18,000.

All of these accounts were opened in Plaintiff's name, with his correct date of birth, his correct Social Security number, and they were all in good standing through March 2018. The one exception was a late mark for April 2016 that briefly appeared on Plaintiff's credit report relating to the U.S. Bank account. That late mark was disputed in Plaintiff's name to Trans Union in May 2017, when Plaintiff was allegedly not in the U.S., and it then disappeared. Exh. 237.

In short, Plaintiff's credit file was extensive and carefully cultivated over several years using his correct personal identifying information.

Payments on all the accounts in Plaintiff's name stopped in the Spring of 2018. This was right around the time Plaintiff obtained his current passport.

### C. The Performance Of The Comenity Account

By December 2015, when the Virgin America–branded Comenity credit card account was opened in Plaintiff's name, Plaintiff's credit file showed he was a good credit risk, with a

history of 100% on time payments on all his existing accounts, and only a small percentage of his available credit was in use. *See id.*

While the Comenity account remained open, all the payments on the account were on time. On January 4, 2018, Comenity closed the account because it was no longer offering the Virgin America–branded card. The balance at the time of closure was about $4,500, which was less than 1/3 of the available credit limit.

Even <u>after</u> the account was closed, payments continued for months, with the last in April 2018. Ultimately, Comenity charged off the remaining balance on the account, and in February 2019 sold the account to DNF Associates. This meant that from Comenity's perspective, no balance was due from Plaintiff. Comenity notified the CRAs of the zero balance and stopped furnishing additional information regarding the account.

### D. Indirect Disputes To Other Creditors

On or about May 10, 2023, Plaintiff began disputing with the CRAs all the information that had accumulated on his credit report over the prior 8-15 years. He did not provide any meaningful information in support of his disputes, however, and therefore it was no surprise that, in response to the Automated Credit Dispute Verifications ("ACDVs") they received from consumer reporting agencies, most creditors confirmed the accuracy of the information they had reported.[1]

### E. Indirect Disputes On The Comenity Accounts

During the period of May to August 2023 (i.e., over five years <u>after</u> the last activity on the account and over four years <u>after</u> sale of the account to DNF) Comenity received nine

---

[1] *See e.g.* Trial Exhs. 174, 181, 187, 190, 207, 219 (ACDVs and dispute results from Experian, Equifax, Trans Union showing U.S. Bank confirmed accuracy in response to disputes); Trial Exhs. 129, 131, 133, 178, 184, 211 (ACDVs and dispute results from Experian, Equifax, Trans Union showing Bank of America confirmed accuracy in response to disputes); Trial Exhs. 173, 180, 186 (ACDVs and dispute results from Experian, Equifax, Trans Union showing Cavalry confirmed accuracy in response to disputes); Trial Exhs. 137-140, 143-145, 175-176, 182-183, 188, 209-210, 218 (ACDVs and dispute results from Experian, Equifax, Trans Union showing Chase confirmed accuracy of one or both Chase accounts in response to disputes).

**COMENITY CAPITAL BANK'S TRIAL BRIEF** 6

ACDVs from the CRAs relating to the Comenity account. Eight of the ACDVs contained no supporting images or documentation.

Comenity investigated each dispute. Among other things, Comenity confirmed that the name and Social Security Number used to open the account matched Plaintiff's, that the address and phone numbers associated with the account tied to Plaintiff in many years of public records, that the account remained open and in use for years, that payments were made both before and after closure, that the credit line was never fully utilized, and that monthly billing statements were never returned undeliverable. Each of these objective data points consistently indicated that Plaintiff was the legitimate account holder. On that basis, Comenity confirmed the accuracy of its reporting. *See* Trial Exhs. 6-14.

On August 18, 2023, Comenity received an ACDV from Trans Union that did include attachments. The employee who reviewed the dispute on August 21, 2023 testified that at the time, she was not required to review attachments enclosed with disputes and that she did not review the attachments. Her testimony about Comenity's policy is incorrect. Regardless, the evidence will show that in this case, the attachments are irrelevant because, as explained below, their contents would not have changed the outcome of the investigation.

### F. Trade Line Deletions

On May 11, 2023, the day after Plaintiff began disputing all accounts in his credit file, Experian informed him that he may have disputed information blocked from his credit report if he identifies the information he is asking to be blocked, provides proof of his identity, and provides a copy of his identity theft report. Trial Exh. 201.

