UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

OLEKSANDR PANCHENKO,                )
                                    )   CV-23-04975 EKL
                    PLAINTIFF,      )
                                    )   SAN JOSE, CALIFORNIA
          VS.                       )
                                    )   NOVEMBER 3, 2025
COMENITY CAPITAL BANK,              )
                                    )   VOLUME 2
                    DEFENDANT.      )
_____     )   PAGES 101 - 309


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EUMI K. LEE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFF:      LOKER LAW, APC
                        BY: MATTHEW M. LOKER
                            CHARLES B. CUMMINS
                        132 BRIDGE STREET
                        ARROYO GRANDE, CALIFORNIA 93420

                        RAMOS LAW
                        BY: MATTHEW R. OSBORNE
                        10190 BANNOCK STREET, SUITE 200
                        NORTHGLENN, COLORADO 80260


          (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT COMENITY: WOMBLE BOND DICKINSON U.S., LLP
                        BY: TOMIO B. NARITA
                            ALISA A. GIVENTAL
                            KRISTINA HOVSEPYAN
                            NATHAN A. SEARLES
                        50 CALIFORNIA STREET, SUITE 2750
                        SAN FRANCISCO, CALIFORNIA 94111

ALSO PRESENT:           COMENITY CAPITAL BANK
                        MIKE GALEANO, IN HOUSE COUNSEL

**INDEX OF PROCEEDINGS**

<u>FOR THE PLAINTIFF:</u>


**OLEKSANDR PANCHENKO**
        DIRECT EXAM BY MR. LOKER                    P. 158
        CROSS-EXAM BY MR. NARITA                    P. 266

**<u>INDEX OF EXHIBITS</u>**

|  | MARKED | ADMITTED |
|---|---|---|
| <u>PLAINTIFF'S:</u> | | |
| 40 | | 170 |
| 41 | | 171 |
| 47 | | 176 |
| 48 | | 177 |
| 24 | | 181 |
| 49 | | 201 |
| 44 | | 215 |
| 51 | | 217 |
| 26 | | 219 |
| 38 | | 222 |
| 52 | | 225 |
| 53 | | 228 |
| 3 | | 232 |
| 4 | | 236 |
| 2 | | 237 |
| 54 | | 259 |
| | | |
| <u>DEFENDANT'S:</u> | | |
| 203 | | 289 |
| 246 | | 299 |

SAN JOSE, CALIFORNIA                        NOVEMBER 3, 2025

P R O C E E D I N G S

(COURT CONVENED AT 8:53 A.M.)

(JURY OUT AT 8:53 A.M.)

THE CLERK:  WE'RE CALLING 5:23-CV-04965 EKL, PANCHENKO VERSUS COMENITY CAPITAL BANK.  THIS IS FOR JURY TRIAL.

COULD YOU PLEASE, PLEASE STATE YOUR APPEARANCES ON THE RECORD STARTING WITH COUNSEL FOR THE PLAINTIFF.

MR. LOKER:  YES, GOOD MORNING, YOUR HONOR.

MATT LOKER ON BEHALF OF THE PLAINTIFF.

THE COURT:  GOOD MORNING.

MR. NARITA:  YOUR HONOR, TOMIO NARITA FOR THE DEFENDANT.

THE COURT:  ALL RIGHT.  GOOD MORNING TO YOU ALL.

I SEE THAT YOUR CLIENTS ARE PRESENT, AS WELL AS THE REST OF YOUR TRIAL TEAM.

SO WE'RE HERE ON A CONFERENCE OUTSIDE OF THE PRESENCE OF THE JURY.  I JUST WANTED TO TOUCH BASE REGARDING A FEW THINGS THAT CAME IN THIS WEEKEND.

SO LET'S BEGIN WITH, FIRST, I JUST WANT TO KNOW, SINCE WE DIDN'T HAVE MADAM COURT REPORTER THERE AT THE TIME, BECAUSE IT WAS AFTER THE JURY HAD BEEN RELEASED AND COUNSEL HAD BEEN RELEASED, BUT I'M PLACING ON THE RECORD AFTER JURORS AND COUNSEL WERE RELEASED, ONE OF OUR JURORS, JUROR NUMBER 10,

STRUGGLED AND HAD A BIT OF A -- HAD A VERY STRONG EMOTIONAL REACTION VERGING ON THE BRINK OF A MENTAL BREAKDOWN FOLLOWING IMPANELMENT, AND SO THAT JUROR HAS BEEN EXCUSED.

COUNSEL HAD STIPULATED PRIOR TO THAT JUROR BEING EXCUSED. SO WE ARE NOW TO A JURY OF SEVEN.  WE ARE ONLY REQUIRED TO HAVE SIX, AND WE CAN EVEN GO LESS THAN THAT WITH THE PARTIES' STIPULATION.

BUT I WANTED TO STATE THAT IN TERMS OF THE RECORD.

TODAY I'M PRE-INSTRUCTING THE JURY AS I INFORMED YOU ALL.

AND JUST TO CONFIRM THE NUMBERS WHICH I WILL BE READING TO THE JURY, THESE ARE THE SAME ONES THAT I HAD MENTIONED EARLIER, BUT I HAD JUST DONE THEM BY SERIES OF NUMBERS.  I'M GOING TO STATE THEM BY THE MODEL JURY INSTRUCTION WITHIN THE NINTH.

SO THE ONES I'M READING TODAY ARE:  1.3; 1.5; 1.6, 1.9; 1.10 THROUGH 1.14; 4.1; 4.2; 1.15 IS THE CONDUCT OF THE JURY. I'M UNLIKELY TO READ THAT IN FULL.  I DID THE OTHER DAY.  BUT I MAY HIGHLIGHT A FEW POINTS JUST TO REMIND THEM.

1.16; 1.17; 1.18 THROUGH 1.21.

AT THE BEGINNING OF THE END OF THE DAY I WILL LIKELY BE READING VERSIONS OF 2.0, WHICH ARE THE CAUTIONARY INSTRUCTIONS.

AND AS NEEDED TODAY, I MAY BE READING 2.2, STIPULATIONS OF FACT; AND 2.4, DEPOSITIONS.

ANY QUESTIONS ABOUT THAT?

MR. LOKER:  NOT FROM THE PLAINTIFF, YOUR HONOR.

MR. NARITA:  NOT FROM THE DEFENDANT.

THE COURT:  ALL RIGHT.  EXPECTED LENGTH OF THE OPENINGS TODAY?

MR. LOKER:  ABOUT 20 MINUTES, 15 MINUTES ON OUR SIDE.

MR. NARITA:  PROBABLY ABOUT 15.

THE COURT:  I JUST WANT TO MAKE SURE I'M TIMING OUT THE JURY'S BREAK.

CONTINUING ON.  I RECEIVED -- I JUST SENT YOU ALL A LIMITING INSTRUCTION THAT I HAD REGARDING WHERE PANCHENKO -- IF PLAINTIFF HAD BEEN REPORTING HEARSAY STATEMENTS, ALLEGED HEARSAY STATEMENTS TO CRA'S, THEY'RE BASICALLY MODELLED DIRECTLY AFTER THE DISPUTED ONES THAT YOU ALL HAD OF -- THE PARTIES HAD SUBMITTED TO THE COURT.

ANY CONCERNS ABOUT THAT, IF NEEDED?

MR. LOKER:  NOT FOR THE PLAINTIFF, YOUR HONOR.

THE COURT:  MR. NARITA?

MR. NARITA:  YEAH, YOUR HONOR.

WOULD THE COURT MIND JUST GETTING ME UP TO SPEED ON THE LIMITING INSTRUCTION?

I READ IT ON MR. SEARLES'S PHONE AND I WASN'T SURE EXACTLY WHAT THE CONTEXT WAS.

THE COURT:  SO THE CONTEXT IS IF -- SO WE HAVE -- LET ME PULL IT UP.

SO IT'S CONTEMPLATING IF THERE'S STATEMENTS BY PLAINTIFF WITHIN CRA REPORTS OR DOCUMENTS, AND SO HEARSAY, BUT THEY'RE

STATED FOR THE LIMITED -- THEY'RE BEING SUBMITTED FOR OTHER PURPOSES, CORRECT, IN TERMS OF -- SO GIVING CONTEXT IN TERMS OF HOW THEY SHOULD WEIGH THOSE STATEMENTS.

MR. NARITA:  UNDERSTOOD.

THE COURT:  SO PARALLEL TO THE TRACK DISPUTES ONE THAT YOU ALL HAD GIVEN, WITH DIRECT DISPUTES, THE CONCERN BEING THAT IS NOT AT ISSUE, RIGHT, THE DIRECT DISPUTES.  THAT IT DOESN'T GO TO THE VIOLATION, WHICH IS AT ISSUE IN THIS TRIAL.

SO THIS PARALLELS IN THE SENSE OF THE STATEMENT HE MAKES TO THE CRA'S ARE NOT NECESSARILY TRUE FOR THE TRUTH OF THE MATTER ASSERTED.

MR. NARITA:  GOT IT.  OKAY.  I UNDERSTAND THE ISSUE. DEFENSE HAS NO CONCERNS.

THE COURT:  OKAY.  SO THE ONLY THING I CHANGED WAS CHANGING FROM THE PLAINTIFF'S ALLEGATIONS AT THE LAST SENTENCE TO WHAT HE TOLD THE CRA'S, JUST TO MAKE IT CLEAR.

MR. NARITA:  OKAY.

THE COURT:  OKAY.  COUNSEL SENT ME SOME EMAILS YESTERDAY AFTERNOON -- TWO EMAILS.  I'M JUST TRYING TO FIND THEM.  ONE MOMENT.

MR. NARITA:  WE TRIED TO KEEP THE SUNDAY EMAILS TO A MINIMUM, YOUR HONOR.

THE COURT:  APPRECIATED.  I WOULD APPRECIATE THEM A LITTLE BIT EARLIER, IN TERMS OF ON SATURDAY INSTEAD, BECAUSE THAT'S THE DAY I WAS IN THE OFFICE, BUT I'LL FIND -- YOU HAD

SUBMITTED THEM -- SO THERE'S EXHIBIT 1, EXHIBIT 2, WHICH THERE WERE LIMITING INSTRUCTIONS THAT THE PARTIES HAD PROPOSED; AND THEN THERE WAS ALSO THE USE OF THE STIPULATED FACTS THAT THE PARTIES HAD MENTIONED IN TERMS OF DEPO DESIGNATIONS WHICH ARE GETTING PLAYED.

MR. LOKER:  RIGHT.

THE COURT:  AND THEN I ALSO RECEIVED YOUR AMENDED STIPULATED FACTS, I BELIEVE EITHER LATE ON FRIDAY OR MAYBE THAT WAS ON SATURDAY.  I CAN'T REMEMBER NOW.

SO LET ME START WITH THE EMAILS.

MR. LOKER:  OKAY.

THE COURT:  SO BEGINNING WITH THE EMAILS AND THOSE EXHIBITS AND THE DEPOSITION DESIGNATIONS DESIGNATIONS, MR. LOKER, WERE THOSE WITNESSES PLACED IN THE SAME ORDER THAT YOU WERE INTENDING TO CALL THEM TODAY?

MR. LOKER:  YES, THAT'S CORRECT, YOUR HONOR.  I DON'T THINK IT WILL BE TODAY.  I THINK TODAY WE'LL ONLY GET TO MR. PANCHENKO, BUT THEY'RE IN THE ORDER THAT WE PLAN TO CALL THEM.

THE COURT:  PERFECT.  THAT WILL MAKE IT EASIER FOR ME TO CUT AND PASTE AND PUT THEM INTO MY NOTES.  THANK YOU.

MR. LOKER:  YES.

THE COURT:  SECOND, I UNDERSTAND THAT COMENITY HAS AN OUTSTANDING -- THEY WOULD LIKE TO BRIEFLY BE HEARD AS TO TWO DOCUMENTS OR THREE DOCUMENTS.

MR. NARITA:  IT'S A GROUPING, YOUR HONOR.  I THINK IT CAN BE ADDRESSED AS A GROUPING.

AND I'M NOT SURE WHETHER MR. LOKER IS GOING TO -- WHAT HIS EXAMINATION IS GOING TO LOOK LIKE OF MR. PANCHENKO.

BUT THE PROBLEM -- THE MAIN PROBLEM WE HAD WAS THE CALL RECORDINGS RELATING TO THE VOICE THAT MR. PANCHENKO SAYS IS NOT HIS.  AND THOSE CALL RECORDINGS ARE, OF COURSE, RECORDINGS THAT WERE FISHED OUT OF MY CLIENT'S FILES, THEIR CONTENTS ARE HEARSAY, THEY'RE --

THE COURT:  HOW ARE THEY HEARSAY IF THEY'RE NOT FOR THE TRUTH OF THE MATTER ASSERTED?

MR. NARITA:  I BELIEVE THAT THEY ARE FOR THE TRUTH OF THE MATTER ASSERTED, YOUR HONOR.  THEY'RE BEING OFFERED FOR THE FACT THAT THIS IS, IN FACT, THE RECORDS OF COMENITY, AND THE RECORDS OF COMENITY IN TRUTH HAVE A VOICE IN THERE THAT IS NOT THE SAME VOICE THAT THEY HEARD LATER IN THEIR BUSINESS RECORDS, AND, THEREFORE, THEY SHOULD HAVE DONE SOMETHING DIFFERENTLY.  THEY SHOULD HAVE INVESTIGATED DIFFERENTLY.

SO THEY'RE NO GOOD WITHOUT THEIR TRUTH.

THE COURT:  THEY'RE NOT FOR THE TRUTH OF WHAT WAS STATED BY THE PERSON WHO REPRESENTED THAT HE WAS MR. PANCHENKO.

SO THOSE -- THE STATEMENTS, WHICH WERE MADE ON THE RECORDING, THAT'S WHERE WE ANALYZE WHETHER OR NOT THEY WERE FOR THE TRUTH OF THE MATTER ASSERTED OR NOT.

SO THE VOICE ITSELF, WHICH IS THE PURPOSE THAT THEY'RE

BEING OFFERED FOR, IS NOT -- THE PERSON DOES NOT SAY I AM -- LIKE, THE VOICE ITSELF, WHICH IS WHAT WE'RE LISTENING TO IT FOR, IS NOT HEARSAY.  IT'S THE STATEMENT THAT THAT VOICE IS MAKING.

SO IT IS NOT HEARSAY FOR THE PURPOSES, SO THE COURT WOULD OVERRULE THAT OBJECTION.

MR. NARITA:  WELL, IF I COULD JUST --

THE COURT:  LET ME HEAR FROM MR. LOKER SINCE I'M ODDLY IN A POSITION WHERE I'M DISCUSSING -- GO AHEAD, MR. LOKER.  LET'S HEAR FROM YOU.

MR. LOKER:  THANK YOU.

AND YOU'RE CORRECT, SO WE HAVE TWO NON-HEARSAY REASONS FOR PLAYING THOSE RECORDINGS.

THE FIRST ONE, LIKE YOU SAID, IS THAT THEY'RE NOT BEING OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.  THEY'RE BEING OFFERED FOR THE FALSITY.

SO IF SOMEONE SAID, I'M OLEKSANDR PANCHENKO, YOU KNOW, THAT'S NOT CORRECT.

SECOND, WE'RE OFFERING THOSE STATEMENTS FOR -- THE SECOND NON-HEARSAY PURPOSE IS THE FACT THAT THEY'RE BEING OFFERED TO SHOW THAT A STATEMENT WAS MADE.

YOU KNOW, THAT COMES UP IN THE NINTH CIRCUIT A COUPLE OF TIMES WITH REGARD TO THESE CASES.  BOTH OF THOSE CASES WE HAVE ALREADY DISCUSSED, DREW VERSUS EQUIFAX, AND IN MR. NARITA'S CASE IN GORMAN, AND IN BOTH OF THOSE CASES THERE WERE HEARSAY

OBJECTIONS AND THE CREDIT REPORT WAS KEPT OUT, AND THEN THE NINTH CIRCUIT SAID THOSE CREDIT REPORTS WERE NOT INTRODUCED FOR THE TRUTH BECAUSE THE CONSUMER WAS SAYING THAT THOSE CREDIT REPORTS WERE FALSE, AND THOSE CREDIT REPORTS WERE ALSO NON-HEARSAY BECAUSE THE CONSUMER IN THOSE MATTERS WAS SAYING THIS STATEMENT WAS MADE SEPARATE AND APART FROM THE TRUTH.

THE COURT: I AM -- WAS INTENDING WITH THAT SERIES OF RECORDINGS -- WELL, NO, THIS WAS FOR THE ONES BEGINNING AT 49.

MR. NARITA, ANYTHING FURTHER?

MR. NARITA: YES. SO THERE'S A COUPLE OF PROBLEMS HERE.

FIRST OF ALL, THERE'S AN AUTHENTICATION AND FOUNDATION PROBLEM, RIGHT?

MR. PANCHENKO DID NOT ACCESS OUR SYSTEM OF THE RECORDS AND PULL THIS BUSINESS RECORD OUT OF OUR SYSTEM OF RECORDS ASSOCIATED WITH HIS ACCOUNT AND PRODUCE IT IN DISCOVERY. HE'S A STRANGER TO US. SO HE CANNOT LAY A FOUNDATION OR AUTHENTICATE THESE RECORDINGS. THEY'RE NOT HIS. THEY ARE OURS.

SO HE CANNOT -- HE CANNOT EVEN SAY THAT THEY ARE WHAT THEY PURPORT TO BE, SO THERE'S NO REASON TO PLAY THEM DURING HIS TESTIMONY. THAT'S ONE --

THE COURT: MR. LOKER?

MR. LOKER: IN THIS PARTICULAR ISSUE, YOUR HONOR,

AND FOUNDATION AND AUTHENTICATION, WE'RE LOOKING TOWARDS THE CASE OF MGM VERSUS GROKSTER, THAT'S 454 F.SUPP. 2D 966, IN WHICH JUDGE WILSON, YOU KNOW, FOUND IN THAT MATTER AUTHENTICATION CAN BE SATISFIED BY JUDICIAL ADMISSION.

THAT JUDICIAL ADMISSION CAN BE BASED UPON EITHER A STIPULATION OF THE PARTIES -- OF COURSE WE DON'T HAVE THAT -- OR PRODUCTION OF THESE ITEMS IN RESPONSE TO DISCOVERY.

SO DURING THE COURSE OF DISCOVERY, MR. PANCHENKO SENT A REQUEST FOR PRODUCTION OF DOCUMENTS.

THE COURT:  WHAT IS THE CITE AGAIN?  I'M SORRY.

MR. LOKER:  IT IS -- I'LL GO SLOWER THIS TIME.  I APOLOGIZE.

454 F.SUPP. 2D 966.  AND THAT'S A CENTRAL DISTRICT OF CALIFORNIA CASE.

THE AUTHORITY HE RELIES UPON, OF COURSE, IS FROM THE NINTH CIRCUIT.

SO WE RECEIVED THESE, THESE RECORDINGS DURING THE COURSE OF DISCOVERY.

AND WHAT JUDGE WILSON FOUND IS, AS A RESULT, RELYING UPON THE NINTH CIRCUIT CASE OF MALIJACK, M-A-L-I-J-A-C-K, VERSUS GOOD TIMES HOME VIDEO CORPORATION.  THE CITE FOR MALIJACK IS 81 F.3D. 881, AND THAT'S FROM THE NINTH CIRCUIT.

BUT THE COURT FOUND THAT BECAUSE THEY WERE PRODUCED IN RESPONSE TO A DISCOVERY REQUEST, THE EVIDENCE THAT WAS CHALLENGED IN THERE WAS AUTHENTICATED.

WE ALSO, BEYOND RECEIVING THOSE RECORDINGS IN OUR RESPONSE TO A DISCOVERY REQUEST, WE HAVE MS. FORD'S DECLARATION THAT WAS FILED IN SUPPORT OF COMENITY'S MOTION FOR SUMMARY JUDGMENT.

MS. FORD IN HER DECLARATION, WHICH IS ON THE DOCKET AT 134, YOU KNOW, SHE FIRST, IN PARAGRAPHS 1 AND 2, DISCUSSES WHO SHE IS AND HER BACKGROUND.

THEN IN PARAGRAPH 4 OF HER DECLARATION SHE DISCUSSED THE BUSINESS RECORDS AND THEY WERE MAINTAINED BY COMENITY, INCLUDING THE AUDIO RECORDINGS, THE AUDIO RECORDINGS THAT WE SEEK TO PLAY BEFORE THE COURT TODAY.

SO IN ESSENCE, WHAT MS. FORD IS DOING IN HER DECLARATION AT PARAGRAPHS 1, 2, AND 4, AND SHE MENTIONS THE RECORDINGS AGAIN AT PARAGRAPH 11, IS AUTHENTICATING THE RECORDINGS THAT WERE PRODUCED FROM COMENITY'S SYSTEM, THEY WERE PULLED OUT OF THEIR SYSTEM AND AUTHENTICATING THEM.

AND BASED UPON MGM AND MALIJACK, THAT SATISFIES AUTHENTICATION.  IT'S BEEN ESTABLISHED FOR PURPOSES OF THIS CASE BECAUSE COMENITY CAN'T, ON ONE HAND, SAY THESE ARE ALL AUTHENTICITY; AND THEN WHEN THE PLAINTIFF TRIES TO USE THOSE RECORDINGS IN OUR CASE, CANNOT NOW SAY THAT THEY ARE NOT AUTHENTIC.

ABSENT THAT DECLARATION AND THE PRODUCTION OF THE RECORDINGS DURING DISCOVERY, WE WOULD HAVE CHANGED OUR WITNESS ORDER.  WE WOULD HAVE CALLED MS. FORD FIRST TO LAY FOUNDATION FOR CERTAIN THINGS.

BUT WE RELIED UPON THOSE JUDICIAL ADMISSIONS TO, YOU KNOW, GET THEM IN WITH MR. PANCHENKO FIRST.

THE COURT:  MR. NARITA?

MR. NARITA:  YEAH.  WELL, I DON'T HAVE MS. FORD'S DECLARATION IN FRONT OF ME.

A FEW THINGS ABOUT THAT.

THE COURT:  SO IS COMENITY REALLY DISPUTING THAT THESE ARE THEIR BUSINESS RECORDS?

MR. NARITA:  NO, YOUR HONOR.  I -- IF -- BUT THEY HAVE TO BE PUT INTO EVIDENCE PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, AND MR. PANCHENKO IS NOT THE WITNESS TO DO THAT.

AND IF MS. FORD IS HERE AND SHE TESTIFIES, I AM CONFIDENT SHE WILL BE ABLE TO AUTHENTICATE THE RECORDINGS AND THAT SHE WILL BE ABLE TO LAY A FOUNDATION FOR THEM.

BUT IT IS NOT APPROPRIATE EVIDENTIARY PROCEDURE TO HAVE MR. PANCHENKO UP THERE --

THE COURT:  OKAY.  LET'S LOOK AT THE DECLARATIONS. LET'S DO THESE ONE AT A TIME.

MR. NARITA:  -- AND HAVE MR. LOKER PLAY LITTLE CLIPS THAT HE WANTS TO PLAY FOR HIS WITNESS, AND THEN HAVE HIM TALK ABOUT DOCUMENTS THAT HE CAN'T AUTHENTICATE AND CANNOT LAY A FOUNDATION FOR.

MR. LOKER:  WE ALSO HAVE --

THE COURT:  MR. LOKER.

MR. LOKER:  SORRY.

-- 901(A)(5).  (A)(5) RELATES TO AN OPINION ABOUT A VOICE.

SO AN OPINION IDENTIFYING A PERSON'S VOICE, WHETHER HEARD FIRSTHAND OR THROUGH MECHANICAL OR ELECTRONIC TRANSMISSION OR RECORDING BASED UPON HEARING THE VOICE AT ANY TIME UNDER CIRCUMSTANCES THAT CONNECT IT WITH THE ALLEGED SPEAKER.

SO 901 RELATES TO AUTHENTICATION.

AND THEN 902 RELATES TO EVIDENCE THAT'S SELF-AUTHENTICATING, WHICH IS SIMILAR TO WHAT WE WERE DISCUSSING EARLIER WITH MS. FORD'S DECLARATION.

SO 902(A) DEALS WITH THE ACKNOWLEDGED DOCUMENTS, SO DOCUMENTS ACKNOWLEDGED BY CERTIFICATE OF ACKNOWLEDGEMENT THAT IS OFTEN EXECUTED BY A NOTARY PUBLIC -- THAT'S NOT THE ONE WE'RE LOOKING AT -- OR ANOTHER OFFICER, WHICH THAT'S WHO WE ARE LOOKING AT FOR MS. FORD, WHO IS AUTHORIZED TO TAKE ACKNOWLEDGEMENTS.

SO WE HAVE THE RESPONSE TO THE REQUEST FOR PRODUCTION, WE HAVE THE DECLARATION, WE HAVE 901 AND 902, ALL REASONS WHICH THESE RECORDINGS ARE ALREADY AUTHENTICATED AND ARE PROPERLY GOING TO BE INTRODUCED THROUGH MR. PANCHENKO.

THE COURT:  MR. NARITA.

MR. NARITA:  YES, YOUR HONOR.

MS. FORD DID WHATEVER SHE DID IN HER DECLARATION.

IS THERE ANY REFERENCE TO THE SPECIFIC RECORDINGS?

MR. SEARLES:  YOUR HONOR, MR. SEARLES ON BEHALF OF

THE DEFENDANT.

THERE'S NO SPECIFIC MENTION OF WHICH CALL RECORDINGS IN HER DECLARATION FOR THE SUMMARY JUDGMENT.  AS MR. LOKER WOULD KNOW, THERE ARE RECORDINGS THAT ARE FROM 2017 AND 2018, AND THEN THERE ARE THOSE OF 2023, BUT THERE'S NO SPECIFIC CITATION IN THAT.

IF MR. LOKER WISHED TO INTRODUCE DEPOSITION DESIGNATIONS FOR MS. FORD, HE COULD HAVE DONE SO, BUT HE DID NOT DO ANY DESIGNATIONS FROM MS. FORD'S DEPOSITION.

AND SO ANY RELIANCE THAT MIGHT BE IN HER MOTION FOR SUMMARY JUDGMENT DECLARATION DOES NOT INCLUDE ANY OF THE SPECIFIC EXHIBITS THAT WE'RE DISCUSSING TODAY.  IT GENERALLY SAYS CALL RECORDINGS.

MR. NARITA:  SO, YOUR HONOR, TO COMPOUND THAT POINT --

THE COURT:  STOP.  STOP.

MR. NARITA:  I'M STOPPING.

THE COURT:  SO THERE HAS BEEN THIS ISSUE IN TERMS OF AUTHENTICATION GOING ON THROUGHOUT.  WE HAVE NOW BEEN PRE-TRYING THIS CASE FOR FOUR WEEKS.  HOW IS THIS NOT RESOLVED AND HOW HAS COUNSEL NOT DISCUSSED THIS BEFOREHAND?

MR. LOKER:  I DIDN'T THINK IT WAS GOING TO BE CHALLENGED.  WE HAVE HER DECLARATION.  WE HAVE THE NINTH CIRCUIT AUTHORITY SAYING THAT THEY'RE JUDICIALLY ADMITTED, THAT THEY'RE AUTHENTIC.

THE COURT:  IS MS. FORD TESTIFYING LATER IN THE PROCESS?

MR. NARITA:  IF WE PUT ON A DEFENSE, MS. FORD WILL BE HERE.  SHE WILL BE ONE OF TWO WITNESSES.

THE COURT:  IF YOU PUT ON A DEFENSE.

MR. NARITA:  I'M NOT SURE THAT WE'RE GOING TO, YOUR HONOR.

THE COURT:  ALL RIGHT.  I'M GOING TO FINISH HEARING YOU ALL OUT.  WE HAVE A JURY WHICH IS PRESENT AND READY AT THIS POINT, IT'S MY UNDERSTANDING.

THE CLERK:  CORRECT, YOUR HONOR, YES.

THE COURT:  AND I NEED TO ENSURE THAT THE REST OF -- MR. LOKER, ARE THE REST OF THE EXHIBITS IN TERMS OF EXPERIAN AND OTHERS, HAVE THOSE ISSUES IN TERMS OF AUTHENTICATION BEEN RESOLVED, WHICH HAVE BEEN ONGOING FOR THE LAST COUPLE OF WEEKS?

MR. LOKER:  I BELIEVE SO, YOUR HONOR.  WE PRODUCED THE DECLARATIONS AND THE BUSINESS RECORDS TO COUNSEL.

THE COURT:  MR. NARITA, DO YOU HAVE ANY OBJECTIONS TO THOSE?

MR. NARITA:  I DON'T KNOW IF WE'VE RECEIVED ALL OF THE BUSINESS RECORDS DECLARATIONS OR NOT.

MR. SEARLES:  YOUR HONOR, MR. SEARLES AGAIN. WE DO NOT HAVE IT FOR TRANS UNION.

MR. LOKER:  I CAN DOUBLE-CHECK THAT, BUT THE TRANS UNION ARE FOR THE STATEMENT, THE FACT THAT THE STATEMENT

OCCURRED, AND SO THAT'S OUR NON-HEARSAY BASIS.

THE COURT:  BUT THEY STILL NEED TO BE AUTHENTICATED.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

THE COURT:  AND IT'S SEPARATE AND APART.

MR. LOKER:  AND IT IS A STATEMENT OF A PARTY OPPONENT BECAUSE THEY WERE PRODUCED IN THIS CASE AS A DEFENDANT.  AND SO THAT WOULD BE FROM 801(2)(D)(2) -- I AM SORRY.

THE COURT:  PARTY OPPONENT, WHICH THAT IS NOT THE CURRENT PARTY AT TRIAL.  WHAT IS YOUR DISTINCTION IN TERMS OF THAT?

MR. LOKER:  THEY WERE A PARTY WHEN THEY WERE PRODUCED, BUT IF THAT'S NOT THE PROPER SCOPE, THEN I'LL WITHDRAW THE ARGUMENT.

THE COURT:  SO LET ME FINISH HEARING FROM BOTH SIDES BRIEFLY ABOUT THESE CALL RECORDINGS.  I'M GOING TO HAVE PARTIES MEET AND CONFER AND WE'RE GOING TO START AT 9:30, AND YOU MAY NEED TO DEAL WITH THIS STUFF DURING THE LUNCH BREAK AND IF YOU AND I HAVE A LUNCH BREAK OFF THE RECORD, THEN THAT MAY BE WHAT WE DO.

BUT I'M NOT GOING TO KEEP THE JURY WAITING THAT MUCH LONGER, SO I'M CONSIDERING THE TIME TO SPEND ON EXHIBITS AND DEPO DESIGNATIONS.

AND I'M, FRANKLY, SURPRISED THAT THIS IS HITTING -- THAT WE'RE ADDRESSING THIS AT 9:15 ON THE FIRST DAY OF TRIAL.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

THE COURT:  MR. NARITA, ANYTHING FURTHER YOU WOULD LIKE TO RAISE IN TERMS OF YOUR ARGUMENTS AND AUTHORITY?  THAT'S IT.

AND THEN, MR. LOKER, I'M GOING TO HAVE YOU DO THE SAME.

MR. NARITA?

MR. NARITA:  THANK YOU.

THE ONLY OTHER THING I WOULD SAY IS THAT MS. FORD, SIERRA FORD, THE ONLY WITNESS I'M AWARE OF THAT COULD AUTHENTICATE AND LAY A PROPER FOUNDATION FOR THESE DOCUMENTS WAS DEPOSED NOT ONCE, BUT TWICE IN THIS CASE.

SO MR. LOKER HAD TWO OPPORTUNITIES TO TAKE TO LAY A FOUNDATION FOR ANY EXHIBIT, INCLUDING RECORDINGS THAT HE WANTED TO AT THOSE TIMES.  AND I THINK SHE MAY EVEN HAVE TESTIFIED TO THOSE.  I DON'T KNOW, I HAVEN'T READ HER DEPO DESIGNATION.

BUT HE HAD THE OPPORTUNITIES IF HE WANTED TO, AND IF HE WANTED TO MAKE SURE THOSE RECORDS GOT IN, HE HAD THOSE CHANCES.

HE ALSO ORIGINALLY LISTED HER AS ONE OF HIS WITNESSES THAT HE WAS GOING TO CALL IN HIS CASE, WE PRESUME, BY DEPOSITION.  HE LATER WITHDREW THAT.

SO HE'S NOT, HE'S NOT, HE'S NOT OFFERED ANY DEPOSITION DESIGNATIONS OF MS. FORD FOR HIS CASE.  THAT'S NOT MADE YOUR HONOR'S LIST.  NO ONE HAS ASKED YOU TO RULE ON THOSE.

SO WE'RE A LONG WAY AWAY FROM WHETHER OR NOT HE'S GOING TO DO THIS BY DEPOSITION.  THAT SHIP SAILED QUITE A LONG TIME AGO.

SO HE'S NOT PREJUDICED BY THIS.  HE MADE A DECISION TO NOT CALL HER IN HIS CASE.  HE MADE A DECISION TO DO WHATEVER HE DID UNDER TWO DEPOSITIONS, AND NOW HERE WE ARE.

THE COURT:  MR. LOKER.

MR. LOKER:  REALLY NOTHING FURTHER, YOUR HONOR.

WE RELIED UPON THE PRODUCTION, WHICH IS A BASIS FOR AUTHENTICATING THE DOCUMENTS.  WE RELIED UPON HER DECLARATION, WHICH IS A SEPARATE BASIS FOR AUTHENTICATING THE DOCUMENTS IN COMPLIANCE WITH THE NINTH CIRCUIT AUTHORITY THAT I MENTIONED, MALIJACK.

SO THAT'S WHY WE MADE THOSE DECISIONS TO NARROW THE TRIAL, NOT PUT UNNECESSARY TESTIMONY IN FRONT OF THE JURY ON AN ISSUE THAT SHOULDN'T BE DISPUTED ABOUT THE AUTHENTICITY OF THOSE RECORDS.

THE COURT:  AND IN TERMS OF A COUPLE OF FOLLOW-UP QUESTIONS, I HAVE A COUPLE OF FOLLOW-UP QUESTIONS FOR MR. NARITA.

IN TERMS OF THE FORD DECLARATION ATTACHED TO THE SUMMARY JUDGMENT MOTION, WHICH CALLS OF THE -- WHICH CALLS WERE ATTACHED?  SO THE ONES WHICH -- IN TERMS OF YOUR EXHIBIT NUMBERS?

MR. LOKER:  SO THE DECLARATION JUST MENTIONED CALL RECORDING SPECIFICALLY.

I DON'T BELIEVE MS. FORD ATTACHED RECORDINGS TO HER DEPOSITION -- I'M SORRY, HER DECLARATION.  WE ATTACH THEM TO

OURS, AND THAT'S HOW THEY GOT BEFORE THE COURT DURING THE SUMMARY JUDGMENT BRIEFING.

BUT IN MULTIPLE PLACES SHE MENTIONED THE CALL RECORDINGS. SHE DOESN'T REFERENCE THE CALL RECORDINGS TO ANY SPECIFIC ONES. SO WHEN IT'S BROAD LIKE THAT, WE INTERPRET IT TO MEAN THAT SHE'S REFERRING TO ALL OF THE CALL RECORDINGS.

THE COURT:  OKAY.  MR. NARITA, FOLLOW-UP QUESTIONS -- WELL, LET ME HEAR FOLLOW-UP QUESTION FOR YOU.

DO YOU ACKNOWLEDGE THAT COMENITY PRODUCED THESE CALL RECORDINGS AS PART OF DISCOVERY?

MR. NARITA:  ALL OF THE CALL RECORDINGS THAT WE HAD WE PRODUCED DURING DISCOVERY, YES.

THE COURT:  OKAY.  SO THAT WAS ONE SET OF OBJECTIONS.

ANYTHING ELSE?

MR. NARITA:  NO, OTHER THAN TO JUST NOTE FOR THE RECORD, YOUR HONOR, THAT WHILE WE'RE NOT WITHDRAWING THE OBJECTIONS THAT WE MADE TO THE EXHIBITS IN THE EXHIBIT LIST, WE FEEL THAT THE COURT HAS ALREADY ADDRESSED THEM THROUGH THE MOTIONS IN LIMINE AND THE RULINGS THAT YOU'VE MADE AND PREPARED THE PRETRIAL CONFERENCES.

SO WE'RE NOT GOING TO BELABOR THE POINT AND REASSERT THE OBJECTIONS.

THE COURT:  OKAY.

MR. NARITA:  THAT'S ALL.

THE COURT:  ALL RIGHT.

THE COURT ALSO THIS WEEKEND SENT OUT -- WELL, LAST QUESTION REGARDING THESE.

YOUR TIMING TODAY, MR. LOKER, IN TERMS OF THE OPENINGS WILL TAKE US THROUGH, AND PRE-INSTRUCTION WILL TAKE US THROUGH PROBABLY CLOSER TO 11:00 AND SUCH SHORTLY AFTER THE BREAK.

WHEN WERE YOU PLANNING TO INTRODUCE THESE CALL RECORDINGS?

MR. LOKER:  THEY WILL BE WITH MR. PANCHENKO PROBABLY ABOUT AN HOUR INTO HIS TESTIMONY.

THE COURT:  AND, IF NECESSARY, COULD YOU RESHUFFLE YOUR TESTIMONY, BECAUSE WE MAY NEED THE LUNCH BREAK?

MR. LOKER:  WE CAN RESHUFFLE.

THE COURT:  OKAY.  JUST BE PREPARED FOR THAT POSSIBILITY.

MR. LOKER:  UNDERSTOOD.

THE COURT:  THE COURT HAD ALSO SENT COUNSEL A REVISED VERSION OF BOTH 34, 36 IN TERMS OF JURY INSTRUCTIONS. THE COURT ALSO INTENDS TO SEND -- WE'RE NOT DISCUSSING THEM RIGHT NOW.

MR. LOKER:  OH, SORRY.

THE COURT:  THE COURT ALSO INTENDS TO SEND A -- ITS OWN VERSION OF THE VERDICT FORMS.  SO JUST SO YOU'RE AWARE, WE'RE GOING BACK-TO-BACK-TO-BACK HERE FOR THIS TRIAL, SO THESE ARE GOING TO COME IN VIA EMAIL AND BE READY TO DISCUSS THEM WHEN WE HAVE TIME AND WE DON'T HAVE THE JURY WAITING FOR US.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  SO WE'LL TAKE A BRIEF RECESS TO ENSURE THAT -- TO TOUCH BASE WITH THE JURY BECAUSE THEY'RE PROBABLY WONDERING WHAT HAPPENED TO US, AND TO MAKE SURE OUR SOUND IS WORKING GENERALLY, AND THEN WE WILL PICK BACK UP, I'M HOPING IN THE NEXT TEN MINUTES.

MR. NARITA:  YOUR HONOR, DID THE COURT INTEND TO BREAK BEFORE LUNCH NOW, OR ARE WE JUST GOING TO PUSH ALL OF THE WAY THROUGH THE LUNCH HOUR?

THE COURT:  IT DEPENDS HOW THE JURORS ARE DOING.  I PROMISED THEM A 15 MINUTE BREAK.  I TRY MY BEST TO KEEP MY PROMISES TO THE JURY.

MR. NARITA:  THANK YOU, YOUR HONOR.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE'RE NOW IN RECESS.

(RECESS FROM 9:21 A.M. UNTIL 9:46 A.M.)

THE COURT:  WE'RE BACK ON THE RECORD IN THE PANCHENKO VERSUS COMENITY CAPITAL BANK.

JUST BRIEFLY, WE'RE ABOUT TO HAVE OUR JURY COME BACK.  THE COURT IS PREPARED TO RULE ON THE OBJECTIONS POSED AS TO EXHIBITS 40 THROUGH 53.  I'M JUST GOING TO ISSUE THE RULING, AND THEN I'M GOING TO INVITE THE JURY IN.

THE COURT OVERRULES COMENITY'S OBJECTIONS TO EXHIBITS 40 THROUGH 53, WHICH ARE A SERIES OF CALL RECORDINGS.  THE

AUTHENTICATION AND FOUNDATION OBJECTIONS ARE OVERRULED BECAUSE COMENITY CONCEDES THAT IT PRODUCED THESE RECORDINGS DURING DISCOVERY AND THAT THE RECORDINGS COULD BE AUTHENTICATED BY A COMENITY WITNESS, SIERRA FORD.

THE HEARSAY OBJECTION IS OVERRULED BECAUSE THE CALLS ARE NOT BEING INTRODUCED FOR THE STATEMENTS MADE IN THE CALLS.

SO I WANT TO GO AHEAD AND MAKE THAT RULING GIVEN THE IMPACT IT WOULD HAVE ON THIS MORNING'S TESTIMONY; AND I DO NOT PROVIDE CASE CITATIONS BECAUSE MR. LOKER -- PLAINTIFF HAD ALREADY STATED THOSE DURING THE PROCESS OF ARGUMENT.

MR. NARITA.

MR. NARITA:  I UNDERSTAND YOUR RULING, YOUR HONOR.

ONE CLARIFYING QUESTION.  IF THE COURT IS INCLINED TO OVERRULE OUR OBJECTION, MAY WE ASK THAT THE RECORDINGS BE PLAYED IN FULL SO THAT THE EVIDENCE IS PRESENTED TO THE JURY IN FULL AND IN ITS CONTEXT?

THE COURT:  COUNSEL, THIS NEEDED TO BE RAISED EARLIER.  YOU CAN DO COUNTERDESIGNATIONS, SO TO SPEAK, DURING YOUR CASE-IN-CHIEF.

THE COURT IS NOT GOING TO ENTERTAIN THAT RIGHT NOW WHEN WE STILL HAVE THE JURY WAITING.

MR. NARITA:  UNDERSTOOD.

MY ONLY POINT, YOUR HONOR, IS THAT THIS IS EVIDENCE THAT MR. LOKER WANTS IN, AND I WOULD JUST ASK THE COURT, IF HE'S GOING TO OFFER CALL RECORDINGS OVER OUR OBJECTION, IF HE WOULD

JUST PLAY THE RECORDINGS IN FULL.  THAT'S ALL.

THE COURT:  COUNSEL, YOU CAN MEET AND CONFER ABOUT THAT DURING THE BREAK.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  SO TO ANSWER MR. NARITA'S OTHER QUESTION, I AM GOING TO TAKE THE BREAK BECAUSE IF NOT BOTH FOR THE PURPOSES OF OUR STAFF AND EVERYTHING ELSE, I MIGHT SHORTEN IT CLOSER TO TEN MINUTES THIS MORNING, BECAUSE WE'RE GOING TO TAKE A BREAK FOR THE COURT REPORTER AND SUCH WHO ARE BUSY AT WORK.

ALL RIGHT.  SO WITH THAT BEING SAID, I THINK WE'RE READY FOR THE JURY.

(JURY IN AT 9:48 A.M.)

THE COURT:  YOU MAY BE SEATED.  GOOD MORNING EVERYBODY.

WE ARE BACK ON RECORD IN THE MATTER OF PANCHENKO VERSUS COMENITY CAPITAL BANK.  WE ARE HERE WITH OUR JURY PRESENT, AS WELL AS THE PARTIES AND THEIR COUNSEL.

I WANT TO SPEND THE INITIAL PART OF THIS MORNING ADDRESSING THE JURY DIRECTLY.  THANK YOU FOR YOUR SERVICE AND FOR BEING HERE.

I HAD MENTIONED THAT WE WOULD TRY TO START ON TIME, AND WE TRY TO KEEP THE WHEELS ON.  UNFORTUNATELY THIS MORNING WE ARE RUNNING A LITTLE BEHIND DUE TO TECHNICAL ISSUES, AND I APPRECIATE YOUR UNDERSTANDING.  BUT COUNSEL AND I HAVE BEEN

HARD AT WORK.

I'M GOING TO JUST BRIEFLY HAVE COUNSEL RESTATE YOUR APPEARANCES THIS MORNING GIVEN THAT IT'S BEEN A FEW DAYS.

MR. LOKER:  YES.  THANK YOU, YOUR HONOR.

AGAIN, MY NAME IS MATTHEW LOKER.  I REPRESENT THE PLAINTIFF HERE, MR. OLEKSANDR PANCHENKO.

FROM MY OFFICE WE HAVE CHARLES CUMMINS, HE'S AN ASSOCIATE ATTORNEY WITH US.  YOU'LL ALSO BE HEARING FROM MATT OSBORNE, HE'S ANOTHER ATTORNEY THAT REPRESENTS MR. PANCHENKO.

THANK YOU.

MR. NARITA:  GOOD MORNING EVERYONE.  WELCOME BACK.

TOMIO NARITA FOR THE DEFENDANT COMENITY CAPITAL BACK BANK.

WITH ME IS MR. GALEANO WHO IS THE CORPORATE REPRESENTATIVE; AND YOU SAW FROM MY TEAM EARLIER, MS. GIVENTAL, AND MR. SEARLES, AND MS. KRISTINA HOVSEPYAN.

THE COURT:  ALL RIGHT.  A COUPLE OF THINGS WHICH I'M REMINDING YOU ABOUT AN INSTRUCTION THAT I HAVE TO GIVE.

AS I STATED LAST WEEK, AND WILL CONTINUE TO EMPHASIZE WITH EACH DAY, IT IS IMPORTANT THAT YOU DECIDE THIS CASE BASED SOLELY ON THE EVIDENCE AND THE LAW PRESENTED HERE.

SO YOU MUST NOT LEARN ANY ADDITIONAL INFORMATION ABOUT THE CASE FROM SOURCES OUTSIDE OF THE COURTROOM TO ENSURE FAIRNESS TO ALL PARTIES IN THIS COURTROOM, AND I WILL ASK THAT EACH OF YOU LET US KNOW IF YOU HAVE LEARNED ANYTHING ACCIDENTALLY OUTSIDE OF THE COURTROOM OVER THE COURSE OF THE LAST FEW DAYS.

IF YOU DO OR IF YOU SOMEHOW HAD, PLEASE RAISE YOUR HAND NOW.

SEEING NO HANDS RAISED, IF SOMETHING WERE TO COME UP, DEFINITELY INFORM OUR COURT STAFF AS SOON AS POSSIBLE.

THANK YOU FOR YOUR ADHERENCE TO MY INSTRUCTION.

ALL RIGHT.  SO THIS MORNING I'LL BEGIN WITH THERE ARE SEVEN OF YOU.  THERE ARE MANY, MANY MORE CHAIRS THAN THAT.  IF FOR SOME REASON YOU'RE UNCOMFORTABLE OR YOU NEED TO SHIFT AROUND OR YOU NEED A BETTER VIEW OF THE SCREEN, FEEL FREE.

AS I SAID TO YOU LAST WEEK AS WELL, IF YOU NEED TO STRETCH OR STAND UP, ALSO FEEL FREE.

WE WILL TAKE A BREAK THIS MORNING, A SHORTER BREAK PERHAPS GIVEN THAT I KNOW YOU ALL HAVE BEEN WAITING, AND THEN THERE WILL ALSO BE THE LUNCH BREAK AND THE AFTERNOON BREAK.

SO LET ME BEGIN BY TELLING YOU A LITTLE BIT ABOUT WHAT WE'RE GOING TO DO THIS MORNING.  I'M GOING TO DO WHAT IS CALLED PRE-INSTRUCTING YOU, WHICH IS TO GIVE YOU INFORMATION ABOUT THE PROCESS, ABOUT WHAT WE'RE GOING TO BE DOING, AND AN OVERVIEW OF THE TRIAL PROCESS.

AFTER I FINISH THESE OPENING INSTRUCTIONS, WE'RE GOING TO RECEIVE OPENING STATEMENTS FROM THE PARTIES.

AND AFTER THAT, YOU'LL RECEIVE -- WE'LL BEGIN THE TRIAL IN EARNEST IN TERMS OF EVIDENCE.

SO THAT'S OUR PLAN THIS MORNING GOING INTO THIS INFORMATION.

AND LET ME BEGIN WITH THE PRE-INSTRUCTION, AND I'M SORRY BECAUSE AS WILL HAPPEN ACROSS THE COURSE OF THIS TRIAL, I'M GOING TO BE LIKE THIS BECAUSE THESE ARE MANDATORY INSTRUCTIONS WHICH I HAVE TO GIVE.

SO MEMBERS OF THE JURY:  YOU ARE NOW THE JURY IN THIS CASE.  IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.  IT IS YOUR DUTY TO FIND THE FACTS FROM ALL OF THE EVIDENCE IN THE CASE. TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO YOU.

YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY. THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

AT THE END OF THE TRIAL, I WILL GIVE YOU FINAL INSTRUCTIONS.  IT IS THE FINAL INSTRUCTIONS THAT WILL GOVERN YOUR DUTIES.

PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING THAT I MAY SAY OR DO THAT I HAVE AN OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

TO HELP YOU FOLLOW THE EVIDENCE, I WILL GIVE YOU A BRIEF SUMMARY OF THE POSITIONS OF THE PARTIES.

PANCHENKO ASSERTS THAT COMENITY VIOLATED THE FAIR CREDIT REGARDING ACT WHEN IT INVESTIGATED DISPUTES THAT HE SUBMITTED ABOUT INFORMATION THAT COMENITY FURNISHED TO THE CONSUMER REPORTING AGENCIES.

THE PLAINTIFF HAS THE BURDEN OF PROVING THESE CLAIMS.

COMENITY DENIES THOSE CLAIMS.

WHEN THE PARTY HAS A BURDEN OF PROVING ANY CLAIM OR AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, IT MEANS THAT YOU MUST BE PERSUADED BY THE EVIDENCE THAT THE CLAIM OR DEFENSE IS MORE PROBABLY TRUE THAN NOT TRUE.

YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE REGARDLESS OF WHICH PARTY PRESENTS IT.

LET'S TALK A LITTLE BIT ABOUT WHAT IS EVIDENCE.  THE EVIDENCE THAT YOU ARE TO CONSIDER IN DECIDING WHAT THE FACTS ARE CONSISTS OF THE SWORN TESTIMONY OF ANY WITNESS; THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE; ANY FACTS TO WHICH THE LAWYERS HAVE AGREED; AND ANY FACTS THAT I MAY INSTRUCT YOU TO ACCEPT AS PROVIDED.

SO WE'LL TALK A LITTLE BIT ABOUT WHAT IS NOT EVIDENCE.

IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE TESTIMONY AND EXHIBITS INTO -- RECEIVED INTO EVIDENCE.  CERTAIN THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE. THE LAWYERS ARE NOT WITNESSES.  WHAT THEY MAY SAY IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.  IF THE FACTS AS YOU HEAR THEM DIFFER FROM THE WAY THE LAWYERS STATED THEM, YOUR MEMORY OF THEM CONTROLS.

2.   QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE. ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE. YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S RULING ON IT.

3.   TESTIMONY THAT IS EXCLUDED OR STRICKEN OR THAT YOU ARE INSTRUCTED TO DISREGARD IS NOT EVIDENCE AND MUST NOT BE CONSIDERED.  IN ADDITION, SOME EVIDENCE MAY BE RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I INSTRUCT YOU TO CONSIDER CERTAIN EVIDENCE ONLY FOR A LIMITED PURPOSES, YOU MUST DO SO AND YOU MAY NOT CONSIDER THAT EVIDENCE FOR ANY OTHER PURPOSE.

ANYTHING THAT YOU MAY SEE OR HEAR WHEN THE COURT IS IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

NOW, SOME EVIDENCE MAY BE ADMITTED ONLY FOR A LIMITED PURPOSE.  WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN ADMITTED ONLY FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THE LIMITED PURPOSE AND NOT FOR ANY OTHER PURPOSE.

I'M GOING TO TALK A LITTLE BIT ABOUT DIRECT AND CIRCUMSTANTIAL EVIDENCE.  EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW, HEARD, OR DID.

CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.

IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE THAT THE SIDEWALK IS WET, LIKE YOU MIGHT THIS WEDNESDAY, YOU MAY FIND FROM THAT FACT THAT IT RAINED DURING THE NIGHT.

HOWEVER, OTHER EVIDENCE SUCH AS A TURNED ON GARDEN HOSE MAY PROVIDE A DIFFERENT EXPLANATION FOR THE PRESENCE OF WATER ON THE SIDEWALK.  THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE EVIDENCE IN LIGHT OF THE REASON, EXPERIENCE, AND COMMON SENSE.

DISCUSSING RULING ON OBJECTIONS.  THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR OFFERS AN EXHIBIT INTO EVIDENCE AND THE LAWYER ON THE OTHER SIDE THINKS THAT'S NOT PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE ANSWERED AND THE EXHIBIT CANNOT BE RECEIVED.

WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT HAVE BEEN.

SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

RECORD AND THAT YOU DISREGARD OR IGNORE THAT EVIDENCE.  THAT MEANS WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT CONSIDER THE STRICKEN EVIDENCE FOR ANY PURPOSE.

CREDIBILITY OF WITNESSES.  IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE OF IT.  IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE INTO ACCOUNT:

1.  THE OPPORTUNITY AND THE ABILITY OF THE WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

2.  THE WITNESS'S MEMORY;

3.  THE WITNESS'S MANNER WHILE TESTIFYING;

4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

6.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY;

7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE; AND,

8.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT CONSISTENT WITH SOMETHING HE OR SHE SAID.  SOMETIMES DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT HAPPENED.

PEOPLE OFTEN FORGET THINGS AND MAKE MISTAKES IN WHAT THEY

REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT OR REMEMBER IT DIFFERENTLY.

YOU MAY CONSIDER THESE DIFFERENCES BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER TESTIMONY.

HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY CHOOSE NOT TO BELIEVE ANYTHING THAT THE WITNESS SAID.

ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY ACCEPT THE PART THAT YOU THINK IS TRUE AND IGNORE THE REST.

THE WEIGHT OF EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

ALL PARTIES ARE EQUAL BEFORE THE LAW AND THE BANK IS ENTITLED TO THE SAME FAIR AND CONSCIENTIOUS DECISION BY YOU AS ANY PARTY.

UNDER THE LAW THE BANK IS CONSIDERED TO BE A PERSON.  IT CAN ONLY ACT THROUGH ITS EMPLOYEES, AGENTS, DIRECTORS OR OFFICERS.  THEREFORE, A NATIONAL BANKING ASSOCIATION IS RESPONSIBLE FOR THE ACTS OF ITS EMPLOYEES, AGENTS, DIRECTORS AND OFFICERS PERFORMED WITHIN THE SCOPE OF AUTHORITY.

NOW I'M GOING TO SAY A FEW WORDS ABOUT YOUR CONDUCT AS

JURORS, AND I'VE BEEN EMPHASIZING THESE THROUGHOUT, SO I'M JUST GOING TO GIVE A VERY SHORT SUMMARY.  JUST REMINDERS FROM THURSDAY.

REMEMBER TO KEEP AN OPEN MIND;

REMEMBER TO DECIDE THIS CASE BASED ONLY THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO THE LAW THAT APPLIES.

IT'S IMPORTANT, AS I'VE EMPHASIZED THROUGHOUT, THAT YOU DO NOT GET EXPOSED TO ANY OTHER INFORMATION.  SO DO NOT COMMUNICATE WITH ANYONE IN ANY WAY OR LET ANYONE ELSE COMMUNICATE WITH YOU REGARDING THE MERITS OF THIS CASE.

DO NOT READ, WATCH, OR LISTEN TO NEWS OR SOCIAL MEDIA OR ANYTHING ELSE WHICH MIGHT DISCUSS THIS CASE OR ISSUES ABOUT THIS CASE.

I'LL JUST EMPHASIZE, AS YOU KNOW, THESE RULES ARE MEANT TO PROTECT THE PARTY'S RIGHTS AND TO ENSURE THE SANCTITY OF THE PROCESS.

TURNING TO PUBLICITY.  IF THERE IS ANY NEWS MEDIA ACCOUNTS OR COMMENTARY BEFORE ABOUT THE CASE OR ANYTHING TO DO WITH IT, YOU MUST IGNORE IT.  YOU MUST NOT READ, WATCH, OR LISTEN TO ANY NEWS MEDIA ACCOUNTS OR ANYTHING TO DO WITH IT.  THE CASE MUST BE DECIDED BY YOU SOLELY AND EXCLUSIVELY BY THE EVIDENCE THAT WILL BE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS TO THE LAW THAT APPLIES.

IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

NOTIFY ME IMMEDIATELY.

SO EVEN THOUGH WE HAVE MADAM COURT REPORTER HERE, I'LL JUST NOTE THAT I URGE YOU TO PAY CLOSE ATTENTION TO THE TRIAL ATTENTION AS IT IS GIVEN.  DURING DELIBERATIONS, YOU'RE NOT GOING TO HAVE A TRANSCRIPT OF THE TRIAL TESTIMONY ITSELF.

YOU'VE BEEN GIVEN NOTEBOOKS.  IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE EVIDENCE.  IF YOU DO TAKE NOTES -- IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF UNTIL YOU GO TO THE JURY ROOM FOR DELIBERATIONS, IN OTHER WORDS, TO DECIDE THE CASE.

DO NOT LET NOTE-TAKING DISTRACT YOU.

WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE COURTROOM.

NO ONE WILL READ YOUR NOTES.

WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF THE EVIDENCE.

NOTES ARE ONLY TO ASSIST YOUR MEMORY.

YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF OTHER JURORS.

ONLY THE LAWYERS AND I ARE ALLOWED TO ASK QUESTIONS OF THE WITNESSES.  A JUROR IS NOT PERMITTED TO ASK QUESTIONS OF THE WITNESSES.  IF, HOWEVER, YOU'RE UNABLE TO HEAR A WITNESS OR A LAWYER, PLEASE RAISE YOUR HAND, AND I WILL CORRECT THE SITUATION.  THAT ALSO MEANS IF YOU CAN'T HEAR ME.  WE'VE HAD ENOUGH TECHNICAL GREMLINS THIS MORNING THAT PLEASE, PLEASE, DO

LET US KNOW.

FROM TIME TO TIME DURING THE TRIAL, IT MAY BE NECESSARY FOR ME TO TALK WITH THE LAWYERS OUTSIDE OF THE HEARING OF THE JURY, OF YOU, SO EITHER BY HAVING A CONFERENCE AT THE BENCH WHEN THE JURY IS PRESENT IN THE COURTROOM OR BY CALLING A RECESS.

PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE WORKING.  THE PURPOSES OF THESE CONFERENCES IS NOT TO KEEP RELEVANT INFORMATION FROM YOU, BUT IT'S TO DECIDE HOW CERTAIN EVIDENCE IS TO BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID CONFUSION AND ERROR.

OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND LENGTH OF THESE CONFERENCES TO A MINIMUM.  I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING A REQUEST FOR A CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR OF WHAT YOUR VERDICT SHOULD BE.

AND THE FINAL INSTRUCTION FOR RIGHT NOW.

LET ME OUTLINE THE PROCESS FOR THE TRIAL.

SO TRIAL PROCEEDS IN THE FOLLOWING WAY:

FIRST, EACH SIDE MAY MAKE AN OPENING STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT THE PARTY EXPECTS THE EVIDENCE WILL SHOW.

A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

THE PLAINTIFF WILL THEN PRESENT EVIDENCE, AND COUNSEL FOR THE DEFENDANT MAY CROSS-EXAMINE.

THEN THE DEFENDANT MAY PRESENT EVIDENCE, AND COUNSEL FOR THE PLAINTIFF MAY CROSS-EXAMINE.

AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL INSTRUCT YOU ON THE LAW THAT APPLIES TO THE CASE, AND THE ATTORNEYS WILL MAKE CLOSING ARGUMENTS.

AFTER THAT, YOU WILL GO TO THE JURY ROOM TO DELIBERATE ON YOUR VERDICT.

SO I WILL LOOK UP NOW AGAIN.  THANK YOU FOR LISTENING SO INTENTLY.

SO NOW WE WILL TURN TO OPENING STATEMENTS BY THE PARTIES.

WE WILL BEGIN WITH THE PLAINTIFF.

MR. OSBORNE:  THANK YOU, YOUR HONOR.

**(COUNSEL FOR PLAINTIFF, MR. OSBORNE, GAVE HIS OPENING STATEMENT.)**

MR. OSBORNE:  GOOD MORNING, EVERYONE.  COMENITY BANK IS A NATIONWIDE CREDIT CARD COMPANY.  THEY ISSUE PRIMARILY STORE CARDS, SO LIKE IKEA, ROSS, VICTORIA SECRET, I THINK, AND SEVERAL, SEVERAL MORE.

NOW, IDENTITY THEFT, YOU'LL SEE, IS A MAJOR PROBLEM IN THIS COUNTRY.  AND WE HOPE THAT BANKS WILL LISTEN WHEN WE TELL THE TRUTH.  WE HOPE THAT WHEN WE PROVIDE PROOF, THAT SOMEONE WILL LOOK AT IT.  AND WE HOPE THAT WHEN WE SAY THIS WASN'T ME, SOMEONE WILL TAKE THE TIME TO FIND OUT IF YOU'RE RIGHT.

OLEKSANDR PANCHENKO, HE GREW UP IN THE UKRAINE.  IN 2009 HE CAME TO AMERICA FOR A SUMMER WHEN HE WAS 20 YEARS OLD FOR A YOUTH PROGRAM, AND HE WORKED AS A HOUSEKEEPER.  AND THEY ISSUED HIM A SOCIAL SECURITY NUMBER SO HE COULD PAY TAXES THAT SUMMER.

AND HE WENT BACK TO THE UKRAINE THAT SUMMER WHERE HIS -- BECAUSE THAT'S WHERE HIS FAMILY WAS, THAT'S WHERE HIS HOME WAS, THAT'S WHERE HE LIVED.

HE ALSO CAME BACK AGAIN IN 2010 TO WORK AGAIN AT THE YOUTH PROGRAM, AND THEN HE WENT BACK TO THE UKRAINE.

AS WE ALL KNOW, IN AROUND FEBRUARY OF 2022 THE WAR IN THE UKRAINE BROKE OUT.  AND HE WAS ABLE TO LEAVE THE UKRAINE AND GO TO POLAND FOR A BIT.

AND ON APRIL 26TH, 2023, ALEX AND HIS WIFE CAME TO AMERICA.  AND THEY BELIEVED THAT IF YOU COME TO AMERICA AND YOU WORK HARD AND YOU FOLLOW THE RULES, YOU'LL HAVE A CHANCE.

AFTER HE GETS TO AMERICA, HE LEARNS QUICKLY HOW IMPORTANT CREDIT IS.  YOU NEED CREDIT FOR EVERYTHING, FROM GETTING AN APARTMENT, TO A BANK ACCOUNT, FOR EVERYTHING.

SO HE PULLS HIS CREDIT REPORT USING THAT 2009 SOCIAL THAT HE GOT.  MUCH TO HIS SURPRISE, HE SEES ALL THESE CREDIT CARDS ON HIS CREDIT FILE, AND HE'S SUPER CONFUSED BECAUSE HE NEVER OPENED A CREDIT CARD ANYWHERE.  AND SO HE'S LIKE, WHAT IS THIS? AND HE STARTS RESEARCHING IT.  HE STARTS LEARNING ABOUT IDENTITY THEFT.

THEY DON'T REALLY HAVE IDENTITY THEFT IN THE UKRAINE.  SO

HE'S NOT SUPER FAMILIAR WITH IT.

THE OTHER THING THAT WAS INTERESTING WAS THAT THE IDENTITY THEFT DIDN'T HAPPEN RECENTLY.  SO IT WAS YEARS AGO, ALL OF THE WAY BACK IN DECEMBER OF 2015 WHILE ALEX WAS LIVING IN THE UKRAINE, SOMEBODY IN LOS ANGELES USED HIS NAME, HIS SOCIAL, AND HIS DATE OF BIRTH TO OPEN UP A VIRGIN AMERICAN CREDIT CARD WITH COMENITY BANK.

AND FOR OVER TWO YEARS THAT PERSON USED THE CARD.  THEY MADE PURCHASES.  MOST OF THE PURCHASES WERE IN LOS ANGELES AND THE SURROUNDING AREAS AT RESTAURANTS AND STORES AND STUFF.

AND THEY LIVED A WHOLE FINANCIAL LIFE PRETENDING TO BE ALEX.

ONE OF THE THINGS THAT YOU'LL FIND IS THAT IN 2015, ALEX WOULD HAVE HAD WHAT IS CALLED A THIN FILE, MEANING HE WOULDN'T HAVE ANY CREDIT, AND HENCE NO CREDIT SCORE.  SO THE REASON THAT THESE FRAUDSTERS WERE MAKING PAYMENTS, WAS THEY NEEDED TO BOOST HIS CREDIT SCORE UP SO THAT THEY COULD EVENTUALLY OPEN UP EVEN MORE CARDS.

NOW, WHEN HE DISCOVERED THE FRAUD, HE SAW THAT COMENITY WAS REPORTING TO EVERYBODY THAT HE WAS A CHARGE OFF, AND A CHARGE OFF IS A VERY DEROGATORY ITEM ON YOUR CREDIT REPORT. OTHER THAN A BANKRUPTCY, IT MAY BE THE SECOND MOST DEROGATORY THING.  AND BASICALLY WHAT IT MEANS IS THAT YOU HAVE NOT MADE ANY PAYMENTS IN 180 DAYS OR MORE, AND THE BANK HAS CHARGED IT OFF, DECLARED IT UNCOLLECTIBLE, AND WRITTEN IT OFF ON ITS

TAXES.

BUT ALEX TOLD THE TRUTH, AND IT TURNED OUT TO BE A TRUTH THAT NOBODY WANTED TO HEAR.  HE DIDN'T RUN.  HE DIDN'T HIDE. HE WENT TO THE MOUNTAIN VIEW POLICE DEPARTMENT, AND HE FILED A POLICE REPORT.  HE EXPLAINED EVERYTHING, THAT HE WAS AN IDENTITY THEFT VICTIM.

HE WENT TO THE FEDERAL TRADE COMMISSION, WHICH IS A FEDERAL AGENCY WHERE YOU COULD FILE AN IDENTITY THEFT REPORT, AND HE SUBMITTED THAT UNDER PENALTY OF PERJURY.

HE GATHERED HIS PASSPORTS, HIS TRAVEL HISTORY, HIS UKRAINIAN BANK STATEMENTS, AND THESE WERE DOCUMENTS THAT WERE PROVING WHILE THIS CARD WAS BEING USED IN LOS ANGELES IN 2015, 2016, AND 2017, ALEX WAS THOUSANDS OF MILES AWAY IN THE UKRAINE.  AND HE CALLED COMENITY, AND HE EXPLAINED IT.  AND HE SENT ALL OF THIS STUFF TO THE CREDIT BUREAUS, EQUIFAX, EXPERIAN, AND HE ALSO SENT IT TO COMENITY.

YOU'LL SEE THAT NINE TIMES BETWEEN MAY AND AUGUST OF 2023, COMENITY WAS NOTIFIED BY THE CREDIT BUREAUS THAT ALEX WAS DISPUTING, AND THEY SENT COMENITY THESE FORMS CALLED ACDV FORMS, AND THAT MEANS AUTOMATED CONSUMER DISPUTE VERIFICATION.

ESSENTIALLY THESE ARE FORMS THAT THE CREDIT BUREAUS SEND TO BANKS WHEN SOMEONE DISPUTES AND THEY SAY, HEY, JOE THE CONSUMER IS DISPUTING, THIS IS HOW THE FILE LOOKS LIKE, PLEASE INVESTIGATE, AND PLEASE TELL US IF YOU'RE REPORTING THIS CORRECT.

AND EIGHT OF THE NINE HAD A CODE CALLED 103. AND 103 MEANS IDENTITY THEFT. AND IT'S LIKE THE INDUSTRY'S PLAY OF WAVING A BIG RED FLAG SAYING THIS PERSON SAYS IDENTITY THEFT, YOU HAVE TO INVESTIGATE THIS.

AND WHAT YOU'LL LEARN IS THAT COMENITY HAD EVERYTHING THAT THEY NEEDED TO DETERMINE WHETHER THIS WAS IDENTITY THEFT. THEY HAD THE POLICE REPORT; THEY HAD THE FTC I.D. THEFT REPORT; THEY HAD THE TRAVEL HISTORY SHOWING THAT ALEX WAS IN THE UKRAINE AND COULDN'T HAVE MADE THESE CHARGES; THEY HAD THEIR OWN CREDIT CARD STATEMENTS SHOWING THE DATES AND TIMES AND EVERYTHING OF THESE CHARGES; THEY HAD THE CREDIT APPLICATION, WHICH HAD THE WRONG EMAIL, THE WRONG ADDRESS, THE WRONG PHONE NUMBER, THE WRONG INCOME. THEY ALSO HAD VOICE RECORDINGS.

YOU SEE, WHEN SOMEBODY CALLS COMENITY, THEY RECORD IT. THEY KEEP THEM IN THEIR BUSINESS RECORDS AND THEIR INVESTIGATORS HAVE ACCESS TO THESE RECORDINGS.

IN 2017 AND 2018, THE PERSON THAT STOLE ALEX'S I.D. CALLED COMENITY MULTIPLE TIMES TO MAKE PAYMENTS, TO ASK ABOUT THE ACCOUNT, NORMAL CREDIT CARD STUFF.

IN 2023 WHEN ALEX WAS DESPERATELY TRYING TO PROVE THIS WASN'T HIM, HE CALLED COMENITY MULTIPLE TIMES AS WELL TRYING TO EXPLAIN, TRYING TO GET SOMEONE TO LISTEN.

AND THEY RECORDED THOSE, TOO.

YOU'LL SEE THAT THERE ARE TWO DIFFERENT VOICES, TWO DIFFERENT ACCENTS, AND DIFFERENT WAYS OF PRONOUNCING THE NAME.

AND IT PROBABLY WOULD HAVE TAKEN 20 TO 30 MINUTES TO LISTEN TO THOSE RECORDINGS.

SO WHAT DID COMENITY DO TO INVESTIGATE?  WELL, THEY MATCHED THE SOCIAL AND THE DATE OF BIRTH.  THEY MADE SURE THAT WHAT THE FRAUDSTER PUT ON THE APPLICATION MATCHED WITH THEIR COMPUTER SYSTEM SHOWED, AND THEN THEY ALSO SAID THAT BECAUSE SOMEBODY MADE PAYMENTS, THAT MEANT IT WASN'T FRAUD.

AND I SUSPECT THAT'S WHAT THEIR EXPERT WILL TELL YOU, BUT I THINK WHAT YOU'LL SEE IS THAT IDENTITY THIEVES DO MAKE PAYMENTS SOMETIMES, AND THERE ARE SOMETIMES REASONS FOR MAKING PAYMENTS, SUCH AS BOOSTING PEOPLE'S CREDIT SCORES, ALSO MAKING PAYMENTS ON TIME SO THAT YOU CAN GET BIGGER CREDIT LIMITS DOWN THE ROAD.  SO THERE ARE REASONS AND TIMES WHEN THEY DO MAKE PAYMENTS.

BUT YOU'LL SEE THAT COMENITY NEVER LISTENED TO THE RECORDINGS.  NOT A SINGLE COMENITY AGENT WHO REVIEWED THE NINE DISPUTES TOOK THE TIME TO PULL THOSE RECORDINGS AND LISTEN, NOT ONE.

THEIR OWN WITNESSES WILL SAY THAT THEY'RE SUPPOSED TO USE THE RECORDINGS TO AID IN THEIR INVESTIGATION, BUT THEY DIDN'T DO IT.

EVEN THOUGH THE RECORDINGS WERE RIGHT THERE, EVEN THOUGH IT WOULD TAKE LESS TIME THAN MOST OF US TAKE ON OUR LUNCH BREAK, THEY DIDN'T DO IT.

AND EVEN THOUGH SEVERAL OF THOSE ACDV FORMS WERE SCREAMING

IDENTITY THEFT ON THEM, THEY NEVER LISTENED.

WELL, WHAT ABOUT ALL OF THOSE DOCUMENTS THAT HE SENT, THE POLICE REPORT, THE FTC AFFIDAVIT, THE TRAVEL HISTORY?  THEY NEVER READ THEM.

THEIR AGENT HAS ADMITTED THAT AT THAT TIME THEY WERE NOT EVEN READING THE DOCUMENTS THAT THEY GOT IN CONNECTION WITH PEOPLE'S DISPUTES.

NOW, I DO HAVE TO TELL YOU ONE THING.  UNFORTUNATELY, WE'RE UNABLE TO MAKE THOSE INDIVIDUALS WHO WORKED ON THE INVESTIGATIONS APPEAR LIVE IN THE COURTROOM, AND THAT'S BECAUSE WE CAN ONLY HAVE PEOPLE COME IN IF THEY'RE WITHIN 100 MILES OF THE COURT HOUSE.  AND ALL OF THE AGENTS ARE LOCATED IN INDIA, AND SO OBVIOUSLY WE CAN'T FORCE THEM TO FLY HERE.  SO WE DO HAVE TO PLAY YOU THOSE VIDEOS, AND, YOU KNOW, ADMITTED, THEY'RE NOT AS EXCITING AS LIVE TESTIMONY, BUT IT'S THE BEST THAT WE CAN DO UNDER THE CIRCUMSTANCES.

BUT YOU'LL SEE THAT NINE TIMES THEY RESPONDED TO THE CREDIT BUREAUS THAT THE INFORMATION WAS ACCURATE AND THAT ALEX WAS NOT A VICTIM OF FRAUD.  IN OTHER WORDS, BASICALLY SAYING THAT HE WAS MAKING IT UP.

AND THEY WERE SAYING THAT ALEX WAS THE ONE WHO MADE ALL OF THESE PURCHASES, AND THAT HE OPENED THIS ACCOUNT, AND THAT HE DIDN'T PAY THE FIVE GRAND, AND THAT HAPPENED FOR MORE THAN 180 DAYS, AND THEY HAD TO CHARGE IT OFF.  NINE TIMES THEY SAID THAT.  EVEN WHEN THEIR OWN POLICIES AND PROCEDURES REQUIRED

THEM TO REVIEW ALL OF THIS EVIDENCE, THEY DIDN'T DO IT.

NOW, AS YOU KNOW, THERE'S A STATUTE CALLED THE FCRA, AND IT'S PASSED TO PROTECT PEOPLE LIKE ALEX.  AND EVERYBODY AGREES THAT ESSENTIALLY WHEN COMENITY GETS NOTICE FROM A CREDIT BUREAU THAT A PERSON IS DISPUTING, THEY'RE SUPPOSED TO DO A REASONABLE INVESTIGATION.  SO IT'S NOT A RUBBER STAMP.  IT'S NOT A SUPERFICIAL OR FAKE INVESTIGATION.  IT'S NOT SPENDING TWO MINUTES CHECKING BOXES.  IT'S A REASONABLE INVESTIGATION.

AND YOU ALL AS THE JURY HAVE TO DECIDE WHAT THAT MEANS AND WAS IT REASONABLE TO NOT READ THE DOCUMENTS AND TO NOT LISTEN TO THE RECORDINGS?  THAT'S UP TO YOU ALL.

WAS IT REASONABLE TO SPEND, YOU KNOW, JUST A FEW MINUTES MATCHING DATA THAT DIDN'T REALLY DETERMINE WHETHER IT WAS FRAUD?

SO WHAT WAS THE HARM DONE?  SO ALEX HAD JUST LEFT THE UKRAINE AND CAME TO THE U.S. WITH THE HOPE THAT HE COULD BUILD A NEW LIFE.

HIS CREDIT WAS DESTROYED BY FRAUD HE HAD NOTHING TO DO WITH, AND HE HAD PANIC ATTACKS, ANXIETY, HE COULDN'T SLEEP, THERE WERE TIMES HE WAS SO STRESSED HIS WIFE HAD TO REMIND HIM TO EAT.  HE SPENT HOURS TRYING TO FIX THIS, CALLING COMENITY, GATHERING DOCUMENTS, MAKING DISPUTES, AND EVERY TIME COMENITY SAID, NO, WE DON'T BELIEVE YOU, THE CHARGE OFF STANDS.

NOW, ONE THING I DO NEED TO TELL YOU, BECAUSE I EXPECT COMENITY WILL BRING THIS UP, IS THAT COMENITY WAS NOT THE ONLY

BANK THAT DID THIS.  SO THERE WERE MULTIPLE ACCOUNTS ON THIS FILE.  AND YOU WILL SEE THAT HE DISPUTED WITH ALL OF THEM.  AND YOU'LL SEE SOME OF THE BANKS BELIEVED THEM AND OTHERS DID WHAT KIND OF COMENITY DID.

SO IT'S UNFORTUNATE BUT THE REALITY OF THE SITUATION IS THAT WHEN THIS HAPPENS, YOU BASICALLY HAVE TO SUE EVERYBODY TO GET IF OFF YOUR FILE OR YOU'LL JUST GO CIRCLES WITH THESE PEOPLE.

AND SO THAT'S WHAT HE DID.  HE SUED EQUIFAX, TRANS UNION, CHASE, BANK OF AMERICA.

BUT COMENITY IS THE ONLY ONE WHO SAID, NOPE, FIGHT HIM. LET'S MAKE HIM PROVE IT.

AND THEY'RE GOING TO TELL YOU THAT THEIR INVESTIGATION WAS SO GOOD, THAT IT ACTUALLY EXCEEDED THE INDUSTRY STANDARD, SO YOU'LL HAVE TO DECIDE IF THAT'S CORRECT.

THEY'RE ALSO GOING TO SAY, HEY, YOU CAN'T PROVE THAT IT WAS OUR REPORTING THAT HURT YOU.  AND, YOU KNOW, IT'S KIND OF LIKE IF YOU ARE WALKING DOWNTOWN, AND YOU GET JUMPED BY EIGHT PEOPLE, AND EVERYBODY PUNCHES YOU, AND THE ONE PERSON SAYS PROVE THAT IT WAS MY PUNCH THAT HURT YOU.

THE TRUTH IS THAT EACH FALSE REPORT AND EACH BANK THAT REFUSED TO INVESTIGATE MADE ALEX'S LIFE HARDER.  THE HARM WASN'T DIVIDED BY EIGHT; IT WAS MULTIPLIED BY EIGHT.

YEAH, I THINK YOU'LL SEE THAT THIS IS HOW THE INDUSTRY WORKS AND COMENITY'S EXPERT WILL TELL YOU ALL OF THE BANKS DO

IT THIS WAY.  ALL OF THE BANKS DON'T READ THE POLICE REPORTS. ALL OF THE BANKS DON'T LISTEN TO RECORDINGS.  ALL OF THE BANKS JUST KIND OF RUBBER STAMP IT.

I'M NOT SURE IF THAT'S DEFINITELY TRUE.  I MEAN, IT WAS CERTAINLY TRUE WITH SOME OF THE BANKS, BUT, YOU KNOW, I GUESS WHAT YOU'LL HAVE TO DECIDE, BECAUSE IF EVERYBODY IN AN INDUSTRY DOES SOMETHING, DOES THAT MAKE IT REASONABLE?  YOU KNOW, THERE WAS A TIME WHEN ALL OF THE TOBACCO COMPANIES SAID THAT CIGARETTES WERE SAFE, AND THAT WAS THE INDUSTRY STANDARD.  THAT DOESN'T MEAN IT'S TRUE.

JUST BECAUSE EVERYBODY DOES IT DOESN'T MAKE IT RIGHT.

NOW, THIS CASE IS NOT COMPLICATED.  COMENITY IS GOING TO SAY, LADIES AND GENTLEMEN, WE FOLLOWED OUR PROCEDURES TO A TEE. THEY'RE GOING TO SHOW YOU PROCEDURES.  THEY'LL SHOW YOU COMPUTER SCREENS AND FLOW CHARTS AND TELL YOU ABOUT ALL OF THE DATA THAT THEY REVIEWED.

BUT REMEMBER, IN SPITE OF ALL OF THAT, THEY KNEW SOMEBODY WAS CLAIMING IDENTITY THEFT, THEY NEVER READ OR LISTENED TO ANYTHING.

THE FCRA DOESN'T REQUIRE PERFECTION.  THAT WE ALL AGREE. IT REQUIRES REASONABLENESS.  IT REQUIRES INVESTIGATING.  IT REQUIRES CARING WHEN SOMEONE TELLS YOU THE TRUTH.

AND AFTER YOU'VE HEARD ALL OF THE EVIDENCE, I'M PROBABLY GOING TO STAND UP HERE AGAIN AND ASK YOU TO DO SOMETHING.  I'M GOING TO ASK THAT YOU HOLD COMENITY ACCOUNTABLE BECAUSE THEY

CHOSE NINE TIMES NOT TO INVESTIGATE, NOT TO LISTEN, AND NOT TO READ.

AND I'M GOING TO ASK YOU TO FIND THAT COMENITY HAS TO LISTEN WHEN SOMEBODY TELLS THE TRUTH AND THEY HAVE TO INVESTIGATE WHEN SOMEONE PROVIDES PROOF.

ALEX CAME TO AMERICA WITH NOTHING BUT HOPE.  HE TOLD THE TRUTH.

AND COMENITY DIDN'T CARE.

AT THE END OF THIS CASE, I'M GOING TO ASK YOU TO SHOW ALEX THAT THE AMERICAN JUSTICE SYSTEM DOES CARE.

THANK YOU.

THE COURT:  THANK YOU, COUNSEL.

MR. NARITA.

MR. NARITA:  THANK YOU, YOUR HONOR.

**(COUNSEL FOR DEFENDANT, MR. NARITA, GAVE HIS OPENING STATEMENT.)**

MR. NARITA:  GOOD MORNING EVERYBODY.  WELCOME BACK.

THANK YOU FOR BEING HERE.  AGAIN, MY NAME IS TOMIO NARITA. I'M THE ATTORNEY FOR THE DEFENDANT IN THIS CASE, COMENITY CAPITAL BANK.

AND MY JOB TODAY, LIKE MR. OSBORNE'S JOB, IS TO GO OVER WHAT I THINK THE EVIDENCE IS GOING TO SHOW YOU THAT YOU'RE GOING TO SEE OVER THE NEXT COUPLE OF DAYS AND HOPEFULLY GIVE YOU A LITTLE BIT OF FRAMEWORK TO TAKE IT ALL IN AS IT ROLLS IN. IT'S GOING TO COME IN IN BITS AND PIECES.

BUT BEFORE I DO THAT, I DO WANT TO TAKE A MINUTE TO SAY THANK YOU.  AND I REALLY MEAN THAT.

THERE IS A LOT OF OTHER PLACES THAT I'M SURE SOME OF YOU WOULD WANT TO BE.  YOU'RE VERY BUSY PEOPLE.  THIS IS A SACRIFICE FOR YOU.  IT'S A SERVICE THAT YOU'RE DOING, AND WE APPRECIATE THE SERVICE.

BUT WE REALLY APPRECIATE YOUR TIME, CERTAINLY MY CLIENT DOES, BECAUSE WE NEED YOU.  THE PARTIES NEED YOU BECAUSE THIS IS ONE OF THOSE RARE CASES THAT IS HERE ALL OF THE WAY AT TRIAL.  IT'S NOT -- NOT EVERY CASE DOES THIS.  THIS IS ONE OF THOSE RARE CASES WHERE THE PARTIES ARE STUCK.  THEY CANNOT AGREE ON WHAT THE FACTS ARE.  YOU ARE ALL GOING TO COLLECTIVELY DECIDE FOR US WHAT THE FACTS ARE HERE.  YOU'RE THE FINDER OF FACT.

THERE'S A MAJOR DISAGREEMENT BETWEEN THESE PARTIES ABOUT THE FACTS, AND THEN THERE IS ALSO A BIG DISAGREEMENT BETWEEN THE PARTIES ABOUT WHAT THE CONSEQUENCES OF THOSE FACTS SHOULD BE.

AND SO, AGAIN, WE VERY MUCH APPRECIATE YOUR SERVICE, AND YOU'RE HERE TO BE THE FACT FINDER.

SO FOR THAT THERE IS SOME GOOD NEWS.  WHAT IS THE GOOD NEWS FOR YOUR JOB?

WELL, THE FIRST GOOD NEWS IS YOU DON'T HAVE TO BE A LEGAL EXPERT TO BE A JUROR.

HER HONOR IS GOING TO INSTRUCT YOU ON THE LAW.  SHE

ALREADY STARTED THIS MORNING.

AND AT THE END OF THE CASE SHE'S GOING TO GIVE YOU THE MORE DETAILED INSTRUCTIONS ON WHAT THE LAW IS.  SO NO ONE HERE HAS TO HAVE GONE TO LAW SCHOOL OR STUDIED THE LAW IN ORDER TO DO YOUR JOB AS OUR FACT FINDER.

YOUR JOB WILL BE TO BE THE EVIDENCE EXPERTS, RIGHT, THE FACT EXPERTS.

AND HER HONOR IS GOING TO TELL YOU WHAT THE LAW IS AT THE END OF THE CASE AND YOU'LL APPLY THE FACTS.  SO THAT'S THE FIRST GOOD NEWS.

THE SECOND GOOD NEWS ABOUT YOUR RESPONSIBILITY IS THAT YOU'RE NOT ALONE.  YOU HAVE THE REST OF YOUR CO-JURORS WHO ARE HERE WITH YOU.

AS I SAID WHEN I SPOKE TO ALL OF YOU DURING THE VOIR DIRE PROCESS, KEEP AN OPEN MIND AND LISTEN TO ALL OF THE EVIDENCE, AND THEN IF YOU WOULD BE PATIENT WITH US, WAIT UNTIL THE END, YOU HAVE ANOTHER GROUP AROUND YOU, THEN YOU'LL ALL BE ABLE TO COLLABORATE IN THE JURY ROOM AND GET DOWN TO WHAT REALLY HAPPENED HERE AND WHAT YOU ALL SHOULD DO ABOUT IT AND HOW YOU SHOULD RULE ON THE FACTS.

SO WHAT DO I THINK THE EVIDENCE IS GOING TO SHOW OVER THE NEXT FEW DAYS?

WELL, I AGREE WITH MR. OSBORNE, MOST OF THIS CASE IS GOING TO BE VERY SIMPLE.  MOST OF THIS CASE RELATES TO THE EXPERIENCE OF ONE PERSON, MR. PANCHENKO HERE.

AND MOST OF THE EVIDENCE YOU ARE GOING TO SEE ACTUALLY RELATES TO A VERY SHORT PERIOD OF TIME BETWEEN MAY OF 2023 AND SEPTEMBER OF 2023.  SO THERE'S ONE PERSON AND A SHORT PERIOD OF TIME IS GOING TO BE THE MAJORITY OF THE EVIDENCE THAT YOU'RE GOING TO HEAR ABOUT.

AND I'M ALSO EXPECTING MR. PANCHENKO TO COME IN AND TESTIFY THAT, YOU KNOW, IN MAY OF 2023 HE CAME IN, HE LOOKED AT HIS CREDIT REPORT FOR THE FIRST TIME, HE LOOKED AT HIS CREDIT SCORE FOR THE FIRST TIME WHEN HE WAS HERE IN AMERICA, AND HE SAW A BUNCH OF ACCOUNTS THAT HE DIDN'T RECOGNIZE ON HIS CREDIT REPORT.

AND ONE OF THOSE ACCOUNTS WAS MY CLIENT'S ACCOUNT, COMENITY BANK, AND IT WAS SHOWING A ZERO BALANCE AT THE TIME.

AND SO I ALSO EXPECT THAT MR. PANCHENKO WILL TELL YOU WHAT HE DID AFTER HE SAYS HE DISCOVERED THIS.  HE STARTED WRITING LETTERS TO PEOPLE.  HE MADE PHONE CALLS TO TRY TO WORK THIS OUT.

HE'LL TELL YOU ABOUT VISITING THE FEDERAL TRADE COMMISSION'S WEBSITE, THE FTC, BECAUSE THEY HAVE RESOURCES ON HOW TO DEAL WITH IDENTITY THEFT.  HE'LL TELL YOU ABOUT HIS VISIT TO THE POLICE DEPARTMENT TO TRY AND GET TO THE BOTTOM OF THIS.

AND WHEN HE DIDN'T GET THE RESULTS HE WANTED FROM THE EFFORTS HE MADE, HE SUED EVERYBODY.  HE SUED ALL OF THE BANKS, RIGHT?

SO WHEN YOU'RE LISTENING TO THE EVIDENCE AS IT COMES IN IN THE NEXT FEW DAYS, I WOULD LIKE YOU TO TRY TO PAY SPECIAL ATTENTION TO THE EVIDENCE THAT IS SPECIFIC TO COMENITY.  ALL RIGHT?  BECAUSE THERE WERE SO MANY BANKS INVOLVED, THERE WAS ALSO THE CREDIT REPORTING AGENCIES INVOLVED, I WOULD LIKE YOU TO PAY CLOSE ATTENTION TO WHAT IS THE COMENITY EVIDENCE, RIGHT?

AND I THINK THIS IS SOME OF THE EVIDENCE THAT YOU'RE GOING TO SEE:

FIRST OF ALL, HE WROTE US ONE LETTER.  HE WROTE US ONE LETTER IN JUNE.

SECOND OF ALL, YOU'RE GOING TO SEE THAT HE CALLED US THREE TIMES.  DURING THIS FIVE MONTH PERIOD, HE CALLED US THREE TIMES.

AND YOU'RE GOING TO SEE EVIDENCE ABOUT THOSE ACDV'S, THOSE AUTOMATED CONSUMER DISPUTE VERIFICATION FORMS THAT MR. OSBORNE TALKED ABOUT.

AND THOSE GOT SUBMITTED ON HIS BEHALF, AND YOU'LL SEE WHAT OUR INVESTIGATORS DID TO INVESTIGATE EACH ONE OF THOSE.

AND ON THAT POINT, I WOULD LIKE YOU TO LOOK CLOSELY AT WHAT WAS THE EVIDENCE, WHAT WAS THE DOCUMENTATION THAT OUR INVESTIGATORS WERE LOOKING AT WHEN THEY WERE REACHING THEIR CONCLUSIONS, RIGHT?  WHAT DID THEY LOOK AT?  HOW DID THEY REACH THEIR CONCLUSIONS?

AND YOU'LL SEE SOME EVIDENCE.  FIRST OF ALL, NOBODY DISPUTES THIS.  THIS ACCOUNT WAS OPENED IN DECEMBER OF 2015.

SO THAT'S AN AGREED FACT IN THIS CASE.

THE ACCOUNT, WHEN IT WAS OPENED, IT WAS OPENED WITH MR. PANCHENKO'S CORRECT NAME, IT WAS OPENED WITH MR. PANCHENKO'S CORRECT SOCIAL SECURITY NUMBER, IT WAS OPENED WITH HIS CORRECT DATE OF BIRTH.

AND YOU'RE GOING TO SEE EVIDENCE THAT IT WAS USED FOR QUITE A WHILE TIME, IT WAS TWO AND A HALF YEARS, LIKE A NORMAL CREDIT CARD ACCOUNT IS USED, RIGHT?  IT'S BEING ACTIVELY USED MONTH AFTER MONTH WITH CHARGES, AND YOU'LL SEE HE NEVER GOT EVEN CLOSE TO WHAT THE CREDIT LIMIT WAS, RIGHT?

YOU'LL SEE EVIDENCE THAT THE CREDIT LIMIT WAS AS HIGH AS $15,000.  THE EVIDENCE WILL SHOW THAT THE HIGHEST BALANCE ON THE CARD WAS ABOUT 5,000.  SO IT'S BEING USED TIME AFTER TIME NORMALLY.

YOU'RE NOT GOING TO SEE ANY EVIDENCE OF ANY OF THE ACCOUNT STATEMENTS GETTING MAILED BACK IN THE MAIL TO COMENITY AS UNDELIVERABLE.

AND YOU'RE NOT GOING TO SEE ANY EVIDENCE THAT WHILE THE ACCOUNT WAS OPENED AND BEING USED ACTIVELY, LIKE A NORMAL CREDIT CARD ACCOUNT, THAT ANYBODY CALLED IN OR WROTE IN AND SAID, HEY, I DISPUTE THIS.  THIS IS NOT MINE.  THIS IS NOT MY CREDIT CARD.

AND THEN PAYMENTS.  YOU ARE GOING TO SEE PAYMENTS.  AND I DON'T MEAN JUST A COUPLE OF PAYMENTS.  YOU'RE GOING TO SEE A LOT OF PAYMENTS ON THIS ACCOUNT.  OKAY?  YOU'RE GOING TO SEE

PAYMENTS ALL THROUGH THE 12 MONTHS OF THE YEAR 2016, PAYMENTS, PAYMENTS, PAYMENTS.

YOU'RE GOING TO SEE PAYMENTS ALL THROUGH THE MONTHS OF THE YEAR 2017, PAYMENTS, PAYMENTS, PAYMENTS.

AND THEN THE ACCOUNT GETS CLOSED IN EARLY 2018, NOT BECAUSE IT WAS BEING MISUSED.  THE REASON YOU'LL SEE THAT THE ACCOUNT GETS CLOSED IN JANUARY OF 2018 IS BECAUSE VIRGIN AMERICA DECIDED IT DIDN'T WANT TO USE COMENITY ANYMORE FOR ITS VIRGIN AMERICA CREDIT CARD ACCOUNTS.  COMENITY HAD TO CLOSE IT.

THEN IN 2018, YOU'RE GOING TO SEE MORE PAYMENTS.  MORE PAYMENTS.  THERE WERE THREE MORE PAYMENTS MADE IN EARLY 2018, EVEN THOUGH WHOEVER WAS USING THE CARD COULDN'T CHARGE ANYMORE.

AND THAT'S PART OF THE EVIDENCE THAT ALL OF OUR INVESTIGATORS WERE LOOKING AT WHEN THEY WERE INVESTIGATING MR. PANCHENKO'S DISPUTES, WHICH, OF COURSE, CAME IN TO US FIVE YEARS LATER.  FIVE YEARS LATER IS THE FIRST TIME THAT WE WERE ASKED TO LOOK AT THIS.

SO YOU'RE GOING TO HAVE TO DECIDE, BASED ON EVERYTHING THAT WAS AVAILABLE TO OUR INVESTIGATORS, WHETHER WHAT THEY DID WAS REASONABLE OR NOT.

AND WHEN ALL OF THE EVIDENCE IS IN, MR. PANCHENKO IS GOING TO ASK YOU TO AWARD HIM MONEY.  OKAY.

SO YOU'RE GOING TO HAVE THE JOB OF LISTENING TO THE EVIDENCE AND FOLLOWING THE LAW THAT HER HONOR IS GOING TO INSTRUCT YOU ABOUT, AND FIRST YOU'RE GOING TO HAVE TO FIND, DID

COMENITY DO ANYTHING WRONG?  DID THEY VIOLATE THE LAW AS HER HONOR HAS TOLD US?

AND THEN YOU'RE ALSO GOING TO HAVE TO FIND, WAS HE HURT BY THAT?  WAS HE INJURED?  WAS HE DAMAGED?

SO WATCH THROUGHOUT THE CASE WHAT YOU HEAR AND DON'T HEAR ABOUT HIS DAMAGES.

LET ME TELL YOU A FEW THINGS THAT YOU'RE NOT GOING TO SEE. HERE'S EVIDENCE YOU'RE NOT GOING TO HEAR:

YOU'RE NOT GOING TO HEAR FROM ANY DOCTOR OR PSYCHOLOGIST WHO IS GOING TO SAY THAT THEY TREATED MR. PANCHENKO FOR ANY STRESS THAT HE SUFFERED OR ANY OTHER MEDICAL CONDITION.  THAT WILL NOT BE PRESENTED TO YOU.

YOU'RE NOT GOING TO HEAR ANY EVIDENCE OF ANY PRESCRIPTION MEDICATIONS THAT HE HAD TO TAKE BECAUSE OF THE STRESS THAT HE SAYS HE SUFFERED FROM.

AND YOU'RE NOT GOING TO HEAR ANY EVIDENCE THAT HE ACTUALLY PAID ANY MONEY TO COMENITY FROM THIS ACCOUNT FOR FIVE YEARS. THAT YOU WON'T SEE.

YOU'RE NOT GOING TO HEAR FROM ANY EXPERT WITNESS WHO IS GOING TO COME IN AND SAY MR. PANCHENKO'S CREDIT SCORE WENT DOWN BY A SPECIFIC AMOUNT BECAUSE OF THIS.  THAT WILL NOT BE PART OF OUR CASE.

AND YOU'RE ALSO NOT GOING TO HEAR ANY EXPERT COME IN AND SAY MR. PANCHENKO LOST OUT ON SOME CREDIT OPPORTUNITY, THAT HE WAS DENIED CREDIT.  YOU'RE ALSO NOT GOING TO HEAR THAT.

THERE WILL NOT BE ANY ACCOUNTANT. NOBODY IS GOING TO COME INTO THE COURTROOM AND COUNT UP THE DAMAGES AND COUNT UP THE MONEY THAT THEY THINK SHOULD BE AWARDED TO MR. PANCHENKO.

ALL RIGHT. SO AS YOU WATCH THE EVIDENCE, THINK THAT -- YOU SHOULD BE THINKING ABOUT A LOT OF THE MONEY PART OF THIS CASE IS GOING TO TURN ON MR. PANCHENKO'S TESTIMONY AND WHETHER -- HOW YOU ASSESS HIM ON THE WITNESS STAND AND HOW HE TESTIFIES ABOUT THE HARM THAT HE SAYS HE SUFFERED AND ANY CONNECTION TO COMENITY.

SO PLEASE BE PATIENT WITH US.

I WILL GET ONE MORE CHANCE TO TALK TO YOU. AT THE CLOSE OF ALL OF THE EVIDENCE, WE DO CLOSING ARGUMENT. BY THAT TIME I'LL GET TO REVIEW WITH YOU SOME OF THE HIGHLIGHTS OF THE EVIDENCE THAT DID COME IN, AND I'M ALLOWED TO THEN GIVE YOU MY TAKE ON WHAT IT MEANS, RIGHT, MY INTERPRETATION, WHICH YOU CAN TAKE OR LEAVE WHEN YOU GO IN AND DELIBERATE.

AT THAT POINT I THINK ALL OF THE INSTRUCTIONS WILL BE FINALIZED, HER HONOR WILL HAVE INSTRUCTED YOU ON THE LAW. I MAY WANT TO TAKE A LITTLE TIME DURING MY CLOSING STATEMENT TO TALK TO YOU ABOUT THE LAW AND HOW I THINK THE LAW GELS WITH THE FACTS YOU'VE SEEN.

AND THERE IS A VERDICT FORM. SO YOUR KIND OF HOMEWORK IN THE CASE WILL BE TO HAVE KIND OF ONE OF YOU BE YOUR FOREPERSON, AND THE FOREPERSON WILL COLLECT AND FILL OUT AND LET ALL OF YOU DECIDE ON THE VERDICT FORM AND RETURN IT TO THE COURT.

SO IF WE HAVE THAT VERDICT FORM, I MIGHT WANT TO STEP THROUGH SOME OF THAT WITH YOU AND EXPLAIN SOME OF THAT TO YOU AS WELL.

BUT I'M CONFIDENT THAT WHEN ALL OF THE EVIDENCE COMES IN, I'M GOING TO BE ASKING YOU TO ENTER A VERDICT IN FAVOR OF COMENITY BANK.

SO THANK YOU FOR BEING PATIENT WITH ME AND THE PARTIES TODAY. I LOOK FORWARD TO THE CHANCE TO GET TO TALK TO YOU AGAIN WHEN THE EVIDENCE IS ALL IN.

THANK YOU, YOUR HONOR.

THE COURT: THANK YOU.

MR. LOKER AND MR. NARITA, WILL YOU APPROACH BRIEFLY.

MR. NARITA.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT: IS PLAINTIFF PREPARED TO CALL THEIR FIRST WITNESS?

MR. LOKER: YES, YOUR HONOR. THANK YOU.

WE CALL MR. PANCHENKO TO THE STAND.

THE COURT: MR. PANCHENKO, STAND FOR A MOMENT AND MADAM CLERK WILL SWEAR YOU IN.

THE CLERK: RAISE YOUR RIGHT HAND.

**(PLAINTIFF'S WITNESS, OLEKSANDR PANCHENKO, WAS SWORN.)**

THE WITNESS: YES.

THE CLERK: ONCE YOU HAVE A SEAT, PLEASE STATE YOUR NAME AND SPELL YOUR NAME, YOUR LAST NAME FOR THE RECORD.

THE WITNESS:  MY NAME IS OLEKSANDR PANCHENKO.

**DIRECT EXAMINATION**

BY MR. LOKER:

Q.   AND CAN YOU PLEASE SPELL THAT PLEASE AS WELL, MR. PANCHENKO?

A.   YEAH.  IT'S O-L-E-K-S-A-N-D-R, AND THE LAST NAME IS P-A-N-C-H-E-N-K-O.

Q.   THANK YOU, MR. PANCHENKO.

AND WHERE WERE YOU BORN?

A.   I WAS BORN IN KYIV, UKRAINE.

Q.   IS YOUR NAME COMMON IN THE UKRAINE?

A.   THE FIRST NAME IS PRETTY COMMON, ONE OF THE MOST COMMON NAMES.

AND THE LAST NAME, IT'S LIKE IN THE MIDDLE SOMEWHERE.

Q.   DID YOU GRADUATE FROM A UNIVERSITY IN UKRAINE?

A.   YES.

Q.   AND WHERE DID YOU GRADUATE FROM?

A.   I GRADUATED FROM KYIV MARKET RELATIONS UNIVERSITY IN UKRAINE.

Q.   AND WHAT WAS YOUR DEGREE?

A.   I GOT TWO DEGREES, ONE IN MARKETING, AND ANOTHER ONE IN MANAGEMENT OF FOREIGN ECONOMIC ACTIVITIES.

Q.   ARE YOU MARRIED, MR. PANCHENKO?

A.   YES.

Q.   TO WHO?

A.   ALLA ODEIANENKO.

Q.   IS ALLA WORKING?

A.   YES.

Q.   AND WHERE IS SHE WORKING?

A.   SHE WORKS AT GOOGLE.

Q.   WHAT DOES SHE DO AT GOOGLE?

A.   SHE DO, LIKE, INTERACTION PRODUCT DESIGNER.

Q.   ON ANY PARTICULAR PROJECTS?

A.   SO SHE WORK AT GOOGLE COMMERCE ON DIFFERENT PROJECTS.

Q.   FAIR ENOUGH.

AND ARE YOU EMPLOYED, MR. PANCHENKO?

A.   YES, EMPLOYED RIGHT NOW.

Q.   AND WHERE ARE YOU WORKING?

A.   I'M WORKING AT NACE.

Q.   N-A-C-E DOT A-I.

A.   YEAH.

Q.   AND WHAT IS NACE.AI?

A.   IT'S AN AI START-UP BASED IN PALO ALTO, CALIFORNIA.

Q.   AND WHAT IS YOUR ROLE WITH THE COMPANY?

A.   YEAH.  I STARTED AS A FOUNDER PRODUCT DESIGNER, WHICH MEANS BASICALLY A FIRST PRODUCT DESIGNER TO JOIN THE TEAM, AND RIGHT NOW I HELD, LIKE, MANY HATS, BUT MOSTLY DOING, LIKE, THE WORK OF HEAD OF PRODUCT DESIGN FOR THE COMPANY.

Q.   IN WHAT ASPECT OF AI IS THE COMPANY FOCUSSED ON?

A.   SO WE FOCUSSED ON FUNDAMENTAL ASPECT OF AI.  SO WE HAVE A

LOT OF MACHINE RESEARCHERS ON OUR TEAM, AND WE MAINLY FOCUS ON THE NEXT GENERATION AI, BUILDING THE NEXT GENERATION AI, SPECIFICALLY BUILDING A SMALL LANGUAGE MODEL.

AND I DON'T KNOW IF YOU KNOW AND HEARD ABOUT LARGE LANGUAGE MODELS. SO BUILD IN SMALL LANGUAGE MODELS AND WAYS TO CREATE THEM BECAUSE THEY'RE MORE EFFICIENT, THEY ARE BETTER FOR SPECIFIC TASKS, AND THERE'S A LOT OF BENEFITS TO BUILDING THEM.

Q. I APPRECIATE IT.

AND WHEN WAS THE FIRST TIME THAT YOU CAME TO THE UNITED STATES?

A. THE FIRST TIME I CAME TO THE UNITED STATES WAS IN 2009.

Q. AND WHERE IN THE UNITED STATES WERE YOU?

A. I CAME TO WORK AT SEASHELL AT TEXAS, SEASHELL PORT OF TEXAS. IT'S A PORT ARANSAS CITY.

Q. PORT, P-O-R-T, ARANSAS.

I'M NOT FAMILIAR WITH TEXAS, I APOLOGIZE?

A. IT'S A SMALL CITY ON THE COAST OF THE GULF OF AMERICA.

Q. THANK YOU, MR. PANCHENKO.

AND WHEN YOU WERE IN TEXAS, WHAT WERE YOU DOING FOR WORK?

A. I WAS DOING HOUSEKEEPING THERE.

Q. DID YOU OBTAIN A SOCIAL SECURITY NUMBER AT THAT TIME IN 2009?

A. YES. SO IT WAS ONE OF THE FIRST THINGS THAT YOU NEED TO DO WHEN YOU COME ON THIS WORKING PROGRAM. SO IN ORDER TO GET PAID BASICALLY, YOU NEED TO GET A SOCIAL SECURITY NUMBER, SO

THIS IS ONE OF THE FIRST THINGS WE DID, WE WENT TO THE SOCIAL SECURITY CENTER AND APPLIED TO GET IT.

Q.   DID YOU ALSO OPEN UP A BANK ACCOUNT?

A.   OH, YES, I OPENED A BANK ACCOUNT WITH BANK OF AMERICA, A DEBIT BANK ACCOUNT.

Q.   AND ANY CREDIT CARDS AT THAT POINT?

A.   NO.  I DON'T KNOW WHETHER I WAS, BUT I DIDN'T NEED TO OPEN ANY CREDIT CARD.

Q.   AND DID YOU REMAIN IN THE UNITED STATES CONSISTENTLY FROM 2009 UP UNTIL TODAY?

A.   NO.

Q.   CAN YOU TAKE US THROUGH THOSE COMINGS AND GOINGS?

A.   SURE.  SO I WORKED FOR THE WHOLE SUMMER OF 2009, BECAUSE THEN I WENT BACK HOME BECAUSE THE WORK AND TRAVEL KIND OF VISA PROGRAM IS USED FOR THE STUDENTS.  SO I WAS A FULL-TIME STUDENT AT THE UNIVERSITY, AND DURING THE SUMMER TIME I CAME HERE TO WORK AND BASICALLY EXCHANGED THE KNOWLEDGE AND DO SOME TRAVELLING AND SO ON.

SO I WENT BACK HOME.

I RETURNED BACK THE NEXT YEAR FOR THE SAME KIND OF PERIOD TO WORK AT THE SAME PLACE BECAUSE I WAS FAMILIAR WITH THE EMPLOYER, WE BECAME KIND OF REALLY CLOSE TO EACH OTHER.

SO AFTER THAT I LEFT THE U.S. AND RETURNED ONLY IN 2018 FOR, LIKE, A BUSINESS TRIP WHILE I WAS WORKING ALREADY AT ONE OF THE COMPANIES AT LUXSOFT.

Q.   L-U-X-S-O-F-T?

A.   YEAH.

Q.   AND THAT -- SO YOU WERE HERE IN 2009, CAME BACK IN 2010; IS THAT CORRECT?

A.   YES.

Q.   IN THIS LAST -- THE MORE RECENT ONE YOU'VE MENTIONED IS 2018?

A.   2018 WAS THE FIRST TIME I RETURNED TO THE U.S. FROM THAT, AND THE NEXT TIME I WAS WORKING WITH EPAM, E-P-A-M.

     I RETURNED SOMEWHERE AROUND 2020 FOR, AGAIN, A WEEK FOR BUSINESS MEETING.  I WAS WORKING WITH ANOTHER COMPANY, U.S. BUSINESS COMPANY, ON THE PROJECT TO DELIVER THEM, LIKE, A DESIGN AND HELP BASICALLY MEET THE BUSINESS, AND UNDERSTAND THEIR BUSINESS, AND THE WORKSHOPS ON WHAT IS GOING ON.

Q.   THANK YOU.

     WERE YOU PRESENT, MR. PANCHENKO, IN THE UNITED STATES AT ALL IN 2015?

A.   NO.

Q.   HOW ABOUT IN 2016?

A.   NO.

Q.   AND THEN 2017, WERE YOU PRESENT IN THE UNITED STATES?

A.   NO.

Q.   WHAT CAUSED YOU TO LEAVE KYIV -- WHAT CAUSED YOU TO LEAVE KYIV?

A.   YEAH.  SO MY WIFE GOT THE JOB WITH GOOGLE.  SHE GOT IT IN

THE UKRAINE, BUT IT WAS -- IT WAS 2021 THAT SHE GOT THIS JOB, AND THERE WAS ALREADY KIND OF ONGOING WAR ON THE PART OF UKRAINE WHERE KIND OF EVERYONE WAS AWARE OF IT, BUT IT WASN'T YET KIND OF FULL SCALE WHERE WE SEE TODAY.

SO OBVIOUSLY FOR MY WIFE AND ME, IT WASN'T, LIKE, A REALLY NICE PLACE TO STAY AND FEEL SAFE, BUT ESPECIALLY TO MY WIFE. SHE WAS FEELING DEPRESSED, AND SO WHEN SHE WAS APPLYING TO GOOGLE, SHE BASICALLY WAS EMPLOYED WITH GOOGLE IN THE UKRAINE, BUT SHE INDICATED THAT SHE WAS GOING TO BE MOVING TO POLAND AS SOON AS IT WAS FEASIBLE FOR THEM.

SO BASICALLY, YEAH, WE MOVED TO POLAND AS SOON AS GOOGLE ALLOWED HER TO MOVE, AND BASICALLY PAID THE EXPENSES TO MOVE TO POLAND.

Q.   AND WHEN DID YOU COME BACK TO THE UNITED STATES?

A.   SO WE CAME BACK TO THE UNITED STATES AT THE END OF APRIL 2023.  YEAH.

Q.   WHAT HAPPENS WHEN YOU MOVE HERE?  WHAT SORTS OF THINGS DO YOU NEED TO ACCOMPLISH WHEN YOU COME TO THE UNITED STATES?

A.   YEAH.  SO MY ASSUMPTION WAS THAT I WILL -- WE BOTH WILL COME, MY WIFE WILL START WORK, GET HER SOCIAL SECURITY NUMBER.

MY ASSUMPTION WAS THAT I WILL GET MY SOCIAL SECURITY NUMBER AGAIN, BECAUSE I ASSUMED BACK THEN THAT MY SOCIAL SECURITY NUMBER THAT I GOT PREVIOUSLY, IT MIGHT BE EXPIRED OR SOMETHING.  I DIDN'T USE IT.

SO I WENT TO THE SOCIAL SECURITY SERVICE WITH MY WIFE.  I

MENTIONED TO THE OFFICER THAT I HAD A SOCIAL SECURITY NUMBER PREVIOUSLY JUST IN CASE, AND SHE SAID, OH, YOU KIND OF -- IF YOU HAD IT, YOU STILL HAVE IT.

SO SHE READ ME THE NUMBER AND SAID I WILL GET A CARD MAILED LATER.

BUT THEN WE BASICALLY FACED ALL THE THINGS THAT YOU NEED TO DO WHILE YOU ARE NEW TO THE COUNTRY, WHICH IS FIND AN APARTMENT.  AND MY PLAN WAS THAT WE WERE GOING TO QUICKLY FIND AN APARTMENT, MAYBE SETTLE SOME DOCUMENTS, LIKE IF YOU NEED TO OPEN BANK ACCOUNTS OR ANYTHING LIKE THAT, AND I CAN START SEARCHING FOR THE JOB POSITION HERE.

Q.   DID ANY ASPECT AT THAT POINT INVOLVE YOU DOING YOUR CREDIT REPORT?

A.   YES.  SO BECAUSE WE PLANNED AND STARTED SEARCHING FOR APARTMENTS, WE OBVIOUSLY SAW THAT EVEN WHEN WE JUST ARRIVED, WE SAW APARTMENTS AND HOUSES THAT REQUIRE SOME LEVEL OF SOCIAL CREDIT SCORE IN ORDER TO RENT THEM.

SO I WAS CURIOUS AND I THOUGHT MAYBE BECAUSE I HAVE THE SOCIAL SECURITY AND THE OFFICER TOLD ME THAT IT'S STILL THERE, MAYBE I CAN HAVE SOME NUMBER THERE.

I DIDN'T EXPECT, LIKE, NOT HAVING A NUMBER, OR MAYBE THIS NUMBER IS GOING TO BE THERE, OR I'M GOING TO BE ABLE TO GET THE NUMBER FASTER.  SO I DECIDED TO INSTALL SOME APPS TO BASICALLY SEE WHETHER OR NOT THERE IS ANY CREDIT SCORE THERE.

AND I FIRST -- MAYBE I TRIED A COUPLE OF APPS, BUT THE

EXPERIAN APP WAS THE ONE THAT ALLOWED ME TO ACTUALLY SIGN UP AND REGISTER, AND WHEN I SAW THE ACCOUNT, I SAW THAT IT'S NOT -- THERE IS ACTUALLY A NUMBER THERE.  IT'S SUPER LOW.  AND THERE IS A LOT OF INFORMATION THERE THAT JUST DIDN'T MAKE ANY SENSE TO ME.

Q.   AT WHAT POINT IN TIME DID YOU REVIEW THAT CREDIT REPORT FOR THE FIRST TIME?

A.   SO IT WAS AROUND, LIKE, EARLY MAY.  IT WAS 11TH OF MAY OR CLOSE TO THAT DATE.

Q.   SO MAY OF 2023.  WAS COMENITY THE ONLY ACCOUNT ON YOUR REPORT?

A.   NO.

Q.   WHO ELSE WAS ON THERE?

A.   THERE WAS ABOUT, LIKE, TEN DIFFERENT ACCOUNTS TO ABOUT MAYBE NINE BANKS OR SOMETHING LIKE THAT.  SO A LOT OF DIFFERENT BANKS AND DIFFERENT ACCOUNTS.

PLUS, THERE WAS INFORMATION ABOUT PREVIOUS JOBS AND SOME TELEPHONE NUMBERS AND ADDRESSES THERE AND SOFT INQUIRIES THAT OBVIOUSLY I DIDN'T RECOGNIZE.

Q.   AND WHAT WAS YOUR IMPRESSION WHEN YOU SAW THOSE ACCOUNTS? WHY DID YOU THINK THAT THEY WERE ON THERE?

A.   SO MY FIRST IMPRESSION WAS THAT -- SO THERE WAS MAYBE SOME CONFUSION.  MAYBE MY SOCIAL SECURITY WAS ACTUALLY KIND OF DISABLED OR SOMETHING.  IT WAS USED BY SOME OTHER PERSON.

SO MY ASSUMPTION WAS MAYBE IT'S JUST A MISTAKE, A

TECHNICAL MISTAKE ON THE EXPERIAN SIDE.

SO I DECIDED TO KIND OF BUY A PREMIUM ACCOUNT WITH EXPERIAN AND START CALLING THEM JUST TO KIND OF SEE WHAT WE CAN DO TO KIND OF CHANGE THAT AND WHETHER IT'S A MISTAKE, OR WHETHER I NEED TO DO SOMETHING ON MY END OR THEY CAN FIX IT BY THEMSELVES.

Q.   WAS IT POSSIBLE THAT THOSE WERE CREDIT CARDS THAT YOU JUST OPENED AND FORGOT?

A.   NO.

Q.   WHY NOT?

A.   BECAUSE I NEVER OPENED CREDIT CARDS ANYWHERE IN THE UKRAINE.  I JUST DIDN'T NEED IT.

Q.   YOU MENTIONED JOBS.  WHAT SORT OF JOB INFORMATION WAS ON YOUR CREDIT REPORT?

A.   SO AS I REMEMBER, IT WAS MAYBE, LIKE, TWO.  IT WAS MULTIPLE POSITIONS.  I RECALL THERE WAS SOME ALEX CONSTRUCTION SERVICES OR THE NAME OF THE COMPANY THAT WAS MENTIONED.

Q.   ARE YOU FAMILIAR WITH THAT COMPANY OTHER THAN ASIDE FROM SEEING IT ON YOUR CREDIT REPORT?

A.   NO.

Q.   AND MORE GENERALLY, HAVE YOU EVER EXPERIENCED FRAUD OR IDENTITY THEFT BEFORE?

A.   I DID NOT EXPERIENCE ANY IDENTITY THEFT OR EVEN ANY FRAUD BEFORE.

Q.   IS IDENTITY THEFT PREVALENT IN THE UKRAINE?

A.   SO IDENTITY THEFT, AS I LEARNED LATER, IS COMMON HERE IN THE U.S.  IT'S NOT PREVALENT IN THE UKRAINE AT ALL.

WE HAVE PROBABLY SOME CASES OF SOME IDENTITY THEFT MAYBE, BUT I NEVER HEARD OF ANYONE THAT, LIKE, SOMEONE CAN OPEN AN ACCOUNT IN ANOTHER PERSON'S NAME WITHOUT ACTUALLY GAINING, LIKE, A LOT OF REAL DOCUMENTS OR FAKE DOCUMENTS.

SO I NEVER HEARD ANYONE GETTING THIS KIND OF FRAUD IN THE UKRAINE.

Q.   AND AT ANY POINT WITH REGARDS TO COMENITY, HAVE YOU CALLED THEM TO MAKE A PAYMENT?

A.   I DIDN'T CALL THEM TO MAKE A PAYMENT.

Q.   BUT FOR OTHER PURPOSES?

A.   YES.

Q.   OKAY.  AND WE'LL GET TO THOSE LATER.

SO DID YOU EVER CALL COMENITY IN 2017 FOR ANY REASON?

A.   I DIDN'T CALL COMENITY IN 2017.

Q.   HOW ABOUT 2018?

A.   IN 2018 I DIDN'T CALL THEM.

Q.   DO YOU RECALL, DURING THE COURSE OF THIS LITIGATION, LISTENING TO RECORDINGS THAT COMENITY PRODUCED?

A.   UH-HUH.

Q.   THAT WAS A YES?  I APOLOGIZE.

A.   SO CAN YOU REPEAT THE QUESTION AGAIN?

Q.   DO YOU RECALL LISTENING TO RECORDINGS THAT RELATE TO THIS COMENITY ACCOUNT?

A.   YES.

MR. LOKER:  YOUR HONOR, I WAS GOING TO PLAY EXHIBIT NUMBER 40.  IT'S A NOVEMBER 24TH, 2017 CALL REPORTING.

MR. NARITA:  YOUR HONOR, JUST FOR THE RECORD, WE RENEW OUR OBJECTIONS THAT THE COURT HAS ALREADY RULED ON.

THE COURT:  THANK YOU.  OVERRULED.

MR. LOKER:  IT'S SIX MINUTES FOR THIS PARTICULAR RECORDING, AND I WAS GOING TO PLAY IT IN ITS ENTIRETY.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   EXHIBIT NUMBER 40.

COULD YOU HEAR THE RECORDING OKAY, MR. PANCHENKO?

A.   YES.

Q.   DID YOU RECOGNIZE THE VOICE OF THE MALE CALLER?

A.   NO.

Q.   WAS IT YOUR VOICE?

A.   NO.

Q.   HAVE YOU EVER HEARD A RECORDING OF YOUR PHONE VOICE?

A.   YES.

Q.   IS THAT WHAT YOU SOUND LIKE ON THE PHONE?

A.   NO.

Q.   HOW ABOUT WITH THE NAME PRONUNCIATION?  DID THEY SAY YOUR NAME PROPERLY?

A.   NOT REALLY.  IT'S -- IT WASN'T, LIKE, PROPER WAY OF HOW I WOULD SAY IT, EITHER TO FOREIGNER OR TO SOMEONE WHO SPEAKS MY

LANGUAGE.

Q.   WHAT DO YOU MEAN BY SAYING IT TO A FOREIGNER?

A.   YEAH.  SO IF -- SOMETIMES WHEN I WOULD KIND OF SPELL MY NAME TO A FOREIGNER, I WOULD KIND OF SOMETIMES SAY IT IN A WAY SO I KNOW THAT THEY CAN PRONOUNCE IT CORRECTLY.

BUT THAT WASN'T ANY OF THESE CASES.

Q.   WHAT WAS YOUR IMPRESSION OF THE ACCENT OF THE CALLER?

MR. NARITA:  OBJECTION, YOUR HONOR.  FOUNDATION.

THE COURT:  OVERRULED.

THE WITNESS:  YEAH, SO IT'S HARD TO SAY, BUT IT FEELS LIKE IT'S GOING TO BE A SLAVIC ACCENT, BY SOMEONE FROM THAT AREA.

BY MR. LOKER:

Q.   WHAT IS THAT AREA?

A.   IT'S, LIKE, POST SOVIET COUNTRIES.

Q.   POST SOVIET?

A.   YEAH.  SO IT COULD BE, LIKE, RUSSIA OR ANY OTHER COUNTRIES.

Q.   THERE'S A MENTION OF AN ACCOUNT ENDING IN 8411.  DID YOU HEAR THAT?

A.   YEAH, I HEARD THOSE NUMBERS, YEAH.

Q.   AND DO YOU HAVE SUCH AN ACCOUNT, OR ANY ACCOUNT, RATHER, THAT ENDS IN 8411?

A.   NO.

Q.   WITH REGARD TO THE RECORDING, MR. PANCHENKO, WAS THAT A

COPY OF THE RECORDING THAT YOU RECALL LISTENING TO BEFORE?

A.   YES.

MR. LOKER:  YOUR HONOR, WITH REGARD TO EXHIBIT 40, WE WOULD ASK THAT IT BE MOVED INTO EVIDENCE.

MR. NARITA:  YOUR HONOR, WITH THE OBJECTIONS THAT WERE PREVIOUSLY NOTED.

THE COURT:  EXHIBIT 40 WILL BE ADMITTED INTO EVIDENCE.

(PLAINTIFF'S EXHIBIT 40 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU, YOUR HONOR.

AND WE'RE GOING TO MOVE TO EXHIBIT NUMBER 41, WHICH IS A JANUARY 11TH CALL OF 2018.

I'M GOING TO PLAY A PORTION OF IT STARTING AT THE 3 MINUTE AND 3 SECOND MARK AND ENDING AT 3 MINUTES AND 20 SECONDS.

MR. NARITA:  AND FOR THE RECORD, WE STAND BY OUR PREVIOUS OBJECTIONS WITH THE PREVIOUS EXHIBIT, WHICH THE COURT ADDRESSED.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   AND THAT WAS A BRIEF EXCERPT FROM THE CALL.

BUT COULD YOU HEAR IT OKAY, MR. PANCHENKO?

A.   YES.

Q.   AND AGAIN, THE CALLER, WAS THAT YOU ON THE LINE?

A.   NO.

Q.   WAS THIS RECORDING THAT WE HAVE HERE, EXHIBIT 41, ONE THAT

YOU ALSO LISTENED TO DURING THE COURSE OF THIS CASE?

A.   YES.

        MR. LOKER:  YOUR HONOR, WITH THAT WE ASK THAT EXHIBIT 41 BE ADMITTED INTO EVIDENCE.

        MR. NARITA:  WE RENEW THE SAME OBJECTIONS, YOUR HONOR.  THANK YOU.

        THE COURT:  STANDING OBJECTION.  OBJECTION NOTED. OBJECTION OVERRULED.

    (PLAINTIFF'S EXHIBIT 41 WAS RECEIVED IN EVIDENCE.)

        THE COURT:  MR. LOKER, WE'RE GOING TO TAKE A SHORT BREAK SOON JUST FOR THE JURY JUST TO HAVE A SHORT MORNING BREAK.

    WOULD NOW BE GOOD, OR WOULD YOU PREFER IT TO BE --

        MR. LOKER:  NOW IS PERFECT, YOUR HONOR.

        THE COURT:  OKAY.  LET'S GO AHEAD AND TAKE A SHORT, JUST SO YOU ALL COULD HAVE A STRETCH BREAK, AND YOU WERE EXPECTING A MORNING BREAK, WHICH WE RAN OVER WITH THE MORNING SESSION.  SO LET'S TAKE SHORT TEN MINUTE BREAK AND EXCUSE THE JURORS NOW.

    THANK YOU.

    (JURY OUT AT 11:09 A.M.)

        THE COURT:  THANK YOU, MR. PANCHENKO.  YOU MAY BE SEATED WITH COUNSEL.

    ANYTHING FURTHER BEFORE WE GO OFF THE RECORD, COUNSEL?

        MR. LOKER:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  THANK YOU.

(RECESS FROM 11:09 A.M. UNTIL 11:24 A.M.)

THE COURT:  BACK ON THE RECORD OUTSIDE OF THE PRESENCE OF THE JURY.

BEFORE I HAVE THE JURY RETURN, I JUST WANTED TO RAISE A BRIEF COMMENT IN TERMS OF A CONCERN IN TERMS OF MR. NARITA'S OBJECTION RAISED EARLIER, OR QUERY REGARDING WHETHER OR NOT TO HAVE THE FULL RECORDING, AND I'M NOW CONSIDERING IT BECAUSE OF THE VERY SHORT EXCERPT THAT YOU JUST PLAYED, MR. LOKER.

I MEAN, WITH THE FIRST ONE THERE WERE DATES AND SUCH PROVIDED WITHIN THE CONTEXT OF THAT PHONE CALL.

WITH THE SECOND ONE -- AND THE REASON I DEFERRED RULING ON THE ADMISSION OF THAT EXHIBIT IS BECAUSE IT SEEMS A BIT UNTETHERED IN TERMS OF DATE OR TIME.

SO I'M JUST CONSIDERING WHETHER OR NOT, IN TERMS OF THAT COMPLETENESS, AND I'M WONDERING IF THE PARTIES, GOING BACK TO MY REQUEST FOR PARTIES TO MEET AND CONFER REGARDING AT LEAST WHETHER OR NOT THERE'S MORE INFORMATION NECESSARY, PARTICULARLY IF YOU'RE POSING DATES ON THE QUESTIONS.

MR. LOKER:  THE -- AND I CAN STOP POSING DATES.

THE DATES OF THE RECORDINGS ARE UNDISPUTED.  THEY CAME OVER TO US FROM COMENITY WITH THE DATES.

THE SOLE PURPOSE OF THE RECORDINGS IS, FOR ONE -- OR I GUESS TWO PURPOSES, RATHER -- WOULD BE TO HAVE ALEX, OR MR. PANCHENKO, MY APOLOGIES, CONFIRM THAT IT'S NOT HIS VOICE;

AND THEN, TWO, GET THEM INTO THE RECORD AS FAR AS THE REASONABLENESS OF THE INVESTIGATION.

SO COMENITY HAD THEM IN THE RECORDS AND DIDN'T LISTEN TO THEM, EVEN THOUGH THEY COULD HAVE SEEN IT WASN'T HIS VOICE.

SO THE DATES OF WHEN THE CALLS ARE HAPPENING AND REALLY WHAT IS SAID BEYOND THE SOUND OF THE VOICE ITSELF ISN'T RELEVANT TO WHAT WE THINK THE RECORDINGS SHOW.

THE COURT:  MR. NARITA.

MR. NARITA:  MAY I?  I WAS WAITING FOR THE COURT.

SO I THINK IF HE WANTS TO PLAY THE RECORDINGS, AND YOUR HONOR HAS NOW SAID HE COULD DO THAT IN HIS CASE-IN-CHIEF, FOR THE PURPOSES THAT HE'S OFFERING THEM, HE NEEDS TO PLAY THE WHOLE THING.

THERE IS, THERE IS A PORTION OF THE RECORDINGS THAT HE LIKES, WHICH IS A VOICE THAT HE SAYS IS NOT HIS CLIENT'S.

THERE'S OTHER PORTIONS OF THE RECORDING THAT HAD, HAD WE REVIEWED THEM, AS HE SAID WE SHOULD HAVE -- AND THE REASON WHY HE SAYS THAT THESE ARE RELEVANT IS IT SHOWS THE DILIGENCE OF THE PERSON CALLING IN TO IDENTIFY THEMSELVES, TO GET BANK INFORMATION, TO AGREE TO MAKE PAYMENTS, THEY HAD TO STAY ON THE LINE FOR A LONG TIME.  THAT, THAT -- YOU KNOW, FOR HIS ARGUMENT TO WORK, WE WERE SUPPOSED TO LISTEN TO ALL OF THAT.

YOU'VE GOT TO LISTEN TO IT IN CONTEXT.  OTHERWISE HE'S JUST SNIPPING OUT ONE THING AND SAYING, I GUESS -- I DON'T KNOW WHAT HE'S SAYING THEN, WE SHOULD HAVE JUST LISTENED TO THE

VOICE AND STOPPED.

HE'S GOT TO --

THE COURT:  SO, COUNSEL, I'M GOING TO HAVE YOU MEET AND CONFER ABOUT THIS.

MR. LOKER, I'M GOING TO ASK THAT YOU PUT LIKE -- EITHER YOU NEED TO EXCLUDE THE DATES IF YOU'RE NOT GOING TO BE, OR GIVING MORE INFORMATION REGARDING WHAT IS HAPPENING.

I WOULD ALSO SUGGEST, WHY NOT WAIT UNTIL AFTER THE LUNCH BREAK TO MEET AND CONFER AND DISCUSS AND WE CAN ROUND BACK ABOUT THIS, BECAUSE WE'RE GOING INTO ARGUMENT AGAIN.

AND, FRANKLY, COUNSEL, THIS IS MY CONCERN, WE HAVE MADE THIS JURY WAIT A LOT.  THIS IS NOT OUR BEST FOOT FORWARD, SO TO SPEAK.

MR. NARITA:  UNDERSTOOD, YOUR HONOR.

MR. LOKER:  AND IN TERMS OF FURTHER RECORDINGS, YOUR HONOR, WHAT I'LL STOP DOING WHERE THERE'S A DISPUTE IS PLAYING SNIPPETS.  THERE ARE LATER RECORDINGS WHERE I WAS GOING TO PLAY THE FULL THING, WHICH I THINK ADDRESSES MR. NARITA'S CONCERNS.

AND THEN THE OTHER RECORDINGS I CAN WAIT UNTIL AFTER LUNCH WHEN WE'VE HAD A CHANCE TO MEET AND CONFER IF THAT'S OKAY.

THE COURT:  YEAH, AND I'LL JUST HAVE YOU ALL COME BACK FROM LUNCH JUST A LITTLE BIT EARLY.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  AND ONE POINT OF CLARIFICATION,

YOUR HONOR.  I DIDN'T WANT TO WAIVE AN OBJECTION BECAUSE MR. LOKER STARTED PLAYING THE WHOLE THING BEFORE HE MOVED IT INTO EVIDENCE, AND THEN I LATER OBJECTED AND THEN HE MOVED AND I OBJECTED.

I HEARD YOUR HONOR SAY I HAD A STANDING OBJECTION, BUT I THINK FOR A CLEAR RECORD, I SHOULD PROBABLY SAY SOMETHING BEFORE THE JURY HEARS THE RECORDING.

THE COURT:  UNDERSTOOD.

MR. NARITA:  AND IT WILL BE BRIEF.  I'M NOT TRYING TO SLOW DOWN THE PROCEEDINGS.

THE COURT:  I UNDERSTAND.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

ALL RIGHT.  MADAM CLERK, CAN WE ASK TO HAVE THE JURY RETURNED.

(JURY IN AT 11:29 A.M.)

THE COURT:  YOU MAY BE SEATED.

MR. LOKER, YOU MAY CONTINUE.

MR. LOKER:  THANK YOU, YOUR HONOR.

AND WE WILL MOVE AHEAD TO ANOTHER CALL RECORDING AT EXHIBIT NUMBER 47.  I'LL PLAY THE ENTIRETY OF THIS RECORDING AND HAVE FOLLOW-UP QUESTIONS.

MR. NARITA:  JUST FOR OUR RECORD, YOUR HONOR, WE RENEW OUR PRIOR OBJECTIONS.

THE COURT:  OVERRULED.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   THAT'S THE END OF EXHIBIT 47.

COULD YOU HEAR THAT OKAY, MR. PANCHENKO?

A.   YES.

Q.   AND COULD YOU HEAR THE TWO DIFFERENT CALLERS?

A.   I HEARD TWO DIFFERENT VOICES, YEAH.

Q.   AND THEN THAT WAS POORLY PHRASED.  THANK YOU FOR THE CORRECTION.

THE MALE VOICE, WAS THAT YOU?

A.   NO.

MR. LOKER:  YOUR HONOR, WE ASK THAT EXHIBIT 47 BE ADMITTED INTO EVIDENCE.

THE COURT:  EXHIBIT --

MR. NARITA:  WITH THE SAME OBJECTIONS, YOUR HONOR.

THE COURT:  OVERRULED.

EXHIBIT 47 WILL BE ADMITTED INTO EVIDENCE.

(PLAINTIFF'S EXHIBIT 47 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THE LAST RECORDING FOR THE MOMENT, YOUR HONOR, WOULD BE EXHIBIT NUMBER 48, WHICH I'LL PLAY THE ENTIRETY OF.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   THAT'S THE END OF THE RECORDING.

MR. PANCHENKO, DID YOU HEAR THE INDIVIDUAL WHO ANSWERED ON

BEHALF CLAIMING THEY'RE MR. PANCHENKO?

A.   YES.

Q.   AND WAS THAT YOU?

A.   NO.

Q.   AND WAS THIS ONE OF THE RECORDINGS THAT YOU LISTENED TO DURING DISCOVERY AS WELL?

A.   YEAH.  I THINK THERE WERE A LIST OF RECORDINGS THERE THAT I LISTENED TO.

MR. LOKER:  YOUR HONOR, WE WOULD ASK THAT EXHIBIT 48 BE ADMITTED INTO EVIDENCE.

MR. NARITA:  WITH THE SAME OBJECTION, YOUR HONOR.

THE COURT:  THE COURT WILL OVERRULE THAT OBJECTION. THE OBJECTION WILL BE -- THE EXHIBIT WILL BE ADMITTED INTO EVIDENCE.

(PLAINTIFF'S EXHIBIT 48 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   IN TERMS OF THE DISPUTE PROCESS, MR. PANCHENKO, DID YOU EVER CALL THE CREDIT BUREAUS TO DISPUTE THE FRAUD THAT WAS ON YOUR CREDIT REPORT?

A.   I CALLED THE CREDIT BUREAUS TO DISPUTE THE FRAUD.

Q.   AND AT WHAT POINT IN TIME WAS THAT?

A.   SO I CALLED EXPERIAN RIGHT AWAY.  AS I REMEMBER, IT WAS THE FIRST ONE BECAUSE I HAD THE PREMIUM ACCOUNT WITH THEM, AND I STARTED CALLING THEM AND I STARTED ALL OF THE DISPUTES WITH THEM.

Q.   AND WHEN YOU SAY "RIGHT AWAY," WHAT MONTH WAS THAT?

A.   IT WAS IN MAY, EARLY MAY.

Q.   OF 2023?

A.   OF 2023, YES.

Q.   AT THIS POINT IN TIME WERE YOU AWARE OF WHAT IDENTITY THEFT WAS?

A.   AT THIS POINT IN TIME I -- NO, I WASN'T AWARE OF THE EXTENT OF WHAT -- LIKE I KNEW THE WORDS THERE.  I KNEW KIND OF THE IMPLICATION OF THEM, BUT I DIDN'T KNOW WHAT IT ACTUALLY MEANS AND HOW IT HAPPENED AND WHAT SHOULD I DO ABOUT IT.

Q.   DID YOU DO RESEARCH TO SEE WHAT YOU COULD DO ABOUT IT?

A.   YES, YES.  I STARTED RESEARCHING OBVIOUSLY, AND OBVIOUSLY I START FROM JUST GOOGLING AND START LEARNING ABOUT THE IDENTITY THEFT AND THE CASES, AND DIFFERENT CASES.

FOR THE MOST PART, I THINK I LEARNED ABOUT SOME IDENTITY THEFT WHEN SOMEONE USED SOMEONE'S CREDIT CARD FOR PAYMENTS.

BUT IT WAS REALLY HARD TO FIND INFORMATION FOR THE CASES WHERE, LIKE, SOMEONE OPENS THE CREDIT CARD, AT LEAST FROM MY GOOGLE AND EVERYTHING.

SO, YEAH, IT WAS A LEARNING CURVE, DEFINITELY, FOR ME TO KIND OF GET TO KNOW WHAT THAT ACTUALLY MEANS.

Q.   AT SOME POINT AFTER YOU PLACED A TELEPHONE DISPUTE TO THE CREDIT BUREAUS, DID YOU RECEIVE RESPONSE BACK FROM THE CREDIT BUREAUS ABOUT HOW THE DISPUTES ARE PROCESSED?

A.   YES.  SO I RECEIVED SOME LETTERS FROM SOME CREDIT

REPORTING AGENCIES REGARDING THE DISPUTES, BUT I REMEMBER THAT THAT WAS REALLY KIND OF RANDOM.  SO SOME OF THEM REALLY ANSWER KIND OF REALLY QUICKLY.  SOME OF THEM REALLY KIND OF RESPONDED IN A COUPLE MONTHS, MAYBE.

I'M NOT SURE I GOT ALL OF THE LETTERS, RESPONSES FOR ALL OF THE CLAIMS AND DISPUTES THAT I SENT THEM AND I TALKED TO THEM.

MR. LOKER:  YOUR HONOR, MAY I PROVIDE AN EXHIBIT BINDER TO THE WITNESS WITH PAPER COPIES?

THE COURT:  YES.

I WOULD JUST ASK THAT THE WITNESS ONLY OPEN THE EXHIBIT TO THE ONE THAT YOU'RE BEING DIRECTED TO BY COUNSEL.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

BY MR. LOKER:

Q.   OKAY.  MR. PANCHENKO, CAN YOU FLIP TO EXHIBIT NUMBER 24, PLEASE.

A.   YES, I THINK I'VE GOT IT.

Q.   AND DO YOU RECOGNIZE WHAT WE HAVE AS EXHIBIT NUMBER 24, MR. PANCHENKO?

A.   SO IT LOOKS LIKE A LETTER FROM EXPERIAN THAT IS -- IT SAYS THAT -- "YOUR DISPUTE RESULTS" IS THE TITLE, AND IT'S SENT TO ME ON 108 MOFFETT BOULEVARD IN MOUNTAIN VIEW.

Q.   THAT ADDRESS ON MOFFETT BOULEVARD, WHICH IS M-O-F-F-E-T-T, IS THAT AN ADDRESS WHERE YOU RESIDED?

A.   YES.

Q.   WHAT IS THE DATE ON THIS LETTER THAT WE HAVE HERE, EXHIBIT NUMBER 24?

A.   IT'S JUNE 1ST, 2023.

Q.   AND IN THIS JUNE 1ST DISPUTE WITH EXPERIAN, DO YOU RECALL RECEIVING THIS LETTER?

A.   SO I -- THIS ADDRESS HERE, THIS WAS THE APARTMENT THAT WAS PROVIDED BY GOOGLE WHEN WE MOVED WITH MY WIFE TO U.S.

SO WE STAYED THERE REALLY BRIEFLY, BUT OBVIOUSLY I HAD ONLY THIS ADDRESS WHEN I STARTED MY DISPUTES.

SO I REMEMBER THAT I WAS -- AFTER WE MOVED ALREADY TO OUR NEW AND LONG TERM APARTMENT, I WAS DRIVING TO THIS APARTMENT JUST TO COLLECT ALL OF THE MAILS THAT MIGHT BE ADDRESSED TO THIS ADDRESS.

SO, YEAH, I REMEMBER THAT, AND I WAS LOOKING FOR ANY POTENTIAL LETTERS THAT WAS ADDRESSED TO OUR OLDER ADDRESS, AND PROBABLY THAT'S HOW I GOT THIS LETTER AS WELL.

MR. LOKER:  YOUR HONOR, MAY I PUBLISH EXHIBIT 24 TO THE JURY?

MR. NARITA:  YOUR HONOR, I THINK WE'VE NOTED OUR OBJECTIONS, AND THE COURT HAS ALREADY ADDRESSED THEM.

THE COURT:  COUNSEL, I WOULD ASK YOU TO LAY A LITTLE FURTHER FOUNDATION THOUGH.

BY MR. LOKER:

Q.   IN TERMS OF THIS LETTER FROM EXPERIAN, MR. PANCHENKO, TAKE

AN OPPORTUNITY TO FLIP THROUGH IT.  WHAT IS YOUR UNDERSTANDING OF THE LETTER?

A.   SO THIS LETTER HAS DIFFERENT ACCOUNTS PRESENT HERE WITH SOME DISPUTE RESULTS REGARDING THEM.

THERE'S SOME REDACTED INFORMATION FROM HERE AS WELL.

AND THERE IS, LIKE FOR ME, PROBABLY THE FIRST VERSION WAS THAT I JUST GOT THIS LETTER AND HERE'S A BUNCH OF FRAUDULENT INFORMATION STILL HERE.

SO THAT WAS KIND OF FRUSTRATING TO SEE.

Q.   AND IN TERMS OF THE LETTER, MR. PANCHENKO, LOOKING AT PAGE 3 OF IT, WHICH IS BATES STAMP EXP_PANCHENKO_143, DO YOU SEE THE PORTION THAT SAYS "HOW TO READ YOUR RESULTS"?

A.   YES.

Q.   AND WHAT IS YOUR UNDERSTANDING OF THAT SECTION OF THE LETTER?

THE COURT:  COUNSEL, I'M GOING TO HAVE YOU APPROACH BRIEFLY.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

MR. LOKER:  YOUR HONOR, WITH REGARD TO EXHIBIT NUMBER 24, WE RENEW THE REQUEST TO PUBLISH IT FOR THE JURY.

MR. NARITA:  AND WE JUST RENEW OUR PRIOR OBJECTIONS, YOUR HONOR.

THE COURT:  UNDERSTOOD.

YOUR REQUEST IS GRANTED.  YOU MAY PUBLISH.

(PLAINTIFF'S EXHIBIT 24 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU.

BY MR. LOKER:

Q.   AND ON THE SCREEN, MR. PANCHENKO, DO YOU SEE THAT WE HAVE EXHIBIT NUMBER 24?

A.   YES.

Q.   AND I'LL TAKE YOU TO THE THIRD PAGE, WHICH IS BATES STAMP NUMBER 143.  WE WERE DISCUSSING THIS SECTION, "HOW TO READ YOUR RESULTS."

DO YOU SEE THAT?

A.   YES, I SEE THAT.

Q.   AND WHAT IS YOUR UNDERSTANDING OF THIS SECTION OF THE EXPERIAN LETTER?

A.   SO IT PROVIDES SOME GUIDANCE ON HOW TO READ THE RESULTS OF THE DISPUTES I GUESS, AND IT PROVIDED THE GUIDANCE FOR ME TO -- KIND OF WHAT TO PAY ATTENTION SPECIFICALLY IN THIS LETTER FROM EXPERIAN.

Q.   HOW ABOUT WHERE IT SAYS "REMAINS"?  WHAT IS YOUR UNDERSTANDING OF WHERE IT SAYS THAT?

A.   MY UNDERSTANDING IS THAT THE ACCOUNT STILL REMAINS ON MY CREDIT REPORT IF IT STATES THE STATUS.

Q.   AND WHICH ACCOUNT ARE YOU REFERRING TO?

A.   SO THERE ARE MULTIPLE ACCOUNTS HERE, AND IT SAYS THAT THEY ARE VERIFIED, AND SOME OF THEM STATES THAT THEY ARE REMAINS AND SOME STATES THAT THEY ARE DELETED.

SO OBVIOUSLY I CAN SEE THAT IN TERMS OF REMAINS, THERE IS

U.S. BANK, THERE IS COMENITY, THERE IS CAVALRY PORTFOLIO?

Q.    IN TERMS OF THE ACCOUNTS THAT REMAIN, MR. PANCHENKO,

COMENITY WAS ONE OF THOSE ACCOUNTS; IS THAT RIGHT?

A.    CORRECT.

Q.    BUT OTHER ACCOUNTS ALSO REMAINED ON YOUR CREDIT FOLLOWING

YOUR INITIAL DISPUTE?

A.    CORRECT.

Q.    THERE ARE SOME ACCOUNTS THAT ARE DELETED AS WELL; IS THAT

CORRECT?

A.    YES.

Q.    HOW DID YOU FEEL WHEN YOU RECEIVED THESE DISPUTE RESULTS?

A.    WELL, THIS RESULT SPECIFICALLY WAS JUST A CLEAR PICTURE

THAT I WILL NOT EASILY HANDLE THIS PROBLEM, RIGHT?

SO I SEE SOME DELETED ACCOUNTS, WHICH IS I GUESS GOOD, BUT

SOME OF THEM STILL ON MY CREDIT REPORT, AND I NEED TO FIGHT

THEM FURTHER.

BUT LATER AS I GOT THE RESULTS LIKE THIS WHERE SOME OF THE

ACCOUNTS STILL REMAIN AND SOME OF THEM ARE DELETED, I FOUND OUT

THE ACCOUNT CAN BE DELETED FROM MY CREDIT REPORT AND THEN

REAPPEAR AGAIN.

SO ACTUALLY, LIKE, LATER I FOUND OUT THAT EVEN IF THE

ACCOUNT STAYS DELETED, IT DOESN'T MEAN MUCH.  IT MEANS THAT IT

WENT TO DISAPPEAR FOR NOW AND IT MIGHT REAPPEAR LATER.

Q.    WERE YOU FEELING CONFUSED WHEN YOU RECEIVED THESE DISPUTE

RESULTS?

MR. NARITA:  IT'S LEADING, YOUR HONOR.

THE COURT:  SPEAKING OBJECTIONS ARE UNNECESSARY.

SUSTAINED.

BY MR. LOKER:

Q.   IN TERMS OF RECEIVING THIS LETTER, WHAT WAS YOUR IMPRESSION OF THE MIXED RESULTS?

A.   YEAH, THESE RESULTS WERE DEFINITELY FIRST CONFUSING, AND I DIDN'T KNOW, LIKE, WHAT WOULD BE A REASON FOR ANY OF THOSE BANKS THAT DIDN'T REMOVE THE ACCOUNTS OR WHAT WOULD BE THE REASON FOR THEM TO REMAIN THEM OR VERIFY THEM OR UPDATE THEM.

SO FOR ME IT WAS, LIKE, DEPRESSING AND CONFUSING TO SEE THAT, AND THE NEXT OF STEP WAS OBVIOUSLY WHAT SHOULD I DO NEXT AND HOW CAN I HANDLE THIS AND REMOVE THIS?

Q.   WHAT DID YOU DO NEXT?  WHAT DID YOU TRY TO GATHER?

A.   YEAH.  SO THIS -- THE MAIN THING THAT I DID THAT I REMEMBER THAT WAS HELPFUL WAS I WENT AND FOUND OUT ABOUT FTC, AND THEY HAVE A GUIDANCE OF PEOPLE WHO HAVE EXPERIENCE IN INTERCEPT.

AND SO I JUST WENT THROUGH THE GUIDANCE AND THE CHECKLIST THAT THEY SPECIFICALLY HAVE AND JUST WENT ONE BY ONE FOR EACH ACCOUNT AND PROVIDED ALL OF THE ACCOUNT AND PROVIDED ALL OF THE INFORMATION THAT I HAVE ABOUT THE ACCOUNT.

AND THEN THEY GENERATED LETTERS FOR EACH ACCOUNT, AND I PRINTED THOSE LETTERS AND I SENT IT TO ALL OF THE BANKS AND OTHER ENTITIES THAT APPEAR ON MY CREDIT REPORT IN THE HOPE

THAT -- AND AS IT STATES IN FTC, THAT THIS SHOULD BASICALLY HELP THEM CLOSE THE ACCOUNT AS SOON AS POSSIBLE.

Q.    THANK YOU.

YOUR HONOR, I WAS GOING TO GO TO THE FTC LETTER, BUT THERE ARE SOME LIMITING INSTRUCTIONS THAT WE DISCUSSED BEFORE.

THE COURT:  LET ME TURN TO THOSE.

MEMBERS OF THE JURY, THE TESTIMONY THAT YOU'RE ABOUT TO HEAR IS REGARDING THE FEDERAL TRADE COMMISSION, WHICH IS BEING REFERRED TO AS FTC.

SO REGARDING THE FTC IDENTITY THEFT REPORT THAT PLAINTIFF SUBMITTED TO THE FTC AND ANY COPIES OF SUCH FTC REPORTS YOU'RE ABOUT TO SEE MAY ONLY BE CONSIDERED FOR THE LIMITED PURPOSE OF UNDERSTANDING PLAINTIFF'S ALLEGATIONS.

THIS REPORT REFLECTS INFORMATION SUBMITTED TO THE FTC BY PLAINTIFF.  THE REPORT MAY BE CONSIDERED SOLELY AS A SUMMARY OF THE ALLEGATIONS MADE BY PLAINTIFF AND DOES NOT REFLECT THE INDEPENDENT FINDINGS OF THE FTC ITSELF.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.    MR. PANCHENKO, WITHIN THAT BINDER, CAN YOU GO TO TAB 1?

A.    YES, I'M HERE.

Q.    AND WHAT DO YOU SEE AT TAB 1, MR. PANCHENKO?

A.    SO THIS LOOKS LIKE A LETTER FTC.IDENTITYTHEFT.GOV.

Q.    FTC.IDENTITYTHEFT.GOV?

A.    THANK YOU.

THERE ARE SOME SMALLER DEDUCTIONS, BUT I CAN SEE THAT THIS

MIGHT BE ONE OF THE EXAMPLES OF THE LETTERS THAT WAS GENERATED BY FTC TO HELP ME SEND THIS LETTER TO THE BANKS, AND SPECIFICALLY IN THIS CASE THIS LETTER FOR COMENITY IN ORDER TO DISPUTE THE FRAUDULENT ACCOUNTS.

Q.   AND WHAT IS THE DATE OF THE LETTER THAT YOU'RE LOOKING AT FOR EXHIBIT 1?

A.   IT SHOWS JUNE 27, 2023.

Q.   IN THIS LETTER IT WAS -- WHAT YOU WERE TALKING ABOUT BEFORE IS GENERATED BASED ON INFORMATION THAT YOU SUBMITTED TO THE FTC; IS THAT CORRECT?

A.   YES.  SO THEY GENERATE MULTIPLE LETTERS BASED ON THE INFORMATION I SUBMITTED.

Q.   AND THIS PARTICULAR LETTER THAT WE'RE LOOKING AT, WHICH BANK DOES IT RELATE TO?

A.   SO I THINK IT RELATES TO COMENITY.

MR. LOKER:  YOUR HONOR, MAY I PUBLISH EXHIBIT 1 TO THE JURY?

MR. NARITA:  YOUR HONOR, WE RENEW OUR PREVIOUS OBJECTIONS, AND I BELIEVE THERE WAS A LIMITING INSTRUCTION RELATED TO THIS.

THE COURT:  I WAS ABOUT TO INTERCEDE REGARDING THE SAME.

SO THE PREVIOUS OBJECTION IS OVERRULED.

HOWEVER, THERE'S A FURTHER LIMITING INSTRUCTION.

SO, MEMBERS OF THE JURY, I JUST DISCUSSED WITH YOU THAT

THERE'S AN FTC REPORT, WHICH IS ABOUT TO SHORTLY BE PUBLISHED. BUT IN ADDITION, THERE'S REFERENCE TO THE FACT THAT THIS IS A DISPUTE WHICH PLAINTIFF SUBMITS DIRECTLY TO COMENITY, AND SO I'M GOING TO READ YOU AN INSTRUCTION REGARDING THAT AS WELL.

SO THE TESTIMONY THAT YOU'RE ABOUT TO HEAR RELATES TO DISPUTES PLAINTIFF SUBMITTED DIRECTLY TO COMENITY, REFERRED TO DURING THIS TRIAL AS DIRECT DISPUTES, AND COMENITY'S HANDLING OF THAT DISPUTE.

YOU MAY CONSIDER THE TESTIMONY ONLY TO THE EXTENT THAT YOU BELIEVE THE INFORMATION PLAINTIFF PROVIDED COMENITY AS PART OF THE DIRECT DISPUTE IN CONTRAST TO THE INDIRECT DISPUTE.

BUT A DIRECT DISPUTE HERE WAS RELEVANT TO COMENITY'S INVESTIGATION OF A LATER DISPUTE THAT COMENITY RECEIVED FROM A CONSUMER REPORTING AGENCY, REFERRED TO DURING THIS TRIAL AS AN INDIRECT DISPUTE.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.   LET ME TRY AGAIN.  DID THE LETTER THEN POP UP YOUR SCREEN, MR. PANCHENKO?

A.   YES.

Q.   AND IN TERMS OF EXHIBIT 1, LOOKING AT THE BODY OF THE LETTER, WHAT WAS -- WHAT WERE YOU CONVEYING TO COMENITY THROUGH THIS LETTER?

A.   SO THIS STATES THAT I PREVIOUSLY IDENTIFIED THAT I'M A VICTIM OF IDENTITY THEFT AND REQUESTED TO DO THE FOLLOWING: CLOSE UNAUTHORIZED ACCOUNT; REMOVE ANY CHARGES ON THIS ACCOUNT;

PANCHENKO DIRECT BY MR. LOKER

AND TAKE STEPS TO REMOVE INFORMATION ABOUT THIS ACCOUNT FROM MY CREDIT FILES.

Q.   DID YOU INCLUDE ANY DOCUMENTS ALONG WITH THE LETTER?

A.   YES, SO I INCLUDED MULTIPLE DOCUMENTS.  AS I REMEMBER, I STARTED WITH INCLUDING ALL OF THE DOCUMENTS THAT THE FTC REQUIRED, LIKE A PROOF OF IDENTITY AND SOME OTHER DOCUMENTS THERE; YES, PROOF OF ADDRESS AS WELL.

BUT LATER I SEND THIS AGAIN AND AGAIN.  I WAS INCLUDING MORE EVIDENCE THERE JUST SO THAT COMENITY AND OTHER ENTITIES WILL HAVE ALL OF THE NECESSARY INFORMATION THAT I HAVE TO HANDLE THEM TO DEAL WITH THIS CASE.

Q.   AND IN STICKING WITH THIS PARTICULAR LETTER, IF YOU COULD FLIP TO THE SECOND PAGE OF IT.  WHAT DO WE HAVE AT BATES STAMP 113, MR. PANCHENKO?

A.   THIS IS MY PASSPORT.

Q.   AND WHY WAS THIS INCLUDED WITHIN THE FTC LETTER?

A.   SO THIS PASSPORT SERVES MULTIPLE REASONS TO INCLUDE IT. FIRST, IT'S PROOF OF IDENTITY THEFT.  THIS IS LIKE MY MAIN WAY OF IDENTIFYING MYSELF IN U.S. AND ANYWHERE, PART OF THE UKRAINE.

THE OTHER ONE IS BECAUSE THIS PASSPORT HAS A NUMBER, PASSPORT NUMBER, AND THAT NUMBER SHOULD HELP COMENITY TO VERIFY MY TRAVEL HISTORY.

Q.   THANK YOU.

AND I APPLIED A REDACTION TO HIS FULL DATE OF BIRTH,

PANCHENKO DIRECT BY MR. LOKER

YOUR HONOR, THAT WASN'T PREVIOUSLY PRESENT ON BATES STAMP 113.

I APOLOGIZE FOR MISSING THAT.

WAS THERE A REASON, MR. PANCHENKO --

THE COURT:  REPEAT THAT ONE MORE TIME.

MR. LOKER:  SORRY.  ON 113, YOU CAN SEE THAT THERE'S NOT A REDACTION FOR HIS FULL DATE OF BIRTH WITHIN EXHIBIT 1.

SINCE IT'S ON A SCREEN, I DID PUT A REDACTION THERE TO COVER THE MONTH AND DATE OF HIS BIRTH, WHICH IS ON HIS PASSPORT.

THE COURT:  OKAY.

THE CLERK:  I'M SORRY, YOUR HONOR.  I'M HAVING A BIT OF A PROBLEM GETTING ALL OF THE MONITORS TO WORK.  I UNDERSTAND THIS WAS REQUESTED TO BE PUBLISHED TO THE JURY?

MR. LOKER:  YES.

THE CLERK:  OKAY.  I BEG EVERYONE'S INDULGENCE.  I'M GOING TO TURN THE MONITORS OFF FOR A SECOND AND TRY TO TURN THEM BACK ON.

THE COURT:  MR. LOKER, THE OTHER THING I WAS GOING TO SAY WAS, BECAUSE MY EVIDENCE MONITOR WAS NOT ON, I WAS CONCERNED WHETHER IT ACTUALLY HAD BEEN PUBLISHED, AND LOOKING AT THE JURORS' FACES, I AM ASSUMING THAT IT HAD NOT BEEN PUBLISHED.

SO IN TERMS OF YOUR QUESTIONING, THEY HAD NOT SEEN IT.

MR. LOKER:  OKAY.  UNDERSTOOD.  OKAY.  THANK YOU, YOUR HONOR.

THE CLERK:  SO NOW IT SHOULD BE PUBLISHED TO EVERYONE.

MR. LOKER:  I SEE IT UP HERE.

THE CLERK:  ARE YOU SEEING IT, YOUR HONOR?

THE COURT:  I AM NOT.

I SEE THE MEMBERS OF THE JURY -- LET ME ASK, ARE YOU ALL SEEING THE EXHIBITS?

JUROR:  YES.

THE COURT:  OKAY.  SO WE WILL JUST MONITOR IT CAREFULLY IN TERMS OF WHETHER OR NOT IT'S BEEN PUBLISHED TO THE JURY OR NOT.  I BELIEVE THE OTHER EXHIBITS, ONCE THEY HAD BEEN PUBLISHED, THAT THE JURY DIDN'T SEE THEM.

MR. LOKER:  THANK YOU.

THE COURT:  ALL RIGHT.  LET'S START THIS AGAIN BEGINNING WITH EXHIBIT NUMBER 1 IN TERMS OF ANY QUESTIONS THAT YOU HAD.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.   AND WE ARE LOOKING AT BATES STAMP 113.

MR. PANCHENKO, WAS THERE A PARTICULAR REASON THAT YOU DIDN'T PROVIDE A CALIFORNIA DRIVER'S LICENSE?

A.   YES, BECAUSE I DIDN'T HAVE A CALIFORNIA DRIVER'S LICENSE.

Q.   SO YOU NEVER HAD ONE?

A.   YES.

Q.   IN MOVING FORWARD WITHIN EXHIBIT 1, THERE'S A LETTER THAT SPANS OVER TWO PAGES, SO I'LL PUT THEM BOTH UP FOR YOU.

AND, MR. PANCHENKO, DO YOU RECOGNIZE WHAT COMES NEXT WITHIN EXHIBIT 1?

A. YES.

Q. AND WHAT IS IT?

A. I BELIEVE THIS IS IDENTITY THEFT REPORT THAT I CREATED, ONE OF THE IDENTITY THEFT REPORTS THAT I CREATED WITH THE FTC.

Q. IN THE TOP PORTION IT HAS CONTACT INFORMATION.

DO YOU SEE THAT?

A. YES.

Q. AND WAS THAT INFORMATION THAT YOU SUBMITTED THROUGH THE FTC WEBSITE?

A. YES.

Q. THERE'S A TELEPHONE NUMBER ENDING IN 9611.

DO YOU SEE THAT?

A. YES.

Q. I SAID THAT WRONG. MY APOLOGIES. 9677?

A. YES.

THE COURT: AND FOR CLARIFICATION, MR. LOKER, ARE YOU REFERRING TO BATES LABELED 114?

MR. LOKER: CORRECT.

THE COURT: OKAY. CONTINUE.

MR. LOKER: THANK YOU, YOUR HONOR.

Q. THE 9677 NUMBER, DID YOU EVER RECEIVE A CALL FROM COMENITY ON THAT NUMBER DURING THE DISPUTE PROCESS?

A. I DON'T REMEMBER RECEIVING ANY CALLS FROM COMENITY ON THAT

NUMBER.

Q.   HOW ABOUT ANY OF THE OTHER BANKS?

A.   I DON'T REMEMBER RECEIVING ANY CALLS FROM ANY OTHER BANKS TO THIS NUMBER.

Q.   AND NEXT THERE'S AN EMAIL.  WHAT IS THE EMAIL THAT IS REFLECTED THERE?

A.   IT'S SASHA8924@GMAIL.COM.

Q.   IS THAT YOUR EMAIL?

A.   YES.

Q.   AND WHERE DOES SASHA COME FROM?

A.   THIS IS BASICALLY MY NAME, MY FIRST NAME.  SO OLEKSANDR, IT'S SASHA.  IT'S USED LIKE -- I KNOW IN THE U.S. THERE'S SOME NAMES THAT HAS DIFFERENT SPELLING, BUT SAME MEANING.  THIS IS THE SAME.

Q.   PERHAPS LIKE ROBERT AND BOB?

A.   YES.

Q.   OKAY.  AND IN TERMS OF THAT EMAIL ADDRESS, MR. PANCHENKO, DID YOU RECEIVE AN EMAIL FROM COMENITY AT THAT ADDRESS DURING THE DISPUTE PROCESS?

A.   I DON'T RECALL RECEIVING EMAILS AT THIS POINT.

Q.   HOW ABOUT FROM ANY OF THE OTHER BANKS?

A.   I DON'T REMEMBER WHETHER I RECEIVED ANY LETTERS FROM OTHER BANKS AT THIS EMAIL.

Q.   AND I'LL SPELL ANOTHER EMAIL FOR YOU AND ASK IF IT'S YOURS.

A.   UH-HUH.

Q.   HAVE YOU EVER USED THE EMAIL OLEKSPANCH89@YAHOO.COM?

A.   NO.

Q.   AT NO POINT?

A.   NO, AT NO POINT.

Q.   PROCEEDING DOWN IN THE EXHIBIT AT BATES STAMP NUMBER 114, THERE'S A PERSONAL STATEMENT.

     DO YOU SEE THAT?

A.   YES.

Q.   IS THAT SOMETHING THAT -- LET ME USE IT IN A DIFFERENT WAY.

     IS THAT SOMETHING THAT YOU TYPED OUT?

A.   YES, I BELIEVE SO.

Q.   AND WHY -- WHAT IS THE PURPOSE OF THIS PERSONAL STATEMENT?

A.   I THINK THE REASON TO TYPE IT WAS BECAUSE THIS WAS ONE OF THE FIELDS I NEED TO TYPE WHEN I CREATE THIS REPORT, AND THERE WAS PROBABLY SOME GUIDANCE FROM FTC THAT EXPLAINS THAT WHY I NEED TO TYPE IT AND WHAT SHOULD IT BE.  SO THAT'S WHY I TYPED IT.

Q.   AND WHAT DID YOU CONVEY THROUGH THAT PERSONAL STATEMENT?

A.   I CONVEYED THAT FRAUDULENT APPLICATIONS MAY BE SUBMITTED IN MY NAME, OR MY IDENTITY MAY HAVE BEEN USED WITHOUT MY CONSENT FOR FRAUDULENTLY OBTAINED GOODS OR SERVICES.

     SO THIS IS LIKE A PRECAUTION FOR ANYONE THAT MIGHT KIND OF CHECK MY CREDIT REPORT AND JUST SO THAT THEY KNOW THAT WHAT IS

HAPPENING WITH THIS ACCOUNT.

Q.   GOING DOWN ON THE PAGE, STILL BATE STAMP 114.  WE SEE A COUPLE OF -- TWO ACCOUNTS REFERRED TO.

DO YOU SEE THAT ON YOUR SCREEN?

A.   YES.

Q.   AND WHERE DID YOU GET THE ACCOUNT INFORMATION TO PUT IN THAT FIELD?

A.   I GOT IT FROM MY CREDIT REPORT.

Q.   AND THOSE ACCOUNTS GO ON TO THE NEXT PAGE, IS THAT RIGHT, BATES STAMP 115?

A.   YES.

Q.   AND TAKE US THROUGH.  WHEN WERE THE ACCOUNTS OPENED?  AND I CAN ZOOM AS NEEDED.

A.   YES.  SO AS IT STATES HERE, BANK OF AMERICA WAS OPENED, LIKE, EARLY 2017; BARCLAYS, EARLY 2016; AND COMENITY WAS OPENED AT THE END OF 2015; JP MORGAN, THERE'S TWO ACCOUNTS, ONE IN 2016, AND ANOTHER ONE 2018.

Q.   AND WOULD -- IN TERMS OF ORDER, FIRST TO LAST, WHEN WAS COMENITY OPENED?

A.   IT LOOKS LIKE THEY WERE OPENED IN THE FIRST ONE, 2015.

Q.   AND, MR. PANCHENKO, I BELIEVE YOU ALSO NOTE THE BALANCES, THE TOTAL FRAUDULENT AMOUNT ON THIS EXHIBIT; IS THAT RIGHT?

A.   YES.

Q.   CAN YOU DESCRIBE THOSE FOR US?

A.   YES.  SO THIS IS SOMETHING THAT I HAD TO TYPE, AND THIS

WAS ANOTHER FIELD I HAD TO FILL FOR EACH ACCOUNT.

SO I TOOK THIS INFORMATION FROM MY CREDIT REPORT AND FILLED IT HERE TO REPORT AS MUCH INFORMATION AS I CAN.

Q.   AND THE BALANCES, ARE THEY ALL EQUAL OR ARE THEY VARYING?

A.   YEAH, YES.  SO THEY'RE NOT ALL EQUAL.  I CAN SEE THAT COMENITY HAD THE LOWEST AMOUNT OUT OF ALL OF THIS.  IT'S A LITTLE BIT ABOVE 5,000.

SO ALL OTHER ACCOUNTS ARE MUCH BIGGER.

Q.   WITH THE LARGER ACCOUNTS, WERE YOU MORE CONCERNED ABOUT THOSE THAN COMENITY?

A.   WELL, FOR ME IT WAS OBVIOUSLY ALL THE ACCOUNTS HERE WAS FRAUDULENT, SO I WASN'T SPECIFICALLY CONCERNED ABOUT THE AMOUNTS.

I BECOME CONCERNED ABOUT THE AMOUNTS ONLY WHEN SOME OF THE BANKS TRIED TO KIND OF ASK ME TO PAY THEM, AND THEN OBVIOUSLY THAT AMOUNT HIT IT BACK ON ME.

BUT AT THIS POINT IN TIME I JUST KIND OF SAW A LOT OF FRAUDULENT INFORMATION ON MY CREDIT REPORT AND I WANTED TO GET RID OF IT.

Q.   OKAY.  LOWER DOWN ON BATES STAMP 115, DO YOU SEE WHERE IT SAYS "SUSPECT INFORMATION"?

A.   YES.

Q.   AND WHAT'S REFLECTED THERE?

A.   THERE'S AN ADDRESS IN LOS ANGELES, 5460 SIERRA VISTA, THE PHONE NUMBER, AND, YEAH.

Q.    AND STARTING FIRST WITH THE ADDRESS, HAVE YOU EVER LIVED AT THAT SIERRA VISTA ADDRESS IN LOS ANGELES?

A.    NO.

Q.    HAVE YOU EVER FILLED OUT ANY APPLICATION SAYING YOU LIVED THERE?

A.    NO.

Q.    THE PHONE NUMBER ENDING IN 9259, HAS THAT EVER BEEN ONE OF YOURS?

A.    NO.

Q.    HAVE YOU EVER REPRESENTED TO ANYONE THAT THAT WAS YOUR TELEPHONE NUMBER?

A.    NO.

Q.    LOWER WE SEE "ADDITIONAL DETAILS."

DO YOU HAVE THAT?

A.    YES.

Q.    AND WHAT DID YOU PUT IN THERE?

A.    I PUT EQUIFAX DATA BREACH.

Q.    AND WHAT IS THE RELEVANCE OF THE EQUIFAX DATA BREACH?

A.    I WANTED TO PUT ALL OF THE INFORMATION I HAD ABOUT THESE FRAUDULENT ACCOUNTS, AND WHEN I WAS INVESTIGATED FOR MYSELF AND COLLECTING ALL OF THE DATA, I MANAGED TO KIND OF LAND ON THE PAGE OF EQUIFAX DATA AND I PUT MY PERSONAL INFORMATION THERE TO CHECK WHETHER I WAS KIND OF PART OF IT, AND IT SHOWED ME THAT I WAS PART OF IT.

SO I INCLUDED HERE IN THE HOPE THAT IT WILL BE HELPFUL TO

ANYONE WHO WANTS TO INVESTIGATE IT.  IT'S JUST SOMETHING THAT I THOUGHT IS RELEVANT FOR HAVING YOUR SOCIAL SECURITY INFORMATION STOLEN FROM EQUIFAX AND THEN MIGHT BE USED.

Q.   DO YOU KNOW WHO STOLE YOUR INFORMATION?

A.   NO, I DON'T KNOW THAT INFORMATION.

Q.   DO YOU KNOW HOW THEY GOT IT?

A.   NO, I DON'T KNOW THAT.

Q.   LOWER DOWN, STILL ON PAGE 115, THERE'S A STATEMENT STARTING WITH "UNDER PENALTY OF PERJURY."

CAN YOU READ THAT TO US?

A.   YES.  "UNDER PENALTY OF PERJURY, I DECLARE THIS INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE."

Q.   AND CONTINUE, PLEASE.

A.   "I UNDERSTAND THAT KNOWINGLY MAKING ANY FALSE STATEMENTS TO THE GOVERNMENT MAY VIOLATE FEDERAL, STATE, OR LOCAL CRIMINAL STATUTES, AND MAY RESULT IN A FINE, IMPRISONMENT, OR BOTH."

Q.   DO YOU UNDERSTAND WHAT THAT STATEMENT MEANS?

A.   YES.

Q.   AND WHAT DOES IT MEAN TO YOU?

A.   IT MEANT TO ME THAT ALL INFORMATION I PROVIDE HERE, I NEED TO PROVIDE AS MUCH INFORMATION -- AS MUCH TRUTHFUL INFORMATION AS I CAN, SO THAT'S WHAT I DID.

Q.   OKAY.  AND WHAT IS THE DATE ON THIS -- WHEN DID YOU SIGN THIS LETTER?

A.   THE DATE HERE IS JUNE 26TH, 2023.

Q.    THANK YOU.

I WAS GOING TO MOVE FORWARD TO ANOTHER EXHIBIT, BUT IT'S ABOUT LUNCH TIME.

THE COURT:  I THINK WE CAN GO AHEAD WITH ONE MORE EXHIBIT.  BUT I'M GOING TO GO AHEAD AND REPEAT THE INSTRUCTION BECAUSE I THINK IT MAKES SENSE IN CONTEXT IN TERMS OF THE FTC REPORT.

SO YOU JUST HEARD TESTIMONY REGARDING THE FTC COMMISSION IDENTITY REPORT THAT THE PLAINTIFF SUBMITTED TO THE FTC AND THEN HERE SUBMITTED THEM TO COMENITY.

THIS IS TO BE CONSIDERED FOR THE LIMITED PURPOSE OF UNDERSTANDING PLAINTIFF'S ALLEGATION.  THIS REPORT REFLECTS INFORMATION SUBMITTED TO THE FTC BY PLAINTIFF.

THE REPORT MAY BE CONSIDERED SOLELY AS A SUMMARY OF THE ALLEGATIONS MADE BY PLAINTIFF AND DOES NOT REFLECT THE INDEPENDENT FINDINGS OF THE FTC ITSELF.

ALL RIGHT.

MR. NARITA:  THANK YOU.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.    AND AT SOME POINT, MR. PANCHENKO, DID YOU CALL COMENITY DIRECTLY TO DISPUTE THE ACCOUNT?

A.    YES.

Q.    AND ABOUT WHEN DID THAT OCCUR?

A.    I DON'T REMEMBER ALL OF THE DATES I CALLED COMENITY, BUT I START CALLING THESE BANKS KIND OF RIGHT AWAY AFTER I REALIZED

THAT THIS IS IDENTITY THEFT, I REALIZE WHAT DOES IT MEAN, AND I GOT THE FIRST DISPUTE RESULTS THAT WERE KIND OF VERIFIED OR REMAINS STATUS.

SO I CALLED COMENITY AND OTHER BANKS, AND THAT WAS KIND OF REALLY HARD TO DO BECAUSE IN ORDER TO CALL THE BANK, YOU -- PROBABLY FIRST THING YOU'RE GOING TO DO IS THAT YOU'RE GOING TO LAND ON THIS ROBOT, KIND OF A ROBOT RESPONDER, THAT IS GOING TO ASK YOU SOME INFORMATION TO DIRECT YOU TO THE RIGHT DEPARTMENT KIND OF.

AND THE FIRST THING THAT BANKS DO IS THAT THEY ASK -- BASICALLY THIS ROBOT ASKS THE PERSON TO PROVIDE AN ACCOUNT NUMBER.

SO BECAUSE I HAD ALL OF THE INFORMATION THAT WAS AVAILABLE ON MY CREDIT REPORT, THE ACCOUNT NUMBER THERE WAS REDACTED FOR THE MOST PART, SO BASICALLY YOU CANNOT CALL THE BANK DIRECTLY, SO YOU HAVE TO FIND A WAY TO TALK TO THE PERSON IN THE BANK AND KIND OF GO THROUGH THIS ROBOT EXPERIENCE IN THERE.

AND EVENTUALLY I FOUND THE WAYS HOW TO DEAL WITH THIS, HOW TO OVERCOME IT, HOW TO FIND SOMEONE TO TALK TO, AND THAT SOMEONE PROBABLY HOPEFULLY WILL REDIRECT MY PHONE CALL TO THE FRAUD DEPARTMENT OR TO THE CREDIT DEPARTMENT IN THE BANK SO I CAN TALK TO KIND OF THE RIGHT PERSON.

MR. LOKER:  AND I WAS GOING TO PLAY EXHIBIT NUMBER 49 IN ITS ENTIRETY.  IT'S SHORTER.

MR. NARITA:  WITH THE SAME OBJECTIONS, YOUR HONOR.

THE COURT:  ONE MOMENT, MR. LOKER.

MR. LOKER:  YES.

(PAUSE IN PROCEEDINGS.)

THE COURT:  YOU MAY PROCEED.

MR. LOKER:  THANK YOU.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   AND THAT'S THE END OF THE RECORDING.

DID YOU RECOGNIZE YOUR VOICE IN THERE, MR. PANCHENKO?

A.   YES.

THE COURT:  MR. LOKER, I WANT TO PROCEED FOR A SECOND WITH A FURTHER LIMITING INSTRUCTION.

MR. LOKER:  OH.

THE COURT:  SO HERE, I WAS GOING TO SAY THE TESTIMONY, BUT HERE THE RECORDING THAT YOU JUST HEARD RELATES TO THE DISPUTE THAT THE PLAINTIFF SUBMITTED DIRECTLY TO COMENITY, REFERRED TO, AS I MENTIONED, AS A DIRECT DISPUTE, AND COMENITY'S HANDLING OF THAT DISPUTE.

YOU MAY CONSIDER THE TESTIMONY ONLY TO THE EXTENT THAT YOU BELIEVE THE INFORMATION THAT PLAINTIFF PROVIDED COMENITY AS PART OF THE DIRECT DISPUTE WAS RELEVANT TO COMENITY'S INVESTIGATION OF A LATER DISPUTE THAT COMENITY RECEIVED FROM A CONSUMER REPORTING AGENCY, REFERRED TO DURING THE TRIAL AS AN INDIRECT DISPUTE.

MR. LOKER:  THANK YOU, YOUR HONOR.

MAY WE MOVE EXHIBIT 49 INTO EVIDENCE?

THE COURT:  YES.

MR. NARITA:  THANK YOU, YOUR HONOR, WITH OUR PRIOR OBJECTION.

THE COURT:  OBJECTION IS NOTED.  OVERRULED.

AND THE EXHIBIT WILL BE ADMITTED.

MR. LOKER:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBIT 49 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  I WAS GOING TO PLAY ANOTHER RECORDING WHICH IS ABOUT TEN MINUTES LONG, AND I'LL PLAY IT IN ITS ENTIRETY IF THERE'S TIME.

THE COURT:  THERE IS, BUT THIS WILL BE THE LAST ONE BEFORE OUR BREAK.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

MR. NARITA:  NUMBER?

MR. LOKER:  50.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   WAS THAT YOU ON THE RECORDING, MR. PANCHENKO?

A.   YES.

MR. LOKER:  YOUR HONOR, WE ASK THAT EXHIBIT 50 BE ADMITTED INTO EVIDENCE.

MR. NARITA:  WITH OUR PRIOR OBJECTIONS, YOUR HONOR.

THE COURT:  OBJECTION NOTED.

THE EXHIBIT WILL BE ADMITTED INTO EVIDENCE WITH THE

FOLLOWING LIMITING INSTRUCTION:

SO IT WILL SOUND FAMILIAR, BUT THE EXHIBIT THAT YOU JUST HEARD RELATES TO THE DISPUTE THAT PLAINTIFF SUBMITTED DIRECTLY TO COMENITY, REFERRED TO AS A DIRECT DISPUTE, AND COMENITY'S HANDLING OF THAT DISPUTE.

YOU MAY CONSIDER THE TESTIMONY ONLY TO THE EXTENT THAT YOU BELIEVE THE INFORMATION PLAINTIFF PROVIDED COMENITY AS PART OF THE DIRECT DISPUTE WAS RELEVANT TO COMENITY'S INVESTIGATION OF A LATER DISPUTE THAT COMENITY RECEIVED FROM A CONSUMER REPORTING AGENCY, WHICH IS AT THE HEART IN THIS CASE, REFERRED TO AS AN INDIRECT DISPUTE FOR PURPOSES OF TRIAL.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  YOU'RE WELCOME.

COUNSEL, WHY DON'T YOU FINISH UP YOUR QUESTIONING ON THIS EXHIBIT?  YOU MAY PROCEED.

MR. LOKER:  I WAS GOING TO MOVE TO ANOTHER RECORDING.

THE COURT:  I THINK THIS MIGHT BE A GOOD TIME FOR THE LUNCH BREAK.

SO MEMBERS OF THE JURY, THANK YOU FOR YOUR ATTENTION THIS MORNING, AND FOR OUR LITTLE GLITCHES HERE AND THERE, WHICH WE'RE STILL WORKING OUT IN THE COURTROOM.  I REALLY APPRECIATE YOUR FOCUS AND ATTENTION.  I'VE SEEN YOU PAY ATTENTION SO FAR THIS MORNING.

WE'RE MOVING INTO THE LUNCH BREAK.  YOU'RE GOING TO HAVE

45 MINUTES.  LUNCH HAS BEEN BROUGHT IN.  I ALSO UNDERSTAND THAT YOU MAY NEED TO STRETCH YOUR LEGS AND WALK AROUND AND SO FORTH, AND I'M SURE MADAM CLERK HAS ALREADY TALKED TO YOU ABOUT IT, BUT IF YOU HAVE ANY QUESTIONS, JUST LET US KNOW, AND PLEASE ENJOY LUNCH.

ALL RIGHT.

OH, ONE LAST INSTRUCTION.  IT'S SO TEMPTING, I UNDERSTAND WANTING TO, BUT YOU ARE NOT PERMITTED TO BEGIN DISCUSSING THIS CASE WITH EACH OTHER.  YOU CAN ONLY START TALKING ABOUT THE CASE AND THE FACTS THAT YOU HEARD THIS MORNING WHEN WE -- AFTER CLOSING ARGUMENTS AND WHEN WE SEND YOU BACK TO DELIBERATE.

IT'S HARD.  I KNOW IT'S HARD.  BUT I ASK THAT -- YOU ARE INSTRUCTED THAT YOU'RE NOT TO DISCUSS THIS CASE WITH EACH OTHER.  THANK YOU VERY MUCH.

MADAM CLERK.

COUNSEL, I'LL ASK YOU TO STAY FOR JUST A FEW BRIEF MINUTES AFTERWARDS.

(JURY OUT AT 12:23 P.M.)

THE COURT:  MR. PANCHENKO, YOU'RE ALSO EXCUSED FROM THE WITNESS STAND.

THE WITNESS:  THANK YOU.

THE COURT:  THANK YOU.

COUNSEL, I WANT TO PUT ONE OR TWO THINGS ON THE RECORD.

COUNSEL ARE PRESENT AND THE PARTIES ARE PRESENT.

WE HAD A SIDE-BAR REGARDING EXHIBIT 24, AND THE COURT

ADMONISHED COUNSEL NOT TO BEGIN TO DISCUSS THE EXHIBIT BEFORE THE EXHIBIT HAS BEEN ADMITTED -- I MEAN PUBLISHED TO THE JURY, AND IT WAS JUST BECAUSE WE WERE HAVING -- THERE WAS AN ISSUE IN TERMS OF FOUNDATION IN TERMS OF BEING ESTABLISHED WHETHER OR NOT PLAINTIFF HAD RECEIVED THAT EXHIBIT.  THE FOUNDATION WAS THEN LAID, HAD BEEN LAID BEFORE, SO JUST BEING CAUTIOUS ABOUT PUBLISHING.

MR. NARITA, THANK YOU FOR JUST VERY CLEARLY STATING YOUR OBJECTIONS AND MOVING ON.  I WAS NOT INDICATING THAT YOU WERE NOT, BUT I APPRECIATE YOU JUST NOTING OBJECTIONS AND US MOVING FORWARD.

EXHIBIT 41, I REALIZE IN RETROSPECT, HAD NOT BEEN ADMITTED JUST BECAUSE WE WERE DISCUSSING SOME OF THE OTHER ISSUES SURROUNDING THOSE EXHIBITS.

MR. LOKER:  CORRECT, YOUR HONOR.

THE COURT:  AND SO -- AND I CAN DO SO BACK WHEN WE'RE IN FULL SESSION, BUT I WOULD ASK COUNSEL TO FINISH ITS MEETING AND CONFERRING REGARDING THOSE EXHIBITS.

AND IF THERE IS ANYTHING ELSE, MR. LOKER, YOU HEARD MY ADMONISHMENT AND CONCERN REGARDING DATES AND REGARDING THAT SET OF EXHIBITS.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  SO THAT'S WHAT I JUST WANTED TO MAKE SURE TO EMBODY SOME OF THE CONVERSATIONS THAT WE'VE HAD AT SIDE-BAR AND OTHERWISE.

BUT ANYTHING FURTHER, MR. NARITA?

MR. NARITA:  JUST BRIEFLY, YOUR HONOR.

I DO NOTE THAT THE LAST TWO EXHIBITS, EXHIBIT 49 AND EXHIBIT 50, WHICH WERE THE RECORDINGS OF MR. PANCHENKO'S VOICE --

THE COURT:  YES.

MR. NARITA:  -- THERE WAS NOTHING THAT I HEARD GIVING THE JURY ANY CONTEXT AS THE DATE THAT THOSE CALLS WERE PLACED, AND IT SOUNDED LIKE THERE WERE TWO CALLS, BUT I THINK MR. LOKER WILL AGREE THAT THAT WAS ACTUALLY TWO RECORDINGS OF THE SAME CALL.  IT WAS JUST THE FIRST ONE TRANSFERRED INTO CHARLES AND THE SECOND ONE.

SO I THINK THERE IS SOME CONFUSION IN THE RECORD NOW THAT IT SOUNDS LIKE HE CALLED TWICE AND TALKED TO TWO PEOPLE, AND WE DON'T KNOW WHICH DATE.

BUT ACTUALLY HE ONLY CALLED ONCE, AND THE SECOND SEGMENT WAS THE TRANSCRIPT CALL.

THE COURT:  MR. LOKER.

MR. LOKER:  AND I ENVISION THE DATES WILL BE PART OF OUR MEET AND CONFER EFFORTS, SO I SPECIFICALLY DIDN'T SAY THE DATES BASED UPON OUR DISCUSSIONS.

THE COURT:  OH, OKAY.

MR. NARITA:  I JUST WANTED TO NOTE THAT I DON'T KNOW WHETHER HE'S PLANNING TO TALK TO MR. PANCHENKO ABOUT THIS, BUT IF WE MOVE ON AND THOSE TWO EXHIBITS ARE JUST KIND OF SITTING

THERE, IT SOUNDS LIKE TWO PHONE CALLS AND WE DON'T KNOW WHAT DATE.

THE COURT:  I THINK MR. LOKER IS ACTUALLY AGREEING WITH YOU AND WAS DEFERRING BECAUSE OF OUR CONCERNS, THE CONCERNS I HAD RAISED REGARDING THE DATES --

MR. LOKER:  YES.

THE COURT:  -- PRE-2023 BECAUSE MR. PANCHENKO WAS NOT THE PERSON WHO HAD -- BUT THEN THESE DATES REGARDING THAT CALL AND JUNE OF 2023 SEEMS LIKE SOMETHING WHICH THE PARTIES CAN EASILY CLEAR UP.

MR. NARITA:  I THINK WE CAN DO THAT.

THE COURT:  AND JUST RE-DO IT AS A FURTHER STIPULATION.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  THE OTHER QUESTION, WHICH I WOULD ASK THAT THE PARTIES ALSO, OR THROUGH MR. PANCHENKO'S TESTIMONY, BUT I WOULD ASK THE PARTIES TO CLARIFY AFTER THE BREAK IS WHEN THEY WOULD LIKE ME TO READ STIPULATION NUMBERS 1 THROUGH 4, WHICH ARE JUST BASIC -- THEY'RE BASICALLY LAYING THE FOUNDATION.

I WAS PLANNING TO, BUT YOU HAD NOT LISTED THEM IN TERMS OF WHAT YOU WANTED READ THIS MORNING.

SO I'M HOLDING OFF ON THAT.  BUT IF YOU WOULD DOUBLE-CHECK ABOUT THAT.

MR. NARITA:  OH, YOUR HONOR, IF I MAY, THAT REMINDS

ME OF SOMETHING.

WE HAD -- BECAUSE OF THE MEET AND CONFER EFFORTS THAT THE COURT ENCOURAGED US TO DO, WE ACTUALLY MADE A LIST OF STIPULATED FACTS MUCH LONGER, AND OVER THE WEEKEND ONE OF THE QUESTIONS WE POSED TO THE COURT WAS WHETHER WE SHOULD FILE THOSE, OR NOT, THE LIST OF STIPULATED FACTS, AND WE DIDN'T HEAR BACK FROM THE COURT AS TO WHAT THE COURT'S PREFERENCE WAS.

THE COURT:  I HAD NOT READ FAR ENOUGH DOWN THAT LIST OF EMAILS APPARENTLY ON THAT EMAIL.

YES, I WOULD GO AHEAD AND FILE THOSE.

I'M ALSO HAPPY IF WE WANT TO HAVE THEM AS THE JURY INSTRUCTION.  WHEN WE DO THAT, WE CAN ALSO JUST ATTACH IT TO THE EXHIBIT.

MR. NARITA:  OKAY.

THE COURT:  AND SO TURN THAT INTO AN EXHIBIT AFTERWARDS.

GO AHEAD AND FILE THEM THOUGH SO THEY'RE ON RECORD.

MR. NARITA:  ALL RIGHT.  THANK YOU.

THE COURT:  THANK YOU FOR DOUBLE-CHECKING THAT.

SO DURING THE LUNCH BREAK, THE PARTIES ARE TO CONFER ON STIPULATIONS 1 THROUGH 4; A POSSIBLE STIPULATION REGARDING THE EXHIBITS 49 AND 50; THE PRE-2023 PHONE CALLS, WHICH ARE EXHIBITS 43 THROUGH 48, IN TERMS OF DATE REFERENCES.  OR IF WE'RE NOT GOING TO DO IT BY DATE REFERENCES, I THINK IT'S EASIER TO STATE THAT THESE WERE RECEIVED DURING THE COURSE OF

DISCOVERY, BUT YOU ALL WILL SORT THAT OUT.

AND I BELIEVE THAT'S ABOUT IT.

MR. NARITA:  THANK YOU.  NOTHING FURTHER, YOUR HONOR.

MR. LOKER:  THANK YOU.

THE COURT:  ALL RIGHT.  NOTHING FURTHER FROM PLAINTIFF --

MR. LOKER:  NOTHING FURTHER.

THE COURT:  -- FOR THE RECORD?

MR. LOKER:  YES.  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE PROBABLY JUST BURNED FIVE MINUTES OF OUR LUNCH BREAK, BUT WE WILL SEE YOU BACK IN 40 MINUTES.

THANK YOU TO THE COURT STAFF, AND WE ARE NOW IN RECESS.

MR. LOKER:  THANK YOU, YOUR HONOR.

(LUNCH RECESS TAKEN AT 12:29 P.M.)

**AFTERNOON SESSION**

(JURY OUT AT 1:11 P.M.)

THE COURT:  SO, COUNSEL, ANYTHING WE NEED TO PUT ON THE RECORD BEFORE?

MR. LOKER:  WELL, WE'VE REACHED SOME AGREEMENTS, YOUR HONOR, IF THAT HELPS.

THE COURT:  LET'S GO BACK ON THE RECORD.

WE'RE HERE IN THE CONTINUING PANCHENKO TRIAL.  COUNSEL IS PRESENT.  COUNSEL IS PRESENT AND THE PARTY IS PRESENT, MR. PANCHENKO.

MY UNDERSTANDING IS THAT COUNSEL HAS MET AND CONFERRED.

MR. LOKER:  THAT'S CORRECT, YOUR HONOR, AND WE HAVE REACHED A SERIES OF AGREEMENTS WHICH I WILL REPEAT BACK TO THE COURT AND ASK MR. NARITA TO MAKE SURE THAT I STATED THEM CORRECTLY.

THE FIRST AGREEMENT IS THE PARTIES AGREE THAT EXHIBITS 49 AND 50 HAPPENED ON THE SAME DATE, AND WITH THE COURT'S PERMISSION, WE PLAN TO TELL THE JURY THAT THOSE TWO RECORDINGS ARE A SINGLE PHONE CALL THAT OCCURRED ON JUNE 30TH OF 2023. EXHIBIT 49 WAS THE FIRST PORTION, AND THEN MR. PANCHENKO GOT TRANSFERRED TO CHARLES IN THE SECOND PORTION, EXHIBIT NUMBER 50.

MR. NARITA:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  WAS THAT 2023?  I NEED TO REOPEN MY

EXHIBITS.

MR. LOKER:  CORRECT, JUNE 30TH, 2023.

THE COURT:  ARE COUNSEL -- WOULD COUNSEL LIKE THE COURT TO INDICATE THAT STIPULATION, OR ARE YOU ALL --

MR. LOKER:  I HAVE NO PREFERENCE.  I WAS PLANNING ON DOING IT, BUT IF YOU HAVE A PREFERENCE.

MR. NARITA:  THAT'S FINE WITH ME, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE'LL HAVE MR. LOKER DO IT UPON STIPULATION OF COMENITY.

NEXT.

MR. LOKER:  YES, YOUR HONOR.

FURTHER AGREEMENTS WOULD BE THAT THE PARTIES STIPULATE TO THE FACTS OF RECORDINGS, AND WHAT I'LL DO BEFORE I PLAY A RECORDING -- AND I'M GOING TO PLAY THE ENTIRETY OF THE RECORDING -- I'LL STATE THAT THIS PARTICULAR RECORDING, SO, FOR EXAMPLE, EXHIBIT 44, WAS ON MARCH 28TH OF 2018, STATE THAT AS A STIPULATED FACT, AND I'LL PLAY THE ENTIRE RECORDING.

THE COURT:  OKAY.  THAT MAKES SENSE.

MR. NARITA:  THAT DOES MAKE SENSE, YOUR HONOR, OBVIOUSLY SUBJECT TO THE OTHER OBJECTIONS THAT YOUR HONOR HAS ALREADY OVERRULED.

THE COURT:  CORRECT.  AND SO IF WE'RE ADDING THOSE, JUST THINK ABOUT WHETHER YOU NEED TO AMEND YOUR STIPULATIONS AGAIN.

MR. LOKER:  WE'LL PROBABLY WORK ON THOSE AGAIN,

YOUR HONOR.

THE COURT:  AND SO ONGOING THROUGHOUT THE PROCESS, WE CAN SUBMIT THAT EXHIBIT AND MARK THAT AS YOUR LAST EXHIBIT FOR THE TRIAL AND SEND IT BACK FOR THE JURY.

MR. LOKER:  YES, YES.

THE COURT:  SO KEEP A RUNNING LIST.

MR. NARITA:  THAT MAKES SENSE, YOUR HONOR.

THE COURT:  ANYTHING ELSE?

MR. LOKER:  NO.  THAT COVERED IT, I THINK.

THE COURT:  ANYTHING ELSE, MR. NARITA?

MR. NARITA:  WAS THERE ONE OTHER --

MR. LOKER:  WE TALKED ABOUT --

MR. NARITA:  EXCUSE ME.

MR. LOKER, THAT WENT IN WITHOUT A DATE.  I'M SORRY.  I CAN'T REMEMBER.

MR. LOKER:  YES.  42, I BELIEVE.

MR. NARITA:  WAS IT 42?

MR. LOKER:  40 EVEN?

MR. NARITA:  YEAH, THAT MIGHT HAVE BEEN THE FIRST ONE.

MR. LOKER:  THE FIRST RECORDING WAS 40, WHICH I DID STATE THE DATE, AND IT WAS ADMITTED.

THE COURT:  YOU DID.

MR. LOKER:  41 WAS WHERE WE HAD THE DISCUSSION AND I DIDN'T STATE THAT DATE.

MR. NARITA:  OKAY.

MR. LOKER:  SO PERHAPS WHAT WE COULD DO IS ALSO NOTE FOR THE RECORD, IF THAT'S OKAY, THAT 41 HAPPENED ON JANUARY 11TH, 2018.  SO I CAN CONVEY THAT TO THE JURY.

THE COURT:  SO WHY DON'T YOU MOVE AGAIN TO ASK TO MOVE THAT -- ASK TO MOVE THAT INTO EVIDENCE AGAIN EITHER AT THE BEGINNING OR END OF TODAY, AND THEN YOU CAN STATE THE DATE.

MR. LOKER:  OKAY.  WHEN WE ASK TO MOVE IT INTO EVIDENCE?

THE COURT:  YES.

MR. LOKER:  OKAY.

THE COURT:  AND THEN YOU CAN INCLUDE IT WITHIN THE STIPULATIONS, THE DATES OF THOSE.

MR. NARITA:  THANK YOU, YOUR HONOR.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

THE COURT:  ALL RIGHT.  SO THAT WILL ACTUALLY BE IN EVIDENCE THEN?

MR. LOKER:  YES, EXACTLY.

THE COURT:  AND JUST A REMINDER -- WE DO NEED TO BRING THE JURY IN, BUT JUST A REMINDER.  I SENT YOU THOSE TWO JURY INSTRUCTIONS, AND SO JUST START THINKING ABOUT THEM.  IF YOU ALL AGREE, DEFINITELY LET ME KNOW AT THE END OF THE DAY.  IF THERE'S GOING TO BE MORE DISCUSSION, LET ME KNOW.

MR. LOKER:  PLAINTIFF AGREES TO THE INSTRUCTIONS.

MR. NARITA:  MY ANTICIPATION, YOUR HONOR, IS THAT WE

WOULD MAKE A SHORT RECORD, BUT WITHOUT EXTENSIVE ARGUMENT, AND JUST SAY THAT WE HAVE NOTHING FURTHER TO ADD TO OUR OTHER ARGUMENT THAT WE GAVE.

WE PREFER, WE PREFER THE INSTRUCTION THAT WE SUBMITTED BEFORE.

THE COURT:  PARTIES GENERALLY DO.

MR. NARITA:  BUT WE WON'T REHASH IT.

THE COURT:  YES.  I JUST WANT TO MAKE SURE THERE WERE NOT ANY ADDITIONAL NITS OR EDITS TO THAT, KEEPING IN THE SPIRIT WITH WHAT THE COURT HAD PRESENTED.

MR. NARITA:  THANK YOU.

THE COURT:  ALL RIGHT.  WELCOME BACK.

SO WITH THAT I BELIEVE WE ARE READY.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  WONDERFUL.  WE'RE ONLY FIVE MINUTES LATE FOR THE JURY.  WE'RE GETTING BETTER.

MR. LOKER:  YES.

THE COURT:  ALL RIGHT.  MADAM CLERK, WHENEVER YOU'RE READY.

THE CLERK:  THANK YOU.

(PAUSE IN PROCEEDINGS.)

(JURY IN AT 1:18 P.M.)

THE COURT:  YOU MAY BE SEATED.

WELCOME BACK FROM LUNCH.  THANK YOU.

I HOPE THE LUNCH WAS GOOD.  OKAY.

ALL RIGHT.  WE'RE CONTINUING ON IN THE MATTER OF PANCHENKO VERSUS COMENITY CAPITAL BANK.

WE HAVE PRESENT IN THE COURTROOM, WE HAVE THE JURORS PRESENT, WE ALSO HAVE COUNSEL AND THE PARTIES.

YOU MAY CONTINUE, MR. LOKER.

MR. LOKER:  THANK YOU, YOUR HONOR.

BEFORE WE PROCEED, CAN I PROVIDE THE STIPULATED FACT?

THE COURT:  YES.

MR. LOKER:  BEFORE LUNCH WE LISTENED TO TWO CALL RECORDINGS, EXHIBIT NUMBER 49 AND EXHIBIT 50.  THE PARTIES AGREE THAT THOSE CALL RECORDINGS OCCURRED IN CONNECTION WITH A SINGLE CALL THAT WAS PLACED TO COMENITY.  IT WAS DATED JUNE 30TH OF 2023.

EXHIBIT 49 WAS THE FIRST PORTION OF THE CALL; AFTER THAT THERE'S A CALL TRANSFER, AND AT EXHIBIT 50, THAT'S WHERE THE CALL CONTINUES.  SO A SINGLE DAY OF CALLS THERE.

THE COURT:  AND SO WHEN MR. LOKER REFERRED TO THIS BEING A STIPULATION BETWEEN COMENITY AND PLAINTIFF, THAT MEANS THE PARTIES HAVE AGREED TO CERTAIN FACTS TO BE PLACED INTO EVIDENCE, AND THAT STIPULATION REGARDING THE LAST TWO EXHIBITS YOU JUST HEARD ABOUT BEFORE THE BREAK, THAT WAS THEIR STIPULATION REGARDING THOSE.

SO YOU MUST, THEREFORE, TREAT THOSE FACTS, WHICH WERE STATED BY MR. LOKER, AS HAVING BEEN PROVED.

MR. LOKER:  THANK YOU, YOUR HONOR.

AND I WAS GOING TO GO TO EXHIBIT 44, A STIPULATED FACT AS TO THE DATE OF THIS CALL.  THIS CALL OCCURRED ON MARCH 28TH OF 2018, AND I'LL PLAY THE ENTIRETY OF THE CALL, YOUR HONOR.

THE COURT:  OKAY.  YOU MAY PROCEED.

MR. NARITA:  ONE SECOND.  SUBJECT TO OUR PRIOR OBJECTIONS THAT WERE RAISED.

THE COURT:  SUBJECT TO OBJECTIONS PREVIOUSLY STATED.  MR. LOKER, NOW YOU MAY PROCEED.

MR. LOKER:  THANK YOU.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   OKAY.  COULD YOU HEAR THAT ALL RIGHT, MR. PANCHENKO?

A.   YES.

Q.   THE CALLER THAT IDENTIFIED THEMSELF AS PANCHENKO, WAS THAT YOU?

A.   NO.

MR. LOKER:  YOUR HONOR, I ASK THAT EXHIBIT 44 BE ADMITTED.

MR. NARITA:  JUST SUBJECT TO OUR OBJECTIONS BEFORE AND THEY BE NOTED.

THE COURT:  THOSE OBJECTIONS HAVE BEEN OVERRULED.  THE EXHIBIT WILL BE ADMITTED.

(PLAINTIFF'S EXHIBIT 44 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU.  AND WE'RE GOING TO EXHIBIT 51, WHICH MIGHT NEED A LIMITING INSTRUCTION AS TO A

DIRECT DISPUTE, YOUR HONOR.

THE COURT: ALL RIGHT.

SO THE EXHIBIT THAT YOU'RE ABOUT TO HEAR RELATES TO THE DISPUTE THAT PLAINTIFFS SUBMITTED DIRECTLY TO COMENITY, REFERRED TO AS A DIRECT DISPUTE DURING THE COURSE OF THIS TRIAL, AND COMENITY'S HANDLING OF THE DISPUTE.

YOU MAY CONSIDER THE TESTIMONY ONLY TO THE EXTENT THAT YOU BELIEVE THE INFORMATION PLAINTIFF PROVIDED COMENITY AS PART OF THE DIRECT DISPUTES WAS RELEVANT TO COMENITY'S INVESTIGATION OF A LATER DISPUTE THAT COMENITY RECEIVED FROM A CONSUMER REPORTING AGENCY, REFERRED TO AS AN INDIRECT DISPUTE FOR PURPOSES OF TRIAL.

MR. LOKER: THANK YOU, YOUR HONOR.

AND EXHIBIT 51 THE PARTIES AGREE IS DATED JULY 18TH OF 2023.

ONE FURTHER THING. IT'S EIGHT MINUTES, JUST SO EVERYONE KNOWS. AND I'LL PLAY THE ENTIRETY.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q. MR. PANCHENKO, MY APOLOGIES.

DURING THIS CALL, HOW WERE YOU FEELING?

A. SUPER CONFUSED, BECAUSE IT SEEMS LIKE I'M CONTACTING THE BANK ABOUT THE FRAUD ACCOUNT THAT IS OPENED WITHIN THE BANK, AND THE BANK REPORT THIS ACCOUNT TO THE CREDIT AGENCIES, BUT THEY KIND OF DON'T KNOW WHAT THEY'RE DOING.

FIRST THEY -- BEFORE THIS CALL THEY SAID THAT I NEED TO CONTACT SOME DIFFERENT COMPANY BECAUSE THEY SOLD IT, AND NOW THEY'RE SAYING, NO, WE ACTUALLY DIDN'T SOLD IT, IT'S OURS.

I'M SUPER CONFUSED.

AND WHEN THE PERSON IS SAYING, OH, I'M GOING TO REDIRECT YOU TO ANOTHER KIND OF DEPARTMENT, USUALLY THIS MEANS THAT I'M GOING TO LISTEN TO SOME MUSIC FOR SOME TIME, AND THEN THE PHONE BROKE UP AND THE CONNECTION BROKE UP, AND I DON'T NEED TO KIND OF DO ALL OF THE SAME.  I NEED TO KIND OF GO THROUGH THE SAME KIND OF PERSON AND TRYING TO GET THE CONNECTION.

SO THAT'S WHY I WAS KIND OF AFRAID OF THAT AND ASKING FOR ACTUAL PHONE NUMBER TO CALL BACK AND I WILL CALL BACK THAT NUMBER, AND IT KIND OF BROKE UP, AND I WILL GET TO THE RIGHT DEPARTMENT ACTUALLY.

MR. LOKER:  YOUR HONOR, WE ASK THAT EXHIBIT 51, THIS JULY 18TH, 2023 CALL, BE ADMITTED INTO EVIDENCE.

MR. NARITA:  WITH OUR PRIOR OBJECTIONS, YOUR HONOR.

THE COURT:  SO NOTED.

THE EXHIBIT WILL BE ADMITTED INTO EVIDENCE.

(PLAINTIFF'S EXHIBIT 51 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   MR. OLEKSANDR -- I'M SORRY.  MR. PANCHENKO, MY APOLOGIES.

GOING BACK TO THE DISPUTE PROCESS, DO YOU RECALL RECEIVING REJECTIONS BY WAY OF THE CREDIT BUREAUS?

A.   WELL, I RECEIVED THE RESULTS FROM THE CREDIT BUREAUS WHERE

MY DISPUTES WAS REJECTED AND THE ACCOUNTS WAS STILL ON MY

PROFILE.

Q.   CAN YOU GO TO EXHIBIT NUMBER 26 IN THE BINDER THERE,

MR. PANCHENKO.

A.   I'M HERE.

Q.   DO YOU RECOGNIZE EXHIBIT 26?

A.   THIS LOOKS LIKE EQUIFAX CREDIT REPORT DISPUTES RESULTS.

JUST CREDIT REPORT FROM EQUIFAX.

Q.   WHAT IS THE DATE ON THE LETTER?

A.   THE DATE IS JULY 19TH, 2023.

Q.   AND IS THE ADDRESS FOR YOU ON THE LETTER, IS THAT AN

ADDRESS ASSOCIATED WITH YOU?

A.   YES, THIS IS THE CORRECT ADDRESS.

Q.   DO YOU RECALL RECEIVING THIS LETTER?

A.   YES, I THINK I DO.  LIKE ALL OF THESE LETTERS, I RECEIVE

THEM AND LATER PROVIDED DURING THE DISCOVERY.

          MR. LOKER:  YOUR HONOR, MAY WE PUBLISH AND ADMIT

EXHIBIT NUMBER 26.

          MR. NARITA:  YOUR HONOR, THIS IS ONE WHERE WE HAVE A

REMAINING OBJECTION, NOT ONLY AUTHENTICATION AND FOUNDATION,

BUT HEARSAY AND THERE IS NO CORRESPONDING DECLARATION.

          MR. LOKER:  THERE IS A BUSINESS RECORDS DECLARATION,

YOUR HONOR, FROM EQUIFAX.

          THE COURT:  COUNSEL, PLEASE APPROACH.

     (SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.
THE COURT FINDS THERE'S A BUSINESS RECORDS EXCEPTION, AS WELL
AS FOR THE OTHER REASONS STATED ON THE RECORD PREVIOUSLY.

MR. LOKER:  SO I MAY PUBLISH AND ADMIT THE EXHIBIT?

THE COURT:  YOU MAY PUBLISH AND ADMIT THE EXHIBIT.

(PLAINTIFF'S EXHIBIT 26 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU, YOUR HONOR.

I'M GETTING AN ERROR.  LET ME TAKE A MOMENT.

IS THIS ON UP HERE, MS. THOMSON?

THE CLERK:  YES.

MR. LOKER:  IT'S SHOWING ERROR.  LET ME GRAB PAPER
COPIES.  MY APOLOGIES.

BY MR. LOKER:

Q.   MY APOLOGIES.  SO EXHIBIT 26, MR. PANCHENKO, DO YOU HAVE
AN UNDERSTANDING OF IT?

A.   YES.

Q.   AND WHAT -- FROM THIS WRITTEN COMMUNICATION, WHAT DO YOU
UNDERSTAND ABOUT THIS WRITTEN COMMUNICATION?

A.   WELL, THIS IS A LETTER FROM EQUIFAX THAT WAS SENT TO ME
WITH SOME RESULTS AND DISPUTES OF THE INFORMATION THAT
CURRENTLY EXISTS ON MY CREDIT REPORT WITH EQUIFAX.

Q.   I'M GOING TO MOVE FORWARD IN THE WRITTEN COMMUNICATION.
I'M GOING TO BATES STAMP 160.

DO YOU SEE HOW THIS PARTICULAR ACCOUNT WAS HANDLED AT
BATES STAMP B160 AT THE BOTTOM?

A.    OKAY, I CAN SEE THE COLLECTION AGENCY INFORMATION.

Q.    AND ARE YOU REFERRING TO CAVALRY?

A.    YES.

Q.    AND WHAT IS YOUR UNDERSTANDING OF HOW THE CAVALRY ACCOUNT WAS HANDLED IN RESPONSE TO YOUR DISPUTE?

A.    IT STATES THAT THIS ACCOUNT IS VERIFIED.

Q.    OKAY.  AND I'LL MOVE FORWARD TO BATES STAMP 162.

      DO YOU SEE COMENITY ON BATES STAMP 162, MR. PANCHENKO?

A.    YES.

Q.    AND WHAT HAPPENED WITH COMENITY IN RESPONSE TO YOUR DISPUTE?

A.    IT'S VERIFIED AGAIN.

Q.    I'LL MOVE FORWARD TO BATES STAMP 165, MR. PANCHENKO.

      AND CAN YOU TAKE ME THROUGH -- WHAT IS YOUR IMPRESSION OF BATES STAMP 165?

A.    THERE'S A TABLE ON TOP, AND UNDER THE TABLE THERE IS MENTION OF ACCOUNTS BEING REMOVED, DELETED FROM THE CREDIT FILE, WHICH WAS NORDSTROM AND CBNA, WHICH IS CITIBANK, I GUESS.

Q.    AND THOSE TWO ACCOUNTS, IT SOUNDS LIKE THEY WERE REMOVED FROM YOUR CREDIT; IS THAT CORRECT?

A.    WELL, IT STATES THAT IT HAS BEEN DELETED FROM THE CREDIT FILE, YEAH.

Q.    SEEING THIS COMMUNICATION AT EXHIBIT 26, WHAT IS YOUR -- HOW WERE YOU FEELING WHEN YOU RECEIVED IT?

A.    WELL, THE FEELING WAS SIMILAR TO WHAT I DESCRIBED BEFORE,

BUT MORE PROGRESS IN TERMS OF DEPRESSION BECAUSE ANY FURTHER

VERIFICATION OF THE ACCOUNTS THAT WAS FRAUDULENT WAS JUST

DEPRESSING FOR ME.  I MEAN, SEEING THIS AFTER MULTIPLE TRIES TO

DISPUTE THIS ACCOUNT WAS DIFFERENT THAN IT IS AND IT WAS

FRUSTRATING.

Q.   AND HOW DO YOU FEEL ABOUT SOME ACCOUNTS BEING VERIFIED AND

SOME ACCOUNTS BEING DELETED?

A.   YEAH, AGAIN, I WAS HAPPY TO SEE SOME ACCOUNTS DELETED FOR

SURE.  I WAS WORRIED THAT THOSE ACCOUNTS THAT WAS DELETED CAN

BE RENEWED.

AND FOR THOSE THAT WERE STILL IN THE FILE, THERE WAS

CONFUSION ON WHAT GROUNDS.  LIKE, WHY ARE THEY ON THE FILE?

Q.   OKAY.  AND CAN YOU GO TO EXHIBIT NUMBER 38, PLEASE, IN

YOUR BINDER, MR. PANCHENKO.

A.   38?

Q.   YEAH, 38.

A.   THIS ONE?  EXPERIAN CREDIT REPORT.

Q.   38 SHOULD BE A COMENITY LETTER.

A.   OH, A COMENITY LETTER.

Q.   DOES THIS LETTER LOOK FAMILIAR TO YOU, MR. PANCHENKO?

A.   YEAH.

Q.   AND CAN YOU TELL US WHO IS IT FROM?  WHAT IS THE DATE?

A.   THIS IS THE LETTER FROM COMENITY THAT I RECEIVED.  IT WAS

SENT IN JULY 19TH, 2023.

Q.   AND YOU RECALL RECEIVING THIS LETTER, MR. PANCHENKO?

A.   YES, I THINK I RECALL THAT.

MR. LOKER:  YOUR HONOR, MAY I PUT THIS LETTER ON THE ELMO, THIS IS EXHIBIT 38, AND HAVE IT ADMITTED?

MR. NARITA:  THERE'S NO OBJECTION, YOUR HONOR.

THE COURT:  YES, YOU MAY.

MR. LOKER:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBIT 38 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   MR. PANCHENKO, DO YOU SEE THE BULLET POINTS ON THE LETTER?

A.   YES, I CAN SEE THEM.

Q.   WHAT ARE THOSE?  WHAT IS YOUR IMPRESSION OF THOSE BULLET POINTS?

A.   WELL, IT SEEMS LIKE THIS IS BULLET POINTS WITH INFORMATION THAT COMENITY REQUESTED FROM ME IN THIS LETTER.

SO I PROVIDE THIS INFORMATION TO THE DISPUTE, SO I CAN DISPUTE THE ACCOUNT.

Q.   WHAT INFORMATION WAS COMENITY ASKING YOU TO PROVIDE TO IT?

A.   YEAH.  IT SAYS YOUR NAME AND ACCOUNT NUMBER, WHICH I DON'T HAVE;

YOUR ADDRESS AND TELEPHONE NUMBER;

AND DISPUTED INFORMATION, LIKE STATE IF YOU ARE DISPUTING THE ENTIRE ACCOUNT AND FEEL YOU ARE A VICTIM OF IDENTITY THEFT;

AND SUPPORTING DOCUMENTS, PROVIDE ANY DOCUMENTATION TO SUPPORT YOUR DISPUTE, INCLUDING A COPY OF THE SELECTION OF THE CREDIT REPORT SHOWING THE ACCOUNT INFORMATION YOU ARE

DISPUTING, IF AVAILABLE.

Q.   AND HOW ARE YOU FEELING SEEING COMENITY ASKING YOU FOR THIS INFORMATION?

A.   GENERALLY FOR ALL OF THIS INFORMATION I WAS CONFUSED BECAUSE I ALREADY SENT THIS INFORMATION TO COMENITY.

AND AS FAR AS THE ACCOUNT NUMBER, I DON'T KNOW THE ACCOUNT.  ALL I CAN SEND THEM, AND I SENT IT PREVIOUSLY, IS PARTIALLY, LIKE, REDACTED ACCOUNT NUMBER THAT I GET FROM MY CREDIT REPORT.

SO SEEING THIS, LIKE, CONFUSION AND I'M A BIT SCARED OF, YOU KNOW, ALL OF THIS INFORMATION BEING SENT TO COMENITY AGAIN WITH NO FULL ACCOUNT NUMBER AND MIGHT RESULT IN SOME CONFUSION ON THEIR PART.  SO, YEAH.

MR. LOKER:  YOUR HONOR, I WAS GOING TO MOVE TO THE EXHIBIT THAT THERE IS AN OBJECTION FOR.  WOULD YOU LIKE US TO APPROACH?

THE COURT:  WHICH EXHIBIT?

MR. LOKER:  IT'S 28.  IT'S A TRANS UNION LETTER.

THE COURT:  PLEASE APPROACH.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  MR. LOKER, PLEASE CONTINUE.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.   WE'RE GOING TO MOVE TO EXHIBIT NUMBER 52, WHICH IS A CALL RECORDING, THE DATE OF WHICH IS AUGUST 7TH OF 2023.

MR. NARITA:  MR. LOKER, THIS MIGHT BE A TWO PART.

MR. LOKER:  YES.  THANK YOU.

SO AS COUNSEL NOTED, SIMILAR TO WHAT WE LISTENED TO BEFORE LUNCH, THE SINGLE CALL HAPPENED ON AUGUST 7TH OF 2023.

THE COURT:  SO IS THIS A STIPULATION OF FACT PURSUANT TO --

MR. LOKER:  CORRECT.

THE COURT:  -- WHICH THE PARTIES HAD REACHED?

MR. LOKER:  THAT'S CORRECT.

THE COURT:  SO THE STIPULATION THAT THE PARTIES HAVE REACHED, MR. LOKER WILL PRESENT THE DATE AND ANY INFORMATION ABOUT THE UPCOMING TWO EXHIBITS.

PROCEED, MR. LOKER.

MR. LOKER:  THANK YOU, YOUR HONOR.

SO THE FIRST PORTION OF THIS AUGUST 7TH, 2023 CALL WILL COME TO US THROUGH EXHIBIT 52; AND THEN THE SECOND PORTION COMES TO US THROUGH EXHIBIT 53, ALSO ON AUGUST 7TH.

THERE IS A 3 MINUTE PERIOD OF SILENCE FOR EXHIBIT 53.  SO IF IT'S UNOBJECTED TO, I WAS GOING TO SKIP THAT SILENCE.

MR. NARITA:  NO OBJECTION TO SKIPPING THE SILENCE, YOUR HONOR.

AND, OF COURSE, BOTH OF THE CALL RECORDINGS WILL COME IN SUBJECT TO OUR PRIOR OBJECTIONS, WHICH THE COURT HAS ALREADY ADDRESSED.

MR. LOKER:  OKAY.

THE COURT:  SO SUBJECT -- THERE ARE NO OBJECTIONS

PAST THAT, AND WE'LL PROCEED WITH THE REST.

MR. LOKER:  THANK YOU, YOUR HONOR.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   BACK TO YOU, MR. PANCHENKO.

HOW ARE YOU FEELING DURING THAT CALL WITH COMENITY?

A.   AGAIN, SUPER CONFUSED FOR MANY REASONS, SPECIFICALLY, LIKE, IT DOESN'T LOOK LIKE YOU'RE TALKING WITH SOME ENTITY THAT KNOWS WHAT THEY'RE DOING.  IT'S ALWAYS KIND OF LIKE NOT THIS DEPARTMENT BUT THAT DEPARTMENT SHOULD HELP YOU.

LIKE, I SAW THEM TALKING TO THE RIGHT PERSON AND THEN, NO, YOU NEED TO CALL THE OTHER DEPARTMENT.

AGAIN, I'M WRITING THIS NUMBER JUST TO BE SAFE AND CALL BACK THAT NEW NUMBER.

BUT, YEAH, IT'S JUST NAVIGATING THIS MAZE AND IT KIND OF NEVER ENDS.

MR. LOKER:  BEFORE WE GET TO PART 2 OF THAT CALL, YOUR HONOR, MAY WE MOVE EXHIBIT 52 IN EVIDENCE?

THE COURT:  YES, SUBJECT TO THE LIMITING INSTRUCTION.

MR. NARITA:  YES, YOUR HONOR, AND OUR PRIOR OBJECTIONS, WHICH YOU'VE ALREADY RULED ON.

THE COURT:  YES.  THOSE OBJECTIONS ARE NOTED AND OVERRULED.

(PLAINTIFF'S EXHIBIT 52 WAS RECEIVED IN EVIDENCE.)

THE COURT:  AND JUST THE LINE OF -- WELL, I'LL WAIT TO GIVE A LIMITING INSTRUCTION.

WHY DON'T WE GO AHEAD AND HEAR THE SECOND HALF, AND IT WILL BE THE SAME LIMITING INSTRUCTION IN TERMS OF DIRECT DISPUTES VERSUS INDIRECT DISPUTES.

MR. LOKER:  THANK YOU, YOUR HONOR.

GOING TO THE SECOND HALF OF EXHIBIT 53, ALSO ON AUGUST 7TH OF 2023 OF COURSE, AT THIS POINT IN THE RECORDING, YOUR HONOR, WE HAVE SILENCE FROM 1 MINUTE AND 45 SECONDS UP TO 4 MINUTES AND 25 SECONDS, AND SO I'LL RESUME IF THAT'S OKAY.

THE COURT:  THAT'S FINE.  THANK YOU.

(AUDIO PLAYED IN OPEN COURT OFF THE RECORD.)

BY MR. LOKER:

Q.   WHAT'S GOING THROUGH YOUR HEAD WHILE YOU'RE HAVING THAT CALL, MR. PANCHENKO?

A.   YEAH.  SO THIS WAS THE ONLY CALL THAT I HAD THAT I REMEMBER.  I ACTUALLY WAS TOLD THAT THERE'S NOTHING THAT WE CAN DO.  YOU'RE GOING TO STAY WITH THIS.  THIS IS THE END BASICALLY.

AND FACING THIS WALL IS NOT FUN.  IT'S NOT A GOOD EXPERIENCE OBVIOUSLY.

SO PROBABLY THIS WAS THE FIRST TIME THAT I STARTED THINKING ABOUT, LIKE, GETTING SOME HELP, LIKE, ATTORNEY HELP TO FIGHT THIS BECAUSE I SEE IT DOESN'T MAKE SENSE.  I'M SENDING ALL OF THESE DOCUMENTS, I'M COMPLYING WITH ALL OF THE

REQUIREMENTS THAT THEY ASK ME FOR, AND I'M JUST GETTING STUCK BECAUSE THEY SAY, LIKE, THERE IS NOTHING THAT WE CAN DO. WE'RE NOT EVEN GOING TO EVEN TRY TO INVESTIGATE, TRY TO DELETE, JUST THAT'S IT.

THE COURT: SO, MR. LOKER, AS TO -- LET ME JUST INTERCEDE FOR ONE MOMENT. WE JUST FINISHED LISTENING TO EXHIBIT 52 AND EXHIBIT 53 RELATING TO AN AUGUST 7TH, 2023 CALL.

MEMBERS OF THE JURY, I'M GIVING YOU THE SAME INSTRUCTION THAT THE EXHIBITS -- THE CALLS RELATED TO A DIRECT DISPUTE BETWEEN -- WHICH PLAINTIFF SUBMITTED DIRECTLY TO COMENITY AND COMENITY'S HANDLING OF THAT DISPUTE.

YOU MAY CONSIDER THE TESTIMONY ONLY TO THE EXTENT THAT YOU BELIEVE THE INFORMATION PLAINTIFF PROVIDED COMENITY AS PART OF THE DIRECT DISPUTE WAS RELEVANT TO COMENITY'S INVESTIGATION OF A LATER DISPUTE THAT COMENITY REFERRED -- RECEIVED FROM A CONSUMER REPORTING AGENCY, REFERRED DURING THIS TRIAL AS AN INDIRECT DISPUTE.

MR. LOKER: THANK YOU, YOUR HONOR.

I'M NOT SURE IF I DID, BUT WE WOULD MOVE EXHIBIT 53 INTO EVIDENCE.

THE COURT: I BELIEVE IT HAS HAPPENED, BUT JUST IN CASE.

MR. NARITA: I BELIEVE IT'S ALREADY IN.

MR. LOKER: JUST IN CASE.

THE COURT: YES, IT'S IN EVIDENCE.

(PLAINTIFF'S EXHIBIT 53 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.  AND, MR. PANCHENKO, WE LISTENED TO SOME CALL RECORDINGS WITH DISPUTES.

DID YOU ALSO SUBMIT DISPUTES THROUGH THE CREDIT BUREAUS?

A.  YES.

Q.  AND DO YOU RECALL AN APPROXIMATE TIMEFRAME OF WHEN YOU SENT THAT WRITTEN DISPUTE TO THE CREDIT BUREAUS?

A.  SO I THINK, YEAH, AS I STARTED SUBMITTING DISPUTES, I SUBMIT THEM BY PHONE.  BUT LATER DOWN THE ROAD I SEND THEM WRITTEN DISPUTES MAYBE, LIKE, SUMMER, MIDDLE OF THE SUMMER, SOMETHING LIKE THAT, I SENT THE DISPUTES TO THE CREDIT AGENCIES.

Q.  IN THE BINDER THERE, MR. PANCHENKO, CAN YOU GO TO EXHIBIT 2?

A.  YES, I'M HERE.

Q.  AND IT'S LENGTHY.  IT RANGES FROM THE BATES STAMP EXP_PANCHENKO_438 TO 497.  TAKE A FEW MOMENTS BEFORE I ASK ANY FURTHER QUESTIONS, MR. PANCHENKO, TO LOOK AT THE DOCUMENT AND LET ME KNOW WHEN YOU'RE READY.

A.  YES, I AM THERE.

Q.  AND WHAT IS EXHIBIT 2?

A.  SO THIS IS A LETTER THAT I SENT TO EQUIFAX, TRANS UNION, EXPERIAN, AND EXPLAINING, LIKE, ALL OF WHAT HAPPENED, LIKE PRESENTING ALL OF THE EVIDENCE AND EXPLAINING HOW TO USE THE

EVIDENCE AND IN HELPING ANYONE WHO IS GOING TO INVESTIGATE THIS, HOW TO USE THAT.

Q.   AND THIS IS A LETTER THAT YOU PUT TOGETHER?

A.   YES.

Q.   SO YOU WROTE THESE WORDS?

A.   YES.

MR. LOKER:  YOUR HONOR, IN TERMS OF EXHIBIT 2, CAN WE PUT IT ON THE ELMO AND ADMIT IT INTO EVIDENCE?

MR. NARITA:  YOUR HONOR, I DON'T THINK A DATE HAS BEEN ESTABLISHED FOR THE EXHIBIT, AND ALSO THERE WOULD BE A -- I THINK TWO LIMITING INSTRUCTIONS FOR THIS BECAUSE OF ITS CONTENTS.

MR. LOKER:  RIGHT.  AND IN TERMS OF THE DATE, I DON'T THINK IT'S BEEN OBJECTED TO, BUT IT'S AUGUST OF 2023.

AND IN TERMS OF THE LIMITING INSTRUCTIONS, BEFORE WE GOT TO THOSE SPECIFIC DISPUTES WITHIN THE DOCUMENT, I WAS GOING TO ASK THE COURT TO READ THOSE ONCE WE GOT THERE.

THE COURT:  THAT'S FINE.  BUT LET'S GIVE A CUE THEN OVER THE SPECIFIC ONES AS THEY COME UP.

IN TERMS OF THE EXHIBIT ITSELF -- COUNSEL, APPROACH FOR ONE MOMENT.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  SO, MR. LOKER, LET'S GO AHEAD AND MOVE ON AND YOU CAN COME BACK.

BY MR. LOKER:

Q.   MR. PANCHENKO, CAN YOU GO TO EXHIBIT NUMBER 3 IN THE BINDER?

A.   YES.

Q.   MY UNDERSTANDING, MR. PANCHENKO, IS THAT YOU SUBMITTED DISPUTES TO EACH OF THE CREDIT BUREAUS; IS THAT RIGHT?

A.   YES.

Q.   WERE THOSE DISPUTES THAT YOU SUBMITTED TO THE CREDIT BUREAU SUBSTANTIALLY THE SAME?

A.   YEAH.

Q.   SO, IN ESSENCE, YOU WROTE THE SAME WORDS IN YOUR LETTER; IS THAT CORRECT?

A.   YES.

Q.   DID YOU ALSO PROVIDE THE SAME SUPPORTING DOCUMENTS?

A.   YES.

Q.   IN TERMS OF EXHIBIT 3 -- AND I'LL GET YOU THE PROPER PAGE. CAN YOU GO TO BATES STAMP 57, PLEASE?

A.   YES, 57.

Q.   IS THIS A DISPUTE THAT YOU SUBMITTED REGARDING THE CREDIT REPORTING?

A.   YEAH.

Q.   AND WHAT IS THE DATE ON THIS LETTER?

A.   THE DATE IS AUGUST 16TH, 2023.

Q.   IS THAT THE DATE -- AROUND THE DATE THAT YOU SUBMITTED ALL OF YOUR DISPUTES TO EACH OF THE CREDIT REPORTING AGENCIES?

A.   YEAH, THIS IS AROUND THE DATE THAT I SUBMITTED THEM.

MR. LOKER:  YOUR HONOR, CAN WE PUT EXHIBIT 3 ON THE ELMO AND ADMIT IT INTO EVIDENCE?

MR. NARITA:  YOUR HONOR, THERE'S NOT BEEN A FOUNDATION FOR THIS LAID.

BY MR. LOKER:

Q.   FOR EXHIBIT 3, MR. PANCHENKO, DID YOU WRITE THIS LETTER?

A.   YES.

Q.   AND YOU GATHERED THE INFORMATION REGARDING THE SUBMITTED DOCUMENTS FOR IT?

A.   YES.

Q.   AND WERE YOU THE ONE WHO PERSONALLY PUT THE WRITTEN COMMUNICATION INTO THE MAIL?

A.   YES.

Q.   AND DID YOU SEE A COPY OF THIS LETTER DURING DISCOVERY IN THIS ACTION?

A.   YES.

Q.   AND IT'S A TRUE AND CORRECT COPY OF THE DISPUTE THAT YOU SUBMITTED THROUGH THE CREDIT BUREAUS?

A.   YES.

MR. LOKER:  YOUR HONOR, CAN WE ADMIT IT INTO EVIDENCE?

MR. NARITA:  YOUR HONOR, THERE'S NOT BEEN A FOUNDATION AS TO WHEN THIS EXHIBIT WAS TRANSMITTED BY MR. PANCHENKO TO ANYONE.

THE COURT:  MR. NARITA.

MR. NARITA:  YES.  FOUNDATION AND LACK OF AUTHENTICATION.

MR. LOKER:  AND IN TERMS OF THAT, YOUR HONOR, WE HAVE THE DATE STAMP 8-16-2023.

THE COURT:  SO --

MR. LOKER:  MY APOLOGIES.

THE COURT:  OVERRULED.

MR. LOKER:  THANK YOU, YOUR HONOR.

MAY I PRESENT IT AND ENTER IT INTO EVIDENCE, YOUR HONOR?

THE COURT:  YES, YOU MAY.

(PLAINTIFF'S EXHIBIT 3 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   IN TERMS OF THIS DISPUTE, MR. PANCHENKO, CAN YOU TAKE US THROUGH THE DRAFTING PROCESS?  HOW LONG DID IT TAKE YOU?

A.   IT TOOK ME SOME TIME BECAUSE I HAD TO, I HAD TO PUT EVERYTHING KIND OF IN A SIMILAR WAY HOW I PUT IT FOR THE POLICE DEPARTMENT PRIOR TO THAT, BUT EMPHASIZING ON THE SUPPORTING DOCUMENTS THAT I KNOW WORKED FOR SOME BANKS.

SO THIS WAS BASICALLY IS A PROCESS FOR ME TO CONNECT -- TO CREATE THIS LETTER WITH THE RIGHT EMPHASIS AND KIND OF SHORT AND EASY TO READ TO ANYONE WHO WAS GOING TO DO AN INVESTIGATION AND PROVIDE AS MUCH EVIDENCE AS I CAN SUPPORTED BY THIRD PARTIES TO VERIFY THE INFORMATION THAT THEY'RE PROVIDING.

Q.   AND DO YOU RECALL EXHIBIT 38?  I'LL PUT IT ON THE SCREEN.

A.   YES, YES.

PANCHENKO DIRECT BY MR. LOKER

Q.   AND DO YOU RECALL, MR. PANCHENKO, THAT COMENITY ASKED YOU FOR SPECIFIC INFORMATION THROUGH THIS LETTER?

A.   YES.

Q.   COULD YOU REMIND US, YOU KNOW, WHAT WAS THE FIRST BULLET POINT?

A.   IT'S ACCOUNT INFORMATION, YOUR NAME, AND ACCOUNT NUMBER.

Q.   AND DOES EXHIBIT 3 HAVE THAT INFORMATION, YOUR NAME, NUMBER ONE?

A.   YES.

Q.   IS THAT YOUR NAME REFLECTED AT THE BOTTOM OF BATES STAMP 58?

A.   YES.

Q.   IN THE TABLE ON BATES STAMP 57, DO YOU SEE ACCOUNT INFORMATION, THE NUMBER?

A.   YES.

Q.   AND WHERE DO YOU SEE THAT?

A.   IT'S THE FIRST ONE, SAME, COMENITY AND REDACTED.

Q.   AND THE ACCOUNT INFORMATION NOW IS REDACTED; IS THAT RIGHT?

A.   YEAH.

Q.   AND DID YOU ALSO, THROUGH THIS EXHIBIT AT NUMBER 3, PROVIDE YOUR CONTACT INFORMATION?

A.   YES.

Q.   AND JUST A REMINDER FROM EXHIBIT 38, COMENITY ASKED YOU TO PROVIDE YOUR CONTACT INFORMATION; IS THAT CORRECT?

A.   CORRECT.

Q.   IS THAT YOUR CONTACT INFORMATION ON BATES STAMP 58?

A.   YES.

Q.   WHICH WOULD BE YOUR ADDRESS AND TELEPHONE NUMBER?

A.   ADDRESS, TELEPHONE NUMBER, PLUS IT EXISTS WITH THE
ATTACHMENTS, ABOUT FIVE ATTACHMENTS ON TOP OF THAT THAT I
PROVIDED PROOF FOR ALL OF THIS CONTACT INFORMATION AS WELL.

Q.   ABOUT FIVE ATTACHMENTS ADDED?

A.   YES.

Q.   OKAY.  LET'S TAKE YOU TO EXHIBIT 38 AGAIN, MR. PANCHENKO.
WE LOOKED AT THE FIRST TWO BULLET POINTS:  ACCOUNT
INFORMATION, CONTACT INFORMATION.
WHAT IS THE NEXT BULLET POINT OF INFORMATION THAT COMENITY
SOUGHT FROM YOU?

A.   DISPUTED INFORMATION.

Q.   AND WHAT DOES THAT MEAN?

A.   AS I UNDERSTAND IT, I NEED TO PROVIDE TO COMENITY WHAT I'M
DISPUTING FOR.  IS IT I'M DISPUTING THE SPECIFIC TRANSACTIONS
OR THE WHOLE ACCOUNT?
SO AS I STATED IN THE LETTER, I DISPUTED THE WHOLE
ACCOUNT.

Q.   AND CAN YOU READ FOR US, MR. PANCHENKO, THE FIRST
PARAGRAPH OF THIS EXHIBIT NUMBER 3?

A.   YES.  "MY NAME IS OLEKSANDR PANCHENKO.  MY SOCIAL SECURITY
NUMBER IS" THIS.  "DATE OF BIRTH IS," AND THEN THE DATE OF

BIRTH.

"ADDRESS IS 111 NORTH RENGSTORFF AVENUE, APARTMENT 1324, IN MOUNTAIN VIEW, CALIFORNIA, 94043.

"I AM A VICTIM OF IDENTITY THEFT.  I AM WRITING TO OFFICIALLY DISPUTE THE FRAUDULENT INFORMATION AND REQUEST AN IMMEDIATE INVESTIGATION.  PLEASE REMOVE THE FRAUDULENT INFORMATION IMMEDIATELY FROM MY FILE."

Q.    AND THAT STATEMENT WAS MADE IN COMPLIANCE WITH BULLET POINT NUMBER 3; IS THAT RIGHT?

A.    YES.

Q.    AND WHAT IS BULLET POINT NUMBER 4 FROM EXHIBIT NUMBER 38?

A.    IT'S SUPPORTING DOCUMENTS.  SUPPORTING DOCUMENTATION, I'M SORRY.

Q.    AND DID YOU ALSO PROVIDE SUPPORTING DOCUMENTS ALONG WITH YOUR CREDIT BUREAU DISPUTES?

A.    YES.

Q.    IN TERMS OF THIS DOCUMENT, EXHIBIT NUMBER 3 -- I MOVED IT INTO EVIDENCE.  I'M SORRY.

LET ME SHOW YOU, BEFORE WE LOOK AT EXHIBIT NUMBER 4 -- LET ME SHOW YOU EXHIBIT NUMBER 4 RATHER.

LET ME KNOW WHEN YOU GET THERE, MR. PANCHENKO.

A.    YEAH, I'M HERE.

Q.    HOW MANY OF THESE DISPUTES DID YOU SUBMIT THROUGH THE CREDIT BUREAUS?

A.    SO I BELIEVE I SUBMITTED FOUR DIFFERENT LETTERS

SPECIFICALLY TO CREDIT BUREAUS WITH THIS INFORMATION.

Q.   AND, AGAIN, THESE WERE SUBSTANTIALLY THE SAME; IS THAT

CORRECT?

A.   CORRECT.

Q.   AND I'LL SHOW YOU -- I'M SORRY.  BEFORE I DO SO, CAN YOU

DESCRIBE EXHIBIT NUMBER 4 FOR US RATHER?  WHAT IS THE DATE ON

THE BOTTOM?

A.   SO THE DATE IS AUGUST 19TH, 2023.

Q.   AND THIS IS AROUND THE TIME WHERE YOU WROTE THESE DISPUTES

AND SENT THEM TO EACH OF THE CREDIT BUREAUS; IS THAT CORRECT?

A.   THAT'S CORRECT.

          MR. LOKER:  AND THEN FOR THE SAME REASONS, WE ALSO

WOULD ASK THAT EXHIBIT 4 BE ADMITTED INTO EVIDENCE.

          MR. NARITA:  NO ADDITIONAL OBJECTIONS OTHER THAN THE

ONES WE'VE RAISED, YOUR HONOR.

          THE COURT:  THANK YOU.

     EXHIBIT NUMBER 4 CAN BE ADMITTED INTO EVIDENCE.

          MR. LOKER:  THANK YOU.

     (PLAINTIFF'S EXHIBIT 4 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   AND I'LL TAKE YOU BACK TO EXHIBIT NUMBER 2, MR. PANCHENKO.

A.   I'M HERE.

Q.   AND EXHIBIT NUMBER 2, MY UNDERSTANDING WAS THIS WAS AN

ADDITIONAL DISPUTE THAT YOU SENT TO THE CREDIT BUREAUS;

CORRECT?

A.   YES.

Q.   AND THAT'S NOT TIME STAMPED; IS THAT RIGHT?

A.   I DON'T SEE A TIME STAMP HERE.

Q.   BUT YOU RECOGNIZE THIS TO BE A DOCUMENT THAT YOU PUT TOGETHER AND YOU PERSONALLY MAILED; IS THAT CORRECT?

A.   CORRECT.

Q.   AND IT WAS AROUND THE SAME TIMEFRAME IN MID-AUGUST OF 2023; IS THAT RIGHT?

A.   YES.  I SENT ALL OF THE LETTERS AT THE SAME TIME.  ONE VISIT TO MOUNTAIN VIEW POST OFFICE.

Q.   SO YOU TOOK THE STACKS OF THE LETTERS TO THE MOUNTAIN VIEW POST OFFICE AND MAILED THEM ALL AT THE SAME TIME IN SEPARATE ENVELOPES?

A.   EXACTLY, YES.

Q.   AND THIS IS ONE OF THOSE LETTERS THAT YOU PUT IN AN ENVELOPE?

A.   YES.

        MR. LOKER:  YOUR HONOR, WE ASK TO MOVE EXHIBIT NUMBER 2 INTO EVIDENCE.

        THE COURT:  SUBJECT TO THE SAME OBJECTIONS, COUNSEL?

        MR. NARITA:  YES, YOUR HONOR.

        THE COURT:  EXHIBIT NUMBER 2 WILL BE ADMITTED INTO EVIDENCE.

        (PLAINTIFF'S EXHIBIT 2 WAS RECEIVED IN EVIDENCE.)

        MR. LOKER:  THANK YOU.

Q.   AND, MR. PANCHENKO, CAN YOU GO TO BATES STAMP 440 OF THIS EXHIBIT.

A.   YES.

Q.   WAS WHAT WE HAVE HERE AT 440, WAS THIS WAS ONE OF THE DOCUMENTS THAT YOU HAVE AS SUPPORTING DOCUMENTS; IS THAT CORRECT?

A.   CORRECT.

Q.   AND WHAT IS IT?

A.   THIS IS A COPY OF AN I-94.

Q.   AND WHAT IS AN I-94?

A.   IT'S A FORM ISSUED I THINK BY IMMIGRATION DEPARTMENT THAT SHOWS ALL OF THE TRAVEL HISTORY FOR A PARTICULAR PERSON FOR TEN YEARS.

Q.   AND WHEN DID YOU PULL THIS DOCUMENT?

A.   I PULLED IT IN 2023 RIGHT BEFORE SENDING THE LETTERS.  SO IT WAS PROBABLY AUGUST OR JULY OF 2023.

Q.   SO IT COVERED WHAT KIND OF TRAVEL HISTORY?

A.   TEN YEARS PRIOR TO THAT DATE.  SO IT WOULD BE SINCE 2013.

Q.   WOULD THAT BE TRAVEL INTO AND OUT OF THE UNITED STATES?

A.   YES.

Q.   AND HERE CAN YOU TAKE US TO THE DATES THAT ARE REFLECTED ON THIS DOCUMENT?

A.   SURE.  SO IT STARTS WITH THE LATEST TRAVEL ARRIVAL TO THE LOCATION IS SAN FRANCISCO ON THE 26TH OF APRIL 2023.

THEN IT SHOWS TWO OF MY VISITS IN 2019 AND IN 2018 THAT I

MENTIONED BEFORE, ARRIVAL AND DEPARTURE BOTH NEW YORK AND HOUSTON.

Q.   SO WE SEE 2018 AND 2019.  IS THAT RIGHT SO FAR?

A.   YES.

Q.   AND 2023 AS WELL AT THE TOP?

A.   YES.

Q.   AND WHY IS THERE NO INFORMATION ABOUT THE OTHER YEARS?

A.   BECAUSE I DIDN'T VISIT THE UNITED STATES IN OTHER YEARS.

Q.   HAD YOU VISITED THE UNITED STATES IN OTHER YEARS, WOULD THOSE DATES HAVE BEEN REFLECTED HERE?

          MR. NARITA:  OBJECTION.  SPECULATION, YOUR HONOR, FOUNDATION.

          THE COURT:  OVERRULED.

          THE WITNESS:  YES.  AS I MENTIONED BEFORE, WHEN I FIRST VISITED THE UNITED STATES IN 2009, AND THEN THEY'VE FALLEN OUT OF SCOPE OF TEN YEAR HISTORY THAT THIS WEBSITE SHOWS AND THIS FORM SHOWS, RIGHT?

     SO THAT'S WHY THERE IS NO INFORMATION FOR THOSE TRAVELS HERE.

BY MR. LOKER:

Q.   WHAT WEBSITE WERE YOU REFERRING TO?

A.   SO IT'S THE GOVERNMENT IMMIGRATION WEBSITE, YEAH.

Q.   AND ONCE THERE, WHAT INFORMATION DID YOU PUT INTO THE WEBSITE TO OBTAIN THIS DOCUMENT?

A.   SO IN ORDER TO OBTAIN THIS DOCUMENT, YOU NEED TO PUT A

PASSPORT NUMBER, THE FIRST NAME AND LAST NAME, AND THE COUNTRY

THAT ISSUED THE PASSPORT.

Q.   AT THE TOP, WHAT IS THE DOCUMENT NUMBER?  WHAT DOES THAT

REFER TO?

A.   THIS IS MY PASSPORT NUMBER.

Q.   AND HOW ABOUT DOCUMENT COUNTRY OF ISSUANCE?

A.   THIS IS THE COUNTRY THAT ISSUED THE PASSPORT.

Q.   IS THIS INFORMATION -- DID YOU HAVE TO PUT IN A PASSWORD

OR SOME SORT OF LOG IN INFORMATION TO OBTAIN THIS DOCUMENT?

A.   NO, NO.  THIS I-94 FORM AND THE WEBSITE IS SPECIFICALLY

DESIGNED SO ANYONE CAN OBTAIN THIS INFORMATION, AND THAT'S WHY

I SPECIFICALLY INCLUDED AND EXPLAINED THAT AND THE LETTER

SHOWED THIS COPY, BUT MY EXPECTATION WAS THAT IN ORDER TO KIND

OF PROVE THE COPY, AS WELL AS ANY INVESTIGATOR CAN JUST ENTER

THE SAME DATA AND SEE IT FOR THEMSELVES.

Q.   AND YOU EXPLAIN THAT PROCESS IN YOUR DISPUTES; IS THAT

CORRECT?

A.   YES, YES.

Q.   DID YOU RECEIVE ANY CALLS FROM COMENITY ABOUT HOW TO

INTERPRET THESE TRAVEL HISTORY RESULTS?

A.   NO.

Q.   DID YOU RECEIVE ANY CALLS FROM ANY BANK FOR THAT MATTER OF

HOW TO INTERPRET THESE TRAVEL HISTORY RESULTS?

A.   NO.

Q.   NEXT, MR. PANCHENKO, WE'RE AT BATES STAMP 441 OF YOUR

PANCHENKO DIRECT BY MR. LOKER

SUPPORTING DOCUMENTS.

WE'VE TOUCHED UPON THIS BEFORE, BUT WHAT IS IT?

A.    THIS IS A COPY OF MY PASSPORT.

Q.    AND WHY DID YOU INCLUDE A COPY OF YOUR PASSPORT WITH A DISPUTE?

A.    WELL, FOR ALL OF THE REASON THAT THIS IS PROOF, MAIN PROOF OF MY IDENTITY THEFT, AND THIS PASSPORT HAS A NUMBER THAT ALLOWS ANYONE TO CHECK MY TRAVEL AGENCY AND WITH THE GOVERNMENT AGENCY IN A SUPER SHORT AMOUNT OF TIME, YEP.

Q.    AND CAN YOU INDICATE WHAT PORTION OF THE PASSPORT, YOU KNOW, FOR EXAMPLE, LEFT SIDE, RIGHT SIDE, BOTTOM, TOP, WHERE IS YOUR PASSPORT REFLECTED HERE ON THIS BATES STAMP?

A.    IT'S THE TOP RIGHT.  IT'S THE FIRST ROW, LAST COLUMN OF THE FIRST ROW.

Q.    OKAY.  WERE THERE ALSO ANY SORT OF STAMPS ASSOCIATED WITH THIS PASSPORT?

A.    WELL, I HAVE STAMPS IN MY PASSPORT, YES.

Q.    AND I'LL PUT THEM ON THE SCREEN SO EVERYONE CAN SEE THEM, BUT CAN YOU DESCRIBE THOSE STAMPS AS WE'RE GOING THROUGH?

A.    OKAY.

SO THE SECOND PAGE DOESN'T HAVE ANY STAMPS.  THIS IS MY U.S. VISA AND IT HAS SOME STAMPS IN HERE, SPECIFICALLY FOR ENTRANCE TO THE UNITED STATES IN THE 2018 AND 2019 WHEN I WAS VISITING THE UNITED STATES.

SO THESE STAMPS WERE MADE BY THE OFFICER ON THE BORDER.

Q.   OKAY.  LET ME TAKE YOU FORWARD A LITTLE BIT.

WE'RE AT BATES STAMP 447.  WHAT IS THIS?

A.   SO THIS IS MY VISA FROM POLAND.

Q.   AND WHY WAS THE VISA INCLUDED?

A.   I INCLUDED ALL OF THE PAGES OF MY PASSPORT JUST TO BE SURE THAT, YOU KNOW, ALL INFORMATION IS PROVIDED AND, LIKE, THERE IS NO DOUBLE THOUGHTS THAT SOMETHING IS MISSING.

Q.   DOUBLE THOUGHTS.  WE'LL SAY DOUBTS?

A.   OKAY.  WE CAN SAY DOUBTS.

SORRY.

YEAH, SO I WANT TO PROVIDE AS MUCH INFORMATION AS POSSIBLE, AND OBVIOUSLY I PROVIDED, LIKE, ALL PASSPORT PAGES JUST TO BE CLEAR.

Q.   OKAY.  AND I'LL SHOW YOU A COUPLE MORE PAGES BEFORE I HAVE SOME FOLLOW-UP QUESTIONS.

WHY AT 449 DO WE SEE THIS REFERENCE OF CANADA?

A.   YEAH, SO THIS IS ONE OF THE PAGES OF MY PASSPORT AND THIS PAGE CONTAINS A CANADA VISA.

Q.   ARE YOU A CANADIAN CITIZEN?

A.   NO.

Q.   IN TERMS OF THE STAMPS -- AND IF YOU NEED TO, FLIP THROUGH EXHIBIT 2, MR. PANCHENKO -- ARE THERE ANY STAMPS THAT COVER 2015?

A.   NO, THERE IS NO STAMPS THAT COVER 2015.

Q.   HOW ABOUT 2016?

A.   THERE ARE NO STAMPS THAT COVER 2016.

Q.   OR 2017?

A.   THE SAME, NO STAMPS THAT COVER 2017.

Q.   AND WHY DID YOU WANT COMENITY TO HAVE A COPY OF YOUR PASSPORT?

A.   SO I WANTED TO PROVIDE, LIKE, AS MUCH INFORMATION AS I CAN, AND ALL THESE PAGES SHOW ALL OF MY, BASICALLY, INTERNATIONAL TRAVEL.

     SO THIS IS A PASSPORT THAT IS USED FOR INTERNATIONAL TRAVEL IN THE UKRAINE, AND IT SHOWS, LIKE, ALL VISAS AND ALL DESTINATIONS THAT I TRAVELLED THROUGHOUT THERE.

Q.   AND DID THE TRAVEL HISTORY SHOW WHERE YOU WERE NOT IN 2015 OR 2017?

A.   NO, IT DOESN'T SHOW PLACES WHERE I WASN'T.

Q.   SO THE ABSENCE OF THOSE DATES REFLECTED ON THE TRAVEL HISTORY SHOWS THAT YOU WEREN'T HERE IN THE STATES?

A.   YES.

          MR. LOKER:  YOUR HONOR, I WAS GOING TO PROCEED TO BATES STAMP 457, WHICH IS THE POLICE REPORT.

          THE COURT:  THANK YOU.

     SO, MEMBERS OF THE JURY, A FURTHER LIMITING INSTRUCTION.

     THE TESTIMONY OF THE EXHIBIT YOU ARE ABOUT -- THE EXCERPT OF THE EXHIBIT YOU'RE ABOUT TO SEE INVOLVES A POLICE REPORT DATED JUNE 13TH, 2023, OR THE COPY OF THE POLICE REPORT.

     THIS THAT YOU'RE ABOUT TO SEE REPRESENTS THE FINDINGS OF

THE POLICE OFFICER MAKING THE REPORT BASED UPON INFORMATION GATHERED BY HIM DURING HIS INVESTIGATION.

YOU MAY CONSIDER THE POLICE REPORT FOR THE LIMITED PURPOSE OF UNDERSTANDING PLAINTIFF'S ALLEGATIONS, AS WELL AS FOR THE PURPOSE OF WHAT COMENITY HAD IN ITS POSSESSION.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.   MR. PANCHENKO, WE'RE AT 457.  YOU SHOULD HAVE A PORTION OF THE POLICE REPORT ON YOUR SCREEN.

DID IT MAKE ITS WAY UP THERE?

A.   YES.

Q.   WHAT'S THE DATE OF THE POLICE REPORT?

A.   SO DATE REPORTED, IT STATES JULY -- I'M SORRY, JUNE 17TH, 2023.

Q.   DID YOU GO TO THE POLICE DEPARTMENT TO HAVE THIS REPORT MADE?

A.   YES, I DID.

Q.   AND ON THE SCREEN WE HAVE A COUPLE OF REDACTIONS, THE BLACK BOXES.

DO YOU SEE THOSE?

A.   YES.

Q.   AND DID YOU APPLY THOSE REDACTIONS?

A.   YES.

Q.   WHO DID?

A.   SO I RECEIVED THIS REPORT LIKE THIS FROM THE POLICE DEPARTMENT WHEN I REQUESTED IT.

PANCHENKO DIRECT BY MR. LOKER

Q.    AND DID COMENITY AT ANY POINT ASK YOU FOR A COPY OF THE UNREDACTED POLICE REPORT?

A.    NO.

Q.    DID ANY BANK ASK FOR A COPY OF THE UNREDACTED POLICE REPORT?

A.    NO.

Q.    WHAT WAS YOUR EXPERIENCE GOING TO THE POLICE STATION?  CAN YOU DESCRIBE THAT FOR US?

A.    SURE.  SO GOING TO THE POLICE STATION WASN'T A NICE EXPERIENCE.  FIRST, I NEVER HAVE BEEN TO THE POLICE DEPARTMENT BEFORE.  I NEVER HAVE.

AND GOING TO ONE IS A STRUGGLE BECAUSE POLICE, ESPECIALLY IS NOT LIKE HAS THE BEST HISTORY IN TERMS OF UKRAINE, SO WE HAD SOME ISSUES WITH POLICE BEING UNLAWFUL IN UKRAINE IN SOME YEARS BEFORE.

SO IT'S NOT A FUN THING TO THINK ABOUT THAT YOU NEED TO GO TO THE POLICE DEPARTMENT, ESPECIALLY IN THE COUNTRY YOU JUST ARRIVED AND YOU'RE NOT FAMILIAR WITH IT AND HOW IT OPERATES.

SO, YEAH, I WENT TO THE POLICE DEPARTMENT.  I FACED SOME PERSON ON THE FRONT DESK.  I STANDED IN LINE.  I TALKED TO THIS PERSON.  THE PERSON EXPLAINED TO ME THAT I NEED -- HE CAN'T HELP ME, SO I NEED TO GO TO ANOTHER PART OF THE POLICE DEPARTMENT AND USE THEIR PHONE, THEIR LAND PHONE, KIND OF IT'S THERE FOR SOME PURPOSES TO CALL THE POLICE DEPARTMENT ON A SPECIFIC NUMBER AND ASK SOMEONE TO COME DOWNSTAIRS.

SO I DID THAT.  I WAITED.

THE DETECTIVE COME DOWNSTAIRS, AND THEN BASICALLY I START TO EXPLAINING TO HIM WHAT HAPPENED, AND HE STARTED TO COLLECT INFORMATION ABOUT ME AND ABOUT THIS CASE.

Q.    AND HOW LONG IS THAT PROCESS?  BREAKING IT DOWN, HOW LONG ARE YOU WAITING IN LINE TO GET TO THE FIRST OFFICER?

A.    WELL, IT WAS PROBABLY -- THE WHOLE PROCESS PROBABLY TOOK THE WHOLE DAY BECAUSE I NEVER DID THAT.  IT WAS THE FIRST TIME IN THIS POLICE DEPARTMENT STANDING IN LINE.  PROBABLY IT'S, YOU KNOW, A COUPLE OF PEOPLE WAS IN FRONT OF ME, SO IT WASN'T THAT LONG.  IT WAS MAYBE BELOW TEN MINUTES.

AND THEN, YOU KNOW, FIGURING THIS ALL OUT TOOK MAYBE ANOTHER 40 MINUTES OR SOMETHING.

AND THEN SOME TIME WE SPENT WITH THE DETECTIVE, HE ASK A LOT OF QUESTIONS, AND BASICALLY, YEAH, HE WROTE EVERYTHING DOWN.

SO I DON'T REMEMBER HOW LONG THAT TOOK, BUT I REMEMBER WE WERE SITTING FOR QUITE SOME TIME IN THE KIND OF HALLWAY OF THE POLICE DEPARTMENT.

Q.    AND HOW WERE YOU FEELING WHEN THE DETECTIVE WAS ASKING YOU QUESTIONS?

A.    IT WAS STRANGE BECAUSE I SAW THE DETECTIVE IS, LIKE, KIND OF COLLECTING SOME EVIDENCE.

HE'S NOT FRIENDLY.  HE'S SUSPICIOUS.  AND HE'S COLLECTING THINGS LIKE, YOU KNOW, COLOR OF THE HAIR OR COLOR OF THE EYES

AND STUFF LIKE THAT.

SO IT WAS A STRANGE EXPERIENCE TO BE THERE AND KIND OF BEING KIND OF UNDER INVESTIGATION.

Q.   WHEN YOU'RE CONVEYING THAT INFORMATION TO THE DETECTIVE, DID YOU FEEL LIKE HE BELIEVED YOU?

A.   NO, I DIDN'T FEEL LIKE HE BELIEVED ME.  I FELT THAT HE JUST, YOU KNOW, HAVE A POKER FACE AND JUST COLLECTING EVIDENCE. HE WAS NOT GIVING ANY CLUES OF, LIKE, WHAT IS GOING TO HAPPEN NEXT.  JUST WRITING DOWN EVERYTHING I SAID, THAT'S IT, AND ASKING QUESTIONS.

Q.   THANK YOU.  AND LET'S GO FORWARD TO BATES STAMP 459.

THIS IS STILL WITHIN THE POLICE REPORT WHICH IS INCLUDED IN THE CREDIT BUREAU DISPUTES.

DO YOU SEE THE SECTION, MR. PANCHENKO, THAT SAYS "DETAILS"?

A.   YES.

Q.   AND WHAT INFORMATION IS REFLECTED UNDER THERE?

A.   THIS IS INFORMATION THAT I PROVIDED TO DETECTIVE REGARDING THAT TIMELINES OF WHAT WAS KNOWN TO ME AT THAT POINT OF TIME.

Q.   AND WHAT DID YOU EXPLAIN TO THE DETECTIVE?

A.   SO I EXPLAINED THE HISTORY AND WHEN I WAS IN THE U.S. AND WHEN I WASN'T IN THE U.S.

I EXPLAINED TO HIM, LIKE, THAT I JUST MOVED TO THE U.S. AND FIND OUT ABOUT THESE FRAUD CASES, AND I BASICALLY NEED TO -- NEED HIS HELP TO INVESTIGATE IT AND FIND THE FRAUDSTER.

YEAH.

AND I REMEMBER HE KIND OF WROTE EVERYTHING DOWN AS MY KIND OF TESTIMONY WHILE HE WAS ASKING ME QUESTIONS, AND LATER PROBABLY IT WASN'T KIND OF ENOUGH INFORMATION, SO HE ASKED ME TO PUT ADDITIONAL DOCUMENTS VIA, LIKE, GOOGLE DOCS AND SEND IT TO HIM ADDITIONALLY SO HE CAN KIND OF, YOU KNOW, HAVE THIS COMMUNICATION, SHOW HIM THE COMMUNICATION AND RECOMMENDATION FROM MY SIDE.

Q.    AND I'LL SHOW YOU BATES STAMP 460.

AT THE TOP IT SAYS "MY TIME LINE."  WHAT IS REFLECTED THERE?

A.    YES.  SO THIS IS ONE OF THE DOCUMENTS THAT I PROVIDED EVENTUALLY TO THE DETECTIVE WITH THE TIMELINE OF MOVING IN AND OUT OF UNITED STATES AS SUPPORTING EVIDENCE TO HELP HIM INVESTIGATE IN THIS CASE.

Q.    AND DID YOU ALSO CONVEY TO THE OFFICER THAT THERE WAS FRAUDULENT ACCOUNTS ON YOUR CREDIT REPORT?

A.    YES.

Q.    AND I'LL SHOW YOU THOSE.  THEY BEGIN AT 462.

WHICH ACCOUNT DO YOU SEE REFLECTED THERE?

A.    THIS IS BANK OF AMERICA.

Q.    AND WAS COMENITY ONE OF THE ACCOUNTS THAT YOU CONVEYED TO THE OFFICER WAS FRAUDULENT?

A.    YES.

Q.    AND THAT IS REFLECTED AT BATES STAMP 464; CORRECT?

A.   CORRECT.

Q.   AND IN TERMS OF THE INFORMATION THAT YOU'RE CONVEYING TO THE OFFICER, DID YOU UNDERSTAND THAT IF YOU FALSIFY THE POLICE REPORT, YOU COULD BE SUBJECT TO IMPRISONMENT OR FINES?

A.   WELL, OF COURSE I WASN'T SUPER FAMILIAR WITH U.S. LAWS, BUT I ASSUME IT KIND OF WORKS THE SAME AS IN THE UKRAINE WHERE ANY FALSE TESTIMONY IS GOING TO HAVE CRIMINAL CHARGES.

Q.   ARE YOU AWARE -- ACTUALLY, LET ME ASK, DO YOU RECALL THE NAME OF THE OFFICER WHO YOU SPOKE TO?

A.   YEAH.  IT'S UNDER -- IT'S JASON POIRIER.

Q.   POIRIER, P-O-I-R-I-E-R.  DOES THAT SOUND CORRECT?

A.   YES.

Q.   ARE YOU AWARE IF DETECTIVE OR OFFICER POIRIER CONCLUDED THEIR INVESTIGATION?

A.   YES.

Q.   AND WHAT DO YOU UNDERSTAND TO BE THE RESULTS OF THAT INVESTIGATION?

A.   SO THERE'S ALSO AN INVESTIGATION THAT HE WAS ABLE TO CONCLUDE THAT I'M THE VICTIM OF IDENTITY THEFT, THAT THIS DIDN'T JUST HAPPEN IN L.A. AREA.  SO IN ORDER TO FIND A FRAUDSTER, HE NEEDS TO MOVE THE CASE TO LAPD TO FURTHER INVESTIGATE AND FIND THE PERSON.

     BUT THAT WAS THE CONCLUSION FOR HIM AND FOR MOUNTAIN VIEW POLICE.

          MR. NARITA:  YOUR HONOR, I'M SORRY, BUT I THOUGHT

THAT THE WITNESS WAS GOING TO BE READING FROM A PORTION OF THE DOCUMENT WHICH IS ALREADY IN EVIDENCE.

THE COURT:  SO --

MR. NARITA:  I MOVE TO STRIKE THE LAST ANSWER.

THE COURT:  MR. NARITA, SPEAKING OBJECTIONS.

MR. NARITA:  MY APOLOGIES, YOUR HONOR.

THE COURT:  SO, COUNSEL, APPROACH FOR ONE MINUTE. WE CAN DISCUSS THE BREAK.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  THE COURT WILL STRIKE THE PRIOR QUESTION AND ANSWER.

MR. LOKER, CAN YOU REPHRASE THE QUESTION.

BY MR. LOKER:

Q.   BATES STAMP 474, MR. PANCHENKO.  DO YOU SEE THE OFFICER'S CONCLUSIONS?

A.   YES.

Q.   CAN YOU READ THAT TO US?

A.   "BASED ON THE INFORMATION I OBTAINED DURING MY INVESTIGATION, I DETERMINED THAT THE SUSPECT COMMITTED A VIOLATION OF CALIFORNIA PENAL CODE 530.5 -- IDENTITY THEFT.  I ALSO DETERMINED THAT THE VIOLATIONS OF THIS STATUTE OCCURRED IN THE FOLLOWING JURISDICTIONS:

LOS ANGELES, FRESNO, NORTH HOLLYWOOD, GLENDALE, VAN NUYS.

CASE CLOSED, COPY TO L.A. COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES POLICE DEPARTMENT, AND GLENDALE POLICE DEPARTMENT."

Q.   THANK YOU.

AND CAN YOU GO FORWARD IN THE EXHIBIT, MR. PANCHENKO, TO BATES STAMP 475.

A.   YES.

Q.   AND WHAT DO WE HAVE HERE AT THIS BASE STAMP 475?

A.   THIS IS IDENTITY THEFT REPORT THAT I FILED WITH FTC.

Q.   AND THIS IS SIMILAR TO WHAT WE LOOKED AT BEFORE; IS THAT CORRECT?

A.   I BELIEVE SO.

THE COURT:   AND FOR THE JURY, YOU'RE UNDER THE SAME LIMITING INSTRUCTIONS IN TERMS OF THE FTC REPORT.   PLEASE RECOGNIZE AND ONLY CONSIDER THIS REPORT FOR PURPOSES OF INFORMATION THAT PLAINTIFF HAD SUBMITTED TO THE FTC.

THE REPORT MAY BE CONSIDERED SOLELY AS A SUMMARY OF THESE ALLEGATIONS MADE BY PLAINTIFF AND DOES NOT REFLECT AN INDEPENDENT FINDING OF THE FTC.

MR. LOKER:   THANK YOU.

Q.   AND WHY DID YOU PROVIDE AN ADDITIONAL COPY OF THE FTC REPORT?

A.   THIS WAS, LIKE, GENERAL KNOWLEDGE FOR ME TO PROVIDE AS MUCH INFORMATION AS POSSIBLE TO ALL PARTIES.

SO I PROVIDED THIS BECAUSE I HAD IT AND BECAUSE AS I UNDERSTOOD FROM FTC THIS WAS A PROPER RECOMMENDATION OF THE FRAUD.

SO THAT'S WHY I PROVIDED IT.

Q.   AND I WOULD TAKE YOU TO BATES STAMP 493, STILL WITHIN EXHIBIT NUMBER 2.

WHAT DO WE HAVE HERE ON BATES STAMP 493?

A.   SO THIS IS MY BANK STATEMENT FROM UKRAINIAN BANK.

Q.   WHICH BANK?

A.   THIS IS A PRIVAT BANK.

Q.   AND WHY WAS THIS PROVIDED?

A.   SO THIS WAS PROVIDED TO SHOW MULTIPLE THINGS.  THE MAIN ONE OBVIOUSLY IS THAT I HAD A -- LIKE, AN ECONOMIC ACTIVITY IN UKRAINE THROUGHOUT ALL OF THESE YEARS.  SO IT'S LIKE IN ADDITION TO TRAVEL HISTORY, I SHOW THAT I JUST, YOU KNOW, USED MULTIPLE DEBIT CARDS AS A NORMAL PERSON WOULD USE IT IN THE UKRAINE.

ADDITIONAL TO THAT, THIS BANK STATEMENT SHOWS MY ADDRESS IN THE UKRAINE AND INFORMATION ABOUT ME.  SO IT'S LIKE I KNOW THAT IN THE U.S. BANK STATEMENTS HAVE, LIKE, MORE WEIGHT IN TERMS OF LIKE SUPPORTING DOCUMENTS, SO THAT'S WHY I PROVIDED THIS.

Q.   AND I'LL MOVE THE DOCUMENT HIGHER ON THE SCREEN.

AND WHAT DATES ARE REFLECTED FOR THAT PAYMENT ACTIVITY THAT YOU REFERENCED?

A.   SO HERE I REFLECTED A PAYMENT FROM JANUARY 2015 TO FEBRUARY 2017.

Q.   AND WHY DID YOU WANT COMENITY TO KNOW ABOUT THOSE SPECIFIC DATES?

A.    BECAUSE BASED ON MY UNDERSTANDING AND THE INFORMATION THAT I FOUND IN MY CREDIT REPORT, THAT WAS THE DATE WHEN THE ACCOUNT WAS OPENED.  SO I WANTED TO COVER THAT DATE AND ANY DATE AFTER IT JUST TO SHOW THAT I WASN'T HERE, I WAS IN THE UKRAINE JUST LIVING MY LIFE.

Q.    I MOVE FORWARD IN BATES STAMP NUMBER 476.

WHAT DO WE HAVE HERE, MR. PANCHENKO?

A.    THIS IS MY UKRAINIAN PASSPORT.

Q.    AND HOW OLD WERE YOU IN THIS PICTURE?

A.    I DON'T KNOW.  MAYBE 23 YEARS.  I FORGOT THE PROPER AGE WHEN YOU NEED TO CHANGE THE PICTURE, BUT I GUESS IT'S 23 YEARS OLD.

Q.    AND WHY WAS THIS INCLUDED WITH YOUR DISPUTE?

A.    SO -- BECAUSE I HAVE THIS PASSPORT, RIGHT, AND THIS IS AN INTERNAL PASSPORT, UKRAINIAN INTERNAL PASSPORT, SO IT DOESN'T NECESSARILY SHOW ANY INTERNATIONAL TRAVEL OR ANYTHING LIKE THAT.

BUT, AGAIN, I JUST WANTED TO INCLUDE AS MUCH INFORMATION AS POSSIBLE, AND THIS PASSPORT YET NOT SHOWING ANY INTERNATIONAL TRAVEL, IT HAS WHAT WE CALL REGISTRY OR RESIDENTIAL ADDRESS, WHICH IS OFFICIAL PLACE WHERE YOU CAN STAY IN UKRAINE, AND YOU HAVE TO REGISTER, AND YOU HAVE TO KIND OF REGISTER AT YOUR PLACE OF LIVING OR SOMETHING LIKE THAT.

SO, YEAH, I INCLUDED THIS JUST IN CASE TO PRESENT AS MUCH INFORMATION AS I CAN.

Q.   AND LAST PAGE WITHIN THIS EXHIBIT.  WE'RE AT BATES STAMP 497.

WHY WAS THIS -- WHAT IS THIS DOCUMENT?

A.   SO THIS IS A STATEMENT FROM PG&E, PG&E THAT I GOT WHILE PAYING FOR ELECTRICITY, AND IT IS JUST A BILL.  AND, YEAH, I PROVIDED THIS AS PROOF OF ADDRESS.

I KNOW IN U.S. YOU NEED KIND OF TO PROVIDE MULTIPLE EVIDENCE FOR THINGS LIKE THAT, LIKE A PROOF OF ADDRESS, SO THAT'S FINE.  I INCLUDED THIS ONE AS WELL.

Q.   IN TERMS OF THE DISPUTES IN WHOLE, SO THE THREE CREDIT BUREAU DISPUTES, YOU KNOW, WHY DID YOU GATHER THAT INFORMATION? WHAT WAS YOUR HOPE THAT THEY WOULD DO IN RESPONSE?

A.   MY HOPE WAS THAT THEY WILL REMOVE ALL OF THE FRAUDULENT INFORMATION.

Q.   WERE YOU UNDER THE IMPRESSION THAT COMENITY WOULD READ THE DISPUTE?

A.   OF COURSE.

Q.   AND AFTER READING IT, WHAT WAS YOUR GOAL?

A.   THAT THEY WOULD REMOVE ANY INFORMATION THAT THEY ARE REPORTING TO CREDIT AGENCIES SO I WOULD HAVE -- I WOULD NOT HAVE THAT FRAUDULENT INFORMATION ON MY CREDIT REPORT.

MR. LOKER:  YOUR HONOR, I WAS GOING TO MOVE TO A NEW EXHIBIT, BUT DID YOU WANT TO DISCUSS A BREAK?

THE COURT:  I THINK WE'RE AT A GOOD TIME FOR A BREAK.

I'M GOING TO GIVE ONE LAST LIMITING INSTRUCTION.

SO AT LEAST FOR THIS AFTERNOON SESSION, MEMBERS OF THE JURY, YOU JUST HEARD TESTIMONY AND SAW EXHIBITS, BOTH EXHIBITS 2, 3, AND 4, REGARDING DOCUMENTS THAT WERE PROVIDED TO CONSUMER REPORTING AGENCIES AS PART OF PLAINTIFF'S DISPUTE.

YOU MAY CONSIDER THESE DOCUMENTS AND TESTIMONY FOR THE PURPOSE OF UNDERSTANDING WHAT MR. PANCHENKO TOLD THE CREDIT REPORTING AGENCIES, AS WELL AS FOR THE PURPOSE OF WHAT COMENITY HAD IN ITS POSSESSION WHEN INVESTIGATING PLAINTIFF'S DISPUTE.

ALL RIGHT.  I THINK IT'S TIME FOR OUR AFTERNOON BREAK, SO LET'S TAKE A 15 MINUTE BREAK.

COUNSEL, I'LL HAVE YOU STAY FOR ONE MOMENT.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  YOU CAN LEAVE YOUR NOTEBOOKS ON YOUR CHAIRS.

AND THANK YOU VERY MUCH, LADIES AND GENTLEMEN.  ENJOY YOUR BREAK.

(JURY OUT AT 2:50 P.M.)

THE COURT:  MR. PANCHENKO, YOU'RE EXCUSED FROM THE WITNESS STAND.

THE WITNESS:  THANK YOU.

THE COURT:  SO JUST BRIEFLY, I'M GOING TO BRIEFLY MEMORIALIZE THE SIDE-BAR, BECAUSE WE ARE TO THIS POINT.

THERE ARE A COUPLE.

SO CONTINUING, WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

COUNSEL AND THE PARTIES ARE BOTH PRESENT.

SO AT SIDE-BAR, AS DISCUSSED WITH COUNSEL, EXHIBIT 26 REGARDING THE OBJECTION CONCERNING AUTHENTICATION, THIS OBJECTION WAS WITHDRAWN IN TERMS OF 26.  THE CONCERN WAS WHETHER OR NOT THE BUSINESS RECORDS OR THE CUSTODIAN OF RECORDS AFFIDAVIT WAS PRESENT.

THIS IS THE ONE WHICH MR. LOKER INDICATED BEFORE WE STARTED TODAY THAT THAT AFFIDAVIT WAS IN HIS POSSESSION, WHICH I'M GOING TO ACTUALLY ASK THAT YOU PROVIDE A COPY TO THE COURT, TO MADAM CLERK DURING THE BREAK OR BY THE END OF THE DAY.

EXHIBIT 28, THE COURT SUSTAINED THE OBJECTION BECAUSE THIS WAS ACTUALLY THE SAME AUTHENTICATION CONCERN, BUT THIS WAS INVOLVING TRANS UNION, AND MR. LOKER INDICATED THAT PLAINTIFF HAD NOT YET RECEIVED THAT BUSINESS RECORDS AFFIDAVIT AS REQUIRED.

MY CONCERN WITH THIS ONE, JUST TO MAKE IT CLEAR FOR THE RECORD, WAS THAT THE PAGE WHICH WAS CITED BY MR. LOKER REGARDING -- I LOST TRACK OF THAT PAGE -- WHETHER SOMETHING WAS DELETED OR NOT DELETED WAS GOING TO THE TRUTH OF THE MATTER ASSERTED AND THE FACT THAT THOSE COMPROMISED ACCOUNTS HAD ACTUALLY BEEN DELETED, AND SO IT WAS FOR THE TRUTH.  SO THE HEARSAY OBJECTION AS WELL.

AND THEN FINALLY, IN TERMS OF EXHIBIT 2, THE COURT HAD INITIALLY SUSTAINED THE OBJECTION UNTIL FURTHER FOUNDATION WAS LAID REGARDING WHEN EXHIBITS 2, 3, AND 4 HAD BEEN SENT BY

PLAINTIFF IN LUMP SUM AT THE POST OFFICE.

FINALLY, IN TERMS OF THE LAST LIMITING INSTRUCTION, I INCLUDED THAT -- I THINK THAT'S THE ONE WE DISCUSSED AT THE BREAK AT THE BEGINNING OF THE DAY -- BECAUSE IT SEEMED APPROPRIATE AND THE PARTIES HAD SIGNED OFF ON THAT ONE AS IT REFLECTED SORT OF THE INVERSE SIDE OF THE DIRECT DISPUTE MOTION IN LIMINE.

SO UNLESS THERE'S -- AND THERE'S MORE THINGS TO MEMORIALIZE AT THE END OF THE DAY, BUT I JUST WANTED TO MAKE SURE OUR SIDE-BARS ARE CAPTURED BEFORE WE FORGOT.

REMINDER, COUNSEL, NO FURTHER SPEAKING OBJECTIONS.  JUST SAY THE WORD.

AND IF YOU NEED TO HEAR IT, I REALLY WOULD LIKE TO DECREASE THE NUMBER OF SIDE-BARS.  THEY'RE EATING INTO YOUR TIME ON BOTH SIDES.

ANYTHING FURTHER SO THAT EVERYONE GETS A BREAK?

MR. NARITA:  NOTHING FURTHER, YOUR HONOR.

MY APOLOGIES AGAIN FOR THE SPEAKING OBJECTION EARLIER.

THE COURT:  UNDERSTOOD.

MR. LOKER:  NOTHING FURTHER FROM THE PLAINTIFFS, YOUR HONOR.

THE COURT:  MAKE SURE YOU GET THE CUSTODIAN OF RECORDS.

MR. LOKER:  THANK YOU.

THE COURT:  THANK YOU.  LET'S ALL TAKE OUR SOMEWHAT

BETWEEN 12 TO 15 MINUTE BREAK FOR THE REST OF US AS WELL

BECAUSE I THINK EVERYONE CAN REFUEL.

MR. LOKER:  THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE IN RECESS.

(RECESS FROM 2:54 P.M. UNTIL 3:13 P.M.)

(JURY IN AT 3:13 P.M.)

THE CLERK:  COURT IS BACK IN SESSION.

THE COURT:  ALL RIGHT.  WE ARE ON THE RECORD.

COUNSEL ARE PRESENT, THE JURORS ARE PRESENT, AS WELL AS THE

PARTIES.

MR. LOKER, YOU MAY CONTINUE WITH YOUR WITNESS.

MR. LOKER:  THANK YOU, YOUR HONOR.

AND OFF THE RECORD, I PROVIDED THE TRANS UNION BUSINESS

RECORDS DECLARATION TO THE COURT AND COUNSEL.  I SENT THEM IN

AN EMAIL.

THE COURT:  OKAY.  WE'LL PICK UP ON THIS AT 4:30.

MR. LOKER:  OKAY.

Q.   LET'S GO TO EXHIBIT NUMBER 54.  CAN YOU FLIP THERE IN YOUR

BINDER, MR. PANCHENKO.

A.   54?

Q.   CORRECT, NEAR THE END THERE.

A.   YES.

Q.   AND DO YOU RECOGNIZE EXHIBIT NUMBER 54?

A.   YES.

Q.   WHAT IS IT?

A.   THIS IS AN EMAIL THAT I GOT REGARDING TRYING TO OPEN A CREDIT CARD WITH APPLE CREDIT CARD.

Q.   AND WHAT IS THE DATE ON THE EMAIL?

A.   THE DATE IS AUGUST 16TH, 2023.

Q.   AND WHO IS THE EMAIL SENT FROM?

A.   THIS EMAIL WAS SENT FROM APPLE, AND PROBABLY THE DEPARTMENT THAT ISSUES THESE CARDS.

Q.   AND WHO WAS THE EMAIL SENT TO?

A.   TO ME, TO OLEKSANDR PANCHENKO.

MR. LOKER:  YOUR HONOR, FOR EXHIBIT 54, MAY WE PUBLISH IT AND ADMIT IT?

MR. NARITA:  YOUR HONOR, WE HAVE A FOUNDATION, AUTHENTICATION, AND HEARSAY OBJECTION TO THIS.

THE COURT:  THE OBJECTION IS OVERRULED.

MR. LOKER:  THANK YOU.

(PLAINTIFF'S EXHIBIT 54 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   MR. PANCHENKO, CAN YOU DESCRIBE THE EMAIL?

A.   YES.  THIS IS AN EMAIL.  IT RELATES TO THE APPLICATION THAT I MADE BEFORE TO GET APPLE CREDIT CARD, AND THIS EMAIL SAYS THAT THEY REVIEWED MY APPLICATION AND THEY DENIED ME. THEY DENIED ME A CREDIT CARD.

Q.   GO TO BATES STAMP 1 OF THE EMAIL.  WHAT IS THE BASIS LISTED FOR THE REJECTION?

A.   SO IT SAYS BECAUSE OF SERIOUS DELINQUENCY, PROPORTION OF

BALANCES TO CREDIT LIMITS ON BANK/NATIONAL REVOLVING OR OTHER

REVOLVING ACCOUNTS IS TOO HIGH; AND TOO FEW ACCOUNTS CURRENTLY

PAID AS AGREED.

Q.   IN TERMS OF THAT DELINQUENCY, COMENITY WAS ONE OF THE

CREDIT CARDS THAT COMPRISED THE DELINQUENCY?

          MR. NARITA:  OBJECTION.  FOUNDATION, YOUR HONOR.

          THE COURT:  ONE MOMENT.

     (PAUSE IN PROCEEDINGS.)

          THE COURT:  COUNSEL, I'LL HAVE YOU REPHRASE THE

QUESTION.

BY MR. LOKER:

Q.   FOR YOUR -- YOU HAVE AN UNDERSTANDING OF THE ACCOUNTS ON

YOUR CREDIT REPORT; IS THAT RIGHT, MR. PANCHENKO?

A.   YES.

Q.   AND DO YOU RECALL HOW COMENITY -- THE AMOUNT OF DEBT THAT

COMENITY WAS REPORTING TO YOUR CREDIT REPORT?

A.   I BELIEVE THERE WAS SOME AMOUNT WAS ABOUT $5,000.

Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHETHER THAT ACCOUNT

WAS REPORTED POSITIVELY OR NEGATIVELY?

A.   I BELIEVE, LIKE ALL THE ACCOUNTS, THEY WERE REPORTED

NEGATIVELY BECAUSE ALL OF THE ACCOUNTS WAS FRAUDULENT ACCOUNTS.

Q.   AND IN TERMS OF THE DENIAL OF CREDIT, YOU ACKNOWLEDGE THAT

SOME OF THE OTHER ACCOUNTS, SOME OF THE OTHER FRAUD WOULD HAVE

PLAYED A ROLE IN THAT DENIAL; IS THAT RIGHT?

A.   YES, OF COURSE.

Q.   LET'S TALK ABOUT YOUR EMOTIONAL DISTRESS.

SAME QUESTION.  SO THERE ARE MULTIPLE BANKS THAT REJECTED YOUR DISPUTES; IS THAT CORRECT?

A.   CORRECT.

Q.   SOME, HOWEVER, DID ACCEPT YOUR DISPUTE AND DELETED THE ACCOUNTS; IS THAT RIGHT?

A.   CORRECT.

Q.   AND AT THE END OF THIS TRIAL, ARE YOU GOING TO ASK THE JURY TO AWARD YOU DAMAGES AGAINST COMENITY FOR WHAT THE OTHERS DID?

A.   NO.

Q.   HOW CAN YOU DISTINGUISH BETWEEN THE HARM CAUSED BY COMENITY AS OPPOSED TO THE HARM CAUSED BY THE OTHER BANKS?

A.   I CAN DISTINGUISH BASED ON MY INSTRUCTIONS WITH COMENITY.

SO, FIRST, COMENITY WAS THE ONLY ONE OUT OF ALL OF THOSE BANKS THAT NOT JUST REMAINED THE ACCOUNT AND REPORTED IT BACK, BUT REFUSED TO CONTINUE ANY INVESTIGATIONS.  SO IT WAS THE ONLY BANK THAT WAS ACTUALLY SAYING, LIKE, WE'RE NOT GOING TO DO ANYTHING, THIS IS IT.

ANOTHER ONE, THE COMENITY ACCOUNT WAS ONE OF THE SMALLEST AMOUNT COMPARED TO OTHER BANKS, AND WAS EITHER FIRST OR ONE OF THE FIRST THAT THIS PERSON OPENED.

SO I SEE THIS ACCOUNT AS BEING, LIKE, A -- OPENING THE GATES BASICALLY FOR ANY OTHER ACCOUNTS THAT COME AFTER IT WHERE MAYBE THIS ACCOUNT WAS EVEN LEVERAGED TO OPEN THESE OTHER

ACCOUNTS WITH OTHER BANKS.

SO BASED ON THIS, PLUS WHAT WE KNOW FROM THE DISCOVERY WHERE I LEARNED THAT ALL OF THESE DOCUMENTS THAT I SEND THEM, THEY DIDN'T EVEN LOOK AT THOSE DOCUMENTS, SO THIS IS CLEARLY FOR ME DIFFERENTIATING COMENITY FROM OTHERS.

AND, LIKE, IN A REALLY CLEAR WAY, LIKE SHOWING THAT THEIR NEGLIGENCE IS MUCH HIGHER THAN OTHER BANKS.

Q.    DID THE DISPUTE PROCESS IMPACT YOUR ABILITY TO GET EMPLOYMENT?

A.    YES.

Q.    CAN YOU DESCRIBE THAT FOR US?

A.    SURE.  SO, LIKE, I STARTED TO LEARN ABOUT IDENTITY THEFT AND HOW TO RECOVER FROM IT AND HOW TO DISPUTE THE ACCOUNTS, AS I SAID BEFORE, IT WAS KIND OF -- I'M TRYING TO DISPUTE THE ACCOUNTS SO IT DOESN'T REMAIN ON MY CREDIT REPORT.

SO WHAT I WAS DOING WAS BASICALLY CALLING THESE BANKS FROM THE MOMENT WHEN MY WIFE WENT TO WORK, I STARTED TO CALL THE BANKS, AND UNTIL THE EVENING WHEN SHE ARRIVES.

SO I HAD, LIKE, A PLAN.  I HAD AT LIST OF ALL THE BANKS. SOME OF THE BANKS WAS ON THE WEST COAST.  SOME OF THEM WAS IN CENTRAL AMERICA.  SOME OF THEM WERE ON THE EAST COAST.

SO OBVIOUSLY I STARTED TO CALL FROM THE EAST COAST SO THAT I WILL HAVE MORE TIME TRYING TO REACH THOSE BANKS.  THEN WHEN THEY KIND OF BECOME UNAVAILABLE AND THE WORKING DAY IS ENDED, I'M STARTING TO CALLING THE CENTRAL.

SO IT WAS LIKE A FULL-TIME JOB FOR ME AND I COULDN'T FIND ANY SMALL AMOUNT OF TIME TO START WORKING ON MY PORTFOLIO AND ACTUALLY APPLYING FOR THE JOBS.

PLUS, I WAS AFRAID TO APPLY FOR THE JOBS BECAUSE I THOUGHT APPLYING FOR THESE HUGE COMPANIES, LIKE GOOGLE AND OTHERS, THEY, FROM MY PREVIOUS EXPERIENCE, THESE BIG COMPANIES, THEY DO A BACKGROUND CHECK, AND I WAS AFRAID THAT THEY WILL DO A BACKGROUND CHECK, THEY WILL FIND THIS INFORMATION, AND THEY WOULD -- THEY WILL SAVE IT IN MY PROFILE.

AND THEN EVEN IF IT'S GOING TO BE DELETED LATER, I'M GOING TO KIND OF BE STUCK WITH THAT BECAUSE IT'S GOING TO BE IN THEIR RECORDS, AND THEY WILL NEVER TELL ME WHY THEY DENIED ME OF JOB APPLICATION.

Q.   HOW ARE YOU SUPPORTING YOURSELF DURING THIS PERIOD SINCE YOU WEREN'T EMPLOYED?

A.   SO I HAD MY SAVINGS THAT I HAD FROM WORKING AT WIX IN POLAND.  I SOLD ALL OF THE LEFT STOCK OPTIONS THAT I WAS APPOINTED WITH WIX, AND I BASICALLY SPENT ALL OF MY SAVINGS DURING THIS TIME TO KIND OF BUY GROCERIES, SUPPORT MY FAMILY, PAY BILLS, LIKE JUST THE REGULAR THINGS THAT YOU DO TO LIVE HERE.

Q.   AND AT WHAT POINT DID YOU RUN OUT OF SAVINGS?

A.   I HAD RAN OUT OF ALL OF THE SAVINGS PROBABLY BY THE END OF 2023, EARLY 2024, LIKE RIGHT BEFORE I ACTUALLY LANDED THE JOB.

Q.   AND HOW, EMOTIONALLY, HOW DID THE REJECTIONS IMPACT YOU?

A.   SO THE BEST WORD TO DESCRIBE IT IS DEPRESSING.  SO JUST TRYING ALL OF MY BEST TO SEND OVER AND OVER ALL OF THESE DOCUMENTS AND SUPPORTING DOCUMENTS AND PROOFS THAT I WASN'T HERE, IT'S NOT MY ACCOUNT, TRYING TO NAVIGATE THE SYSTEM AS A FOREIGNER AND SEEING LITTLE TO NO EFFECT, ESPECIALLY AT SOME BANKS, WAS FRUSTRATING AND DEPRESSING.

SO OBVIOUSLY IT WAS LIKE A DARK TIME.  YOU DON'T HAVE A JOB, YOU'RE LOSING YOUR SAVINGS, YOU DON'T KNOW WHEN IT'S GOING TO END, AND THERE ARE NOT MANY OPTIONS YOU CAN EXPLORE, RIGHT?

SO MY WIFE WAS WORKING WITH GOOGLE, BUT OBVIOUSLY, LIKE, THE OPTIONS, YOU CAN SEE THERE IS -- LIKE, IF I'M NOT GOING TO HAVE A CHANCE TO GET A JOB HERE, WHAT SHOULD I DO?  LIKE, WE SHOULD MOVE OUT, LOOK IN ANOTHER COUNTRY TO SETTLE IN?  HOW IT'S SUPPOSED TO WORK?  HOW IT'S POSSIBLE THAT IT'S WORKING THIS WAY?  YOU KNOW, SOME FRAUD CAN KIND OF MESS YOUR LIFE UP.

SO, YEAH, THAT WAS THE FEELINGS.

Q.   DID YOU OBTAIN THERAPY FOR THE DEPRESSION?

A.   NO.

Q.   WHY NOT?

A.   BECAUSE AS I SAID, I WAS REALLY COUNTING MY SAVINGS AND TRYING TO KIND OF BALANCE EVERYTHING OUT.  I DIDN'T KNOW HOW LONG I WOULD HAVE TO KIND OF FIGHT THIS AND NOT BE ABLE TO WORK, SO I COULDN'T AFFORD TO GO TO THERAPY.

AND MY WIFE'S INSURANCE THAT GOOGLE PROVIDED TO MY SPOUSE DIDN'T COVER THE THERAPY.  IT COVERED THE THERAPY FOR MY WIFE

AND SHE KIND OF WENT TO THE THERAPY, BUT I DIDN'T BECAUSE IT WASN'T, LIKE, IN THE POSSIBLE BUDGET FOR ME AND FOR US.

Q.    WERE YOU FEELING NERVOUS AFTER YOUR DISPUTES GOT REJECTED?

A.    YES, OBVIOUSLY, LIKE EVERY REGULAR PERSON WOULD FEEL NERVOUS SEEING IT.

Q.    WHAT -- HOW DOES YOUR -- HOW DO YOU REACT WHEN YOU FEEL NERVOUS?

A.    WELL, FOR ME USUALLY IT'S LIKE TAKING EVERYTHING AND ALL OF THESE FEELINGS INTERNALLY AND NOT SHARING IT TO THE FAMILY MEMBERS OR FRIENDS.  SO USUALLY WHEN I'M NERVOUS, I DON'T ACTUALLY EAT MUCH BECAUSE OF THE NAUSEA.

SO IT'S BASICALLY, LIKE, TRYING TO, YOU KNOW, BE CONSCIOUS AS WELL OF WHAT IS HAPPENING, TRYING TO FIGHT THAT, AND JUST STAY FOCUSSED AND NOT LOSE YOUR MIND ON THESE ISSUES THAT YOU HAVE.

Q.    MY UNDERSTANDING IS THAT YOU'RE WORKING NOW AT NACE.AI THAT WE COVERED; IS THAT CORRECT?

A.    YES.

Q.    AND ARE YOU HAPPY WITH THE AMOUNT OF MONEY THAT YOU EARN FROM NACE?

A.    I'M HAPPY WITH COMPENSATION, BOTH WITH BASE AND TOTAL COMPENSATION WITH ALL OF THE STOCK OPTIONS THAT NACE GAVE ME.

Q.    IS THIS CASE ABOUT MONEY TO YOU?

A.    NO, IT'S NOT ABOUT MONEY.

Q.    DO YOU WANT TO BE HERE RIGHT NOW?

A.   NO, I DON'T WANT TO BE HERE RIGHT NOW.

LIKE, I HAVE -- SO THIS WEEK IS ONE OF THE MOST IMPORTANT FOR OUR COMPANY.  WE HAVE OUR KIND OF BIG DEAL WITH ONE OF THE BIG FOUR'S, A HUGE CLIENT, HUGE OPPORTUNITY FOR THE COMPANY, POTENTIALLY LIKE NEXT ROUND OF INVESTMENTS, AND I COULDN'T BE THERE JUST TO HELP MY TEAM NAVIGATE IT.  I DON'T HAVE ANY CONTEXT OF WHAT IS HAPPENING.  SO OBVIOUSLY EVERYONE IN THE TEAM IS FRUSTRATED BECAUSE OF THAT, AND I'M FRUSTRATED BECAUSE OF THAT.

SO, YEAH, THIS IS NOT THE PLACE I WANT TO BE.

Q.   SO WHY ARE WE HERE, MR. PANCHENKO?

A.   WE ARE HERE TO MAKE SURE THAT THIS WILL NOT HAPPEN TO ANYONE ELSE AND TO HOLD ACCOUNTABLE THE PARTY BASICALLY OF ALL OF THESE VIOLATIONS, AND BASICALLY NOT LET ANYONE ELSE EXPERIENCE THIS IN THE FUTURE.

Q.   I DON'T HAVE ANY FURTHER QUESTIONS.

THE COURT:  MR. NARITA, YOUR WITNESS.

MR. NARITA:  THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION**

BY MR. NARITA:

Q.   GOOD AFTERNOON, MR. PANCHENKO.

A.   GOOD AFTERNOON.  THANK YOU.

Q.   NICE TO SEE YOU AGAIN.

A.   NICE TO SEE YOU TOO.

Q.   I WANT TO MAKE SURE THAT I GET A FEW DATES STRAIGHT SO WE

HAVE A GOOD CHRONOLOGY IN THE RECORD.  OKAY?

SO YOU GOT MARRIED SEPTEMBER 21ST, 2021; RIGHT?

A.   IT WAS SEPTEMBER 21ST, CORRECT.

Q.   YOU BETTER REMEMBER THAT DATE.  IT'S A JOKE.  SORRY.

AND THEN MY NOTES SAY THAT YOUR WIFE STARTED WORKING FOR GOOGLE SHORTLY AFTER THAT, OCTOBER 4TH, 2021; RIGHT?

A.   SHE STARTED TO WORK FOR GOOGLE AROUND THAT TIME, BUT I DON'T REMEMBER WHETHER IT WAS PRIOR OR AFTER THAT DATE.

Q.   OKAY.  AND AT THE TIME, THE TWO OF YOU WERE LIVING IN KYIV; RIGHT?

A.   YES.

Q.   AND THERE WAS ALREADY A SITUATION BREWING WITH THE RUSSIANS THAT DID NOT LOOK GOOD.  IS THAT FAIR TO SAY?

A.   YES.  IT WASN'T GOOD AT THAT TIME, BUT IT WAS CLEAR AND HIGHLY LIKELY TO ESCALATE BECAUSE YOU HAVE TROOPS OF FOREIGN COUNTRY CONCENTRATED ON THE BORDERS, YOU HAVE ALL OF THIS INTELLIGENCE FROM THE U.S. AS WELL, AND SO IT'S OBVIOUSLY LIKE A REALLY DARKENING DOWN.

Q.   OKAY.  AND AT THAT TIME, HAD YOU ALREADY SERVED IN THE MILITARY BEFORE?

A.   NO.

Q.   OKAY.  SO IN LATE 2021, YOU AND YOUR WIFE, RIGHT AROUND THE TIME YOU GOT MARRIED, YOU STARTED MAKING PLANS TO SEE IF YOU COULD GET OUT OF THE UKRAINE; CORRECT?

A.   I THINK IN SOME SENSE WE MADE THESE PLANS MUCH PRIOR TO

THE DATE.  SO AS YOU CAN IMAGINE, BEING ACCEPTED TO THE GOOGLE IS NOT LIKE ONE DAY JOB.

SHE APPLIED TO GOOGLE MUCH MORE TIME BEFORE THAT, RIGHT, MANY MONTHS BEFORE THAT.  THE PROCESS YOU GO THROUGH, THROUGH THE INTERVIEWS AND EVERYTHING, IT'S SUPER LONG.

SO I GUESS WE HAD THIS IDEA OF MOVING OUT FOR QUITE SOME TIME.

Q.   AND THEN MY NOTES SAY THAT YOU ACTUALLY LEFT THE UKRAINE AROUND JANUARY 17TH, 2022, TO MOVE TO WARSAW.  IS THAT ABOUT RIGHT?

A.   IT'S ABOUT RIGHT, YEAH, AROUND THAT DATE, YEAH.

Q.   WHICH WAS JUST A FEW WEEKS BEFORE THE BIG CONFLICT STARTED ON FEBRUARY 24TH, 2022; RIGHT?

A.   THAT'S CORRECT.

Q.   AND THEN THAT'S WHEN ZELENSKYY DECLARED MARTIAL LAW AND EVERYTHING STARTED TO GO REALLY BAD AT THAT POINT; CORRECT?

A.   YES, THAT'S CORRECT.

Q.   OKAY.  WERE YOUR FAMILY AND YOUR FRIENDS, WERE THEY ABLE TO GET OUT OF HARM'S WAY?

A.   SOME, YES.  SOME NOT, YEAH.  IT DEPENDS.

Q.   OKAY.  SO SOME REMAINED IN THE UKRAINE AND SOME WERE ABLE TO LEAVE?

A.   SO IF YOU'RE TALKING ABOUT FAMILY MEMBERS, ALL OF MY FAMILY MEMBERS WERE IN THE UKRAINE WHEN THE WAR STARTED, BECAUSE, YES, WE ANTICIPATED SOMETHING MIGHT HAPPEN, BUT NO ONE

ACTUALLY BELIEVED THIS WILL ACTUALLY HAPPEN.  WE WERE KIND OF -- YOU SEE ALL OF THIS NEWS, BUT YOU DON'T ACTUALLY BELIEVE THIS IS POSSIBLE.

SO THEY WERE IN UKRAINE.  A LOT OF MY FRIENDS WERE IN THE UKRAINE.  SOME OF MY FRIENDS DECIDED TO MOVE OUT OF UKRAINE FOR DIFFERENT REASONS, AND SOME OF THEM WERE OUTSIDE OF UKRAINE AT THAT POINT.

Q.   OKAY.  DO YOU AND ALLA HAVE ANY PLANS IN THE NEAR FUTURE TO RETURN TO THE UKRAINE?

A.   WELL, MY PLANS WAS SPECIFICALLY, RIGHT?  SO I WAS EMPLOYED WITH WIX, W-I-X, AND SO MY PLAN WAS THAT SHE IS GOING TO WORK IN RUSSIA IN GOOGLE OFFICE, AND I'M GOING TO WORK STILL WITH WIX IN KYIV OFFICE JUST TRAVELLING BACK AND FORTH WHEN I NEED IT, BECAUSE IT'S A 50 MINUTE FLIGHT OR SOMETHING LIKE THAT, AND SUPER SHORT AND KIND OF HANDY, SO IT'S HANDY TO GO BACK AND FORTH.

AND SO THAT WAS MY PLAN.

Q.   OKAY.  SO WHEN YOU LEFT THE UKRAINE IN JANUARY OF 2022, YOUR PLAN WAS TO TRY AND BASICALLY COMMUTE BACK AND FORTH OVER THE BORDER IF YOU COULD?

A.   YES.  I THINK WE EVEN HAD TICKETS FOR THE 24TH OF FEBRUARY OR SOMETHING LIKE THAT THAT WAS KIND OF CANCELLED BECAUSE THERE WAS NO FLIGHT ON THAT DATE.

Q.   GOT IT.  AND OF COURSE A LOT HAS HAPPENED SINCE 2022, BUT AS OF TODAY, DO YOU AND YOUR WIFE HAVE ANY IMMEDIATE PLANS TO

RETURN TO THE UKRAINE?

A.    AS OF RIGHT NOW, WE DON'T HAVE ANY IMMEDIATE PLANS TO RETURN TO THE UKRAINE.

Q.    YOU FEEL PRETTY SETTLED DOWN HERE IN THE U.S.?

A.    I CAN SAY THAT I FEEL PRETTY SETTLED DOWN HERE IN THE U.S.

BUT THAT DOESN'T MEAN THAT WE CAN PLAN TO RETURN TO UKRAINE WITH THE CURRENT SITUATION SPECIFICALLY.

Q.    OKAY.  SO LET'S GO BACK TO ONE OF THE EXHIBITS THAT YOU WERE LOOKING AT WITH MR. LOKER.  IT WAS EXHIBIT NUMBER 2.

AND I BROUGHT THE WRONG BINDER WITH ME, SO GIVE ME A MOMENT.  I'M GOING TO GET THE OTHER ONE.

A.    SURE.

Q.    AND THAT IS ALREADY ADMITTED INTO EVIDENCE, SO I THINK YOU CAN PUT THAT UP ON THE SCREEN.

DO YOU HAVE THAT ONE IN FRONT OF YOU?

A.    YES, NUMBER 2.

Q.    AND THIS IS ONE OF THE LONGER DOCUMENTS.

THE COURT:  MR. NARITA, LET ME WAIT ONE MOMENT.  I DON'T THINK -- IT JUST WENT OUT.  WE JUST WANTED TO MAKE SURE THAT WE DIDN'T HAVE THE DISCONNECT AGAIN.

MR. NARITA:  HOPEFULLY THE JURY CAN SEE IT.

THE CLERK:  NOT YET.  IT HAS TO WARM UP.

MR. NARITA:  THE GREMLINS AGAIN.

THE COURT:  THE GREMLINS TAKE A LITTLE WHILE TO WARM UP.

YOU MAY PROCEED, MR. NARITA.

MR. NARITA:  THANK YOU, YOUR HONOR.

Q.   SO THIS WAS ONE OF THE MULTIPAGE EXHIBITS THAT YOU WENT OVER WITH MR. LOKER THAT RELATES TO THE DISPUTE THAT YOU SUBMITTED TO THE CONSUMER REPORTING AGENCIES IN AUGUST OF 2023; RIGHT?

A.   CORRECT.

Q.   TURNING QUICKLY TO THE POLICE REPORT PART OF THIS, WHICH I THINK IS PAGE 20, 20 OF 60.

WHERE DOES THAT START?

THE BATES NUMBER, YOUR HONOR, IS 457.

IF YOU COULD FIND THE NUMBER IN THE CORNER, 457.

A.   I FOUND THE PAGE.

Q.   OKAY.  SO THAT'S THE BEGINNING OF THE POLICE REPORT THAT WE TALKED ABOUT EARLIER?

A.   CORRECT.

Q.   RIGHT.  SO WHEN DID YOU ACTUALLY GET A COPY OF THIS, SIR?

A.   SO I GOT A COPY OF THIS AFTER THERE WAS SOME CONCLUSIONS FROM THE OFFICER.  SO WE CHATTED BACK AND FORTH AND HE ASKED ME TO PROVIDE SOME ADDITIONAL DOCUMENTS OR SEND SOME LINKS OR WHATEVER.

AFTER I ASKED HIM WHEN I CAN GET THE POLICE REPORT.  AT SOME POINT HE SAYS, OH, THE POLICE REPORT IS AVAILABLE FOR YOU TO DOWNLOAD.  YOU NEED TO GO TO THIS WEBSITE AND PUT ALL OF THIS INFORMATION AND REQUEST IT.

SO I DID THAT.  AND THEN I WAITED FOR SOME TIME, MAYBE A WEEK OR TWO, AND I RECEIVED THIS REPORT.

Q.   OKAY.  SO THE -- I NOTICE ON THE FRONT PAGE IT SAYS REPORT DATED JUNE 13TH, 2023.

DO YOU SEE THAT, SIR?

A.   JUNE 13TH, 2023, YES.

Q.   AND THEN UNDERNEATH THAT, IT SAYS DATE PRINTED, JUNE 14TH, 2023, AND THEN THERE'S A TIME; CORRECT?

A.   YES.

Q.   IS THAT WHEN YOU GOT THIS REPORT?

A.   NO.

Q.   OKAY.  SO DO YOU KNOW THE EXACT DATE THAT YOU GOT A COPY OF THIS?

A.   NO, I DON'T RECALL THE EXACT DATE.

Q.   OKAY.  DO YOU THINK IT WAS WITHIN A WEEK OF JUNE 14TH, 2023?

A.   NO, I DON'T BELIEVE THAT WAS WITHIN A WEEK.  BUT I DON'T REMEMBER THE EXACT DATE.

Q.   OKAY.  DO YOU THINK IT WAS WITHIN A MONTH?

A.    IT MIGHT BE IN A MONTH, YEAH.

I REMEMBER THERE WAS QUITE SOME TIME BETWEEN WHEN I ACTUALLY, LIKE, FILED THE REPORT AND KIND OF WAS PRESENT AT THE POLICE DEPARTMENT UNTIL THE TIME I ACTUALLY GET IT AS, LIKE, A PAPER, YOU KNOW, ON HAND.

Q.   OKAY.  AND THEN IT'S YOUR TESTIMONY THAT WHEN YOU

DOWNLOADED IT FROM THEIR WEBSITE, THESE REDACTIONS, THESE BLACKED OUT PORTIONS OF IT WERE ALREADY THERE?

A.   YES.

Q.   OKAY.  AND DID YOU GO BACK INTO THE POLICE STATION EVER AND SAY, HEY, I'M THE VICTIM HERE, I WOULD LIKE AN UNREDACTED COPY OF THIS?

A.   NO, I NEVER WENT BACK TO THE POLICE DEPARTMENT.  I NEVER WENT BACK TO THE POLICE DEPARTMENT.

Q.   OKAY.  SO YOU HAVEN'T BEEN BACK TO THE MOUNTAIN VIEW POLICE DEPARTMENT SINCE JUNE 13TH OF 2023; RIGHT?

A.   THAT'S CORRECT.

Q.   OKAY.  DID YOU CALL THE POLICE DEPARTMENT AND SAY, HEY, I DOWNLOADED MY POLICE REPORT, BUT THERE'S A TON OF IT THAT'S BLACKED OUT, COULD I GET AN UNREDACTED COPY BECAUSE I'M THE VICTIM?

A.   SO I CALLED THE POLICE DEPARTMENT MULTIPLE TIMES IN MOUNTAIN VIEW AND L.A.  I NEVER REQUESTED AN UNREDACTED VERSION.  I ASSUME THAT THIS IS JUST A NORMAL VERSION WITH REDACTED INFORMATION THAT IS REDACTED FOR THE PURPOSES OF SAVING MY PRIVACY INFORMATION.

     NONE OF THE BANKS ASKED ME TO DO THAT, SO I NEVER ASKED FOR ANY UNREDACTED VERSION.

Q.   OKAY.  AND IF YOU WOULD TURN TO -- AT THE BOTTOM IT'S 459.  YOU LOOKED AT THAT BRIEFLY WITH MR. LOKER.

     THERE'S A SUMMARY OF DETAILS THERE.

DO YOU SEE THAT?

DO YOU SEE IT SAYS "DETAILS"?

A. YES.

Q. SO THERE'S ONE, TWO, THREE PARAGRAPHS THAT SAYS "DETAILS," AND THEN IT LOOKS LIKE THERE'S A BUNCH OF STUFF BLACKED OUT; CORRECT?

A. NO, NOT CORRECT.

Q. OKAY. MAYBE WE'RE LOOKING AT DIFFERENT PAGES.

ON PAGE 459, SIR?

A. YES, I'M LOOKING AT 459.

Q. I SEE ONE, TWO, THREE PARAGRAPHS OF INFORMATION, AND THEN ANOTHER BLACK OUT PAGE?

A. YEAH, SOME PORTION OF THE INFORMATION IS BLACKED OUT.

Q. OKAY. SO SOME PORTION OF THE DETAILS THAT YOU PROVIDED TO THE OFFICER WERE PRINTED HERE BUT REDACTED; CORRECT?

A. CORRECT.

Q. DO YOU REMEMBER, BASED ON WHAT YOU TOLD THEM, WHAT WAS MISSING?

A. I DON'T REMEMBER, JUST SEEING THIS PAGE RIGHT NOW, WHAT WAS EXACTLY THE INFORMATION THERE THAT WAS REDACTED.

Q. OKAY. SO EVEN THOUGH YOU'RE THE ONE THAT WENT TO THE POLICE STATION AND MADE THE REPORT, YOU COULDN'T TELL ANY OF US WHAT IT WAS THAT YOU TOLD THE OFFICER THAT IS UNDERNEATH THAT BLACKED OUT PAGE?

A. A LOT OF INFORMATION, RIGHT, LIKE MANY YEARS AGO, THREE

YEARS AGO I PROVIDED A LOT OF INFORMATION TO THE OFFICER.

IT'S REALLY HARD TO RECALL EXACT WORDS THAT WAS, LIKE, REDACTED.

Q.   OKAY.  THAT'S FINE.  BUT THIS -- BUT THE SUMMARY THAT HE WRITES HERE, THAT IS -- DID HE ACCURATELY CAPTURE WHAT YOU REPORTED TO HIM?

A.   I HOPE SO, YEAH.

Q.   BUT, I MEAN, YOU'VE READ IT; RIGHT?  SO THERE'S NOTHING IN HERE THAT YOU THINK IS INACCURATE, IS THERE?

A.   I READ IT, YEAH.  I DON'T THINK I REMEMBER SEEING ANY INACCURACIES.

Q.   OKAY.  THE OFFICER SAYS IN HIS SUMMARY, UPON MOVING TO MOUNTAIN VIEW, HE CHECKED HIS CREDIT AND FOUND THAT THERE WERE SEVERAL ACCOUNTS ASSOCIATED WITH HIS SOCIAL SECURITY NUMBER OF WHICH HE HAD NO KNOWLEDGE, AND ALL OF WHICH WERE OPEN DURING THE TIMEFRAME HE WAS NOT IN THE COUNTRY; RIGHT?

A.   CORRECT.

Q.   AND SO IS, IS IT YOUR TESTIMONY, SIR, THAT THE FIRST TIME THAT YOU RAN YOUR CREDIT REPORT WAS AFTER YOU GOT TO THE UNITED STATES IN MAY OF 2023?

A.   YES, AS FAR AS I REMEMBER THIS IS THE FIRST TIME I ACTUALLY TRIED TO GET MY CREDIT REPORT.

Q.   OKAY.  WHAT ABOUT YOUR CREDIT SCORE?  DID YOU GET YOUR CREDIT SCORE BEFORE YOU CAME TO THE UNITED STATES IN LATE APRIL OF 2023?

A.   WELL, I NEVER SAW MY CREDIT SCORE BEFORE 2023.

Q.   OKAY.  AND THEN ON THE NEXT PAGE IS YOUR TIMELINE THAT YOU HAD GENERATED; RIGHT?  HE JUST PASTED THAT IN?

A.   NO.  LIKE ALL OF THE TIMELINES AND ALL OF THE DESCRIPTIONS ARE ALL MINE, RIGHT.  SO IT'S NOT LIKE SOMETHING IS NOT MINE.

Q.   OKAY.

A.   THIS WAS PART OF THE DOCUMENT THAT I GENERATED, YES.

Q.   UNDERSTOOD.  SO ALL OF THIS IS REALLY YOUR -- WHAT YOU REPORTED TO THE POLICE; CORRECT?

A.   YES.

Q.   OKAY.  AND SO ON THE NEXT PAGE, FOR EXAMPLE, YOU HAVE A DATE OF MAY 9TH, 2023; CORRECT?  DO YOU SEE THAT?

A.   MAY 9, 2023, YES.

Q.   OKAY.  AND YOU TOLD THE POLICE "I CREATED AN EXPERIAN ACCOUNT USING MINE SSN AND DISCOVERED SOME INFORMATION IN THE REPORT ABOUT CREDIT CARD, BANK ACCOUNTS, JOBS, HOME ADDRESSES THAT WEREN'T MINE.  I STARTED A PROCESS OF DISPUTING THIS INFO, CREATED TWO REPORTS ON IDENTITYTHEFT.GOV WITH REFERENCE TO NUMBERS," AND THEN THE NUMBERS ARE BLACKED OUT; CORRECT?

A.   CORRECT.

Q.   SO WAS THAT THE DATE THEN, MAY 9TH, 2023, WHEN IT WAS THE FIRST TIME THAT YOU HAVE EVER SEEN YOUR CREDIT REPORT?

A.   I BELIEVE WHEN I TALKED TO POLICE, THIS WAS THE DATE THAT I RECALLED ACTUALLY CREATING THE ACCOUNT.  AS OF NOW, I DON'T REMEMBER THE EXACT DATE WHEN I ACTUALLY MANAGED TO SIGN UP WITH

EXPERIAN, BUT, YEAH, THIS IS WHAT I REPORTED TO THE POLICE.

Q.   OKAY.  WELL, YOU, YOU GAVE THIS REPORT TO THE POLICE OVER TWO YEARS AGO; RIGHT?

A.   YES.

Q.   AND SO DO YOU THINK THAT THE DATE THAT YOU GAVE THE POLICE WAS THE ACCURATE DATE?

A.   I THINK I GAVE THE ACCURATE DATE.

Q.   ARE YOU UNSURE?

A.   NO.

Q.   OKAY.  AND SO WAS THAT ALSO THE FIRST TIME THAT YOU EVER SAW YOUR CREDIT SCORE, MAY 9TH, 2023?

A.   I BELIEVE -- SO WHEN I CREATED MY EXPERIAN ACCOUNT AND ACTUALLY ENTERED MY EXPERIAN PROFILE, THIS WAS THE FIRST TIME THAT I SAW MY CREDIT SCORE, YES.

Q.   OKAY.  AND YOU TALKED A LITTLE BIT ABOUT THAT, BUT I THINK YOUR TESTIMONY IS THAT IN MAY OF 2023 YOU CREATED AN EXPERIAN ACCOUNT BY DOWNLOADING THE APP ON TO YOUR PHONE; RIGHT?

A.   AS I RECALL RIGHT NOW, YES.

Q.   OKAY.  AND, WELL, DO YOU THINK THAT'S ACCURATE THAT THAT HAPPENED IN MAY OF 2023 FOR THE FIRST TIME?

A.   YES.

Q.   OKAY.  AND THEN WHEN YOU DOWNLOADED THE EXPERIAN APP ON YOUR PHONE FOR THE FIRST TIME IN MAY OF 2023, DID YOU GET YOUR CREDIT STORE FOR THE FIRST TIME?

A.   I SAW MY CREDIT SCORE FOR THE FIRST TIME, YES.

Q.   IN MAY OF 2023; CORRECT?

A.   YES.

Q.   OKAY.  AND THEN DID YOU ALSO SEE YOUR CREDIT REPORT FOR THE FIRST TIME IN MAY OF 2023?

A.   HIGHLY LIKELY, YEAH, BECAUSE TO GET A CREDIT REPORT WITH EXPERIAN, YOU NEED TO KIND OF REQUEST IT, RIGHT?  IT'S NOT, LIKE, A FREE OPTION THAT YOU GET RIGHT AWAY.

SO I REMEMBER I BOUGHT A PREMIUM ACCOUNT WITH EXPERIAN TO GET THIS REPORT, AND IT HAPPENED RIGHT AWAY.

SO I BELIEVE THIS WAS SOME TIME IN THE MAY DATE, AROUND THAT TIME, YEAH.

Q.   AND IT WOULD HAVE BEEN AVAILABLE TO YOU RIGHT ON THE EXPERIAN APP THAT YOU DOWNLOADED ON TO YOUR PHONE; RIGHT?

A.   YES.

Q.   OKAY.  NOW, YOU TOLD MR. LOKER ABOUT THE VISITS THAT YOU MADE TO THE UNITED STATES BEFORE YOU AND YOUR WIFE CAME HERE IN 2023.  I JUST HAVE A FEW FOLLOW-UP QUESTIONS ON THAT.

SO IN 2009, ON YOUR FIRST VISIT HERE, YOU WERE BASICALLY A TEENAGER; RIGHT?  SO 19, APPROXIMATELY?

A.   I WAS A STUDENT.

Q.   AND DID YOU COME WITH OTHER FRIENDS FROM THE UKRAINE?

A.   I CAME WITH ONE FRIEND FROM THE UKRAINE, YES.

Q.   OKAY.  AND DID YOU MEET OTHER STUDENTS WHO WERE ALSO IN THE PROGRAM WHEN YOU WERE IN THE U.S.?

A.   YES, I MET OTHER STUDENTS AS WELL.

Q.   OKAY.  AND THEN YOU LEFT AND YOU WENT BACK TO THE UKRAINE, AND THEN THE FOLLOWING SUMMER YOU JOINED THE SAME PROGRAM AGAIN?

A.   I JOINED THE SAME PROGRAM.  IT WAS EASIER BECAUSE I ALREADY HAD A JOB OFFER WITH THE SAME EMPLOYER, RIGHT?  AND SO YES.

Q.   OKAY.  AND DID YOU SEE SOME OF THE SAME FRIENDS THAT WERE IN THE PROGRAM FROM THE PRIOR YEAR?

A.   NOT REALLY BECAUSE NOT EVERYONE GOES EVERY YEAR, OR LIKE A COUPLE YEARS IN A ROW.  SO I SAW KIND OF NEW PEOPLE THERE.

Q.   OKAY.  DID YOU -- WHEN YOU CAME BACK THE SECOND TIME, DID YOU HAVE ANY PEOPLE THAT YOU ALREADY KNEW THAT WERE IN THE UNITED STATES?

A.   I BROUGHT ANOTHER TWO FRIENDS WITH ME TO THE SAME EMPLOYER, TO CHARLES.

Q.   OKAY.  GREAT.  SO TWO OF YOUR FRIENDS FROM THE UKRAINE CAME ALONG WITH YOU THE SECOND TIME?

A.   YES.

Q.   AND ALL OF YOU WERE ISSUED UNITED STATES SOCIAL SECURITY NUMBERS AT THE TIME; CORRECT?

A.   I BELIEVE SO, YES.

Q.   OKAY.  AND THEN YOU WENT BACK TO THE UKRAINE AT THE END OF THE PROGRAM IN 2010; CORRECT?

A.   CORRECT.

Q.   DID ANYONE ASK YOU TO, YOU KNOW, BUY YOUR SOCIAL SECURITY

NUMBER FROM YOU?

A.   TO DO WHAT?  I'M SORRY?

Q.   DID ANYONE SAY, HEY, YOU'RE GOING BACK TO THE UKRAINE, WILL YOU SELL ME YOUR SOCIAL SECURITY NUMBER?

A.   OH, NO.  I NEVER, NEVER HEARD THAT FROM ANYONE.

Q.   ALL RIGHT.

A.   AND I DON'T KNOW, LIKE, FOR SURE, BUT I DIDN'T HEAR ANYONE ELSE GOT ANYTHING, ANY LIKE INQUIRY LIKE THIS FROM ANYONE.

Q.   OKAY.  AND THEN THERE ARE JUST TWO OTHER TRIPS TO THE U.S., AND THEY WERE BUSINESS TRIPS I GUESS; RIGHT?

A.   YES.

Q.   ONE IN THE -- IN APRIL OF 2018 YOU WENT TO HOUSTON; CORRECT?

A.   CORRECT.

Q.   AND THEN ONE MORE IN SEPTEMBER OF 2019 YOU WENT TO NEW YORK CITY; RIGHT?

A.   CORRECT.

Q.   BACK TO EXHIBIT 2.  LET'S LOOK AT THAT FTC REPORT.

     I THINK WE'RE GOING TO GO TO 475.  THE NUMBER ON THE DOCUMENT IN THE CORNER IS 475.

     TELL ME WHEN YOU'RE THERE, SIR.

A.   475, YEAH.

Q.   OKAY.  AND SO THIS IS THE IDENTITY THEFT REPORT THAT YOU FILLED OUT YOURSELF THROUGH THE FEDERAL TRADE COMMISSION'S ONLINE PORTAL THAT THEY HAVE TO ASSIST VICTIMS OF IDENTITY

THEFT; RIGHT?

A.   CORRECT.

Q.   AND WHEN YOU CREATE A REPORT, THEY ASK YOU TO PUT A BUNCH OF INFORMATION INTO IT ABOUT WHATEVER ACCOUNT OR ACCOUNTS YOU THINK ARE THE SUBJECT OF YOUR REPORT; CORRECT?

A.   CORRECT.

Q.   SO ALL OF THE DATA IN HERE ABOUT THE VARIOUS ACCOUNTS IS DATA THAT YOU ENTERED; CORRECT?

A.   CORRECT.

Q.   OKAY.  AND THEN THEY -- I THINK THERE'S ONE TYPOGRAPHICAL ERROR IN YOUR PERSONAL STATEMENT.  CAN WE LOOK AT THAT AND JUST BE SURE?  DO YOU SEE THE PERSONAL STATEMENT?

A.   YES.

Q.   IT SAYS, "I MOVED TO U.S. 26 MAY 2023."

     DO YOU SEE THAT?

A.   YES.

Q.   THAT'S A TYPO; RIGHT?

A.   YES.

Q.   BECAUSE YOU MOVED TO THE UNITED STATES IN THE 26 APRIL 2023; RIGHT?

A.   THAT'S CORRECT.

Q.   OKAY.  BUT OTHER THAN THAT, THE PERSONAL STATEMENT IS ACCURATE?

A.   I BELIEVE SO, YEAH.  I DON'T SEE ANY OTHER, LIKE, TYPOS.

Q.   OKAY.  DID YOU WRITE THIS PERSONAL STATEMENT YOURSELF OR

DID ANYONE HELP YOU WRITE IT?

A.    NO, I WRITE IT MYSELF.

Q.    OKAY.  DID YOUR WIFE HELP YOU WORK ON THIS?

A.    NO.

Q.    YOUR WIFE DIDN'T HELP YOU WITH ANY OF THIS DISPUTE PROCESS THAT YOU'RE GOING THROUGH?

A.    SHE HELPED ME LIKE -- HELP ME DEAL WITH IT MORALLY AND, LIKE, SUPPORT ME.  BUT OBVIOUSLY SHE HAD TO GO TO WORK.

AND AS I MENTIONED PREVIOUSLY, DEALING WITH THESE DISPUTES AND CALLING ALL OF THESE BANKS AND TRYING TO KIND LEARN HOW THE SYSTEM WORKS TAKES A LOT OF TIME, ESPECIALLY RECOVERING FROM FRAUD, RIGHT?

SO SHE COULDN'T HELP ME EVEN IF SHE KIND OF TRIED TO, BUT I OBVIOUSLY TRIED TO ENCOURAGE HER NOT TO HELP ME BECAUSE I DIDN'T WANT HER TO SPEND ANY ADDITIONAL TIME AND NOT BE FOCUSSED ON HER WORK.

Q.    YOU DIDN'T WANT TO BE A DISTRACTION TO HER?

A.    OF COURSE.

Q.    OKAY.  UNDERSTOOD.

AND FOR EACH ONE OF THE CREDIT CARD ACCOUNTS THAT YOU LIFTED ON YOUR FTC REPORT, THERE'S A SECTION THAT ASKS FOR YOU THE DATE THAT I HAD DISCOVERED IT.

DO YOU SEE THAT?

A.    YES.

Q.    AND IN EACH CASE, INCLUDING WHEN YOU WERE ASKED ABOUT THE

COMENITY REPORT, YOU SAID THAT THE DATE THAT YOU DISCOVERED IT WAS MAY OF 2023; RIGHT?

A.   YES.

Q.   AND IS THAT BECAUSE THAT'S THE FIRST TIME THAT YOU LOADED THE EXPERIAN APP AND PULLED YOUR CREDIT REPORT AND THEN GOT YOUR CREDIT SCORE?

A.   THAT'S CORRECT.

Q.   OKAY.  AND I THINK YOU SAID YOU WENT TO THE SOCIAL SECURITY OFFICE IN PERSON WHEN YOU GOT TO THE UNITED STATES IN MAY OF 2023; RIGHT?

A.   YES.

Q.   YOU AND YOUR WIFE WENT TOGETHER?

A.   WELL, ACTUALLY I'M NOT SURE WHETHER IT WAS EARLY MAY OR EVEN LATE APRIL BECAUSE WE WENT TO SOCIAL SECURITY LIKE REALLY, REALLY CLOSE TO ALL OF OUR ARRIVAL DATES.

Q.   OH.

A.   I DON'T REMEMBER THE EXACT DATE, BUT IT WAS REALLY CLOSE.

Q.   HOPEFULLY YOU GAVE YOURSELF A LITTLE BIT OF TIME TO RECOVER FROM THE JET LAG OF ALL OF THE TRAVEL.

     BUT YOU GOT INTO THE COUNTRY ON THE 26TH OF APRIL; RIGHT?

A.   YES.

Q.   SO IT WAS EITHER THE LAST FEW DAYS OF APRIL OR RIGHT IN THE BEGINNING OF MAY OF 2023; RIGHT?

A.   YES.

Q.   SO TELL US A LITTLE BIT MORE ABOUT YOUR TRIP TO THE SOCIAL

SECURITY OFFICE.

WELL, FIRST OF ALL, DID YOU GO TO THE LOCAL ONE NEAR -- THAT'S RIGHT NEAR YOUR NEW APARTMENT?

A.   WE GOOGLED -- I THINK WE FIND THE LOCAL OFFICE CLOSEST TO US, AND WE SCHEDULED AN POINT APPOINTMENT, AND WE WENT THERE.

Q.   I DID THAT, TOO, I GOOGLED IT, AND I FOUND ONE ON NORTH SHORELINE BOULEVARD IN MOUNTAIN VIEW.  DOES THAT SOUND LIKE --

A.   ACTUALLY, I REMEMBER THAT WHEN WE MOVED HERE, BECAUSE WE MOVED WITH GOOGLE, GOOGLE HAD SOME SERVICES THAT THEY PROVIDED US TO HELP US SETTLE IN, AND IT REMINDS ME THAT SOME PERSON FROM THE SERVICE SCHEDULED THE APPOINTMENT FOR US, AND SO WE JUST WENT THERE AT THE ADDRESS IT WAS SCHEDULED FOR.  IT MIGHT BE SHORELINE.  I'M NOT SURE OF THE ADDRESS, BUT IT WAS CLOSE TO THE APARTMENTS.

Q.   THAT'S NICE THAT THEY SET THAT UP FOR YOU.

SO TELL US AGAIN ABOUT WHAT HAPPENS.  IT'S VERY LATE APRIL 2023, OR EARLY MAY, YOU'RE IN THE SOCIAL SECURITY OFFICE. WHAT DO YOU SAY TO THE PEOPLE THERE, AND, YOU KNOW, WHAT DO THEY SAY BACK TO YOU?

A.   YEAH.  SO WE WAITED IN LINE.  WE PROCEEDED TO WAIT IN LINE UNTIL OUR NUMBER APPEARED.

WE SAID TO THE PERSON THAT WAS WORKING THERE -- FIRST WE SAID HERE'S MY WIFE, AND HERE'S MY DOCUMENTS, AND I HAVE SOCIAL SECURITY, AND SHE NEEDS TO CREATE ONE.

AND ACTUALLY, I REMEMBER, LIKE, I WAS GIVING MY DOCUMENTS TO THE OFFICER, AND I WAS ACTUALLY EXPECTING TO GET A NEW SOCIAL SECURITY IS MY EXPECTATION.  AS I SAID BEFORE, I SAID MINE IS EXPIRED.  I BELIEVE I SAW IT'S LIKE EVEN FOR TEN YEARS OR SOMETHING.

AND I JUST MENTIONED TO THE OFFICER, OH, I HAD SOCIAL SECURITY PREVIOUSLY IN 2009 AND 2010 WHEN I WAS WORKING HERE, SO WHETHER IT'S RELEVANT OR NOT, I DON'T KNOW.

AND THE OFFICER TOLD ME THAT SHE NEEDS TO KIND OF CHECK. SHE WROTE DOWN MY SOCIAL SECURITY NUMBER THAT I GAVE HER.  SHE WENT SOMEWHERE.  SHE RETURNED.  SHE SAID THAT THE SOCIAL SECURITY STILL, THIS IS STILL MY NUMBER.  IF I GET IT ONCE, I GET IT FOREVER.

SO WHAT THEY ARE GOING TO NEED TO DO, IS THAT THEY ARE GOING TO ISSUE A NEW CARD FOR ME THAT I'M GOING TO RECEIVE ALONGSIDE MY WIFE, AND MY WIFE IS GOING TO GET HER SOCIAL SECURITY NUMBER.

Q.   OKAY.  SO THEY ISSUED YOU A NEW CARD, BUT IT HAD THE SAME SOCIAL SECURITY NUMBER THAT YOU GOT BACK IN 2009; RIGHT?

A.   THAT'S CORRECT.

Q.   OKAY.  AND SO IS THAT WHEN YOU DECIDED THAT YOU NEEDED TO LOAD UP THE EXPERIAN APP AND CHECK WHAT WAS GOING ON WITH YOUR SOCIAL SECURITY NUMBER, IF ANYTHING?

A.   YES, I BELIEVE SO, YES.

Q.   AND TELL US AGAIN, WHAT PROMPTED YOU TO SAY, WELL, THIS IS

PANCHENKO CROSS BY MR. NARITA

A VALID SOCIAL SECURITY NUMBER SO I BETTER GET THE EXPERIAN APP? HOW DID YOU CONNECT THOSE TWO?

A. SO BECAUSE THIS WAS THE SAME SOCIAL SECURITY NUMBER I GOT IN 2009 AND 2010, I DIDN'T EXPECT MUCH, BUT I KNEW IN ORDER TO GET AN EXTRA SCORE THERE, WE WILL PROBABLY NEED TO WAIT AT LEAST SIX MONTHS, AND WE NEED AN APARTMENT NOW.

SO IT'S LIKE AN EASY THOUGHT THAT YOU INSTALL THE APP, CHECK YOUR CREDIT SCORE. IF THERE IS NOT -- YOU'RE TRYING TO GET IT BECAUSE IT'S GOING TO BE A FASTER PROCESS BECAUSE IT'S OTHER SOCIAL SECURITY OR WHATEVER, THAT'S GOOD. BUT IF NOT, IT DOESN'T HARM, RIGHT?

Q. SO I ACTUALLY DON'T HAVE THE EXPERIAN APP ON MY PHONE. SO ARE YOU ABLE TO DESCRIBE JUST BASICALLY WHAT YOU HAVE TO DO TO LOAD THE APP ON TO YOUR PHONE?

A. SURE. SO JUST TO LOAD THE APP, YOU NEED TO FIND IT IN THE APP STORE AND INSTALL IT.

THE PROBLEMS BEGUN WHEN YOU ACTUALLY TRIED TO LOG IN OR CREATE THE ACCOUNT, RIGHT?

SO FOR ME, I DON'T HAVE PREVIOUSLY ANY ACCOUNTS WITH ANY OF THIS CREDIT TRACKING APPS OR ANYTHING LIKE THAT, SO THE ONLY THING WAS FOR ME TO CLICK SIGN UP OR REGISTER A NEW ACCOUNT, RIGHT? AND THIS IS WHAT I DID.

BUT WHAT I START NEXT IS KIND OF A PROCESS FOR RESTORING THE ACCOUNT, SO THEY'RE PROBABLY GOING TO RECOGNIZE IT'S NOT A NEW ACCOUNT, IT'S NOT A NEW SOCIAL SECURITY, OR SOMETHING LIKE

THAT.  AND THEY START ASKING ME QUESTIONS LIKE WHERE WAS YOUR LAST MORTGAGE?  WHERE WAS THE CAR LOAN YOU TOOK?  WHERE WAS YOUR LAST JOB AND SO ON?

Q.   THEY'RE TRYING TO CONNECT YOU TO THE SOCIAL SECURITY NUMBER; RIGHT?

A.   YES.  AND THERE WAS LIKE EXAMPLES, LIKE OPTIONS TO ANSWER.

AND ALL OF THE OPTIONS DIDN'T MAKE SENSE BECAUSE IT WAS LIKE SOME RANDOM ADDRESSES IN U.S. STATES, AND I WAS CONFUSED. BUT, LIKE, I TRIED TO KIND OF NAVIGATE IT, AND THEN I WAS JUST CLICKING RANDOMLY ON THE FUNCTION TO SEE WHAT WAS NEXT, JUST TO SEE WHETHER THERE WAS SOMETHING ELSE THAT I COULD DO TO BE ABLE TO CREATE THE ACCOUNT.

Q.   OKAY.  AND -- BUT ULTIMATELY IN MAY OF 2023 YOU WERE ABLE TO NAVIGATE THAT AND DOWNLOAD THE APP ON TO YOUR PHONE?

A.   DOWNLOAD THE APP AND KIND CREATE OR RESTORE THIS ACCOUNT AND LOG INTO THE ACCOUNT.

Q.   I'M NOT SURE I UNDERSTAND WHAT YOU MEAN BY CREATE OR RESTORE THE ACCOUNT.

A.   SO IT WASN'T CLEAR WHEN I'M CREATING THE NEW ACCOUNT OR TRYING TO GET ACCESS TO SOME ACCOUNT THAT ALREADY WAS CREATED AND I'M JUST RESTORING ACCESS TO THE SECOND ACCOUNT, THAT'S WHY DISCRETIONS APPEAR.

SO IT FELT LIKE, ALTHOUGH I CLICK AND SIGN UP, BUT I'M GOING THROUGH SIGN IN FLOW IN ORDER TO GET TO THE APP.

Q.   OKAY.  SO YOU WEREN'T SURE WHETHER THEY WERE ASKING YOU TO

SIGN BACK IN IN MAY OF 2023 OR SIGN UP FOR THE VERY FIRST TIME?

A.    YES.

Q.    OKAY.  SO DID IT SEEM LIKE YOU WERE JUST GOING THROUGH THE PROCESS OF RENEWING YOUR ACCOUNT FOR YOUR EXPERIAN APP?

A.    SO I WASN'T RENEWING ANYTHING FOR ANY ACCOUNT.  I WAS CREATING THE ACCOUNT FOR MYSELF FOR THE FIRST TIME, BUT THE FLOW THAT THEY PRESENTED ME LOOKED LIKE AS IF I'M RESTORING THE ACCOUNT, AND THAT WAS THE FIRST KIND OF PROBLEMATIC EXPERIENCE THAT I HAD THAT I CAN'T JUST CREATE A NEW ACCOUNT.  I'M GETTING, YOU KNOW, DIVERGED TO THIS FLOW OF ANSWERING SOME RANDOM OR STRANGE QUESTIONS.

Q.    OKAY.  CAN I SEE THE BINDER.

SIR, LET'S -- WE'RE GOING TO -- I DON'T THINK YOU HAVE OUR EXHIBIT BINDERS UP THERE, SO WE'RE GOING TO GET THEM FOR YOU.

I'M GOING TO ASK YOU TO TURN TO EXHIBIT 203.

YOUR HONOR, I'M TOLD BY THOSE WHO KNOW THAT THERE'S WITNESS BINDERS HERE IN THE COURT ON THE WITNESS STAND OF EXHIBITS THAT WERE DELIVERED ON FRIDAY.

MR. NARITA:  YOUR HONOR, WE'LL USE IT FOR NOW.  MAY I HAND IT OR HAVE IT HANDED UP TO THE WITNESS?

THE COURT:  YES.

MR. NARITA:  (HANDING.)

THE CLERK:  (HANDING.)

THE COURT:  THANK YOU, MADAM CLERK.

BY MR. NARITA:

Q.   WHEN YOU GET A MOMENT, JUST TURN TO EXHIBIT 203.

DO YOU HAVE IT?

A.   YES.

Q.   AND THAT SHOULD BE A MAY 2023 EXPERIAN CREDIT REPORT THAT WAS DELIVERED TO YOU AT YOUR ADDRESS; IS THAT CORRECT?

A.   YES, THIS IS AN EXPERIAN REPORT SENT TO MOFFETT BOULEVARD.

Q.   OKAY.  AND YOU WERE GETTING MAIL THAT WAS SENT TO THERE?

A.   YES.

Q.   OKAY. AND THIS IS RIGHT AROUND THE TIME THAT YOU JUST DESCRIBED FOR US THAT YOU WERE SIGNING UP FOR THE EXPERIAN APP AND GETTING YOUR CREDIT REPORT AND CREDIT SCORE FOR THE FIRST TIME; RIGHT?

A.   YES.

Q.   OKAY.

YOUR HONOR, I DON'T THINK THERE'S ANY OBJECTION TO THIS EXHIBIT.  I'D LIKE TO MOVE IT INTO EVIDENCE.

THE COURT:  SO MOVED.  IT'S ADMITTED INTO EVIDENCE.

(DEFENDANT'S EXHIBIT 203 WAS RECEIVED IN EVIDENCE.)

MR. NARITA:  CAN WE JUST SHOW THE FIRST PAGE OF 203 TO THE COURT AND TO THE JURY SO THEY CAN SEE IT?

THERE IT IS.  MAKING SURE OUR TECHNOLOGY CAUGHT UP WITH ME.

Q.   SO LET'S LOOK AT THE INQUIRY REPORT.  CAN YOU TAKE US, KRISTINA, TO THE SOFT INQUIRY SECTION.

AND I DON'T HAVE A COPY ON MY EXHIBIT.  I DON'T KNOW WHAT

THE PAGE IS.  I DON'T KNOW WHAT THE NUMBER IS.  YEAH, YOU HAD IT.

YOUR HONOR, THE NUMBER IS 63.

THE COURT:  THANK YOU.

BY MR. NARITA:

Q.   AND YOU'VE GOTTEN FAMILIAR WITH CREDIT REPORTS NOW GIVEN YOUR EXPERIENCE, BUT DO YOU SEE THE SECTION ON SOFT INQUIRIES THERE?

A.   I SEE PARTIAL, YES.

Q.   OKAY.  LET'S GO BACK UP TO THE BOTTOM OF THE PRIOR PAGE. THERE YOU GO.  AND THAT'S WHAT IT SAYS WHEN IT SAYS SOFT INQUIRIES; RIGHT?

A.   YES.

Q.   AND IT SAYS, "SOFT INQUIRIES DO NOT IMPACT YOUR CREDIT SCORE"; RIGHT?

A.   CORRECT.

Q.   AND SO THE SOFT INQUIRIES ON THIS REPORT START THERE ON THIS PAGE, AND THEN THEY FLOW ON TO THE NEXT PAGE; RIGHT?

A.   I THINK SO, YES.

Q.   OKAY.  SO LET'S GO TO THE NEXT PAGE.  THE NEXT PAGE, THESE ARE SHOWING VARIOUS ENTITIES THAT HAVE ACCESSED YOUR CREDIT REPORT; RIGHT?  IF YOU LOOK AT SPECIFIC GAS AND ELECTRIC ON MAY 29TH, 2023.

DO YOU SEE THAT?

A.   YES.

Q.   YOU SHOWED US EARLIER THAT YOU HAD A SPECIFIC GAS AND ELECTRIC ACCOUNT THAT YOU SET UP WHEN YOU GOT YOUR APARTMENT; RIGHT?

A.   YES.

Q.   AND SO THEY DID AN INQUIRY ON YOUR CREDIT REPORT ON MAY 9TH, 2023 IN CONNECTION WITH THAT; RIGHT?

A.   I GUESS.

Q.   WELL, DO YOU HAVE ANY REASON TO DOUBT THAT'S WHAT HAPPENED?

A.   I DON'T KNOW WHETHER THEY DID ONLY, LIKE, ON THIS SOFT INQUIRY OR ANYTHING ELSE, BUT THIS REPORT SHOWS PACIFIC GAS & ELECTRIC MAKE A SOFT INQUIRY, YES.

Q.   OKAY.  AND IF YOU LOOK UP JUST ABOVE THAT, YOU SEE THE ENTRY FOR EXPERIAN CREDIT MATCH; RIGHT?

A.   YES.

Q.   AND THAT'S DATED OCTOBER 20TH, 2022; RIGHT?

A.   THERE IS MULTIPLE DATES THERE.

Q.   AND THE FIRST ONE IS OCTOBER 20TH, 2022; RIGHT?

A.   THE LAST ONE IS OCTOBER 20TH, 2022.

Q.   OKAY.  AND ARE YOU FAMILIAR WITH THE EXPERIAN CREDIT MATCH PRODUCT THAT THEY OFFER?

A.   I'M NOT SURE I'M FAMILIAR WITH IT.

Q.   OKAY.  WELL, WHEN YOU, WHEN YOU DOWNLOADED YOUR EXPERIAN APP, DO YOU OCCASIONALLY GET, LIKE, PRE-QUALIFIED OFFERS FOR CREDIT CARDS THAT THEY'LL SHOW YOU RIGHT WHEN YOU SIGN IN?

A.   I THINK WHEN I JUST SIGN UP WITH THEM, I GOT SOME NOTIFICATIONS LIKE THAT AND A SECTION LOOKING HOW TO KIND OF DISABLE THEM.

Q.   THE FIRST THING THEY WANT TO DO IS TRY AND SELL YOU SOMETHING, SO THEY PUT IT RIGHT IN THE BEGINNING; RIGHT?

A.   I GUESS.

Q.   OKAY.  SO DO YOU REMEMBER THAT WHEN YOU DOWNLOADED THE EXPERIAN APP TO YOUR PHONE, YOU WERE PRESENTED WITH SOME PRE-QUALIFIED CREDIT CARD OFFERS ON THAT DAY?

A.   NO.  I WAS PRESENTED WITH SOME ADVERTISEMENT THAT WAS RELATED TO CREDIT CARDS, BUT I CAN'T SAY IT'S LIKE PRE-QUALIFIED.

Q.   OKAY.  BUT YOU GOT SOME ADS THAT RELATED TO CREDIT CARDS?

A.   YES, YES.

Q.   OKAY.  FANTASTIC.

AND WAS THAT ON OCTOBER 20TH, 2022, SIR?

A.   NO.

Q.   OKAY.  HOW DO YOU KNOW?

A.   BECAUSE I DIDN'T HAVE AN EXPERIAN APP IN OCTOBER OF 2022.

Q.   AND THERE'S ALSO SOME OTHER SOFT INQUIRIES FOR EXPERIAN GOING BACK ON OCTOBER -- GOING BACK AS EARLY AS OCTOBER 20TH; RIGHT?  NOT EXPERIAN CREDIT MATCH, BUT JUST FOR EXPERIAN.

GO A LITTLE HIGHER.

DO YOU SEE THAT?  THERE ARE MULTIPLE INQUIRIES FOR EXPERIAN AND MANY OF THEM BEGIN ON OCTOBER 20TH OF 2022; RIGHT?

A.   YES, THEY HAVE THIS DATE, OCTOBER AND NOVEMBER 2022, YES.

Q.   OKAY.  AND DOES THAT REFRESH YOUR MEMORY THAT, IN FACT, YOU FIRST DOWNLOADED THE EXPERIAN APP ON TO YOUR PHONE ON OCTOBER 20TH OF 2022?

A.   NO.

Q.   ARE YOU SURE?

A.   YES.

Q.   AND THERE'S SOME OTHER INQUIRIES, IF YOU KEEP LOOKING ON THE EXPERIAN INQUIRIES.  DO YOU SEE THERE'S ONE ON JANUARY 11TH, 2023?

A.   I'M SORRY.  THERE'S A LOT OF DATES.  WHAT ARE YOU REFERRING TO?

Q.   WELL, I WISH I HAD A COPY OF THE EXHIBIT, BUT I HAVE AN ELECTRONIC COPY.

SO LET'S START FIRST WITH THEY'RE THE LONGEST -- THERE'S A REALLY LONG SET OF INQUIRIES UNDER EXPERIAN.

DO YOU SEE THAT IT GOES THREE LINES, AND IT SAYS EXPERIAN, AND THERE ARE THREE LINES; RIGHT?

AND THOSE INQUIRIES START ON OCTOBER 20TH, 2022.  AND I'LL JUST READ THEM.  OKAY.

OCTOBER 20TH, 2022; THERE WAS ANOTHER ON NOVEMBER 2ND, 2022; ANOTHER ON NOVEMBER 16TH, 2022; THERE WAS AN INQUIRY NOVEMBER 30TH, 2022; THERE WAS ONE ON DECEMBER 14TH, 2022; AND, DECEMBER 28TH, 2022.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  WERE YOU, WERE YOU CHECKING YOUR CREDIT SCORE USING THE EXPERIAN APP ON THOSE DATES?

A.   NO.

Q.   AND NOW THERE'S ONE JANUARY 11TH, 2023.

DO YOU SEE THAT?

A.   YES.

Q.   OKAY.  DID YOU CHECK YOUR EXPERIAN CREDIT SCORE ON THAT DATE, SIR?

A.   NO.

Q.   OKAY.  DO YOU REMEMBER FROM TIME TO TIME YOU WOULD GET NOTIFICATIONS FROM YOUR EXPERIAN APP, AND IT WOULD JUST TELL YOU THAT YOUR CREDIT SCORES CHANGED?

A.   I DISABLED NOTIFICATIONS, SO I DON'T GET THAT.

Q.   OKAY.  BUT THERE WAS A FEATURE AT ONE POINT WHERE IF YOUR SCORE CHANGED, THEN YOU WOULD GET A NOTIFICATION; CORRECT?

A.   MAYBE EMAIL NOTIFICATIONS, BUT NOT IN THERE, DEFINITELY NOT.

Q.   OKAY.  SO SOMETIMES YOU GET EMAILS FROM THEM, AND THEY LET YOU KNOW THAT YOUR SCORE CHANGED; RIGHT?

A.   YEAH, IT MIGHT BE IN THAT CASE, YEAH.

Q.   DO YOU REMEMBER GETTING A NOTICE FROM EXPERIAN ON JANUARY 11TH, 2023 THAT YOUR CREDIT SCORE HAD CHANGED?

A.   I DID NOT GET ANY NOTIFICATIONS FROM EXPERIAN BEFORE I MOVED HERE.

PANCHENKO CROSS BY MR. NARITA

Q.   YOU'RE CERTAIN OF THAT?

A.   YES.

Q.   AND THERE'S ALSO SOME INQUIRIES HERE FOR CREDIT KARMA INC.

DO YOU SEE THAT?

A.   YES.

Q.   AND YOU DOWNLOADED THEIR APP AS WELL, DID YOU NOT?

A.   I DON'T REMEMBER WHETHER I DID OR DID NOT DOWNLOAD CREDIT KARMA, BUT I KNOW ABOUT THE APP, AND I MIGHT TRY TO INSTALL IT AS WELL.

Q.   BECAUSE THEIR APP IS FREE.  THEY GIVE YOU THE SCORES FOR FREE; RIGHT?

A.   I DIDN'T KNOW THAT, BUT I KNEW ABOUT THE APP, AND I MIGHT TRY TO DOWNLOAD IT AND INSTALL IT, YES.

Q.   AND DO YOU SEE ON THE CREDIT KARMA INC. LINE THAT THERE'S -- THE FIRST INQUIRY THERE IS JANUARY 11TH, 2023, SIR?

A.   YES.

Q.   AND SO DOES THAT REFRESH YOUR MEMORY THAT YOU DOWNLOADED THE CREDIT KARMA INC. ON JANUARY 11TH, 2023, AND YOU GOT YOUR SCORES?

A.   NO, I DID NOT DOWNLOAD CREDIT KARMA AT JANUARY 2023.  AND EVEN IF I DOWNLOADED IT, AFTER I CAME TO THE U.S., I HAVE NEVER BEEN ABLE TO REGISTER AN ACCOUNT WITH THEM.

Q.   OKAY.

A.   SO THERE CAN'T BE ANY INQUIRIES.

Q.   OKAY.  OH, STILL ON THE EXHIBIT.  THERE'S A SECTION CALLED

HARD INQUIRIES.

CAN WE FIND THAT.  PUT THAT UP FOR THE JURY, PLEASE.

DO YOU SEE IT SAYS WHO HAS VIEWED YOUR INFORMATION IN RED?
DO YOU SEE THAT?

AND THEN IT SAYS, "CREDIT APPLICATIONS/HARD INQUIRIES."

DO YOU SEE THAT?

A.   YES, I SEE THAT.

Q.   FANTASTIC.  AND DO YOU SEE THAT THERE ARE TWO HARD
INQUIRIES THAT SHOW UP ON YOUR CREDIT REPORT BOTH IN OCTOBER OF
2022, ONE FOR CAP ONE AND ONE FOR CITI CARDS?

A.   YES.

Q.   AND DO YOU REMEMBER THAT WAS THE DATE THAT YOU GOT ONE OF
THOSE OFFERS SENT TO YOU THROUGH YOUR EXPERIAN APP INVITING YOU
TO APPLY FOR CREDIT CARDS AND THAT YOU ACTUALLY DID APPLY?

A.   NO, I DIDN'T APPLY FOR ANY CREDIT CARDS.

I WASN'T IN THE U.S.  I WASN'T EVEN THINKING LIKE GOING TO
THE U.S. OR APPLYING FOR ANY CREDIT CARDS.

SO THIS IS OBVIOUSLY A FRAUDULENT INQUIRIES.

Q.   YOU THINK THOSE ARE FRAUDULENT?

A.   OF COURSE.

Q.   OKAY.  LET ME TRY ONE MORE DOCUMENT.  YOU CAN TAKE THAT
ONE DOWN.  CAN WE HAVE 246.

I'VE GOT ONE MORE I WANT TO SHOW YOU TO SEE IF IT HELPS.

YOUR HONOR, I'M GOING TO ASK FOR PERMISSION TO HAND THE
EXHIBIT, A TRIAL EXHIBIT THAT WE HAVE PREMARKED AS EXHIBIT 246.

THIS WAS PRODUCED TO US BY MR. PANCHENKO DURING THIS LITIGATION, AND IT BEARS BATES NUMBER PANCHENKO_448.

I HAVE A COPY FOR MR. LOKER.

MR. LOKER:  I DON'T HAVE IT ON THE EXHIBIT LIST.

THE COURT:  I DO NOT EITHER.

MR. NARITA:  IT'S AN IMPEACHMENT DOCUMENT, YOUR HONOR.  IT WAS PRODUCED BY MR. PANCHENKO.

I HAVE COPIES FOR THE COURT AND FOR THE WITNESS AS WELL.

THE COURT:  WE'RE GOING TO GIVE MR. LOKER A MOMENT.

IF YOU'LL PASS UP A COPY FOR THE COURT.

MR. NARITA:  THIS IS FOR THE COURT.

THE COURT:  I'M ALSO TRYING TO BE MINDFUL OF THE TIME.

MR. NARITA:  YES.  (HANDING.)

(PAUSE IN PROCEEDINGS.)

MR. LOKER:  IT'S IMPROPER IMPEACHMENT BECAUSE IT'S NOT INCONSISTENT WITH ANYTHING HE'S SAID AS FAR AS I CAN TELL FROM THE SMALL IMAGES.

THE COURT:  SO, COUNSEL, COME SIDE-BAR QUICKLY.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  WE'RE GOING TO TAKE A BRIEF RECESS, STRETCH BREAK.

JURY, I'M GOING TO HAVE YOU STRETCH AND GET UP IN YOUR SEATS.  WE'RE GOING TO STEP IN THE HALLWAY FOR JUST ONE MOMENT.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  YOU MAY BE SEATED.  YOU CAN KEEP STRETCHING.  YOU ARE PERMITTED TO KEEP STRETCHING, OR STANDING, AS YOU NEED TO.

SO WE'RE BACK ON THE RECORD.  THANK YOU FOR YOUR PATIENCE.

MR. NARITA, YOU MAY CONTINUE.

MR. NARITA:  YOUR HONOR, MAY I HAND TO YOUR CLERK A COPY OF THE PREMARKED EXHIBIT 246 SO THAT SHE MAY HAND IT TO THE WITNESS?

THE COURT:  YES.

MR. NARITA:  (HANDING.)

YOUR HONOR, MAY I ALSO HAND TO THE CLERK A MAGNIFYING GLASS IN CASE THE WITNESS NEEDS A MAGNIFYING GLASS TO READ?

THE COURT:  YES, YOU MAY.

ANY OBJECTION, MR. LOKER?

MR. LOKER:  NO OBJECTION.

THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT THAT THE MAGNIFYING GLASS IS BEING HANDED TO MR. PANCHENKO.

SO, MR. NARITA, I'M REMINDING YOU REGARDING TIME.

MR. NARITA:  YES.  I JUST WANTED TO GIVE THE WITNESS A CHANCE TO READ IT.

Q.   HAVE YOU SEEN EXHIBIT 246 NOW, SIR?

A.   THE ONE I WAS HANDED.  I CAN SEE THAT THIS IS AN EXCHANGE OF MESSAGES WITH MY WIFE.

Q.   SO THIS DOCUMENT REFLECTS AN EXCHANGE OF MESSAGES BACK BETWEEN YOU AND YOUR WIFE; RIGHT?

A.   YES, I THINK SO.

Q.   AND YOU PRODUCED A COPY OF THIS, AND IT WAS PRODUCED BY YOUR LAWYER IN THIS CASE; RIGHT?

A.   THAT'S CORRECT.

           MR. NARITA:  YOUR HONOR, I MOVE TO ADMIT IT?

           MR. LOKER:  NO OBJECTION.

           THE COURT:  EXHIBIT 448 -- NO.

           MR. NARITA:  EXHIBIT 246.

           THE COURT:  EXHIBIT 246 IS HEREBY ADMITTED.

     (DEFENDANT'S EXHIBIT 246 WAS RECEIVED IN EVIDENCE.)

BY MR. NARITA:

Q.   SO LET'S TAKE A LOOK.  THIS IS AN EXCHANGE BACK AND FORTH BETWEEN YOU AND YOUR WIFE ON MAY 11TH, 2023; RIGHT?

A.   YES.

Q.   AND WE SEE YOUR FACE AS ONE OF THE IMAGES AND YOUR WIFE'S FACE AS ANOTHER ONE; RIGHT?

A.   THAT'S CORRECT.

Q.   AND WHAT MESSAGE PLATFORM ARE YOU USING?

A.   THIS IS TELEGRAM.

Q.   TELEGRAM.

     SO THE MESSAGES START AT THE TOP WITH THESE TWO IMAGES AND THEY FLOW DOWN IN TIME; RIGHT?

A.   THAT'S CORRECT.

Q.   CAN WE BLOW UP THE VERY FIRST MESSAGE AND THE TEXT UNDERNEATH IT, PLEASE.

NOW, WHAT WE'RE SEEING HERE, MR. PANCHENKO, IS AN IMAGE OF A SCREENSHOT THAT YOU SAVED ON YOUR PHONE AND THEN YOU SENT THAT SCREENSHOT TO YOUR WIFE; RIGHT?

A.    THAT'S CORRECT.

Q.    OKAY.  AND THE SCREENSHOT IS FROM THE EXPERIAN APP; RIGHT?

A.    YES.

Q.    AND IT'S ALERTING YOU TO A CREDIT RATING INCREASE.  IT'S SAYING THAT THERE IS GOOD NEWS, THAT YOUR CREDIT RATING HAS CHANGED FROM POOR TO FAIR; RIGHT?

A.    IT SHOWS A NOTIFICATION IN THE CREDIT APP, THAT'S CORRECT.

Q.    OKAY.  AND THE DATE OF THE NOTIFICATION IS JANUARY 11TH, 2023; RIGHT?

A.    THE DATE OF NOTIFICATION, IT SAYS -- IT STATES IT'S JANUARY 11TH, 2023, YES, IN THE APP.

Q.    AND THEN IT INVITES YOU -- IT TELLS YOU WHAT YOUR NEW SCORE IS, RIGHT?  587, RIGHT?  YOUR NEW CREDIT SCORE?

A.    YES, IT SAYS NEW SCORE OF 587, YES.

Q.    AND THEN IT INVITES YOU TO SEE ALL THREE CREDIT SCORES BY PUSHING ON THAT MAROON BUTTON; CORRECT?

A.    NOT REALLY.  THEY UPSELL IT SO IT WAS A TRADITIONAL PRICE, BUT, YES.

Q.    BUT YOU COULD REVIEW YOUR CREDIT REPORT IF YOU PUSHED THE BUTTON AT THE BOTTOM; RIGHT?

A.    YES.

Q.    AND THEN YOU TEXTED SOMETHING TO YOUR WIFE RIGHT BELOW THE

IMAGE THAT YOU HAD SAVED ON YOUR PHONE AND IT'S IN UKRAINIAN; RIGHT?

A.   YES.

Q.   COULD YOU TELL US IN ENGLISH WHAT YOU TEXTED TO HER?

A.   SURE.  IT SAYS I HAD IN JANUARY A CREDIT SCORE OF 587.

Q.   OKAY.  SO YOU'RE TELLING YOUR WIFE USING THIS SCREENSHOT THAT YOU HAD SAVED ON YOUR PHONE THAT YOU HAD A CREDIT SCORE OF 587 IN JANUARY 11TH; RIGHT?

A.   AS IT REPORTS ON THE SCREENSHOT, YES.

Q.   AND SO YOU ALREADY HAD THAT SCREENSHOT SAVED ON YOUR PHONE AND YOU SENT IT TO HER; CORRECT?

A.   I DID IT IN THAT SAME MOMENT, I DID THE SCREENSHOT AND SENT IT --

Q.   OKAY.

A.   -- AS IT STATES IN THIS SCREENSHOT THAT YOU CAN SEE.

Q.   OKAY.  YEAH.  SO THE MOMENT WOULD BE JANUARY 11TH, 2023, RIGHT, IT CAME IN ON YOUR REPORT, ON YOUR PHONE?

A.   NO.  IT WAS ACTUALLY IN MAY 11TH, 15:39.  SO THE SCREENSHOT I SENT TO MY WIFE SAYS 15:39 AND THE TIMESTAMP FOR THE MESSAGE IS 15:39.  I JUST MADE THE SCREENSHOT AND SENT IT TO MY WIFE.

            THE COURT:  MR. NARITA, WE ARE A MINUTE PAST THE TIME.

            MR. NARITA:  OKAY.  YOUR HONOR, GIVEN THAT I'M OUT OF TIME, I'LL RESERVE TOMORROW.

THE COURT: ABSOLUTELY. WE'LL PICK UP TOMORROW.

MR. NARITA: OKAY.

THE COURT: SO, MEMBERS OF THE JURY, THANK YOU SO MUCH. I KNOW BETWEEN THE TIME CHANGE AND EVERYTHING ELSE, IT IS VERY, VERY MUCH APPRECIATED.

I HAVE TO GIVE YOU THE CAUTIONARY INSTRUCTION WHICH YOU'VE HEARD FROM ME BEFORE, AND SO I'M GOING TO MAKE IT VERY SHORT TODAY.

AS I'VE INDICATED TO YOU THROUGHOUT, THE JURY MUST DECIDE THIS CASE BASED SOLELY ON THE EVIDENCE PRESENTED HERE IN THE COURTROOM.

THIS MEANS AFTER YOU LEAVE TONIGHT, DO NOT CONDUCT YOUR OWN INDEPENDENT RESEARCH, DON'T SEARCH ONLINE, DON'T EMAIL OTHER FOLKS, DON'T LOOK AT NEWSPAPERS, AND DON'T LOOK AT MEDIA, AND YOU'RE NOT TO COMMUNICATE WITH ANYONE EITHER REGARDING THIS CASE.

SO THANK YOU FOR YOUR SERVICE. LET US KNOW IF THERE IS ANYTHING ELSE YOU ALL NEED. I WILL LOOK FOR COOKIES OR SOMETHING FOR THE AFTERNOON BREAK LIKE COOKIES TODAY.

SO THANK YOU VERY MUCH AND HAVE A WONDERFUL EVENING.

IF HAVE YOU QUESTIONS, ANTIONIQUE CAN HELP, OR OUR STAFF CAN HELP, AND WE'LL SEE YOU TOMORROW. WE'LL GET STARTED AT 9:00 AND JUST CHECK IN BEFORE THEN AS WE'VE REQUESTED BEFORE.

THANK YOU.

THE CLERK: FEEL FREE TO LEAVE YOUR BADGES AND YOUR

NOTEBOOKS ON YOUR CHAIRS, AND THEY'LL BE THERE FOR YOU TOMORROW.

THE COURT:  THANK YOU FOR THE REMINDER, MADAM CLERK.

(JURY OUT AT 4:33 P.M.)

THE COURT:  MR. PANCHENKO, YOU ARE EXCUSED FROM THE WITNESS CHAIR ONCE THE JURY DEPARTS.

SO COUNSEL DOES NOT NEED TO BE SEATED.  BRIEFLY, WE'RE GOING TO WRAP UP IN THE NEXT FIVE MINUTES TO SEVEN MINUTES BECAUSE I HAVE A 4:45 TRO STATUS CONFERENCE.

SO WE ARE CONTINUING, AND WE ARE STILL ON THE RECORD.  THE PARTIES ARE PRESENT, COUNSEL ARE PRESENT.  THE JURY HAS BEEN EXCUSED.

LET'S SEE.  THERE WAS A SIDE-BAR HELD OUTSIDE OF THE PRESENCE OF THE JURY.  THE COURT -- MR. LOKER HAD OBJECTED AS IMPROPER IMPEACHMENT.  AFTER BEING ABLE TO SEE A ZOOMED IN VERSION OF THE EXHIBIT, THE COURT PERMITTED IT GIVEN THE FACT THAT THE JANUARY 11TH, 2023 DATE ON THE SCREENSHOT COULD, AND WE'LL SEE WHAT HAPPENS, AND SO THAT EXHIBIT WAS ADMITTED.

I DON'T BELIEVE THERE ARE ANY OTHER SIDE-BARS WHICH OCCURRED DURING THAT TIME PERIOD.

ANYTHING ELSE WHICH THE PARTIES WANTED TO PUT ON THE RECORD?

I KNOW THERE'S ONE THING FROM MS. GIVENTAL IN TERMS OF SOME AMENDED EXHIBITS, I BELIEVE, VERY QUICKLY THE EXHIBITS WHICH YOU MENTIONED TO MY LAW CLERK.

AND THEN I WANTED TO FOLLOW UP WITH YOU, MR. LOKER, REGARDING TRANS UNION.

GO AHEAD AND COME UP, MS. GIVENTAL.

FINALLY, LAST BUT NOT LEAST, IF THE PARTIES WANT ME TO GIVE THE STIPULATIONS 1 THROUGH 4, LET ME KNOW.

MS. GIVENTAL.

MS. GIVENTAL:  YOUR HONOR, WE HAVE THREE EXHIBITS. ONE IS AN EXHIBIT THAT WE JUST FOUND SOME MORE THINGS THAT SHOULD BE REDACTED, SO WE WANTED TO SUB IT IN SO THAT EVERYTHING IS PERFECTLY REDACTED.

WE THOUGHT THAT THE COURT SHOULD HAVE THREE BINDERS AND ONLY ONE OF THEM WOULD HAVE THE COMPLAINT, WHICH IS EXHIBIT 245.  SO WE HAVE BROUGHT TWO COPIES TO ADD THEM IN.

THE COURT:  THANK YOU.

MS. GIVENTAL:  AND THEN THERE WAS ONE EXHIBIT THAT WE DISCOVERED THAT NOT IN THE BINDERS, THAT WE HAD AT LEAST, WAS NOT THE EXHIBIT THAT WAS BEING DESCRIBED IN THE EXHIBIT LIST.

WE SENT AN EMAIL ABOUT IT TO MR. LOKER YESTERDAY, AND SO WE BROUGHT IN COPIES TO SUB IN THE CORRECT COPY OF THAT EXHIBIT.

THE COURT:  WONDERFUL.  IF YOU COULD GIVE THOSE TO, WELL, MADAM CLERK BECAUSE SHE'S RIGHT THERE AND ACCORDINGLY -- ACTUALLY, SHOULD WE GIVE YOU BACK OUR BINDERS?  WHAT DO YOU THINK IS EASIEST?  THERE'S JUST THOSE THREE, RIGHT?

MS. GIVENTAL:  WE'RE HAPPY TO SUB THEM IN FOR YOU.

THE COURT:  I THINK THAT MIGHT BE EASIER.  THERE IS A LOT OF PAPER FLYING AROUND.  WHY DON'T YOU GO AHEAD, AND YOU CAN JUST HAND THEM TO ZACH, HE'S THERE.  THANK YOU.  HE'S THE LAW CLERK ON THIS CASE.

MS. GIVENTAL:  THANK YOU.

THE COURT:  AND THEN RELATEDLY, WE SHOULD TRACK DOWN THE RIGHT EXHIBIT BINDERS FOR THE WITNESS.  I DON'T THINK WE HAVE ANYMORE OF YOUR EXHIBIT BINDERS, BUT YOU ALL CAN DISCUSS.

MR. NARITA:  WE HAD OUR PARALEGAL ACTUALLY HAND DELIVER THEM ON FRIDAY WAS MY UNDERSTANDING.  I WAS NOT WITH HER.

THE COURT:  WHO DID SHE HAND DELIVER THEM TO?

MR. NARITA:  I'LL HAVE TO FIND THAT OUT.

THE COURT:  LET'S FIND THAT OUT BECAUSE MY STAFF WAS REMOTE FOR PART OF THAT DAY, SO I'M NOT SURE WHO WAS WHERE AND WHO THAT WOULD HAVE BEEN GIVEN TO SO --

MR. NARITA:  I NEED TO FIND OUT.

THE COURT:  YES, WE NEED TO FIGURE OUT WHERE THAT IS OR WE NEED ANOTHER SET, OR IT'S UP TO YOU ALL.

THE CLERK:  DID IT SAY WITNESS BINDER ON IT OR WAS IT A MULTIPLE --

MR. NARITA:  I THINK IT WAS AN EXHIBIT BINDER LIKE THIS (INDICATING).

THE COURT:  I HAVEN'T SEEN AN EXTRA ONE YET,

MR. NARITA.  JUST SO YOU'RE NOT CAUGHT FLATFOOTED FOR YOUR OWN COPY.

MR. NARITA:  SURE.

THE COURT:  MR. LOKER, YOU EMAILED THE COURT WHAT I THOUGHT WAS THE TRANS UNION.  I WAS EXPECTING THE EXPERIAN AND THE OTHER.  SO WHAT DID YOU GIVE ME?

MR. LOKER:  I HAVE EXPERIAN AND EQUIFAX IN PAPER BECAUSE WE RECEIVED THOSE A LITTLE WHILE AGO.  I ASKED FOR TRANS UNION'S BY FRIDAY BECAUSE OF TRIAL ON MONDAY.  WE RECEIVED IT TODAY IN THE MIDDLE OF THE EXAM.  SO I FORWARDED YOU THE TRANS UNION DECLARATION BUT I COULD ALSO PRINT IT OUT AND GET PAPER COPIES OF ALL THREE OF THEM.

THE COURT:  COULD WE GET PAPER COPIES OF ALL THREE FOR THE RECORD?

MR. LOKER:  YES.

MR. NARITA:  YOUR HONOR, I'M NOT EXACTLY SURE WHAT WAS SENT TO US.  IT'S SOMETHING THAT IS CAPTIONED IN THE NORTHERN DISTRICT OF ILLINOIS, AND IT REFERENCES ANOTHER CONSUMER.

THE COURT:  MR. NARITA, WE NEED TO PICK THIS UP TOMORROW BECAUSE I HAVE --

MR. NARITA:  UNDERSTOOD.  YOU HAVE A TRO.

THE COURT:  I HAVE A TRO SHORTLY, AND MY STAFF NEEDS A BREAK.  SO YOU HAVE THREE MINUTES LEFT AND COUNTING.

AND, MADAM CLERK, IF YOU'LL LET THE NEXT MATTER KNOW WE

WILL BE STARTING FIVE MINUTES LATE.  SO THREE MINUTES AND COUNTING.

I'M ASSUMING THAT WE SHOULD TALK TOMORROW AT 8:30.  GIVEN THAT, WE'LL TALK ABOUT THE BUSINESS RECORDS.  MR. LOKER SENT US THEM EARLY, THE BUSINESS RECORDS.  GO AHEAD AND EMAIL THEM TONIGHT.

STIPS 1 AND 4, WHEN DO YOU WANT THOSE READ?

MR. LOKER:  IN TERMS OF STIPULATIONS, 2, 3, AND 4 RELATE TO EQUIFAX, WHICH IS FOR COMENITY.  I'M NOT SURE WHY THEY WANT THOSE READ.  1 IS SIMPLY THE OPENING OF THE ACCOUNT.

THE COURT:  OKAY.  YOU'LL LET ME KNOW.  AND GIVEN THAT WE'RE ADDING TO THEM, I'M NOW GETTING MORE AND MORE INCLINED -- I MEAN, I WANT A WORKING VERSION SO EVERYBODY IS IN AGREEMENT ABOUT WHAT IS BEING SUBMITTED, BUT I DO THINK THAT WE SHOULD INCLUDE THIS AS A SEPARATE JURY INSTRUCTION JUST SO WE'RE NOT REFERENCING SO THAT IT'S JUST GETTING COPIED WITH EVERYTHING ELSE TO GO BACK TO THE JURY.  I COULD SEE IF WE'RE TRYING TO GET IT ADMITTED AND THERE BEING A SLIGHT HITCH.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  YES, YOUR HONOR.

THE COURT:  THOSE WERE -- I'M PLANNING TO EMAIL YOU THE VERDICT FORM SHORTLY, AT LEAST THE COURT'S DRAFT.  LET ME MAKE SURE THAT THERE'S NOTHING ELSE.

I KNOW WHAT WE NEED.  OKAY.  I NEED YOUR ESTIMATES.  I NEED YOUR WITNESSES TOMORROW, AND I ALSO WANT TO PREVIEW AND

FOR YOU ALL TO MEET AND CONFER ABOUT -- I DON'T THINK WE NEED JURY INSTRUCTION NUMBER 45 ANY LONGER, BUT MAYBE I'M WRONG. TAKE A LOOK.

MR. NARITA:  WE WILL.

THE COURT:  CONSUMER REPORTS.

MR. NARITA:  OKAY.

THE COURT:  THEY'RE JUST NOT REFERENCED ANYWHERE ELSE, SO THEY MAY BE CONFUSING.

SO WHAT ARE YOUR TIME ESTIMATES TODAY, OR DO YOU NEED TO MEET AND CONFER IN THE BACK AND TELL ME AFTER MY HEARING?

MR. NARITA:  WE CAN DO THAT.

THE COURT:  LET'S DO THAT.  MY HEARING WILL PROBABLY LAST ABOUT 10 TO 20 MINUTES.  SO I'M HOPING 10.  IT'S MORE OF A SCHEDULING.

AND THEN WITNESSES FOR TOMORROW?

MR. LOKER:  ONCE WE FINISH WITH MR. PANCHENKO AND WE'RE GOING TO MOVE TO THE VIDEOS AND I DON'T KNOW HOW LONG TOMORROW WE'LL GO BUT WE HAVE -- I SENT THE ORDER.

THE COURT:  SO THOSE DEPOSITIONS ARE THE ONES WHICH ARE UP?

MR. LOKER:  CORRECT.

THE COURT:  GREAT.  YOU ALL WILL LET ME KNOW IF THERE'S ANY TWISTS TO THAT, AND ALSO JUST DISCUSS AND MAKE SURE YOU'RE ON THE SAME PAGE REGARDING THAT.

I APPRECIATED THE DETAILED LIST LAST -- YESTERDAY.

LET'S PLAN ON GETTING HERE AT 8:30.  WE'LL TRY TO START -- EVERYBODY WAS MEETING AND CONFERRING AND WE WERE HAVING TECHNICAL ISSUES, BUT LET'S TRY TO START AT 8:30 SO WE CAN TAKE A SHORT BREAK BEFORE THE JURY COMES IN.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU EVERYBODY.  HAVE A GOOD EVENING.

MR. LOKER:  ALL RIGHT.  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE ARE NOW IN RECESS.  I'M GOING TO STAY AND TALK TO MY STAFF QUICKLY.

MADAM CLERK AND MADAM COURT REPORTER, PLEASE TAKE A FULL TEN MINUTE BREAK.

THANK YOU EVERYBODY.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  OR LONGER.

(COURT ADJOURNED AT 4:41 P.M.)

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  NOVEMBER 3, 2025