UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

OLEKSANDR PANCHENKO,                    )
                                        )   CV-23-04975 EKL
                    PLAINTIFF,          )
                                        )   SAN JOSE, CALIFORNIA
          VS.                           )
                                        )   NOVEMBER 4, 2025
COMENITY CAPITAL BANK,                  )
                                        )   VOLUME 3
                    DEFENDANT.          )
_____         )   PAGES 310 - 539


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EUMI K. LEE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFF:        LOKER LAW, APC
                          BY: MATTHEW M. LOKER
                              CHARLES B. CUMMINS
                          132 BRIDGE STREET
                          ARROYO GRANDE, CALIFORNIA 93420

                          RAMOS LAW
                          BY: MATTHEW R. OSBORNE
                          10190 BANNOCK STREET, SUITE 200
                          NORTHGLENN, COLORADO 80260


          (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
                          LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER

311

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT COMENITY: WOMBLE BOND DICKINSON U.S., LLP
                         BY: TOMIO B. NARITA
                             ALISA A. GIVENTAL
                             KRISTINA HOVSEPYAN
                             NATHAN A. SEARLES
                         50 CALIFORNIA STREET, SUITE 2750
                         SAN FRANCISCO, CALIFORNIA 94111

ALSO PRESENT:            COMENITY CAPITAL BANK
                         MIKE GALEANO, IN HOUSE COUNSEL

INDEX OF PROCEEDINGS

FOR THE PLAINTIFF:


OLEKSANDR PANCHENKO
        CROSS-EXAM BY MR. NARITA (RES.)           P. 332
        REDIRECT EXAM BY MR. LOKER                P. 423
        RECROSS-EXAM BY MR. NARITA                P. 439


PAVLO BILASHCHUK
        DIRECT EXAM BY MR. LOKER                  P. 444
        CROSS-EXAM BY MR. NARITA                  P. 448


ARSHIYA BANU
        VIDEOTAPED DEPOSITION                     P. 470


ALLA ODEIANENKO
        DIRECT EXAM BY MR. LOKER                  P. 473
        CROSS-EXAM BY MR. NARITA                  P. 483


PRAGHATHI GOPINATH
        VIDEOTAPED DEPOSITION                     P. 520

**INDEX OF EXHIBITS**

|  | MARKED | ADMITTED |
|---|---|---|
| PLAINTIFF'S: | | |
| 39 | | 423 |
| 32 | | 429 |
| 30 | | 438 |
| 23 | | 471 |
| 13 | | 471 |
| 37 | | 471 |
| DEFENDANT'S: | | |
| 201 | | 356 |
| 212 | | 360 |
| 216 | | 364 |
| 217 | | 374 |
| 229 | | 381 |
| 236 | | 396 |
| 245 | | 404 |
| 123 | | 414 |

SAN JOSE, CALIFORNIA                    NOVEMBER 4, 2025

P R O C E E D I N G S

(COURT CONVENED AT 8:35 A.M.)

(JURY OUT AT 8:35 A.M.)

THE CLERK:  WE'RE CALLING CASE NUMBER 5:23-CV-04965 EKL, PANCHENKO VERSUS COMENITY CAPITAL BANK.

THIS IS OUR SECOND DAY OF JURY TRIAL.

COUNSEL, PLEASE STATE YOUR APPEARANCES ON THE RECORD STARTING WITH COUNSEL FOR THE PLAINTIFF.

MR. LOKER:  GOOD MORNING, YOUR HONOR.

MATT LOKER ON BEHALF OF THE THE PLAINTIFF.

MR. NARITA:  GOOD MORNING, YOUR HONOR.

TOMIO NARITA FOR THE DEFENDANT.

THE COURT:  GOOD MORNING TO YOU BOTH.

WE'RE OUTSIDE OF THE JURY.  WE HAVE THE PARTIES, MR. PANCHENKO IS PRESENT, COUNSEL IS PRESENT.

SO THERE ARE SEVERAL THINGS WHICH I HAD ON THE AGENDA TO DISCUSS THIS MORNING IN ADDITION TO THE HOMEWORK WHICH I GAVE YOU ALL.

SO I WAS GOING TO LIST WHAT I HAVE, AND THEN WE'LL SEE WHETHER THERE'S ANYTHING ELSE I SHOULD KNOW ABOUT.

ONE IS THE BUSINESS RECORDS EXCEPTION, I.E., THE CUSTODIAN OF RECORDS AFFIDAVITS WHICH WERE PROVIDED;

TWO, VERDICT FORMS.  THE COURT HAS SENT THOSE OUT.  I DON'T KNOW IF WE'RE GOING TO START THAT CONVERSATION TODAY OR

THIS MORNING OR NOT.  BUT IT WOULD BE GOOD TO GET AT LEAST AN INITIAL TAKE BECAUSE MY SENSE BASED OFF OF PRIOR CONVERSATIONS;

THREE, JURY INSTRUCTIONS.  ANY LAST REACTIONS AS TO THOSE, AT LEAST IN TERMS OF 34 AND 36, AND I ASKED COUNSEL TO CONSIDER 45.

MY GOAL IS THAT WE ARE POSTING AND FILING A VERSION SOME TIME TONIGHT SO THAT YOU ALL HAVE THAT TO REACT TO SO THAT WE CAN HAVE OUR FINAL CHARGING CONFERENCE END OF DAY TOMORROW. THE HOPE WOULD BE THAT THE JURY -- THAT WE CAN RELEASE THE JURY, LIKE HOPEFULLY SAY AROUND 4:00 OR SOMETHING, IF WORSE COMES TO WORST 4:30, BUT I'M HOPING AT 4:00, AND THEN WE CAN MEET FOR AN HOUR AND JUST HAMMER EVERYTHING ELSE OUT AND SO THAT THEY'RE READY TO BE COPIED.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  YES, YOUR HONOR.

THE COURT:  AND THEN LAST BUT NOT LEAST, I WANTED TO DISCUSS IMPEACHMENT BRIEFLY, AND IN LIGHT OF, ESPECIALLY JUST A REMINDER IN LIGHT OF AMENDMENTS TO FEDERAL RULE OF EVIDENCE 613(B) WHICH WAS AMENDED EFFECTIVE 12-31-2024.

SO WITH THAT, LET ME START WITH THE BUSINESS RECORDS EXCEPTION.  I'M SORRY, LET ME GET OUT OF EVIDENCE CLASS MODE AND INTO THE CUSTODIAN OF RECORDS.

SO THERE WERE THREE WHICH WERE PRESENTED BY PLAINTIFF YESTERDAY, TWO WHICH HAD BEEN REFERENCED TO EARLIER, ONE WHICH CAME IN AT THE END OF THE COURSE OF THE DAY.

SO, MR. NARITA, ARE THERE ANY OBJECTIONS TO ANY OF THE THREE?

MR. NARITA:  THE TRANS UNION DECLARATION, YOUR HONOR, WE THINK IS STILL DEFECTIVE.  IT DOESN'T EVEN REFERENCE THE PROPER SUBPOENA THAT IT'S RESPONDING TO, AND IT DOESN'T REFERENCE THE PROPER RANGE OF DOCUMENTS EITHER, AND SO WE DON'T THINK IT'S ADEQUATE TO AUTHENTICATE WHAT WAS PRODUCED.

WE WERE THE, WE WERE THE PARTY THAT SUBPOENAED TRANS UNION, AND SO THE RESPONSE WILL BE TO US, NOT TO THE PLAINTIFF.

AND ALSO, THE RANGE OF DOCUMENTS IS NOT A RANGE OF DOCUMENTS THAT WAS GIVEN TO US.

THE COURT:  OKAY.  SO I'M -- LET ME PULL THIS UP BECAUSE YESTERDAY YOUR BIGGEST -- WHAT SEEMED TO BE THE DEFENDANT'S BIGGEST OBJECTION WAS THE FACT THAT IT WAS CAPTIONED WITH THE NORTHERN DISTRICT OF ILLINOIS VERSUS THE NORTHERN DISTRICT OF CALIFORNIA.  SO I WAS LESS CONCERNED ABOUT THAT BECAUSE THE CASE NUMBER AND SUCH IS CORRECT.  AND THERE WAS A REFERENCE TO THE NORTHERN DISTRICT OF CALIFORNIA LATER.

SO FOR ME, THAT IS NOT A CONCERN.

NOW YOU'RE RAISING SOMETHING ELSE, BUT I NEED YOU TO BE SPECIFIC.

MR. NARITA:  SURE.

THE COURT:  SO WAIT ONE MOMENT WHILE I PULL UP THE DECLARATION ITSELF.

MR. NARITA:  JUST FOR CLARIFICATION AS TO YESTERDAY, YOUR HONOR, THE OTHER DEFECT YESTERDAY WAS THAT IT DIDN'T EVEN REFER TO MR. PANCHENKO AT ALL, IT REFERRED TO A COMPLETELY DIFFERENT CONSUMER, WITH A DIFFERENT NAME THAT I DID NOT RECOGNIZE.

SO I DON'T KNOW WHAT THEY WERE RESPONDING TO, BUT IT WAS A WHOLE SET OF DIFFERENT RECORDS.

THE COURT:  OKAY.

MR. NARITA:  NOW WE HAVE SOMEONE DECLARING THAT THEY'RE RESPONDING TO A SUBPOENA THAT I'M NOT AWARE OF BECAUSE I DON'T KNOW THAT PLAINTIFF SENT THIS TO YOU, BUT PERHAPS THEY DID.

AND THEY'RE ALSO REFERENCING A RANGE OF DOCUMENTS, TU 1 THROUGH 543, THAT I DO NOT UNDERSTAND HAS BEEN PRODUCED TO US IN THIS CASE.

THE COURT:  OKAY.  SO BATES RANGE, THE PERSON, THE NAME OF PRASAD SHANKAR, P-R-A-S-A-D, SHANKAR, S-H-A-N-K-A-R, AND THE BATES RANGE BEING DIFFERENT.

ALL RIGHT.  OUTSIDE OF THAT, DOES THAT FULFILL THE ELEMENTS OF -- I CAN'T REMEMBER IF IT'S 803 OR 902 -- BUT DOES IT FULFILL THE ELEMENTS OF THE RULES OF EVIDENCE?

MR. NARITA:  WELL --

THE COURT:  JUST --

MR. NARITA:  I DON'T -- I CAN'T OPINE WHETHER IT COMPLIES WITH THE RULES OF EVIDENCE, YOUR HONOR.

THE COURT:  I'M ASKING IF THERE IS AN OBJECTION ON THAT BASIS.  I DIDN'T SEE ONE WHICH IS READILY APPARENT.  IT SEEMED TO FULFILL THE ELEMENTS.  I JUST WANT TO HAVE YOUR OBJECTIONS FOR THE RECORD SO THAT I CAN TURN TO MR. LOKER AND ASK HIM TO ADDRESS THEM.

MR. NARITA:  WELL, FOR THE REASONS I HAVE STATED, I DON'T THINK IT LAYS A FOUNDATION OR AUTHENTICATES THE RECORDS THAT HAVE BEEN PRODUCED TO US.

THE COURT:  I UNDERSTAND.  I JUST WANT TO MAKE SURE THERE'S NOTHING ELSE UNDER THE FEDERAL RULES THAT YOU'RE OBJECTING TO.

MR. NARITA:  NO, YOUR HONOR.

THE COURT:  THANK YOU.

MR. LOKER.

MR. LOKER:  YES.  THE UPDATED DECLARATION WAS RECEIVED THIS MORNING, AND I PROVIDED IT TO THE COURT UPON RECEIPT.  SO THIS WAS IN RESPONSE TO -- SO MR. WAGNER AUTHENTICATED DOCUMENTS THAT WERE PRODUCED TO US DURING THE COURSE OF THE LITIGATION.

WE SUBMITTED A SUBPOENA.  AND I GUESS WHEN WERE PUTTING THE DECLARATION TOGETHER YESTERDAY, THEY HAD SOME TYPOS IN TERMS OF THE COURT AND THE CONSUMER'S NAME.  MR. HUGHES, WHO WAS TRANS UNION'S COUNSEL, FIXED THOSE TYPOS, RESUBMITTED IT, AND FOR THAT REASON WE THINK IT'S SUFFICIENT TO AUTHENTICATE THE RECORDS FROM TRANS UNION.

THE COURT:  HAVE YOU SENT IT TO THE COURT?

THE CLERK:  YOUR HONOR, HE DID, AND I DIDN'T SEE THEM, BUT NOW I DO.  SO THERE WAS ONE AT 8:42.  THERE WAS ONE AT 8:19 AND 8:42.

MR. LOKER:  RIGHT NOW, YES.

THE CLERK:  AND THE 8:42 WAS THE CORRECT ONE.

MR. LOKER:  THE ONE AT 8:19 AND 8:42 WAS THE SAME. I DIDN'T KNOW HOW MANY EMAILS YOU ALL WOULD RECEIVE, SO I WANTED IT TO BE AT THE TOP OF YOUR INBOX.

THE CLERK:  DO YOU WANT ME TO PRINT THEM?

THE COURT:  I HAVE IT BEFORE ME.  WE MAY NEED IT LATER.  CAN YOU ADDRESS THE ISSUE OF THE BATES LABEL RANGE.

MR. LOKER:  THE BATES LABEL RANGE, WE RECEIVED 346 DOCUMENTS FROM TRANS UNION.  IN THOSE 346 DOCUMENTS THAT WERE PRODUCED, I DON'T KNOW WHAT IS BEYOND 347 AND HIGHER.

WE'RE NOT RELYING UPON ANYTHING THAT IS FROM BATES RANGE 347 TO 543.  SO I DON'T KNOW IF THAT'S A TYPO OR IF TRANS UNION BELIEVED THAT THEY PRODUCED THOSE DOCUMENTS TO US AND WE JUST MISSED THEM, BUT WE'RE ONLY RELYING UPON DOCUMENTS WITHIN THE RANGE AS PROVIDED TO COUNSEL.

THE COURT:  AND WERE THESE -- SO ONE OF THE THINGS MR. NARITA SAID WAS THAT THESE WERE DOCUMENTS WHICH WERE PRODUCED IN RESPONSE TO, IN RESPONSE TO COMENITY'S SUBPOENA RATHER THAN IN RESPONSE TO PLAINTIFF.  I SAW, MR. LOKER, YOU SHAKING YOUR HEAD AT THAT TIME.

MR. LOKER:  RIGHT.

THE COURT:  WHAT IS -- CAN YOU INFORM THE COURT WHAT PLAINTIFF'S POSITION IS?

MR. LOKER:  OF COURSE.  WE ISSUED A SUBPOENA ON AUGUST 21ST, 2024, AND RECEIVED DOCUMENTS 1 THROUGH 346 IN RESPONSE TO THAT.

WHEN I CONNECTED WITH MR. HUGHES, TRANS UNION'S COUNSEL, THAT WAS A SUBPOENA THAT I REFERENCED AND THE DOCUMENT RANGES I REFERENCED IN TERMS OF THE DECLARATION.

THE COURT:  AND WERE THOSE BATES LABELED AS WELL WITH T-U?

MR. LOKER:  CORRECT.

THE COURT:  SO -- AND WAS THERE ANOTHER SEPARATE SUBPOENA BY COMENITY?  DID YOU BOTH -- DID BOTH PARTIES ISSUE SUBPOENAS?

MR. LOKER:  WE DID A DOCUMENT SUBPOENA DURING LITIGATION, AND WE ALSO -- BOTH OF US DID TRIAL SUBPOENAS.

THE COURT:  AND WERE THOSE BATES LABELED DIFFERENTLY OR THE SAME?  I'M JUST CONFUSED ABOUT --

MR. LOKER:  THEY WERE -- OH, I'M SORRY.

THE COURT:  GO AHEAD.

MR. LOKER:  THEY WERE LITERALLY THE SAME.  SO IN TERMS OF THE RESPONSE OF THE TRIAL SUBPOENA, MR. HUGHES, COUNSEL FOR THEM, SAID, HEY, WE HAVE ALREADY PROVIDED THE DOCUMENTS, WHAT ELSE DO YOU NEED?  AND THAT'S WHEN WE ASKED FOR

THE DECLARATION.

BUT THE PRODUCTIONS WERE ALL THE SAME.  THEY JUST REFERRED BACK TO THEIR PRIOR PRODUCTION.

MR. NARITA:  WELL, YOUR HONOR, THAT'S NOT ACCURATE.

THE COURT:  MR. NARITA, I'M IN THE MIDDLE OF --

MR. NARITA:  MY APOLOGIES.

MR. LOKER:  AT LEAST ON MY END THEY REFERRED BACK TO THEIR PRIOR PRODUCTION.  I CAN'T SPEAK FOR WHAT MR. NARITA RECEIVED.

THE COURT:  WHICH PRIOR PRODUCTION?

MR. LOKER:  THE ONE FROM -- IN RESPONSE TO OUR AUGUST 2024 SUBPOENA.

THE COURT:  AND SO ARE YOU SAYING THAT THE DOCUMENTS YOU RECEIVED BOTH IN RESPONSE TO THE TRIAL SUBPOENA AND TO THE DISCOVERY SUBPOENA WERE IDENTICAL?

MR. LOKER:  IN ESSENCE.  WE DIDN'T RECEIVE ANY DOCUMENTS IN RESPONSE TO THE TRIAL SUBPOENA.  MR. HUGHES REFERRED BACK TO HIS PRIOR PRODUCTION IN RESPONSE TO OUR DISCOVERY SUBPOENA.

THE COURT:  OKAY.  MR. NARITA.

MR. NARITA:  THANK YOU, YOUR HONOR.  THE THING THAT IS NOT ACCURATE IS THAT THEY'RE THE SAME.

AGAIN, I DON'T KNOW WHAT DOCUMENTS MR. WAGNER IS REFERRING TO.  HE DOESN'T ATTACH ANYTHING, BUT HE'S CLEARLY REFERRING TO A DIFFERENT SET OF DOCUMENTS BECAUSE THEY START AT NUMBER 1 AND

THEY END AT NUMBER 543.

TO MY KNOWLEDGE, NOBODY IN THIS CASE HAS EVER GOTTEN 543 DOCUMENTS FROM TRANS UNION.  IT MUST BE SOME OTHER CASE. PROBABLY THE CASE HE WAS REFERRING TO YESTERDAY WHEN HE DID THE EARLIER DRAFT.

THE COURT:  OKAY.  ARE YOU RAISING A NEW OBJECTION?

MR. NARITA:  NO, IT'S THE SAME ONE.

THE COURT:  SO I UNDERSTAND.  I HEAR YOU, MR. NARITA.  I'M JUST TRYING TO MOVE IT ALONG BECAUSE I'M NOT KEEPING MY JURY WAITING.

SO UNDERSTOOD, YOUR OBJECTION HAS BEEN RECORDED, I WILL MAKE A DECISION.  I WANT TO TAKE A CLOSER LOOK AT THAT, AND I'LL MAKE A DECISION.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  BUT WE'RE MOVING ON.

MR. NARITA:  OKAY.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  I'M GOING TO SAY THIS BECAUSE WE'RE NOT GETTING AS FAR AS I WANT TO, BUT WE ARE STARTING ON TIME OR AT LEAST AS CLOSE AS POSSIBLE.

SO A COUPLE OF THINGS REGARDING IMPEACHMENT, WHICH I HAD TO REMIND MYSELF ACTUALLY THAT FEDERAL RULE OF EVIDENCE 613(B) WAS AMENDED IN 2024 EFFECTIVE AT THE END OF LAST YEAR, BEGINNING OF THIS YEAR, AND IT DOES REQUIRE -- WELL, JUST TAKE A READ OF IT.  I READ IT SEVERAL TIMES TODAY, JUST TO MAKE

SURE, BUT IT REQUIRES THAT EXTRINSIC EVIDENCE MAY NOT BE ADMITTED UNTIL AFTER THE WITNESS HAS BEEN GIVEN AN OPPORTUNITY TO EXPLAIN OR DENY THE STATEMENT AND AN ADVERSE PARTY IS GIVEN AN OPPORTUNITY TO EXAMINE THE WITNESS ABOUT IT.

THAT'S SEPARATE AND APART IN TERMS OF THE TIMING.  AND THE SUBDIVISION DOES NOT APPLY TO AN OPPOSING PARTY'S STATEMENT, BUT I JUST WANT YOU ALL TO KEEP IT IN MIND BECAUSE WE HAVE THIRD PARTY WITNESSES WHO ARE COMING OR NON-PARTY WITNESSES WHO ARE COMING.

A FEW THINGS REGARDING IMPEACHMENT.  I MEAN, IF IT'S NOT A DOCUMENT WHICH HAS BEEN PREMARKED, YOU NEED TO MARK IT FOR THE RECORD.  SO JUST MAKE SURE THAT IT'S MARKED AND ASK TO HAVE THAT MARKED.

AND LAST BUT NOT LEAST, IF IT'S IN UKRAINIAN, I NEED TO KNOW WHAT IT SAYS BEFORE I CAN ADEQUATELY MAKE A DETERMINATION IF THERE'S AN OBJECTION, SO SPECIFICALLY WHAT IT SAYS.

SO I SORT OF WENT ON COUNSEL'S REPRESENTATION THAT IT WAS INCONSISTENT YESTERDAY, BUT I WOULD EXPECT A PROFFER WITH WHAT IT ACTUALLY SAYS.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

MR. NARITA:  THANK YOU, YOUR HONOR.  UNDERSTOOD.

THE COURT:  ALL RIGHT.  LET ME GET --

MR. NARITA:  YOUR HONOR, SINCE YOU RAISED IT, ON THE NOTE THAT YOU JUST RAISED ABOUT THE TRANSLATION FROM THE UKRAINIAN DOCUMENTS, OR THE UKRAINIAN LANGUAGE IN DOCUMENTS, WE

DO HAVE EXHIBIT 246 FROM YESTERDAY.  THERE IS SOME ADDITIONAL UKRAINIAN LANGUAGE IN THAT EXHIBIT.  IT WAS WRITTEN BY THE PLAINTIFF, SO I WAS PLANNING ON GOING OVER IT WITH HIM ON THE STAND.

DOES THE COURT NEED -- SINCE IT'S ALREADY IN EVIDENCE, DOES THE COURT NEED A TRANSLATION BEFORE THE WITNESS TESTIFIES ABOUT IT, OR NOT?

THE COURT:  I MEAN, AT THIS POINT IT'S ALREADY BEEN ADMITTED, SO IT'S PAST, SO TO SPEAK.

BUT IN TERMS OF MAKING THAT -- IN TERMS OF MAKING THAT RULING, IN TERMS OF WHETHER OR NOT IT'S IMPROPER IMPEACHMENT, I NEED TO KNOW WHETHER OR NOT THERE'S TRULY A CONTRADICTION.  SO I NEED THE --

MR. NARITA:  THAT'S AN EXCELLENT POINT, YOUR HONOR, AND I SHOULD HAVE ANTICIPATED THAT YESTERDAY, AND I DIDN'T.  WE CAN DO THAT.

THE COURT:  AND THEN THE OTHER POINT THAT WAS RAISED WAS THAT I NEED TO BE ABLE TO READ IT, AND SO WITH BOTH OF THOSE THINGS, BECAUSE IT GOT A LITTLE HEATED ON SIDE-BAR, AND I EXPECT BOTH OF THOSE THINGS ARE NECESSARY FOR ME TO BE ABLE TO DO MY JOB TO HELP YOU DO YOUR JOB.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  APOLOGIES FROM ME AND THE DEFENSE IF THERE WAS ANY HEAT THAT I SHOULDN'T HAVE EXPRESSED DURING OUR SIDE-BAR.

THE COURT:  ALL RIGHT.  LET'S MOVE TO JURY INSTRUCTIONS.

SO ANY REACTION TO 45 AND OUR EXCLUSION OF THAT, THE CONSUMER REPORT?  BECAUSE THERE'S NO REFERENCE TO IT ACROSS THE OTHER JURY INSTRUCTIONS, SO IT SEEMS LIKE IT WOULD LEAD TO CONFUSION.

MR. LOKER:  YES, YOUR HONOR.  MS. GIVENTAL AND I DISCUSSED THAT --

THE COURT:  MS. GIVENTAL, YOU'RE WELCOME TO.

MR. LOKER:  -- THIS MORNING, AND THE PLAINTIFF'S REACTION IS THAT WE DON'T THINK IT NEEDS TO BE READ TO THE JURY.

MS. GIVENTAL, ON BEHALF OF COMENITY, WOULD LIKE TO KEEP IT IN THERE JUST IN CASE ANY OF THE EXPERTS REFER TO IT.

IF THEY DON'T AND IT'S NOT NECESSARY, WE MAY TAKE IT OUT AT THAT TIME.

THE COURT:  OKAY.  NO, I'M FINE WITH IT.  IF IT ENDS UP BEING PART OF A REFERENCE WHICH IS DISCUSSED, WHICH I DON'T WANT TO CAUSE CONFUSION VERSUS HELP CONFUSION.  SO THAT'S MY BIGGEST POINT.  SO WE'LL SEE THEN.

BUT I WANT TO NOTE, BASED ON WHAT IS IN THE INSTRUCTIONS SO FAR, I THINK IT WILL ADD TO CONFUSION UNNECESSARILY.

MS. GIVENTAL:  UNDERSTOOD, YOUR HONOR.

THE COURT:  OKAY.  AND THEN 34 AND 36, WE STARTED DISCUSSING THAT YESTERDAY.  THE COURT SENT OUT THE PROPOSAL, I

THINK WITH REASONABLE INVESTIGATION ACTUALLY BEING CLOSER TO WHAT COMENITY HAD PROPOSED IN PART, AND THEN WITH 36 I THINK IT WAS CLOSER TO -- MAYBE I'M REMEMBERING THIS WRONG, BUT MR. LOKER IS NODDING.

MR. LOKER:  YES.

THE COURT:  -- CLOSER TO WHAT PLAINTIFF HAD PROPOSED.  WE HAD EXTENSIVE ARGUMENT ABOUT THIS, BUT IS THERE ANYTHING CLEANING UP WISE THAT I SHOULD BE AWARE OF?

MS. GIVENTAL.

MS. GIVENTAL:  IF I MAY.

THERE IS ONE SENTENCE THAT WE HAD IN OUR INSTRUCTION IN 34 WHICH WE THINK WOULD BE IMPORTANT TO KEEP IN, WHICH IS THAT THE PLAINTIFF BEARS THE BURDEN OF PROVING THAT COMENITY'S INVESTIGATION WAS UNREASONABLE.

I THINK THE WAY THAT THE EVIDENCE IS BEING PRESENTED, COMENITY IS NOW -- IT LOOKS LIKE, EVEN THOUGH IT'S PLAINTIFF'S BURDEN OF PROOF, THAT COMENITY HAS TO PROVE THAT IT WAS REASONABLE, VERSUS THAT PLAINTIFF MUST PROVE THAT IT'S UNREASONABLE.

THAT IS OUR ONLY COMMENT ON THAT ONE.

THE COURT:  THAT IS ALREADY IN THE INSTRUCTIONS IN TERMS OF THAT COMENITY -- THAT PANCHENKO BEARS THE BURDEN OF PROVING ALL OF THE ELEMENTS, RIGHT?  I CAN'T REMEMBER THE INSTRUCTION NUMBER OF THAT FIRST ONE.

SO I DON'T WANT THAT TO LEAD TO CONFUSION AGAIN AND THEY

THINK, OH, DOES THAT MEAN THAT THEY DON'T NEED TO PROVE THIS OR PROVE THAT?

I THINK MY PAST EXPERIENCE IS THAT IT'S ALMOST EASIER JUST TO PUT IT UP THERE AND BE LIKE, THIS IS THEIR BURDEN AND THIS IS EVERYTHING THEY NEED TO PROVE.

SO THAT'S MY CONCERN ON THAT.

I'LL TAKE YOUR REQUEST UNDER CONSIDERATION, BUT IF I SAY NO, THAT'S THE REASON, BECAUSE I ACTUALLY DON'T WANT TO MAKE IT SEEM LIKE THERE'S ANY BURDEN ON COMENITY IN TERMS OF ANY ELEMENTS.

MS. GIVENTAL:  THANK YOU, YOUR HONOR.

THE COURT:  AND THEN VERDICT FORMS.

LAST THING I'LL NOTE IS THAT IT SEEMS LIKE -- MR. LOKER, YOU DON'T OBJECT?  JUST TO MAKE MY RECORD CLEAN, YOU DON'T OBJECT TO THE BURDEN OF PROOF?  BECAUSE I SAW YOU NODDING.

MR. LOKER:  CORRECT.  WE PREFER THE INSTRUCTION AS IS, BUT IF THAT'S ADDED IN THERE, THAT'S OKAY.

THE COURT:  OKAY.  ALL RIGHT.

AND LET ME -- VERDICT FORMS.  WE'RE GOING TO HAVE MORE TIME TO TALK ABOUT IT, BUT, AGAIN, IT'S SOMEWHAT DIFFERENT BETWEEN WHAT YOU ALL DID, AND ALSO ADDED A SLIGHTLY DIFFERENT STRUCTURE.

SO QUICK HIT REACTION SO WE CAN BEGIN TO PROCESS. MR. LOKER?

MR. LOKER:  NO PROPOSED EDITS OR CHANGES BY THE

PLAINTIFF.

MR. NARITA:  QUICK HIT RESPONSE, YOUR HONOR, WE DID FEEL LIKE -- I KNOW OUR FORM WAS LONGER AND IT STEPPED THE JURY THROUGH THE VARIOUS ELEMENTS, BUT WE FELT LIKE IN THIS CASE THAT WAS IMPORTANT BECAUSE EACH -- IF THEY DON'T HIT EACH OF THE ELEMENTS, THEN THEY DON'T GO TO THE NEXT STEP, AND IT JUST -- WE THINK IT WOULD MAKE FOR A CLEAR VERDICT FORM TO HAVE THE ADDITIONAL DETAILED STEPS THAT WE PROPOSED.

THAT'S MY QUICK REACTION TO THAT.

THE COURT:  I HAVEN'T SEEN THAT IN ANY OTHER FCRA VERDICT FORMS, AND MINE IS MORE DETAILED THAN A LOT OF THE OTHER ONES I'VE SEEN BECAUSE I WANT TO MAKE SURE THAT WE WERE CLEARLY FOLLOWING THE STATUTES, AND GIVEN THE SAME JURY INSTRUCTION, WHICH APPARENTLY I SHOULD HAVE MEMORIZED THE JURY INSTRUCTIONS WITH THE ELEMENTS, AND THE NUMBER ONE, I THINK THAT THE NUMBER ONE UNDER THE VERDICT FORMS, I THINK THAT ADDRESSES COMENITY'S CONCERNS.

MR. NARITA:  YES.

THE COURT:  AND I'M WONDERING IF THAT IS JUST GOING TO ADD CONFUSION OTHERWISE, BECAUSE THE STATUTORY SCHEME BETWEEN 1681N AND 1681O I FIND CONFUSING MYSELF.  LIKE, I SPENT QUITE A BIT OF TIME LOOKING AT THAT STATUTE THIS WEEKEND.

MR. NARITA:  YOUR HONOR, WHEN CONGRESS WRITES IT, IT ALWAYS WRITES IT IN A CLEAR MANNER.

THE COURT:  OF COURSE.

MR. NARITA:  SO WHY THERE WOULD BE ANY CONFUSION? THE RECORD SHOULD REFLECT MY SARCASM.

THE COURT:  NO, NO.  I THINK IT'S BEST FOR THE RECORD.

SO THAT'S MY RESPONSE TO THAT, WHICH I'M NOT LIKELY TO GIVE ALL OF THOSE.  I THINK IT DOES LEAD TO CONFUSION AND JUST -- ANYTHING ELSE?

MR. NARITA:  THAT WAS MY FIRST OF REACTION TO IT.

WE'LL PUT A MICROSCOPE ON IT LATER TODAY.  BUT I ALWAYS THINK ABOUT AN APPEAL AND WHAT -- IF YOU DON'T UNDERSTAND WHY THE JURY REACHED A CONCLUSION THAT THEY DID, THAT IT'S HARD TO SORT THINGS OUT IF THERE'S AN APPEAL.

SO WHEN THERE'S A LOT OF PRECISION ON THE VERDICT FORM, IT REALLY -- IT BASICALLY SHOWS HOW THE JURY GOT THERE.

SO I WOULD JUST LIKE IT TO BE CLEAR ON THE VERDICT FORM.

THE COURT:  OKAY.

MR. NARITA:  THAT'S MY GENERAL APPROACH TO THE VERDICT FORMS, IF YOU WILL.

THE COURT:  OKAY.  AND I DIDN'T SEE ANY EXEMPLARS WHICH WERE SUBMITTED BY -- BUT IT'S FINE.  BUT IT SEEMS TO ME THAT THE ELEMENTS ARE CLEAR FROM THE EARLIER EMAIL, I MEAN EARLIER INSTRUCTION.

SO I'M CONCERNED THAT IT WOULD ADD CONFUSION.

MR. NARITA:  UNDERSTOOD.

THE COURT:  SO TO PUT A MICROSCOPE UNDER IT, MAKE

SURE IF YOU HAVE ANY THOUGHTS, IF THERE ARE NITS, IF THERE ARE TYPOS, IF THE LOGIC GAME DOESN'T WORK OUT, LET ME KNOW, IN TERMS OF THIS AND THAT.

MR. NARITA:  WE CAN ALSO USE A MAGNIFYING GLASS.  WE HAVE TWO OF THOSE.

THE COURT:  GREAT.  WE NEED TO.

ALL RIGHT.  SO THAT IS THAT.  AND LET ME JUST TURN BACK, BECAUSE WE HAVE ABOUT TWO MINUTES LEFT BEFORE I'M GOING TO TAKE A COUPLE MINUTE BREAK AND MAKE SURE THAT OUR JURORS ARE AROUND AND ACCOUNTED FOR.

SO, MR. LOKER, I THINK -- I'M NOT MAKING A RULING YET.  I WANT TO TAKE A CLOSER LOOK AT THE MOST RECENT ITERATION OF THE AFFIDAVIT, AND WE HAVEN'T HAD TRANS UNION MARKED DOCUMENTS COMING IN AT THIS POINT BECAUSE YOU'VE VERIFIED THEM THROUGH OTHER.

MR. LOKER:  CORRECT.

THE COURT:  BUT HERE'S MY CONCERN, IT'S JUST IF THE BATES LABEL DOESN'T MATCH -- LIKE, I MEAN, ARE THE NUMBER OF PAGES -- SO THE 543 VERSUS 347 OR 346 BATES LABEL, THOSE WERE THE NUMBER OF PAGES THAT YOU RECEIVED, 376, AND THAT'S WHERE YOUR BATES LABELLING ENDS.

MR. LOKER:  EITHER 346 OR 376, YES, YOUR HONOR.

THE COURT:  BOTH 3 -- OKAY.  THEN IN EITHER CASE, I MEAN, WHAT IT LOOKS LIKE TO ME IS THAT MR. WAGNER WAS BEING -- IS TRYING TO GET THIS TO YOU VERY QUICKLY AND IS BEING SLOPPY

IN TERMS OF USING HIS TEMPLATE, AND IT WOULD BE MUCH CLEANER IF WE JUST HAD A CORRECT VERSION FROM HIM --

MR. LOKER:  OKAY.

THE COURT:  -- VERSUS ARGUING AND MR. NARITA HAVING TO ARGUE, WELL, THIS IS THAT, OR THIS IS THIS, AND ME MAKING A DETERMINATION ON AN IMPERFECT DECLARATION.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.  WE'LL PLACE A PHONE CALL.

THE COURT:  OKAY.  I WILL SEE YOU ALL WHEN WE HAVE OUR JURY.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.  WE ARE NOW IN RECESS.

(RECESS FROM 9:00 A.M. UNTIL 9:10 A.M.)

(JURY IN AT 9:10 A.M.)

THE COURT:  SO WE'LL CONTINUE WITH THE TRIAL IN PANCHENKO VERSUS COMENITY CAPITAL BANK.

LET ME BEGIN --

AND WE'RE CONTINUING WITH MR. PANCHENKO ON THE STAND; CORRECT.

MR. NARITA:  CORRECT, YOUR HONOR.

THE COURT:  ALL RIGHT.  BEFORE WE DO THAT, LET ME JUST ALSO SAY GOOD MORNING.  IT IS GOOD TO SEE OUR JURORS PRESENT.  COUNSEL IS PRESENT, THE PARTIES ARE PRESENT, AND WE

HAVE ALL SEVEN JURORS HERE.

SAME ADMONITION AS YESTERDAY:  IF THERE IS ANY INFORMATION THAT YOU SOMEHOW LEARNED, DISCUSSED, WERE EXPOSED TO, PLEASE LET MY STAFF KNOW OR PLEASE RAISE YOUR HAND NOW.

SEEING NO HANDS RAISED, I WILL ASSUME THAT YOU'VE BEEN EXPOSED TO NO ADDITIONAL INFORMATION ABOUT THIS CASE OUTSIDE OF WHAT YOU'VE HEARD IN THE COURTROOM YESTERDAY.

SO WITH THAT, LET'S CONTINUE WITH THE CROSS-EXAMINATION OF THE WITNESS.

MR. PANCHENKO, YOU MAY COME TO THE WITNESS STAND.

JUST AS A REMINDER, SIR, YOU ARE STILL UNDER OATH.

THE WITNESS:  YES.

**(PLAINTIFF'S WITNESS, OLEKSANDR PANCHENKO, WAS PREVIOUSLY SWORN.)**

MR. NARITA:  IS OUR TECHNOLOGY FIRED UP?

MS. HOVSEPYAN:  WE ARE ALL GOOD.

MR. NARITA:  OKAY.

**CROSS-EXAMINATION (RESUMED)**

BY MR. NARITA:

Q.   GOOD MORNING, MR. PANCHENKO.  HOW ARE YOU?

A.   GOOD MORNING.

Q.   SO YESTERDAY ONE OF THE DOCUMENTS THAT WE WERE TALKING ABOUT WAS TRIAL EXHIBIT 2.  I WONDER IF YOU HAVE A BINDER UP THERE THAT HAS TRIAL EXHIBIT 2 IN IT.

A.   I DON'T SEE IT.

THE CLERK:  IT MIGHT BE NEXT TO YOU.

MR. LOKER:  I HAVE IT.

THE CLERK:  OH.

THE COURT:  LET THE RECORD REFLECT THAT MR. LOKER JUST PROVIDED THE WITNESS BINDER BACK TO MR. PANCHENKO.

MR. NARITA, YOU MAY CONTINUE.

BY MR. NARITA:

Q.   IF ANY OF HIS NOTES ARE IN THERE, YOU CAN HAMMER THEM, MR. PANCHENKO.

I'M JOKING.

LET ME KNOW WHEN YOU'VE FOUND EXHIBIT 2, SIR.

A.   I FOUND IT.

Q.   OKAY.  FANTASTIC.

SO EXHIBIT 2, WHICH IS UP -- THE FIRST PAGE IS ON THE SCREEN NOW.  THIS WAS ONE OF THE LETTERS WITH ALL OF THE ENCLOSURES THAT YOU SENT TO THE CONSUMER REPORTING AGENCIES IN ABOUT AUGUST OF 2023; RIGHT?

A.   YES.

Q.   OKAY.  AND WE WENT THROUGH A LOT OF THE ATTACHMENTS YESTERDAY, SO I WON'T GO THROUGH ALL OF THEM.

COULD WE TURN, THOUGH, AND SHOW THE JURY PAGE 449.

AND MAYBE YOU CAN TURN TO IT AS WELL.

THE COURT:  MR. NARITA, I'M GOING TO HAVE YOU PUSH THE MICROPHONE JUST A LITTLE BIT UPWARDS.  THERE YOU GO.

MR. NARITA:  I KEEP MOVING AWAY FROM THE MICROPHONE,

YOUR HONOR.  I'LL TRY NOT TO DO THAT.

Q.   LET ME KNOW WHEN YOU'VE FOUND 449.

A.   449, I'VE FOUND IT.

Q.   OKAY.  AND CAN YOU TELL THE JURY WHAT IS THIS IMAGE THAT WE'RE SEEING IN 449?

A.   THIS IS A CANADIAN VISA.

Q.   THIS IS YOUR CANADIAN VISA?

A.   CORRECT.

Q.   DID YOU GO TO LONDON TO GET THIS?

A.   NO.

Q.   I DON'T KNOW MUCH ABOUT CANADIAN VISAS.  IT JUST SAYS "ISSUED AT," AND THEN UNDERNEATH IT SAID LONDON?

A.   CORRECT.

Q.   DO YOU KNOW WHY?  BECAUSE I DON'T KNOW WHY.

A.   I ASSUMED THAT MY -- I APPLIED FOR THIS VISA IN WARSAW, POLAND.  TO GET THE VISA, I NEEDED TO GIVE THEM, CONSUL IN WARSAW, MY PASSPORT, AND THEY WILL PROBABLY SEND IT TO LONDON BECAUSE I HAVEN'T HAD A PASSPORT FOR A COUPLE OF YEARS, AND THEN IT RETURNS BACK THIS VISA.

THE COURT:  MR. PANCHENKO, YOU SAID FOR CLARIFICATION, WARSAW?

THE WITNESS:  YEAH, WARSAW.

THE COURT:  GREAT.  THANK YOU.

BY MR. NARITA:

Q.   AND SO YOU APPLIED FOR A CANADIAN VISA ON SEPTEMBER 6TH,

2022; RIGHT?

A.   IT WAS AROUND THAT TIME.

Q.   WAS IT BEFORE THAT?

A.   HUH?

Q.   WAS IT BEFORE THAT?

A.   WELL, WE APPLIED FOR CANADIAN VISA AT SOME TIME IN 2022. THE PROCESS TAKES SOME TIME, SO I DON'T REMEMBER WHEN EXACTLY IT WAS.  BUT FOR CANADIAN VISA, I REMEMBER IT WAS A PRETTY FAST PROCESS, SO YEAH.

Q.   OKAY.  SO AT SOME POINT PRIOR TO SEPTEMBER 6TH, 2022, YOU WERE APPLYING FOR A CANADIAN VISA AND THEN YOU GOT ONE; CORRECT?

A.   YES.

Q.   AND YOU WERE DOING THAT BECAUSE YOU AND YOUR WIFE WERE THINKING ABOUT POTENTIALLY MOVING WEST?

A.   YES.  SO AS I MENTIONED BEFORE, EVEN THOUGH WE WERE IN POLAND, IT WAS CLEAR AT LEAST AT THE START OF THE FULL SCALE INVASION, SO IT WAS CLEAR THAT IT MIGHT -- SO THEY HAVE INTENT TO GO FURTHER THAN UKRAINE, SPECIFICALLY TO BALTIC COUNTRIES AND POLAND.

SO IT WASN'T STILL KIND OF A SUPER SAFE PLACE, SO, YES, WE WERE THINKING TO GO FURTHER WEST.

AND MY WIFE WAS WORKING BACK THEN AT GOOGLE CLOUD.  GOOGLE CLOUD HAS A REPRESENTATION IN CANADA AS WELL, SO WE WERE THINKING ABOUT MOVING TO CANADA, YEAH.

Q.   OKAY.  BUT AS IT TURNED OUT, YOU NEVER ACTUALLY TOOK A TRIP TO CANADA; IS THAT RIGHT?

A.   YES.

Q.   YES, YOU DID?

A.   I DID NOT TAKE A TRIP TO CANADA.  I'VE NEVER BEEN TO CANADA.

Q.   SORRY.  MAYBE THAT WASN'T A GOOD QUESTION.  OKAY.

     AND LET'S TURN TO PAGE 440 OF THAT DOCUMENT.  IT SHOULD BE JUST A FEW PAGES EARLIER.

     THAT WAS THE TRAVEL HISTORY THAT YOU WERE TALKING TO MR. LOKER ABOUT YESTERDAY; CORRECT?

A.   CORRECT.

Q.   AND YOU PROVIDED THIS TRAVEL HISTORY TO THE CONSUMER REPORTING AGENCIES ALONG WITH ALL OF THESE OTHER ATTACHMENTS; RIGHT?

A.   I PROVIDED IT TO THE CONSUMER AGENCIES AND TO ALL OF THE BANKS, YES.

Q.   OKAY.  AND IN ORDER TO GENERATE THE TRAVEL HISTORY ON PAGE 440, YOU USED THE PASSPORT THAT IS ON THE NEXT PAGE; RIGHT?

A.   CORRECT.

Q.   OKAY.  SO THE -- LET'S LOOK AT THE NEXT PAGE THEN.  IT'S 441.

     AND THAT'S YOUR PASSPORT; RIGHT?

A.   CORRECT.

Q.   AND IT WAS ISSUED MARCH 27TH, 2018; RIGHT?

A.   CORRECT.

Q.   AND SO IT WOULD -- SO THAT WAS VALID FROM MARCH 27TH, 2018 FORWARD; CORRECT?

A.   THE PASSPORT IS VALID FOR MARCH 27TH, YEAH.

Q.   SO THE TRAVEL HISTORY THAT IS CONNECTED TO THAT PASSPORT WOULD ONLY SHOW YOUR WHEREABOUTS FROM MARCH 27TH, 2018 FORWARD; RIGHT?

A.   INCORRECT.  NO.

Q.   OKAY.  TELL ME WHAT IS CORRECT, SIR.

A.   SO THE TRAVEL HISTORY, I SEND IT.  IT'S MY TRAVEL HISTORY. IT'S NOT CONNECTED TO ANY PASSPORT.

     SO HOW IT WORKS IS THAT IT DOESN'T MATTER WHAT PASSPORT NUMBER YOU HAVE AND WHAT YOU'RE GOING TO PUT THERE, YOU'RE GOING TO ONLY SEE A TRAVEL HISTORY FOR THE PERSON BECAUSE SOME PEOPLE HAVE MULTIPLE PASSPORTS.

     SO THIS TRAVEL HISTORY IS AN IMMIGRATION TRAVEL HISTORY OF THE GOVERNMENT THAT TRACKS ALL TRAVEL HISTORY FOR THE PERSON FOR TEN YEARS.

     SO IT DOESN'T MATTER WHAT PASSPORT YOU'RE GOING TO PUT THERE.  I CAN PUT THERE MY PREVIOUS PASSPORT NUMBER IF I HAD IT AND IT'S GOING TO SHOW ME EXACTLY THE SAME INFORMATION.

Q.   OKAY.  AND HOW DID YOU LEARN THAT, SIR?

A.   I THINK I TRIED TO PUT THE PREVIOUS PASSPORT NUMBER.

Q.   OKAY.  AND DO YOU HAVE THE RESULTS OF THAT INQUIRY FOR US

TODAY?

A.   NO.

Q.   OKAY.  LET'S GO TO I THINK A DIFFERENT BINDER, SIR.  IT'S THE EXHIBIT 246 THAT WE WERE LOOKING AT YESTERDAY.  OR MAYBE IT'S NOT IN A BINDER.  IT MIGHT BE LOOSE.  THAT WAS THE TELEGRAM EXCHANGES BETWEEN YOU AND YOUR WIFE.

     DO YOU REMEMBER THOSE?

     DO YOU HAVE EXHIBIT 246 IN FRONT OF YOU?

A.   YES.

Q.   OKAY.  AND WE'RE GOING TO BE -- CAN YOU SEE THE SCREEN ALSO, SIR?  BECAUSE WE'RE GOING TO --

A.   I CAN SEE IT ON THE SCREEN.

Q.   -- BLOW SOME THINGS UP.  OKAY.

     SO CAN WE ENLARGE THE PART OF IT WITH THE FIRST TWO IMAGES THAT ARE SENT THERE.

     OKAY.  CAN YOU SEE THAT A LITTLE BETTER?

A.   YES.

Q.   OKAY.  SO THIS IS -- THESE TWO IMAGES AND THE TEXT THAT WE LOOKED AT YESTERDAY WERE SENT BY YOU TO YOUR WIFE ON MAY 11TH, 2023; RIGHT?

A.   THESE IMAGES, I SENT IT ON MAY 11TH, YES.

Q.   OKAY.  AND YOUR TESTIMONY YESTERDAY WAS THAT YOU HAD NOT DOWNLOADED THE EXPERIAN APP ONTO YOUR PHONE UNTIL MAY 9TH, 2023; RIGHT?

A.   YES.

Q.   HAD YOU EVER, HAD YOU EVER OPENED UP AN EXPERIAN ACCOUNT USING A DESKTOP COMPUTER?

A.   NO.

Q.   YOU'RE SURE OF THAT; RIGHT?

A.   I'M SURE.

Q.   SO IF YOU'RE GOING TO ACCESS THE EXPERIAN APP, IT'S GOING TO BE THROUGH YOUR PHONE?

A.   YES.

Q.   OKAY.  MY WIFE IS LIKE THAT.  SHE CAN RUN HER WHOLE LIFE THROUGH HER PHONE.  IT'S TOO SMALL FOR ME.

     SO YESTERDAY YOU TOLD US WHEN YOU DOWNLOADED THE EXPERIAN APP, YOU TURNED OFF ALL OF THE NOTIFICATIONS; RIGHT?

A.   AT SOME POINT I TURNED OFF THE NOTIFICATIONS, YES.

Q.   OKAY.  DO YOU REMEMBER WHEN?

A.   I DON'T REMEMBER WHEN.

Q.   WAS IT PRETTY SOON AFTER YOU DOWNLOADED THE APP?

A.   I DON'T REMEMBER WHEN.  I JUST REMEMBER THAT I RECEIVED SOME ADVERTISEMENTS AND NOTIFICATIONS THAT I DIDN'T WANT TO SEE, SO THAT'S WHY I TURNED THE NOTIFICATION OFF.

Q.   OKAY.  CAN YOU TELL US THEN, IF YOU TURNED OFF THE NOTIFICATIONS AFTER YOU DOWNLOADED THE APP IN MAY OF 2023, HOW IS IT THAT WE'RE SEEING AN IMAGE OF A NOTIFICATION THAT HAD BEEN SENT JANUARY 11TH, 2023, THAT YOU HAD SAVED TO YOUR PHONE AND SENT TO YOUR WIFE?

A.   SO THIS IS THE SCREENSHOT OF THE APP, RIGHT?  SO WHEN I

OPENED THE APP, I SAW SOME NOTIFICATIONS THERE, SOME CARTS LIKE THIS THAT WAS DATED PRIOR TO ME ACTUALLY DOWNLOADING EXPERIAN APP AND CREATING AN ACCOUNT.

SO THERE WAS SOME HISTORY OF THIS NOTIFICATIONS THERE.

THIS NOTIFICATION SAYS THAT AT SOME POINT IN EARLY 2023 THE CREDIT SCORE WAS CHANGED.

THIS NOTIFICATION HAD -- THIS WAS THE ONLY NOTIFICATION THAT I SAW THAT HAD A NEW SCORE THERE, AND THAT'S WHY I MADE THE SCREENSHOT AND SENT IT TO MY WIFE.

I DID NOT RECEIVE THIS NOTIFICATION ON MY PHONE LIKE A NOTIFICATION FROM OPERATING SYSTEMS, RIGHT?

I RECEIVED IT JUST AS I WAS OPENING THE APP AND SEEING IT IN THE APP.

AND WHEN I TURNED THE NOTIFICATIONS ON MY PHONE FROM THE APP, I DON'T REMEMBER WHETHER IT WAS MAY OR LATER.

Q.   OKAY.  SO IF I'M UNDERSTANDING YOU CORRECTLY, WHEN YOU DOWNLOADED THE EXPERIAN APP IN MAY OF 2023 FOR THE FIRST TIME, YOU WERE ABLE TO SEE SOME HISTORICAL INFORMATION ABOUT ALERTS THAT HAD BEEN SENT TO SOMEBODY ELSE BEFORE YOU EVER DOWNLOADED THE APP?

A.   I DON'T KNOW WHETHER THEY WAS SENT TO ANYONE, BUT I SAW HISTORIC NOTIFICATIONS THERE IN THE APP, YES.

Q.   OKAY.  SO IS IT YOUR UNDERSTANDING THEN THAT SOMEBODY HAD BEEN GETTING NOTIFICATIONS ABOUT YOUR CREDIT SCORE INCREASING IN THE PAST?

A.   I MEAN, IT'S POSSIBLE.  I SAW THE SOFT INQUIRIES FROM EXPERIAN, SO I CAN ASSUME THAT A PERSON WHO COMMITTED FRAUD MIGHT INSTALL THE APP, CREATED THE ACCOUNT, AND RECEIVED SOME NOTIFICATIONS, AND MAYBE THIS IS THE SAME NOTIFICATIONS LATER I GOT TO SEE IN MY APP.

Q.   SO YOU THINK THAT SOMEONE WHO COMMITTED FRAUD AGAINST YOU STARTING BACK IN 2015 HAD DOWNLOADED THE EXPERIAN APP IN OCTOBER OF 2022 AND THAT THEY WERE GETTING NOTIFICATIONS ABOUT CHANGES TO YOUR CREDIT SCORE?

A.   I DON'T KNOW WHEN ANYONE DOWNLOADED OR DOESN'T DOWNLOAD. I DON'T KNOW HOW THEY USED IT, RIGHT?

BUT I CAN SEE HISTORIC NOTIFICATIONS THAT IS NOT MINE.

WHEN I STARTED TO CREATE THE ACCOUNT, I SAID THAT IT WAS -- IT FELT LIKE I'M ACTUALLY -- LIKE THEY ARE CHECKING SOME INFORMATION ABOUT ME, LIKE I'M RESTORING THE ACCOUNT, YOU KNOW, RESTORING ACCESS TO THE ACCOUNT?  SO THAT WAS WEIRD.

AND, YEAH I SAW THESE NOTIFICATIONS.  THIS IS NOT MY NOTIFICATIONS.  THEY ARE NOT RELATED TO ME, SO I ASSUMED THESE NOTIFICATIONS ARE FRAUDULENT.

BUT WHAT SPECIFICALLY WAS INTERESTING FOR ME IN THIS CASE IS THAT THERE WAS ONE NOTIFICATION THAT THERE WAS A CREDIT SCORE THAT I SHOWED TO MY WIFE.

Q.   AND WHY WAS IT INTERESTING TO YOU THAT THE CREDIT SCORE THAT YOU SAY RELATED TO SOMEBODY ELSE'S ACTIVITY HAD INCREASED FROM POOR TO FAIR?

A.    IT'S NOT THAT I WAS INTERESTED IN THE CREDIT SCORE THAT WAS INCREASED.  THIS WAS THE ONLY NUMBER OF CREDIT SCORE THAT I SAW IN THE APP.

Q.    WELL, YOU SAW A SCORE FOR MAY 11TH, 2023; RIGHT?

A.    IT WAS -- SO THIS WAS THE ONLY NUMBER THAT I SAW IN THE APP THAT WAS SAYING THAT THIS IS YOUR SCORE.  SO FOR THE MAIN KIND OF SCREEN, I BELIEVE IT WAS JUST DASHES.

Q.    SO YOU'RE SAYING THAT YOU DOWNLOADED THE EXPERIAN APP IN MAY OF 2023 AND IT DIDN'T SHOW YOU A SCORE ON THAT DAY?

A.    I MEAN, IT SHOWED ME A SCORE.

Q.    WHAT WAS IT, SIR?

A.    THIS WAS THE SCORE I SAW.

Q.    SO IT ONLY SHOWED YOU THE SCORE THAT YOU HAD BACK IN JANUARY OF 2023?

A.    I MEAN, THIS IS THE ONLY SCORE THAT I SAW, AND I HAD SENT IT TO MY WIFE.

Q.    I GUESS YOU WERE HAPPY ABOUT THE FACT THAT IT WAS GOING UP AND THAT'S WHY YOU USED THE MUSCLE EMOJI WHEN YOU SENT IT TO HER?

A.    NO, THAT'S NOT CORRECT.

Q.    WHAT DOES THE MUSCLE EMOJI MEAN?

A.    THIS IS SARCASM.  THIS MEANS I HAD A SCORE THAT IS SO, SO LOW THAT I'M GOING TO BE EMBARRASSED TO SHOW IT TO ANYONE.

Q.    THIS IS YOUR SARCASTIC BACK AND FORTH WITH YOUR WIFE, THE MUSCLE EMOJI?

A.   THIS IS MY SARCASTIC MESSAGE, YES, TO MY WIFE.

Q.   OKAY.  YOU WEREN'T PLANNING ON UTILIZING A CREDIT SCORE THAT SOMEONE ELSE HAD DEVELOPED BEFORE YOU HAD CAME TO THE UNITED STATES TO GET CREDIT WHEN YOU GOT TO THE UNITED STATES, WERE YOU?

A.   NO.

Q.   THAT WASN'T YOUR PLAN?

A.   NO.

Q.   OKAY.  AND THEN CAN WE ZOOM OUT SO THAT THE JURY AND MR. PANCHENKO CAN SEE THE REST OF THE EXCHANGES WITH HIS WIFE.

SIR, I TRIED MY BEST TO GET A TRANSLATION OF THESE EXCHANGES, BUT MAYBE YOU COULD HELP US WITH IT.  THERE'S NOT TOO MUCH HERE IN UKRAINIAN.

YOUR WIFE, AFTER YOU SENT HER THE MUSCLE BICEPS EMOJI, SHE RESPONDS BACK; CORRECT?

A.   CORRECT.

Q.   IN UKRAINIAN.  AND WHAT DID SHE SAY?  COULD YOU TELL US IN ENGLISH?

A.   YEAH.  SHE'S SAYING THIS IS BAD, THIS IS REALLY BAD.

Q.   AND WHAT DID YOU UNDERSTAND HER TO BE REFERRING TO WHEN SHE SAID THIS IS BAD?

A.   THAT THIS IS A BAD CREDIT SCORE.

Q.   OKAY.  AND THEN YOU RESPOND BACK TO HER.  WOULD YOU MIND TELLING US IN ENGLISH WHAT YOUR RESPONSE BACK TO HER IS?

A.   YEAH.  I'M SAYING I KNOW AND SMILEY EMOJI.

Q.   AND THEN SHE RESPONDS BACK TO YOU.  WOULD YOU TELL US IN ENGLISH WHAT HER RESPONSE IS?

A.   SO SHE ASKED ME WHETHER I CALLED THEM.

Q.   AND WHO IS THE "THEM"?

A.   IN THIS CASE THIS IS EXPERIAN.

Q.   SO SHE WANTED TO KNOW WHETHER YOU HAD CALLED EXPERIAN OR NOT?

A.   YES.

Q.   OKAY.  AND THEN YOU RESPONDED TO HER; CORRECT?

A.   YES.

Q.   WOULD YOU MIND TELLING US WHAT YOUR RESPONSE WAS IN ENGLISH?

A.   YES.

Q.   WHAT WAS IT?

A.   SO, YEAH, I JUST CALLED THEM.  THERE IS, LIKE, CARELESS PEOPLE EVERYWHERE, BUT I DID DISPUTE ALL OF THIS ACCOUNT.  NOW I'M GOING TO BE WAITING FOR RESULTS.

Q.   OKAY.  DID YOU SAY "CARELESS PEOPLE EVERYWHERE"?

A.   YES.

Q.   OKAY.  WHO ARE THE CARELESS PEOPLE?

A.   SO IN THIS CASE THERE WAS A PERSON WHO I TALKED TO FROM EXPERIAN SIDE THAT I WAS ASKING ABOUT ALL OF THESE ACCOUNTS, BUT THEY -- AND I DON'T REMEMBER WHETHER AT THIS POINT I ALREADY BOUGHT THE PREMIUM OR NOT, BUT I WAS EXPECTING SOME HELP FROM THEM, BUT I DIDN'T RECEIVE NONE OF THE HELP, NONE OF

THE EXPLANATION.

SO THEY WAS KIND OF -- THEY WASN'T CARING THAT MUCH ABOUT WHAT I WAS ASKING THEM FOR.  THEY WAS JUST SAYING, LIKE, ARE YOU -- IS IT YOUR ACCOUNTS OR NOT YOUR ACCOUNTS?  LIKE, TELL US.

LIKE, I'M SAYING, IT'S NOT MY ACCOUNTS.

SO THEY WOULD JUST, YOU KNOW, DO SOME TYPE IN THERE AND DIDN'T PROVIDE ME INFORMATION OR ANYTHING ABOUT HOW THESE ACCOUNTS ACTUALLY APPEARED ON MY CREDIT REPORT.

Q.   AND WAS THAT FRUSTRATING FOR YOU?

A.   IT WAS SUPER FRUSTRATING, YES, AND CONFUSING.

Q.   MY TRANSLATION -- AND I DON'T SPEAK YOUR LANGUAGE -- BUT MY TRANSLATION THAT CAME UP WAS THAT THERE ARE IDIOTS EVERYWHERE, NOT THAT THERE ARE CARELESS PEOPLE.

DID YOU SAY THAT THERE ARE IDIOTS?

A.   NO, IT'S NOT THE RIGHT TRANSLATION, BECAUSE THIS IS DIMINUTIVE OF THE WORD, SO IT DOESN'T USE THAT WAY.

Q.   OKAY.  SO YOU JUST WERE TELLING HER THEY WERE CARELESS?

A.   THEY ARE CARELESS, YEAH.  BASICALLY I WAS KIND OF TELLING HER MY EXPERIENCE WITH THESE PEOPLE, HOW I WAS CALLING THEM, BUT THEY WAS KIND OF UNRESPONSIVE TO MY QUESTIONS.  INSTEAD OF PROVIDING ME WITH SOME GUIDANCE, I GOT NONE.

Q.   SO YOUR FRUSTRATION WAS ALREADY STARTING WITH EXPERIAN, RIGHT, IN MAY OF 2023; RIGHT?

A.   YES.

Q.   AND THEN A LITTLE BIT FARTHER DOWN YOU TEXT HER SOME LANGUAGE ALL IN ENGLISH; CORRECT?

A.   YES.

Q.   AND THAT'S THE, THAT'S THE NOTICE THAT YOU GOT FROM EXPERIAN ON THE APP THAT TOLD YOU THAT YOU HAD SUCCESSFULLY PUT A SECURITY ALERT ON YOUR FILE WITH EXPERIAN; RIGHT?

A.   YES, YES.

Q.   AND IT LOOKS LIKE YOU COPIED AND PASTED THAT NOTICE THAT YOU GOT FROM EXPERIAN AND YOU JUST SENT IT TO YOUR WIFE; CORRECT?

A.   I THINK I -- I DON'T REMEMBER -- I REMEMBER ALL THREE AGENCIES HAD A DIFFERENT WAY HOW YOU CREATE THIS NOTICE.

SO IT MIGHT BE THAT I COPY AND PASTED OR THAT I CREATED IT MYSELF AND SHARED IT WITH MY WIFE.

Q.   OKAY.  AND WE CAN LOOK AT THE EXPERIAN EXHIBIT A LITTLE BIT LATER.  I THINK -- I COULD BE WRONG, BUT I THINK THAT THE NOTICE ON YOUR EXPERIAN EXHIBIT -- AND WE CAN LOOK AT IT, IT IS 203.  THAT'S THE EXACT LANGUAGE.  BUT WE'LL DOUBLE CHECK THAT IN A MOMENT.

IN ANY EVENT, THEN THERE'S, BELOW THAT, AFTER YOU PASTED IT -- WELL, AFTER YOU SENT HER THAT NOTICE, THERE'S ALSO WHAT LOOKS TO BE A PASSWORD; RIGHT?

A.   YES.

Q.   AND WHAT IS THAT PASSWORD FOR?  WHAT DOES IT GET YOU INTO?

A.   I ACTUALLY DON'T REMEMBER WHAT WAS THIS PASSWORD FOR.

Q.   WAS IT -- DO YOU THINK IT WAS THE PASSWORD THAT YOU HAD TO USE TO LOG INTO THE FTC IDENTITY THEFT REPORT THAT YOU WERE CREATING ONLINE?

A.   NO.

Q.   OKAY.  BUT YOU WERE DOING THAT; RIGHT?  YOU WERE CREATING AN FTC IDENTITY THEFT REPORT ONLINE; CORRECT?

A.   SO ON THE 11TH OF MAY WE ARE AROUND THE TIME OF MOVING FROM ONE APARTMENT TO THE OTHER, SO THIS MIGHT BE LIKE A PASSWORD OR SOMETHING THAT I SHARED WITH HER.

Q.   OKAY.  SO YOU'RE PRETTY SURE IT WASN'T ANYTHING TO DO WITH THE FTC IDENTITY THEFT REPORT?

A.   NO.  I WOULDN'T SHARE, LIKE, ANY INFORMATION REGARDING FTC REPORT.

Q.   WITH YOUR WIFE?

A.   YEAH.

Q.   WHY NOT?

A.   LIKE, WHY WOULD I?  I, I JUST SHARED SOME INFORMATION ABOUT MY CREDIT SCORE.  SHE'S PROBABLY AT WORK.  I DON'T WANT TO BOTHER HER.

     AND WHY WOULD I SHARE ANY PASSWORDS?

Q.   OKAY.  BUT SHE WASN'T -- SO SHE WASN'T HELPING YOU WORK ON THE FTC IDENTITY THEFT REPORT AT THIS TIME?

A.   NO.

Q.   OKAY.  SO LET'S SEE.  SO SHE RESPONDS TO YOU, THOUGH, AFTER YOU SEND THE PASSWORD; RIGHT?

A.   CORRECT.

Q.   OKAY.  AND THEN CAN WE BLOW UP THE RESPONSE WHERE IT SAYS "FRAUDULENT APPLICATIONS."

DO YOU SEE THAT?

A.   YES.

Q.   AND SO THAT'S THE TEXT THAT SHE RESPONDS BACK AND SENDS TO YOU; RIGHT?

A.   YES.

Q.   AND THAT'S THE EXACT TEXT THAT APPEARS IN THE PERSONAL STATEMENT OF YOUR FTC IDENTITY THEFT REPORT; RIGHT?

A.   IT LOOKS FAMILIAR, YEAH.

Q.   WELL, IT'S EXACTLY THE SAME, ISN'T IT, SIR?

A.   I DON'T HAVE THE FTC REPORT IN FRONT OF ME, BUT IT LOOKS SIMILAR.

Q.   WELL, LET'S SEE IF IT'S THE SAME.  DO YOU STILL HAVE TRIAL EXHIBIT -- THE BINDER WITH TRIAL EXHIBIT 2 UP THERE?

AND IF YOU LOOK AT TRIAL EXHIBIT 2 AND YOU GO TO PAGE 475, I THINK YOU'LL GET IT.

CAN YOU GET TO PAGE 475?

A.   YES.

Q.   OKAY.  WE'RE GOING TO TRY AND PUT IT UP FOR THE JURY, TOO.

CAN YOU BLOW UP THE PERSONAL STATEMENT.

SO THAT'S THE -- ON EXHIBIT 2, WHICH WAS THE DOCUMENT THAT YOU SENT IN TO ALL OF THE CONSUMER REPORTING AGENCIES --

A.   UH-HUH.

Q.   -- YOU INCLUDED A COPY OF THE FTC FRAUD REPORT THAT YOU FILED UNDER PENALTY OF PERJURY WITH THE FEDERAL GOVERNMENT; RIGHT?

A.   CORRECT.

Q.   AND THIS IS A COPY OF IT, AND THAT'S THE PERSONAL STATEMENT THAT APPEARS IN YOUR IDENTITY THEFT REPORT THAT YOU FILED; RIGHT?

A.   YES.

Q.   AND THAT'S THE SAME TEXT, THAT'S THE SAME LANGUAGE THAT YOUR WIFE TEXTED BACK TO YOU ON MAY 11TH, 2023 IN THIS TELEGRAM EXCHANGE THAT WE'RE LOOKING AT; RIGHT?

A.   YES.

Q.   OKAY.  SO DOES THAT REFRESH YOUR MEMORY THAT SHE WROTE THAT LANGUAGE FOR YOU AND SENT IT TO YOU?

A.   NO.  LIKE, SHE WROTE THAT MESSAGE TO ME AND SENT IT TO ME, BUT WE PROBABLY DID IT WHILE I WAS DISCUSSING IN THE EVENING WITH HER, LIKE, ALL OF THE STUFF I WENT THROUGH THROUGHOUT THE DAY.

AND SHE MIGHT HAVE SUGGESTED SOMETHING AND JUST WROTE IT INSTEAD OF SAYING IT TO ME.

Q.   OKAY.  SO YOUR MEMORY IS NOW, LATER IN THE EVENING ON MAY 11TH, 2023, YOU WERE TALKING ABOUT WHAT YOU HAD BEEN TO DOING DURING THE DAY.  ONE OF THE THINGS THAT YOU MUST HAVE TALKED ABOUT WAS THAT YOU WERE FILLING OUT THE FTC FRAUD AFFIDAVIT?

A.   I'M NOT SURE I WAS DOING ANY FTC AT THIS POINT.

BUT I WAS DISCUSSING WITH MY WIFE PROBABLY THE EXPERIAN DISPUTES, AND IT MIGHT BE THAT SHE SHARED WITH ME THE -- SOMETHING WE DISCUSSED WITH HER ABOUT HOW THE STATEMENT IS SUPPOSED TO BE EITHER ON EXPERIAN OR OTHER CREDIT AGENCIES.

Q.   OKAY.  SO THE TWO OF YOU WERE WORKING TOGETHER ON THIS DISPUTE PROCESS IN MAY OF 2023; RIGHT?

A.   IT WAS NOT -- IT WASN'T WORKING TOGETHER.  SHE WAS JUST SUGGESTING SOMETHING.

Q.   OKAY.  AND IT TURNED OUT THAT HER SUGGESTION IS EXACTLY WHAT YOU LATER USED AND WORKED INTO YOUR FRAUD AFFIDAVIT WITH THE FTC; RIGHT?

A.   YES.

Q.   OKAY.  DO YOU STILL HAVE EXHIBIT 203 UP THERE?  IT'S PROBABLY IN THE BINDERS.  LET'S GO BACK TO EXHIBIT 203 JUST SO EVERYBODY -- WHILE YOU'RE FINDING IT, SIR, SO EVERYBODY REMEMBERS WHAT THIS IS, THIS IS YOUR CREDIT REPORT DATED MAY 11TH, 2023 THAT YOU GOT FROM EXPERIAN RIGHT AFTER YOU STARTED THIS PROCESS; RIGHT?

A.   YES.

Q.   OKAY.  WE LOOKED AT A LITTLE BIT OF THIS YESTERDAY, BUT LET'S TURN TO THE PAGE THAT TALKS ABOUT YOUR POTENTIALLY NEGATIVE ACCOUNT ACTIVITY.  I THINK IT'S THE SECOND PAGE.

DO YOU SEE THAT?

A.   YES, I CAN SEE THAT.

Q.   OKAY.  AND SO THESE ARE ACCOUNTS THAT EXPERIAN IS TELLING YOU APPEAR ON YOUR CREDIT REPORT AS OF MAY 11TH, 2023 THAT ARE POTENTIALLY NEGATIVE; CORRECT?

A.   THEY APPEAR UNDER THE TITLE, YEAH, "POTENTIAL NEGATIVE ACCOUNTS."

Q.   OKAY. AND IT LOOKS LIKE THE FIRST ONE IS A BANK OF AMERICA ACCOUNT THAT WAS PAID, CLOSED, WRITTEN OFF FOR $17,105; RIGHT?

A.   RIGHT.

Q.   OKAY.  AND THEN THERE'S THE NEXT ONE IS A CAVALRY PORTFOLIO SERVICE ACCOUNT, COLLECTION ACCOUNT, AND THE BALANCE WAS $4,633, AND IT SAYS PAST DUE AS OF APRIL 2023; CORRECT?

A.   CORRECT.

Q.   AND THEN IF WE GO TO THE NEXT PAGE, THEY CONTINUE; RIGHT?

THERE'S A JP MORGAN CHASE ACCOUNT LISTED THERE, CHARGED OFF.  THE BALANCE IS $33,377.  IT SAYS IT'S PAST DUE AS OF DECEMBER 18TH, EXCUSE ME, DECEMBER 2018; RIGHT?

A.   YES.

Q.   AND IT LOOKS LIKE THERE'S ANOTHER JP MORGAN CHASE CARD, RIGHT?  THE ACCOUNT IS CHARGED OFF WITH $49,957 BALANCE AND IT'S PAST DUE AS OF JANUARY 2019; RIGHT?

A.   YES, THAT'S CORRECT.

Q.   AND IT LOOKS LIKE THERE'S ANOTHER ONE FROM SOMETHING SYNCB/HOME.

DO YOU SEE THAT?

A.   YES.

Q.   AND DO YOU UNDERSTAND THAT'S SYNCHRONY BANK?

A.   I THINK I DIDN'T UNDERSTAND IT BACK THEN, BUT NOW I GUESS IT'S CORRECT.

Q.   NOW YOU UNDERSTAND THAT'S A SYNCHRONY BANK ACCOUNT AND IT'S LISTED AS CHARGED OFF FOR $3,770; CORRECT?

A.   YEAH.

Q.   OKAY.  AND THEN THE LAST ONE ON THE ACCOUNT IS FOR U.S. BANK ACCOUNT CHARGED OFF FOR $9,886; CORRECT?

A.   YES.

Q.   NOW, SIR, WE CAN DO THIS ON A CALCULATOR, AND IF I WERE BETTER AT MATH, I WOULD PROBABLY BE AN ENGINEER LIKE EVERYBODY ELSE IN MY FAMILY.

BUT I DID IT WITH A CALCULATOR.  I ADDED UP ALL OF THOSE NUMBERS, AND WHEN I ADDED THEM UP, THEY ADDED UP TO $118,728 OF BALANCES THAT WERE LISTED AS POTENTIALLY NEGATIVE ACCOUNTS ON YOUR MAY 11TH, 2023 EXPERIAN REPORT.

DOES THAT SOUND ABOUT RIGHT TO YOU?

A.   YEAH.  THAT'S A LOT OF ACCOUNTS THERE.  YEAH.

Q.   SO HOW DID THAT MAKE YOU FEEL?

A.   WELL, I'M NOT SPECIFICALLY LOOKING AT BALANCES AT THIS POINT BECAUSE NONE OF THE BANKS ASKED ME YET TO RETURN ANY OF THIS FRAUDULENT ACTIVITY MONEY.

SO FOR ME, I SEE FRAUDULENT ACCOUNTS OPENED IN MY NAME. WHEN YOU REALIZE THAT, YOU'RE KIND OF SCARED THAT SOMEONE CAN

DO THAT, RIGHT?

SO I'M WORRIED THAT IT'S POSSIBLE TO DO.  I HAVE A BUNCH OF THEM.  THEY'RE ALL FRAUDULENT.  I NEED TO DO SOMETHING.

SO THIS IS WHAT I FELT ON MAY 11TH.

Q.   OKAY.  SO YOU SAW ALL OF THESE -- IF MY ARITHMETIC IS CORRECT, THEY ADDED UP TO OVER $118,000 OF BALANCES, AND THE BALANCES DIDN'T CONCERN YOU AT ALL?

A.   WELL, NO, BECAUSE WHY WOULD YOU BE CONCERNED ABOUT BALANCES IF NONE OF THESE ACCOUNTS ARE YOURS?

Q.   RIGHT.  YOU KNOW THAT YOU DON'T OWE ANY OF THIS MONEY; RIGHT?

A.   SAY AGAIN.

Q.   WELL, YOU KNOW THAT YOU DON'T OWE ANY OF THIS MONEY; CORRECT?

A.   I KNOW THAT NONE OF THESE ACCOUNTS ARE MINE, YEAH.

Q.   SO YOU WEREN'T CONCERNED ABOUT THE SIZE OF THE BALANCES?

A.   I WASN'T CONCERNED ABOUT THE SIZE OF THE BALANCES, RIGHT.

Q.   OKAY.  AND THEN LET'S GO TO THE NEXT PAGE.

SO EXPERIAN, ON THE SAME CREDIT REPORT ON THE SAME DAY, HAS THIS GREEN SECTION, YOUR POSITIVE ACCOUNT ACTIVITY; RIGHT?

DO YOU SEE THAT?

A.   I CAN SEE COMENITY BELOW THE "POSITIVE ACCOUNT ACTIVITY" TITLE, YEAH.

Q.   IT SAYS, "GREAT JOB PAYING THESE ACCOUNTS ON TIME.  PAYMENT HISTORY IS THE BIGGEST FACTOR OF YOUR CREDIT SCORE";

RIGHT?

IS THAT WHAT EXPERIAN SAID?

A.   YES, THAT'S WHAT IS IN THE BOX, THAT'S CORRECT.

Q.   AND UNDER THE POTENTIALLY POSITIVE ACCOUNT ACTIVITY, THERE ARE TWO ACCOUNTS LISTED, RIGHT?  THERE'S A BARCLAYS ACCOUNT LISTED THERE?

A.   CORRECT.

Q.   AND THERE'S THE COMENITY ACCOUNT THAT BRINGS US HERE TODAY; RIGHT?

A.   CORRECT.

Q.   OKAY.  SO EXPERIAN WAS TELLING YOU IN MAY OF 2023 THAT THE COMENITY ACCOUNT WAS POTENTIALLY A POSITIVE ACCOUNT FOR YOUR CREDIT HISTORY; RIGHT?

A.   WELL, I DON'T KNOW WHAT EXPERIAN WANTED TO TELL ME BY SENDING ME THIS LETTER, BUT THIS COMENITY ACCOUNT APPEARED HERE UNDER THE POSITIVE ACCOUNT ACTIVITY.

IT APPEARED UNDER THE NEGATIVE ACCOUNT ACTIVITY AS A CHARGED OFF ACCOUNT BY OTHER CREDIT ENTITIES.

SO FOR ME, I LOOKED AT IT AS I HAVE A BUNCH OF FRAUDULENT ACCOUNTS ON MY CREDIT REPORT.  ON HERE IT APPEARS ON SOME POSITIVE ACCOUNT ACTIVITY.  ON OTHERS IT APPEARS AS NEGATIVE ACCOUNT ACTIVITY.

THERE'S SOME MESS THERE.  I MAY THINK THERE IS SOME MISTAKE THERE EVENTUALLY FOR THESE ACCOUNTS TO BE IN MY NAME ON MY CREDIT REPORT.  WHY WOULD THESE ACCOUNTS APPEAR ANYWHERE ON

MY CREDIT REPORT?

AND OBVIOUSLY THIS WASN'T GOOD FOR ME IN TERMS OF THIS ACCOUNT NOT ONLY APPEARS ON MY CREDIT REPORT, BUT IT ACTUALLY REPORTS AN ADDRESS, AND SOME OF THESE ADDRESSES LATER APPEARS AS A MAIN ADDRESS IN YOUR CREDIT REPORT.

AND SOME BANKS CAN USE THIS ADDRESS TO SEND LETTERS THERE AND COMMUNICATION.

SO ANOTHER CONCERN WAS, LIKE, SOME FRAUDULENT ADDRESSES, SOME PERSON, OR WHOEVER IS LIVING THERE, IS GOING TO RECEIVE SOME COMMUNICATIONS FROM IT THAT THE BANKS ARE SENDING ME.

LIKE, IT'S KIND OF SUPER BAD FOR ME.  SO THAT'S WHY I WAS CONCERNED ABOUT ANY FRAUDULENT INFORMATION ON MY CREDIT REPORT.

Q.   OKAY.  THANK YOU FOR THAT ANSWER.

BUT JUST TO BE CLEAR, ON MAY 11TH, 2023, WHEN YOU GOT THIS CREDIT REPORT, THAT'S THE FIRST CREDIT REPORT THAT YOU'VE TOLD US THAT YOU'VE EVER SEEN FOR YOU; RIGHT?

A.   WELL, IT -- I RECEIVED IT AFTER MAY 11TH, RIGHT?  THIS IS THE LETTER.

BUT, YEAH, IT WAS PROBABLY THE FIRST ONE I SAW, YES.

Q.   SO YOU WEREN'T LOOKING AT CREDIT REPORTS FROM OTHER AGENCIES TO CROSS-CHECK TO SEE IF YOU WERE LISTED AS A NEGATIVE ON SOME OTHER CREDIT REPORT, WERE YOU?

A.   OH, I MIGHT HAVE LOOKED AT OTHER AGENCIES BACK WHEN I RECEIVED THIS LETTER, OF COURSE.

Q.   ARE YOU SURE?

A.   YEAH.

Q.   WELL, WE'LL TRY TO FIND THOSE.

SO HOW DID THAT MAKE YOU FEEL WHEN EXPERIAN TOLD YOU THAT MY CLIENT'S ACCOUNT WAS A POTENTIALLY POSITIVE ACCOUNT?

A.   I MEAN, I WAS CONFUSED.  WHAT DOES IT MEAN TO HAVE A POSITIVE ACCOUNT THAT IS FRAUDULENT?

SO I DIDN'T PAY MUCH ATTENTION FOR THESE GREEN WORDS THAT SAYS POSITIVE ACCOUNT ACTIVITY.

Q.   OKAY.

A.   I HAVE A FRAUD, I NEED TO DEAL WITH IT.

Q.   OKAY.  DO YOU HAVE EXHIBIT 201 IN THAT SAME BINDER, SIR?

A.   YES.

Q.   AND THAT'S ANOTHER NOTICE THAT WAS SENT TO YOU ON MAY 11TH, 2023 BY EXPERIAN WHEN YOU STARTED THIS PROCESS WITH THEM; CORRECT?

A.   YES.

Q.   OKAY.

I DON'T BELIEVE THERE'S ANY OBJECTION TO THIS, YOUR HONOR. I WOULD LIKE TO MOVE IT INTO EVIDENCE.

MR. LOKER:  CORRECT.  NO OBJECTION, YOUR HONOR.

THE COURT:  ALL RIGHT.  EXHIBIT 201 WILL BE MOVED INTO EVIDENCE.

(DEFENDANT'S EXHIBIT 201 WAS RECEIVED IN EVIDENCE.)

MR. NARITA:  CAN WE SHOW THAT TO THE JURY.  OKAY.

Q.   SO, SIR, THIS IS ONE OF THE NOTICES THAT YOU GOT FROM

EXPERIAN ON MAY 11TH, 2023; RIGHT?

A.   YEAH, SOMETIME AFTER MAY 11TH.

Q.   AND WE'RE GOING TO BE MERCIFUL TO EVERYBODY HERE IN THE COURTROOM.  WE'RE NOT GOING TO READ THIS WHOLE THING.  THERE'S A LOT OF PRINT HERE.

     BUT COULD WE BLOW UP PARAGRAPH 5 SO WE COULD READ THAT A LITTLE BIT BETTER.

     OKAY.  SO HERE'S WHAT'S -- ONE OF THE THINGS THAT EXPERIAN IS TELLING YOU TO DO IF YOU BELIEVE THAT INFORMATION IN YOUR FILE COMES FROM IDENTITY THEFT; RIGHT?

A.   YEAH.

Q.   OKAY.  SO THEY'RE GIVING YOU SOME STEPS ABOUT WHAT THEY WANT YOU TO SEND TO THEM; RIGHT?

A.   CAN I READ IT?

Q.   OH, I'M SORRY.  GO AHEAD AND READ IT.

A.   YEAH.

Q.   IT'S A LOT OF TEXT.

     (PAUSE IN PROCEEDINGS.)

          THE COURT:  ONE MOMENT, MR. NARITA.  I SEE A COUPLE OF THE JURORS STRAINING THEIR NECK.

     IF IT'S HELPFUL, YOU'RE WELCOME TO MOVE FROM THE SECOND ROW TO THE SEAT IN THE FRONT AS WELL.

          MR. NARITA:  THANK YOU, YOUR HONOR.

          THE WITNESS:  YES.

BY MR. NARITA:

Q.   OKAY.   HAVE YOU HAD A CHANCE TO READ PARAGRAPH 5?

A.   YES.

Q.   OKAY.   GREAT.   SO THESE ARE SOME STEPS THAT EXPERIAN IS ASKING YOU TO FOLLOW TO PROVIDE THEM WITH A LETTER TO LAY OUT YOUR CLAIM OF IDENTITY THEFT; RIGHT?

A.   MY UNDERSTANDING IS THAT THIS IS THEIR SUGGESTION, FOR ME TO -- IF I BELIEVE THAT THERE IS AN IDENTITY THEFT, I NEED TO NOTIFY THEM, YES.

Q.   OKAY.   AND THEY WANT YOU TO IDENTIFY WHAT INFORMATION THAT YOU WANT BLOCKED, PROVIDE PROOF OF YOUR IDENTITY, AND PROVIDE A COPY OF YOUR IDENTITY THEFT REPORT; RIGHT?

A.   YES.

Q.   OKAY.   AND ULTIMATELY YOU DID THAT, BUT YOU DIDN'T DO IT UNTIL AUGUST OF 2023; RIGHT?

A.   NO, THAT'S NOT CORRECT.

Q.   OKAY.   WELL, WE SAW TRIAL EXHIBIT 2 WE WERE LOOKING AT; RIGHT?   THAT'S THAT LONG EXHIBIT.

     AND WE SAW TRIAL -- THE ONE WHERE YOU PUT IN YOUR IDENTITY THEFT REPORT AND YOU SENT IT IN TO THE CONSUMER REPORTING AGENCIES; RIGHT?

A.   YEAH.

Q.   AND YOU SENT IT TO ALL THREE OF THEM I THINK IN AUGUST OF 2023; RIGHT?

A.   YES.

Q.   OKAY.   SO YOU GOT THIS NOTICE FROM EXPERIAN AND YOU

RESPONDED WITH EVERYTHING THAT THEY WANTED IN AUGUST OF 2023;

CORRECT?

A.   NOT CORRECT.

Q.   OKAY.  WELL --

A.   I SENT IN MY DISPUTES BEFORE THAT.  I CREATED THE DISPUTES

OVER THE PHONE AND SEND THEM OVER ALL OF THE RECOMMENDATION.

THE ONE YOU'RE REFERRING FOR WAS ONE OF THE LAST ONES I

SENT IN AUGUST AND IT WAS ONE OF THE FULLEST BECAUSE I COLLECT

A BUNCH OF ADDITIONAL SUPPORTING DOCUMENTS.

BUT IT WASN'T THE FIRST ONE I SENT TO EXPERIAN.

Q.   OKAY.  BUT WHEN YOU, WHEN YOU PROVIDED THE SUPPORTING

DOCUMENTS THAT EXPERIAN HAD ASKED FOR, THEN THEY BLOCKED ALL OF

THOSE ACCOUNTS, INCLUDING THE COMENITY ACCOUNT, FROM YOUR

CREDIT REPORT; RIGHT?

A.   NO.

Q.   DIDN'T THEY BLOCK THE ACCOUNTS ON AUGUST 16TH, 2023 FROM

YOUR CREDIT REPORT?

A.   THEY MAY HAVE BLOCKED SOME ACCOUNTS ON AUGUST 16TH, OR

AROUND AUGUST.  I DON'T REMEMBER WHETHER THEY BLOCKED ALL OF

THEM OR ONLY PARTIALLY.  BUT THEY DID NOT BLOCK ACCOUNTS BEFORE

IT WHEN I PROVIDED THEM ALL OF THE SAME INFORMATION.

Q.   I SEE.  SO YOU THINK THAT YOU HAD ALREADY PROVIDED

EXPERIAN WITH EVERYTHING THAT THEY ASKED FOR IN PARAGRAPH 5

BEFORE THAT?

A.   OF COURSE.

Q.   OKAY.  IS EXHIBIT 212 IN THE BINDER IN FRONT OF YOU, SIR?

A.   212, YES.

Q.   OKAY.  SIR, EXHIBIT 212 IS A DOCUMENT ENTITLED "YOUR DISPUTE RESULTS," AND IT'S DATED JUNE 1ST, 2023, AND IT WAS SENT FROM EXPERIAN TO YOU; CORRECT?

A.   CORRECT.

Q.   OKAY.  AND THAT'S YOUR CORRECT ADDRESS THERE; RIGHT?

A.   YES.

Q.   AND YOU RECEIVED EXHIBIT 212?

A.   YEAH.

MR. NARITA:  YOUR HONOR, I DON'T THINK THERE'S ANY OBJECTION.  I MOVE IT INTO EVIDENCE.

MR. LOKER:  THERE ARE NO OBJECTIONS TO THEIR EXHIBITS, YOUR HONOR.  WE'RE OKAY WITH EVERYTHING.

MR. NARITA:  THANK YOU.

THE COURT:  IT'S ADMITTED.

(DEFENDANT'S EXHIBIT 212 WAS RECEIVED IN EVIDENCE.)

MR. NARITA:  CAN WE SHOW EXHIBIT 212.  GREAT.

Q.   SO YOU STARTED THE PROCESS OF DISPUTING THESE ACCOUNTS ON MAY 12TH, 2023 WITH EXPERIAN, AND THEN YOU GOT THIS LETTER BACK FROM THEM ON JUNE 1ST, 2023; CORRECT?

A.   I STARTED TO DISPUTE ALL OF THESE ACCOUNTS IN EARLY MAY, AND, YES, I RECEIVED THIS SOMETIME AFTER JUNE 1ST, YES.

Q.   OKAY.  AND THEY'RE PROVIDING YOU WITH ALL OF THE RESPONSES THAT THE VARIOUS CREDITORS HAD MADE, INCLUDING COMENITY;

CORRECT?

A.   YES.

Q.   OKAY.

A.   THESE ARE THE RESULTS OF THE DISPUTE, YEAH.

Q.   AND AGAIN, IF WE GO TO PAGE 137, WHICH IS A FEW PAGES IN, AT THE BOTTOM THERE OF PAGE 137, SIR, THEY START AGAIN ADVISING YOU OF WHAT YOUR POTENTIALLY NEGATIVE ACCOUNT ACTIVITY IS; CORRECT?

A.   WHAT PAGE DID YOU SAY?

Q.   I'M SORRY.  THE BOTTOM PAGE SHOULD BE 137 IN THE BOTTOM RIGHT HAND CORNER.

A.   YES, "YOUR POTENTIALLY NEGATIVE ACCOUNT ACTIVITY."

Q.   CORRECT.  AND IF YOU TURN TO THE NEXT PAGE, YOU'LL SEE THAT THEY LIST, AGAIN, THE U.S. BANK, THE JP MORGAN CHASE, THE CAVALRY ACCOUNT AMONGST YOUR POTENTIALLY NEGATIVE ACCOUNT ACTIVITY; RIGHT?

A.   YES.

Q.   AND THEN ONE MORE PAGE IF YOU TURN IN, IT LISTS YOUR POSITIVE ACCOUNT ACTIVITY; CORRECT?

A.   YES, IT SAYS "YOUR POSITIVE ACCOUNT ACTIVITY," YES.

Q.   AND ONE OF THE ACCOUNTS THEY LIST THERE IS THE COMENITY ACCOUNT; RIGHT?

A.   YES.

Q.   OKAY.  AND HOW DID THAT MAKE YOU FEEL WHEN YOU GOT THAT?

A.   THE SAME AS BEFORE I FIRST STATED, BECAUSE I HAVE

FRAUDULENT ACCOUNTS ON MY CREDIT REPORT STILL.

Q.   OKAY.   NOW, YOU WENT TO THE POLICE STATION A FEW WEEKS LATER; RIGHT?   THIS IS JUNE 1ST, 2023, AND YOU WENT TO THE POLICE STATION ON JUNE 13TH, 2023; RIGHT?

A.   ABOUT THAT TIME, YES.

Q.   OKAY.   WE CAN LOOK AT THE POLICE REPORT, BUT I'M PRETTY SURE THAT THE DATE OF THE REPORT IS JUNE 13TH, 2023.

DOES THAT SOUND RIGHT TO YOU?

A.   YEAH.

Q.   OKAY.   NOW, WHEN YOU WENT TO THE POLICE STATION, DID YOU BRING ANY OF YOUR, YOUR CREDIT REPORTS THAT EXPERIAN HAD BEEN SENDING WITH YOU?

A.   I DON'T REMEMBER WHETHER OR NOT I BROUGHT ANYTHING TO THE POLICE DEPARTMENT.   IT WAS A NEW EXPERIENCE FOR ME, SO I DON'T KNOW WHETHER I THOUGHT I NEEDED TO BRING ANYTHING.

BUT IT DEFINITELY -- I REMEMBER I DEFINITELY SENT TO THE POLICE ALL OF THE DOCUMENTATION THAT THEY REQUESTED FROM ME.

SO THEY REQUESTED PROBABLY SOME FTC REPORTS LATER, OR SOME OTHER DOCUMENTATION.   I SENT ALL OF THE INFORMATION THAT THEY REQUESTED, I SENT IT TO THEM.

Q.   UNDERSTOOD.   SO YOU VISITED THE POLICE STATION ON JUNE 13TH, 2023, AND THEN THEY ASKED YOU TO SEND SOME MORE INFORMATION AFTER THAT; CORRECT?

A.   YES.

Q.   OKAY.   AND YOU DID SEND THEM MORE INFORMATION; CORRECT?

Case 5:23-cv-04965-EKL  Document 234  Filed 11/10/25  Page 54 of 230  363
PANCHENKO CROSS BY MR. NARITA (RESUMED)

A.   YES.

Q.   DID ANY OF THE INFORMATION THAT YOU GAVE THE POLICE OFFICER, EITHER AT THE POLICE STATION OR AFTERWARDS, TELL THE POLICE OFFICER THAT THE COMENITY ACCOUNT WAS BEING REPORTED AS POTENTIALLY ONE OF YOUR POSITIVE ACCOUNTS?

A.   I DON'T KNOW.

Q.   DO YOU REMEMBER THAT?

A.   LIKE, I DON'T KNOW WHETHER ANY DOCUMENTATION THAT I SENT TO THE POLICE WAS HAVING COMENITY REPORT AS POSITIVE OR NEGATIVE THERE.

Q.   OKAY.  DO YOU REMEMBER TALKING TO THE POLICE OFFICER AND TELLING HIM THAT COMENITY'S ACCOUNT WAS ACTUALLY REPORTING AS A POSITIVE ACCOUNT ON YOUR EXPERIAN REPORT?

A.   I REMEMBERED TALKING TO POLICE AND SAYING THAT I HAVE FRAUDULENT ACCOUNTS AND ADDRESSES AND JOB POSITIONS AND TELEPHONE NUMBERS THAT REPORTED ON MY CREDIT REPORT, AND I WAS REPORTING EVERYTHING AS FRAUD.

Q.   OKAY.  DO YOU HAVE 216 IN YOUR BINDER?

A.   YES.

Q.   EXHIBIT 216 IS ANOTHER EXPERIAN CREDIT REPORT.  THIS ONE IS DATED JUNE 21ST, 2023; CORRECT?

A.   YES.

Q.   AND YOU RECEIVED THIS REPORT; CORRECT?

A.   YES.

Q.   OKAY.

UNITED STATES COURT REPORTERS

YOUR HONOR, MAY IT BE ADMITTED?

THE COURT:  SO ADMITTED.

(DEFENDANT'S EXHIBIT 216 WAS RECEIVED IN EVIDENCE.)

MR. NARITA:  SHOW THIS ONE.

Q.   SO THIS ONE IS DATED AFTER YOU GOT BACK FROM THE POLICE STATION; CORRECT?

A.   I ASSUME IT'S PROBABLY SOME DAY AFTER JUNE 21ST, 2023.

Q.   OKAY.  SO THAT WAS AFTER YOU HAD GONE IN TO THE MOUNTAIN VIEW POLICE DEPARTMENT AND MADE YOUR REPORT TO THE POLICE; RIGHT?

A.   YEAH, I GUESS SO.

Q.   OKAY.  AND, AGAIN, THIS IS SHOWING A LIST OF POTENTIALLY NEGATIVE ACCOUNT ACTIVITY.  THERE ARE THREE LISTED THERE; RIGHT?  THE CAVALRY ACCOUNT, ONE OF THE JP MORGAN CHASE ACCOUNTS, AND THE U.S. BANK ACCOUNT, RIGHT, IF YOU TURN INTO THE REPORT?

A.   YES.

Q.   AND THEN AGAIN UNDER THE POSITIVE ACCOUNT ACTIVITY, IT LISTS THE BARCLAYS ACCOUNT AND THE COMENITY ACCOUNT; RIGHT?

A.   YES.

Q.   AND HOW DID THAT MAKE YOU FEEL?

A.   THE SAME.  AGAIN, I RECEIVED ANOTHER CREDIT REPORT FROM EXPERIAN THAT SAYS THAT I HAVE A FRAUDULENT ACCOUNT ON MY CREDIT REPORT.

Q.   OKAY.  THERE'S A BUNCH OF BINDERS IN THIS CASE, SIR.  DO

YOU HAVE THE BINDER WITH TRIAL EXHIBIT 1 UP THERE, OR NOT?

IT'S THE VERY FIRST EXHIBIT.

A.   SO I HAVE ONE THAT SAYS IDENTITY THEFT, FEDERAL COMMISSION

LETTER.

Q.   ALL RIGHT.

A.   IS THAT CORRECT?

Q.   IT SHOULD, IT SHOULD START WITH A DATE OF JUNE 27TH, 2023

AT THE TOP; CORRECT?

A.   YES.

Q.   AND IT'S ADDRESSED TO COMENITY; CORRECT?

A.   YES.

Q.   AND THEN IS THERE THAT RED -- I THINK IT'S IN EVIDENCE SO

WE CAN SHOW IT -- THERE'S A RED STAMP ON IT THAT SAYS "SORTED"

ON THE RIGHT-HAND SIDE.

     DO YOU SEE THAT?

A.   YES.

Q.   AND THE DATE IS JULY 6TH, 2023; CORRECT?

A.   YEAH.

Q.   OKAY.  SO IS THIS EXHIBIT 1 A LETTER THAT YOU MAILED

DIRECTLY TO MY CLIENT?

A.   YEAH.  SO THIS -- LIKE, THIS LETTER IS SOMETHING THAT I

MAILED TO COMENITY.

Q.   OKAY.  AND WHEN DID YOU MAIL IT?

A.   I DON'T REMEMBER THE EXACT DATE WHEN I WAS MAILING THEM.

I REMEMBER I WAS MAILING MULTIPLE TIMES.

AS SOON AS I GET AN UNDERSTANDING OF WHAT I NEED TO MAIL, AND TO WHAT ADDRESS, SO I HAVE THIS INFORMATION, FOR EXAMPLE, ON THE PHONE OR SOMEWHERE ELSE, I WOULD MAIL ALL OF THE INFORMATION THAT I HAVE TO DIFFERENT BANKS.

SO AT SOME POINT I VERIFIED THE RIGHT ADDRESS TO MAIL TO COMENITY AND I MAILED THEM, AND THEN I JUST REPEATED THAT MULTIPLE TIMES.

Q.   OKAY.  BUT -- SO THIS IS -- TO BE CLEAR, THIS IS THE ONLY LETTER THAT MY CLIENT HAS THAT IT EVER RECEIVED FROM YOU.

DO YOU THINK YOU HAVE ANOTHER LETTER THAT YOU SENT DIRECTLY TO MY CLIENT THAT WE HAVEN'T SEEN?

A.   OF COURSE.  I SENT MULTIPLE TIMES LETTER TO COMENITY.

Q.   WELL, DID WE GO OVER THEM YESTERDAY WITH MR. LOKER?

A.   NO.  I SENT THEM TO COMENITY.

Q.   OKAY. SO THIS IS, THIS IS THE ONLY ONE THAT WE HAVE HERE TODAY, SO WHY DON'T WE TAKE A LOOK AT THIS ONE.  OKAY?

A.   SURE.

Q.   OKAY.  SO YOU THINK YOU MAILED THIS LETTER SOMETIME AFTER JUNE 27TH, 2023?

A.   I DON'T REMEMBER THE EXACT DATE, BUT I MAILED IT SOMETIME DEFINITELY IN THE SUMMER OF 2023, YEAH.  AS SOON AS -- SO THIS LETTER GENERATED WITH FTC, SO THIS WAS AFTER I REGISTERED THIS FRAUDULENT ACCOUNT AND CREATED THIS FTC ACCOUNT, GENERATED LETTERS AND SENT THEM.

Q.   OKAY.  SO IS THIS LIKE A FORM THAT THE FTC'S WEBSITE SORT

OF GENERATES FOR YOU?

A.   IT'S LIKE A CHECKLIST.  IT LOOKS LIKE A CHECKLIST.

Q.   OKAY.  BUT HOW DO THESE, HOW DO THESE LETTERS GET GENERATED?  BECAUSE YOU CAN SEE -- IT'S A LITTLE FADED, BUT YOU CAN SEE IN THE UPPER LEFT SIDE IT SAYS FEDERAL TRADE COMMISSION IDENTITYTHEFT.GOV; RIGHT?

A.   YES.

Q.   SO IS THIS A FORM THAT YOU FILL IN AND AT THE END OF THE PROCESS IT PRINTS OUT FOR YOU?

A.   SO THE PROCESS IS THAT FIRST YOU CREATE THE FTC ACCOUNT AND THEY ALLOW YOU TO ADD A LIMITED AMOUNT OF FRAUDULENT ACCOUNTS THERE, SO YOU ADD THE ACCOUNTS THAT YOU REPORT AS FRAUDULENT.

     AND THEN THEY GIVE YOU A CHECKLIST YOU NEED TO GO THROUGH IN ORDER TO RECOVER FROM THAT.

     BASICALLY WHAT IT SAYS IS THAT TAKE THESE LETTERS AND SEND IT TO THIS BANK.  TAKE THESE LETTERS AND SEND IT TO THIS BANK.

     AND THEN WAIT UNTIL THE BANK RESPONDS TO YOU WITH THIS LETTER.  THE LETTER IS SUPPOSED TO SAY THIS AND THAT.

     SO THE LETTER IS SUPPOSED TO SAY THAT YOU ARE NOT LIABLE FOR THE ACCOUNT.

     AND THEN DO SOMETHING ELSE.

     SO THIS WAS LIKE A CHECKLIST TO GO THROUGH.

Q.   OKAY.  SO IT'S, IT'S A FORM LETTER THAT GETS GENERATED AS PART OF THE FTC'S CHECKLIST?

A.   THIS IS A LETTER THAT GETS GENERATED, YEAH, THAT CHECKLIST, YEAH.

Q.   OKAY.  AND THE LETTER STARTS OUT BY SAYING, "DEAR SIR OR MADAM.

"I PREVIOUSLY NOTIFIED YOU THAT I AM A VICTIM OF IDENTITY THEFT AND REQUESTED YOU TO DO THE FOLLOWING:

"CLOSE THE UNAUTHORIZED ACCOUNT;

"REMOVE ANY CHARGES ON THE UNAUTHORIZED ACCOUNT; AND,

"TAKE STEPS TO REMOVE INFORMATION ABOUT THIS INFORMATION FROM MY CREDIT FILES."

CORRECT?

A.   CORRECT.

Q.   OKAY.  HAD YOU ACTUALLY PREVIOUSLY MADE THAT REQUEST DIRECTLY TO MY CLIENT?

A.   OF COURSE.  I SENT LETTERS.  SO I BELIEVE -- IT WAS A LONG TIME AGO, BUT I BELIEVE THAT IT MIGHT BE THE FTC ACTUALLY PROVIDES YOU WITH MULTIPLE LETTERS TO SEND.  SO -- AND MULTIPLE LETTERS THAT THEY GENERATE.

SO WHAT I WAS SAYING BEFORE, I IDENTIFIED COMENITY AND I SEND MAILS TO COMENITY MULTIPLE TIMES, AS I DID FOR ALL OF THE BANKS.

AND THIS MIGHT NOT BE THE FIRST LETTER THAT I SENT.  IT PROBABLY WAS NOT THE FIRST ONE.  IT WAS LIKE MAYBE THE SECOND ONE.

SO, YEAH, THAT'S WHY IT STATES WHAT I PREVIOUSLY STATED I

NOTIFIED.

Q.   OKAY.  WE HAVEN'T -- SO FAR IN THIS TRIAL, WE HAVEN'T SEEN AN EARLIER LETTER THAT YOU SENT TO MY CLIENT, AND I'M NOT AWARE OF ANY OTHER LETTER OTHER THAN THIS ONE.

AND SO ARE YOU CERTAIN THAT YOU MAILED AN EARLIER LETTER TO COMENITY?

A.   YES, I CERTAINLY -- SO EVERYTHING I STATED I'M CERTAIN OF. I PREVIOUSLY, BEFORE THAT DATE, I NOTIFIED COMENITY.  I NOTIFIED COMENITY ABOUT THIS FRAUD AND I REQUESTED TO REMOVE IT.

Q.   BY MAILING US A LETTER THAT SAID ALL OF THESE THINGS?  IS THAT YOUR TESTIMONY?

A.   I BELIEVE SO.

THE COURT:  MR. NARITA, IN TERMS OF TIMING, I'M THINKING ABOUT FIVE TO TEN MINUTES IN TERMS OF A BREAK.

MR. NARITA:  THAT'S GREAT, YOUR HONOR.  THANK YOU FOR THE ADVISEMENT.

THE COURT:  WHATEVER WORKS WELL.

MR. NARITA:  THANK YOU.

Q.   AND ON THIS EXHIBIT 1, WHICH IS DATED JUNE 27TH, 2023, I NOTICE YOU DIDN'T INCLUDE A COPY OF THE POLICE REPORT THAT YOU FILED JUNE 13TH, 2023.  RIGHT?

A.   I MAY NOT INCLUDE THE COPY, YES.

Q.   OKAY.  WHY NOT?

A.   I MIGHT NOT HAVE HAD THE POLICE REPORT BACK THEN.

Q.   SO YOU DON'T THINK YOU HAD THE POLICE REPORT FROM JUNE 13TH, 2023 IN YOUR POSSESSION AS OF JUNE 27TH, 2023?

A.   SO AS SOON AS I GOT A POLICE REPORT ON HAND, I STARTED SENDING THEM TO THE BANKS AND TO THE CREDIT AGENCIES.

AS I STATED BEFORE, IT WAS SOMETIME AFTER I WENT TO THE POLICE DEPARTMENT TO THE TIME WHEN THEY ACTUALLY ALLOWED ME TO REQUEST, AND THEN SOME TIME UNTIL THEY GENERATED IT.

SO THEY GENERATED IT AT SOME TIME, AND I START SENDING IT, BUT I COULDN'T SEND IT BEFORE THEY PROVIDED ME WITH THE REPORT.

Q.   OKAY.  SO IF YOU HAD HAD THE REPORT IN YOUR POSSESSION AS OF JUNE 27TH, 2023, YOU WOULD HAVE SENT IT IN TO MY CLIENT; RIGHT?

A.   YES.

Q.   OKAY.  SO DOES IT STAND TO REASON THEN, SIR, THAT YOU DIDN'T HAVE A COPY OF YOUR POLICE REPORT AS OF JUNE 27, 2023?

A.   I WAS TRYING MY BEST TO SEND ANYTHING THAT CAN HELP TO INVESTIGATE THIS TO ALL OF THE PARTIES AT ANY TIME.

SO, YEAH, I TRIED TO INCLUDE AS MUCH INFORMATION AS POSSIBLE AND SEND THEM TO THE BANKS AND TO THE CREDIT AGENCIES.

Q.   OKAY.  BUT AS BEST WE CAN TELL, AT LEAST FROM THIS -- FROM WHAT IS BEFORE US HERE AND WHAT IS YOUR MEMORY, YOU DIDN'T SEND THE POLICE REPORT TO MY CLIENT ON JUNE 27TH, 2023, PROBABLY BECAUSE YOU DIDN'T HAVE A COPY OF IT; RIGHT?

A.   I MIGHT NOT HAVE HAD A COPY, YES.

Q.   WHICH MEANS THAT YOU WOULDN'T HAVE BEEN ABLE TO SEND IT

BEFORE JUNE 27TH, 2023; RIGHT?

A.   YEAH.  I DON'T REMEMBER WHEN I GOT THE COPY, YES.

MR. NARITA:  OKAY.  YOUR HONOR, THIS WOULD PROBABLY BE A GOOD TIME FOR THE BREAK IF THAT WORKS FOR THE COURT.

THE COURT:  ALL RIGHT.  SO, MEMBERS OF THE JURY, WE'RE GOING TO TAKE A 15 MINUTE BREAK, AND WE'LL SEE YOU BACK AFTER THE BREAK.

(JURY OUT AT 10:14 A.M.)

THE COURT:  MR. PANCHENKO, YOU'RE EXCUSED FROM THE WITNESS STAND.

ALL RIGHT.  I ASSUME THAT THERE WASN'T ANYTHING FURTHER TO SAY ON THE RECORD, COUNSEL.

SO WE'RE CURRENT -- WE ARE ON THE RECORD STILL.  THE JURORS ARE NOT PRESENT, AND WE'RE JUST HERE WITH THE PARTIES AND COUNSEL.

EVERYONE MAY BE SEATED.

MR. NARITA, WAS THERE SOMETHING THAT YOU WANTED TO RAISE?

MR. NARITA:  NO, NOT AT THIS TIME, YOUR HONOR.  I'M SORRY IF I MISCOMMUNICATED THAT.

THE COURT:  WHEN YOU GET TO THAT PODIUM, I JUST ASSUME THAT YOU WANT TO TELL ME SOMETHING.

MR. NARITA:  NO.  I ASSUMED I MOVED OUT OF MR. LOKER'S POSITION.

THE COURT:  MR. LOKER, IS THERE ANYTHING YOU WOULD LIKE TO PUT ON THE RECORD?

MR. LOKER:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  WONDERFUL.  THEN WE WILL ALL TAKE A 15 MINUTE BREAK.

MR. LOKER:  THANK YOU, YOUR HONOR.

(RECESS FROM 10:15 A.M. UNTIL 10:32 A.M.)

(JURY IN AT 10:32 A.M.)

THE COURT:  YOU MAY BE SEATED.

THE COURT IS NOW BACK IN SESSION.  THE WITNESS IS BACK ON THE STAND.  THE JURY IS PRESENT, AS WELL AS COUNSEL AND THE PARTIES.

MR. NARITA, YOU MAY CONTINUE.

MR. NARITA:  THANK YOU.

Q.   MR. PANCHENKO, YESTERDAY WHEN YOU WERE TESTIFYING FOR MR. LOKER, WE ALL LISTENED TO SOME CALL RECORDINGS.

DO YOU REMEMBER THAT?

A.   YES.

Q.   AND SOME OF THE CALL RECORDINGS HAD YOUR VOICE ON THEM; CORRECT?

A.   CORRECT.

Q.   OKAY.  AND THE PARTIES HAVE BEEN WORKING TOGETHER THROUGH THEIR COUNSEL TO COME TO SOME AGREEMENTS ABOUT EXHIBIT NUMBERS AND SO FORTH, SO I'M GOING TO ASK YOUR COUNSEL TO CONFIRM THIS, BUT I BELIEVE WE AGREED YESTERDAY THAT THE CALL RECORDINGS THAT WE HEARD AS TRIAL EXHIBIT 49 AND TRIAL EXHIBIT 50, THERE WERE TWO OF THEM, BUT THEY WERE ACTUALLY PART OF ONE PHONE CALL

WHERE YOU WOULD TRANSFER FROM ONE AGENT TO ANOTHER.

DO YOU KNOW THAT FROM YOUR OWN MEMORY?  AND IT'S OKAY IF YOU DON'T, BUT I'M JUST ASKING.

A.    YEAH.  SO OBVIOUSLY I REMEMBER THAT IN MANY CALLS WITH THESE BANKS, I WAS TRANSFERRED BETWEEN AGENTS.  SO IT'S POSSIBLE THAT I TALKED TO ONE PERSON AND THEN TRANSFERRED AND TALKED TO ANOTHER ONE.

MR. NARITA:  OKAY.  YOUR HONOR, AT THIS TIME I WOULD JUST ASK THAT MR. LOKER CONFIRM, AND I THINK HE WILL, THAT TRIAL EXHIBITS 49 AND 50 FROM YESTERDAY WERE TWO SEPARATE RECORDINGS, BUT THEY WERE FROM THE SAME CALL THAT WAS MADE FROM MR. PANCHENKO TO COMENITY ON JUNE 30TH, 2023.

THE COURT:  SO, COUNSEL, WE STIPULATED TO THAT.  THE PARTIES STIPULATED TO THAT ON THE RECORD, AND THE COURT ENTERED THAT STIPULATION.

MR. NARITA:  MY APOLOGIES.

THE COURT:  WE STATED IT ON THE RECORD.

AND I THINK -- MR. LOKER IS NODDING, AND I THINK WE'RE ALL ON THE SAME PAGE THAT EXHIBITS 49 AND 50 WERE PART OF THE SAME CALL ON JUNE 30TH, 2023.

MR. NARITA:  OKAY.  THANK YOU.

Q.    AND, SIR, WE LISTENED TO THOSE CALLS YESTERDAY, SO I'M NOT GOING TO PLAY THEM AGAIN.

BUT WE ADDED UP THE TOTAL TIME OF THOSE CALL RECORDINGS OURSELVES, AND WHAT WE GOT WAS 11 AND A HALF MINUTES.

HAVE YOU EVER ADDED UP THE TOTAL TIME OF BOTH OF THOSE CALL RECORDINGS YOURSELF?

A.   I DIDN'T ADD UP A TIME FOR THE CALL RECORDINGS YOU PRODUCED DURING THE DISCOVERY.

Q.   OKAY.  DO YOU KNOW WHETHER OR NOT OUR CALCULATION OF 11 AND A HALF MINUTES FOR THE TOTAL TIME OF EXHIBIT, TRIAL EXHIBIT 49 AND TRIAL EXHIBIT 50 IS ABOUT ACCURATE?

A.   I DON'T KNOW.

Q.   YOU DON'T KNOW.  OKAY.

DO YOU HAVE TRIAL EXHIBIT 217 IN YOUR BINDER UP THERE?

A.   WHAT'S THE NUMBER?

Q.   217.

A.   YES.  YES, EXPERIAN CREDIT REPORT.

Q.   YES.  THIS ONE IS DATED JULY 14TH, 2023; CORRECT?

A.   YES, CORRECT.

Q.   AND THIS WAS MAILED TO YOU AT YOUR ADDRESS; CORRECT?

A.   IT WAS MAILED TO THE ADDRESS WHERE I LIVED, YEAH.

Q.   OKAY.

YOUR HONOR, I WOULD MOVE IT INTO EVIDENCE.

THE COURT:  EXHIBIT 217 IS ADMITTED.

(DEFENDANT'S EXHIBIT 217 WAS RECEIVED IN EVIDENCE.)

MR. NARITA:  LET'S TAKE A LOOK AT 217.

Q.   SO THAT'S YOUR JULY 14TH, 2023 EXPERIAN CREDIT REPORT.

AND LET'S GO THROUGH THIS QUICKLY BECAUSE WE'VE DONE WITH IT WITH SOME OTHER ONES.

AGAIN, IT HAS A SECTION, "YOUR POTENTIALLY NEGATIVE ACCOUNT ACTIVITY" IN RED; CORRECT?

DO YOU SEE THAT ON THE NEXT PAGE?

A.    YES, IT SAYS "YOUR POTENTIALLY NEGATIVE ACCOUNT ACTIVITY."

Q.    AND THERE IT'S LISTING THE CAVALRY CARD, THE JP MORGAN CHASE CARD, AND THEN ON THE NEXT PAGE IT STILL HAS THAT U.S. BANK CARD; CORRECT?

A.    YES.

Q.    OKAY.  AND THEN UNDER THE GREEN SECTION, THE "POTENTIALLY POSITIVE ACCOUNT ACTIVITY," NOW THE ONLY ACCOUNT THAT IS STILL LISTED THERE IS THE COMENITY ACCOUNT; RIGHT?

A.    CORRECT.

Q.    SO AS OF JULY 14TH, 2023, THE ONLY POTENTIALLY POSITIVE ACCOUNT THAT WAS LISTED ON YOUR EXPERIAN REPORT WAS THE COMENITY ACCOUNT; RIGHT?

A.    I MEAN, IT WASN'T POSITIVE FOR ME, BUT IT WAS LISTED ON THE POSITIVE ACCOUNT ACTIVITY ON EXPERIAN, BUT IT WAS A DIFFERENT ONE FOR OTHER AGENCIES.

Q.    OKAY.  SO YOU UNDERSTAND THAT IF THIS POTENTIALLY POSITIVE ACCOUNT GOT REMOVED FROM YOUR CREDIT REPORT AND THERE WAS ONLY THESE NEGATIVE ONES, THAT WOULD CAUSE YOUR CREDIT SCORE TO GO DOWN; RIGHT?

A.    I DON'T KNOW WHAT WOULD CAUSE IT TO DO WITH THE CREDIT SCORE.

I KNEW THAT THIS ACCOUNT WAS FRAUDULENT AND CAUSING ME

HARM, AND I NEED TO REMOVE IT AS QUICKLY AS POSSIBLE.

Q.   OKAY.  SO DID YOU THINK THAT YOUR CREDIT SCORE WOULD IMPROVE IF YOU REMOVED THE ONLY POTENTIALLY POSITIVE ACCOUNT ACTIVITY ON YOUR CREDIT REPORT?

A.   I DON'T KNOW WHAT WOULD HAPPEN TO THE CREDIT SCORE IF THEY REMOVED IT.

Q.   OKAY.  SIR, ONE OF THE OTHER CALL RECORDINGS THAT WE LISTENED TO YESTERDAY WAS TRIAL EXHIBIT 51, AND THE PARTIES HAVE AGREED THAT THAT CALL BETWEEN YOU AND COMENITY TOOK PLACE ON JULY 18TH, 2023, SO A LITTLE BIT AFTER THIS EXPERIAN CREDIT REPORT THAT WE JUST LOOKED AT.  THAT'S A STIPULATED FACT BETWEEN THE TWO PARTIES.

AND, AGAIN, WE LISTENED TO THE ENTIRE CALL RECORDING YESTERDAY.  AGAIN, I'M NOT GOING TO PLAY IT FOR THE JURY.

BUT OUR CALCULATION OF THE TOTAL TIME THAT YOU WERE ON THE PHONE CALL WITH COMENITY WAS 6 MINUTES AND 57 SECONDS, SO JUST ABOUT 7 MINUTES.

DOES THAT SOUND ABOUT RIGHT TO YOU?

A.   NO, OF COURSE NOT.

Q.   OKAY.  DO YOU THINK IT WAS MORE?

A.   OF COURSE.

Q.   OKAY.  BUT, AGAIN, I'M JUST TALKING ABOUT ONE, ONE CALL FROM YESTERDAY THAT WE LISTENED TO, NOT ALL OF THEM.  IT WOULD BE TRIAL EXHIBIT 51.

A.   YEAH, YEAH.  I THINK FOR THAT CALL SPECIFICALLY, IT WAS

MUCH MORE TIME THAT I HAD SPENT ON THAT CALL, BECAUSE IF YOU

LISTEN TO THE RECORDINGS, IT STARTS WITH SOMEONE SPEAKING,

RIGHT?  EITHER ME OR THE REPRESENTATIVE FROM COMENITY.

BUT AS YOU CAN IMAGINE, WHEN YOU CALL THE BANK, NO ONE

STARTS TO SPEAK RIGHT AWAY, SO YOU SPEND HOURS AND HOURS

LISTENING TO THE MUSIC, TRYING TO GET TO THE RIGHT DEPARTMENT,

AND YEAH.

SO PROBABLY WHEN I GOT TO SOME DEPARTMENT, THERE WAS A

RECORDING, AND WE LISTENED TO IT YESTERDAY.

Q.   OKAY.  SO ON JULY 18TH, 2023, HOW MUCH TIME DID YOU WAIT

ON HOLD BEFORE THE CONVERSATION STARTED THAT WE LISTENED TO

YESTERDAY AS TRIAL EXHIBIT 51?

A.   I CAN'T REMEMBER EXACTLY THE AMOUNT OF TIME THAT I SPENT

ON THE CALL 2.5 YEARS AGO, BUT I REMEMBER THAT I WAS SPENDING

ON THE, LIKE, WAITING FOR SOMEONE TO TAKE A PHONE FROM THIS

BANK, LIKE I'M SPENDING FROM EARLY MORNING UNTIL THE EVENING.

I WAS ACTUALLY ON THE PHONE WHILE THE PHONE WAS CONNECTED TO

THE CHARGER, AND IT WAS EITHER IN MY EARPHONE EARBUD AND IT WAS

JUST LISTENING TO THE MUSIC AND WAITING.  SO IT WAS THE WHOLE

DAY THAT I EXPERIENCED THAT.

Q.   OKAY.  AND DID YOU KEEP ANY KIND OF LOG OR RECORD OF HOW

LONG YOU WERE ON HOLD WITH COMENITY WHEN YOU MADE YOUR CALLS TO

COMENITY?

A.   I GENERALLY TRIED TO KEEP SOME RECORDS, BUT BECAUSE I USED

THE IPHONE FOR IOS, IT'S IMPOSSIBLE TO RECORD THE PHONE CALLS

FOR PRIVACY PURPOSES, SO I COULDN'T MANAGE TO DO THAT.

Q.   OKAY.  SO YOU DON'T HAVE ANY KIND OF LOG OR JOURNAL THAT YOU COULD SHARE WITH THE JURY THAT SHOWS THEM HOW MUCH TIME YOU WAITED ON HOLD WITH COMENITY BEFORE ANY OF THESE PHONE CALLS THAT THEY LISTENED TO YESTERDAY, DO YOU?

A.   SO I DIDN'T TRACK HOW MUCH TIME I WAITED.

BUT I DID TRACK THE NUMBER OF TIMES I CALLED AND RECEIVED INFORMATION FROM COMENITY.  THAT LOG WE PROVIDED DURING THE DISCOVERY.

Q.   OKAY.  AND DID WE SEE THAT LOG YESTERDAY WHEN YOU WERE TESTIFYING FOR MR. LOKER?

A.   NO, I BELIEVE YESTERDAY WE DIDN'T SAW IT.

Q.   OKAY.  AND THERE WAS ANOTHER CALL THAT WE LISTENED TO YESTERDAY.  THERE WERE TWO RECORDINGS, TRIAL EXHIBITS 52 AND 53, AND THE PARTIES HAVE AGREED THAT TRIAL EXHIBITS 52 AND 53 ARE ONE PHONE CALL THAT YOU MADE TO COMENITY ON AUGUST 7TH, 2023, AND YOU WERE -- YOU GOT PICKED UP BY ONE AGENT AND THEN YOU WERE TRANSFERRED TO ANOTHER AGENT.  OKAY.

SO, AGAIN, OUR TEAM LOOKED AT THOSE RECORDINGS, AND WE ADDED UP THE TOTAL CALL TIME FOR BOTH OF THOSE RECORDINGS, AND WE GOT JUST UNDER -- ABOUT 15 MINUTES OF TIME FOR BOTH OF THE CALL RECORDINGS THAT WE LISTENED TO WITH THE JURY YESTERDAY.

DOES THAT SOUND ABOUT RIGHT TO YOU?

A.   I MEAN, I DON'T KNOW THE NUMBER, YEAH.

Q.   OKAY.  DOES THAT SOUND TOO LONG?  TOO SHORT?

Case 5:23-cv-04965-EKL   Document 234   Filed 11/10/25   Page 70 of 230

PANCHENKO CROSS BY MR. NARITA (RESUMED)
379

A.   IT SOUNDS SUPER SHORT COMPARED TO THE AMOUNT OF TIME I SPENT TO GET ON THE CALL WITH THE AGENT.  IT SOUNDS LIKE A SUPER SHORT AMOUNT OF RECORDINGS THAT WE GOT DURING THE DISCOVERY.

Q.   OKAY.  BUT, AGAIN, YOU DON'T HAVE ANY RECORD THAT YOU COULD SHARE WITH US FOR HOW MUCH TIME YOU WERE ON HOLD BEFORE THE AUGUST 7TH CALL, DO YOU?

A.   YEAH, I DIDN'T RECORD THE AMOUNT OF TIME THAT I WAS SPENDING.

Q.   OKAY.  SO WHEN WE ADDED UP, WHEN OUR TEAM ADDED UP ALL OF THE TIME, SORT OF THE TOP TIME OF THE THREE CALLS THAT WE LISTENED TO YESTERDAY, WE GOT A TOTAL OF 33 AND A HALF MINUTES OF TIME THAT YOU WERE ON THE PHONE WITH COMENITY.

DOES THAT SOUND ABOUT RIGHT TO YOU?

A.   IT DOESN'T SOUND RIGHT TO ME.  OBVIOUSLY I WAS SPENDING MORE TIME CALLING COMENITY.

Q.   OKAY.  AND THAT WOULD AGAIN RELATE TO WHATEVER TIME YOU WERE ON HOLD IN ADVANCE OF THOSE CALLS?

A.   NOT NECESSARILY.  IT RELATES TO THE TIME THAT I CALLED.  I WENT THROUGH AND TALKED TO THE PERSON, BUT PROBABLY THEN THE CONNECTION WAS BROKE UP OR SOMETHING HAPPENED AND I HAD TO RE-CALL AND CALL BACK AGAIN.

SO MY ASSUMPTION THAT IF I DIDN'T PROVIDE -- IF I DIDN'T HAVE TIME TO PROVIDE MY PERSONAL INFORMATION TO COMENITY, LIKE MY NAME AND SOCIAL SECURITY, AND WAS JUST MOVED BETWEEN

DIFFERENT DEPARTMENTS ON THE CALL, I DIDN'T HEAR THOSE CALLS THAT YOU PRODUCED DURING THE DISCOVERY.

SO THAT MEANS THAT I CALLED, THEY DID NOT IDENTIFY ME.

YEAH, I DIDN'T FIND THOSE CALLS DURING THE DISCOVERY THAT YOU PRODUCED.

Q.   OKAY.  BUT YOU DIDN'T HAVE ANY OF YOUR OWN, LIKE, PHONE RECORDS OR ANYTHING THAT SHOWED THE ACTUAL CALL TIMES WHEN YOU WERE CALLING US, DID YOU?

A.   I HAVE THE DATES WHEN I CALLED COMENITY AND COMENITY PROVIDED ME WITH SOME GUIDANCE, LIKE, WHAT THEY DID, LIKE, DID THEY SOLD MY ACCOUNT TO SOMEONE.  I HAVE THIS KIND OF MILESTONE CALLS RECORDED IN MY HISTORY, YES.

Q.   OKAY.  ARE THESE THREE CALLS THE MILESTONE CALLS THAT WE WENT OVER WITH THE JURY?

A.   IT WASN'T THREE CALLS.  IT WAS MORE.

Q.   OKAY.  IS THAT A DOCUMENT THAT YOU WENT OVER WITH MR. LOKER YESTERDAY?

A.   NO.

Q.   OKAY.  DO YOU HAVE EXHIBIT 229 IN FRONT OF YOU?

A.   YES.

Q.   OKAY.  AND CAN YOU TELL US -- JUST TO IDENTIFY IT FOR THE RECORD, IT'S A DOCUMENT THAT YOU PRODUCED TO US THROUGH YOUR LAWYERS AND IT'S GOT BATES STAMP AT THE BOTTOM PANCHENKO_451 THROUGH 455.

CAN YOU TELL US WHAT IS TRIAL EXHIBIT 229, SIR?

A.   I DON'T KNOW.  IT LOOKS LIKE SOMEONE'S TELEGRAM MESSAGES WITH ME.

Q.   OKAY.  AND ARE THESE MESSAGES THAT YOU EXCHANGED WITH YOUR FRIEND PAVLO?

A.   I GUESS SO, YES.  THIS MIGHT BE PAVLO.  I DON'T SEE THAT HIS NAME HERE, BUT IT LOOKS LIKE SOME EXCHANGE WITH HIM.

Q.   OKAY.  WELL, YOU'VE JUST LOOKED AT THIS FOR THE FIRST TIME, SO TAKE A MOMENT AND, YOU KNOW, JUST GO THROUGH THE EXCHANGES BACK AND FORTH AND SEE IF YOU THINK IT'S AN EXCHANGE WITH YOU AND YOUR FRIEND PAVLO.

A.   YES, I AM SURE.

Q.   OKAY.

     YOUR HONOR, MOVE TO ADMIT EXHIBIT 229.

          THE COURT:  THE EXHIBIT IS ADMITTED.

     (DEFENDANT'S EXHIBIT 229 WAS RECEIVED IN EVIDENCE.)

BY MR. NARITA:

Q.   SO, EXHIBIT 229, SIR, STARTS WITH AN IMAGE THAT WAS TRANSMITTED TO YOU BY PAVLO; RIGHT?

A.   I GUESS, YEAH.

Q.   CAN WE ZOOM IN ON THE IMAGE, KRISTINA, AND THEN THE TWO PURPLE MESSAGES BELOW.

     THE IMAGE IS SOMETHING THAT PAVLO SENT TO YOU, AND THEN YOU SENT HIM BACK A THUMBS UP EMOJI; RIGHT?

A.   YEAH.

Q.   OKAY.  AND THEN HE RIGHTS BACK TO YOU SAYING, "APPLE

TITANIUM CARD LOOKS NICE."

"AND YOU SUPPOSE TO ACTIVATE IT LIKE AIRPODS WITHIN NFC."

CORRECT?

A.   CORRECT.

Q.   SO IS THIS PAVLO TELLING YOU THAT HE HAD GOTTEN APPROVED FOR THE APPLE TITANIUM CARD?

A.   HE'S TELLING ME THAT HE RECEIVED IT, YEAH.

Q.   AND HE'S ACTUALLY SENDING YOU AN IMAGE OF THE NEW CARD HE GOT IN THE MAIL; RIGHT?

A.   YES.

Q.   AND THAT'S WHAT THE IMAGE IS ON THE SCREEN; RIGHT?

A.   YES.

Q.   AND THEN WE CAN ZOOM OUT, KRISTINA.

AND YOU ASK HIM "IS IT CREDIT?"  RIGHT?

A.   YES.

Q.   WHY DID YOU ASK HIM THAT?

A.   I WAS WONDERING WHETHER OR NOT I CAN GET THIS CARD, AND I WAS ASKING IF IT'S CREDIT OR DEBIT CARD SO I CAN UNDERSTAND WHETHER I NEED THIS CARD.

Q.   OKAY.  AND WHEN IS THIS EXCHANGE THAT YOU'RE HAVING WITH YOUR FRIEND, PAVLO?  BECAUSE THIS IS THE WAY WE GOT THE DOCUMENT.  I DON'T SEE A DATE ON IT.  DO YOU KNOW?

A.   I DON'T SEE A DATE, BUT IT'S PROBABLY SOME YEARS AGO.

Q.   SOME YEARS AGO?

A.   YEAH.

Q.   OKAY.  SO WHEN YOU ASK HIM IF IT'S CREDIT, HE RESPONDS BACK "YEAH"; CORRECT?

A.   YES.

Q.   AND YOU RESPOND BACK AND SAY, "NICE, YESTERDAY I ASKED FOR CREDIT CARD IN MY BANK.

"THEY DIDN'T HAVE IT TO ME BECAUSE I CAN FEEL UP THE FORM AND PROVIDE EMPLOYER."

CORRECT?

A.   YES.

Q.   AND WHAT WERE YOU DESCRIBING IN YOUR MESSAGE TO YOUR FRIEND PAVLO?

A.   I WAS TELLING HIM I WAS DENIED A CREDIT CARD IN THE BANK BECAUSE I COULDN'T FILL OUT THE FORM AND PROVIDE THE EMPLOYER.

Q.   OKAY.  SO WAS THIS AT A TIME WHEN YOU WERE UNEMPLOYED?

A.   YES.

Q.   OKAY.  SO DO YOU THINK THIS IS WHEN YOU'RE HERE IN THE UNITED STATES AND YOU WERE LOOKING FOR A JOB?

A.   I BELIEVE SO.

Q.   OKAY.

A.   I DON'T BELIEVE I WAS LOOKING FOR A JOB.  I BELIEVE IT WAS IN THE TIME WHEN I WAS KIND OF DEALING WITH THE IDENTITY THEFT.

Q.   OKAY.  OKAY.  SO YOU THINK THIS WAS DURING THAT SUMMER OF 2023 MAYBE?

A.   IT COULD BE.  I DON'T REMEMBER EXACTLY.

Q.   OKAY.  BUT YOU SAID YESTERDAY YOU ASKED FOR A CREDIT CARD

IN MY BANK.

DO YOU REMEMBER ACTUALLY APPLYING FOR A CREDIT CARD IN A BANK?

A.    SO APPLYING FOR THE CREDIT CARD TO THE BANK, I REMEMBER APPLYING FOR THE CREDIT CARD TO THE BANK BY GOING TO THE PERSON IN THE BANK AND ASKING THEM WHETHER OR NOT I CAN OPEN A CREDIT CARD.

Q.    OKAY.  AND THEY TOLD YOU THAT SINCE YOU WERE NOT EMPLOYED, YOU COULDN'T?

A.    THEY TOLD ME THAT THEY NEED A CREDIT SCORE AND THEY NEED EMPLOYMENT.

AND WHEN I SAID I DON'T HAVE A CREDIT SCORE AND I DON'T HAVE EMPLOYMENT, AND THEY SAID PROBABLY WE COULDN'T HELP YOU.

Q.    SO YOU -- ONCE THEY SAID THAT, THEN YOU DIDN'T APPLY?

A.    WELL, FOR ME IT WAS -- I WAS APPLYING IN THAT MOMENT, YES.

Q.    OKAY.  SO YOU TELL YOUR FRIEND THIS EXPERIENCE, AND THEN HE SHOOTS BACK A MESSAGE AND SAID, "TRY APPLE.  FOR EMPLOYER YOU MAY ENTER SELF-EMPLOYED, FOR ANNUAL INCOME (HOUSEHOLD INCOME) YOU CAN BASICALLY NAME ALLA'S SALARY THAT'S FINE."

CORRECT?

A.    CORRECT.

Q.    BUT WHAT DO YOU UNDERSTAND HIM TO BE TELLING YOU THERE?

A.    THAT I CAN OPEN A CREDIT CARD AND STILL START WORKING ON A POSITIVE CREDIT HISTORY.

Q.    BY USING YOUR WIFE'S INCOME AS YOUR INCOME ON THE

APPLICATION; RIGHT?

A.   BY USING JUST SOME LEGAL PROCESS THAT I CAN USE, YEAH.  BY UTILIZING SOMETHING THAT I CAN UTILIZE BASICALLY.

Q.   OKAY.  BUT YOU WEREN'T SELF-EMPLOYED AT THE TIME; RIGHT? YOU WERE UNEMPLOYED?

A.   I DIDN'T HAVE A JOB.

Q.   SO YOU WERE NOT SELF-EMPLOYED; RIGHT?

A.   I'M NOT SURE I KNOW THE EXACT LEGAL DEFINITION OF SELF-EMPLOYED, BUT I DIDN'T HAVE A JOB YET.

Q.   OKAY.  AND THEN ON THE NEXT PAGE OF THE EXHIBIT, SIR, HE SAID, "ZHENYA OPENED AN APPLE CARD AFTER SHE QUIT SPOTIFY AND EVERYTHING WORKED OUT ANYWAY."

DO YOU SEE THAT?

A.   YES.

Q.   AND WHO IS ZHENYA?

A.   IT IS PAVLO'S WIFE.

Q.   OKAY.  SO WHAT DO YOU UNDERSTAND HIM TO BE COMMUNICATING TO YOU HERE?

A.   JUST THE SAME INFORMATION THAT YOU PREVIOUSLY -- IT WAS PROBABLY, LIKE, TWO MESSAGES SENT TOGETHER, THAT I CAN DO SOMETHING IN ORDER TO START WORKING ON MY CREDIT SCORE.

Q.   OKAY.  SO HE'S TELLING YOU, "LOOK, MY WIFE QUIT HER JOB AT SPOTIFY, BUT SHE GOT THIS APPLE CREDIT CARD ANYWAY."

RIGHT?

A.   HE'S TELLING ME THAT SHE DIDN'T HAVE A JOB AT SPOTIFY.

SHE QUIT HER JOB AND SHE STILL GOT APPROVED FOR THE CREDIT CARD, YES.

Q.   OKAY.  AND THEN YOU ASK HIM, "WOW.  DID SHE HAVE A CREDIT SCORE?"

CORRECT?

A.   YES.

Q.   AND THEN HE SAID "SURE"?

A.   YES.

Q.   AND THEN YOU ASK HIM, "AND YOU APPLY FROM THE IPHONE?"

CORRECT?

A.   YES.

Q.   AND THEN HE SAYS, "YEAH, THROUGH THE WALLET APP."

CORRECT?

A.   YES.

Q.   AND THEN YOU APPLIED; RIGHT?

A.   PROBABLY.

Q.   WELL, DID YOU APPLY FOR THE APPLE CARD OR NOT?

A.   I APPLIED FOR THE APPLE CARD, YES.

Q.   OKAY.  AND THEN WE PICK UP ON AUGUST 16TH, 2023, RIGHT, IN YOUR EXCHANGES ON HERE?

A.   YEP.

Q.   AND DID YOU TAKE HIS ADVICE?  DID YOU LIST YOUR WIFE'S ANNUAL INCOME AS YOUR HOUSEHOLD INCOME WHEN YOU APPLIED?

A.   I DON'T KNOW WHETHER I DID THAT.  I DON'T KNOW WHETHER THEY ACTUALLY ASK ME TO LIST ANY INCOME IN THERE.

Q.   YOU DON'T REMEMBER IN THE APPLICATION THEM ASKING YOU TO LIST YOUR INCOME AND YOU LISTED 175,000?

A.   I DON'T REMEMBER.

Q.   DO YOU THINK THAT'S POSSIBLE, SIR?

A.   IF IT'S POSSIBLE, PROBABLY.  BUT I DON'T REMEMBER WHETHER I LISTED ANYTHING OR WHETHER THEY ASKED ME ANYTHING THERE.

Q.   WAS THAT YOUR WIFE'S SALARY IN 2023 WITH GOOGLE, 175,000 A YEAR?

A.   I BELIEVE IT MIGHT BE A BASE SALARY, BUT NOT TOTAL COMPENSATION.

Q.   THAT WAS HER BASE SALARY, BUT SHE ALSO HAD STOCK OPTIONS ON TOP OF THAT; RIGHT?

A.   YES.

Q.   AND THEN SHE WAS ALSO ELIGIBLE FOR A BONUS EACH YEAR, TOO; RIGHT?

A.   I GUESS SO.

Q.   AND THEN DID YOU DESCRIBE YOURSELF AS SELF-EMPLOYED WHEN YOU APPLIED FOR THE APPLE CARD?

A.   I DON'T REMEMBER WHETHER THEY ASKED THOSE QUESTIONS, SO I CAN'T SAY WHETHER I DID OR DID NOT.

Q.   SO YOU CAN'T REMEMBER WHETHER APPLE ASKED YOU WHETHER YOU HAD A JOB WHEN YOU WERE APPLYING FOR THEIR CREDIT CARD?

A.   YEAH, I DON'T REMEMBER.

Q.   OKAY.  IN ANY EVENT, YOU -- ON THE 16TH OF AUGUST, 2023, YOU SEND HIM BACK AN IMAGE; CORRECT?  AN APPLICATION STATUS?

A.   YES.

Q.   OKAY.  AND THEN -- COULD WE BLOW THAT UP.

WHAT IS IT THAT YOU'RE SENDING BACK TO YOUR FRIEND PAVLO?

A.   AGAIN, WHAT PAGE ARE YOU TALKING ABOUT?  BECAUSE WE HAVE DIFFERENT PAGES ON THE SCREEN.

Q.   I'M SORRY.  IF YOU LOOK -- CAN YOU ZOOM OUT AGAIN.

IF YOU LOOK ON PAGE 452 OF THE EXHIBIT, DO YOU SEE AT THE BOTTOM 452?

A.   UH-HUH.

Q.   I SHOULD HAVE GUIDED YOU THERE, SIR.  I'M SORRY.

ON THAT PAGE, THERE'S AN IMAGE THAT YOU TEXTED TO YOUR FRIEND PAVLO; RIGHT?

A.   YES.

Q.   AND IT SAYS APPLICATION STATUS; CORRECT?

A.   YES, YES.

Q.   AND THAT WAS ON AUGUST 16TH, 2023; RIGHT?

A.   YEAH, IT'S -- YEAH, IT'S AROUND THAT DATE, YEAH.

Q.   AND THAT'S WHEN YOU APPLIED FOR THE APPLE CREDIT CARD AND YOU GOT ADVISED THAT YOU WERE DENIED; RIGHT?

A.   IT'S AROUND THE DATE THAT I APPLIED TO THE CREDIT CARD.

Q.   AND YOU WERE TEXTING THAT STATUS TO YOUR FRIEND PAVLO; RIGHT?

A.   YEAH.

Q.   OKAY.  LET'S GO TO THE NEXT PAGE, 453.

YOU INCLUDED AN EMOJI WITH YOUR DENIAL WHEN YOU SENT IT TO

PAVLO; RIGHT?

A.   YEAH, I SEND THE DENIAL AND SEND THAT, YES.

Q.   OKAY.  WHAT IS THE EMOJI?  I DON'T USE A LOT OF EMOJIS, SO WHAT WERE YOU COMMUNICATING TO YOUR FRIEND WITH THE -- I GUESS THAT'S A SMILEY FACE, BUT THERE'S A TEAR ON IT; CORRECT?

A.   FOR ME, IT'S JUST LIKE A TEAR.  THAT'S IT.

Q.   IT'S A TEAR.

A.   THE INTENTION FOR ME WAS TO COMMUNICATE THE TEAR, YES.

Q.   OKAY.  SO YOU WERE TRYING TO TELL YOUR FRIEND THAT YOU WERE NOT HAPPY ABOUT BEING DENIED FOR THE CARD?

A.   I WAS TRYING TO SAY THAT I WAS NOT HAPPY THAT I WAS DENIED.

Q.   OKAY.  AND THEN HE RESPONDS BACK TO YOU; RIGHT?

A.   YES.

Q.   HE SAYS, "THAT'S FINE THEY REJECTED ME 5 TIMES.

     "KEEP TRYING EVERY MONTH."

     AND THEN IT SAYS, "MAYBE THAT'S BECAUSE OF YOUR STOLEN IDENTITY."

     RIGHT?

A.   CORRECT.

Q.   SO HE KNEW THAT YOU WERE WORKING THROUGH ISSUES ON YOUR CREDIT REPORT THAT YOU SAID WERE DUE TO IDENTITY THEFT; RIGHT?

A.   YES.

Q.   OKAY.  AND THEN YOU WRITE BACK "PROBABLY"; RIGHT?

A.   CORRECT.

Q.   AND WHAT DID YOU MEAN BY THAT?

A.   WELL, I JUST ASSUMED THAT THAT MIGHT BE THE REASON.

Q.   SO YOU -- WHEN YOU APPLIED FOR THE APPLE CARD ON AUGUST 16TH, 2023, YOU KNEW THAT THERE WERE, OR YOU SUSPECTED THERE WERE STILL SOME NEGATIVE ACCOUNTS SHOWING ON YOUR CREDIT REPORT THAT RELATED TO THIS IDENTITY THEFT SITUATION; RIGHT?

A.   I DON'T REMEMBER WHAT WAS ON THE CREDIT REPORTS THAT WAS USED FOR THIS APPLICATION, BUT YES, SO I APPLIED REGARDLESS OF ANY FRAUDULENT INFORMATION ON MY CREDIT REPORT.

Q.   OKAY.  AND SO WHEN YOU APPLIED, YOU HAD NO JOB, AND YOU KNEW THAT THERE WAS AT LEAST THE POSSIBILITY THAT THERE WAS GOING TO BE SOME NEGATIVE ACCOUNTS SITTING ON YOUR CREDIT REPORT; RIGHT?

A.   YES.  SO THE CREDIT REPORT WAS CHANGING THREE TIMES THROUGH THAT SUMMER -- MULTIPLE TIMES FOR THAT SUMMER WHILE ACCOUNTS WAS APPEARING AND DISAPPEARING.  THERE WAS SOME ACCOUNTS WAS DELETED AND SOME WAS VERIFIED AND SOME WERE REAPPEARING AGAIN.

     SO I JUST WANTED TO TRY MY BEST TO START APPLYING FOR CREDIT CARDS AS EARLY AS POSSIBLE, BECAUSE I KNEW THAT I NEEDED TO HAVE THIS CREDIT CARD AS EARLY AS POSSIBLE TO START WORKING ON MY CREDIT SCORE.

Q.   SO WERE YOU SURPRISED THEN WHEN APPLE CARD DENIED YOU?

A.   I WAS JUST DEPRESSED FROM ALL OF THIS STUFF THAT WAS HAPPENING WITH MY CREDIT REPORTS, AND THAT WAS JUST ANOTHER

NEGATIVE STUFF THAT HAPPENED HERE.

I COULDN'T GET THE CARD I WANTED, SO, YEAH, I WASN'T SUPER SURPRISED, BUT I WASN'T HAPPY WITH THE LIST.

Q.   SIR, YOU HAVE NEVER WORKED FOR GOLDMAN SACHS; RIGHT?

A.   I DON'T RECALL WORKING FOR GOLDMAN SACHS.

Q.   AND YOU KNOW THAT GOLDMAN SACHS BANK IS THE BANK THAT ISSUES THE APPLE CARD; RIGHT?

A.   I SAW THE LOGO ON SOME EMAILS THAT APPLE SENT, YES.

Q.   OKAY.  SO IS IT CORRECT THAT YOU DON'T HAVE ANY IDEA AS YOU SIT HERE TODAY EXACTLY WHAT CREDIT CRITERIA GOLDMAN SACHS BANK APPLIED WHEN IT MADE THE DECISION TO DENY YOUR APPLICATION?

A.   I DON'T KNOW.

Q.   AND YOU DON'T HAVE A COPY OF A CREDIT REPORT THAT THEY USED IF THEY DID USE ONE?

A.   YEAH, I DON'T HAVE A COPY.

Q.   OKAY.  LET'S GO TO THE NEXT PAGE OF EXHIBIT 229.  THIS IS A FURTHER COMMUNICATION WITH YOU AND YOUR FRIEND PAVLO; RIGHT?

DO YOU SEE IT'S -- THE BOTTOM IS 454, SIR?

A.   YEAH.

Q.   OKAY.  SO NOW WE'RE -- NOW WE'RE IN JANUARY 19TH OF 2024; RIGHT?

A.   YEAH, YES.

Q.   OKAY.  AND BY THAT POINT YOU HAVE ALREADY FILED THIS LAWSUIT AGAINST EVERYBODY; RIGHT?

A.   YES, I BELIEVE SO, YES.

Q.   OKAY.  AND YOU TEXT YOUR FRIEND PAVLO AND ASK HIM WHETHER HE WOULD MIND IF YOU ADDED HIM AS A WITNESS TO THE IDENTITY THEFT CASE; RIGHT?

A.   YES.

Q.   AND THEN HE RESPONDS BACK, LAUGHS, AND SAYS THAT'S AN INTERESTING WAY TO START A CONVERSATION; RIGHT?

A.   CORRECT.

Q.   OKAY.  SO HAD YOU TALKED TO HIM BEFORE YOU SENT THIS MESSAGE ABOUT YOUR IDENTITY THEFT CASE?

A.   I DON'T REMEMBER.  WE SOMETIMES TALK ON THE PHONE, BUT IT LOOKS FROM THIS CONVERSATION THAT WE DIDN'T DISCUSS THIS QUESTION.

Q.   AND THEN HE ASKS YOU, "SURE.  DO I NEED TO CONFIRM SOMETHING IF SOMEONE CALLS ME?"

RIGHT?

A.   YEAH.

Q.   OKAY.  AND THEN YOU EXPLAIN WHAT YOU THINK HE OUGHT TO DO IN THE NEXT FEW MESSAGES; RIGHT?

A.   I BELIEVE SO, YES.

Q.   AND THE LAST PART OF THE MESSAGE THAT YOU SENT TO YOUR FRIEND THAT DAY SAYS, "BECAUSE WE SUED THEM, OUR CLAIM IS THAT THIS FRAUDULENT ACCOUNTS NOT ONLY SHOULD BE CLOSED BUT ALSO THEY NEED TO COVER MY MENTAL DAMAGE AND TIME DAMAGE AND TO PROVE THAT I WAS IN BAD MENTAL STATE AND SPENT A LOT OF TIME

TRYING TO RECOVER."

CORRECT?

A.   YES.

Q.   SO WHY WERE YOU SENDING THAT MESSAGE TO YOUR FRIEND, SIR?

A.   TO GIVE HIM CONTEXT OF WHAT THIS QUESTION THAT I SENT HIM PRIOR IS ABOUT.

Q.   OKAY.  SO YOU'RE GIVING YOUR FRIEND SOME CONTEXT OF WHAT YOU THINK HE'LL BE ASKED TO TESTIFY ABOUT IF HE WAS CALLED AS A WITNESS IN THE CASE; RIGHT?

A.   I GAVE HIM CONTEXT OF WHAT I WAS ASKING HIM TO BE A WITNESS IN THIS CASE, YES.

Q.   OKAY.  YOU DIDN'T EXPECT HIM TO COME IN AND BE A WITNESS AGAINST YOU, DID YOU?

A.   I DON'T KNOW HOW IT WORKS, SIR.

Q.   OKAY.  AND THEN LET'S GO TO THE NEXT PAGE, 455.

A.   UH-HUH.

Q.   YOUR MESSAGES TO HIM CONTINUE.

AND YOU SAY, "SO WITNESS SHOULD BE ABLE TO TESTIFY ON THIS EXPERIENCE OF MINE."

CORRECT?

A.   YES, CORRECT.

Q.   OKAY.  SO YOU WERE TELLING YOUR FRIEND THAT YOU WOULD EXPECT THAT HE WOULD BE ABLE TO TESTIFY ABOUT YOUR BAD MENTAL STATE AND THE TIME THAT YOU SPENT TRYING TO RECOVER; CORRECT?

A.   NO.  I WAS JUST TRYING TO PROVIDE THE CONTEXT.  I WASN'T

SAYING ANY OF MY EXPECTATIONS.

I WAS ASKING HIM WHETHER HE CAN BE ADDED AS A WITNESS, AND I WAS GIVING HIM THE CONTEXT OF WHAT THIS WITNESS ARE GOING TO BE TESTIFYING FOR.  IF HE HAS ANY CONTEXT, THEN HE WOULD AGREE. IF HE DOESN'T HAVE ANY CONTEXT, THEN HE WOULD SAY NO.

Q.   OKAY.  AND THEN HE WRITES BACK TO YOU AND SAID, "ALRIGHT. GOT IT."

A.   YES.

Q.   AND THEN HE SENDS YOU SOME SORT OF IMAGE OR GIF.

WHAT IS THAT?

A.   I BELIEVE THIS IS FROM A SERIES -- YEAH.  THIS IS LIKE A MESSAGE THAT HE SAID, YES, GOOD, WITH SOME GIF IN THERE.

Q.   IS THAT LIKE FROM A TELEVISION SERIES OR SOMETHING?

A.   YES.

Q.   DO YOU KNOW WHAT TELEVISION SERIES THAT IS?

A.   I DON'T REMEMBER THE NAME OF IT.  MAYBE "SUITS."

Q.   "SUITS."  OH, THE "SUITS" SHOW ABOUT THE LAWYERS?

A.   YES.

Q.   OKAY.  I THINK I'VE SEEN ADVERTISEMENTS FOR THAT ONE.

AND THEN WHEN YOU -- WHEN HE SENDS YOU THAT IMAGE, OR THE GIF, YOU RESPOND BACK TO HIM WITH A LAUGHING EMOJI; RIGHT?

A.   YES.

Q.   SO YOU THOUGHT THAT WAS JUST KIND OF A FUNNY JOKE THAT YOUR FRIEND HAD MADE ABOUT THE T.V. SHOW?

A.   NO.  I THOUGHT THAT HE SAID YES, BUT SAID IT IN A FUNNY

WAY.  SO --

Q.   YOU WERE JUST ACKNOWLEDGING HIS HUMOR?

A.   YES.

Q.   OKAY.  DO YOU HAVE EXHIBIT 236 IN THAT BINDER, SIR?

A.   YES.

Q.   SIR, IT'S A LITTLE HARD TO SEE BECAUSE THE NUMBERS ARE QUITE SMALL, BUT THERE'S, THERE'S A BATES STAMP AT THE BOTTOM OF THAT DOCUMENT.

AND MAYBE SOMEONE FROM MY TEAM CAN TELL ME WHAT THAT NUMBER IS OR GIVE ME A MAGNIFYING GLASS OR MAYBE A MICROSCOPE.

OH, YOU HAVE THE MAGNIFYING GLASS.  OH, YOU CAN LOOK AT IT, TOO, AND CONFIRM.

BUT CAN WE SEE -- WITHOUT DISPLAYING IT, CAN WE SEE WHAT THE NUMBER IS, KRISTINA?

MS. HOVSEPYAN:  MADAM CLERK, WE JUST NEED THE SCREENS TURNED OFF FOR A MOMENT SO I CAN CHECK WHAT THE BATES LABELS ARE IF THAT'S OKAY.

MR. NARITA:  I'VE EVEN MISPLACED MY READING GLASSES, SO I'M GOING TO BE AT THE MERCY OF OUR TEAM.

LOOK AT THAT, HER HONOR FOUND THEM FOR ME.

Q.   I'M BACK, MR. PANCHENKO.  LET ME SEE IF I CAN ZERO IN ON THIS.

MR. LOKER:  241 IF THAT HELPS.

THE COURT:  THANK YOU, MR. LOKER.

MR. NARITA:  IT TAKES A VILLAGE.

Q.   THIS DOCUMENT WAS PRODUCED BY YOU, AND IT'S STAMPED 241.

ARE YOU FAMILIAR WITH IT, SIR?

A.   YES.

Q.   IS THIS A SCREENSHOT THAT YOU TOOK FROM YOUR PHONE REFLECTING SOME INFORMATION AS OF SEPTEMBER 17TH, 2023?

A.   I TOOK THIS ON SOME DATE IN THE SUMMER AND, YES, THERE IS A CREDIT REPORT DATED SEPTEMBER.

Q.   AND THE DATE IS SEPTEMBER 17TH, 2023; IS THAT CORRECT?

A.   THAT IS WHAT IT SAYS FOR THE CREDIT REPORT.

Q.   OKAY.

YOUR HONOR, I MOVE TO ADMIT EXHIBIT 236.

THE COURT:  IT MAY BE SO ADMITTED AND PUBLISHED TO THE JURY.

(DEFENDANT'S EXHIBIT 236 WAS RECEIVED IN EVIDENCE.)

MR. NARITA:  THANK YOU.

Q.   AND SO THIS IS INFORMATION THAT YOU CAPTURED ON YOUR PHONE ABOUT WHAT THE TRANS UNION CREDIT REPORT WAS REPORTING ON SEPTEMBER 17TH, 2023; IS THAT RIGHT?

A.   I BELIEVE SO.

Q.   AND AT THAT POINT IT SAYS YOU HAVE TWO ACCOUNTS; RIGHT?

A.   IT SAYS TWO ACCOUNTS HERE, YES.

Q.   ONE OF THEM IS OUR ACCOUNT, RIGHT, THE VIRGIN AMERICA ACCOUNT?

A.   YES, I BELIEVE SO.

Q.   AND THE STATUS OF THE REPORT IS CLOSED, REVOLVING ACCOUNT

WITH A BALANCE OF ZERO DOLLARS; RIGHT?

A.   THIS IS WHAT IT SHOWS, YES.

Q.   OKAY.  AND THEN THERE'S ONE OTHER THAT IT CAPTURES.  IT'S A CHASE ACCOUNT AND IT LISTS THAT ONE AS CLOSED, IT'S A REVOLVING ACCOUNT, AND THE BALANCE IS $33,377; CORRECT?

A.   YES.

Q.   OKAY.  AS FAR AS YOU KNOW, THERE WEREN'T ANY OTHER ACCOUNTS SHOWN ON THIS DOCUMENT ANYWAY; RIGHT?

A.   ACCOUNTS?  I BELIEVE THAT WHEN IT SHOWS ACCOUNTS TWO, IT'S SUPPOSED TO BE TWO ACCOUNTS FOR THIS CREDIT REPORT, YES.

Q.   OKAY.  SO YOU KNEW, SIR, AS OF SEPTEMBER 17TH, 2023, THAT, AT LEAST AS REFLECTED ON THIS DOCUMENT, THAT TRANS UNION WAS LISTING THE COMENITY ACCOUNT AS CLOSED WITH A ZERO BALANCE; RIGHT?

A.   NO.  I KNEW THAT SOME DATE AFTER THAT DATE.

SO THIS SHOWS LIKE A HISTORIC CREDIT REPORT.  IT MIGHT BE SEPTEMBER 17TH OR SOME DAY AFTER IT.

Q.   OKAY.  I'M JUST READING IT.  IT SAYS AS OF 09.17.2023; RIGHT?

A.   YES.

Q.   AND SO READING THIS, IS IT YOUR UNDERSTANDING THAT THIS IS SUPPOSED TO REFLECT THE INFORMATION THAT TRANS UNION HAS AS OF SEPTEMBER 17TH, 2023?

A.   YES, THIS IS MY UNDERSTANDING OF THIS, YES.

Q.   OKAY.  AND ABOUT A WEEK LATER YOU FILED THIS LAWSUIT

AGAINST MY CLIENT AND THE OTHER BANKS; RIGHT?

A.   I BELIEVE SO.  I FILED -- WE FILED IT AROUND, YEAH, SEPTEMBER.

Q.   OKAY.  NOW, WHEN YOU WERE TESTIFYING FOR MR. LOKER YESTERDAY, YOU TOLD HIM ABOUT YOUR JOB SEARCH AND HOW YOU FELT THAT DEALING WITH THESE ISSUES WITH CREDIT REPORTS AND THE ACCOUNTS HAD SOMEHOW DELAYED YOUR JOB SEARCH; IS THAT CORRECT?

A.   CORRECT.

Q.   OKAY.  AND SO YOU FOUND OUT ABOUT THE ACCOUNTS IN MAY OF 2023; CORRECT?

A.   YES, AROUND THAT DATE, YEAH.

Q.   OKAY.  AND DURING THE ENTIRE MONTH OF 2023, HOW MANY HOURS DID YOU DEVOTE TO YOUR JOB SEARCH?

A.   CAN YOU REPEAT AGAIN?  DURING WHAT TIME IS THAT?

Q.   SURE.  DURING THE ENTIRE MONTH OF MAY 2023, HOW MUCH TIME DID YOU SPEND DEVOTED TO SEARCHING FOR A JOB?

A.   I DON'T REMEMBER THAT.  I MIGHT NOT HAVE SPENT ANY TIME OR I MIGHT HAVE SPENT SOME TIME, BUT I DON'T REMEMBER EXACTLY.  IT WAS TOO LONG AGO.

Q.   OKAY.  SO YOU COULDN'T TELL THE JURY HOW MUCH TIME YOU SPENT DURING THAT MONTH?

A.   I REMEMBER ONLY THAT OBVIOUSLY IT WASN'T ENOUGH TIME TO START SEARCHING FOR THE JOB.  THAT WAS MY FRUSTRATION.  YOU REMEMBER THIS NEGATIVE EXPERIENCE OBVIOUSLY.

Q.   OKAY.  SO DO YOU FEEL LIKE YOU SPENT SOME TIME LOOKING FOR

A JOB IN MAY OF 2023?

A.   I DON'T REMEMBER AT THIS TIME.

Q.   OKAY.  HOW ABOUT JUNE OF 2023?  DO YOU RECALL HOW MUCH TIME YOU SPENT LOOKING FOR A JOB IN JUNE OF 2023?

A.   NO.

Q.   OKAY.  AND THEN JULY, CAN YOU TELL US HOW MANY HOURS YOU SPENT LOOKING FOR A JOB IN JULY OF 2023?

A.   I DON'T REMEMBER, BUT IT DEFINITELY WASN'T ENOUGH TIME TO KIND OF ACTUALLY START SEARCHING FOR THE JOB.

Q.   OKAY.  WELL, DO YOU REMEMBER SPENDING ANY TIME IN THE MONTH OF JULY LOOKING FOR A JOB?

A.   I DON'T REMEMBER IT.

Q.   OKAY.  AND THEN AUGUST OF 2023.  HOW MUCH TIME DID YOU SPEND LOOKING FOR A JOB IN THE MONTH OF AUGUST OF 2023?

A.   I DON'T REMEMBER.

Q.   OKAY.  DO YOU KNOW IF YOU SPENT ANY TIME?

A.   I DON'T KNOW.

Q.   OKAY.  AND THEN SEPTEMBER OF 2023.  HOW MUCH TIME DID YOU SPEND LOOKING FOR A JOB IN SEPTEMBER OF 2023, SIR?

A.   I DON'T REMEMBER.

Q.   OKAY.  CAN YOU TELL US WHETHER YOU SPENT ANY TIME IN THAT MONTH?

A.   YEAH, I DON'T REMEMBER.  SO I CAN'T SAY THAT.

Q.   OKAY.  DID YOU SPEND TIME SUBMITTING ACDV'S RELATING TO THE COMENITY ACCOUNT?

A.    CAN YOU EXPLAIN WHAT'S THAT.

Q.    SURE.  SO ACDV'S ARE ELECTRONIC DISPUTES THAT YOU CAN SUBMIT TO THE CONSUMER REPORTING AGENCIES.

MR. LOKER:  FOUNDATION, YOUR HONOR.

MR. NARITA:  HE ASKED ME TO EXPLAIN.

THE COURT:  SUSTAINED.  SO CAN YOU JUST SAY WHAT THE WORDS OF THE ACRONYM IS, ACDV.

MR. NARITA:  SURE.

Q.    IT'S AUTOMATED CONSUMER DISPUTE VERIFICATION.

DO YOU RECOGNIZE THAT TERM?

A.    I SUBMITTED DISPUTES WITH THE CREDIT AGENCIES, BOTH, LIKE, SENDING THE LETTERS AND CALLING THEM AND TRYING TO DO THIS VIA THE WEBSITE OR THE APP.  THIS IS WHAT I DID.

BUT I DON'T RECALL WHAT THIS SPECIFIC THING THAT YOU ARE SAYING.

Q.    FAIR ENOUGH.  BUT YOU FEEL LIKE YOU SPENT SOME TIME DISPUTING ALL OF YOUR ACCOUNTS WITH THE CREDIT REPORTING AGENCIES; RIGHT?

A.    I SPENT A LOT OF TIME, YEAH, DISPUTING THAT.

Q.    HOW MUCH OF THAT TIME RELATED TO THE COMENITY ACCOUNT?

A.    LIKE, ALL OF THE TIME.  I WAS DISPUTING ALL OF THE FRAUDULENT ACTIVITIES IN MY CREDIT REPORTS, AND COMENITY, AS OF SEPTEMBER FOR TRANS UNION, FOR EXAMPLE, THEY WERE STILL ON MY CREDIT REPORT.

SO ALL OF THE TIME I DISPUTED WITH TRANS UNION, I WAS

DISPUTING COMENITY AS WELL.

Q.   OKAY.  BUT HOW MUCH OF THE TIME THAT YOU SPENT EITHER GOING ONLINE OR ASSEMBLING YOUR LETTERS OR WRITING YOUR LETTERS, HOW MUCH OF THAT TIME RELATED TO THE COMENITY ACCOUNT SPECIFICALLY AS OPPOSED TO THE CHASE ACCOUNT OR THE BANK OF AMERICA ACCOUNT OR THE CAVALRY ACCOUNT OR THE U.S. BANK ACCOUNT, ALL OF THOSE OTHERS?

A.   ALL OF THE TIME, RIGHT?  I WASN'T DISPUTING ONE ACCOUNT ONE BY ONE, RIGHT?  I WAS COMBINING ALL OF THE EVIDENCE, PUT IN ALL OF THE FRAUDULENT ACCOUNTS, ADDRESSES AND ALL OF THE INFORMATION THERE.  SO ALL OF THE TIME WAS RELATED TO COMENITY AND THE OTHER BANKS.

Q.   OKAY.  SO YOU DIDN'T DISTINGUISH BETWEEN THE TIME THAT YOU WERE SPENDING WORKING ON THE COMENITY ACCOUNT VERSUS THE TIME YOU WERE SPENDING ON ALL OF THESE ACCOUNTS THAT YOU THOUGHT WERE FRAUDULENT; RIGHT?

A.   YES.  I WAS FRUSTRATED WITH ALL OF THEM APPEARING ON MY CREDIT REPORT OBVIOUSLY, YES.

Q.   AND THEN ALL OF THE TIME THAT YOU SPENT DEALING WITH THE CONSUMER REPORTING AGENCIES WAS SORT OF TO COLLECTIVELY DISPUTE ALL OF THE FRAUDULENT ACCOUNTS; RIGHT?

A.   YES, AND CALLING THE BANKS, YEAH.  I WAS TRYING TO DO IT, LIKE, AS MUCH AS POSSIBLE, DISPUTING WITH CREDIT AGENCIES AND WITH THE BANKS DIRECTLY.

Q.   OKAY.  DID YOU KEEP TRACK OF THAT TIME?

A.   THAT I SPENT?

Q.   YES.

A.   WELL, YOU DON'T NEED TO CHECK TIME IF IT GOES THE WHOLE DAY FOR YOU, RIGHT?  IT IS LIKE A FULL-TIME JOB.

I ASSUMED THAT ALL OF THE TIME THAT I HAVE, I'M DEDICATED TO RECOVER FROM THIS.

Q.   OKAY.  SO YOU, YOU SPENT ALL OF YOUR TIME EVERY DAY OF THE MONTH, FULL TIME BETWEEN MAY, JUNE, JULY, AUGUST, AND SEPTEMBER 2023 WORKING ON NOTHING ELSE BUT THIS PROBLEM; RIGHT?

A.   I BELIEVE THAT I HAVE SPENT, YES, LIKE WORKING AS A FULL TIME, YES, FOR MANY MONTHS JUST TO RECOVER FROM THIS.

Q.   OKAY.  SIR, I HAVE A BINDER, BUT I WANT TO MAKE SURE THAT YOU HAVE IT UP THERE.  DO YOU HAVE A BINDER UP THERE WITH 245 IN IT?  IT'S PROBABLY GOING TO BE A DIFFERENT ONE.

A.   I DON'T SEE 245 HERE.

Q.   YOU DON'T HAVE 245?

A.   IT ENDS WITH 244.

Q.   OKAY.  LET ME TALK TO MY TEAM BRIEFLY AND WE'LL TRY TO LOCATE 245.  HANG ON.

THE COURT:  WE'RE OFF THE RECORD FOR A MOMENT.

(PAUSE IN PROCEEDINGS.)

THE COURT:  TO THE JURORS, FEEL FREE TO STAND UP. STRETCH.

(STRETCHING.)

MR. NARITA:  WE THINK IT'S IN THE BACK.

(PAUSE IN PROCEEDINGS.)

THE COURT:  WE'RE BACK ON THE RECORD.

MR. NARITA:  YOUR HONOR, WE --

THE COURT:  SO JUST QUICKLY, THE JURORS ARE PRESENT, THE PARTIES ARE PRESENT, COUNSEL ARE PRESENT.

MR. PANCHENKO IS STILL ON THE WITNESS STAND.

YOU MAY CONTINUE.

MR. NARITA:  THANK YOU, YOUR HONOR.

WE'VE LOCATED EXHIBIT 245, AND MERCIFULLY IT'S PREMARKED AND IT'S THREE HOLE PUNCHED, SO MAY I HAND IT TO YOUR CLERK TO HAND IT TO THE WITNESS?

THE COURT:  YES.  YOU MAY ALSO APPROACH THE WITNESS, BUT THAT WORKS AS WELL.

THANK YOU, MADAM CLERK.

MR. NARITA:  (HANDING.)

BY MR. NARITA:

Q.   TAKE A MOMENT TO LOOK AT EXHIBIT 245 AND LET ME KNOW WHEN YOU'VE HAD A CHANCE TO LOOK IT OVER.

SIR, IS THAT A COPY OF THE COMPLAINT THAT YOU FILED AGAINST MY CLIENT AND THE OTHER BANKS AND CREDIT REPORTING AGENCIES IN THIS CASE?

A.   IT LOOKS LIKE SOMETHING MY LAWYERS FILED, YES.

Q.   OKAY.  BUT YOU WORKED WITH YOUR LAWYERS BEFORE THIS WAS FILED ON YOUR BEHALF; RIGHT?

A.   YES.

Q.   OKAY.  AND DID YOU READ THROUGH IT TO MAKE SURE THAT AT LEAST THE FACTUAL ALLEGATIONS IN IT WERE TRUE AND ACCURATE?

A.   I BELIEVE SO.

Q.   OKAY.  AND THE DATE ON THIS IS SEPTEMBER 27TH, 2023; CORRECT?

A.   YES, SIR.

MR. NARITA:  YOUR HONOR, I WOULD MOVE TO ADMIT IT.

MR. LOKER:  NO OBJECTION, YOUR HONOR.

THE COURT:  THE EXHIBIT IS ADMITTED.

(DEFENDANT'S EXHIBIT 245 WAS RECEIVED IN EVIDENCE.)

BY MR. NARITA:

Q.   LET'S LOOK AT THE FRONT PAGE THERE.  SO THERE'S THE BLUE DATE ACROSS THE TOP, SIR.  THAT SHOWS THE DATE IT WAS FILED; CORRECT?

A.   YES.

Q.   AND YOU AGREE WITH ME THAT IT WAS FILED SEPTEMBER 27TH, 2023; RIGHT?

A.   YES.

Q.   OKAY.  AND THEN IF YOU LOOK DOWN ON THE CAPTION ON THE LEFT-HAND SIDE, THAT SHOWS ALL OF THE DIFFERENT ENTITIES THAT YOU SUED IN THIS CASE; RIGHT?

A.   I BELIEVE SO, YES.

Q.   OKAY.  AND MY CLIENT IS IN THAT LIST SOMEWHERE, CORRECT, COMENITY CAPITAL BANK?

A.   YES.

Q.   OKAY.  IT'S A LONG DOCUMENT, SO WE'RE NOT GOING TO GO THROUGH ALL OF IT, SIR.  WE WOULD BE HERE FOR QUITE A WHILE.

WOULD YOU TURN IN THE DOCUMENT TO PARAGRAPH 70, 7-0.

A.   DO YOU KNOW THE PAGE?

Q.   WE CAN GET THAT FOR YOU.

A.   IS IT 9?

Q.   AT THE BLUE NUMBERS AT THE TOP, IT WOULD BE PAGE 10 OF 17.

A.   OKAY.

Q.   SO THAT'S PARAGRAPH 70 OF YOUR COMPLAINT.

COULD WE ZOOM IN ON PARAGRAPH 70 MOMENTARILY.

AND IN THAT PARAGRAPH, YOU'RE DESCRIBING SOME OF THE DAMAGE THAT YOU THINK THAT THE DEFENDANTS HAVE CAUSED YOU; RIGHT?

A.   YES.

Q.   OKAY.  AND ONE OF THE THINGS THAT YOU ALLEGE IN PARAGRAPH 70 IS THAT THERE IS A LARGE DEBT THAT MISCHARACTERIZES PLAINTIFF AS SOMEONE THAT FINANCIALLY OVEREXTENDS HIMSELF AND HARMS HIS CREDIT SCORE; RIGHT?

A.   YES.

Q.   OKAY.  WELL, BUT THAT'S NOT TRUE AS OF SEPTEMBER 27TH, 2023 WITH RESPECT TO COMENITY, IS IT?

A.   I DISAGREE.

Q.   OKAY.  WELL, COMENITY WASN'T REPORTING -- WELL, YOUR COMENITY ACCOUNT WASN'T APPEARING AS A LARGE DEBT ON ANY CONSUMER REPORT AS OF THE DATE THAT YOU FILED THE LAWSUIT, WAS

IT?

A.   IT WAS APPEARING WITH MORE THAN $5,000, SO I WOULD CONSIDER THAT LARGE AS WELL.

Q.   WELL, WE SAW YOUR, WE SAW YOUR TRANS UNION SCREENSHOT FROM THE WEEK EARLIER; RIGHT?

A.   YES.

Q.   AND IT WAS, IT WAS REPORTING THERE AS A ZERO BALANCE, RIGHT, NOT 5,000?

A.   SO THE BALANCE FIELD WAS ZERO, BUT THE AMOUNT THAT WAS CHARGED OF IT WAS REPORTING WAS MORE THAN $5,000.

Q.   OKAY.  BUT THERE WASN'T A $5,000 FIGURE ON THAT CHART, WAS THERE?  IT WAS JUST ZERO?

A.   YES, BECAUSE IT WAS ONLY THE BALANCE THAT WAS SHOWING THERE.

Q.   SO IT WAS REPORTING A ZERO BALANCE; RIGHT?

A.   TECHNICALLY FOR THE ROW'S BALANCE, IT WAS REPORTING ZERO.

Q.   OKAY.

A.   BUT FOR THE CHARGED OFF BALANCE, IT WAS REPORTING THAT $5,000.

Q.   OKAY.  WELL, MAYBE I'M MISREMEMBERING THAT EXHIBIT.  MAYBE WE SHOULD JUST TAKE A QUICK LOOK BACK THERE AND SEE IF I MISSED SOMETHING.

WAS THERE A $5,000 REFERENCE ON THAT EXHIBIT?

A.   NO, IT WASN'T ON THE EXHIBIT.

BUT IT WAS WRITTEN IN THE REPORT.

Q.   OKAY.  GOT IT.

AND THE OTHER TWO CONSUMER REPORTING AGENCIES, EXPERIAN AND TRANS UNION -- EXCUSE ME, EXPERIAN AND EQUIFAX, THEY ALREADY HAD BLOCKED THE COMENITY REPORT FROM YOUR CREDIT FILE IN AUGUST OF 2023; RIGHT?

A.   I REMEMBER EXPERIAN BLOCKED IT.  I DON'T REMEMBER WHEN EQUIFAX BLOCKED IT, SO I CAN'T SAY THAT.

BUT I WAS CHECKING MOSTLY EXPERIAN BECAUSE I HAD THE APP, AND I REMEMBER THEY BLOCKED IT BEFORE THAT.

Q.   OKAY.  OKAY.  SO EXPERIAN BLOCKED THE ACCOUNT, THE COMENITY ACCOUNT FROM YOUR EXPERIAN REPORT ON AUGUST 16TH, 2023; RIGHT?

A.   AROUND THAT DATE.

Q.   OKAY.  AND THEN THE NEXT DAY EQUIFAX BLOCKED THE COMENITY ACCOUNT FROM YOUR REPORT?

A.   I'M NOT SURE.

Q.   OKAY.  WELL, I THINK THAT'S A -- I THINK THAT'S AN AGREED FACT BETWEEN THE PARTIES, SO WE'LL JUST REFERENCE THAT LATER.

A.   OKAY.

Q.   OKAY.  SO, AGAIN, AS OF THE DATE THAT YOU SUED US AND YOU ALLEGE THAT WE WERE MISCHARACTERIZING YOU AS HAVING A LARGE DEBT, NONE OF THE CONSUMER REPORTING AGENCIES WERE REPORTING A BALANCE FOR THE COMENITY ACCOUNT; RIGHT?

A.   IT'S INCORRECT.  AS I SAID, TRANS UNION WAS REPORTING A CHARGED OFF BALANCE.

Q.   OKAY.  DID WE SEE THAT YESTERDAY WITH MR. LOKER?

A.   I DON'T REMEMBER, SIR.

Q.   OKAY.  LET'S GO TO PARAGRAPH 77.  MAYBE WE CAN ZOOM IN ON THAT, TOO.

NOW, IN PARAGRAPH 77, AGAIN, YOU'RE MAKING ALLEGATIONS AGAINST ALL OF THE DEFENDANTS THAT YOU SUED AND YOU'RE TELLING THEM -- YOU KNOW, YOU'RE TELLING US AND TELLING THE COURT HOW YOU THINK THEY HARMED YOU; RIGHT?

A.   I BELIEVE THAT I -- CAN I READ THIS?

Q.   YEAH, TAKE YOUR TIME.  READ PARAGRAPH 77 AND THEN I'LL ASK IT.

A.   OKAY.  YES.

Q.   OKAY.  SO ONE OF THE THINGS YOU LIST IS INCREASED COSTS FOR CREDIT; RIGHT?

A.   INCREASED COST FOR CREDIT, YES.

Q.   OKAY.  NOW, COMENITY DIDN'T CAUSE YOU ANY INCREASED COSTS FOR CREDIT; RIGHT?

A.   WELL, IF I WERE TO OPEN -- IF I WERE TO TRY AND GO GET A CAR LOAN, FOR EXAMPLE, I WOULD GET A MUCH HIGHER INTEREST RATE, RIGHT, BECAUSE MY CREDIT SCORE IS NOT A -- LIKE, NON-EXISTENT, IT'S SUPER LOW, AND IT GETS REPORTS OF CHARGED OFF DEBT.

SO MAY BE CONFUSED, BUT IT'S MY UNDERSTANDING THAT I HAVE AN INCREASED COSTS IF I WANT TO GO GET THE CAR IN THE UNITED STATES.

Q.   OKAY.  BUT JUST TO BE CLEAR, WHEN YOU SUED US ON

SEPTEMBER 27TH, 2023, YOU HAD NO CREDIT THAT HAD BEEN EXTENDED TO YOU; RIGHT?  NOBODY EXTENDED YOU CREDIT?

A.    I DON'T BELIEVE I HAD A CREDIT CARD THEN, YES.

Q.    SO THERE WAS NO INCREASE IN THE COST OF CREDIT THAT WAS EXTENDED TO YOU BECAUSE YOU HAD NO CREDIT; RIGHT?

A.    AS I JUST SAID, AS I UNDERSTAND THE CREDIT COSTS MEANS THAT IF I WERE TO TAKE ANY CREDIT FROM -- TO GET A CAR, FOR EXAMPLE, I WOULD HAVE AN INCREASED COST THERE.

SO THAT'S WHY I'M NOT TAKING IT, BECAUSE I DON'T WANT TO PAY EXTRA.

Q.    OKAY.  SO WHAT YOU'RE SAYING IS NOT THAT YOU'VE ALREADY INCURRED ANY INCREASED COSTS OF CREDIT, BUT THAT YOU'RE -- YOU JUST DIDN'T APPLY FOR CREDIT BECAUSE OF THE COMENITY ACCOUNT; RIGHT?

A.    BECAUSE OF THE INCREASED COSTS, YES.

Q.    OKAY.  BUT ACTUALLY YOU HAD ALREADY APPLIED TWICE FOR CREDIT; RIGHT?  YOU SAID YOU WENT TO YOUR BANK AND TRIED TO GET A CREDIT CARD, AND THEN YOU WENT TO APPLE; RIGHT?

A.    CORRECT.  SO I APPLIED FOR CREDIT CARDS BECAUSE IF I GET A CREDIT CARD AND JUST WILL NOT GO IN A NEGATIVE BALANCE, I WILL NOT -- I WILL NOT NEED TO PAY ANY ADDITIONAL INTEREST ON IT.

SO THE INTEREST, I DON'T CARE ABOUT THE INTEREST ON THE CREDIT CARD.

BUT I CANNOT APPLY FOR A CAR LOAN OR A MORTGAGE OR ANYTHING LIKE THAT WHERE THE INTEREST NEEDS TO BE PAID RIGHT

AWAY BECAUSE THERE IS GOING TO BE AN INCREASED COST FOR THAT INTEREST.

Q.    SO YOU THINK THAT HYPOTHETICALLY, IF YOU APPLIED TO PURCHASE A CAR OR SOMETHING ELSE, THAT YOU MIGHT GET AN OFFER AT A HIGHER INTEREST RATE; IS THAT IT?

A.    NO, IT'S NOT HYPOTHETICAL.  YOU NEED THE CAR TO DRIVE THROUGH.  IT'S LIKE A COUNTRY WHERE YOU HAVE TO DRIVE, RIGHT?

Q.    BUT I THOUGHT YOU DIDN'T HAVE YOUR CALIFORNIA DRIVER'S LICENSE, SIR.

A.    BUT I HAVE MY DRIVER'S LICENSE FROM UKRAIN, AND I CAN DRIVE WITH IT.

Q.    OKAY.  AND SO DO YOU HAVE A CAR?

A.    WE HAVE A CAR.

Q.    IT DRIVES OKAY?

A.    IT DRIVES OKAY.

Q.    YOU ALSO SAY IN PARAGRAPH 77 THAT YOU SPENT COUNTLESS HOURS AND SUFFERED PECUNIARY LOSS IN ATTEMPTING TO CORRECT THE DEFENDANTS' INACCURATE AND DEROGATORY INFORMATION WITHOUT SUCCESS; RIGHT?

A.    I'M SORRY.  WHAT IS THE NUMBER?

Q.    IT'S AT THE VERY END OF PARAGRAPH 77.

A.    YES.

Q.    OKAY.  SO HOW MANY OF THOSE COUNTLESS HOURS RELATED TO COMENITY, SIR?

A.    AS WE DISCUSSED PREVIOUSLY, LIKE ALL OF, ALL OF THE HOURS

I SPENT TO RECOVER FROM THIS WHILE COMENITY WASN'T COMPLYING WITH IT IS RELATED TO COMENITY DIRECTLY.

Q.   OKAY.  AND YOU DIDN'T COUNT THEM; RIGHT?

A.   YEAH.

Q.   OKAY.  PARAGRAPH 78, COULD WE ZOOM IN ON THAT.

SIR, DID THE COMENITY ACCOUNT CAUSE YOU TO PAY AN INCREASED SECURITY DEPOSIT ANYWHERE?

A.   SO -- YEAH, BECAUSE I COULDN'T PROVIDE MY SOCIAL SECURITY NUMBER TO THE COMPANY THAT WE WERE RENTING OUR APARTMENT FROM, AND BECAUSE THERE WAS A SUPER LOW CREDIT SCORE THERE, WE HAD TO PAY ADDITIONAL SECURITY DEPOSITS ON TOP OF THE REGULAR PRICE. SO, YES.

Q.   WELL, DID YOU, DID YOU GO OVER ANYTHING ABOUT THAT WITH MR. LOKER YESTERDAY?

A.   I DON'T REMEMBER WHETHER WE WENT THROUGH ANY RELEVANT DOCUMENTS FOR THIS.

Q.   SO YOU CAN'T POINT THE JURY TO ANY DOCUMENT THAT YOU HAVE THAT SAYS THAT YOU PAID AN INCREASED SECURITY DEPOSIT BECAUSE OF THE COMENITY ACCOUNT; RIGHT?

A.   WE PROVIDED A DOCUMENT, I BELIEVE, THAT WAS IN EMAILS FROM THE COMPANY THAT WE WERE RENTING WHERE THEY ASKED SPECIFICALLY TO PAY AN EXTRA SECURITY DEPOSIT.

Q.   OKAY.  AND THAT WAS, THAT WAS EMAILS THAT WERE DATED BEFORE YOU EVER DISPUTED THIS ACCOUNT WITH COMENITY; RIGHT?

A.   I REMEMBER THERE WERE MULTIPLE EMAILS.  SOME OF THEM --

SOME OF THEM WAS AFTER WE DISPUTED COMENITY.

Q. DID WE SEE ANY OF THOSE EMAILS YESTERDAY?

A. I DON'T, I DON'T RECALL SEEING THOSE EMAILS YESTERDAY.

Q. OKAY. LET'S TAKE A LOOK AT EXHIBIT 123, SIR.

IS THAT IN ONE OF THE BINDERS UP THERE?

A. NOT IN MINE.

Q. DO YOU HAVE THAT?

A. NO.

Q. OH, YOU DON'T HAVE IT. WE DON'T HAVE EXHIBIT 123 IN THE BINDERS.

A. I HAVE SOME BINDERS ON THE FLOOR, BUT I DIDN'T KNOW --

Q. SIR, IT MIGHT BE ON ONE OF THE BINDERS ON THE FLOOR. WOULD YOU MIND LOOKING FOR IT FOR US?

THE COURT: SO, MR. PANCHENKO, IT WOULD BE IN THE OTHER COMENITY MARKED BINDER.

THE WITNESS: OKAY. SO 120 --

MR. NARITA: 123.

THE WITNESS: YES.

BY MR. NARITA:

Q. TAKE A MOMENT TO LOOK OVER THAT EXHIBIT, AND WHEN YOU'VE HAD A MOMENT, JUST LET ME KNOW.

A. YES.

Q. OKAY. DO YOU RECOGNIZE EXHIBIT 123?

A. THIS IS A DECLARATION IN SUPPORT OF THE DEFENDANT, A POSITION OF THE DEFENDANT.

Q.   OKAY.  AND MAYBE TURN TOWARDS THE BACK OF THE EXHIBIT,
SIR.  THE LAST TWO PAGES -- WELL, I'M SORRY.  THE LAST THREE
PAGES.

A.   SO WHAT IS THE PAGE NUMBER?

Q.   SURE.  IT WILL -- AT THE TOP, THE BLUE PAGE NUMBER WOULD
BE 5 OF 7 AND 6 OF 7.

A.   OKAY.

Q.   SO YOU'RE AT 5 OF 7?

A.   YES.

Q.   OKAY.  IS THAT YOUR ELECTRONIC SIGNATURE THERE AT THE
BOTTOM?

A.   YES, IT LOOKS LIKE MY SIGNATURE, YES.

Q.   AND THEN THE NEXT TWO PAGES ARE CONFIRMATION OF YOUR
ELECTRONIC SIGNATURE.

     IS THAT WHAT YOU UNDERSTAND THAT TO BE?

A.   YES.

Q.   SO YOU ELECTRONICALLY SIGNED THIS DOCUMENT UNDER PENALTY
OF PERJURY ON JULY 9TH OF THIS YEAR; RIGHT?

A.   I BELIEVE SO.

Q.   OKAY.  WELL, DO YOU HAVE ANY DOUBT THAT YOU DID?

A.   NO.

Q.   OKAY.  AND SO YOU UNDERSTOOD WHEN YOU WERE SUBMITTING THIS
TO THE COURT THAT EVERYTHING HAD TO BE TRUE AND ACCURATE AND
COMPLETE; RIGHT?

A.   YES.

Q.   OKAY.  AND FOR THAT REASON YOU READ IT CAREFULLY BEFORE YOU SIGNED IT; RIGHT?

A.   YES.

Q.   OKAY.  ALL RIGHT.

     I WOULD MOVE TO ADMIT IT, YOUR HONOR.

          MR. LOKER:  NO OBJECTION.

          THE COURT:  THE EXHIBIT WILL BE ADMITTED.

     (DEFENDANT'S EXHIBIT 123 WAS RECEIVED IN EVIDENCE.)

BY MR. NARITA:

Q.   TAKE A LOOK AT PARAGRAPH 19, SIR.  IT'S ON PAGE 3 OF 7.

A.   YES, 19.

Q.   OKAY.  IN 19, YOU TESTIFIED THAT YOU CALLED COMENITY TO DISPUTE THE FRAUD TWICE ON JUNE 30TH, 2023; RIGHT?

A.   THAT'S WHAT THIS SAYS, YES.

Q.   OKAY.  AND THAT'S ACTUALLY NOT ACCURATE BECAUSE YOU ONLY CALLED US ONCE IN JUNE 2023; RIGHT?

A.   NO, IT'S NOT CORRECT.  I MEAN, IF IT SAYS HERE THAT I CALLED COMENITY TWICE, I BELIEVE THEN I CALLED COMENITY TWICE.

Q.   OKAY.  BUT WE HEARD THE, WE HEARD THE RECORDINGS FROM JUNE 30TH, 2023, AND IT WAS ALL PART OF ONE CALL.  SO WE HEARD THAT YESTERDAY; CORRECT?

A.   WE HEARD THE RECORDINGS, BUT IT DOESN'T MEAN THAT I DIDN'T CALL COMENITY MULTIPLE TIMES THAT DAY.

Q.   OKAY.  SO WHAT RECORDS DO YOU HAVE THAT YOU CALLED US A SECOND TIME THAT YOU RELIED ON TO TESTIFY UNDER OATH HERE THAT

YOU CALLED US TWICE?

A.   THIS WAS WHAT I REMEMBER BACK THEN, THAT I CALLED YOU MULTIPLE TIMES.  THIS WAS WHAT I TESTIFIED TO, AND I REMEMBER I WAS CALLING MULTIPLE TIMES COMENITY.

SO I WOULD SAY THAT THE SAME THING TODAY AND EVEN TWO AND HALF YEARS AFTER.

Q.   OKAY.  BUT DO YOU HAVE A RECORD OF SOME SORT, A DOCUMENT THAT YOU COULD SHOW US THAT SHOWS YOU CALLED US TWICE INSTEAD OF ONCE?

A.   SO WE PROVIDED ALL OF THE DOCUMENTS THAT WE HAD DURING THE DISCOVERY.

IN THOSE DOCUMENTS THERE WAS SOME MENTION OF MY CALLS TO COMENITY WITH SPECIFIC DATES, BUT I DON'T REMEMBER WHETHER I WAS, LIKE, MARKING SPECIFICALLY HOW MUCH TIME I WAS CALLING DURING THE DAY COMENITY, HOW MUCH TIME DID COMENITY RESPONDED, WHAT THEIR RESPONSE WAS.

I MARKED ON THE MILESTONES WHEN I GOT SOME NEW INFORMATION FROM COMENITY.

Q.   OKAY.  THAT'S FAIR.

SO IF -- YOU KNOW, WHEN THE JURY GOES BACK TO DELIBERATE, DO YOU HAVE ANY DOCUMENTS THAT YOU'RE AWARE OF THAT YOU'LL BE ABLE TO SHARE WITH THEM THAT SHOWS THAT YOU CALLED US TWICE ON THAT DAY INSTEAD OF JUST ONCE?

A.   WE PROVIDED ALL OF THE DOCUMENTS WE HAVE DURING THE DISCOVERY, SO I HOPE THAT THERE IS SOME INFORMATION ABOUT IT,

BUT I DON'T REMEMBER.

Q.   OKAY.  THAT'S FINE.

AND THEN ON THE -- PARAGRAPH 25 -- LET'S GET THERE. THAT'S ON THE SAME PAGE.

DO YOU SEE THAT?

A.   YES.

Q.   AND THERE YOU TESTIFIED, "I CALLED COMENITY TWICE ON AUGUST 7TH, 2023 TO DISPUTE THE FRAUD."  RIGHT?

A.   YES.

Q.   AND YESTERDAY WE ONLY LISTENED TO ONE CALL ON THAT DAY; RIGHT?

A.   MAYBE.  MAYBE IT WAS ONE CALL, YES.

Q.   AND SO DO YOU HAVE ANY KIND OF DOCUMENT OR ANY EVIDENCE THAT YOU COULD POINT THE JURY TO THAT WOULD SHOW THAT YOU CALLED US TWICE ON THAT DAY, RATHER THAN JUST ONCE?

A.   SO I BELIEVE ALL OF MY TESTIMONY HERE, LIKE SPECIFICALLY THE DATES, IT'S HARD TO REMEMBER THE EXACT DATE THAT YOU CALL SOMEONE.  ESPECIALLY TODAY, RIGHT?  BUT EVEN MONTHS AFTER WHEN YOU CALL ALL OF THESE BANKS.

SO I BELIEVE ALL OF THESE NUMBERS HERE I PROVIDED FROM MY LOGS.

AND IF IT SAYS HERE THAT I CALLED COMENITY TWICE, THIS WAS SOMETHING THAT I REMEMBERED AND MARKED AND THAT'S WHY I HAD PUT IT HERE.

Q.   OKAY.  SO YOU THINK THAT THERE IS A LOG OF SOME SORT THAT

YOU KEPT THAT SHOWS TWO CALLS ON AUGUST 7TH, 2023 INSTEAD OF ONE?

A.   I BELIEVE IF IT SAYS THAT I CALLED TWICE, THIS IS WHAT I DID.

Q.   OKAY.  AND PARAGRAPH 32 OF YOUR TESTIMONY, IT SAYS, "I DEVOTED MUCH OF MY TIME TO DISPUTING THIS FRAUD WITH COMENITY."
     RIGHT?

A.   YES.

Q.   OKAY.  AND WE TALKED EARLIER THAT YOU DON'T HAVE ANY LOG OR DOCUMENT THAT ACTUALLY COUNTS UP HOW MUCH TIME THAT RELATES SPECIFICALLY TO COMENITY; RIGHT?

A.   WELL, AS I SAID BEFORE, I SPENT SO MUCH TIME THAT I DON'T NEED TO LOG IT WHEN YOU SPEND THE WHOLE TIME YOU HAVE, RIGHT?

Q.   OKAY.  SO THIS TESTIMONY THAT YOU GAVE HERE REFERS TO THE, BASICALLY YOUR TESTIMONY THAT YOU SPENT FULL TIME, DAY IN AND DAY OUT, FOR ALL OF THE MONTHS OF MAY, JUNE, JULY, AUGUST, AND SEPTEMBER WORKING ON THESE PROBLEMS; RIGHT?

A.   YES, I SPENT ALL THE TIME THAT I HAD TO WORK ON THESE PROBLEMS, TO ACTUALLY WORKING ON THEM AND TRYING TO FIGURE OUT, YES.

Q.   OKAY.  AND THEN IN PARAGRAPHS 41 AND 42 OF YOUR TESTIMONY, YOU SAY THAT THE DISPUTE PROCESS INTERFERED WITH MY ABILITY TO LOOK FOR A JOB, AND THAT I BELIEVE MY EMPLOYMENT WAS DELAYED BECAUSE I WAS UNABLE TO FOCUS ON APPLYING FOR JOBS WHILE I WAS DISPUTING THIS FRAUD WITH COMENITY; RIGHT?

A.   CORRECT.

Q.   OKAY.  AND I THINK YOUR TESTIMONY THAT YOU JUST GAVE US EARLIER WAS THAT YOU ACTUALLY SPENT NO TIME LOOKING FOR A JOB THAT YOU CAN RECALL DURING ANY OF THE MONTHS OF MAY, JUNE, JULY, AUGUST, OR SEPTEMBER OF 2023; RIGHT?

A.   I SAID THAT I DON'T REMEMBER HOW MUCH TIME I SPENT, YES.

Q.   ALL RIGHT.  SO YOU COULDN'T TELL US HOW MUCH TIME YOU DEVOTED TO LOOKING FOR A JOB IN ANY OF THOSE MONTHS; RIGHT?

A.   YES.

Q.   OKAY.  MR. PANCHENKO, YESTERDAY WHEN YOU WERE TESTIFYING FOR MR. LOKER, YOU TOLD HIM THAT YOU DIDN'T REALLY WANT TO BE HERE; RIGHT?

A.   YES.

Q.   AND YOU WERE -- YOU DESCRIBED HOW YOU REALLY WOULD RATHER BE WITH SOME OF YOUR WORK COLLEAGUES AND THERE'S A BIG OPPORTUNITY RIGHT NOW THAT IS HAPPENING WITH YOUR COMPANY THAT YOU WISH YOU COULD HELP THEM OUT WITH; RIGHT?

A.   YES.

Q.   AND YOU UNDERSTAND, SIR, THAT YOU'RE THE ONE WHO IS SUING COMENITY; RIGHT?  WE'RE NOT SUING YOU; CORRECT?

A.   YES, I'M SUING COMENITY.

Q.   AND YOU UNDERSTAND THAT IF YOU WANT TO DISMISS ALL OF YOUR CLAIMS AGAINST COMENITY, YOU COULD DO THAT TODAY; RIGHT?

A.   I DON'T KNOW, BUT I GUESS, YES.

Q.   BUT DO YOU HAVE ANY REASON TO DOUBT THAT IF YOU WANTED TO

DISMISS ALL OF YOUR CLAIMS AGAINST COMENITY RIGHT NOW AND THEN GO JOIN YOUR COLLEAGUES AT WORK, YOU COULD DO SO?

A.   I DON'T KNOW HOW IT WORKS.

BUT FOR ME, THIS IS A CASE ABOUT FRAUD AND NEGLIGENCE, AND I DON'T KNOW WHETHER I HAVE THE ABILITY TO DISMISS ANYTHING. LIKE, I'M HERE FOR A REASON, RIGHT, TO FIGHT THIS.  SO WHY WOULD I DISMISS ANYTHING?

Q.   SO YOU ARE HERE FOR A REASON, SIR?

A.   OF COURSE.

Q.   AND WHAT IS THAT REASON, SIR?

A.   TO HOLD COMENITY ACCOUNTABLE FOR THE VIOLATIONS THAT THEY HAVE, TO MAKE COMENITY PAY FOR THE DAMAGES THAT THEY CAUSED, AND TO PUNISH COMENITY, AND NOT FOR COMENITY TO DO THIS FOR ANYONE ELSE.

Q.   OKAY.  SO YOU WANT TO PUNISH MY CLIENT?

A.   I WANT COMENITY TO BE MONETARILY PUNISHED SO THAT THEY WILL STOP DOING AND EXECUTING THESE PROCEDURES THAT THEY HAVE.

Q.   OKAY.  AND YOU TOLD MR. LOKER THAT THIS CASE WAS NOT ABOUT THE MONEY FOR YOU; RIGHT?

A.   YES.

Q.   SO WOULD IT BE OKAY IF THE JURY AWARDED YOU NO MONEY THEN?

A.   THAT WOULD BE A DECISION OF THE JURY.

Q.   THAT WOULD BE -- AND THAT WOULD BE FINE WITH YOU BECAUSE YOU'RE NOT IN IT FOR THE MONEY; RIGHT?

A.   YEAH.  WHAT WOULD BE FOR ME IS HAVING SEEN COMENITY DOING

THIS TO ANYONE ELSE AND CONTINUING DOING THIS TO ME.  SO I WANT TO STOP THAT AND MAKE COMENITY STOP THAT, YES.

Q.   OKAY.  SO YOU WANT SOME SORT OF INJUNCTION OR COURT ORDER STOPPING COMENITY FROM DOING THAT?

A.   I KNOW THAT MONETARY POWER AND THAT COMENITY CAN SEE BY PAYING PUNITIVE DAMAGES, FOR EXAMPLE, CAN STOP THESE PROCEDURES TO BE EXECUTED BY COMENITY.

SO THAT IS WHAT I WOULD LIKE TO SEE, YES.

Q.   OKAY.  SO YOUR GOAL FOR THIS CASE IS TO HAVE THIS JURY AWARD YOU PUNITIVE DAMAGES; IS THAT FAIR?

A.   MY GOAL IS TO HAVE MY DAMAGES COVERED AND COMENITY BE PUNITIVELY KIND OF PUNISHED FOR WHAT THEY DID.

Q.   OKAY.  HOW MUCH MONEY WOULD YOU LIKE THE JURY TO AWARD YOU?

A.   I CAN'T ESTIMATE IT.  IT'S NOT UP TO ME.

Q.   OKAY.  WELL, HAVE YOU DONE ANYTHING AT ALL, SIR, TO CREATE ANY KIND OF CALCULATION OR ESTIMATE THAT THE JURY COULD USE WHEN THEY GO BACK TO DECIDE WHETHER THEY WANT TO AWARD YOU ANY MONEY?

A.   I DON'T KNOW ANY ESTIMATION OR CALCULATION FOR THAT.

Q.   YOU'VE NOT DONE ANYTHING TO TRY TO DO THAT THAT THE JURY COULD RELY ON, HAVE YOU?

A.   I'M NOT AWARE OF THAT, YES.  I DIDN'T -- PERSONALLY, I DIDN'T DO ANYTHING.

Q.   OKAY.

YOUR HONOR, I'M AT A BREAKING POINT AND A POINT WHERE I WOULD LIKE TO CHAT WITH MY TEAM.

I DON'T KNOW WHAT THE COURT'S --

THE COURT:  WE HAVE ABOUT 15 MORE MINUTES.

MR. NARITA:  OKAY.  MAY I CHAT WITH MY TEAM BRIEFLY AND SEE WHERE WE ARE IN TERMS OF THE EXAMINATION?

THE COURT:  WE CAN DO A QUICK STRETCH BREAK WHILE COUNSEL SPEAKS WITH YOUR TEAM.

MR. NARITA:  OF COURSE.

THE COURT:  OKAY.  SO, MR. PANCHENKO, YOU'RE EXCUSED FROM THE STAND FOR A MOMENT IF YOU WANT TO SIT NEXT TO YOUR TEAM AND EVERYONE CAN JUST STRETCH.

TO THE JURORS, WE WILL BE TAKING OUR LUNCH BREAK IN 15 MINUTES.

BUT WE'RE DOING A STRETCH BREAK FOR RIGHT NOW.  I WILL JOIN YOU IN STRETCHING.

JUROR:  MAY I GO TO THE BATHROOM?

THE COURT:  YES, WHY DON'T WE DO THAT.  SO WE'LL TAKE A BRIEF FIVE MINUTE RECESS.

(JURY OUT AT 11:59 A.M.)

(RECESS FROM 11:59 P.M. UNTIL 12:03 P.M.)

(JURY IN AT 12:03 P.M.)

THE COURT:  EVERYBODY PLEASE BE SEATED.  WE'RE GOING TO COME BACK FROM A VERY SHORT RECESS REQUESTED BY THE DEFENDANT.

JURORS ARE PRESENT, COUNSEL IS PRESENT, YOUR CLIENTS ARE PRESENT.

MR. PANCHENKO IS BACK ON THE WITNESS STAND.

MR. NARITA.

MR. NARITA:  THANK YOU, YOUR HONOR.

Q.   WELCOME BACK, MR. PANCHENKO.

I THINK I'M THROUGH WITH MY EXAMINATION, BUT I JUST WANTED TO GIVE YOU THE OPPORTUNITY -- YOU KNOW, WE'VE BEEN TALKING A LOT.  IS THERE ANY TESTIMONY THAT YOU GAVE FOR ME YESTERDAY OR TODAY THAT YOU THINK YOU WOULD LIKE TO MODIFY OR CHANGE IN ANY WAY?

A.   I DON'T BELIEVE SO.

Q.   OKAY.  SO YOU'RE COMFORTABLE WITH THE TESTIMONY THAT YOU'VE GIVEN US?

A.   YES.

Q.   OKAY.

YOUR HONOR, I WOULD PASS THE WITNESS AT THIS TIME.

THE COURT:  OKAY.  THANK YOU.

REDIRECT?

MR. LOKER:  YES.

THE COURT:  AS I MENTIONED, WE'RE TAKING OUR LUNCH BREAK AROUND 12:15, SO YOU HAVE SOMEWHERE IN THE RANGE OF 5 TO 15 MINUTES.

MR. LOKER:  THANK YOU, YOUR HONOR.

I'M SORRY, I FORGOT A CORD.

MY APOLOGIES.

**REDIRECT EXAMINATION**

BY MR. LOKER:

Q.   MR. PANCHENKO, THE BINDER THAT YOU HAVE UP THERE SHOULD HAVE EXHIBIT 39, THE BINDER THAT HAS MY LOGO ON IT.  CAN YOU FLIP TO EXHIBIT 39.

YOUR HONOR, EXHIBIT 39 IS UNOBJECTED TO, SO CAN I DISPLAY IT AND HAVE IT ADMITTED?

MR. NARITA:  NO OBJECTION, YOUR HONOR.

THE COURT:  OKAY.  SO EXHIBIT 39 MAY BE ADMITTED, AND IT WILL BE PUBLISHED TO THE JURY.

MR. LOKER:  THANK YOU.

(PLAINTIFF'S EXHIBIT 39 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   MR. PANCHENKO, DO YOU HAVE EXHIBIT 39 IN FRONT OF YOU? HAVE?

A.   YES.

Q.   AND EXHIBIT 39, MR. PANCHENKO, THESE ARE STATEMENTS THAT RELATED TO THE COMENITY ACCOUNT THAT WE'VE DISPUTED AS FRAUD.

DO YOU RECALL LOOKING AT THESE DURING THE COURSE OF DISCOVERY?

A.   YES, I THINK I REMEMBER THAT, YES.

Q.   AND THEY GO IN REVERSE CHRONOLOGICAL ORDER, SO I'LL TAKE YOU TO THE END OF THESE, SPECIFICALLY THE BATES STAMP 229.

AND OF COURSE THE BATES STAMP, THAT'S THE NUMBER IN THE

RIGHT-HAND CORNER.

DO YOU SEE IT ON YOUR SCREEN?

A.   I CAN SEE IT ON MY SCREEN.

Q.   AND THIS STATEMENT -- ACTUALLY THE PAYMENT DATE, WHAT IS REFLECTED THERE?

A.   PAYMENT DUE DATE IS AUGUST 19TH, 2017.

Q.   OKAY.  AND THE ADDRESS ON THE STATEMENT?  LET ME ZOOM IN THERE.  WHAT IS THE ADDRESS THAT IS REFLECTED?

A.   5460 SIERRA VISTA AVENUE, APARTMENT 115.

Q.   ARE YOU FAMILIAR WITH THAT ADDRESS?

A.   NO.

Q.   AND DO YOU RECALL DISPUTING THAT ADDRESS WITH COMENITY?

A.   I RECALL DISPUTING THIS ADDRESS THAT WAS SIERRA VISTA FROM MY CREDIT REPORT, YES.

Q.   AND LET'S LOOK AT THE TRANSACTION HISTORY ON THIS PARTICULAR STATEMENT.

NEAR THE MIDDLE OF THE PAGE THERE ARE TRANSACTIONS THAT OCCURRED IN JULY OF '17.

DO YOU SEE THOSE?

A.   YES.

Q.   AND ONE OF THOSE TRANSACTIONS IS A PAYMENT ON JULY 19TH, 2017.

DO YOU RECALL THAT?

A.   YES.

Q.   AND IS IT ACCURATE TO SAY THAT YOU DID NOT SUBMIT ANY

PAYMENTS WHATSOEVER TO COMENITY; CORRECT?

A.   I DID NOT SUBMIT ANY PAYMENTS TO COMENITY.

Q.   AND YOU DID NOT SUBMIT THIS PARTICULAR PAYMENT ON JULY 19TH OF 2017; IS THAT RIGHT?

A.   I DID NOT SUBMIT ANY PAYMENTS ON JULY 19TH, 2017, YEAH.

Q.   THANK YOU.

     AND THE TWO TRANSACTIONS ABOVE THE PAYMENT -- WE'LL DO THEM ONE AT A TIME RATHER.

     THERE'S A JULY 3RD, 2017 TRANSACTION WITH EXPERIAN; RIGHT?

A.   YES.

Q.   IN THE AMOUNT OF 29.95?

A.   YES.

Q.   AND RIGHT BELOW THAT, ON JULY 7TH OF 2017, THERE'S ANOTHER TRANSACTION WITH EXPERIAN; IS THAT RIGHT?

A.   YES.

Q.   14.97 FOR THAT AMOUNT?

A.   YES.

Q.   DID YOU HAVE AN EXPERIAN ACCOUNT IN 2017?

A.   NO.

Q.   WHEN DID YOU FIRST OBTAIN -- I'M SORRY, OPEN UP AN EXPERIAN ACCOUNT?

A.   I OPENED UP AN EXPERIAN ACCOUNT IN 2023, IN MAY OF 2023.

Q.   ANY IDEA WHO OPENED THIS ACCOUNT IN 2017?

A.   NO.

Q.   AND, MR. PANCHENKO --

YOUR HONOR, I WAS GOING TO PROCEED TO A TRANS UNION DOCUMENT.  SHOULD WE HAVE A SIDE-BAR ABOUT THAT?  IT RELATES TO THE BUSINESS RECORDS DECLARATION.

THE COURT:  YES.  QUICK SIDE-BAR, MR. NARITA.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

BY MR. LOKER:

Q.  WE'LL GO IN A DIFFERENT ORDER.

MR. PANCHENKO, WHEN YOU WERE SPEAKING WITH MR. NARITA, DO YOU RECALL LOOKING AT EXHIBIT NUMBER 203?  AND I'LL PUT IT ON THE SCREEN.  I KNOW THERE'S A BUNCH OF BINDERS UP THERE.

A.  YES.

Q.  AND THIS EXHIBIT NUMBER 203, THIS IS THE CREDIT REPORT FROM EXPERIAN DATED MAY 11TH, 2023.

DO YOU RECALL THAT?

A.  YES.

Q.  WITHIN THIS EXHIBIT THERE WAS NEGATIVE ACCOUNTS, A COUPLE OF PAGES OF THEM, AND POSITIVE ACCOUNTS.

DO YOU RECALL THAT?

A.  YES.

Q.  YOU TOOK A MOMENT WITH MR. NARITA -- MY APOLOGIES -- TO LOOK AT THESE POSITIVE ACCOUNTS; IS THAT RIGHT?

A.  YES.

Q.  AND MY UNDERSTANDING FROM YOUR TESTIMONY, MR. PANCHENKO, IS THAT YOU DISPUTED BOTH OF THESE POSITIVE ACCOUNTS; IS THAT RIGHT?

A.    CORRECT.

Q.    SO YOU DISPUTED THE FIRST POSITIVE ACCOUNT, BARCLAYS?

A.    YES.

Q.    YOU ALSO DISPUTED A SECOND ACCOUNT, POSITIVE ACCOUNT RELATED TO COMENITY?

A.    YES.

Q.    AND WHY DID YOU DISPUTE THEM IF THEY ARE LISTED AS A POSITIVE PIECE OF YOUR CREDIT REPORT?

A.    BECAUSE THEY'RE A FRAUD ACCOUNT THAT APPEARS ON MY CREDIT REPORT AND I NEED TO REMOVE THEM.

Q.    SO EVEN THOUGH THEY'RE LISTED AS POSITIVE, YOU DON'T WANT TO, TO PHRASE IT THE WAY MR. NARITA DID, UTILIZE SOMEONE'S CREDIT REPORT, UTILIZE THEIR CREDIT HISTORY TO BENEFIT YOURSELF?

A.    NO, OF COURSE NOT.

Q.    AND YOU ALSO LOOKED AT SEVERAL OTHER CREDIT REPORTS WITH MR. NARITA.

      DO YOU RECALL THAT?

A.    YES.

Q.    AND JUST FOR EFFICIENCY, WE LOOKED AT EXHIBIT NUMBER 212. THAT'S ANOTHER JUNE LETTER FROM EXPERIAN.

      DO YOU SEE THAT ON YOUR SCREEN?

A.    YES.

Q.    AND THIS IS A JUNE 1ST, 2023 DISPUTE RESULTS; RIGHT?

A.    YES.

PANCHENKO REDIRECT BY MR. LOKER

Q.   AND LATER WITH MR. NARITA YOU LOOKED AT EXHIBIT NUMBER 216, A JUNE 21ST, 2023 EXPERIAN CREDIT REPORT?

A.   YES.

Q.   AND ON BOTH OF THOSE, EXPERIAN HAD THE COMENITY ACCOUNT STILL REPORTING POSITIVE; RIGHT?

A.   CORRECT.

Q.   AND THEN WE'LL GO TO EXHIBIT NUMBER 217.  THAT'S THE JULY 14TH, 2023 EXPERIAN CREDIT REPORT.

AGAIN, COMENITY WAS REPORTED POSITIVE; IS THAT RIGHT?

A.   CORRECT.

Q.   AND LATER YOU LOOKED AT EXHIBIT NUMBER 236 WITH MR. NARITA, AND THIS WAS JUST THE SCREENSHOT FROM SEPTEMBER OF 2023 SHOWING THAT TRANS UNION HAS A ZERO BALANCE; RIGHT?

A.   YES, THIS IS A PARTIAL SCREENSHOT OF THE REPORT.

Q.   IN THE BINDER, CAN YOU TAKE A LOOK AT EXHIBIT 32, MR. PANCHENKO.

A.   YES.

Q.   AND WHAT IS EXHIBIT -- WHAT IS EXHIBIT NUMBER 32, MR. PANCHENKO?

A.   THIS IS A CREDIT REPORT FROM EXPERIAN DATED AUGUST 16TH, 2023.

Q.   AND YOU REVIEWED THIS CREDIT REPORT FROM EXPERIAN ON AUGUST 16TH, 2023?

A.   YES.

Q.   AND YOU RECOGNIZE THIS CREDIT REPORT FROM EXPERIAN?

A.   YES.

MR. LOKER:  FOR EXHIBIT NUMBER 32, YOUR HONOR, WE ASK TO PUBLISH IT AND ADMIT IT INTO EVIDENCE.

MR. NARITA:  NO OBJECTION, YOUR HONOR.

THE COURT:  EXHIBIT 32 WILL BE ADMITTED INTO EVIDENCE AND PUBLISHED TO THE JURY.

MR. LOKER:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBIT 32 WAS RECEIVED IN EVIDENCE.)

THE COURT:  MR. LOKER, WE'RE AT 12:15, SO HOWEVER YOU WANT TO DO IT NEXT.

MR. LOKER:  SUPER SHORT.

THE COURT:  2 TO 5 MINUTES.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.   AND LET'S LOOK AT THE CREDIT REPORT.  WHAT IS THE FIRST NEGATIVE ACCOUNT THAT IS LISTED?

A.   IT LISTS COMENITY AS A NEGATIVE.

Q.   AND WHAT IS THE BALANCE THAT'S LISTED THERE?

A.   THE BALANCE -- SO I SEE IT SHOWS CLOSEOUT $5,085.

Q.   THERE'S A RECENT BALANCE NEAR THE MIDDLE COLUMN.

DO YOU SEE THAT?

A.   OH, YES.  RECENT BALANCE SHOWS ZERO AS OF FEBRUARY 2019.

Q.   AND HOW ABOUT THE STATUS THAT IS LISTED FOR THIS COMENITY ACCOUNT?

A.   YEAH.  SO IN THE STATUS IT SAYS CLOSED, AND $5,085 WRITTEN OFF.

Q.   OF THE FIVE CREDIT REPORTS THAT YOU REVIEWED WITH MR. NARITA, THIS WAS NOT ONE OF THEM; RIGHT?

A.   YEAH, THIS WAS NOT ONE OF THEM.

Q.   AND THIS IS A CREDIT REPORT SHOWING COMENITY BEING REPORTED NEGATIVE; IS THAT CORRECT?

A.   CORRECT.

Q.   IN BETWEEN MAY WHERE EXPERIAN HAD IT POSITIVE, YOU -- IN AUGUST WHERE EXPERIAN HAS IT NEGATIVE, THE COMENITY ACCOUNT, YOU MADE DISPUTES TO COMENITY IN MAY; IS THAT RIGHT?

A.   CORRECT.

Q.   AND YOU ALSO HAD SOME TELEPHONE CALLS WITH COMENITY IN JUNE; IS THAT RIGHT?

A.   CORRECT.

Q.   SUBMITTED SOME WRITTEN DISPUTES TO COMENITY IN JUNE?

A.   YES.

Q.   AND THEN IN JULY YOU PLACED SOME TELEPHONE CALLS TO COMENITY TO DISPUTE AS WELL?

A.   YES.

Q.   AND SENT SOME LETTERS TO COMENITY AS WELL?

A.   YES.

Q.   AND IN AUGUST WE HEARD SOME REPORTS OF YOU DISPUTING THIS COMENITY ACCOUNT AS WELL?

A.   YES.

Q.   AND YOU SENT SOME WRITTEN DISPUTES THROUGH THE CREDIT BUREAUS REGARDING COMENITY; IS THAT CORRECT?

A.   YES.

Q.   SO AFTER ALL OF THAT, AFTER ALL OF THOSE DISPUTES, BECAUSE YOU HAD THE AUDACITY TO DISPUTE WITH COMENITY, NOW WE SEE THE NEGATIVE CREDIT REPORTING; IS THAT RIGHT?

A.   YES.

          MR. LOKER:  I DON'T HAVE ANY FURTHER QUESTIONS RIGHT NOW, YOUR HONOR.

          THE COURT:  OKAY.  ARE YOU ASKING TO -- ARE YOU --

          MR. LOKER:  OH, BREAK.  I'M SORRY.  I PHRASED THAT POORLY.  I WAS LOOKING AT MY WATCH FOR THE BREAK, SO I MEANT TO ASK FOR A BREAK.

          THE COURT:  OKAY.  SO THE COURT WILL NOW TAKE ITS -- IT WILL NOW TAKE THE LUNCH BREAK.

     COUNSEL, I'M GOING TO ASK YOU TO STAY FOR A MINUTE AFTERWARDS.

     JURORS, YOU'RE EXCUSED.  I HOPE YOU HAVE A WONDERFUL LUNCH, AND WE WILL RECONVENE AT 1:00.

     (JURY OUT AT 12:15 P.M.)

          THE COURT:  MR. PANCHENKO, YOU'RE EXCUSED FROM THE WITNESS STAND.

     SO LET'S -- DURING THE SIDE-BAR, COUNSEL RAISED THE ISSUE OF THE TRANS UNION -- LET ME JUST SAY -- TAKE A STEP BACK.

     JURORS HAVE NOW LEFT THE COURTROOM.  WE ARE CONTINUING. COUNSEL IS PRESENT.  THE PARTIES ARE PRESENT.

     LET ME BEGIN.

SO DURING THE SIDE-BAR, MR. LOKER HAD RAISED THE QUESTION AND THE ISSUE OF THE TRANS UNION BUSINESS RECORDS DECLARATION, WHICH HAS NOW BEEN PROVIDED TO THE COURT, AS WELL AS OPPOSING COUNSEL, AN AMENDED COPY WITH THE BATES LABEL NUMBER CORRECTED.

AND, MR. NARITA, YOU HAD AN OBJECTION.

MR. NARITA:  YES, YOUR HONOR.

AS I'VE POINTED OUT AT THE SIDE-BAR, THIS DECLARATION, WHICH APPARENTLY HAS GONE THROUGH MULTIPLE DRAFTS JUST IN THE LAST FEW DAYS, DOES NOT ACTUALLY AUTHENTICATE ANYTHING SPECIFICALLY BECAUSE IT DOESN'T ATTACH ANYTHING.

WE'VE NOW HAD THE SAME DECLARANT SAY THREE DIFFERENT THINGS.

FIRST HE SAID SOMETHING ABOUT A COMPLETELY DIFFERENT CONSUMER.

THEN HE SAID SOMETHING ABOUT MR. PANCHENKO, BUT HE REFERENCED A SERIES OF DOCUMENTS THAT HAVE NOT BEEN PRODUCED IN THIS CASE, BATES RANGES THAT HAVE NOT BEEN PRODUCED IN THIS CASE.

AND NOW APPARENTLY HE'S REFERENCING THIS CASE, THIS CONSUMER, WITH THE CORRECT BATES RANGE, BUT HE DOESN'T ACTUALLY ATTACH THE RECORDS THAT HE IS PURPORTING TO AUTHENTICATE.

UNDER THE CIRCUMSTANCES, YOUR HONOR, I JUST DON'T SEE THAT IT'S TRUSTWORTHY.  THERE'S A LOT OF -- THERE'S A LOT TO SUGGEST THAT IT'S NOT TRUSTWORTHY.  IT SUGGESTS TO ME SOMEONE WHO IS VERY BUSY WHO IS JUST SIGNING THINGS WILLY NILLY WITHOUT

ACTUALLY GOING BACK TO LOOK AT PARTICULAR DOCUMENTS AND BOTHERING TO SAY, YES, THIS -- THESE ARE THEM AND THEN ATTACHING THEM.

SO I DON'T THINK WE'VE LAID A FOUNDATION -- WE'VE AUTHENTICATED THEM OR LAID A FOUNDATION.

THE COURT:  THANK YOU.

MR. LOKER.

MR. LOKER:  WELL, OBVIOUSLY THEY'RE TYPOS, YOUR HONOR.

AND I ALSO WANT TO MENTION THAT WITH EQUIFAX AND EXPERIAN, NEITHER OF THEM ATTACH ANY RECORDS EITHER.  THEY BOTH -- AND THOSE DECLARATIONS ARE NOT OBJECTED TO BY MR. NARITA AND THEY'VE BEEN ACCEPTED BY MR. NARITA.

THEY JUST SPECIFY THE BATES RANGE, JUST LIKE MR. WAGNER DID.

THE COURT:  I'M JUST PULLING THIS BACK UP BECAUSE I HAD NOT -- WE RECEIVED THIS WHEN WE WERE IN SESSION.

(PAUSE IN PROCEEDINGS.)

THE CLERK:  MADAM CLERK, COULD YOU FORWARD THAT TO ME.  I KNOW YOU SENT THAT EARLIER, I JUST -- JUST REALLY QUICKLY WHILE I PULL THAT UP, I JUST WANT TO CONFIRM ONE THING FROM OUR LAST CONVERSATION, OUR LAST CONFERENCE.

SO REGARDING THE JURY INSTRUCTIONS AND THE BURDEN OF PROOF AND REASONABLE INVESTIGATION, IS IT STILL COMENITY'S PREFERENCE TO INCLUDE THE BURDEN OF PROOF LANGUAGE?

MR. NARITA:  LET ME CONFER.

THE COURT:  MS. GIVENTAL?

MR. NARITA:  YES, YOUR HONOR.

THE COURT:  OKAY.  THANK YOU.

ALL RIGHT.  HAVING REVIEWED THE BUSINESS RECORDS DECLARATION, THE COURT IS INCLINED TO ACCEPT THE BUSINESS RECORDS DECLARATION IN LINE WITH -- AND THAT IT FULFILLS THE REQUIREMENTS SET FORTH UNDER THE FEDERAL RULES OF EVIDENCE.

THE TYPOS, WHICH WERE THERE, WERE CLEAR TYPOS, YOU KNOW, WHICH LOOKED, FRANKLY SPEAKING, FROM JUST HAVING A PRO FORMA, GOING BACK AND JUST CORRECTING IT THROUGHOUT, BATES LABEL RANGES, THERE HAVE BEEN MULTIPLE BACK AND FORTHS IN TERMS OF -- REGARDING WHAT WAS EXPECTED AND WHAT WAS REQUIRED, AND THE COURT FINDS THAT IT IS SUFFICIENT.

SO WITH ALL THREE OF THEM, LET'S MAKE SURE THAT WE HAVE COPIES WHICH ARE FILED.

MR. LOKER:  FILED.

THE COURT:  JUST TO HAVE AS PART OF THE RECORD.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  ANYTHING ELSE?

MR. NARITA:  YES.  MAY I CLARIFY -- I'M NOT GOING TO REARGUE.

MAY I CLARIFY A POINT FOR THE RECORD, YOUR HONOR?

THE COURT:  YOU ARGUED IT, COUNSEL.

MR. NARITA:  I'M CLARIFYING A POINT THAT MR. LOKER

MADE.

WE HAVE NEVER WITHDRAWN OUR OBJECTIONS TO THE ADMISSION OF THE CREDIT REPORTS.  WE HAVE JUST ACKNOWLEDGED THAT YOUR HONOR HAS ACCEPTED THE DECLARATIONS.

THE COURT:  OKAY.

MR. NARITA:  SO WE HAVE NOT WITHDRAWN THOSE OBJECTIONS.

THE COURT:  THANK YOU.

MR. NARITA:  AND I MAY HAVE MISSPOKE OR MISLED THE RECORD EARLIER.

EXHIBIT 32 IS ONE OF THOSE -- THAT MR. LOKER OFFERED IS ONE OF THOSE CREDIT REPORTS, AND I SAID NO OBJECTION WHEN HE OFFERED IT.

BUT IT'S REALLY -- WHAT I MEANT WAS NO OBJECTION BECAUSE WE HAVE A STANDING OBJECTION THAT THE COURT HAS EFFECTIVELY OVERRULED, WHICH IS AUTHENTICATION AND FOUNDATION.

THE COURT HAS DECIDED TO ACCEPT THE BUSINESS RECORDS EXCEPTION.

THE COURT:  OKAY.  SO THE COURT WILL NOTE -- I MEAN, LET'S BE CAUTIOUS WITH THAT BECAUSE THE RECORD WOULD HAVE INDICATED THAT IT HAD BEEN WITHDRAWN.

THE COURT WILL ACCEPT AND NOTE THAT COMENITY HAD OBJECTED PREVIOUSLY IN TERMS OF THE EXHIBIT LIST TO EXHIBIT 32 REGARDING NO FOUNDATION AND NO AUTHENTICATION.

NO OBJECTIONS RAISED.

AND THAT THE COURT FOUND THAT THOSE OBJECTIONS HAD BEEN MET AND WERE ADDRESSED BY THE BUSINESS RECORDS DECLARATION FILED AS TO EXPERIAN.

MR. NARITA:  THANK YOU, YOUR HONOR.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  SO WE ARE NOW IN LUNCH RECESS UNTIL AROUND 1:00.  1:00.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

(LUNCH RECESS TAKEN AT 12:22 P.M.)

**AFTERNOON SESSION**

(JURY IN AT 1:04 P.M.)

THE COURT:  THE COURT IS NOW BACK IN SESSION IN THE MATTER OF PANCHENKO VERSUS COMENITY CAPITAL BANK.

YOU MAY BE SEATED.

ALL COUNSEL ARE PRESENT, THE JURY IS PRESENT, AND ALL OF THE PARTIES ARE PRESENT AFTER THE COURT'S BREAK.

I HOPE LUNCH WAS GOOD.  I SEE NODS TODAY.  I TAKE THAT AS A GOOD SIGN.

WE STILL HAVE THE WITNESS ON THE STAND.

MR. LOKER, IT'S YOUR WITNESS.

MR. LOKER:  THANK YOU, YOUR HONOR.

Q.   WITH MR. NARITA, MR. PANCHENKO, DO YOU RECALL TAKING A LOOK AT THE SCREENSHOT FROM TRANS UNION THAT SHOWED THE ZERO BALANCE?

A.   YES.

Q.   AND THE SCREENSHOT THAT YOU LOOKED AT WITH MR. NARITA WAS NOT A FULL CREDIT REPORT, WAS IT?

A.   CORRECT.

Q.   IN THE BINDER UP THERE, MR. PANCHENKO, CAN YOU GO TO EXHIBIT NUMBER 30, PLEASE.

A.   YES.

Q.   WHAT IS EXHIBIT NUMBER 30?

A.   IT'S A LETTER FROM TRANS UNION TO ME REGARDING THE

DISPUTES.

Q.   AND YOU RECALL RECEIVING THIS LETTER; IS THAT RIGHT?

A.   YES.

MR. LOKER:  YOUR HONOR, MAY WE PUBLISH AND ADMIT EXHIBIT NUMBER 30?

MR. NARITA:  YOUR HONOR, SUBJECT TO THE OBJECTIONS THAT WE PREVIOUSLY ADDRESSED.

THE COURT:  EXHIBIT 30 MAY BE ADMITTED AND PUBLISHED TO THE JURY.

MR. LOKER:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBIT 30 WAS RECEIVED IN EVIDENCE.)

BY MR. LOKER:

Q.   ALL RIGHT.  MR. PANCHENKO, WHAT IS THE DATE ON THIS LETTER?

A.   IT'S 9TH OF SEPTEMBER 2023.

Q.   THANK YOU.

AND IF YOU FLIP FORWARD TO BATES STAMP 336, I'LL GUIDE US THERE ON THE SCREEN.

DO YOU SEE THE COMENITY ACCOUNT REFERENCE ON THIS PAGE?

A.   YES.

Q.   AND IN TERMS OF THIS COMENITY ACCOUNT, WHAT IS THE BALANCE THAT IS REPORTED?

A.   SO THE BALANCE FIELD IS ZERO, AND THE HIGH BALANCE IS ABOUT 5,000.

Q.   IN THAT HIGH BALANCE ABOUT 5,000, DO YOU SEE THAT BEING

REPORTED AS A CHARGE OFF?

A.   YES.

Q.   AND THIS LETTER FROM SEPTEMBER 9TH, 2023 IS ALSO CONVEYING TO YOU THAT THE COMENITY ACCOUNT WAS VERIFIED AS ACCURATE; IS THAT RIGHT?

A.   CORRECT.

MR. LOKER:  I DON'T HAVE ANY FURTHER QUESTIONS, YOUR HONOR.

MR. NARITA:  JUST A BRIEF REDIRECT, YOUR HONOR.

THE COURT:  RECROSS.

MR. NARITA:  RECROSS.  EXCUSE ME.

THE COURT:  MR. NARITA.

**RECROSS-EXAMINATION**

BY MR. NARITA:

Q.   I'LL BE BRIEF.

MR. PANCHENKO, DO YOU STILL HAVE EXHIBIT 32 IN FRONT IT OF YOU.  IT'S IN A BINDER.

A.   YES.

Q.   SO THAT IS THE AUGUST 16TH, 2023 EXPERIAN REPORT THAT MR. LOKER SHOWED YOU; RIGHT?

A.   CORRECT.

Q.   AND THAT IS THE ONE EXPERIAN REPORT THAT WE HAVE SEEN ALL DAY THAT LISTS THE COMENITY ACCOUNT AS A POTENTIALLY NEGATIVE ACCOUNT; RIGHT?

A.   CORRECT.

Q.   ALL RIGHT.  NOW, THIS CREDIT REPORT WAS NEVER TRANSMITTED TO ANYBODY BUT YOU; RIGHT?

A.   IT WAS TRANSMITTED FIRST TO ME, AND THEN IT WAS SHARED WITH EVERYONE.

Q.   WITH WHOM, SIR?

A.   DURING THE DEPOSITION, RIGHT, WE SHARED ALL OF THE LETTERS THAT I RECEIVED.

Q.   OH, OKAY.  BUT I MEANT THAT EXPERIAN -- IT LOOKS LIKE THEY MAILED A COPY OF IT TO YOU; RIGHT?

A.   YES.

Q.   BUT THIS IS THE EXACT SAME DAY THAT EXPERIAN BLOCKED ALL OF YOUR ACCOUNTS FROM YOUR CREDIT FILE; RIGHT?

A.   I DON'T KNOW.  YOU NEED TO ASK EXPERIAN WHEN THEY ACTUALLY REMOVED THE ACCOUNTS.

Q.   OKAY.  WELL, IT'S ACTUALLY A STIPULATED FACT IN THE CASE THAT ON AUGUST 16TH, 2023, EXPERIAN BLOCKED ALL ACCOUNTS FROM YOUR CREDIT FILE.

A.   SO IT'S UP TO EXPERIAN, YEAH, TO SAY WHEN THEY BLOCKED ANYTHING.

BUT, LIKE I MENTIONED, I RECEIVED THIS AFTER AUGUST 16TH, RIGHT?  AND AFTER AUGUST 16TH, EVEN, LIKE, I SAW THAT THERE ARE STILL ACCOUNTS THERE.  SO IT WAS PROBABLY LATE AUGUST THAT I SAW ACCOUNTS REPORTED AS FRAUDULENT ACCOUNTS REPORTED HERE IN MY CREDIT REPORT.

Q.   UNDERSTOOD.  BUT I JUST -- BACK TO MY EARLIER QUESTION,

Q.   WHICH IS THAT YOU'RE ACTUALLY THE ONLY PERSON THAT YOU KNOW OF THAT HAS EVER SEEN EXHIBIT 32; RIGHT?

A.   I DON'T KNOW.  I DON'T KNOW WHETHER ANYONE ELSE DID.

Q.   SO YOU DON'T KNOW WHETHER ANY, LIKE, PROSPECTIVE CREDITOR/LENDER EVER SAW IT; RIGHT?

A.   YEAH, I DON'T KNOW WHO PULLED THIS REPORT.

Q.   OKAY.  AND THEN THE LAST ONE WE SAW, WAS IT 34 OR 33? WHAT WAS THE LAST ONE THAT MR. LOKER --

          MR. LOKER:  30.

          MR. NARITA:  30 EVEN.  OKAY.

Q.   SO DO YOU HAVE EXHIBIT 30 IN FRONT OF YOU?

A.   YES.

Q.   AND THAT IS THE LETTER THAT YOU GOT FROM TRANS UNION ON SEPTEMBER 9TH, 2023 WITH SOME DISPUTE RESULTS; RIGHT?

A.   CORRECT.

Q.   AND AS MR. LOKER POINTED OUT, HERE THE COMENITY ACCOUNT IS SHOWING WITH A BALANCE OF $5,085; CORRECT?

A.   THE BALANCE, THE CHARGED OFF BALANCE IS ABOUT $5,085.

Q.   OKAY.  AND THEN BELOW THAT THERE'S A JP MORGAN CHASE CARD; RIGHT?

A.   YES.

Q.   AND THE BALANCE THERE IS SHOWING AS CHARGED OFF $33,377; RIGHT?

A.   CORRECT.

Q.   OKAY.  SO DID ONE OF THESE ACCOUNTS BOTHER YOU ANY MORE

THAN THE OTHER?

A.    THEY BOTH BOTHER ME IN A DIFFERENT SENSE.  SO JP MORGAN BOTHERED ME BECAUSE IT WAS A HUGE AMOUNT THERE, AND COMENITY BOTHERED ME BECAUSE ADDITIONAL TO, LIKE, EVERYTHING WE DISCUSSED, RIGHT?  IT WAS AN ACCOUNT THAT WAS OPENED PRIOR TO THAT.

SO MY ASSUMPTION IS THE FIRST PERSON WHO OPENED THIS ACCOUNT WITH A SMALLER AMOUNT, PAID FOR SOME TIME, GAINED SOME CREDIT SCORE, AND USED THAT ACCOUNT TO OPEN A MUCH BIGGER ACCOUNT WITH JP -- WITH CHASE.

SO BOTH OF THEM ARE KIND OF -- IT'S NOT SUPPOSED TO BE THERE.  BOTH OF THEM ARE FRAUD, AND I'M MAD ABOUT BOTH OF THEM FOR THE DIFFERENT REASONS.

Q.    OKAY.  BUT YOU DIDN'T KNOW IN SEPTEMBER OF 2023 BEFORE YOU FILED THIS LAWSUIT WHAT ANY FRAUDSTER DID TO OPEN ACCOUNTS OR IN WHAT ORDER; RIGHT?

A.    YES, I CAN ONLY OPERATE WITH THE INFORMATION THAT I HAD FROM MY CREDIT REPORT, YES.

Q.    SO YOU DIDN'T HAVE ANY, ANY EVIDENCE THAT THE COMENITY ACCOUNT WAS SOME SORT OF GATEWAY ACCOUNT THAT ALLOWED THE FRAUDSTER TO OPEN UP OTHER ACCOUNTS OR ANYTHING LIKE THAT; RIGHT?

A.    I ONLY HAD THIS INDIRECT EVIDENCE THAT IT WAS ONE OF THE FIRST ACCOUNTS TO BE OPENED, THE AMOUNT THAT WAS SMALL COMPARED TO OTHERS, AND THE FACT THAT THERE WAS SOME PAYMENTS ON THE

ACCOUNT, ON THE DATE.  IT HELPED ME ASSUME THAT THERE MIGHT BE A TIMELINE THERE.

Q.   OKAY.  OKAY.  WHAT DID YOU INFER, IF ANYTHING, FROM THE FACT THAT SOMEONE HAD PAID THE ACCOUNT OVER AND OVER AGAIN FOR ALMOST TWO AND A HALF YEARS?  ANYTHING?

A.   I DON'T KNOW WHY THEY DID IT, BUT IT'S REASONABLE FOR ME TO THINK THAT IT MIGHT BE TO OPEN BIGGER ACCOUNTS LATER.

Q.   OKAY.  IS THAT, IS THAT A CONCLUSION THAT YOU REACHED IN SEPTEMBER OF 2023?

A.   I DON'T REMEMBER WHEN EXACTLY I REACHED THAT CONCLUSION.

Q.   OKAY.

NOTHING FURTHER, YOUR HONOR.

THE COURT:  OKAY.  MAY THE WITNESS BE EXCUSED OR, MR. LOKER, DO YOU HAVE FURTHER QUESTIONS?

MR. LOKER:  NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  MR. PANCHENKO, YOU'RE EXCUSED.

MR. LOKER:  OUR NEXT WITNESS IS PAVLO.  HE'S IN THE HALL.  CAN I GRAB HIM?

THE COURT:  YES.  GOOD AFTERNOON, SIR.

THE WITNESS:  HELLO.

THE COURT:  YOU CAN APPROACH THE WITNESS STAND.  MY NAME IS JUDGE LEE.

THE WITNESS:  OKAY.

THE COURT:  SO MADAM CLERK IS GOING TO ASK YOU TO RAISE YOUR RIGHT HAND SO SHE CAN SWEAR YOU IN.

THE CLERK:  THANK YOU.

**(PLAINTIFF'S WITNESS, PAVLO BILASHCHUK, WAS SWORN.)**

THE WITNESS:  YES.

THE CLERK:  THANK YOU.  IF YOU COULD STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

THE WITNESS:  YES.  MY NAME IS PAVLO BILASHCHUK.  MY LAST NAME IS SPELLED B-I-L-A-S-H-C-H-U-K.

THE COURT:  THANK YOU, SIR.  YOU MAY BE SEATED.

**DIRECT EXAMINATION**

BY MR. LOKER:

Q.   MR. BILASHCHUK, HOW DO YOU KNOW MR. PANCHENKO?

A.   WE ARE FRIENDS.

Q.   AND WHEN DID YOU MEET HIM?

A.   I THINK IT WAS MAY 2017.

Q.   AND HOW DID YOU TWO MEET?

A.   WE USED TO WORK TOGETHER IN THE SAME COMPANY AND THE SAME OFFICE.

Q.   WHAT WAS THAT COMPANY?

A.   LUXOFT CONSULTANCY.

Q.   CAN YOU SPELL THAT FOR THE COURT REPORTER, PLEASE.

A.   YEAH.  IT'S L-U-X-O-F-T.

Q.   I APPRECIATE THAT.  WHERE WERE YOU TWO WHEN YOU WERE WORKING FOR LUXOFT?

A.   IT WAS BACK IN UKRAINE, KYIV.

Q.   IS THAT WHERE YOU ARE FROM?

A.   YES.

Q.   AND EVENTUALLY DID YOU MOVE TO THE UNITED STATES?

A.   CORRECT.

Q.   AND WHERE IN THE STATES WERE YOU LIVING?

A.   NEW YORK CITY.

Q.   AND WHEN YOU COME TO THE UNITED STATES, IS THAT A SMOOTH TRANSITION?

A.   NOT REALLY.  IT'S QUITE STRESSFUL, AND YOU HAVE THINGS TO DO.  DO YOU WANT ME TO ELABORATE ON THIS?

Q.   CAN YOU SPEAK A LITTLE CLOSER TO THE MIC.

A.   DO YOU WANT ME TO ELABORATE ON THIS?

Q.   YEAH, CAN YOU DESCRIBE FOR US.

A.   YEAH.  SO EVEN BEFORE YOU COME HERE, YOU HAVE TO COLLECT ALL OF THE DOCUMENTS, BOOK AN APPOINTMENT WITH THE EMBASSY, HAVE AN INTERVIEW WITH THE OFFICER.  SO IT'S A LOT OF THINGS YOU NEED TO DO, AND IT'S SOMETIMES STRESSFUL.

AND AFTER YOU COME TO THE UNITED STATES, IT'S ALSO A LOT OF THINGS THAT YOU HAVE TO DO TO ESTABLISH YOURSELF IN A NEW COUNTRY.

SO, YEAH, I CAN GIVE YOU A FEW EXAMPLES FROM MY PERSONAL EXPERIENCE.

SO WHEN I ARRIVED TO THE UNITED STATES, I WAS STAYING IN A HOTEL BY MY COMPANY TEMPORARILY WHILE I SEARCHED FOR A PERMANENT APARTMENT, WHICH WAS VERY -- NOT AN EASY THING TO DO BECAUSE IN THE UNITED STATES I REALIZED THAT LANDLORDS WANT TO

CHECK YOUR CREDIT SCORE, THEY WANT TO SEE YOUR TAX RETURNS, THEY WANT TO HAVE SOMETIMES EVEN REFERENCE LETTERS FROM OTHER LANDLORDS FROM THE SAME AREA, AND NONE OF THAT OBVIOUSLY WAS IN MY POSSESSION.  SO I DIDN'T HAVE TAX RETURNS YET, I DIDN'T HAVE THE CREDIT SCORE.  SO IT WAS VERY DIFFICULT TO COMPETE FOR THE APARTMENT WITH PEOPLE WHO HAD ALL OF THAT.

AND EVEN CREATING AND OPENING BANK ACCOUNTS, AND SOME OF IT SHOULD BE RELATIVELY EASY.  IT'S NOT EASY BECAUSE WHAT I LEARNED IS THAT YOU HAVE TO HAVE A PERMANENT ADDRESS HERE IN ORDER TO OPEN THE BANK ACCOUNT.  SO I DIDN'T HAVE, FOR EXAMPLE, A PERMANENT ADDRESS.  AT THE TIME I LIVED IN THE HOTEL, SO IT WAS -- I HAD SOME COMPLICATIONS OPENING A BANK ACCOUNT.

AND EVENTUALLY EVEN WHEN I FOUND THE APARTMENT THAT APPROVED US, WE HAD TO MAKE A LOT OF PAYMENTS WITHIN 24 HOURS. SO WE HAD 24 HOURS TO PAY THE BROKERS FEES, FIRST AND LAST MONTH, SECURITY DEPOSIT.  AND WHEN I TRIED TO MAKE THOSE PAYMENTS, I OPENED MINE IN THE UKRAINE BANK, AND I REALIZE THAT I CANNOT TRANSFER MY MONEY HERE BECAUSE OF WAR IN THE UKRAINE, CENTRAL BANK PROHIBITED ALL OF THE TRANSFERS ABROAD TO FOREIGN BANK.

SO IT WAS VERY STRESSFUL FOR MOMENTS LIKE THAT.  YEAH, SO JUST TO GIVE YOU A FEW EXAMPLES HOW IT MAY WORK FOR IMMIGRANTS.

Q.   I APPRECIATE THAT.  AND ARE YOU FAMILIAR WITH MR. PANCHENKO'S CLAIMS ABOUT THE FRAUD?

A.   YEAH, I THINK SO, GENERALLY.

Q.   IN TERMS OF THAT, ARE YOU TWO -- I KNOW YOU'RE IN NEW YORK AND HE'S HERE IN CALIFORNIA, DO YOU TWO COMMUNICATE OFTEN?

A.   I MEAN, YEAH, I WOULD SAY WE REGULARLY ARE IN TOUCH, YEAH.

Q.   AND WOULD THAT BE PHONE CALLS AND MESSAGES?

A.   YES.  SOMETIMES IN PERSON, BUT MORE, YEAH.

Q.   AND IN SPEAKING WITH MR. PANCHENKO, WHAT WAS YOUR IMPRESSION OF HOW HE WAS HANDLING THE FRAUD PROCESS?

A.   WELL, MY IMPRESSION OF HIS STATE WAS THAT HE WAS FRUSTRATED WITH THE SITUATION, AND ALSO LIKE WITH THE SITUATION ITSELF IS A PROBLEM, AND ALSO WITH THE FACT HE CANNOT START LOOKING FOR A JOB RIGHT AWAY BECAUSE HE'S WORKING ON SOLVING HIS PROBLEM.

     SO, YEAH, TO ME HE FELT LIKE KIND OF TIRED AND HELPLESS, HOURS ON THE PHONE WITH ALL OF THESE ORGANIZATIONS RIGHT AFTER HIS ARRIVAL IS MY IMPRESSION OF HIS STATE.

Q.   YOU MENTIONED ORGANIZATIONS.  ARE YOU AWARE THAT THERE ARE MULTIPLE FRAUDULENT ACCOUNTS COUPLED WITH A HANDFUL OF DIFFERENT BANKS?

A.   YEAH, I THINK HE MENTIONED IT WAS LIKE SEVERAL OR LIKE SOME NUMBER OF ACCOUNTS.

Q.   ARE YOU UNDER THE IMPRESSION THAT AT LEAST SOME OF THE STRESS AND DURESS MR. PANCHENKO WAS UNDER WAS STEMMING FROM COMENITY?

          MR. NARITA:  IT'S LEADING, YOUR HONOR.

          THE COURT:  SUSTAINED.  CAN YOU REPHRASE THE

QUESTION?

MR. LOKER:  YEAH.

THE COURT:  SO TOTALLY NORMAL, BUT AS PART OF THE TESTIMONY, SOMETIMES OPPOSING COUNSEL WILL MAKE OBJECTIONS AND JUST LET ME RULE ON IT, AND THEN MR. LOKER WILL DIRECT YOU.

THE WITNESS:  ALL RIGHT.

BY MR. LOKER:

Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHETHER COMENITY WAS RESPONSIBLE FOR ANY OF THE STRESS THAT YOU MENTIONED?

MR. NARITA:  OBJECTION.  FOUNDATION.

THE COURT:  OVERRULED.

BY MR. LOKER:

Q.   GO AHEAD.

A.   SO RIGHT NOW MY UNDERSTANDING IS THAT, YES, BECAUSE THIS ORGANIZATION IS PART OF THIS STORY.  SO, YES, I WOULD SAY THIS IS MY UNDERSTANDING.

Q.   THANK YOU.

I DON'T HAVE ANY FURTHER QUESTIONS.

**CROSS-EXAMINATION**

BY MR. NARITA:

Q.   GOOD AFTERNOON, SIR.

A.   HELLO.

Q.   IT'S NICE TO MEET YOU.  I'M THE ATTORNEY FOR COMENITY CAPITAL BANK.

A.   NICE TO MEET YOU.

Q.   WHEREABOUTS DO YOU LIVE IN NEW YORK CITY?  MY DAUGHTER LIVES THERE.

A.   WHERE?

Q.   YES.

A.   UPPER WEST SIDE.

Q.   BEAUTIFUL PART OF THE CITY.

A.   YEAH, YEAH, YEAH.

Q.   I SPENT ONE SUMMER THERE AND FELT PRETTY SPECIAL SO.

JUST A FEW FOLLOW-UP QUESTIONS FOR YOU.

SO WHEN EXACTLY DID YOU LEAVE THE UKRAINE?

A.   IF I'M NOT MISTAKEN, IT WAS FEBRUARY 7TH, IF MY MEMORY IS CORRECT.  THAT'S WHEN I LEFT THE UKRAINE.

Q.   OF WHICH YEAR?

A.   SORRY.  2022.

Q.   2022?

A.   YEAH.

Q.   OKAY.  SO THAT WAS JUST A COUPLE OF WEEKS BEFORE ZELENSKYY DECLARED MARTIAL LAW; RIGHT?

A.   YES, EXACTLY.

Q.   AND WHAT WAS YOUR FIRST DESTINATION, NEW YORK CITY?

A.   NO.  MY FIRST DESTINATION WAS LISBON, PORTUGAL.

Q.   AND WHO WAS YOUR EMPLOYER WHEN YOU GOT TO LISBON?

A.   AT THE TIME MY EMPLOYER WAS EPAM SYSTEMS.

Q.   EPAM?

A.   EPAM.

Q.    AND THAT'S E-P-A-M?

A.    CORRECT.

Q.    OKAY.  AND HAD YOU AND MR. PANCHENKO WORKED TOGETHER AT EPAM?

A.    YES.

Q.    SO WERE YOU AND HE WORK COLLEAGUES IN JANUARY OF 2022?

A.    NO.

Q.    OKAY.  HE HAD MOVED ON TO SOME OTHER COMPANY?

A.    YES.

Q.    AND YOU STILL WORKED AT EPAM?

A.    YES.

Q.    SO YOU FIRST LEFT UKRAINE AND YOU WENT TO LISBON.

      HOW LONG WERE YOU THERE?

A.    ROUGHLY -- I DON'T REMEMBER THE NUMBER OF DAYS I SPENT THERE BUT ROUGHLY TWO AND A HALF MONTHS.  SOMETHING LIKE THAT.

Q.    YOU WERE IN LISBON AT THE TIME THAT MR. PANCHENKO WAS IN WARSAW; CORRECT?

A.    YES.

Q.    AND THEN WHAT IS YOUR NEXT STOP AFTER LISBON, SIR?

A.    WARSAW.

Q.    OKAY.  SO YOU OVERLAPPED WITH HIM IN WARSAW; CORRECT?

A.    CORRECT.

Q.    OKAY.  IS THAT STILL IN 2022?

A.    YES.

Q.    AND THEN WHAT IS YOUR NEXT STOP AFTER WARSAW?

A.   NEW YORK.

Q.   AND THEN WHEN WAS THAT?

A.   APRIL -- SO I ARRIVED IN NEW YORK CITY APRIL 15TH, 2022.

Q.   2022?

A.   2022.

Q.   OKAY.  PRETTY QUICKLY AFTER YOU GOT OUT OF THE UKRAINE YOU WERE IN NEW YORK CITY; CORRECT?

A.   YES, YOU COULD SAY THAT I GUESS.

Q.   WELL, I'M SORRY ABOUT HOW STRESSFUL IT WAS.  YOU PICKED THE BIGGEST CITY WE HAVE TO SETTLE DOWN IN, AND I'VE BEEN THERE, AND IT CAN BE A LITTLE OVERWHELMING.

SO SINCE -- WELL, WHEN WAS THE LAST TIME THAT YOU HAD SAW MR. PANCHENKO BEFORE YOU LEFT FOR NEW YORK CITY?

A.   YOU WANT ME TO STATE A DATE OR --

Q.   APPROXIMATELY.  YEAH, APPROXIMATELY.

A.   I DON'T REMEMBER A DATE, BUT IT WAS DURING THE PERIOD IN WARSAW.  SO IT WAS I GUESS APRIL 2022.

Q.   OKAY.  THEN WHEN WAS THE NEXT TIME AFTER APRIL OF 2022 THAT YOU PHYSICALLY SAW MR. PANCHENKO?

A.   I WOULDN'T BE ABLE TO TELL YOU A DATE EXACTLY, BUT I BELIEVE IT WAS IN 2023 WHEN HE WAS IN NEW YORK CITY AFTER RELOCATION.

Q.   OKAY.  SO IN ABOUT JULY OF 2023, HE AND HIS WIFE TOOK A TRIP TO NEW YORK CITY, AND THEY VISITED YOU WHILE THEY WERE THERE; RIGHT?

A.   YEAH, IT WAS SUMMER, YES.

Q.   OKAY.  DID THE THREE OF YOU HAVE FUN RECONNECTING?

A.   I WOULD SAY SO, YEAH, WE SPENT SOME TIME HANGING OUT IN NEW YORK.

Q.   OKAY.  AND HOW LONG WERE THEY IN NEW YORK?

A.   A COUPLE OF WEEKS I GUESS.

Q.   OKAY.  AND DOES MR. PANCHENKO'S WIFE, IS SHE FRIENDLY WITH YOUR WIFE?

A.   YEAH, YEAH.

Q.   AND SO THE FOUR OF YOU ALL ARE GOOD SOCIAL FRIENDS?

A.   YEAH.

Q.   OKAY.  SO DURING THE TWO WEEKS THAT THEY WERE THERE IN JULY, DID YOU SEE A GOOD AMOUNT OF THEM?

A.   YOU MEAN HOW OFTEN?

Q.   YEAH, HOW OFTEN.

A.   PROBABLY WE COULD SPEND MORE TIME TOGETHER BUT, YOU KNOW, WE SPENT SOME TIME.  I WAS WORKING DURING THE TIME, SO I WASN'T ABLE TO SPEND EVERY DAY WITH THEM.  BUT, YEAH.

Q.   OKAY.  REMIND ME AGAIN, WERE YOU STILL WORKING FOR EPAM IN JULY OF 2023 OR SOMEONE ELSE?

A.   EPAM.

Q.   OKAY.  AND WHERE WAS YOUR WIFE WORKING?

A.   AT THAT TIME SHE PROBABLY WAS SELF-EMPLOYED.

Q.   SO SHE DIDN'T HAVE AN EMPLOYER?

A.   AT THE TIME I BELIEVE, NO, IF I REMEMBER CORRECTLY.

Q.   SHE WORKED FOR SPOTIFY AT SOME POINT; RIGHT?

A.   YEAH, THE FIRST YEAR BASICALLY.

Q.   AND THEN DID SHE GET A JOB AT SOME POINT AFTER JULY OF 2023?

A.   YEAH.  CURRENTLY SHE'S EMPLOYED.

Q.   WITH WHOM?

A.   ZEBRALUTION, ZEBRALUTION.  IT DEPENDS.  I DON'T KNOW THE EXACT SPELLING OF THE COMPANY.  YEAH.

Q.   THAT'S OKAY.  AND HOW LONG HAS SHE BEEN EMPLOYED THERE?

A.   LESS THAN A YEAR.  SO SHE WAS EMPLOYED IN JANUARY OF THIS YEAR AND SO IT'S LESS THAN A YEAR.

Q.   OKAY.

     EXCUSE ME.  SORRY, SIR.  SOMETIMES THERE'S SO MANY PAPERS THAT YOU LOSE YOUR PLACE.

     DO YOU HAVE ANY BINDERS UP THERE NEAR YOU WITH SOME EXHIBITS?

A.   I HAVE A FOLDER.

Q.   OKAY.  SO, SIR, IS ONE OF THEM -- SIR, DOES ONE OF THEM HAVE THE NUMBER 229?

          MR. LOKER:  MAY I ASSIST HIM BECAUSE THERE'S SO MANY?

          THE COURT:  MR. NARITA, I ASSUME THERE'S NO OBJECTION?

          MR. NARITA:  NO.

          THE COURT:  MR. LOKER IS APPROACHING.

(PAUSE IN PROCEEDINGS.)

MR. NARITA:  MADAM CLERK, CAN WE HAVE THE TECHNICAL GREMLINS WORK IN OUR FAVOR.  CROSS OUR FINGERS.

MR. LOKER:  229.

MR. NARITA:  YES.

THE COURT:  SO WITH MR. LOKER'S ASSISTANCE, I BELIEVE THE EXHIBIT IS BEFORE THE WITNESS.

MR. NARITA:  AND THIS IS ALREADY IN EVIDENCE.  WE CAN BRING IT UP ON THE SCREEN.

MR. LOKER:  THAT WAS NOT 229 IN THE BINDER.  ONE SECOND.

MR. NARITA:  LET'S MAKE SURE HE'S LOOKING AT THE RIGHT ONE.

MR. LOKER:  YEAH, HIS IS FLIPPED.

MR. NARITA:  THANK YOU, MR. LOKER.

Q.   NOW, THE WITNESS HAS 229 IN FRONT OF HIM.  SIR, WE HAVE ALREADY ADMITTED 229, BUT LET ME ASK YOU -- ACTUALLY, TAKE A MOMENT, SIR, AND FLIP THROUGH THE PAPER IN FRONT OF YOU, AND WHEN YOU'VE HAD AN OPPORTUNITY TO FLIP THROUGH IT, I'LL ASK YOU SOME QUESTIONS.

A.   YEAH, I'M DONE.

Q.   OKAY.  AND DO YOU RECOGNIZE WHAT HAS BEEN MARKED AS TRIAL EXHIBIT 229?

A.   YEAH, I RECOGNIZE.

Q.   AND THIS IS AN EXCHANGE BACK AND FORTH BETWEEN YOU AND

MR. PANCHENKO; CORRECT?

A.   CORRECT.

Q.   OKAY.   WHAT, WHAT APPLICATION WERE YOU USING TO SEND THESE MESSAGES?

A.   TELEGRAM.

Q.   TELEGRAM.   OKAY.   AND THE FIRST PAGE OF THIS EXHIBIT, IT HAS AN IMAGE THAT YOU SENT TO MR. PANCHENKO; RIGHT?

A.   UH-HUH, YES.

Q.   CAN WE BLOW THAT UP A LITTLE BIT.

AND WHAT IS IT THAT YOU'RE SENDING TO MR. PANCHENKO, SIR?

A.   THIS IS CREDIT CARD.

Q.   IT'S AN APPLE TITANIUM CREDIT CARD?

A.   CORRECT.

Q.   AND DID YOU GET THAT CREDIT CARD WHEN YOU WERE ALREADY IN THE UNITED STATES?

A.   YES.

Q.   IS THAT THE FIRST CARD THAT YOU GOT WHEN YOU WERE IN THE UNITED STATES?

A.   GOOD QUESTION.   LET ME THINK ABOUT IT.   IT WAS PROBABLY NOT THE FIRST CARD PER SE BECAUSE I HAD A DEBIT CARD AS MY FIRST CARD.

I DON'T REMEMBER IF THAT WAS MY FIRST CREDIT CARD, TO BE HONEST, BUT IT WAS NOT MY FIRST BANK CARD IN GENERAL.

Q.   OKAY.   AND WHY DID YOU TEXT AN IMAGE OF IT TO MR. PANCHENKO?

A.    BECAUSE IT WAS JUST A NICE LOOKING CARD TO BE HONEST.

Q.    OKAY.  AND CAN YOU TELL, SIR, OR MAYBE YOU COULD THINK FROM CONTEXT, WHAT DATE THIS EXCHANGE OCCURRED ON, BECAUSE WE DON'T HAVE A DATE FOR IT?

A.    DATE?  OH, I DON'T REMEMBER, TO BE HONEST.

Q.    DO YOU THINK THAT THIS WAS BEFORE MR. PANCHENKO AND HIS WIFE CAME AND HAD A VISIT WITH YOU AND YOUR WIFE IN NEW YORK CITY IN JULY OF 2023 OR DO YOU THINK IT WAS AFTER THAT TIME?

A.    FRANKLY, I DON'T REMEMBER, SO I PREFER NOT TO GUESS.  BUT, YEAH, I JUST DON'T REMEMBER IF IT WAS BEFORE OR AFTER.

Q.    OKAY.  FAIR ENOUGH.

WELL, DO YOU REMEMBER WHEN YOU SENT THIS CARD TO HIM, WHETHER HE WAS ALREADY WORKING ON THE ISSUES WITH HIS CREDIT REPORT?

A.    I KNOW ALL ABOUT THIS SITUATION BECAUSE I WAS AWARE.  SO I DON'T KNOW IF HE WORKED LIKE ON THAT AT THE TIME, BUT I ASSUME SO.

Q.    SO YOUR ASSUMPTION IS THAT WHEN YOU SENT HIM THIS IMAGE OF A CREDIT CARD YOU GOT FROM APPLE, HE WAS ALREADY WORKING ON THE ISSUES THAT HE HAD DISCOVERED WITH HIS CREDIT REPORT?

A.    THAT'S MY ASSUMPTION.

Q.    AND SO WAS THERE ANY REASON FOR YOU TO TEXT THIS IMAGE TO HIM OTHER THAN IT LOOKED NICE?

A.    WELL, I DON'T REMEMBER IF IT WAS BEFORE IN THAT CHAT, BUT IT WAS PRETTY EASY TO APPLY FOR.  SO MAYBE THAT WAS ONE OF THE

REASONS AS WELL, BUT NOTHING MORE THAN THAT.

Q.   OKAY.  DID YOU UNDERSTAND THAT MR. PANCHENKO WAS -- WANTED A CREDIT CARD FOR SOME REASON?

A.   SO I DIDN'T HAVE ANY SPECIFIC KNOWLEDGE ABOUT THAT, BUT I JUST USED COMMON SENSE, YOU PROBABLY HAVE TO HAVE ONE IN ORDER TO BUILD YOUR CREDIT SCORE.

Q.   OKAY.  SO YOU DON'T HAVE ANY MEMORY OF MR. PANCHENKO CONTACTING YOU AND SAYING THAT HE REALLY NEEDED A CREDIT CARD FOR SOME REASON?

A.   NO, NO.

Q.   OKAY.  AND THEN HE RESPONDS BACK TO YOU AND HE TALKS ABOUT HOW "YESTERDAY I ASKED FOR CREDIT CARD IN MY BANK.

     "THEY DIDN'T HAVE IT TO ME BECAUSE I CAN FEEL UP THE FORM AND PROVIDE EMPLOYER."

     DO YOU SEE THAT?

A.   YEP.

Q.   AND WHAT DID YOU UNDERSTAND HIM TO BE COMMUNICATING TO YOU, SIR?

A.   SO PROBABLY HE DIDN'T GET THE CARD BECAUSE -- YEAH, NOW THAT I'M READING THIS -- MAYBE IT'S NOT GRAMMATICALLY CORRECT, SO IT'S HARD TO SAY EXACTLY WHAT OLEKSANDR MEANT, BUT THE MESSAGE WAS PROBABLY ABOUT HE DIDN'T GET THE CARD.

Q.   OKAY.  AND DID YOU UNDERSTAND THAT HE WAS TELLING YOU THAT HE DIDN'T GET A CARD BECAUSE HE DIDN'T HAVE A JOB?

A.   I DON'T KNOW.  PROBABLY.  IT'S NOT -- I DON'T THINK SO

BECAUSE HAVING A JOB IS NOT A REQUIREMENT FROM MY UNDERSTANDING TO GET A CREDIT CARD.  SO IT WOULD BE HARD FOR ME TO SAY.

Q.   OKAY.  OKAY.  AND ACTUALLY, YOU, IN THE NEXT EXCHANGE THERE, YOU ACTUALLY ENCOURAGE HIM TO APPLY FOR APPLE, RIGHT, AT THE VERY BOTTOM; CORRECT?

A.   CORRECT.

Q.   AND WHAT ARE YOU TELLING HIM TO DO WHEN YOU'RE EXPLAINING HOW TO APPLY FOR AN APPLE CARD?

A.   SO IF HE MAY ENTER HOUSEHOLD SALARY AS HIS INCOME, AND HE MAY GET HIS SELF-EMPLOYED.

Q.   OKAY.  WAS HE SELF-EMPLOYED AT THE TIME THAT YOU SENT HIM THIS MESSAGE?

A.   I DON'T KNOW.

Q.   BUT YOU WERE TELLING HIM HE SHOULD ENTER SELF-EMPLOYED IF HE WANTED TO TRY TO GET THE CARD; RIGHT?

A.   IT WAS JUST MY UNDERSTANDING FROM WHAT IS AN ACCEPTABLE ANSWER TO A FORM QUESTION.

Q.   OKAY.  THEN ON THE NEXT PAGE YOU'RE TALKING ABOUT HOW ZHENYA OPENED AN APPLE CARD AFTER SHE QUIT SPOTIFY; RIGHT?

A.   CORRECT.

Q.   AND ZHENYA IS YOUR WIFE?

A.   CORRECT.

Q.   IS THAT WHAT SHE DID, SHE JUST APPLIED AND LISTED HERSELF AS SELF-EMPLOYED?

A.   CORRECT.

Q.   AND SHE PUT HER INCOME AS YOUR INCOME?

A.   YES.

Q.   AND THEN SHE GOT THE CARD; CORRECT?

A.   YES.

Q.   OKAY.  SO YOU WERE JUST SUGGESTING TO MR. PANCHENKO THAT HE SHOULD DO THE SAME THING?

A.   I JUST SHARED MY OPINION, SOMETHING.

Q.   OKAY.  AND THEN CAN YOU TURN TO THE NEXT PAGE, THE ONE THAT HAS 453 AT THE BOTTOM, SIR.

A.   YES.

Q.   SO MR. PANCHENKO SENDS YOU AN IMAGE; RIGHT?

A.   UH-HUH.

Q.   ARE YOU ABLE TO READ THE IMAGE OR SHOULD WE BLOW IT UP A LITTLE BIT?

     MAYBE WE SHOULD BLOW IT UP A LITTLE BIT.

     THANK YOU, KRISTINA.  JUST -- YES.

     MAYBE YOU CAN READ IT ON THE SCREEN A LITTLE BETTER.

A.   YES.

Q.   AND THAT'S THE IMAGE THAT HE HAD SENT TO YOU; RIGHT?

A.   YES.

Q.   AND THEN BELOW THAT HE SENT LIKE A LITTLE EMOJI; RIGHT?

A.   YES.

Q.   AND WHAT IS THE EMOJI HE SENT TO YOU?

A.   WHAT IS IT?

Q.   YES.

A.    WHAT EMOTION DID IT COMMUNICATE?

Q.    YES, WHAT EMOTION DID IT COMMUNICATE TO YOU?

A.    SADNESS.

Q.    SADNESS.  OKAY.  AND THEN -- SO HE'S TELLING YOU THAT HE APPLIED FOR THE APPLE CARD, AND HE GOT DENIED; RIGHT?

A.    HE WAS NOT EXPLICITLY TELLING ME THAT, BUT HE'S SENDING ME SCREENSHOTS OF HIS REJECTIONS.

Q.    AND THE EMOJI?

A.    AND THE EMOJIS.

Q.    AND YOU UNDERSTOOD HIM TO BE SAYING I APPLIED, AND I GOT REJECTED; RIGHT?

A.    YEAH.

Q.    AND YOU ENCOURAGED.  YOU SAID THAT'S FINE, THEY HAD REJECTED YOU FIVE TIMES; RIGHT?

A.    YEAH, THEY REJECTED ME FIVE TIMES, THAT'S WHAT I SAID.

Q.    SO DID YOU APPLY FOR AN APPLE CARD FIVE TIMES, AND THEY REJECTED YOU EVERY TIME?

A.    YEAH, YEAH SOMETHING LIKE THAT.  IT WAS A LOT OF TIMES A LOT OF REJECTIONS.

Q.    AND EVEN THOUGH YOU HAD A JOB AT THE TIME, THEY REJECTED YOU FIVE TIMES?

A.    YES.

Q.    OKAY.  AND YOU KEPT TRYING AND EVENTUALLY THEY GAVE YOU THE CARD?

A.    CORRECT.

Q.  OKAY.  LET'S GO TO THE NEXT PAGE 454, SIR.  AND THIS IS AN EXCHANGE BETWEEN YOU AND MR. PANCHENKO ON TELEGRAM STARTING ON JANUARY 19TH, 2024; RIGHT?

A.  YES.

Q.  OKAY.  SO HE SAYS, "HEY, HOW YOU DOING?

"WOULD YOU MIND IF I ADD YOU AS A WITNESS TO THE IDENTITY THEFT CASE?"

RIGHT?

A.  YES.

Q.  AND THAT'S THIS CASE THAT WE'RE ALL IN THE COURT FOR; RIGHT?

A.  YES, I BELIEVE SO.

Q.  AND THAT WAS YOUR INVITATION TO THIS PARTY.

AND YOU RESPOND BACK TO HIM AND SAY, "LOL, IT'S AN INTERESTING WAY TO START A CONVERSATION."

AND YOU PUT A LITTLE SMILEY SYMBOL?

A.  YES.

Q.  AND YOU SAY, "SURE.  DO I NEED TO CONFIRM SOMETHING IF SOMEONE CALLS ME?"

RIGHT?

A.  YES.

Q.  AND WHEN WAS THE LAST TIME THAT YOU HAD SPOKEN TO MR. PANCHENKO BEFORE HE TEXTED YOU ON JANUARY 19TH, 2024?

A.  I'M AFRAID I DON'T REMEMBER EXACTLY WHEN.

Q.  IN ANY EVENT, DID IT COME AS A SURPRISE TO YOU THAT HE

WAS -- HE WANTED TO ADD YOU AS A WITNESS TO HIS CASE?

A.   NO, IT WAS NOT A SURPRISE TO ME PER SE, BUT IT WAS JUST A PROCEDURE OF, YEAH -- IT WAS NOT A SURPRISE IN GENERAL, BUT IT WAS NOT A USUAL THING TO ASK I WOULD SAY.

Q.   YOU HADN'T GOTTEN A TEXT MESSAGE LIKE THAT BEFORE; RIGHT?

A.   YEAH, NO ONE EVER INVITED ME.

Q.   OKAY.  BUT WE'RE CERTAINLY GLAD TO HAVE YOU.

AND THEN MR. PANCHENKO GIVES YOU SOME MORE INFORMATION IN HIS MESSAGES BELOW?

A.   YEAH.

Q.   SO DID YOU UNDERSTAND HIM TO BE GIVING YOU SOME GUIDANCE AS TO WHY HE WANTED TO ADD YOU AS A WITNESS TO THE CASE?

A.   LET ME REFRESH MY MEMORY AGAIN.

Q.   PLEASE GO AHEAD AND DO SO.

A.   YEAH.  CAN YOU REPEAT THE QUESTION, PLEASE.

Q.   SURE.  MY QUESTION WAS DID YOU UNDERSTAND THAT HE WAS SENDING YOU THOSE MESSAGES TO HELP GIVE YOU SOME GUIDANCE AS TO WHY HE WANTED YOU TO TESTIFY?

A.   YES, HE'S EXPLAINING.

Q.   HE'S EXPLAINING WHY HE WANTS TO LIST YOU AS A WITNESS; RIGHT?

A.   YES.

Q.   AND HE'S YOUR GOOD FRIEND AND SO YOU WERE UP FOR IT; RIGHT?

A.   I MEAN, NOT ONLY BECAUSE HE'S MY GOOD FRIEND, BUT I

ACTUALLY -- YEAH, I COMMUNICATE WITH HIM OFTEN, AND I PROBABLY CAN BE USEFUL IN TELLING THE STORY, THE TRUTH.

Q.   OKAY.  AND YOU WANTED TO HELP HIM WITH HIS CASE; RIGHT?

A.   I MEAN, I DIDN'T WANT TO HELP HIM WITH HIS CASE PER SE.  I JUST WANTED TO HELP TELL THE STORY AND TELL IT TRUTHFULLY.

Q.   OKAY.  AND THEN YOU RESPOND BACK TO HIM AND YOU SAY, "ALL RIGHT.  GOT IT."

IN THE PURPLE?

A.   YES.

Q.   AND THEN YOU SENT HIM A GIF OF SOME SORT.  WHAT DID YOU TEXT BACK TO HIM?

A.   THIS IS A GIF, A GIF ANIMATION, A FRAGMENT FROM A SERIES. I BELIEVE IT'S CALLED "SUITS," WHERE THE LAWYER SAYS GOOD.

Q.   OKAY.  SO THAT'S A -- IF WE ALL WENT ONLINE, WHICH WE'RE NOT GOING TO DO BECAUSE HER HONOR INSTRUCTED US NOT TO DO ANY RESEARCH, BUT MAYBE AFTER THE TRIAL IS OVER, THERE MIGHT BE A GIF LIKE THAT, THAT SAYS SOMETHING FUNNY.

WAS THIS A JOKE BASICALLY, YOU'RE COMMUNICATING TO HIM SOME HUMOR?

A.   JUST A JOKE PER SE BUT A FUNNY WAY TO SAY OKAY.

Q.   SO YOU WERE JUST EXPLAINING IN A HUMOROUS WAY THAT YOU WOULD AGREE TO BE A WITNESS IN THIS CASE FOR HIM; RIGHT?

A.   JUST A CASUAL WAY OF SAYING IT, YES.  NOTHING PARTICULAR FUNNY ABOUT IT, BUT, YEAH.

Q.   OKAY.  ARE YOU A FAN OF THE SHOW "SUITS"?

A.   I SAW IT.  I DON'T THINK I'M A BIG FAN, BUT I SAW IT, AND I'M FAMILIAR WITH THE SHOW.

Q.   OKAY.  WHAT'S IT ABOUT, BECAUSE I'VE NEVER WATCHED IT, BUT I'VE SEEN IT SORT OF ROLL THROUGH AS A POSSIBILITY?

A.   THE SHOW IS ABOUT A LAW FIRM IN NEW YORK AND HOW THEY SOLVE DIFFERENT CASES.

Q.   OKAY.  AND AS OF, AS OF THE DATE OF THIS EXCHANGE, WHICH WAS JANUARY 2024, HAD MR. PANCHENKO EVER SAID ANYTHING SPECIFIC TO YOU ABOUT COMENITY CAPITAL BANK?

A.   PROBABLY ONLY THE FACT THAT THIS BANK IS ONE OF THE BANKS THAT IS INVOLVED.  NOTHING MORE THAT I CAN RECALL RIGHT NOW.

Q.   ALL RIGHT.  JUST MAYBE THAT IT WAS ONE OF THE MANY BANKS THAT HE WAS HAVING PROBLEMS WITH AND THAT HE HAD SUED; IS THAT FAIR?

A.   YEAH, I THINK SO.

Q.   OKAY.  SO HE DIDN'T TELL YOU ANY SPECIFIC EVENT OR HAPPENING THAT OCCURRED RELATED TO COMENITY THAT REALLY STOOD OUT?

A.   WHAT EVENT?

Q.   WELL, I'LL TELL YOU WHAT, IT WAS A TERRIBLE QUESTION.  I'M GOING TO WITHDRAW IT AND ASK A DIFFERENT ONE.  HOW ABOUT THAT?

     DID HE EVER SHARE WITH YOU SOME SORT OF SPECIFIC EVENT THAT HAPPENED WITH COMENITY THAT STOOD OUT AS OPPOSED TO THE REST OF THE BANKS?

A.   I DON'T BELIEVE SO.

Q.   OKAY.

NOTHING FURTHER, YOUR HONOR.

THE COURT:  MR. LOKER?

MR. LOKER:  NO FOLLOW-UP.

THE COURT:  ALL RIGHT.  THANK YOU.

THE WITNESS:  THANK YOU.

THE COURT:  YOU'RE EXCUSED.

THE WITNESS:  OKAY.  THANK YOU SO MUCH.

THE COURT:  ALL RIGHT.  MR. LOKER.

MR. LOKER:  YES, YOUR HONOR.  WE'RE GOING TO MOVE TO A VIDEO OF MS. BANU.

THE COURT:  OKAY.

MR. LOKER:  AND THE REQUEST WAS TO READ A COUPLE OF STIPULATED FACTS BEFORE THAT, YOUR HONOR.

AND I DON'T RECALL, DO YOU WANT ME TO READ THOSE OR SHOULD THAT BE THE COURT?

THE COURT:  I'M HAPPY TO READ THEM.  EITHER WAY.

MR. LOKER:  I THINK THE COURT SHOULD.

THE COURT:  THAT'S WHAT I WAS LEANING TOWARDS AS WELL.

MR. LOKER:  THANK YOU.

THE COURT:  SO MR. LOKER MENTIONED THEY'RE GOING TO BE PRESENTING A VIDEO.  SO I'LL GIVE YOU A LITTLE INFORMATION ABOUT THE FACTS AND HOW A DEPOSITION IS USED.

FIRST, BEGINNING WITH STIPULATIONS, AS MENTIONED BEFORE,

THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT WILL NOW BE READ TO YOU.  YOU MUST THEREFORE TREAT THEM AS FACTS WHICH HAVE BEEN PROVEN.

FACT NUMBER 5 -- I'M GOING TO OMIT THE -- JUST IN CASE, HAVE YOU RENUMBERED?

MR. LOKER:  WE HAVE NOT RENUMBERED.

THE COURT:  SO FACT NUMBER 5.  WHEN A CREDIT REPORTING AGENCY TRANSMITS A CONSUMER'S DISPUTE, IT DOES SO VIA THE AUTOMATED CREDIT DISPUTE VERIFICATION FORM REFERRED TO AS ACDV.

LET ME READ THAT ONE MORE TIME.  WHEN A CREDIT REPORTING AGENCY TRANSMITS A CONSUMER'S DISPUTE, IT DOES SO VIA THE AUTOMATED CREDIT DISPUTE VERIFICATION FORM, ACDV.

SO I'LL JUST REPEAT THAT JUST BECAUSE WE'VE REFERRED TO ACDV PREVIOUSLY.

NEXT FACT.  WHEN A CONSUMER'S DISPUTE IS MADE BY THE CONSUMER IN THE FORM OF A LETTER (OR OTHER DOCUMENT), THE LETTER IS TRANSMITTED WITH THE ACDV.  THE ACDV INDICATES THAT SUCH A LETTER WAS INCLUDED WITH THE ACDV BY STATING:  "IMAGES: 1."  IF NO DOCUMENT WAS TRANSMITTED WITH THE ACDV, IT STATES: "IMAGES: 0."  ALTERNATIVELY, AN ACDV MAY SAY, "ASSOCIATED IMAGES: NO" OR "ASSOCIATED IMAGES: YES" DEPENDING ON WHETHER A DOCUMENT WAS TRANSMITTED WITH THE ACDV.

TURNING TO THE NEXT STIPULATED FACTS.

THE FOLLOWING INDIVIDUALS ARE COMENITY'S EMPLOYEES WHO ARE

BASED IN BANGALORE, INDIA.

MR. LOKER:  I CAN TAKE THE NAMES, YOUR HONOR.

THE COURT:  I'M GOING TO HAVE YOU TAKE THE NAMES, MR. LOKER.

MR. LOKER:  THANK YOU.  THE FIRST ONE IS POOJITHA KADARESH.

NEXT, J. ELIZABETH RANI.

NEXT, RAMYA SHASHIDHAR.

NEXT, PAVITHRA S.

NEXT, PRAGHATHI GOPINATH.

NEXT IS SHANMUGAM ARUL.

LASTLY, ARSHIYA BANU.

THE COURT:  NEXT, STIPULATED FACT.

COMENITY'S EMPLOYEES WHO INVESTIGATED PANCHENKO'S IDENTITY THEFT DISPUTES TARGET TO COMPLETE 36 DISPUTES PER DAY. COMENITY'S INVESTIGATORS WORK NINE-HOUR SHIFTS WITH MEAL AND REST BREAKS RESULTING IN EIGHT HOURS OF WORK PER SHIFT. COMENITY'S INVESTIGATORS ARE ONLY ELIGIBLE FOR PERFORMANCE OR QUANTITY INCENTIVES IF THEY ATTAIN 100% QUALITY AND ACCURACY, AS DEFINED BY COMENITY, FOR THE PRIOR MONTH.

ON AUGUST 19TH -- STRIKE THAT.

ON AUGUST 21ST, 2023, ARSHIYA BANU PROCESSED AN ACDV WITH IMAGE ATTACHMENTS CONTROL NUMBER 438955551034002 REGARDING PANCHENKO'S DISPUTE TO TRANS UNION AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE.

468

TRIAL EXHIBIT 13.  ARSHIYA BANU'S CONCLUSIONS FOR ACDV FROM TRANS UNION WITH CONTROL NUMBER 438955551034002 ARE DOCUMENTED IN HER EASE, CAPITAL E-A-S-E, NOTES AT TRIAL EXHIBIT 23.

MR. LOKER:  OKAY.  THANK YOU, YOUR HONOR.

AND I WILL --

THE COURT:  ONE MORE.

MR. LOKER:  I'M SORRY.

THE COURT:  SO SOME PRE-INSTRUCTIONS AS WELL REGARDING THIS.

SO A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE TRUTH, AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.

THE QUESTIONS AND ANSWERS ARE RECORDED.  HERE THEY'RE VIDEOTAPED, AND WHEN A PERSON IS UNAVAILABLE TO TESTIFY AT TRIAL, THE DEPOSITION OF THAT PERSON MAY BE USED AT THE TRIAL.

AND AS DISCUSSED EARLIER, MS. BANU'S DEPOSITION WAS TAKEN ON MARCH 12TH, 2025.  THAT SEEMS OFF.

MR. LOKER:  I THINK -- LET'S SEE HERE.  I NEED THE TRANSCRIPT.  THAT MIGHT BE RIGHT ACTUALLY.  THAT'S RIGHT. YEAH.

THE COURT:  SO MARCH 12TH, 2025.  I JUST WANTED TO CONFIRM THAT DATE.

MR. LOKER:  YES.

THE COURT:  BUT, MR. LOKER.

MR. LOKER: YES. THANK YOU, YOUR HONOR. WELL, NOW IT'S NOT CONNECTING.

IS THERE A BUTTON, MS. THOMSON, TO GET THE DISPLAY HERE?

THE CLERK: WELL, WE'LL NEED A MOMENT TO WARM UP.

MR. LOKER: I CAN TRY FROM COUNSEL TABLE.

I CAN TRY MY LAPTOP AS WELL.

LET ME GRAB MY LAPTOP INSTEAD. THIS CONNECTION IS NOT WORKING NOW.

CAN WE SWITCH IT TO COUNSEL TABLE, MS. THOMSON?

THE CLERK: YES.

MR. LOKER: SHOULD WE TRY TO TAKE A BREAK, YOUR HONOR?

THE COURT: IS SEEMS THAT WAY.

MADAM CLERK, ANY LUCK?

THE CLERK: WELL, FOR SOME REASON THAT SOURCE IS NOT WORKING. LET'S GO BACK TO THE LECTERN REALLY QUICK WITH THE LAPTOP.

THE COURT: ALL RIGHT. SO, MR. LOKER, IF THIS DOESN'T WORK, LET'S TAKE A BREAK.

MR. LOKER: OKAY.

THE COURT: IF YOU COULD TRY IT ONCE, LET'S SEE IF IT WORKS.

MR. LOKER: UNDERSTOOD, YOUR HONOR.

THE COURT: JUST FOR THE RECORD, WE'RE HAVING PROBLEMS WITH THE AUDIO/VISUAL EQUIPMENT ONCE AGAIN.

MR. LOKER:  THE AUDIO IS COMING THROUGH MY LAPTOP, SO I CAN DO THE MICROPHONE NEAR IT.

**(VIDEO DEPOSITION OF ARSHIYA BANU PLAYED IN OPEN COURT OFF THE RECORD.)**

THE COURT:  MR. NARITA, ARE YOU WITHDRAWING YOUR OBJECTION BECAUSE THERE WAS STILL AN OBJECTION ON THE CLIP THAT I DIDN'T REALIZE.

MR. NARITA:  WE WITHDRAW THAT OBJECTION.

THE COURT:  OBJECTION IS WITHDRAWN.  CAN YOU REWIND 10 SECONDS, 20 SECONDS?

MR. LOKER:  IF I WILL TRY, YOUR HONOR.  IT'S GOING BACK.  OKAY.

THE COURT:  SO IF THERE ARE ANY OTHER OBJECTIONS, ARE THEY WITHDRAWN?

MR. NARITA:  YES, CORRECT, THEY'RE WITHDRAWN, YOUR HONOR.

THE COURT:  THANK YOU.  YOU MAY PROCEED.

MR. LOKER:  THANK YOU, YOUR HONOR.

**(VIDEO DEPOSITION OF ARSHIYA BANU PLAYED IN OPEN COURT OFF THE RECORD.)**

MR. LOKER:  IN TERMS OF THE EXHIBITS DISCUSSED THERE, YOUR HONOR, TRIAL EXHIBIT 3 IS ALREADY IN EVIDENCE.

WE ASK THAT TRIAL EXHIBIT NUMBER 23 BE ADMITTED, WHICH WERE THE EASE NOTES THAT YOU READ ABOUT IN THE STIPULATIONS OF FACT.

THE COURT:  IS IT JUST EXHIBIT 23?

MR. LOKER:  THERE'S EXHIBIT 13 AS WELL, THE ACDV, AND 37 AS WELL.

THE COURT:  MR. LOKER, ARE YOU READING THE EXHIBIT NUMBERS FROM THE EXHIBIT LIST?

MR. LOKER:  CORRECT, YES.

THE COURT:  SO BEGINNING WITH 23, THE EASE NOTES WHICH WERE REFERENCED, UNLESS THERE'S NO OBJECTION, THE COURT WILL ADMIT THAT.

MR. NARITA:  THERE'S NO OBJECTION, YOUR HONOR.

THE COURT:  WE'LL ADMIT EXHIBIT 23.

WHAT WERE THE OTHERS?

(PLAINTIFF'S EXHIBIT 23 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  EXHIBIT NUMBER 13, YOUR HONOR.

THE COURT:  EXHIBIT NUMBER 13, OUTSIDE OF THE OBJECTIONS THAT WERE PREVIOUSLY NOTED AND GIVEN THE DECLARATIONS THAT WERE RECEIVED, THE COURT WILL ADMIT THAT.

MR. NARITA:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBIT 13 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  AND THE LAST ONE, EXHIBIT NUMBER 37, WHICH I DON'T BELIEVE OBJECTIONS WERE NOTED FOR THAT.

THE COURT:  EXHIBIT NUMBER 37 I HAVE NOTHING -- I HAVE NO OBJECTIONS BEING LISTED ON THEIR ORIGINAL EXHIBIT LIST, AND THE COURT SEEING MR. NARITA NOD, THE COURT WILL ADMIT EXHIBIT NUMBER 37.

(PLAINTIFF'S EXHIBIT 37 WAS RECEIVED IN EVIDENCE.)

THE COURT:  SO THE COURT ALSO WANTED TO NOTE, I HAD, AFTER CONFIRMING IN TERMS OF WHAT WAS FILED, THE STIPULATIONS THAT I WAS READING OUT LOUD TO YOU, TO THE MEMBERS OF THE JURY, JUST TO BE CLEAR, WERE STIPULATION NUMBERS 5, 6, 13, 14, AND 38 PRIOR TO THE START OF THAT DEPOSITION.

SO, MR. LOKER, WERE WE AT THE END OR WAS THAT YOUR ADVERTISEMENT BREAK FOR US?

MR. LOKER:  THAT IS THE END OF THE VIDEO, YOUR HONOR.

THE COURT:  ALL RIGHT.  SO THIS SEEMS LIKE A GOOD TIME FOR US TO TAKE OUR AFTERNOON BREAK.

SO LET'S GO AHEAD AND RELEASE THE MEMBERS OF THE JURY. THANK YOU.  STRETCH.  RELAX AND TAKE A 15 MINUTE BREAK, AND LET US KNOW IF YOU NEED ANYTHING THERE.

COUNSEL, I'LL ASK YOU TO STAY FOR JUST A MINUTE, BUT THEN WE'LL ALSO TAKE OUR BREAK.

(JURY OUT AT 2:36 P.M.)

THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD. EVERYONE MAY BE SEATED.

COUNSEL IS PRESENT, AND THE PARTIES ARE PRESENT OUTSIDE OF THE PRESENCE OF THE JURY.

I ASSUME THERE IS NOTHING FURTHER WHAT WE NEED DISCUSS NOW, THAT WE'RE APPROACHING EVERYTHING AT THE END FOR TODAY?

MR. LOKER:  YES, FOR THE PLAINTIFF.

MR. NARITA:  I'M NOT AWARE OF ANY ISSUES UNTIL THE END OF THE DAY, YOUR HONOR.

THE COURT:  ALL RIGHT.  WONDERFUL.

WE WILL ALSO TAKE A 15 MINUTE BREAK TODAY.

SO I WILL SEE YOU BACK IN 15 MINUTES.  THANK YOU.

MR. LOKER:  THANK YOU, YOUR HONOR.

(RECESS FROM 2:37 P.M. UNTIL 2:56 P.M.)

(JURY IN AT 2:56 P.M.)

THE COURT:  ALL RIGHT.  MR. LOKER, YOUR NEXT WITNESS.

MR. LOKER:  THANK YOU, YOUR HONOR.

WE CALL MR. PANCHENKO'S WIFE, ALLA, TO THE STAND.

THE CLERK:  I'LL HAVE YOU RAISE YOUR RIGHT HAND, PLEASE.

**(PLAINTIFF'S WITNESS, ALLA ODEIANENKO, WAS SWORN.)**

THE WITNESS:  YES.

THE CLERK:  AND ONCE YOU HAVE A SEAT, PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD, PLEASE.

THE WITNESS:  I'M ALLA ODEIANENKO.  WOULD YOU LIKE ME TO SPELL IT?

MR. LOKER:  LAST NAME, PLEASE.

THE WITNESS:  O-D-E-I-A-N-E-N-K-O.

**DIRECT EXAMINATION**

BY MR. LOKER:

Q.   THANK YOU.  AND YOU'RE MARRIED TO MR. PANCHENKO; IS THAT

RIGHT?

A.    THAT'S CORRECT.

Q.    AND WHEN DID THE TWO OF YOU MEET?

A.    WE MEET AT WORK MAYBE 2018.

Q.    OKAY.  WHERE WERE YOU WORKING AT THE TIME?

A.    WE BOTH WORK AT THE LUXOFT.  IT'S A SOFTWARE ENGINEERING
COMPANY AND THEY DO CONSULTING FOR THEIR CLIENTS.

Q.    AND WHERE ARE YOU FROM, ALLA?

A.    I'M FROM KYIV, UKRAINE.

Q.    AND WHAT DO YOU DO FOR A LIVING?

A.    I'M AN INTERACTION DESIGNER.

Q.    AND WHO IS YOUR EMPLOYER?

A.    GOOGLE.

Q.    AND CAN YOU TAKE US THROUGH, WHAT IS AN INTERACTION
DESIGNER?

A.    YEAH.  SO BASICALLY, LIKE, DIGITAL INTERFACE HAS TO BE
DEVELOPED BY SOMEONE, AND THERE ARE DESIGNERS WHO CREATE THIS
NOT JUST TO MAKE IT LOOK BETTER, BUT WORK PROPERLY FOR, LIKE,
PEOPLE WHO ARE GOING TO USE THAT.

      WE TRY TO UNDERSTAND, LIKE, WHO ARE THE USERS WHO ARE
GOING TO BE USING THAT, IF IT'S TECHNICAL PEOPLE, IF THEY HAVE
ANY SPECIFIC ORGANIZATION, OR IF IT'S LIKE GENERAL PEOPLE THAT
USE SOFTWARE APPLICATION.

Q.    THANK YOU.

      HAVE YOU EVER CONSULTED WITH A CREDIT BUREAU?

A.   YES, I DID.

Q.   AND WHICH CREDIT BUREAU?

A.   EQUIFAX.

Q.   WHEN WAS THAT?

A.   SO IT WAS JUST ABOUT WHEN COVID STARTED.  IT WAS 2020, AT THE BEGINNING OF THAT YEAR BEFORE THE WORLD DOORS WERE CLOSED.

     I TRAVELLED TO CHINA WHERE I CONSULTED AN EQUIFAX AGENCY AFTER THEY HAD A DATA BREACH, AND I WAS PRIMARILY THERE TO EVALUATE THEIR USER INTERFACE AND UNDERSTAND IF THERE'S, LIKE, ANY ISSUES AND SUGGEST HOW THAT COULD BE IMPROVED, AND THAT WOULD BE UP TO THAT AGENCY WHICH RECOMMENDATIONS THEY WOULD LIKE TO TAKE.

Q.   AND DID YOU INTERACT WITH ANY OF THEIR USERS AT THAT TIME?

A.   OH, YES, I DID.

     SO THERE WAS A TIME THAT SOME OF THEIR MANAGEMENT COULDN'T ANSWER SOME OF THE QUESTIONS THAT I HAD, HOW IT WORKS, HOW THE AGENTS GO THROUGH THE PROCESS, SO I ASKED THEM WHERE IS THEIR AGENTS LOCATED.

     AND TO MY SURPRISE, THEY WERE JUST IN THE BUILDING NEXT TO THEM, WHICH WAS GOOD FOR ME, SO I COULD JUST GO AND TALK TO THEM.

     BUT IN, LIKE, KIND OF, I DON'T KNOW, IN 50 YEARS, NO ONE EVER TALKED TO THEM, SO THEY DIDN'T UNDERSTAND HOW THE PROCESS AND HOW THEY WORKED WITH THE SYSTEM.

     AND WHEN I SPENT, LIKE, MAYBE A FEW WEEKS WITH THEM, JUST

WENT THROUGH THE PROCESS.  SO I ASKED THEM IF THEY COULD TAKE SOME TIME TO UNDERSTAND WHAT THEY DO ON A REGULAR BASIS WITH THE CASES BECAUSE THERE WAS AGENTS WITH, LIKE, OVER THE DIFFERENT TYPE, THEY WOULD POSSESS DIFFERENT TICKETS THAT WOULD FALL INTO THEIR SYSTEM.

I WAS SURPRISED HOW OUTDATED THAT WAS, AND THAT WAS JUST SHOCKING HOW OLD THE SYSTEM WAS, AND THAT THERE WAS STILL PEOPLE LIKE WORKING WITH THAT.

THEY HAD ISSUES TRAINING NEW AGENTS AND, YOU KNOW, THEY JUST HAD TO BE IMPROVED.

Q.    THANK YOU.

AND WHEN DID YOU MOVE TO AMERICA, OR COME TO THE STATES RATHER?

A.    YES.  SO THAT WAS APRIL 26TH OF 2023.

Q.    OKAY.  DID YOU CHECK YOUR CREDIT WHEN YOU ARRIVED?

A.    I KNEW THAT I DIDN'T HAVE ANY CREDIT, SO I DIDN'T CHECK MINE.

Q.    OKAY.  AND IS THE CREDIT SYSTEM IN THE U.S. THE SAME AS THE CREDIT SYSTEM IN THE UKRAINE?

A.    SO WE DIDN'T HAVE THE CONCEPT OF THE CREDIT SYSTEM IN THE UKRAINE IN GENERAL.

IF YOU WERE TO GET THE LOAN OR SOMETHING LIKE THAT, YOU WOULD JUST GO TO THE BANK AND THEY WILL JUST TRY TO EVALUATE YOUR TRUSTWORTHINESS BASED ON YOUR WORK, DO YOU HAVE, LIKE, A PLACE TO LIVE, THOSE KIND OF THINGS.

SO THAT WOULD BE SUBJECTIVE TO THE PERSON, FOR EXAMPLE, IF YOU WANT TO TAKE A LOAN.

Q.    ARE YOU FAMILIAR WITH MR. PANCHENKO'S CLAIMS IN THIS MATTER?

A.    I THINK IN GENERAL I DO.

Q.    AND WHAT IS YOUR UNDERSTANDING OF THEM?

A.    SO BASICALLY I DO UNDERSTAND THAT THERE WAS A GROUP OF THE BANKS THAT WAS IN THE BEGINNING AND THAT INCORRECTLY REPORTED TO THE CREDIT BUREAU OLEKSANDR CREDIT SCORE AND DIFFERENT LOANS THAT BASICALLY WASN'T HIS, AND WITH SOME OF THEM THEY WERE, LIKE, EASIER OR HARDER JUST TO GO THROUGH THE PROCESS.

AND I DON'T KNOW.  THAT'S IT.

Q.    PERFECT.  DID YOU OBSERVE MR. PANCHENKO WHEN HE WAS GOING THROUGH THE PROCESS?

A.    YES, I DID.  SO BASICALLY ON OUR DATE WHEN WE JUST MOVED HERE, WE WENT TO GET OUR CREDIT -- NOT THE CREDIT, BUT OUR SOCIAL SECURITY NUMBER.  AND TO OUR SURPRISE, THE LADY TOLD US, OH, IF YOU EVER HAD YOUR SOCIAL SECURITY NUMBER, YOU PROBABLY HAVE THIS -- YOU PROBABLY HAVE IT STILL BECAUSE IT'S ONE FOR LIFE.

SO I THINK, LIKE, AFTER THAT, OLEKSANDR CHECKED, LIKE, IN THE EVENING OR SO IF HE HAS ANY CREDIT SCORE.

ONCE HE SAW THAT, HE BASICALLY STARTED THE PROCESS OF TRYING TO DISPUTE THEM, CONTACTING THE BANKS AND SENDING THEM DIFFERENT DOCUMENTS JUST TO DISPUTE THAT IT'S NOT HIS.

Q.   OKAY.  DID YOU OBSERVE OLEKSANDR DURING THE DISPUTE PROCESS AND THE STEPS THAT HE WAS TAKING?

A.   IN GENERAL, YES.  SO I MIGHT NOT KNOW ALL OF THE DETAILS OF THE, LIKE, DOCUMENTS THAT HE WAS PREPARING OR SENDING, BUT IN GENERAL, YES, BECAUSE WE LIVE TOGETHER, SO I WOULD SEE HIM WORKING ON THAT AND PREPARING DIFFERENT THINGS THAT HE NEEDS TO SEND THEM JUST GENERALLY TO UNDERSTAND WHAT IT IS, BECAUSE THAT'S A COMPLETELY NEW SYSTEM FOR US.

AND AT FIRST, LIKE, WE MAY NOT UNDERSTAND THIS COMPLETELY WHAT THAT WAS, JUST BECAUSE WE DIDN'T HAVE THIS IN OUR COUNTRY.

THEN I WOULD WAKE UP IN THE MORNING AND HE WOULD START HIS DAY JUST GOING TO THE BANK, AND THEY WORK BUSINESS HOURS AND YOU HAVE TO CALL THEM ON THEIR LINE TO TALK TO THE PERSON WHO CAN ACTUALLY ANSWER SOME OF YOUR QUESTIONS, WHERE THE DOCUMENTS CAN BE SENT, AND DISPUTE THINGS, AND HOW TO PROCEED WITH THEM.

I WOULD GO TO WORK, I WOULD RETURN BACK, AND HE WOULD STILL BE SITTING AND WORKING AND TRYING TO, I DON'T KNOW, SEND THE DOCUMENTS AND DO OTHER THINGS.

Q.   AROUND WHAT TIME WOULD YOU LEAVE FOR WORK DURING THE DAY?

A.   SO I START AROUND 8:00 EVERY MORNING.  SO 8:00ISH HE WOULD START CALLING BECAUSE THAT'S WHEN EVERYBODY STARTS WORKING.

Q.   AND THEN HE WOULD STILL BE WORKING ON THE DISPUTES WHEN YOU RETURNED HOME FROM WORK; IS THAT RIGHT?

A.   THAT'S RIGHT.

Q.   AND WHAT TIME WOULD YOU RETURN HOME FROM WORK?

A.   IT'S AROUND 4:00 OR 5:00 EVERY DAY, EVEN WHEN HE CAN'T CALL ANYMORE, BECAUSE SOMETIMES THEY WILL PUT YOU ON THE HOLD LINE AND YOU CAN BE THERE FOR, LIKE, TWO HOURS OR SO JUST WAITING.

AND THEN HE WOULD JUST GO THROUGH THE LIST OF THINGS HE WOULD NEED TO DO.  IF HE HAD THE CHANCE TO TALK TO SOMEONE, MAYBE HE NEEDS TO SEND THEM OVER SOME DOCUMENTS AND SOME OTHER THINGS.

Q.   ARE YOU AWARE THAT MR. PANCHENKO WENT TO THE POLICE STATION IN CONNECTION WITH THIS FRAUD?

A.   YES, I WAS, AND I AM.

Q.   AND YOU STILL ARE.

IN TERMS OF THE POLICE IN THE UKRAINE, WHAT IS THAT SITUATION LIKE?

A.   SO I THINK WE HAVE A HISTORY THAT, LIKE, OVER A LOT OF DECADES THE POLICE WASN'T THERE AND NOT TO SUPPORT CIVILIANS, BUT MORE TO PROTECT THE GOVERNMENT.

AND PEOPLE IN MY COUNTRY, WE WOULDN'T HAVE, LIKE, THE WHOLE TRUST TO THE POLICE.  IF YOU WOULD SEE THEM, LIKE, ON THE STREET, YOU WOULD PROBABLY WANT TO SWITCH THE SIDE ON WHICH YOU'RE GOING.

AND WE ALSO HAVE A HISTORY THAT WE HAVE SEVERAL REVOLUTIONS AND THE POLICE WAS THERE TO DEFEND GOVERNMENT, NOT PEOPLE.

SO WE DO HAVE SOME HISTORY WITH THE POLICE.  AND WE --

EVEN THOUGH THEY'RE TRYING TO WORK ON THEIR IMAGE RIGHT NOW, BUT IT'S JUST LIKE YOU CAN'T WIPE OUT THE HISTORY THAT WE HAVE WITH THEM.

SO FOR US, IT WAS SCARY.  WE JUST CAME TO A NEW COUNTRY AND, LIKE, FIRST, WHEN YOU GET THE INFORMATION THAT YOU OWE SOMETHING THAT YOU NEVER TOOK, LIKE YOU NEVER BORROWED THOSE MONEY.

AND ANOTHER THING IS, LIKE, YOU DON'T UNDERSTAND WHAT IT IS AND WHAT IT APPLIED TO, AND YOU UNDERSTAND I HAVE TO GO TO THE POLICE JUST BECAUSE YOU NEED TO JUST TELL THE POLICE THAT THERE'S SOMETHING HAPPENING, LIKE, YOU DIDN'T NEVER, LIKE, OPEN THOSE ACCOUNTS.

SO I REMEMBER I WAS TRUST FOR HIM, BUT HE WENT BY HIMSELF THERE, AND HE NEEDED TO GO THERE, LIKE, DURING THE WORKING HOURS AND I HAD TO GO TO WORK.

BUT, YEAH, I FEEL LIKE IT'S A PRETTY SCARY THING.  CAN YOU IMAGINE, LIKE, GOING TO ANOTHER COUNTRY AND RIGHT AWAY IN THE FIRST WEEK AND GOING TO THE POLICE, OR THE SECOND WEEK THERE YOU JUST GO TO THE POLICE?

MR. NARITA:  YOUR HONOR, I'M GOING TO MOVE TO STRIKE AS NONRESPONSIVE TO THE QUESTION.

THE COURT:  OVERRULED.

BY MR. LOKER:

Q.   IN TERMS OF MR. PANCHENKO, DID YOU OBSERVE HIM FEELING EMOTIONAL ABOUT THE DISPUTE PROCESS?

MR. NARITA:  IT'S LEADING, YOUR HONOR.

THE COURT:  OVERRULED.

THE WITNESS:  YES, I DID.

SO I KNOW OLEKSANDR, LIKE, EVEN BEFORE WE GET MARRIED AND START BEING TOGETHER, I KNOW HIM FROM, LIKE, EVEN WORK-RELATED THINGS, AND HE WAS ALWAYS SUPPORTIVE AND CALM AND HE WOULD USUALLY SUPPORT, LIKE, OTHER PEOPLE AND COLLEAGUES THAT WE KNOW.

AND IN THIS MOMENT I SAW THAT THE PERSON WHO WAS ALWAYS THERE TO SUPPORT FOR ME WAS REALLY STRESSED.  WE EVEN HAD A MOMENT, LIKE, IN EIGHT YEARS I NEVER SEEN HIM CRYING, AND IN SOME OF THE MOMENTS, LIKE WHEN HE WAS DEPRESSED BECAUSE IT FEELS LIKE IT WOULD NEVER MOVE FORWARD, I HAVE SEEN HIM CRY AND I HAVE NEVER SEEN IT BEFORE.

EVEN, LIKE, FOR THE PEOPLE WHO COME FROM THE COUNTRY WHERE WE HAVE WAR, WE HAVE FAMILY TO SUPPORT, WE HAVE A LOT OF STUFF THAT IS GOING ON, THAT WAS JUST LIKE ON TOP OF THAT, THAT WAS A LITTLE TOO MUCH.

BY MR. LOKER:

Q.   DID THIS SITUATION WITH THE FRAUD IMPACT MR. PANCHENKO'S SLEEP?

A.   YES, IT DID.

MR. NARITA:  OBJECTION, YOUR HONOR.  SPECULATION.

MR. LOKER:  SHE CAN -- OH, SORRY.

THE COURT:  SUSTAINED IN TERMS OF LEADING.

BY MR. LOKER:

Q.   WERE THERE ANY OTHER IMPACTS ON MR. PANCHENKO THAT YOU OBSERVED?

A.   SO I KNOW THAT HE WOULD HAVE THE ISSUES LIKE WITH EATING, SLEEPING, ALL OF THE THINGS THAT WOULD SHOW THAT HE'S, LIKE, EMOTIONALLY STRESSED ABOUT THAT.

     I WOULD SEE HIM, LIKE -- BECAUSE I DO HAVE SOME ANXIETY ISSUES, SO I CAN WAKE UP SOMETIMES IN THE MIDDLE OF THE NIGHT, BUT HE WOULD BE AWAKE AS WELL.  SO WE CAN, LIKE, DISCUSS WHAT IS BOTHERING HIM.

     AND I KNOW THAT HE DIDN'T HAVE, LIKE -- HE DIDN'T SLEEP ON THE FIRST DAY OF THIS -- ON YESTERDAY -- YES, I'M SORRY -- OF THE TRIAL.

     AND I KNOW FOR A FACT THAT HE DIDN'T EAT YESTERDAY UNTIL IT WAS THE END OF THE DAY.

     SO I KNOW THAT THAT'S NOT USUAL BEHAVIOR FOR THE PERSON WHO FEELS, LIKE, PSYCHOLOGICALLY SAFE AND IN A GOOD WAY.

Q.   AND DO YOU FEEL THAT THAT SITUATION WITH COMENITY HAD AN IMPACT ON MR. PANCHENKO?

          MR. NARITA:  IT'S LEADING, YOUR HONOR.

          THE COURT:  REPHRASE THE QUESTION.

BY MR. LOKER:

Q.   AND IN TERMS OF THE SITUATION WITH MR. PANCHENKO, DO YOU FEEL THAT IT HAD A -- LEFT AN IMPRESSION UPON HIM?

A.   I THINK SO, BECAUSE HE DEVELOPED -- LIKE, HOW DO YOU

EXPLAIN IT?  YOU GO TO THE COUNTRY WHERE YOU FEEL LIKE YOU'RE

GOING TO BE SAFE, AND THEN SOMETHING BAD LIKE THIS IS

HAPPENING.

AND I WOULD NOT WISH THIS TO ANYONE THAT WOULD EVER HAPPEN

TO SOMEONE, ESPECIALLY IN A SITUATION WHERE YOU'RE ALREADY

RUNNING FROM WAR AND OTHER THINGS THAT ARE HAPPENING IN YOUR

LIFE.  AND IT'S JUST, LIKE, YOU WOULD DEVELOP THE CONSTANT

ANXIETY THAT WILL AFFECT YOUR DAY-TO-DAY LIFE.

MR. LOKER:  I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  MR. NARITA, YOUR WITNESS.

MR. NARITA:  THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION**

BY MR. NARITA:

Q.   GOOD AFTERNOON, MA'AM.

A.   HELLO.

Q.   NICE MEETING YOU, MA'AM.

A.   NICE MEETING YOU, TOO.

Q.   MA'AM, TELL US A LITTLE BIT MORE ABOUT YOUR CONSULTING

WITH EQUIFAX IN 2020.  I WASN'T AWARE OF THAT.

A.   SO I WAS BASICALLY WORKING FOR THE AGENCY, AND WE WOULD

HAVE DIFFERENT CLIENTS WHO WOULD NEED ANALYSIS OF THEIR

SOFTWARE, AND PART OF THAT IS A USER EXPERIENCE AS WELL.  IT'S

NOT ONLY THE ENGINEERING PART.  USER EXPERIENCE IS ALSO VERY

IMPORTANT.

SOMETIMES CLIENTS WANT DIFFERENT THINGS, FOR EXAMPLE,

FASTER TIME ON TASKS, SO THEIR AGENTS WILL PROCEED FASTER

THROUGH THE, LIKE, APPLICATIONS FOR PROBLEMS THAT THEY HAVE IN

THE SYSTEM.

SOMETIMES THEY WOULD LOVE TO JUST UNDERSTAND THE GENERAL

HEALTH OF THE APPLICATION AND MAYBE, LIKE, HOW MANY MISTAKES

THE AGENT CAN MAKE MOVING THROUGH THE SYSTEM.

SO USER EXPERIENCE WOULD TRY TO MINIMIZE THOSE MISTAKES

THAT AGENTS CAN MAKE --

Q.   OKAY.

A.   -- IN THAT SPECIFIC CASE.

Q.   SO WAS THIS LIKE A CONSULTING ROLE FOR EQUIFAX?

A.   YES, THAT'S CORRECT.

Q.   AND THEN WHAT WAS THE NAME OF YOUR EMPLOYER WHO WAS

PROVIDING THE CONSULTING SERVICES?

A.   EPAM.

Q.   EPAM.  OKAY.

AND DID YOU COME OVER TO THE UNITED STATES TO DO SOME WORK

FOR THEM?

A.   YES, I DID.  I WORKED IN THE CONSULTING DEPARTMENT FOR THE

USER EXPERIENCE, AND SOMETIMES I WOULD GO -- WHEN WE HAVE JUST

THE FIRST PERIOD WITH OUR CLIENT, I WOULD GO TO EVALUATE THE

SITUATION, PROVIDE MY INPUT, AND THEN AFTER THAT THE TEAM WILL

TAKE IT OVER AND CONTINUE IF THE CLIENT WANTS YOU TO AFTER YOU

PROVIDE THOSE RECOMMENDATIONS THAT WE PROVIDE FOR THEM.

Q.   OKAY.  WHAT CITY OR CITIES IN THE UNITED STATES DID YOU GO

TO?

A.   THAT WAS ATLANTA, GEORGIA.

Q.   THAT THEIR HEADQUARTERS?  DO YOU KNOW?

A.   I DON'T KNOW.

Q.   AND HOW LONG DID YOU WORK ON THE CONSULTING PROJECT FOR EQUIFAX?

A.   NOT FOR A VERY LONG TIME, BECAUSE I WAS LEADING THAT DEPARTMENT, SO I WOULD USUALLY GO AND SPEND WITH THE CLIENT USUALLY LIKE TWO OR THREE DAYS.

IN THAT CASE THAT WAS UP TO A MONTH BECAUSE THE SYSTEM WAS HEAVY AND IT'S ACTUALLY -- SO THEY WERE FORCED ACTUALLY TO RETHINK THEIR SYSTEM BECAUSE THE SYSTEM WAS OUTDATED.  IT WAS, LIKE, 60 OR ABOVE 60 YEARS OLD.  THERE WAS LIKE A BLACK SCREEN.

I ALMOST NEVER SEEN THAT TYPE OF INTERFACE BEFORE.  IT'S BASICALLY A CONSOLE AND PEOPLE HAVE TO JUST KNOW THE SYSTEM WELL TO WORK WITH THAT.

SO I HAD TO NATURALLY SPEND A LOT MORE TIME WITH THIS CLIENT JUST TO UNDERSTAND WHAT THE SYSTEM IS ABOUT, WHAT THEY'RE TRYING TO IMPROVE WITH THE SYSTEM, AND TO WRITE MY REPORT ABOUT THAT.

Q.   AND SO THE SYSTEM THAT YOU WERE WORKING ON TO TRY TO IMPROVE THE USER EXPERIENCE, DID THAT RELATE TO PEOPLE'S CREDIT REPORTS IN ANY WAY?

A.   DIRECTLY.

Q.   AND WHO WERE THE PEOPLE THAT WERE USING THE SYSTEM?

A.    SO THERE WOULD BE AGENTS WHO ARE REVIEWING TELEPHONE CALLS OR MAILS, PHYSICAL OR ELECTRONIC MAILS WITH REQUESTS OF THE DISPUTE, OR MAYBE ANY OTHER CORRECTIONS THAT THEIR CLIENTS MIGHT SEND TO THEM, LIKE MY HUSBAND DID.

SO I NEVER KNOW THIS.  I WOULD SEE THIS ON THE OTHER SIDE OF THAT.  SO I WAS WORKING FOR THEIR TECHNICAL USERS WHO ARE AGENTS REVIEWING THESE REQUESTS.  IT MAY NOT ALWAYS BE DISPUTES.  IT MIGHT BE A CORRECTION OR SOMETHING.

Q.    SO THERE'S A LITTLE BIT OF IRONY HERE.  IN 2020, BEFORE ALL OF THIS STARTED, YOU ACTUALLY CAME ALL OF THE WAY TO THE UNITED STATES AND YOU HELPED -- OR TRIED TO HELP EQUIFAX IMPROVE THE USER INTERFACE ON THE SYSTEM THAT ITS AGENTS WERE USING TO PROCESS CONSUMER'S DISPUTES; CORRECT?

A.    YES, THAT'S CORRECT.  AND UNFORTUNATELY, I HAD A LOT OF EMPATHY FOR THE PEOPLE WHO HAD TO GO THROUGH AND THEN THEIR DISPUTES WOULD GET INTO THE SYSTEM THAT WAS VERY OUTDATED AND IT'S VERY HARD TO FIX THINGS FOR THEM.

BUT I NEVER CAN UNDERSTAND THAT THERE MAY BE ANOTHER SIDE OF THIS, BECAUSE WE JUST DON'T HAVE THE SAME SYSTEM IN UKRAINE. AND I WAS LIKE, THAT'S CRAZY HOW THAT CAN BE.

Q.    SO YOU -- BUT I GUESS YOU GOT SORT OF A CRASH COURSE ON HOW IMPORTANT CREDIT IS HERE IN THE UNITED STATES WHEN YOU CAME TO WORK WITH EQUIFAX; CORRECT?

A.    IT WASN'T DIRECTLY RELATED TO THE CREDIT SCORE BECAUSE IT WAS MOSTLY DIRECTED TO HOW THEIR SPECIFIC AGENTS PROCESS THOSE

TICKETS AND REQUESTS FROM THEIR CLIENTS.

SO I WOULD NOT SAY THAT I DO UNDERSTAND -- LIKE, BACK THEN I UNDERSTAND VERY WELL HOW THE CREDIT SCORE WORKS.

I JUST UNDERSTAND THAT IT'S A PART OF THAT CREDIT SCORE SYSTEM AND THAT THERE'S A LOT OF TICKETS THAT PEOPLE ARE TRYING TO FIX AND CHANGE, AND I WAS LIKE, OKAY, THAT'S INTERESTING.

Q.    OKAY.  I TAKE IT THERE'S NO EQUIVALENT SYSTEM OVER IN THE UKRAINE WHERE THERE IS THIS SET OF PRIVATE ENTITIES, LIKE THE CONSUMER REPORTING AGENCIES, THAT HAVE ALL OF THIS DATA THAT IS VERY IMPORTANT TO PEOPLE'S CREDIT RATINGS?

A.    YEAH.

Q.    OKAY.  SO -- BUT YOU LEARNED ABOUT THAT WHEN YOU WERE HERE IN 2020, CORRECT, WHAT OUR U.S. SYSTEM WAS LIKE A LITTLE BIT?

A.    SO, I -- I GET THE BASIC CONCEPT OF THAT, AND THE SYSTEM I WAS WORKING ON WAS JUST LIKE A PIECE THAT CONTRIBUTED TO THAT, SO IT'S NOT THE ENTIRE PICTURE OF THAT.

FOR ME IT WAS JUST SURPRISING THAT SOMEONE CAN HAVE YOUR SOCIAL SECURITY NUMBER AND DO SOMETHING WITH THAT, BECAUSE WE DO HAVE SIMILAR, LIKE, NUMBER THAT IS SOCIAL SECURITY.

BUT I CAN TELL MY UKRAINIAN NUMBER TO ANYONE AND NO ONE CAN ACTUALLY DO WITH THAT ANYTHING.

Q.    OKAY.  SO AFTER YOU DID YOUR CONSULTING FOR EQUIFAX, YOU WENT BACK TO THE UKRAINE, AND MY NOTES SAY THAT YOU MARRIED ALEX IN ABOUT SEPTEMBER OF 2021; IS THAT RIGHT?

A.    THAT'S CORRECT.

ODEIANENKO CROSS BY MR. NARITA

Q.   AND THEN SHORTLY AFTER THAT, IN OCTOBER OF 2021, THAT'S WHEN YOU WERE FIRST HIRED BY GOOGLE?

A.   YES, THAT'S CORRECT.

Q.   AND YOU WERE WORKING IN KYIV FOR GOOGLE; CORRECT?

A.   FOR ABOUT THREE MONTHS BECAUSE I WAS LIKE A TRANSFEREE. SO IN MY CONTRACT IT WAS THE PART THAT I'M GOING TO MOVE TO POLAND, AND WHILE THEY WERE -- LIKE, WE WERE WORKING ON THE DOCUMENTS AND VISA, YES, I WORKED AT THEIR DEPARTMENT IN KYIV --

Q.   OKAY.

A.   -- FOR, LIKE, A FEW MONTHS OR SO, YEAH.

Q.   AND SO WHEN YOU GOT THE JOB IN OCTOBER OF 2021, THERE WAS ALREADY A PLAN FOR YOU TO MOVE TO WARSAW?

A.   THAT WAS PART OF MY CONTRACT.

Q.   IT WAS RIGHT IN YOUR CONTRACT WITH GOOGLE?

A.   YEAH.

Q.   OKAY.  GREAT.  AND THEN YOU MOVED TO WARSAW IN JANUARY OF 2022?

A.   I THINK SO, YEAH.

Q.   AND THEN I GUESS IN WARSAW THE FIGHTING BROKE OUT IN LATE FEBRUARY OF 2022?

A.   YEAH.

Q.   CORRECT?

A.   BUT THEN IT'S BEEN ABOUT THE YEAR THAT WE HAD THE RUSSIAN TROOPS AROUND OUR BORDER, AND WHEN YOU SEE 300 MEN STANDING

THERE WITH THE WEAPONS AND THE TANKS, YOU DON'T THINK THAT THEY'RE CASUALLY WORKING THERE, BECAUSE WE HAD THE WAR SINCE 2015 AND THEY ALREADY OCCUPIED A LOT OF THE TERRITORY IN UKRAINE.

SO WHEN I WAS LOOKING FOR THE NEW OPPORTUNITIES WITH JOB, I WAS THINKING, LIKE, WHERE WE CAN MOVE NOT THAT FAR SO WE CAN AVOID IF THAT WOULD HAPPEN.

Q.   RIGHT.  OKAY.  BUT, IN OTHER WORDS, THERE WAS ALREADY -- BY THE TIME YOU GOT A JOB WITH GOOGLE, THERE WAS ALREADY A LOT OF CONCERN ABOUT WHAT MIGHT HAPPEN WITH THE RUSSIANS; IS THAT FAIR?

A.   YEAH.  SO EVERYBODY WERE AWARE THAT IT'S JUST A MATTER OF THE SPECIFIC DATE THAT THEY WOULD INVADE.

Q.   OKAY.  AND THEN YOU MOVED TO WARSAW IN JANUARY OF 2022. HOW LONG AFTER THAT DID YOU START THINKING ABOUT MAYBE MOVING EVEN FURTHER AWAY FROM THE WAR ZONE?

A.   SO I THINK, LIKE, WARSAW IS VERY CLOSE TO KYIV.  IT WILL TAKE YOU, I WOULD SAY LIKE YOU CAN COMPARE THIS LIKE DRIVING FROM SAN FRANCISCO TO L.A.  IF YOU HAD, LIKE, IN ANY OF THOSE CITIES, LIKE, WORK, YOU WOULD PROBABLY BE WORRIED ABOUT THAT, JUST BECAUSE IT'S VERY CLOSE.

Q.   SURE.

A.   IT WILL TAKE YOU, I DON'T KNOW, EIGHT TO TEN HOURS JUST TO DRIVE ONE WAY.

SO I FEEL LIKE WE START HAVING, LIKE, A SMALL CASE WITH

THE DOCUMENTS AND, LIKE, SOME NECESSARY THINGS IN POLAND.

AND WE JUST DECIDED IT'S NOT HELPING WITH OUR, LIKE, SITUATION AND EMOTIONAL STATE, AND WE DECIDED THAT WE WILL LOOK WHERE WE CAN MOVE FARTHER.

AND IT TOOK US ABOUT, LIKE, MAYBE JUST OVER A YEAR.

AND THEN AFTER THE YEAR, LIKE, WE START LOOKING FOR OTHER OPPORTUNITIES, AND IT JUST HAPPENED THAT WE GOT ONE HERE.

Q.   OKAY.  AND SO ONE OF THE EXHIBITS THAT WE LOOKED AT WITH YOUR HUSBAND EARLIER WAS A VISA THAT HE GOT FOR CANADA IN SEPTEMBER OF 2022.

DO YOU REMEMBER A TIME PERIOD RIGHT AROUND SEPTEMBER OF 2022 WHEN YOUR HUSBAND WAS GETTING A VISA TO CANADA?

A.   YES, BECAUSE WE BOTH GOT ONE.

SO WE HEARD ABOUT THAT CANADA OPENED A SPECIAL VISA FOR UKRAINIANS, AND I ACTUALLY STARTED THINKING, YEAH, MAYBE IT'S, LIKE, FAR ENOUGH THAT WE WOULD NOT FEEL THAT ANXIOUS AND STRESSED ABOUT THAT.

SO ACTUALLY THE FIRST -- WE DECIDED, OKAY, WE CAN GET IT JUST IN CASE BECAUSE IT'S OPEN DATE.  THEY GIVE US -- I DON'T REMEMBER, MAYBE, LIKE, FIVE TO SEVEN YEARS YOU CAN ENTER. THERE'S NO SPECIFIC DAY THAT YOU CAN ENTER, MEANING THAT WE'RE LIKE, OKAY, WE STILL LIVE HERE, BUT JUST IN CASE WE HAVE A VISA TO ANOTHER COUNTRY IN CASE WE HAVE TO GO FARTHER.

AND WHEN YOU LIVE WITH THIS UNCERTAINTY, YOU HAVE TO HAVE PLAN A, B, C, D, WHATEVER, AND THAT WAS JUST, LIKE, ANOTHER

PLAN THAT WE WERE THINKING ABOUT.

Q.    ANOTHER CONTINGENCY PLAN?

A.    YEAH.

Q.    OKAY.  AND DO YOU REMEMBER ABOUT WHAT TIME YOU STARTED LOOKING FOR OTHER POSITIONS WITHIN GOOGLE THAT WERE -- YOU KNOW, THAT WOULD TAKE YOU FARTHER AWAY FROM WARSAW?

A.    I THINK IT WAS, LIKE, ABOUT AFTER A YEAR OR SO SIMPLY BECAUSE WE HAVE A RULE THAT ONCE YOU MOVE TO A NEW COUNTRY, YOU CAN CHANGE, LIKE -- YOU CAN CHANGE TEAMS, BUT YOU CAN'T CHANGE COUNTRY WITHIN THE FIRST YEAR.

      SO BY THE RULE IT HAS TO BE AT LEAST ONE YEAR, AND THEN YOU CAN MOVE TO ANOTHER COUNTRY.

      AND I FIRST LOOKED AT CANADA BECAUSE I WOULD SAY, OH, LIKE, I HAVE VISA AND YOU DON'T HAVE TO SUPPORT ME WITH THAT AND SO WE CAN GO THERE.

      SO IT'S ABOUT A YEAR.

Q.    OKAY.  AND AT SOME POINT DID YOU START APPLYING FOR POSITIONS IN MOUNTAIN VIEW?

A.    THAT WAS ACTUALLY BY ACCIDENT.  SO I WAS APPLYING TO ALL OF THE CANADIAN CITIES JUST BECAUSE WE HAVE VISA AND I THOUGHT THAT WOULD BE EASIER FOR US TO MOVE THERE, AND THERE WAS LIKE, ANOTHER POSITION, AND I READ THIS.  I SAW CANADA AND MOUNTAIN VIEW AND OTHER LOCATIONS.

      I APPLIED AND I WENT THROUGH THE PROCESS, I MET THE TEAM, THEY WERE AWESOME, AND THEN I TALKED TO OLEKSANDR IF HE WOULD

BE WILLING TO MOVE THERE BECAUSE IT'S A REALLY BIG MOVE.  HE WOULD HAVE TO LEAVE HIS JOB BECAUSE WIX DIDN'T HAVE A JOB HERE IN THE U.S.  LIKE, IN THE OFFICE HE COULD BE MOVED FROM UKRAINE -- SO IN THE UKRAINE, WIX HAS OFFICE, AND IN POLAND THEY ALSO HAVE AN OFFICE.

SO THEY WERE OKAY WITH MOVING HIM FROM ONE OFFICE TO ANOTHER, BUT THEY JUST DIDN'T HAVE AN OFFICE IN THE UNITED STATES, WHICH WOULD BE HARDER FOR HIM.

SO THAT WAS A DECISION THAT WE HAD TO MAKE, OKAY, WE WERE MOVING FARTHER, BUT HE WOULD HAVE TO SEARCH FOR A NEW JOB.

Q.   OKAY.

THE COURT:  AND OCCASIONALLY THE COURT REPORTER WILL HAVE TO INTERRUPT JUST BECAUSE SHE HAS TO REPORT EVERYTHING THAT IS BEING SAID IN THE COURTROOM, SO SHE CLARIFIES.

THE WITNESS:  THAT'S OKAY.  LET ME KNOW IF I CAN --

BY MR. LOKER:

Q.   OKAY.  AND BASED ON THE CONSULTING WORK THAT YOU DID IN 2020 WITH EQUIFAX, YOU ALREADY KNEW, WHEN YOU WERE GOING TO MOVE TO THE UNITED STATES, THAT ESTABLISHING CREDIT WAS GOING TO BE SOMETHING THAT WAS IMPORTANT TO DO; RIGHT?

A.   SO I THINK AT THAT MOMENT IN MY COMPANY, I HAD ANOTHER PERSON THAT WOULD CONSULT ME WITH THE THINGS I WOULD HAVE TO DO WHEN I MOVED HERE BECAUSE IT WAS A NEW SYSTEM, AND BY THE WAY, YOU NEED TO DO THIS, THIS, AND THAT.

AND THE CREDIT REPORT WAS ONE OF THE THINGS, AND SHE

ACTUALLY HELPED US AT THE APPOINTMENT TO GO AND APPLY FOR THE SOCIAL SECURITY NUMBER.

Q.    OKAY.  AND YOU KNEW THAT YOUR HUSBAND, ALEX, ALREADY HAD A SOCIAL SECURITY NUMBER FROM THE TIME WHEN HE HAD VISITED THE U.S. AS A STUDENT; RIGHT?

A.    I THINK WE DISCUSSED THAT, AND I REMEMBER HE SAID, BUT, LIKE, THAT'S GIVEN TO YOU FOR TEN YEARS.

AND I'M LIKE, THAT'S STRANGE.  OKAY.

BUT ANYWAY, WE DIDN'T KNOW THAT MUCH ABOUT THE SYSTEM, SO HE WAS PRETTY SURE THAT IT'S GIVEN TO YOU, LIKE, FOR TEN YEARS, AND THEN, I DON'T KNOW, YOU HAVE TO RENEW THAT.

Q.    OKAY.

A.    THAT'S HOW MUCH WE KNOW ABOUT THE SYSTEM.

Q.    OKAY.  AND AT SOME POINT DO YOU RECALL -- WELL, WHAT DO YOU RECALL ABOUT THE VISIT TO THE SOCIAL SECURITY OFFICE?  THE TWO OF YOU WENT TOGETHER; RIGHT?

A.    YEAH.

Q.    OKAY.  WHAT DO YOU REMEMBER ABOUT THAT?

A.    THAT THAT WAS CLOSE TO THE APARTMENT THAT WE WERE LIVING AT AT THE MOMENT.  THERE WAS A NICE LADY WHO HELPED US WITH THAT.  SHE TOOK, LIKE, MY APPLICATION.  SHE JUST GIVE ME THE APPLICATION I HAVE TO FILL IN.

ALEX ACTUALLY ASKED HER, BY THE WAY, I WAS HERE WHEN I WAS A STUDENT.  I HAD, LIKE, MY SOCIAL SECURITY NUMBER.  THAT'S TRUE THAT IT'S ONLY FOR TEN YEARS?

AND SHE'S LIKE, NO, IT'S FOREVER.  SO I WOULD HAVE TO GO AND FIND IT, AND WE'RE GOING TO SEND IT TO YOU WITHIN, LIKE, PHYSICAL MAIL.  WE'LL SEND IT TO YOU IN, LIKE, I DON'T KNOW, A WEEK OR TWO WEEKS.

Q.   OKAY.  DID HE HAVE TO SHOW HER ANYTHING TO PROVE WHO HE WAS BEFORE SENDING A SOCIAL SECURITY CARD?

A.   HONESTLY, I DON'T REMEMBER.  WE JUST SHOW HER THE PASSPORT AND SOME OF THE DOCUMENTS PROBABLY JUST FOR THE APPLICATIONS, TOO.

Q.   OKAY.  SO YOU DON'T HAVE ANY MEMORY OF YOUR HUSBAND CHECKING WHETHER OR NOT HE HAD ANY KIND OF CREDIT SCORE BEFORE THE TWO OF YOU CAME TO MOUNTAIN VIEW TOGETHER?

A.   YES.  SO THAT'S CORRECT.

AFTER WE WENT TO THIS OFFICE, HE INSTALLED THE APPLICATION AND WAS CHECKING, BECAUSE BEFORE WE DIDN'T HAVE ANY REASON TO CHECK IT.  WE WERE, LIKE, ABSOLUTELY SURE IT'S, LIKE, ZERO, SO THERE'S NOTHING TO CHECK.  WE'RE, LIKE, NOT ZERO, BUT NOTHING.

Q.   SO YOUR EXPECTATION WOULD BE THAT HE WOULD HAVE A ZERO CREDIT SCORE, LIKE NO CREDIT SCORE?

A.   I THINK SO, BECAUSE IT SHOULD BE, LIKE, CLEAN.  THERE'S, LIKE, NOTHING.  LIKE, I STARTED, I DIDN'T EVEN HAVE ZERO.  SO THERE WAS JUST NO DATA.

Q.   RIGHT.  SO WHEN YOU CAME TO THE U.S., THEY ISSUED YOU A SOCIAL SECURITY NUMBER FOR THE FIRST TIME AND YOU HAD NO CREDIT; CORRECT?

A.   I DIDN'T HAVE ANY CREDIT.

Q.   OKAY.  SO NO CREDIT SCORE; CORRECT?

A.   NO.  SO MY DATA SHOWED UP ABOUT, LIKE, IN SIX MONTHS, AND I HAD ABOUT, LIKE, 750 CREDIT SCORE RIGHT AWAY.

Q.   OKAY.

A.   IN SIX MONTHS.

Q.   AND THEN -- SO THAT WAS YOUR EXPECTATION FOR YOUR HUSBAND, TOO, THAT WHEN YOU -- IF HE CHECKED HIS CREDIT SCORE, THERE WOULDN'T BE ANY?  THERE WOULD BE ZERO; RIGHT?

A.   THERE WOULD BE NO DATA.

Q.   OKAY.  SO YOU GET TO THE U.S., YOU START YOUR NEW JOB WITH YOUR NEW COLLEAGUES AT GOOGLE.  IS THAT -- IT'S A FULL-TIME JOB; CORRECT?

A.   THAT'S CORRECT.

Q.   IS IT REMOTE OR DO YOU GO INTO THE OFFICE?

A.   I'M GOING INTO THE OFFICE ALMOST EVERY DAY.

Q.   ALMOST EVERY DAY.

     AND SO YOU LEAVE AT 8:00 O'CLOCK IN THE MORNING EACH DAY, AND YOU COME BACK AT 5:00 O'CLOCK EACH DAY; CORRECT?

A.   I DO, YEAH.

Q.   OKAY.  SO YOU'RE NOT SITTING NEXT TO YOUR HUSBAND SEEING WHETHER HE'S MAKING PHONE CALLS; RIGHT?

A.   YES.  BUT WHEN I LEAVE I SEE HIM WORKING ON THAT, AND WHEN I COME BACK, I ALSO SEE HIM CONTINUE TO WORK ON THAT.

Q.   OKAY.  BUT, LIKE, JUST WHILE YOU'RE AT WORK, I ASSUME

YOU'RE BUSY; RIGHT?

A.   YES, I AM.

Q.   OKAY.  SO YOU'RE NOT MONITORING YOUR HUSBAND TO SEE WHETHER HE'S ON THE PHONE OR WHETHER HE'S WRITING A LETTER OR WHAT HE'S DOING; RIGHT?

A.   I HAVE FUNDAMENTAL TRUST IN MY HUSBAND, SO I KNOW THAT IF HE HAS SOMETHING AS IMPORTANT AS THIS, HE WOULD BE WORKING ON THAT.

Q.   OKAY.  AND I UNDERSTAND THAT.  I'M SURE THAT YOU TRUST YOUR HUSBAND, MA'AM.  I WASN'T TRYING TO SUGGEST OTHERWISE.

I'M JUST TRYING TO KNOW WHAT YOU SAW VERSUS THE TRUST THAT YOU HAD IN HIM.  OKAY?  I JUST WANT TO DISTINGUISH BETWEEN THOSE TWO.

SO ISN'T IT TRUE, MA'AM, THAT EVERY SINGLE DAY THAT YOU WENT TO WORK FULL TIME, YOU DID NOT HAVE THE CHANCE TO OBSERVE WHAT YOUR HUSBAND WAS DOING WHILE HE WAS AT HOME; RIGHT?

A.   WHEN I WOULD RETURN BACK HOME -- THAT'S TRUE, I WOULD NOT SEE HIM DURING THE DAY.  I WOULD SEE HIM -- I CAN SHARE ONLY WHAT I SAW, LIKE, BEFORE I GO TO WORK AND WHEN I COME BACK.

BUT WHEN I COME BACK, HE WOULD SHARE WITH ME WHAT HE DID, LIKE, THROUGH THE DAY JUST IN GENERAL, MAYBE WITHOUT SHOWING ME SOME DOCUMENTS THAT HE HAS TO PREPARE AND MAYBE GO AND SEND IT, GO AND SCAN THEM.

BUT THEN HE WOULD SHARE WITH ME THAT, OH, LIKE THE SYSTEM, I HAD TO SPEND THREE HOURS JUST ON THE PHONE WAITING FOR

SOMEONE TO TALK TO ME, OR HE WOULD GET, LIKE, SOME EMAIL BACK AND HE WOULD SHARE WITH ME SOMETHING IN GENERAL TERMS THAT WOULD GIVE ME THE UNDERSTANDING THAT HE WAS BUSY WITH THAT.

Q.    OKAY.  UNDERSTOOD.

SO HE STARTED THIS PROCESS IN MAY, CORRECT, OF 2023?

A.    YEAH, I THINK SO.

Q.    OKAY.  AND WHEN DID YOU OBSERVE HIM SORT OF END THE PROCESS OF WORKING FULL TIME ON TRYING TO ADDRESS THIS ISSUE WITH HIS CREDIT SCORE OR CREDIT REPORT?

A.    OKAY.  SO I THINK THAT FOR SOME TIME, LIKE, HE WOULD TRY TO RESOLVE THOSE BY HIMSELF.

AND THEN I'M NOT SURE, BUT IT COULD BE, LIKE, SEPTEMBER/OCTOBER OF THAT YEAR WHEN HE ACTUALLY FOUND HIS LAWYERS WHO COULD START, LIKE, HELPING HIM WITH THE PROCESS.

Q.    OKAY.  AND DURING THAT -- AND DURING THAT TIME BETWEEN MAY AND SEPTEMBER WHEN HE STARTED WORKING WITH HIS LAWYERS, WHAT WAS YOUR UNDERSTANDING OF WHAT HE WAS DOING AT HOME WHILE YOU WERE WORKING AT GOOGLE?

A.    THAT HE WAS TRYING TO DISPUTE THE ACCOUNTS THAT WASN'T HIS.

Q.    OKAY.  AND NOTHING ELSE?

A.    SO I THINK THAT THE POLICE, LIKE -- SO WHEN HE WENT TO THE POLICE, THEY JUST THOUGHT THAT THEY WOULD SEND IT OVER TO THE LAPD BECAUSE THE CRIME WAS IN THE LAPD, SO HE WOULD SHARE WITH ME THE PROCESS THAT WAS GOING ON THERE.

AND THEN HE HAD COMMUNICATION WITH THE POLICE IN L.A.

HE ALSO HAD A LOT OF COMMUNICATION WITH THE BANKS AND THE CREDIT ROLES ABOUT DIFFERENT ACCOUNTS AND EVERYTHING THAT GOES FROM THOSE ACCOUNTS INTO HIS CREDIT REPORT BECAUSE WE EXPECT THAT THAT WILL BE CLEAN.

AND HE WOULD JUST SHARE WITH ME THE PROGRESS ON THAT.  AND THAT'S KIND OF A LOT BECAUSE IT HAS TAKEN SOME TIME TO SEND SOME DOCUMENTS, GET BACK SOME RESPONSE, RESPOND TO THAT RESPONSE THAT YOU JUST GOT.  SO THAT HAS TAKEN SOME TIME.

Q.   OKAY.  SO THIS PROCESS THAT YOU JUST DESCRIBED THAT YOU UNDERSTOOD HE WAS DOING WHILE YOU WERE WORKING, YOU UNDERSTOOD THAT THAT WAS WHAT HE WAS DOING FULL TIME EVERY DAY BETWEEN MAY AND SEPTEMBER OF 2023?

A.   I WOULD SAY YES, BECAUSE I'VE SEEN THAT THERE IS, LIKE, NO FREE TIME FOR THAT, LIKE, FOR ANYTHING ELSE.

HE WOULD JUST BE WORKING ON THIS ALL OF THE TIME, AND HE WOULD HAVE ON HIS TABLE A LIST OF THINGS THAT HE HAD TO DO, DIFFERENT ENVELOPES THAT HE HAD THAT HE WOULD HAVE TO SEND, OPEN AND SEND TO THEM.

SO I WOULD SAY YES.

Q.   OKAY.  AND THAT WAS BASED ON YOUR OBSERVATIONS OF WHAT YOU SAW BEFORE YOU LEFT FOR WORK AND WHAT YOU SAW WHEN YOU GOT HOME; RIGHT?

A.   AND ON WHAT WE DISCUSSED TOGETHER.

Q.   AND WHAT YOU DISCUSSED.  OKAY.

SO IT'S YOUR MEMORY, THEN, THAT BETWEEN MAY OF 2023 AND SEPTEMBER OF 2023, YOUR HUSBAND DIDN'T DO ANYTHING TO LOOK FOR A JOB HERE IN THE UNITED STATES; RIGHT?

A.   IT'S ACTUALLY, I THINK IT ALSO COULD BE CHALLENGING TO DO THAT BECAUSE RIGHT NOW SOME OF THE FIRMS ACTUALLY WANT TO CHECK YOUR CREDIT SCORE.

WITH THE CREDIT SCORE THAT HE HAD AT THAT MOMENT, THAT WOULD BE VERY HARD BECAUSE, FOR EXAMPLE, AT GOOGLE SOMETIMES THEY CHECK, AND IF YOU DON'T HAVE 750, YOU DON'T LOOK LIKE A TRUSTWORTHY POTENTIAL EMPLOYEE, AND I KNOW THAT SOME OF COMPANIES DO THE SAME.

Q.   OKAY.  WELL, THANK YOU FOR THAT ANSWER, MA'AM.  BUT I WONDER IF YOU COULD ANSWER THE QUESTION THAT I ASKED YOU.

A.   I KNOW THAT HE CHECKED A FEW TIMES, BUT THAT WAS HIS PRIMARY FOCUS AT THAT MOMENT.

Q.   OKAY.  WELL, WHAT DO YOU UNDERSTAND THAT HE DID TO TRY AND LOOK FOR A JOB AT ANY TIME IN, LET'S SAY, THE MONTH OF MAY 2023?

A.   SO HE WOULD GO -- WE ACTUALLY WENT TOGETHER TO A FEW CONFERENCES JUST TO MEET OTHER PEOPLE AND UNDERSTAND MORE ABOUT COMPANIES THAT ARE IN THE AREA WHERE HE CAN GO AND APPLY FOR THE JOB.

I REMEMBER HE APPLIED A FEW TIMES, BUT ACTUALLY THIS PROCESS TOOK SO MUCH TIME, WE DECIDED IT'S BETTER FOR HIM TO FOCUS ON THAT AT THE MOMENT, AND ONCE IT'S DONE, HE CAN START

SEARCHING FOR A JOB.

Q.   OKAY.  SO YOU THINK HE PUT A COUPLE OF APPLICATIONS IN AND IN MAY OF 2023 THEN?

A.   I DON'T WANT TO BE WRONG, BUT I THINK SO.  I'M NOT SURE.

Q.   YOU'RE NOT SURE.

WHAT ABOUT JUNE OF 2023, CAN YOU TELL US ANYTHING SPECIFIC THAT YOU KNOW THAT YOUR HUSBAND DID TO TRY AND LOOK FOR A JOB IN JUNE OF 2023?

A.   SPECIFICALLY IN JUNE?  I CAN'T TELL.

Q.   OKAY.  HOW ABOUT JULY OF 2023?  ANYTHING YOU COULD SHARE WITH US ABOUT -- SPECIFICALLY ABOUT WHAT YOUR HUSBAND DID TO LOOK FOR A JOB DURING THAT MONTH?

A.   YOU CAN USE, LIKE, ANY SPECIFIC MONTHS, JUNE, JULY, SEPTEMBER, I WOULD PROBABLY NOT REMEMBER ANYTHING SPECIFIC.

Q.   OKAY.

A.   BECAUSE SEARCHING FOR A JOB CAN TAKE ALSO A LOT OF TIME. HERE IT'S A VERY COMPETITIVE MARKET, AND YOU JUST NEED TO PUT A LOT OF EFFORT INTO THAT.

Q.   OKAY.  WHEN WAS THE FIRST TIME THAT YOU SAW YOUR HUSBAND PUTTING IN THE KIND OF EFFORT THAT YOU THOUGHT WAS NEEDED TO LAND A JOB?

A.   SO I THINK THAT HE HAD, LIKE, SOME -- A LITTLE BIT OF RELIEF WHEN HE FOUND HIS LAWYERS WHO STARTED HELPING HIM WITH THE CASE JUST BECAUSE THEY HAVE MORE KNOWLEDGE OF THE SYSTEM AND OTHER THINGS, AND IT'S JUST EASIER TO FEEL LIKE THAT KIND

OF SUPPORT THAT YOU HAVE SOMEWHERE TO LEAN.

AND HE WAS SEARCHING FOR A JOB FULL TIME, AND HE FOUND HIS CURRENT JOB WITHIN, LIKE, A MONTH OR TWO.

Q.   OKAY.  AND IN JULY, THE TWO OF YOU GOT A CHANCE TO TAKE A TRIP TO SEE HIS FRIEND AND YOUR FRIEND IN NEW YORK CITY; RIGHT?

A.   YEAH.  I HAD TO COMBINE THIS WITH MY BUSINESS TRIP AS WELL.

Q.   OKAY.

A.   SO WE THOUGHT IT'S A GOOD OPPORTUNITY IF I HAVE TO BE THERE FOR WORK, WHY NOT GO TOGETHER.

Q.   OKAY.  AND DID YOU GUYS ENJOY THE TRIP IN SEEING YOUR FRIENDS?

A.   THESE ARE OUR CLOSE FRIENDS, AND WE HAVEN'T SEEN THEM FOR A VERY LONG TIME.

RIGHT NOW, I THINK WITH THE SITUATION, EVERYBODY IS DISTRIBUTED AROUND THE WORLD, AND WE HAVE FRIENDS IN DIFFERENT COUNTRIES, AND WE FOUND THAT A VERY GOOD OPPORTUNITY FOR US JUST TO SPEND TIME TOGETHER.

Q.   I CAN IMAGINE.

DID YOU DO ANYTHING TO HELP YOUR HUSBAND WORK ON THE DISPUTE PROCESS WITH ALL OF THE BANKS THAT HE WAS DEALING WITH?

A.   NOT REALLY, NO.  SO I KNOW THE PROCESS IN GENERAL.  I KNOW IN GENERAL TERMS, LIKE, WHAT IS HAPPENING.  I TRIED TO SUPPORT HIM ON A LEVEL LIKE A WIFE WOULD DO, JUST ON HIS MENTAL AND EMOTIONAL AND PHYSICAL LEVEL TO HELP HIM GO THROUGH THAT, BUT I

NEVER, LIKE, HELPED TO PREPARE ANY DOCUMENTS FOR HIM.

Q.   OKAY.  SO YOU DON'T KNOW WHICH BANK OR BANKS HE WAS WRITING TO ON ANY PARTICULAR DAY OR ANY PARTICULAR MONTH; RIGHT?

A.   ANY PARTICULAR DAY AND MONTH?  NO.  I JUST KNOW THE NAMES OF THE BANKS THAT WAS PART OF THE PROCESS FOR DISPUTING.

Q.   OKAY.  WHICH BANKS ARE YOU AWARE OF?

A.   CHASE, BANK OF AMERICA.  THERE WAS BUREAUS CREDIT UNION AND COMENITY TOO.

Q.   AND WAS BANK OF AMERICA ONE OF THEM?

A.   YES.  I SAID IT.

Q.   OKAY.  AND THEN THERE WAS A COLLECTION COMPANY, CAVALRY; RIGHT?

A.   THAT'S CORRECT.

Q.   SO YOU'RE GENERALLY FAMILIAR WITH THE FACT THAT HE WAS WORKING ON ISSUES THAT INVOLVED ALL OF THOSE ENTITIES; RIGHT?

A.   THAT'S CORRECT.

Q.   BUT YOU DON'T HAVE ANYTHING SPECIFIC THAT YOU COULD SHARE WITH US ABOUT WHAT HE WAS DOING TO DEAL WITH THE COMENITY ACCOUNT, DO YOU?

A.   I THINK I DO, BECAUSE I REMEMBER THAT HE WAS SURPRISED THAT THAT WAS THE ONLY BANK THAT HE SENT DIFFERENT REQUESTS, AND I THINK COMENITY IS THE ONLY BANK WHO ACTUALLY SAID THAT THEY DID INVESTIGATIONS, AND THEY WOULD NOT DO ANY INVESTIGATION FURTHER.  THAT'S JUST, LIVE WITH THAT.

SO I REMEMBER THAT HE WAS STRESSED ABOUT THAT, AND WE DISCUSSED THIS IN, LIKE, ONE OF THE EVENINGS, BUT I DON'T REMEMBER THE SPECIFIC DATE WHEN THAT WAS.  IT'S JUST I REMEMBER HE WAS SO IMPRESSED THAT ALL OTHER BANKS THEY WOULD GO BACK AND FORTH AND ASK FOR MORE DOCUMENTS AND DO THIS AND THAT AND JUST TAKE MUCH MORE TIME, BUT THAT WAS THE ONLY TIME THAT HE GOT THE ANSWER THAT THEY'RE NOT GOING TO DO ANY FURTHER INVESTIGATION.

Q.   SO YOU REMEMBER A CONVERSATION SPECIFICALLY WITH YOUR HUSBAND ABOUT COMENITY SAYING SOMETHING LIKE THEY WEREN'T GOING TO INVESTIGATE FURTHER?

A.   I DO.

Q.   AND WHAT MONTH WAS THAT?

A.   I COULD NOT TELL YOU THE MONTH.  THAT WOULD BE USUALLY WHEN I CAME FROM WORK, AND WE WOULD JUST SHARE SOME OF THE NEWS FROM THE DAY, AND HE JUST SHARED THAT WITH ME.

Q.   OKAY.  AND SO WHAT DO YOU -- I MEAN, DESCRIBE WHAT YOU REMEMBER OBSERVING ABOUT YOUR HUSBAND WHEN HE WAS TELLING YOU ABOUT THE CALL?

A.   I THINK IT WAS GENERAL SURPRISE AND FRUSTRATION BECAUSE HE WOULD NOT EXPECT THAT TYPE OF AN ANSWER, ESPECIALLY WHEN YOU HAVE SOMETHING TO PRESENT, LIKE YOU HAVE THE POLICE REPORT, YOU HAVE LIKE OTHER DOCUMENTS THAT JUST GENERALLY PROVE THAT IT WASN'T YOURS, AND IT'S SHOCK AND SURPRISE.  IT'S LIKE, WHAT DOES IT MEAN?  WE CAME TO THE COUNTRY FOLLOWING THE LAW, AND WE'RE GETTING THE ANSWER THAT WE'RE NOT GOING TO INVESTIGATE

THIS FARTHER, THAT THAT WAS JUST SURPRISE AND SHOCK.

Q.   OKAY.  SO ARE YOU DESCRIBING FOR US RIGHT NOW A SPECIFIC MEMORY THAT YOU HAVE OF A CONVERSATION WITH YOUR HUSBAND ABOUT COMENITY?

A.   YES, I DO.

Q.   OKAY.  YOU JUST DON'T REMEMBER THE MONTH?

A.   YEAH, I DON'T REMEMBER THE MONTH.

Q.   OKAY.  ANYTHING ELSE THAT YOU CAN REMEMBER OBSERVING ABOUT HIM WHEN YOU HAD THIS CONVERSATION WITH HIM?

A.   NO.  I THINK THAT'S IT.

Q.   OKAY.  WAS THAT THE TIME THAT YOU SAW HIM CRY?

A.   NO, THAT WAS ANOTHER TIME.  THAT WAS THE TIME WHEN IT WAS LIKE EVEN BEFORE WE FOUND THE LAWYERS WHO STARTED HELPING US WITH THE CASE, I FEEL LIKE HE HAD JUST A DESPERATE MOMENT MOVING TO ANOTHER COUNTRY, AND IT SEEMS LIKE YOU CANCELLED THAT ON YOUR OWN BECAUSE YOU DON'T UNDERSTAND THE SYSTEM, YOU DON'T KNOW WHAT MAYBE OTHER POTENTIAL STEPS YOU CAN DO TO FIX THAT, AND I FEEL THAT'S THE GENERAL FEAR OF YOU IN A FOREIGN COUNTRY AND SOMETHING LIKE THIS PRETTY BAD HAPPENED TO YOU AND YOU JUST NEED TO SOLVE THAT.

Q.   WELL, IS THAT WHAT HE TOLD YOU OR IS THAT WHAT YOU THOUGHT HE WAS GOING THROUGH?

A.   SO I WAS AT HOME, AND HE WAS WORKING ON SOME OF THE THINGS, AND I SAW THAT HE WAS, LIKE, REALLY UPSET.

I STARTED ASKING HIM WHAT IS GOING ON AND OTHER STUFF AND

TRIED TO, I DON'T KNOW, SUPPORT HIM, AND THEN WE HAD THE CONVERSATION ABOUT THAT.

Q.   OKAY.  BUT HE DIDN'T SAY ANYTHING SPECIFIC ABOUT COMENITY?

A.   MEN IN OUR COUNTRY WOULD NOT SHARE LIKE THIS SPECIFICALLY. YOU HAVE TO JUST PULL THE STRINGS AND ASK ABOUT HIS EMOTIONS. HE WOULD NOT JUST COME AND START CRYING TO ME.  THAT WAS THE ONLY TIME THAT I HAVE SEEN THAT HAPPEN.

Q.   OKAY.  BUT DID HE MENTION MY CLIENT, COMENITY CAPITAL BANK?

A.   NO.  WHILE HE WAS CRYING HE DIDN'T SAY, LIKE, BANK OF AMERICA, COMENITY, OR ANYONE ELSE SPECIFICALLY.  THE GENERAL SITUATION WAS UPSETTING.

Q.   THAT ALL OF THE BANKS WEREN'T LISTENING TO HIM I GUESS?

A.   I THINK AT THAT MOMENT WHEN THAT WAS HAPPENING, I THINK IT WAS A PROCESS OF HIM TRYING TO SOLVE IT BY HIMSELF, SO I BELIEVE AT THAT MOMENT ALL OF THE BANKS STILL WAS PART OF THE DISCUSSION.

Q.   OKAY.  SO WHEN WAS THE -- WHAT YEAR WAS THE DISCUSSION THAT YOU HAD WITH HIM WHERE HE TALKED ABOUT COMENITY SPECIFICALLY AND THIS NOTION THAT THERE WAS A PHONE CALL AND THEY TOLD HIM THAT THEY WERE NOT GOING TO DO ANYTHING FURTHER? WAS THAT THIS YEAR?

A.   NO.  I THINK IT WAS MAYBE 2024, BUT I MIGHT NOT BE SURE.

Q.   OKAY.  SO YOU'RE NOT SURE WHAT YEAR IT WAS?

A.   YES.

Q.   OKAY.  CAN WE SEE EXHIBIT 246, PLEASE.

MA'AM, THERE'S A LOT OF BINDERS FLOATING AROUND THIS COURTROOM, AND I DON'T KNOW IF THE RIGHT ONE IS UP THERE BY YOU.

BUT ONE OF THE BINDERS THAT WE HOPE IS NEARBY YOU HAS EXHIBIT 246 THERE.

DO YOU HAVE ANY BINDERS?

MR. LOKER:  MAY I ASSIST?

THE COURT:  MR. NARITA, MR. LOKER IS ASKING WHETHER OR NOT HE CAN APPROACH THE WITNESS.

MR. NARITA:  ABSOLUTELY.

THE COURT:  MR. LOKER IS GOING TO HELP RETRIEVE THE BINDER.

THE EXHIBIT WILL ALSO APPEAR ON THE SCREEN, MA'AM, AS WELL.

THE WITNESS:  I SEE.

MR. LOKER:  THIS ONLY GOES -- OH, I'M SORRY.

(DISCUSSION OFF THE RECORD.)

MR. NARITA:  MAYBE IT'S LOOSE ON THE STAND, MR. LOKER, BECAUSE IT WAS HANDED TO THE WITNESS EARLIER.  IT'S THE TELEGRAM EXCHANGE.

MR. LOKER:  YEAH, I KNOW WHICH ONE IT IS.  OH, IT'S SITTING RIGHT THERE.

MR. NARITA:  WE HAVE FOUND IT.  IT WAS NOT IN A BINDER, YOUR HONOR, BECAUSE IT WAS ENTERED AFTER THE BINDERS

WERE CREATED.

THE COURT:  MR. LOKER WAS TRYING TO BE HELPFUL.

ALL RIGHT.  WE NOW HAVE EXHIBIT 246 IN FRONT OF THE WITNESS.  SHE'S HOLDING A SINGLE PAGE SHEET, AND IT'S ALSO UP ON THE SCREEN.

MR. NARITA:  FANTASTIC.

THE COURT:  MR. NARITA.

MR. NARITA:  THANK YOU.

Q.   AND JUST SO WE HAVE A CLEAR RECORD, MA'AM, THIS IS A DOCUMENT THAT WAS MARKED AS TRIAL EXHIBIT 246.  IT'S STAMPED PANCHENKO 448.  THIS WAS PRODUCED BY YOUR HUSBAND'S ATTORNEYS, AND IT HAS A DATE OF MAY 11TH, 2022 AT THE TOP.

AND I CAN SEE THAT YOU'RE STRAINING YOUR EYES A LITTLE BIT BECAUSE IT'S KIND OF HARD TO READ.

MR. LOKER:  YOUR HONOR, THE DATE ON THE EXHIBIT IS MAY 11TH, 2023.

MR. NARITA:  EXCUSE ME.  THANK YOU FOR THE CORRECTION.

YOUR HONOR, THE DATE ON THIS EXHIBIT IS MAY 11TH, 2023.

THE COURT:  ALL RIGHT.

BY MR. NARITA:

Q.   SO, MA'AM, THIS IS -- YOUR HUSBAND HAS ALREADY TOLD US A LITTLE BIT ABOUT THIS EXHIBIT, SO I'LL JUST ORIENT YOU.

THIS IS A PAGE OF EXCHANGES BETWEEN YOU AND HIM USING TELEGRAM?

A.    UH-HUH.

Q.    AND YOU GUYS USE TELEGRAM?

A.    YEAH, WE USE TELEGRAM, TOO, YEAH, MOSTLY.

Q.    OKAY.  SO IF WE COULD, IF WE COULD BLOW UP THE FIRST TWO IMAGES ON THE RIGHT-HAND SIDE AND MAKE IT A LITTLE BIT EASIER FOR THE WITNESS TO READ.

THE COURT:  MR. NARITA, DO YOU HAVE THAT MAGNIFYING GLASS ALSO SO SHE CAN --

MR. NARITA:  I DO SOMEWHERE.

THE COURT:  THE WITNESS HAS THE MAGNIFYING GLASS.

MR. NARITA:  OH, THERE IT IS.

THE COURT:  JUST IN CASE IT'S HELPFUL TO REVIEW THE WHOLE DOCUMENT.

MR. NARITA:  TOMORROW WE'LL BRING A MICROSCOPE AND TELESCOPE.

THE WITNESS:  THAT WOULD BE COOL.

BY MR. NARITA:

Q.    SO WHEREVER YOU WOULD LIKE TO LOOK TO BEST SEE THE DOCUMENT, EITHER ON THE SCREEN OR WITH THE MAGNIFYING GLASS, CAN YOU SEE THE TWO IMAGES THAT YOUR HUSBAND SENT TO YOU ON MAY 11TH, 2023?

A.    YEAH, I CAN SEE THAT.

Q.    OKAY.  AND DO YOU REMEMBER THIS EXCHANGE BETWEEN HE AND YOU?

A.    NOT REALLY, NO.

Q.   OKAY.

A.   BUT NOW THAT I SEE IT, I BELIEVE IT.

Q.   OKAY.   SURE.   AND SO HE'S SENDING YOU AN IMAGE OF AN UPDATE FROM AN EXPERIAN APP REFLECTING A CHANGE IN HIS CREDIT SCORE THAT OCCURRED ON JANUARY 11TH, 2023.

DO YOU SEE THAT?

A.   I SEE THAT.

Q.   OKAY. AND THEN BELOW THAT HE SAYS SOMETHING TO YOU IN UKRAINIAN; CORRECT?

A.   YES.

Q.   AND WOULD YOU MIND TRANSLATING THAT FOR US IN ENGLISH?

A.   OF COURSE.   HE SAYS IN JANUARY HE HAD THE CREDIT SCORE OF 587.

Q.   OKAY.  AND SO -- AND THEN THERE'S THAT BICEPS EMOJI UNDERNEATH IT; RIGHT?

A.   THAT'S SARCASM.

Q.   THAT'S SARCASM?

A.   YES.

Q.   OKAY.  WHY DO YOU SAY THAT, MA'AM?

A.   BECAUSE HE WAS JUST, LIKE, OKAY, THAT'S COOL, BUT IT'S ACTUALLY NOT.  SO HE KIND OF USED SARCASM JUST TO SHOW THAT -- YOU MEAN LIKE I HAVE TO EXPLAIN THE EMOJI?

Q.   WELL, I'M ACTUALLY A LITTLE BIT OLDER.  I THINK I MISSED THE EMOJI WORLD.  SO, YEAH, I AM ACTUALLY ASKING YOU TO EXPLAIN WHAT YOU UNDERSTAND HE WAS COMMUNICATING BY THE EMOJI.  I

APOLOGIZE.

A.    SO USUALLY WE SHOW THE EMOJI WHEN IT'S SOMETHING COOL, BUT IN THIS SITUATION BECAUSE IT'S NOT COOL, IT'S KIND OF SARCASM.

Q.    OKAY.  SO YOU UNDERSTOOD YOUR HUSBAND TO BE CONVEYING A SARCASTIC MESSAGE TO YOU?

A.    YES.

Q.    AND WHAT DID YOU UNDERSTAND THE SARCASTIC MESSAGE THAT HE WOULD BE SENDING YOU?

A.    THAT HE HAD THAT CREDIT SCORE SOME TIME BACK, AND I GUESS EXPERIAN GIVE THIS CREDIT SCORE, LIKE, BEFORE WE EVEN CAME HERE, AND WHEN HE DOWNLOADED THE APP, HE JUST MADE A SCREENSHOT AND SENT IT TO ME TO SHOW, OH, COOL, I COULD HAVE ALL OF THESE DISPUTES, BUT BY THE WAY, I HAVE AN AMAZING CREDIT SCORE, WHICH IS SARCASM.

Q.    OKAY.  AND DO YOU KNOW IF -- DO YOU KNOW WHEN YOUR HUSBAND FIRST DOWNLOADED THE EXPERIAN APP?

A.    YEAH, I WAS THERE.  SO I BELIEVE THAT WAS THE EVENING WHEN WE CAME FROM THE SOCIAL SECURITY OFFICE AND WHEN THE LADY TOLD US, OH, YOU PROBABLY HAVE TO HAVE IT STILL.

SO I THINK IT WAS THIS DAY OR MAYBE THE NEXT DAY, HE WAS, LIKE, OH, THERE'S SOME APP THAT CAN SHOW YOU THAT BECAUSE WE ALSO DIDN'T KNOW ABOUT ALL OF THE APPS THAT CAN SHOW YOU YOUR CREDIT SCORE.

SO HE DOWNLOADED THAT, AND WE STARTED LOOKING AT THAT.  HE STARTED LOOKING AT THAT.  I WAS MAKING DINNER PROBABLY.

Q.   OKAY.  AND SO IS IT YOUR UNDERSTANDING THAT HE -- WHEN HE DOWNLOADED -- WELL, FIRST OF ALL, DID YOU WATCH HIM TRY AND INSTALL THE APP?

A.   I KNOW THAT WHEN HE FOUND THE APP, HE ACTUALLY SAID TO ME THAT I CAN INSTALL, AND I THINK WE INSTALLED THAT PROBABLY LIKE IN THE SAME DAY, OR SOMETHING LIKE THAT.

     BUT WHEN I INSTALLED THAT, THERE WAS NOTHING ON MINE.  I WAS LIKE, OKAY, NOTHING.  AND HE FOUND SOME INTERESTING STUFF, AND HE STARTED JUST LOOKING AT THAT, BECAUSE AT FIRST, I THINK WE BOTH DIDN'T UNDERSTAND WHAT THAT MEANS, ALL OF THOSE ACCOUNTS AND STUFF BECAUSE MINE WAS EMPTY.  AND I'M, LIKE, OKAY, MINE, NOTHING, AND HIS WAS LIKE FULL OF THE DIFFERENT THINGS.

Q.   OKAY. SO WHAT, WHAT DID YOU RESPOND BACK TO HIM WHEN HE MADE HIS SARCASTIC BICEPS?

A.   I SAID THAT IT'S PRETTY BAD AND THE CRYING EMOJI.

Q.   OKAY.  AND THEN DID YOU SAY ANYTHING ELSE?

A.   I SAID DID YOU CALL THEM?  AND HE SAID, YES, JUST RIGHT NOW, BUT THERE'S NOT VERY SMART PEOPLE THERE SO I, I TRIED TO, LIKE, DISPUTE ALL OF THOSE ACCOUNTS AND MENTIONED THAT HE DIDN'T KNOW IF IT WAS SUCCESSFUL, SO I WILL BE WAITING FOR THE RESULTS.

Q.   OKAY. SO WHERE DID HE CALL WHERE HE SAID HE THOUGHT THAT THEY WERE NOT VERY SMART PEOPLE, DO YOU KNOW?

A.   I DON'T KNOW.  I THINK FOR ME THAT WAS JUST LIKE IN

GENERAL BECAUSE THERE WAS A LOT OF ACCOUNTS.  SO I DON'T KNOW.

Q.   OKAY.

A.   THERE WASN'T, LIKE, ANY SPECIFIC ONE, BECAUSE EXPERIAN, HE TRIED TO CALL EXPERIAN.  I'M SORRY FOR NOT BEING VERY SPECIFIC, AND IT'S BEEN TWO AND HALF YEARS NOW.

Q.   THAT'S FINE.  YOU CAN ONLY TESTIFY TO WHAT YOU REMEMBER, AND SOMETIMES WHEN YOU READ SOMETHING, IT REFRESHES YOUR MEMORY, SO THAT'S ALL WE'RE ASKING.

THEN BELOW THAT EXCHANGE HE TEXTED YOU SOMETHING IN ENGLISH.

DO YOU SEE THAT?

A.   YES, I DO.

Q.   IT STARTS WITH THE I.D. SECURITY ALERT.

DO YOU SEE THAT?

A.   YES.

Q.   AND DO YOU UNDERSTAND WHAT HE'S SENDING YOU THERE?

A.   SO I DON'T KNOW.  IT'S LIKE A MESSAGE.  MAYBE HE FROZE HIS ACCOUNT AND TRIED TO PUT THIS MESSAGE ON.  I'M NOT SURE.

Q.   FAIR ENOUGH.  AND THEN IT LOOKS LIKE HE'S SENDING YOU SOME SORT OF PASSWORD BELOW THAT?

A.   I THINK SO.  HE USED MY TELEGRAM SHOT AS A PLACEHOLDER FOR HIS MESSAGES I GUESS.

Q.   AND IT'S SORT OF A PARK IN PLACE?

A.   YES.

Q.   AND THEN YOU SEND HIM SOMETHING BACK IN ENGLISH BELOW

THAT; CORRECT?

A.   YES.

Q.   AND WHAT IS IT THAT YOU'RE SENDING HIM BACK IN ENGLISH WHERE IT SAYS, "FRAUDULENT APPLICATIONS"?

A.   HONESTLY, I HAVE NO IDEA WHAT THAT IS.

Q.   YOU DON'T KNOW WHERE THAT LANGUAGE CAME FROM?

A.   YEAH.  YEAH, I DON'T REMEMBER THAT, YEAH.

Q.   OKAY.  IS THAT SOMETHING THAT YOU DRAFTED AND SENT TO HIM?

A.   I THINK THAT HE COULD USE MY COMPUTER JUST TO DRAFT IT, AND HE CONTINUED TO USE IT AS A CHAT, BUT I'M NOT SURE.

Q.   OKAY.  WELL, YOU SENT THAT TO HIM, THOUGH, RIGHT, THE STUFF THAT STARTS AT "FRAUDULENT APPLICATIONS"?

A.   YEAH, I SEE THE MESSAGE, I JUST DON'T REMEMBER, LIKE, WHY WOULD I WRITE SOMETHING LIKE THAT TO HIM.

Q.   OKAY.  DO YOU REMEMBER WHETHER HE WAS WORKING ON AN FTC FRAUD -- AN IDENTITY THEFT REPORT AT THIS TIME?

A.   SO WE HAVE, LIKE, ONE COMPUTER AT HOME THAT WE SHARE.

Q.   UH-HUH.

A.   AND HE DIDN'T HAVE HIS OWN COMPUTER UNTIL HE STARTED WORKING, SO HE WOULD USE THAT HOME BASE COMPUTER THAT WE HAVE THERE, AND HE COULD USE THAT.

     I'M NOT EXCLUDING THAT I MIGHT SEND THAT, LIKE, SECOND MESSAGE THAT IS FROM MY NAME, BUT I JUST DON'T REMEMBER, LIKE, I WAS CORRECTING ANYTHING OR DOING THERE.

Q.   OKAY.  WELL, BUT DO YOU HAVE A MEMORY THAT YOUR HUSBAND

WAS ALREADY WORKING ON AN FTC IDENTITY THEFT REPORT ON MAY 11TH, 2023?

A.   I THINK THAT WAS -- I THINK THAT MAYBE HE WENT TO THE POLICE AND MAYBE HE DECIDED THAT HE NEEDS TO TO PRINT SOMETHING OR DO STUFF.  YEAH, MAYBE.

Q.   OKAY.  DO YOU THINK HE WENT TO THE POLICE IN MAY OF 2023?

A.   I THINK THAT IT WAS, LIKE, ONE OF THE FIRST THINGS THAT HE DID.  THAT WAS PRETTY SOON WHEN HE FIND OUT.

Q.   OKAY.

A.   I THINK SO.

Q.   YOU DIDN'T GO TO THE POLICE STATION WITH HIM; RIGHT?

A.   NO.  I WAS SCARED FOR ME, TOO, BUT -- AND I HAD TO BE AT WORK, AND SO HE WENT THERE.

Q.   UNDERSTOOD.  YOU'VE MENTIONED FOR MR. LOKER THAT YOU SAW YOUR HUSBAND AT TIMES WHERE HE STRUGGLED TO SLEEP DURING THIS TIMEFRAME; RIGHT?

A.   THAT'S CORRECT.

Q.   OKAY.  DID YOU EVER SEE HIM STRUGGLING TO SLEEP AND MENTION THE COMENITY CAPITAL BANK SPECIFICALLY?

A.   SO, NO, HE DIDN'T SAY ANYTHING SPECIFIC LIKE, "I'M GOING TO BED, BUT I'M THINKING ABOUT COMENITY," AND THEN I WOULD FIND HIM IN THE MIDDLE OF THE NIGHT NOT SLEEPING.

     I KNOW THAT HE HAD TROUBLE SLEEPING WHEN HE WAS PREPARING FOR THIS TRIAL, AND IT'S RELATED ONLY, I GUESS, TO THE COMENITY AT THIS MOMENT.

BUT I THINK WHILE HE WAS GOING THROUGH THIS PROCESS, OF COURSE THAT AFFECTS HIS SLEEP. AND HE NEVER, LIKE, SPECIFICALLY MENTIONED TO ME IN THE MIDDLE OF THE NIGHT THAT "I'M NOT SLEEPING BECAUSE OF COMENITY."

Q. OKAY. DID HE EVER SAY ANYTHING TO YOU ABOUT HIS -- ANY STRESS OR ANXIETY THAT HE WAS FEELING THAT SPECIFICALLY IS RELATED TO COMENITY, AS OPPOSED TO ANY OF THE OTHER BANKS OR CREDIT REPORTING AGENCIES THAT HE SUED?

A. YEAH, I THINK SO. SO MAYBE, LIKE, A YEAR AGO OR SO, THAT WOULD BE HARDER TO SAY. I WOULD NOT BE ABLE TO SAY ABOUT WHICH SPECIFIC BANK HE WOULD BE UPSET ABOUT THE MOST.

RIGHT NOW IT'S LIKE, AS I SAID, TWO AND A HALF YEARS. I'M UPSET MYSELF THAT I HAVE TO TAKE A DAY OFF AND BE HERE, LIKE, TWO AND A HALF YEARS AFTER WE FIND OUT ABOUT THAT.

SO I DO SHARE HIS FEELING THAT, YES, LIKE, RIGHT NOW HE'S UPSET ABOUT THIS BANK, ESPECIALLY BECAUSE THEY, AS I ALSO SAID BEFORE, THEY'RE ONLY ONE BANK WHO DECIDED THEY'RE NOT GOING TO INVESTIGATE THIS FARTHER.

SO, I THINK, YEAH, THAT WOULD BE THE REASON THAT WE WOULD DISCUSS THAT.

Q. OKAY. SO DO YOU REMEMBER A CONVERSATION THAT YOU HAD WITHIN THE LAST YEAR WHERE HE TALKED ABOUT COMENITY SPECIFICALLY?

A. I THINK SO, YEAH.

Q. DURING THIS LITIGATION PROCESS; CORRECT?

A.   BECAUSE HE NEEDS TO OCCASIONALLY, LIKE, WORK ON THIS, PAY ATTENTION TO THAT, AND HE WOULD SHARE SOME OF THE FEELINGS AND THE EMOTIONS.

AND I THINK THAT THIS IS THE ONLY BANK THAT IS LEFT IN THIS PROCESS, SO HE WOULD USE THE SPECIFIC NAME OF THE BANK BECAUSE THAT'S THE ONE.

BUT WHEN IT WAS TEN BANKS, HE WOULDN'T SAY ALL OF THE BANKS.

Q.   YEAH.  NOW THAT THERE'S ONE BANK LEFT, HE'S SAYING OUR NAME A LITTLE BIT MORE OFTEN?

A.   NOT ONLY THAT, I THINK THAT I DO UNDERSTAND -- I THINK I DO UNDERSTAND WHY COMENITY MIGHT BE, FOR HIM, SO UPSETTING, LIKE THIS EXPERIENCE COULD BE SO UPSETTING, BECAUSE OF THE DENIAL IN INVESTIGATING THIS FARTHER.

MY UNDERSTANDING WAS COMENITY WAS ONE OF THE FIRST ACCOUNTS THAT THE PERSON WHO COMMITTED THE FRAUD OPENED BECAUSE IT'S ONE OF THE EASIEST ONES I GUESS.

SO, YEAH, I THINK THAT IN GENERAL THAT JUST CREATE THIS VIEW THAT HE HAS SOME, LIKE, UNPLEASANT EMOTIONS ABOUT THAT, SAME AS I RIGHT NOW.

Q.   OKAY.  WELL, WE'RE SORRY TO HAVE TO TAKE YOU AWAY FROM YOUR WORK.  I KNOW YOU'RE PROBABLY VERY BUSY.

YOU DO WANT YOUR HUSBAND TO BE SUCCESSFUL IN THIS LAWSUIT, THOUGH; RIGHT?

A.   I WANT THAT TO BE A FAIR OUTCOME OF THIS LAWSUIT.

ODEIANENKO CROSS BY MR. NARITA

Q.   OKAY.  BUT YOU BELIEVE A FAIR OUTCOME OF THIS LAWSUIT WOULD BE FOR HIM TO WIN; RIGHT?

A.   I THINK THAT, YES, BECAUSE, FOR EXAMPLE, EQUIFAX I WORKED FOR, THEY WOULD NOT EVER LOOK INTO THEIR SYSTEM IF THEY WOULD NOT BE FORCED TO DO THAT.

     AND I FEEL LIKE IF THE SYSTEM CAN HARM OTHER PEOPLE, THAT HAS TO BE CHANGED.

Q.   OKAY. SO YOU WANT, YOU WANT YOUR HUSBAND TO BE SUCCESSFUL IN THIS LAWSUIT BECAUSE YOU FEEL LIKE IF HE IS, THEN THE SYSTEM WILL CHANGE?

A.   AND I KNOW THIS FOR A FACT BECAUSE I WAS A PART OF THE SYSTEM THAT WAS CHANGING THAT.

Q.   OKAY. WELL, WAS THERE SOME LAWSUIT THAT LED TO YOUR CONSULTANCY PROCESS?

A.   SO THEY HAD DATABASE LEAKAGE THAT FORCED THEM -- THAT LED TO THOUSANDS OF PEOPLE BECOMING, LIKE, VICTIMS.

Q.   OKAY. GOT IT.  YEAH, THERE'S BEEN A LOT OF DATA BREACHES.

     ACTUALLY, WE FOUND OUT THAT MANY OF OUR PROSPECTIVE JURORS, AND MAYBE SOME OF OUR ACTUAL JURORS, HAVE GOTTEN NOTICES ABOUT DATABASES.  IT'S QUITE COMMON.

A.   I'M SO SORRY.

Q.   IT'S JUST 2025.

     MA'AM, IS THERE A SPECIFIC AMOUNT OF MONEY THAT YOU THINK IT WOULD BE FAIR FOR THE JURY TO AWARD YOUR HUSBAND?

A.   THAT'S NOT UP TO ME TO DECIDE.  I THINK THAT IS JUST NOT

MY ROLE HERE.

Q.   OKAY.

YOUR HONOR, I HAVE NOTHING FURTHER.

THE COURT:  THANK YOU, MR. NARITA.

MR. LOKER, DO PLAINTIFFS HAVE ANY FURTHER QUESTIONS FOR THIS WITNESS?

MR. LOKER:  NO, WE DON'T, YOUR HONOR.

THE COURT:  OKAY.  YOU'RE EXCUSED.  THANK YOU.

THE WITNESS:  THANK YOU.

THE COURT:  SO, MR. LOKER, DO YOU HAVE YOUR NEXT WITNESS OR DEPOSITION EXCERPT?

MR. LOKER:  WE DO.  THE NEXT VIDEO IS ABOUT 30 MINUTES.  DO YOU WANT TO GO INTO THAT?

THE COURT:  LET'S DO IT.

MR. LOKER:  OKAY.

THE COURT:  BUT WHEN YOU'RE SETTING THIS UP, WE ARE GOING TO TAKE A STRETCH BREAK.  EVERYBODY, INCLUDING MYSELF, IS GOING TO STAND UP RIGHT NOW.

MR. LOKER:  THANK YOU.

THE COURT:  WHY DON'T YOU GO AHEAD AND SET IT UP.

MR. LOKER:  THANK YOU, YOUR HONOR.

(STRETCHING.)

THE COURT:  ALL RIGHT.  MR. LOKER, IS PLAINTIFF PREPARED TO CALL, SO TO SPEAK, ITS NEXT DEPOSITION?

MR. LOKER:  YES, YOUR HONOR.

THE NEXT DEPOSITION IS OF MS. GOPINATH.

THE COURT:  OKAY.

MR. LOKER:  AND WE ARE REQUESTING TWO STIPULATED FACTS BE READ, NUMBER 28, AS WELL AS NUMBER 37.

THE COURT:  YES.

SO MEMBERS OF THE JURY, I'M GOING TO READ TWO STIPULATED FACTS WHICH THE PARTIES HAVE DISCUSSED AND WHICH MAY AND SHOULD BE ACCEPTED AS FACTS IN EVIDENCE.

FACT NUMBER 28.

ON AUGUST 10TH, 2023, PRAGHATHI GOPINATH PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 1521492445002, REGARDING PANCHENKO'S DISPUTE TO EXPERIAN, AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNTING INFORMATION AS ACCURATE, TRIAL EXHIBIT 10.

PRAGHATHI GOPINATH'S CONCLUSIONS FOR ACDV FROM EXPERIAN WITH CONTROL NUMBER 1521492445002, WHICH IS THE SAME NUMBER, ARE DOCUMENTED IN HER EASE -- CAPITAL LETTERS E-A-S-E -- NOTES AT TRIAL EXHIBIT 19.

CONTINUING TO STIPULATED FACT 37.

ON AUGUST 21ST, 2023, PRAGHATHI GOPINATH PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 442466217003003, REGARDING PANCHENKO'S DISPUTE TO TRANS UNION AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE, TRIAL EXHIBIT 14.  PRAGHATHI GOPINATH'S CONCLUSIONS FOR ACDV FROM TRANS UNION WITH CONTROL NUMBER 442466217003003 ARE

DOCUMENTED IN HER EASE NOTES AT TRIAL EXHIBIT 22.

AS STATED BEFORE, MEMBERS OF THE JURY, A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE TRIAL.

THIS WITNESS HAS BEEN PLACED UNDER OATH TO TELL THE TRUTH AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.

THE QUESTIONS AND ANSWERS ARE RECORDED.

WHEN A PERSON IS UNAVAILABLE TO TESTIFY AT TRIAL, THE DEPOSITION OF THAT PERSON MAY BE USED AT TRIAL.

IN THIS -- THE DEPOSITION OF PRAGHATHI GOPINATH WAS TAKEN ON MARCH 27TH, 2025.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT OFF THE RECORD.)**

THE COURT:  OBJECTION WITHDRAWN.

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT OFF THE RECORD.)**

MR. NARITA:  WITHDRAW THE OBJECTION.

THE COURT:  THANK YOU.

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT OFF THE RECORD.)**

MR. NARITA:  WITHDRAWN, YOUR HONOR.

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT OFF THE RECORD.)**

MR. NARITA:  WITHDRAWN, YOUR HONOR.

521

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT OFF THE RECORD.)**

THE COURT:  SO THE BELL TIME IS 4:28, SO LET'S TIMESTAMP WHERE WE ARE IN THE MIDDLE OF THIS DEPOSITION.

WE'LL PICK UP WITH THAT QUESTION THAT WAS JUST ASKED.  YOU CAN ASK THAT QUESTION AND CONTINUE.

MR. LOKER:  THANK YOU.

THE COURT:  BUT I WANT TO MAKE SURE THAT WE KEPT TO OUR PROMISES WITH THE JURY.

IT'S BEEN A LONG DAY, A LOT OF TESTIMONY, AND A LOT OF VIDEOS, WHICH I KNOW ARE HARD TO WATCH SOMETIMES JUST IN TERMS OF FOCUS.

SO I APPRECIATE ALL OF YOUR ATTENTION.

BUT FOR THOSE REASONS, WE'RE STICKING WITH THE 4:30.

WE'RE AT 4:28.  I NEED TO GIVE YOU YOUR END OF THE DAY ADMONITION.

SO AS I INDICATED BEFORE THIS TRIAL STARTED, YOU AS JURORS WILL DECIDE THIS CASE BASED ONLY ON THE EVIDENCE PRESENTED IN THIS COURTROOM.  THIS MEANS THAT AFTER YOU LEAVE HERE FOR THE NIGHT, YOU MUST NOT CONDUCT ANY INDEPENDENT RESEARCH ABOUT THIS CASE, THE MATTERS INVOLVED IN THIS CASE, THE LEGAL ISSUES IN THIS CASE, OR INDIVIDUALS OR ENTITIES INVOLVED IN THIS CASE.

YOU MUST ALSO NOT COMMUNICATE WITH ANYONE IN ANY WAY ABOUT THIS CASE, AND YOU MUST IGNORE ANY INFORMATION ABOUT THIS CASE THAT YOU MIGHT SEE BROWSING ON THE INTERNET OR ON SOCIAL MEDIA

FEEDS, OR WITH EACH OTHER.

YOU MAY NOT DISCUSS THIS CASE.

THANK YOU VERY MUCH.  WE'LL START AT THE SAME TIME AND SAME PLACE TOMORROW MORNING.  THERE WILL BE BREAKFAST.

WE'LL GET STARTED AT 9:00.  WE ASK THAT YOU COME AT LEAST A FEW MINUTES BEFOREHAND JUST TO GET YOUR THINGS SETTLED IN, AND WE REALLY APPRECIATE ALL OF YOUR SERVICE.

THANK YOU.  THE JURORS ARE EXCUSED.

(JURY OUT AT 4:30 P.M.)

THE COURT:  ALL RIGHT.  AND FOR COUNSEL AND THE PARTIES THAT ARE IN THE COURTROOM, IT HAS BEEN A LONG DAY.  WE ARE GOING TO BE MEETING, BUT I THINK YOU, LIKE, ME, PROBABLY NEED A 7 MINUTE BREAK OURSELVES JUST TO STRETCH, MAYBE 10 MINUTES.  LET ME CHECK IN WITH MY COURTROOM STAFF.

(DISCUSSION OFF THE RECORD.)

THE COURT:  IT'S 4:30.  LET'S AIM TO BE BACK BY 4:40, MAYBE A COUPLE MINUTES BEFORE.  I WANT EVERYONE TO BE RELEASED BY 5:00 AT THE LATEST.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  THE AGENDA ITEMS?

THE COURT:  THE AGENDA ITEMS?  THE VERDICT FORMS. WE'RE GOING TO TOUCH BASE ON ANYTHING ELSE WE NEED TO ABOUT THE JURY INSTRUCTIONS BEFORE WE POST TONIGHT, SO IF THERE'S ANY OTHER -- ANYTHING NEW WHICH HASN'T BEEN ARGUED.

AND THEN YOU ALL SHOULD PROBABLY MEET AND CONFER AND

EITHER EMAIL ME OR TELL ME WHAT IS COMING NEXT.

SO I KNOW WE HAVE SOME DEPOSITIONS OUTSTANDING, BUT I THINK WE'RE PROBABLY STARTING TO SHIFT ON.

THAT'S IT.  THANKS EVERYONE.  WE'RE NOW IN RECESS.

(RECESS FROM 4:31 P.M. UNTIL 4:42 P.M.)

THE COURT:  HOW'S EVERYONE DOING?

MR. NARITA:  WELL.  THANK YOU, YOUR HONOR.

MR. LOKER:  HOW ARE YOU?

THE COURT:  I'M ALL RIGHT.

ALL RIGHT.  WE'RE BACK ON THE RECORD IN PANCHENKO VERSUS COMENITY CAPITAL BANK.

COUNSEL ARE PRESENT, AND THE PARTIES ARE PRESENT.  THE JURORS HAVE BEEN EXCUSED FOR THE DAY.

SO ANYTHING WHICH WE NEED TO PUT ON THE RECORD?  OUR SIDE-BARS WERE VERY SHORT.  I THINK I CAPTURED ALL OF THEM FROM THIS MORNING.

ANYTHING ELSE ON THE RECORD BEFORE WE GO ON TO JURY FORMS AND SO FORTH?

MR. NARITA:  REGARDING SIDE-BARS OF TODAY, YOUR HONOR?  NOTHING.

THE COURT:  ANYTHING ELSE ON THE RECORD?

MR. NARITA:  NOT THAT I CAN THINK OF, YOUR HONOR.

THE COURT:  THANK YOU.

MR. LOKER:  NOTHING ABOUT SIDE-BARS.

BUT DOCKET NUMBER 213 WHERE YOU LISTED OUT THE EXHIBITS

FROM DAY ONE, WE WOULD LIKE TO HAVE A DISCUSSION ABOUT THAT AT SOME POINT.

MR. NARITA:  ON THE MINUTE ORDER?

MR. LOKER:  CORRECT.  BECAUSE THERE WERE A COUPLE OF EXHIBITS THAT WERE INTRODUCED AND ADMITTED IN EVIDENCE THAT WEREN'T LISTED ON THE COURT'S LIST, SO WE JUST WANT TO MAKE SURE THAT WE'RE ON THE SAME PAGE ABOUT WHAT ACTUALLY GOT IN.

THE COURT:  SO I'LL HAVE YOU DO THAT WITH MADAM CLERK.

I HAVE SHOULD HAVE MENTIONED THIS BEFOREHAND.  YOU ALL SHOULD BE TOUCHING BASE WITH MADAM CLERK AT THE END OF EACH DAY.  I CAN VERIFY WITH HER AS WELL.

BUT RIGHT NOW I WOULD NORMALLY HAVE MY FULL LIST, AND I DON'T HAVE MY FULL LIST COMPILED.  IT'S JUST IN MY NOTES.

MR. LOKER:  OKAY.

THE COURT:  SO LET'S CONFIRM WITH MS. THOMSON, AND I'M HAPPY TO CHIME IN IF NEEDED.

MR. LOKER:  UNDERSTOOD.  THANK YOU, YOUR HONOR.

THE COURT:  AND YOU AND MR. NARITA HAVE CONFERRED ABOUT THOSE?

MR. NARITA:  JUST THAT WE HAVE SLIGHTLY DIFFERENT NUMBERS.  SO WE'LL DISCUSS IT FURTHER.

THE COURT:  YES.  WHAT I WOULD SUGGEST IS AT THE END OF EACH DAY, AND WE'LL DEFINITELY DO IT AT THE END OF TOMORROW SO WE'LL HAVE OUR FULL AND FINAL LIST BEFORE THE RECORD IS

CLOSED.  I CAN EVEN KEEP THE RECORD OPEN UNTIL THURSDAY MORNING.  BUT LET'S JUST MAKE SURE AND CONFIRM THAT BEFOREHAND.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  YOU CAN DO IT WITH HER TOMORROW MORNING WHEN I'M NOT AROUND.

MR. LOKER:  OKAY.

THE COURT:  ALL RIGHT.  ANYTHING ELSE?

MR. LOKER:  NO, YOUR HONOR.

THE COURT:  OKAY.

LET'S START WITH THE JURY FORMS, BECAUSE WE'RE GOING TO END UP WITH A VERY FULL DAY TOMORROW BECAUSE WE'VE GOT -- WE LOST TIME DUE TO TECHNOLOGY, AND THEN DIFFERENT ISSUES AND JUROR THIS.  SO WE LOST A LITTLE TIME ON MONDAY.

SO TOMORROW I WAS HOPING TO HAVE A -- TO END EARLY WITH A CHARGING CONFERENCE WHEN, IN REALITY, I'M GUESSING WE MAY OR MAY NOT.  WE'LL SEE.  SO WE'RE GOING TO START WITH SOME OF THIS TODAY.

LET'S START WITH THE VERDICT FORMS AND THE REACTIONS FROM COUNSEL NOW THAT YOU'VE HAD A LITTLE BIT MORE TIME.

MR. LOKER:  NO PROPOSED CHANGES OR EDITS FROM THE PLAINTIFF, YOUR HONOR.

MR. NARITA:  AND, YOUR HONOR, SORT OF PICKING UP FROM MY COMMENTS EARLIER, THE DEFENDANT DID SUBMIT A PROPOSED VERDICT FORM THAT WAS A LITTLE MORE DETAILED AND ROLLED THE JURY THROUGH THE ELEMENTS OF A 1681S-2(B) CLAIM, AND THEN INTO

THE, YOU KNOW, THE -- WHETHER THE VIOLATION WAS EITHER WILLFUL OR NEGLIGENT, AND THEN INTO THE DAMAGES, AND THEN PUNITIVE DAMAGES SECTION.

AND WE THINK -- I UNDERSTAND YOUR HONOR'S COMMENTS THAT, HEY, A LOT OF THIS IS IN THE JURY INSTRUCTIONS AND SO YOU DON'T NEED TO PUT IT INTO THE VERDICT FORM, AND I UNDERSTAND THAT.

WE THINK IT'S PARTICULARLY IMPORTANT HERE, AND LOOKING AT THE PROPOSED FORM FROM THE COURT AND LOOKING AT OURS, THERE'S BEEN A LOT OF EVIDENCE SUBMITTED IN THE CASE ABOUT DIRECT DISPUTES THAT WERE SUBMITTED TO COMENITY, PHONE CALLS, LONG PHONE CALLS, WE HAD LETTERS THAT WERE SENT IN, WE HAD TESTIMONY FROM THE PLAINTIFF ON THIS, WE HAD TESTIMONY FROM THE PLAINTIFF'S WIFE.

I KNOW YOUR HONOR GAVE SOME LIMITING INSTRUCTIONS ON THAT, BUT I JUST THINK THAT IF THE JURY IS UNDERSTANDING THE CLAIMS AND IS UNDERSTANDING THE INSTRUCTIONS, AND THEY'RE -- AND THEY'RE GOING TO RULE FOR THE PLAINTIFF, THEY'RE NOT GOING TO HAVE ANY TROUBLE GOING DOWN EACH OF THE CHECK MARKS IN OUR CHECKLIST AND ANSWERING CORRECTLY FOR THE PLAINTIFF.

BUT IT'S A FAIR -- OURS IS A FAIR LIST BECAUSE IT TRACKS EXACTLY THE ELEMENTS THAT THE PLAINTIFF HAS TO STEP THROUGH IN ORDER TO GET TO THE NEXT SECTION.

THE COURT:  OKAY.

MR. LOKER, LET ME HEAR YOUR RESPONSE.

MR. NARITA:  OH.

THE COURT: MR. NARITA, I'M JUST TRYING TO FOCUS THE ARGUMENT IN TERMS OF --

MR. NARITA: SURE.

THE COURT: SO IT SOUNDS LIKE DEFENDANT'S POINT IS, OKAY, LET'S WALK THROUGH EACH OF THE ELEMENTS OF 1681, AND SO FOR THE REASONS THAT YOU STATED IN TERMS OF THERE BEING EVIDENCE OF BOTH DIRECT AND INDIRECT DISPUTES AND SO FORTH WITH WHAT THE PARTIES HAVE PRESENTED.

SO LET ME HEAR -- IS THAT A CORRECT SUMMARY?

MR. NARITA: THAT IS A CORRECT --

THE COURT: BECAUSE WE HAVE 12 MINUTES LEFT AND WE HAVE MANY OTHER POINTS TO COVER.

MR. NARITA: THE COURT'S PROPOSAL IS JUST TO BASICALLY COMPRESS MOST OF OUR QUESTIONS INTO ONE QUESTION, WHICH IS, DID COMENITY CAPITAL BANK VIOLATE THE FAIR CREDIT REPORTING ACT?

AND I THINK THERE IS SO MUCH EVIDENCE IN THE RECORD THAT HAS NOTHING TO DO WITH A SECTION 1681S-2(B) CLAIM, THAT HAS EVERYTHING TO DO WITH DIRECT DISPUTES, THAT THE JURY IS, YOU KNOW, DESPITE WHATEVER LIMITING INSTRUCTIONS, IS GOING TO THINK, WELL, IF HE GOT UPSET AFTER A PHONE CALL THAT HE MADE OR SOMETHING LIKE THAT, WELL, THAT'S, THAT'S A VIOLATION, OR HIS WIFE SAID SOMETHING ABOUT IT.

AND SO THE RECORD IS AWASH IN TESTIMONY AND EVIDENCE ABOUT A CLAIM OF WHICH THERE'S NO PRIVATE RIGHT OF ACTION FOR. I

MEAN, THERE'S NINTH CIRCUIT AUTHORITY ON THAT.  THERE'S NO PRIVATE RIGHT OF ACTION FOR A DIRECT DISPUTE CLAIM.

AND ALMOST HALF OF THE TESTIMONY IN THIS CASE HAS BEEN ABOUT DIRECT DISPUTES AND HOW HE FELT ABOUT THEM AND SO FORTH.

SO I JUST THINK IT'S SAFER FOR OUR RECORD TO STEP THROUGH EACH OF THE ELEMENTS OF AN (S)(2)(B) CLAIM, WHICH IS WHAT OUR PROPOSED VERDICT FORM DOES.

AND, AGAIN, IF THE JURY IS WITH THE PLAINTIFF, THEY'RE GOING TO DO IT AND WE'RE GOING TO KNOW WHY.

MR. LOKER:  THE PROPOSED VERDICT FORM FROM COMENITY, YOUR HONOR, IS CUMBERSOME AND CONFUSING AND HARD TO GO THROUGH.

WE PROPOSED A MUCH MORE NARROW VERDICT FORM, AND I FEEL LIKE THE COURT FOUND A MIDDLE GROUND THAT TOOK SOME FROM COMENITY AND TOOK SOME FROM PANCHENKO, AND I THINK IT'S A HAPPY COMPROMISE BETWEEN THE TWO.

THE ARGUMENTS THAT MR. NARITA IS ASSERTING, THESE ARE THINGS THAT CAN BE DISCUSSED DURING CLOSING ARGUMENT.  HE CAN WALK THEM THROUGH THE JURY INSTRUCTIONS.  HE CAN WALK THEM THROUGH THE JURY INSTRUCTION AND SAY, THIS IS WHAT NEEDS TO BE PROVEN.  THERE ARE JURY INSTRUCTIONS THAT RELATE TO DIRECT DISPUTES.  THESE ARE IRRELEVANT TO THE 1621(S)(2)(B) CLAIMS.

SO THE ISSUES AND THE CONFUSION THAT HE'S TALKING ABOUT CAN BE HANDLED.

I'VE SEEN HIM CLOSE, AND HE CAN WALK THE JURY THROUGH WHAT IS NECESSARY TO CHECK YES OR NO ON THAT.

SO I THINK THE VERDICT FORM IS A GOOD COMPROMISE.

THE COURT:  SO THERE IS ONE CAUSE OF ACTION.  THERE ARE TWO DIFFERENT LEFT REMAINING IN THIS CASE.  THE COURT KICKED OUT ALMOST ALL OF THE CAUSES OF ACTION IN MOTION FOR SUMMARY JUDGMENT.  THERE IS ONE CAUSE OF ACTION.  THERE ARE DIFFERENT TYPES OF DAMAGES.

I'M WORRIED THAT THIS VERDICT FORM IS TOO CUMBERSOME, THE ONE WHICH WAS PROPOSED BY COMENITY.  I DID TRY TO REACH A MIDDLE GROUND.

I DO THINK IF THERE ARE CERTAIN PARTS WHICH COUNSEL IS CONCERNED ABOUT -- I HEAR YOU REGARDING DIRECT AND INDIRECT.  I DO THINK THAT'S SOMETHING WHICH BOTH, IN ADDITION TO CLOSING, I ACTUALLY FEEL LIKE IT'S THE IMPORTANCE OF THE JURY INSTRUCTIONS, THE -- WHAT YOU ALL HAD NUMBERED AS 50, WHERE IT SAYS GIVE DIRECTION REGARDING WALKING THROUGH THE JURY FORM, THAT I SHOULD GIVE DIRECTION, AND I CAN DO SO, AND I WOULD BE HAPPY TO TAKE THE PARTIES' SUGGESTION REGARDING THAT.

AND I'M GOING TO ASK YOU ALL TO MEET AND CONFER REGARDING, ASSUMING WE'RE USING THIS FORM, THAT YOU MEET AND CONFER REGARDING PROPOSED INSTRUCTIONS TO THE JURY ABOUT HOW TO FILL OUT THE FORM, AND THAT THEY MUST WALK THROUGH ALL OF THE ELEMENTS IN 1681, WHICH IS IN ANOTHER ONE OF THEIR INSTRUCTIONS.

I ALSO THINK SOME OF THIS COULD HAVE BEEN SIMPLIFIED BY THE REQUEST WHICH I HAD ASKED COUNSEL BEFORE, LIKE, ARE THERE

ELEMENTS WHICH ARE NOT AT ISSUE?  OR CAN WE AT LEAST SAY SUCH AND SUCH -- YOU KNOW, I'M CONCERNED OF JUST, YOU KNOW, WHAT IS A CONSUMER REPORTING AGENCY?

COUNSEL IS REFERRING TO THEM BOTH AS CREDIT BUREAUS AND CONSUMER REPORTING AGENCIES.

I TALKED ABOUT THE PARTIES INCLUDING A STIPULATION TO MAKE THE RECORD CLEAN IN TERMS OF THAT.  I THINK THAT WOULD LEAD TO LESS CONFUSION THAN HAVING A VERDICT FORM THAT LOOKS LIKE THIS.

IT'S A PROPOSAL.  IT'S A SUGGESTION.  IT'S ONE OF THE STIPULATIONS THAT I HAD PROPOSED TO THE PARTIES EARLIER.

SO LET'S SEE IF WE CAN TRY TO ADDRESS IT THROUGH THE JURY INSTRUCTION QUESTIONS.

I'M ALSO HAPPY TO GIVE ANOTHER LIMITING INSTRUCTION REGARDING DIRECT VERSUS INDIRECT USING SOME OF THE LANGUAGE WHICH, OR PARTIES, OR THIRD PARTIES, WHICH ARE BEING DISCUSSED IN THIS CASE, BECAUSE I THINK IT WOULD MAKE IT EASIER FOR THE JURY.

I DON'T THINK WALKING THROUGH THIS WITHOUT A LOT MORE -- I THINK IF I ADD INSTRUCTION ON TOP OF THIS VERDICT FORM AND THEN TRY TO SAY THIS, THIS, THIS, THAT, I THINK IT'S GOING TO LEAD TO MORE CONFUSION AND CAUSE ERROR.

SO THAT'S MY CONCERN.

SO I'M OPEN TO OTHER SUGGESTIONS, BUT RIGHT NOW I THINK THIS IS SOMETHING -- I THINK THE REST OF WHAT YOU ARE DISCUSSING CAN BE ADDRESSED BOTH THROUGH JURY INSTRUCTIONS, HOW

THEY FILL OUT THE VERDICT FORMS, WHETHER OR NOT THERE ARE ANY OTHER STIPULATED FACTS WHICH WE SHOULD CONSIDER.

AND I'M ALSO OPEN TO CONSIDERING OTHER LIMITING INSTRUCTIONS THAT MIGHT BE HELPFUL.

MR. NARITA:  OKAY.  I DON'T WANT TO REPEAT WHAT I SAID EARLIER.

I THINK MY LAST POINT, YOUR HONOR, TO LEAVE IT ON YOUR HONOR'S -- THE COURT'S PROPOSED INSTRUCTION, THE FIRST QUESTION IS, DID COMENITY CAPITAL BANK VIOLATE THE FAIR CREDIT REPORTING ACT?

OKAY.  MAYBE THEY STEP THROUGH THE INSTRUCTIONS AND THEY SAY YES.

THE NEXT ONE IS, DID THE PLAINTIFF SUFFER ANY ACTUAL DAMAGES FROM THE VIOLATION OF THE ACT?

WELL, NOW WE'VE GOT ALL OF THIS TESTIMONY ABOUT HOW HE FELT WITH THE DIRECT DISPUTES, I MEAN, HOW MUCH TIME HE SPENT ON THE DIRECT DISPUTES, HOW FRUSTRATED HE WAS WITH THE RESPONSES.

HIS WIFE TESTIFIED SPECIFICALLY ABOUT HOW UPSET HE WAS WHEN HE TALKED ON A PHONE CALL AFTER A DIRECT DISPUTE.

I MEAN, NOW THEY'RE GOING TO BE, LIKE, WELL, WE HEARD ALL ABOUT HOW UPSET HE WAS.  HOW DO WE SEPARATE THAT OUT WHEN THAT'S A CAUSE OF ACTION THAT HE HAS NO PRIVATE RIGHT OF ACTION FOR?

SO HE'S GOT ALL OF THIS DAMAGE EVIDENCE RELATING TO A

CLAIM THAT HE'S NOT ALLOWED TO ASSERT, AND WE'VE GOT A BIG MESS IN THE RECORD AS TO -- HOW AM I SUPPOSED TO TELL THE JURY AT THIS POINT, LIKE, WELL, IF HE FELT BAD ABOUT CALLING IN, YOU KNOW, THAT'S NOT -- HE CAN'T RECOVER FOR THAT.

IT'S FRAUGHT WITH ERROR IS ALL I'M SAYING.

I'M JUST TRYING TO KEEP A CLEAN RECORD BY BEING AS PRECISE AS POSSIBLE AS WE CAN WITH THE VERDICT FORM.  THAT'S ALL I'M TRYING TO DO.

THE COURT:  AND, MR. NARITA, IT SEEMS LIKE THE POINTS THAT YOU'RE MAKING ARE EXACTLY WHAT SHOULD BE RAISED IN CLOSING ARGUMENT.

MR. NARITA:  WELL, I UNDERSTAND THAT.

BUT I CAN'T -- I CAN'T ARGUE IN CLOSING ARGUMENT, WELL, LADIES AND GENTLEMEN, THERE'S NO PRIVATE RIGHT OF ACTION FOR A DIRECT DISPUTE.  THAT'S TOTALLY OUTSIDE OF YOUR INSTRUCTIONS OR ANYTHING ELSE.

AND YOUR HONOR HAS INSTRUCTED YOU THAT IF HE, IF HE FELT BAD ABOUT A PHONE CALL, YOU CAN'T CONSIDER THAT, BECAUSE YOU HAVEN'T SO INSTRUCTED THEM, RIGHT?

THIS IS JUST ALL A BIG --

THE COURT:  MR. NARITA, I MEAN, THAT PHONE CALL, IT IS NOT CLEAR WHAT IT WAS CAUSED -- THAT IS UP FOR THE JURY TO DECIDE WHETHER THAT WAS RELATED TO COMENITY OR NOT RELATED TO THE ISSUES WITH COMENITY.

SO YOUR INTERPRETATION IS YOUR INTERPRETATION OF THAT, BUT

THAT -- I MEAN, THAT'S -- IN TERMS OF HAVING THIS CASE ALL TOGETHER, THAT'S WHAT WE HAD DISCUSSED TO BEGIN WITH, THAT YOU NEED TO BE ABLE TO DISTINGUISH AND SEPARATE, AND THE JURY NEEDS TO BE ABLE TO DISTINGUISH AND SEPARATE THAT.

I THINK IF THERE'S AN INSTRUCTION REGARDING DIRECT DISPUTES ARE NOT AT ISSUE, AND THERE CANNOT BE -- LIKE, I THINK WE COULD GIVE AN INSTRUCTION.  I COULD GIVE AN INSTRUCTION IN TERMS OF THAT --

MR. NARITA:  OKAY.

THE COURT:  -- AND WHAT IS A DIRECT DISPUTE.

I MEAN, IT'S ANOTHER THING WHICH I WONDERED IN TERMS OF THE PARTIES HAD NOT CLEARLY DEFINED DIRECT VERSUS INDIRECT DISPUTE, DESPITE YOUR STIPULATION.

SO I THINK THAT IS SOMETHING WHICH COULD BE A STIPULATED FACT, OR CAN BE PART OF AN INSTRUCTION, BUT YOU ALL NEED TO GET THESE TO ME.

IF YOU HAVE A PROPOSED INSTRUCTION REGARDING DIRECT DISPUTE VERSUS INDIRECT DISPUTE, WHICH THE PARTIES INTRODUCED IN THEIR STIPULATION, WHICH YOU DIDN'T DEFINE IN ANY SPECIAL INSTRUCTIONS, I'M HAPPY TO CONSIDER THAT AND WOULD ACTUALLY ENCOURAGE YOU TO DO SO TO AVOID THAT.

MR. NARITA:  WE'LL MEET AND CONFER ON THAT, YOUR HONOR.

THE COURT:  YEAH, LET'S DO THAT.  I THINK THAT WOULD BE VERY HELPFUL FOR THE LISTENER.

MR. NARITA:  OKAY.

THE COURT:  AND FOR OUR JURORS.

MR. LOKER.

MR. LOKER:  I DON'T HAVE ANYTHING FURTHER, YOUR HONOR.

THE COURT:  OKAY.  LET ME TURN TO THE DIFFERENT INSTRUCTIONS.

SO BURDEN OF PROOF.  NO.

WHAT I'M REFERRING TO IS THE 2.0 SERIES AS APPLICABLE.  I WILL CONFER WITH YOU AFTER ALL OF THE EVIDENCE WHETHER OR NOT THEY SHOULD BE INCLUDED, FOR EXAMPLE, OPINION TESTIMONY, CHARTS, OR SO FORTH.

I THINK PROBABLY SOME OF THESE WILL NOT HAPPEN AND SOME WILL.  WE WILL CONFIRM BEFORE WE PRINT.

I DON'T EXPECT THERE TO BE PROTESTATIONS ABOUT THOSE BECAUSE WE'LL ALL CHECK EACH OTHER ON THAT.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  YES, YOUR HONOR.

THE COURT:  LET'S MOVE ON TO -- I MEAN, SIMILARLY WITH THE 3.0 SERIES REFERRING TO THE MODEL JURY INSTRUCTIONS.

SO WE'RE NOT GOING TO GO THROUGH THOSE TODAY.

NOW I'M GOING TO START WITH DISPUTED INSTRUCTIONS, AND I'LL HAVE MY PERFECTLY COMPILED LIST, SO YOU ALL WILL GO WITH ME ON THIS.

DISPUTED INSTRUCTION 32.  SO AS ALREADY INDICATED, THE

COURT IS ADOPTING PANCHENKO'S INTERPRETATION OF THAT.  THAT WAS OUR FIRST DAY OF JURY INSTRUCTION CONFERENCE BACK DURING PRETRIAL CONFERENCE.

CONTINUING ON TO DISPUTED INSTRUCTION 33, INVESTIGATION, OBLIGATION TRIGGERED BY PANCHENKO.  PLAINTIFFS SUBMITTED -- WITHDREW ITS PROPOSAL, SO THE COURT WILL BE ADOPTING COMENITY'S PROPOSED JURY INSTRUCTION NUMBER 33.

JURY INSTRUCTION NUMBER 34.  THE COURT TRIED TO REACH A BALANCE BETWEEN BOTH SIDES REGARDING THIS, AND ALSO REVIEW THE LAW AND MADE ITS OWN PROPOSAL.

I'M STILL CONSIDERING WHETHER OR NOT TO ADD THE BURDEN OF PROOF.  I'M INCLINED TO DO IT.

BUT JUST IN TERMS OF COMENITY HAS ASKED FOR IT, AND THERE WAS INITIALLY NO OBJECTION.  MY CONCERN IS ITS PLACEMENT, JUST TO MAKE SURE IT DOESN'T CONFUSE THE ISSUES, AND INDICATE THAT THERE SHOULDN'T BE LESS OF A BURDEN OF PROOF, OR IT SHOULDN'T BE ON COMENITY FOR THE REST OF THE ELEMENTS.

BUT SINCE COMENITY IS NOT WORRIED ABOUT THAT CONFUSION, I'M INCLINED TO GO AHEAD AND DO THAT.

BUT THAT WAS THE COURT'S CONCERN WAS TO PROTECT COMENITY.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

MR. NARITA:  UNDERSTOOD, YOUR HONOR.

THE COURT:  SO CONTINUING ON TO -- THERE'S STIPULATED INSTRUCTION 35.  THE COURT LEFT THAT UNCHANGED.

JURY INSTRUCTION NUMBER 36.  I HEARD ARGUMENT AND THE

536

COURT SUBMITTED -- NOT SUBMITTED -- SENT TO COUNSEL ITS PROPOSED LANGUAGE.

ANYTHING FROM PLAINTIFF ON THAT?

MR. LOKER:  NO.  IT'S ACCEPTABLE TO THE PLAINTIFF, YOUR HONOR.

THE COURT:  OKAY.

ANYTHING FOR THE DEFENDANT ON THAT?  I BELIEVE THERE WAS NOTHING FROM THIS MORNING, BUT WAS THERE ANYTHING?

MS. GIVENTAL:  NO, YOUR HONOR.

THE COURT:  OKAY.  THANK YOU.

MOVING ON TO DISPUTED INSTRUCTION NUMBER 37.  THE COURT ISSUED A RULING -- DID THE COURT ISSUE A RULING?  LET ME PULL THIS UP.  I'LL TAKE A LOOK.

SO 37.  THIS IS THE ONE WHERE THE PARTIES HAD REACHED STIPULATED LANGUAGE EXCEPT FOR THE LAST SENTENCE RELATED TO PUNITIVES.

AND BECAUSE THE COURT IS FINDING THAT PUNITIVES ARE A JURY QUESTION, NOT A COURT QUESTION, THE COURT WILL PROCEED EXCEPT FOR THAT LAST SENTENCE.

SO STIPULATED INSTRUCTION 38 REMAINS UNCHANGED.

DISPUTED INSTRUCTION NUMBER 39 HAS BEEN WITHDRAWN --

MR. LOKER:  CORRECT.

THE COURT:  -- BY BOTH PARTIES.

DISPUTED INSTRUCTION NUMBER 40/41, WHICH WAS, IN FACT, JUST 40 BUT GOT MISNUMBERED, WAS WITHDRAWN BY THE PARTIES.

DISPUTED INSTRUCTION NUMBER 42, PROXIMATE CAUSE OFFERED BY BOTH PARTIES, HAS BEEN WITHDRAWN.

STIPULATED INSTRUCTION NUMBER 43 REMAINS.

DISPUTED INSTRUCTION 44, THE COURT IS ADOPTING PANCHENKO'S BECAUSE OF THE WHOLE FINDING REGARDING PUNITIVE DAMAGES AND THE BANE QUESTION IS FOR THE JURY.

STIPULATED INSTRUCTION 45 I UNDERSTAND IS REGARDING CONSUMER REPORTS.  I UNDERSTAND THAT WE WILL CIRCLE BACK TO THIS AT THE END OF TESTIMONY.

AND THEN WE'RE TO THE 3.0 MODEL INSTRUCTION SERIES.

MS. GIVENTAL:  YOUR HONOR, ARE WE RENUMBERING THEM BECAUSE NOW SOME OF THEM HAVE BEEN WITHDRAWN?  OR IS IT THE ORIGINAL NUMBERS?

THE COURT:  WE'RE STICKING WITH THE ORIGINAL NUMBERS TO MAKE MY RECORD CLEAN, AND BECAUSE THAT'S HOW I'VE BEEN REFERRING TO THEM WITH YOU ALL.

MS. GIVENTAL:  UNDERSTOOD.

THE COURT:  AND THEY MAY BE SHUFFLED AROUND.  I MIGHT, LIKE, TRY TO FIGURE OUT WHAT MAKES SENSE TO TELL THEM.

I ALREADY STATED ON THE RECORD PREVIOUSLY THE ONES FROM THE 1.0 SERIES I WILL BE REPEATING AS PART OF MY FINAL INSTRUCTIONS TO THE JURY.

I WILL ALSO REPEAT, IF YOU WOULD LIKE, I WILL CONSIDER WHETHER -- WELL, WE'LL GO THROUGH THE REST OF THE 3.0 SERIES.

AND YOU WILL LET ME KNOW BY TOMORROW MORNING IF THERE'S

SOMETHING ELSE YOU WANT ME TO GIVE IN TERMS OF A LIMITING, OR IF THERE'S ANOTHER JURY INSTRUCTIONS IN TERMS OF THE LAW REGARDING INDIRECT VERSUS DIRECT, BUT YOU NEED TO PROVIDE IT BY TOMORROW MORNING.

SO WE'RE HERE LATE.  YOU ALL CAN JOIN US ACROSS THE STREET.  WE'LL BE IN OUR SEPARATE CORNERS WORKING DILIGENTLY, BUT YOU ALL NEED TO SORT THAT OUT --

MR. LOKER:  YES, UNDERSTOOD.

THE COURT:  -- SINCE YOU INTRODUCED THE TERMS.

MR. NARITA:  THANK YOU.

THE COURT:  ALL RIGHT.  ANYTHING ELSE?

MR. LOKER:  NOT FROM THE PLAINTIFF, YOUR HONOR.

MR. NARITA:  NOTHING FROM THE DEFENDANT, YOUR HONOR.

THE COURT:  OKAY.  YOU ALL ARE VERIFYING YOUR TIME ESTIMATES.  YOU'RE GIVING THEM TO LAURA SO WE JUST HAVE OUR TOTALS.

AND THEN YOU ALL ARE SENDING ME AN EMAIL WITH ANY LIMITING INSTRUCTIONS, THE SAME THING YOU ALL HAVE BEEN GIVING ME ABOUT THE WITNESSES FOR THE NEXT DAY.

IF THERE ARE ANY FURTHER STIPULATIONS YOU WANT ME TO READ, LET ME KNOW.

I HAVE YOUR PAST EMAIL FROM MR. LOKER.

I'M SORRY, I'M STARTING TO LOSE MY VOICE, SO I'M GOING TO STOP NOW.

MR. LOKER:  OKAY.  THANK YOU, YOUR HONOR.

539

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  THANK YOU.

THE CLERK:  THE COURT IS NOW IN RECESS, OR IS
ADJOURNED FOR TODAY.

THANK YOU.

(COURT ADJOURNED AT 5:05 P.M.)