Plaintiff ignored this advice until sometime in August 2023, however, when he finally mailed to Experian the requested information and Experian deleted all disputed accounts (including the Comenity account) from his credit file. Trial Exh, 220. Experian notified Plaintiff of this fact in a letter dated August 16, 2023. *See id*. On the same date, Experian notified Equifax that it was accepting Plaintiff's block notification request. As a result, Equifax also deleted all disputed accounts (including the Comenity account) from Plaintiff's credit report. *See* Equifax Deposition Testimony 173:12-174:4.

COMENITY CAPITAL BANK'S TRIAL BRIEF                                                                                   7

This left only Trans Union. Based on a screenshot produced by Plaintiff, the Comenity account was showing on Plaintiff's Trans Union credit report on September 17, 2023 as a positive, paid in full account. Trial Exh. 236. By that time, however, Plaintiff had already retained his present attorneys, and ten days later, on September 27, 2023, this action was filed.

On December 21, 2023, Comenity submitted a request to all CRAs, including Trans Union, to delete the trade line for the Comenity account. Trial Exh. 154.

### G. Credit Denials

There are a total of two credit denials that Plaintiff has identified as attributable to disputed information in his credit reports: a denial by Stanford Federal Credit Union ("SFCU") and Goldman Sachs. Both applications and denials occurred on August 16, 2023 – the same date that Experian and Equifax deleted Comenity's trade line from Plaintiff's credit. Both predate Comenity's receipt of the one dispute that contained any attachments. For the reasons discussed below, neither can be attributed to any alleged failure by Comenity to conduct a reasonable investigation of Plaintiff's disputes.

### III. ARGUMENT

#### A. Plaintiff Will Not Prove That Comenity Violated Section 1681s-2(b) Of The Fair Credit Reporting Act

Plaintiff will not prevail on the essential elements of his section 1681s-2(b) claim. "The FCRA regulates how furnishers must respond to a notice of dispute from a credit reporting agency…[T]he furnisher must correct or delete inaccurate information after conducting an 'investigation with respect to the disputed information.'" *Gross v. CitiMortgage, Inc.,* 33 F.4th 1246, 1250–51 (9th Cir. 2022) (quoting 15 U.S.C. § 1681s-2(b)). "That 'investigation' must be at least 'reasonable' and 'non-cursory.' " *Id.* (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009)). "Although the FCRA's []investigation provision, …does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim, many courts, including our own, have imposed such a requirement." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010). "This order of proof makes sense: if there is no inaccuracy, then the reasonableness of the investigation is not in play." *Gross,* 33 F.4th at 1251.

### 1. Comenity's Reporting Was Not Patently Incorrect

The Ninth Circuit has held that information can be inaccurate "because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman,* 584 F.3d at 1163 (furnisher's failure to report a consumer's dispute of a debt was misleading and thus inaccurate); *Gross*, 33 F.4th at 1252 (reporting debtor was responsible for debt that had been "abolished" by Arizona's anti-deficiency statute was "patently incorrect").

Plaintiff does not contend the reporting of a Comenity account on his credit was misleading; he claims that it was patently incorrect. The jury in this action will be able to assess all the evidence, including Plaintiff's credibility, and make a determination on whether it believes Plaintiff is a true victim of identity theft. But this is not something that is "patently" obvious based upon the information that was submitted by Plaintiff to the CRAs or that was in Comenity's possession. Nor can his status as an alleged victim be established as an objectively verifiable fact.[2] As such, Plaintiff will not be able to establish that Comenity's reporting of the account was patently incorrect and his claim will fail.

---

[2] It is on this basis, that Comenity has urged the court to assess whether Plaintiff's dispute is actionable under the FCRA. The argument is based on a longstanding body of caselaw in and out of the Ninth Circuit recognizing that not all inaccuracies are actionable under the FCRA. *See e.g. Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) ("reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts"); *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) ("Like CRAs, furnishers are 'neither qualified nor obligated to resolve' matters that 'turn[ ] on questions that can only be resolved by a court of law.' "). While traditionally courts drew the line between actionable and inactionable disputes based on whether the underlying issue in question is legal versus factual, Courts have recently veered away from this distinction, *Gross v. CitiMortgage, Inc*., 33 F.4th 1246, 1250–51 (9th Cir. 2022) ("FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance.")), in favor of considering whether a dispute involves information that is objectively and readily verifiable by the CRA or furnisher charged with investigating a dispute. In so doing, Courts have started to recognize that a dispute may not be actionable under the FCRA if it "involves complex fact-gathering," "requires credibility determinations and quasi-discovery," or concerns "claims of tortious conduct that require a furnisher to evaluate the subjective nature of the parties' actions—such as claims of fraud or retaliation." *Roberts v. Carter-Young, Inc.,* 131 F.4th 241, 250–51 (4th Cir. 2025).

**COMENITY CAPITAL BANK'S TRIAL BRIEF** 9

        **2.   Comenity's Investigation Was Reasonable And In Line With Industry Standards**

A furnisher's obligation to investigate is procedural; what matters is the process used, not the outcome. "An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *See Gorman,* 584 F.3d at 1161. And because the focus is on process rather than outcome, a plaintiff bears the burden of identifying facts the furnisher should have discovered as part of its investigation that would have demonstrated the information reported was incomplete or inaccurate. *See Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023),[3] citing *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018); *see Holden v. Holiday Inn Club Vacations Inc.*, 98 F.4th 1359, 1367 (11th Cir. 2024); *Suluki v. Credit One Bank, N.A.*, 2025 WL 1508887, at *8 (2nd Cir. May 28, 2025) (summary judgment on FCRA claim affirmed where Plaintiff failed to show a reasonable investigation would have led to a different result).

---

[3] In *Milgram,* the plaintiff's employee opened a credit card with Chase using plaintiff's name, ran up thousands of dollars of charges, and then illegally accessed plaintiff's bank accounts to make payments in response to the monthly statements. *See* Milgram, 72 F.4th at 1214. Chase rejected plaintiff's fraud claims concluding that the consistent payments made from an account owned by plaintiff reflected the employee had "apparent authority" to incur the charges. *Id.* The district court granted summary judgment for Chase on plaintiff's FCRA claims, concluding that the Bank's investigating had been "reasonable," and the Eleventh Circuit affirmed. *Id.* The facts supporting plaintiff's dispute in *Milgram* were far more compelling than those presented by Plaintiff here. Indeed, by the time plaintiff in *Milgram* submitted her last dispute to Chase, her former employee had already plead guilty to "seven counts of grand theft in the second and third degree, criminal use of personal identification information, and defrauding a financial institution" and had been sentenced to three years in prison. *Id.* at 1216. Plaintiff attached to her dispute a Florida state court order which recognized the employee had fraudulently opened the Chase card and had transferred money to make the payments without plaintiff's permission. Id. In response to plaintiff's dispute, however, Chase re-verified that plaintiff was responsible for the charges. *Id.* Nonetheless, the Eleventh Circuit concluded that Chase's investigation was reasonable, because plaintiff could not point to any fact that would have undercut Chase's determination that plaintiff had vested her employee with apparent authority to use the card. *Id.* at 1221 (The Court observed: "We don't think the criminal judgment was relevant to Chase's apparent-authority determination. To be sure, Williams's criminal judgment proved that Williams lacked actual authority. But Milgram's automatic payments to pay off the card each month led Chase to conclude that Williams had authority to incur those charges.").

**COMENITY CAPITAL BANK'S TRIAL BRIEF**                                                     10

While this Court has so far declined to assess whether the ownership of Plaintiff's account is an objectively and readily verifiable issue that is actionable under the FCRA, the Court recognized when it denied Comenity's motion for summary judgment that "there is a genuine dispute of fact as to whether there was "'objectively and readily verifiable' information that could [have] help[ed] resolve whether Panchenko opened and used the account." Dkt. No. 148. There will be no evidence that information Comenity had and was required to review under industry standards would have or should have changed the outcome of its investigation. To the contrary, Comenity's investigation procedures were thorough, consistent with industry standards, and objectively reasonable given the information available to it at the time of its investigations.

Comenity investigated each of the nine ACDVs it received between May and August 2023. For each, Comenity verified the account details against its own internal records and those of third-party vendors (Accurint and Ekata) and determined that all the data – including name, address, date of birth, and social security number – matched Plaintiff's identifying information. Comenity also reviewed the account's historical activity. The account had been open for years, payments were made on the account for years, including payments made after the account's closure, the credit line was never maxed out (nor ever close) and billing statements were mailed and never returned undeliverable. Based on these objective facts, Comenity reasonably concluded that Plaintiff was responsible for the account. Trial Exhs. 6-14.

Plaintiff is expected to point to call recordings that allegedly contained a different voice as an example of accessible information that Comenity failed to review as part of its investigation. But a review of recordings to conduct voice comparisons is not the industry standard. Call recordings are not always (nor required to be) maintained, can be voluminous and take hours to review, and are unlikely to produce conclusive information, both because investigators are not voice recognition experts and because establishing a definitive difference in the voices of two callers does not mean that one is not calling at the behest of the other.

Plaintiff is also expected to argue that Comenity's investigation fell short due to one investigator's failure to review attachments to the one ACDV that included them. Even if Plaintiff established this, it would make no difference. None of the enclosures with the ACDV

COMENITY CAPITAL BANK'S TRIAL BRIEF                                                        11

dated August 18, 2023 had any information that would have or even should have changed the outcome of the investigation. The images included a police report, two FTC reports, a copy of Plaintiff's current passport, the I-94 Travel History for his current passport, a document described as a bank statement proving Ukrainian residency, and an electricity bill described as proof of current US residency.

The police report was heavily redacted, omitting nearly all identifying information, including Plaintiff's date of birth, social security number, address history, and the specific account information he claimed was fraudulent. The I-94 Travel History was not any official U.S. government document nor even appears to have been printed from a U.S. government website. Importantly, the Travel History also did not include any information about Plaintiff's whereabouts in 2015, when the Comenity account was opened, or prior to March 2018, when he obtained his current passport.

Similarly, the FTC reports did not include Plaintiff's date of birth or social security number and merely identified various accounts Plaintiff was disputing, without any meaningful information about the disputes other than a reference to the "Equifax data breach" in the suspect information section. At best, this reference suggested Plaintiff was challenging activity on the accounts after 2017, when the data breach occurred, which of course has no bearing on the opening of an account like Comenity's which was opened in December 2015.

It is unclear how Plaintiff contends that the bank document was probative of his residence as it does not list his residence or otherwise establish his whereabouts. The PG&E statement did confirm Plaintiff's address as 111N Rengstorff Ave, Apt. 1324, Mountain View, California for an unspecified period on or around June 2023, but it did not establish any information relevant to Plaintiff's dispute of the Comenity account.

Thus, although Plaintiff is expected to make a big point of the alleged failure by Comenity to review the documents attached to his August 18, 2023 dispute, the evidence cannot support a finding that it should have reached a different outcome based on those attachments.

B. **Plaintiff Will Not Be Able To Establish a Negligent or Willful Violation**

The Parties agree that under the FCRA, if Plaintiff proves by a preponderance of the

evidence that Comenity negligently failed to conduct a reasonable investigation of a dispute it received about Plaintiff from a CRA, Comenity is liable to Plaintiff in the amount of any actual damages that he sustained as a result of the failure. *See* Dkt. No. 198 (both Parties' versions of Disputed Instruction No. 37). The Parties also agree that if Plaintiff proves by a preponderance of the evidence that Comenity willfully failed to conduct a reasonable investigation of a dispute it received about Plaintiff from a consumer reporting agency, Comenity is liable to Plaintiff in the amount of any actual damages that Plaintiff sustained as a result of the failure or damages of not less than $100 and not more than $1,000.[4] *See id.*

The Parties' Stipulated Instruction No. 35 explains that "To prove a negligent violation of section 1681s-2(b) of the Fair Credit Reporting Act, Panchenko must prove by a preponderance of the evidence that Comenity failed to use 'reasonable care' in investigating the dispute from a consumer reporting agency," and that "reasonable care" means "the degree of care that a reasonably prudent person would use under similar circumstances."

The standard for finding a willful violation under the Fair Credit Reporting Act was established by the U.S. Supreme Court in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69, 127 S. Ct. 2201, 2215 (2007), wherein the Court explained that to prove a willful violation, Plaintiff must establish that Comenity acted in knowing or "reckless disregard" of its obligations under the law, and that *"*a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.*  As explained by the Ninth Circuit's analysis of Safeco, "Recklessness is an objective standard," and a company does not act recklessly even if it violates the law, if its actions are not objectively unreasonable. *Shaw v. Experian Info. Sols., Inc.,* 891 F.3d 749, 760 (9th Cir. 2018).

---

[4] The Parties' only disagreement about recovery under the FCRA is whether the Court or jury decides the availability of punitive damages. *See id.* Because Plaintiff cannot prove a willful violation or entitlement to any actual damages, this point of disagreement is moot.

Plaintiff will not be able to prove that Comenity negligently failed to conduct a reasonable investigation because he cannot establish that it failed to take the degree of care that a reasonably prudent person would use under similar circumstances. To the contrary, the evidence at trial will establish that Comenity acted consistently with industry standards and reached the same conclusions as others in the industry based on similar evidence. Given that Comenity's conduct and conclusions were similar to those of its peers, it is inconceivable how a jury could reasonably find that Comenity's actions were objectively unreasonable under the circumstances.

Hence, the evidence will not support a finding of a negligent or willful violation.

### C. There Will Be No Evidence Of Actual Damages Caused By Comenity

Plaintiff sued multiple banks and consumer reporting agencies in this case (and in a related case against Experian) alleging they all caused him to suffer the exact same categories of harm. Dkt. No. 1, ¶¶ 69-72; Exh. 126. There will be no evidence that Plaintiff suffered any tangible, identifiable harm as a result of Comenity's conduct. Thus, even if Plaintiff could prove a negligent or willful violation, he could not demonstrate entitlement to any recovery.

The jury will be instructed as follows: "If you find for [Plaintiff] on [Plaintiff]'s FCRA claim, you must determine [Plaintiff]'s damages. [Plaintiff] has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate [Plaintiff] for any injury you find was caused by [Comenity]." Stipulated Jury Instruction No. 38. Moreover, "[a] plaintiff can only recover actual damages for a violation of the FCRA if []he has suffered damages as a result of the violation." *Martinez v. American Express Nat'l Bank,* Case No. CV-21-8130-DMG (MAAx), 2022 WL 16571194, at *5 (C.D. Cal. Nov. 1, 2022); *King v. Bank of Am., N.A.*, 2012 WL 4685993, at *6 (N.D. Cal. Oct. 1, 2012) ("[A] mere drop in Plaintiff's credit score without any damages actually incurred would likely not satisfy the [FCRA's] actual damages requirement."). "'It is black-letter law that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery.'" *Robbins v. CitiMortgage, Inc.*, Case No. 16-CV-04732-LHK, 2017 WL 6513662, *17 (N.D. Cal. Dec. 20, 2017) (quoting *Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001), and *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1006 (9th Cir. 1981)).

### 1. *Plaintiff Will Not Be Able To Establish That The Apple Card Denial Was Caused By Comenity Failure to Conduct a Reasonable Investigation*

The evidence will show that Plaintiff applied for and was denied an Apple Card issued by Goldman Sachs on or around August 16, 2023. However, the evidence will not include a copy of the credit report that Goldman Sachs considered when it made the decision to deny his application on this date. This means Plaintiff cannot prove that information furnished by Comenity had any impact on Goldman's decision to deny the application. Plaintiff's claim must fail on this basis alone.

In addition, Plaintiff cannot tie the denial reasons listed in the Goldman Sachs adverse-action notice to Comenity's reporing. The Notice states the denial was based on a Trans Union credit report and identifies the following reasons for denial: serious delinquency; proportion of balances to credit limits on bank/national revolving or other revolving accounts is too high; too few accounts currently paid as agreed. Trial Exh. 54.

Plaintiff's strongest argument is that Comenity failed to conduct a reasonable investigation of the one ACDV it received with attachments on August 19, 2023, and processed on August 21, 2023. But that dispute is irrelevant to the Apple Card denial because it was received and processed after the August 16, 2023 denial took place.

Even if Plaintiff could establish a failure to conduct a reasonable investigation of any <u>earlier</u> disputes Comenity received from Trans Union, Plaintiff will not be able to demonstrate the denial of credit on August 16, 2023 was the result of Comenity's trade line appearing on his credit. This is not only because he cannot say what Goldman Sachs actually saw in Plaintiff's Trans Union credit file on August 16, 2023, but also because the only available information about the contents of Plaintiff's Trans Union credit file on or around this date indicate that Comenity could not have been relevant to the denial.

Specifically, the Trans Union consumer disclosure dated August 15, 2023, indicates that Plaintiff's credit file on that date contained a total of three accounts with past due balances: a charged-off JPMorgan Chase account with a balance of $49,957, another charged-off JPMorgan Chase account with a balance of $33,377, and a charged-off U.S. Bank account with a balance of

$9,886. Trial Exh. 31. The same disclosure indicates that Comenity was not reporting a past due balance; instead, it was reporting as a sold, previously charged off account with a $0 balance.

The first and third reasons for denial communicated by Goldman Sachs would have existed due to the US Bank and Chase trade lines regardless of whether or not Comenity's trade line was on Plaintiff's credit report on August 16, 2023. As to the second reason for denial, Comenity was the only account showing a zero balance and could not have contributed to the proportion of balances to credit limits being too high. Comenity's expert, Mr. Ulzheimer, will testify at trial to these points and Plaintiff will ultimately be unable to prove that Comenity <u>caused</u> this credit denial.

### 2. *Plaintiff Will Not Be Able To Establish That The SFCU Denial Was Caused By Comenity's Failure to Conduct a Reasonable Investigation*

Plaintiff applied for credit with the Stanford Federal Credit Union on August 16, 2023. Plaintiff does not include the denial letter as a Trial Exhibit and is not believed to be planning to claim that the denial may be attributed to Comenity's failure to investigate any of his credit disputes. To the extent that he does, Comenity will present impeachment evidence to conclusively demonstrate that it had nothing to do with that denial.

### 3. *Plaintiff's Emotional Distress Claim Cannot Be Connected To Comenity*

Plaintiff is expected to testify at trial in line with his deposition and written discovery responses (Trial Exhs. 100–120), in which he broadly attributed emotional distress—including "anxiety, frustration, stress, lack of sleep, nervousness, anger, and embarrassment"—to discovering multiple charged-off accounts on his credit report. Yet when questioned under oath, Plaintiff offered only vague references to stress, panic attacks, and headaches, without any detail regarding their duration, frequency, or severity. He failed to connect these symptoms to Comenity's conduct specifically, as opposed to his general frustration with the presence of delinquent accounts. His testimony was conclusory, unsupported by medical records, counseling history, or any documentation of treatment.

Plaintiff may also attempt to link his distress to a period of unemployment between May and September 2023, during which he claims he refrained from seeking work to focus on

repairing his credit. But he admitted that job prospects during that time were minimal due to broader market conditions. Even if he had pursued employment, there is no evidence that he would have secured a position any earlier than he ultimately did in 2024. His alleged lost wages are speculative and not recoverable.

Plaintiff intends to call his wife, Alla Odeianenko, and a friend, Pavlo Bilaschuk, to testify about his emotional distress. Neither is expected to offer firsthand or credible evidence of any symptoms or their connection to Comenity's conduct. Ultimately, Plaintiff's emotional distress claim is unsupported by facts, documentation, or causation. As the evidence will show, he cannot recover actual damages for emotional distress under the FCRA.

### 4. *Plaintiff's Emotional Distress Claim Is Indivisible And Aimed at Double Recovery*

Plaintiff's emotional distress claim is not only unsupported—it is indivisible. He has consistently attributed the same generalized emotional harm to the conduct of all defendants, without distinguishing which entity caused which injury. His deposition testimony, written discovery responses, and Rule 26 disclosures uniformly lump all defendants together, asserting that each contributed to the same anxiety, stress, and credit denials. This undifferentiated theory of harm directly implicates the "one satisfaction rule," which prohibits double recovery for the same injury. Plaintiff's attempt to recover again from Comenity for injuries he has already been compensated for by other defendants is not only legally impermissible—it underscores the speculative nature of his damages claim.

## IV. CONCLUSION

Plaintiff's claims against Comenity fail on every required element. The evidence will show that Comenity's reporting was not patently inaccurate, its investigation was reasonable, and no actual damages were caused by its conduct.

DATED: October 27, 2025                Respectfully submitted,

By: /s/ Alisa A. Givental

Alisa A. Givental
Attorneys for Defendant
Comenity Capital Bank