UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |  |
|---|---|---|
| OLEKSANDR PANCHENKO, | ) | |
| | ) | CV-23-04975 EKL |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | NOVEMBER 5, 2025 |
| COMENITY CAPITAL BANK, | ) | |
| | ) | VOLUME 4 |
| DEFENDANT. | ) | |
| _____ | ) | PAGES 540 - 712 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EUMI K. LEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        LOKER LAW, APC
                         BY: MATTHEW M. LOKER
                             CHARLES B. CUMMINS
                         132 BRIDGE STREET
                         ARROYO GRANDE, CALIFORNIA 93420

                         RAMOS LAW
                         BY: MATTHEW R. OSBORNE
                         10190 BANNOCK STREET, SUITE 200
                         NORTHGLENN, COLORADO 80260


            (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074
                         LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT COMENITY: WOMBLE BOND DICKINSON U.S., LLP
                        BY: TOMIO B. NARITA
                            ALISA A. GIVENTAL
                            KRISTINA HOVSEPYAN
                            NATHAN A. SEARLES
                        50 CALIFORNIA STREET, SUITE 2750
                        SAN FRANCISCO, CALIFORNIA 94111

ALSO PRESENT:           COMENITY CAPITAL BANK
                        MIKE GALEANO, IN HOUSE COUNSEL

542

INDEX OF PROCEEDINGS

FOR THE PLAINTIFF:


PRAGHATHI GOPINATH
      VIDEOTAPED DEPOSITION                        P. 553

PAVITHRA S.
      VIDEOTAPED DEPOSITION                        P. 555

J. ELIZABETH RANI
      VIDEOTAPED DEPOSITION                        P. 556

SHANMUGAM ARUL
      VIDEOTAPED DEPOSITION                        P. 560

RAMYA SHASHIDHAR
      VIDEOTAPED DEPOSITION                        P. 562

POOJITHA KADARESH
      VIDEOTAPED DEPOSITION                        P. 566, 567




FOR THE DEFENDANT:


SIERRA FORD
      DIRECT EXAM BY MR. SEARLES                   P. 569
      CROSS-EXAM BY MR. LOKER                      P. 641

543

INDEX OF EXHIBITS

|  | MARKED | ADMITTED |
|---|---|---|
| PLAINTIFF'S: | | |
| 10 | | 554 |
| 19 | | 553 |
| 14 & 22 | | 554 |
| 8 | | 555 |
| 15 | | 557 |
| 7 & 16 | | 558 |
| 11 & 12 | | 560 |
| 20 & 21 | | 560 |
| 9 | | 563 |
| 17 | | 563 |
| | | |
| DEFENDANT'S: | | |
| 105, 106, 133, 171-178, 180-188, AND 190-192 | | 565 |
| 247 | 565 | 565 |
| 158, MARKED CONFIDENTIAL | | 593 |
| 151, 153, 155, 156, 157, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 170, 243, AND 244 | | 595 |
| 35 | | 615 |
| 154 | | 632 |
| 131 AND 132 | | 664 |

UNITED STATES COURT REPORTERS

SAN JOSE, CALIFORNIA                    NOVEMBER 5, 2025

P R O C E E D I N G S

(COURT CONVENED AT 8:51 A.M.)

(JURY OUT AT 8:51 A.M.)

THE COURT:  WE'RE HERE IN THE MATTER OF PANCHENKO VERSUS COMENITY CAPITAL BANK.

COUNSEL ARE PRESENT.  WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

BOTH PLAINTIFF AND DEFENDANT ARE REPRESENTED AND PRESENT, AND COUNSEL ARE OBVIOUSLY PRESENT AS MENTIONED.

MR. LOKER, DO YOU BRIEFLY WANT TO STATE YOUR APPEARANCE, AND THEN I'LL HAVE MR. NARITA DO SO.

MR. LOKER:  YES, YOUR HONOR.  THANK YOU.

MATT LOKER ON BEHALF OF THE PLAINTIFF.

MR. NARITA:  YOUR HONOR, TOMIO NARITA FOR THE DEFENDANT.

THE COURT:  ALL RIGHT.  I WAS LOOKING THROUGH THE SERIES OF THE EMAILS FROM LAST NIGHT AND THE WEE HOURS OF THIS MORNING, SOME OF WHICH I GOT LAST NIGHT AND SOME OF WHICH I RECEIVED THIS MORNING, AND SO WE'RE RUNNING -- I'M RUNNING TIGHTER IN TERMS OF MY HOPE OF A START TIME THIS MORNING, BUT GIVEN THAT I JUST FIGURED WE'D PUT ON THE RECORD WHAT WAS RECEIVED, AND THEN WE'LL SORT IT ALL OUT DURING THE CHARGING CONFERENCE THIS EVENING, HOPEFULLY BY 4:00 BUT IT LOOKS LIKE IT MAY BE CLOSER TO 4 :30 JUDGING BY WHAT COUNSEL HAS STATED.

SO JUST TO MAKE SURE THAT WE ALL HAVE THE SAME THINGS.

MR. NARITA:  OKAY.  OUR LAUNDRY LIST.

THE COURT:  YES, LET'S MAKE SURE WE ALL HAVE THE SAME PUNCH LIST.

SO I RECEIVED TIME ESTIMATES RE TRIAL AND BY MY NUMBERS IT LOOKS LIKE WE WILL BE VERY TIGHT ON BOTH SIDES, BUT WHAT I SAW WAS THAT IT WOULD PROBABLY TAKE US TO THE END OF TODAY, BETWEEN THE DEPOSITIONS THIS MORNING AS WELL AS -- AND THEN THE DEFENDANT BEGINNING THEIR CASE, THE EXPERTS, AND THEN -- AND SO FORTH.  SO IT LOOKED LIKE WE WOULD BE TAKING THE FULL DAY TODAY.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  I THINK THAT'S RIGHT, YOUR HONOR.

THE COURT:  SO I ALSO RECEIVED TWO ADDITIONAL STIPULATIONS, AND I SAW THAT THE AMENDED VERSION HAD BEEN -- WAS WITH US, AND I THOUGHT BOTH OF THOSE WERE HELPFUL STIPULATIONS, THE FIRST DEALING WITH THE BREAD FINANCIAL, THE USEFUL CONTEXT IN TERMS OF WHAT WAS HAPPENING WITH THAT, AS WELL AS THE -- I FORGOT ABOUT THE SECOND ONE BECAUSE I WAS EXCITED ABOUT MY COFFEE.

MR. LOKER:  WE DEFINED EQUIFAX, EXPERIAN, AND TRANS UNION ARE CONSUMER REPORTING AGENCIES AND SOMETIMES THEY'RE REFERRED TO AS CREDIT BUREAUS.

THE COURT:  AND WITH THOSE TWO STIPULATIONS, WOULD YOU LIKE THOSE READ AT THE BEGINNING OF TODAY?

MR. LOKER:  YES, PLEASE, YOUR HONOR.

MR. NARITA:  THAT'S PERFECTLY FINE, YOUR HONOR.

THE COURT:  OKAY.  SO I WILL DO SO BEFORE THE FIRST DEPOSITION PLAYS ALONG WITH THE NORMAL -- I AM SUPPOSED TO READ WITH THE FIRST DEPOSITION.

AND WHO IS THE FIRST DEPOSITION THIS MORNING?  OH, WE'RE CONTINUING.

MR. LOKER:  WE'RE CONTINUING WITH MS. GOPINATH, AND THERE'S ABOUT 11 MINUTES LEFT.

THE COURT:  GREAT.  AND THEN AFTER THAT -- I RECEIVED -- WELL, YOU ALL RECEIVED THE TENTATIVE JURY INSTRUCTIONS, WHICH I PROMISED LAST NIGHT.  THEY WERE SENT LATE LAST NIGHT, SO A WORKING DRAFT.  WELL, CLOSE TO OUR FINAL REGARDING THAT.

THERE'S SOME LANGUAGE WHICH NEEDS TO BE REMOVED IN TERMS OF PAST TENSE, PRESENT TENSE OF WHAT WAS GIVEN PRELIMINARILY AND THE CLEANUP LIKE THAT, BUT IT'S BASICALLY, OTHER THAN THAT, OUR VERSION.

I'VE INCLUDED THE LIMITING INSTRUCTIONS, BECAUSE I THINK IT WILL HELP IN TERMS OF, FOR EXAMPLE, THE DIRECT AND INDIRECT DISPUTE, WHICH WAS RAISED LAST NIGHT, AN ISSUE WHICH WAS RAISED LAST NIGHT.

SO YOU HAVE THOSE FOR OUR DISCUSSIONS THIS AFTERNOON.

MR. NARITA:  OKAY.

THE COURT:  I ALSO RECEIVED PLAINTIFF'S DRAFT OF THE

JURY INSTRUCTION, WHICH I HAD REQUESTED YESTERDAY, ABOUT INDIRECT VERSUS DIRECT, AND THEN WHAT APPEARS TO BE THE DEFENDANT'S IN LIEU OF THE JURY INSTRUCTION VERDICT FORM, AMENDED VERDICT FORM, PROPOSED VERDICT FORM.  SO THOSE WERE RECEIVED.

IS THERE ANYTHING ELSE THAT I'M MISSING THAT I RECEIVED FROM YOU ALL?

MR. LOKER:  NOT THAT I CAN THINK OF, YOUR HONOR.

THE COURT:  SORRY.  MY SOUTHERN SOMETIMES KICKS IN WHEN I GET A LITTLE TIRED.

MR. NARITA:  I CAN'T REMEMBER ANYTHING ELSE, YOUR HONOR.

THE COURT:  OKAY.  WONDERFUL.  WE'RE STILL MISSING A COUPLE OF JURORS, SO WE'RE GOING TO HOLD OFF TO MAKE SURE THEY'RE ASSEMBLED AS THEY'RE REQUIRED TO BE.

MR. NARITA:  PROBABLY THE RAIN, YOUR HONOR.

THE COURT:  WELL, IT STARTED WHEN I CAME IN AT 6:30 OR 7:00 AND I THOUGHT, OH, NO, THIS IS GOING TO HIT THEIR TRAFFIC AT THE TIME THAT THEY WERE DRIVING, AND IT WAS UNFORTUNATE BECAUSE IT STARTED TO COME DOWN HARD AROUND 7:00.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  ANYTHING ELSE?

MR. LOKER:  IN TERMS OF THE JURY INSTRUCTIONS, YOUR HONOR, YOU ASKED US TO BE READY TO DISCUSS INSTRUCTION 50, BUT I WAS ASSUMING THAT WOULD BE AT THE END OF THE DAY AS

OPPOSED TO NOW, BUT EITHER TIME IS GOOD FOR THE PLAINTIFF.

THE COURT:  REMIND ME WHICH -- I KEEP REFERRING TO THEM IN DIFFERENT WAYS.  SO NUMBER 50 WAS OUR NUMBERING.

MR. LOKER:  CORRECT.  AND THAT RELATES TO THE VERDICT FORM AND WHETHER THE COURT SHOULD PROVIDE AN EXPLANATION OF THE VERDICT FORM.

THE COURT:  YES.  MR. LOKER, SO I DIDN'T SEE ANYTHING, I THINK IN PART BECAUSE THE DEFENDANT HAD SUGGESTED ANOTHER VERSION, MOVING AWAY FROM THE GENERAL VERDICT FORM REGARDING THE FCRA CLAIM ITSELF AGAIN.

BUT DID YOU HAVE A VERSION OR WHAT DID YOU WANT TO ADDRESS WITH THE COURT?

MR. LOKER:  IN TERMS OF WALKING THROUGH THE VERDICT FORM, MR. OSBORNE AND I DON'T KNOW EXACTLY WHICH ONE OF US WILL GET TO DO THE CLOSING, BUT THE MATTS WOULD PREFER TO WALK THE JURY THROUGH THE VERDICT FORM AS OPPOSED TO RELYING UPON THE COURT TO DO THAT.

THE COURT:  MR. NARITA, I KNOW THAT COMENITY IS TRYING TO CHANGE THE VERDICT FORM OR ASKING TO CHANGE THE VERDICT FORM, BUT AS A PRINCIPLE, ANY GENERAL THOUGHTS?

MR. NARITA:  YEAH.  I THINK THAT ONCE WE SETTLE ON A VERDICT FORM, THE COURT SETTLES ON ONE, THEN THE PARTIES CAN WALK THE JURY THROUGH IT AND LET THEM KNOW.  THAT'S BEEN THE WAY THAT I'VE ALWAYS HANDLED IT.

THE COURT:  OKAY.  SO I WILL TAKE -- YOU KNOW, I HAD

SUGGESTED IN LARGE PART BECAUSE OF COMENITY'S CONCERNS THAT WERE RAISED YESTERDAY, BUT I WILL SEE WHERE WE SHAKE OUT AND TAKE IT FROM THERE, BUT I'LL TAKE THE PARTIES' REQUESTS UNDER CONSIDERATION.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  I'M GOING TO REBOOT AND TAKE A MOMENT TO DO THAT.

SO OUR SCHEDULE TODAY WILL BE ABOUT THE SAME.  IF WE START A LITTLE BIT LATER, THEN BECAUSE OF MISSING JURORS, THEN I WILL PUSH LUNCH A LITTLE BIT LATER.  SO I AIM FOR 12:15.  THIS IS TO HELP YOU ALL KEEP THINGS IN MIND.

IF WE START 15 MINUTES LATER, I'LL PUSH IT 15 MINUTES, AND THEN WE TAKE THE 45 MINUTE BREAK, AND I DIVIDE THE AFTERNOON IN HALF OR IF THE JURY LOOKS SLEEPY, THEN I'LL TAKE IT A LITTLE BIT EARLIER, AND THEN AFTER THAT WE WILL TAKE A SHORT, SHORT BREAK.  LIKE, IT WILL BE SHORTER THAN YESTERDAY.  SO PROBABLY IT WILL BE LIKE 5 MINUTES, STRETCH, RUN TO THE RESTROOM IF YOU NEED TO, AND START ON THE CHARGING INSTRUCTION -- I MEAN CHARGING CONFERENCE, AND THAT WILL BE IT.

AND MY GOAL TOMORROW IS THAT WE'RE WALKING IN, I'M GIVING THEM INSTRUCTIONS, SUBSTANTIVE INSTRUCTIONS, AND THEN YOU ALL ARE DOING YOUR CLOSINGS, AND THEN I'M GIVING THEM THEIR DELIBERATION INSTRUCTIONS, AND OFF THEY GO.

MR. LOKER:  VERY GOOD.

MR. NARITA:  THAT'S GREAT.  ONE HOUSEKEEPING MATTER,

YOUR HONOR, WHILE WE'RE TALKING ABOUT SCHEDULING.

WE DO ANTICIPATE THAT THE PLAINTIFF WILL REST TODAY, AND AT THAT TIME WE WILL BE MAKING A MOTION UNDER RULE 50.  SO I DON'T KNOW -- I DON'T KNOW IF THE COURT WANTS ME TO SORT OF BOOKMARK THAT IN THE RECORD.  WE WILL BE FILING SOMETHING AS WELL AT THE TIME THAT THE PLAINTIFF RESTS.  I DIDN'T WANT THAT TO COME AS A SURPRISE.

THE COURT:  OKAY.  I APPRECIATE THE HEADS UP.  SO I DON'T WANT YOU MAKING ANY ARGUMENT OBVIOUSLY IN FRONT OF THE JURY.  SO I WOULD JUST -- WHEN THEY REST, AND THE PLAINTIFF RESTS THEIR CASE-IN-CHIEF, JUST SAY THE DEFENDANT MAKES THE MOTION, AND I'LL SAY WONDERFUL, WE'LL DISCUSS BRIEFLY AT THE BREAK OR WHATEVER ORALLY.

WHEN ARE YOU FILING IT?

MR. NARITA:  IT DEPENDS ON WHEN WE ARE DONE WITH THE VIDEOS, BUT I THINK THE VIDEOS ARE GOING TO LAST --

MR. LOKER:  THEY SHOULD BE DONE THIS MORNING.  WE ONLY HAVE ABOUT TWO HOURS LEFT OF VIDEO.

MR. NARITA:  SO I THINK OUR PLAN WAS THAT WHEN THE LAST VIDEO ENDS, MR. LOKER WILL SAY THAT WE REST, AND WE'LL E-FILE SOMETHING, AND THEN BEFORE WE, BEFORE WE PUT ON A DEFENSE, WE WOULD LIKE TO BE HEARD AT LEAST BRIEFLY PROBABLY OUTSIDE OF THE PRESENCE OF THE JURY.

THE COURT:  I MEAN, IT'S DEFINITELY GOING TO BE OUTSIDE OF THE PRESENCE.  I WILL WAIT UNTIL YOU FILE SOMETHING.

YOU CAN ORALLY JUST STATE THE GROUNDS DURING A BREAK, BUT WE'RE NOT GOING TO ARGUE IT AT THAT POINT. I DON'T WANT TO TAKE AWAY AND DERAIL OUR TRIAL SCHEDULE FOR TODAY.

MR. NARITA: OKAY.

THE COURT: I'LL EITHER DEFER, TAKE IT UNDER SUBMISSION, OR ONCE I LOOK AT YOUR WRITTEN MATERIALS, ORALLY RULE ON IT.

MR. NARITA: I'M GLAD I BROUGHT IT UP MECHANICALLY THEN, YOUR HONOR. THANK YOU.

THE COURT: ALL RIGHT. OTHERWISE IF WE HAVE ARGUMENT ON IT, THEN WE'RE 20 MINUTES DELAYED, THEN WE'RE 20 MINUTES BEHIND. I DON'T WANT THAT TO HAPPEN.

MR. NARITA: UNDERSTOOD.

THE COURT: SO WE WILL ADDRESS IT DURING THE COURSE. UNDERSTOOD.

SO WITH THAT I'M GOING TO -- I THINK WE HAVE AN UPDATE ABOUT THE JURY. SO I'M JUST GOING TO GO AHEAD AND FINISH SETTING UP AND LOGGING IN, AND WE'LL WAIT FOR THE JURY TO COME.

MR. LOKER: THANK YOU, YOUR HONOR.

THE COURT: OH, MR. LOKER, I DIDN'T ASK, ANYTHING FURTHER FROM PLAINTIFFS, SINCE I ASKED THE DEFENDANTS?

MR. LOKER: NOTHING FURTHER, YOUR HONOR. THANK YOU.

THE COURT: ALL RIGHT. THANK YOU. WE ARE NOW IN RECESS.

(RECESS FROM 9:01 A.M. UNTIL 9:10 A.M.)

(JURY IN AT 9:10 A.M.)

THE CLERK:  WE'RE BACK TODAY IN CASE NUMBER 5:23-CV-04965 EKL, PANCHENKO VERSUS COMENITY CAPITAL BANK FOR OUR JURY TRIAL.

THE COURT:  ALL RIGHT.  GOOD MORNING EVERYBODY.  EVERYONE LOOKS A LITTLE TIRED.  GOOD MORNING.

THANK YOU FOR COMING, COMING TIMELY, AND FOR MAKING IT THROUGH THE RAIN, IF YOU HAD RAIN WHERE YOU WERE.

I WILL NOTE FOR THE RECORD, WE HAVE ALL OF THE JURORS PRESENT, WE HAVE THE PARTIES PRESENT, AS WELL AS COUNSEL.

SO WE'RE GOING TO PICK UP WHERE WE LEFT OFF YESTERDAY, WHICH WAS THE PLAINTIFF'S CASE-IN-CHIEF WATCHING THE DEPOSITION, CONTINUING WITH THE DEPOSITION THAT HAD BEEN PLAYING.

BEFORE WE GET STARTED, I DID HAVE TWO ADDITIONAL STIPULATIONS THAT THE PARTIES HAVE ASKED THAT I READ THIS MORNING.

AS MENTIONED, THE PARTIES HAVE AGREED THAT THESE FACTS HAVE BEEN STIPULATED TO, WHICH MEANS THAT YOU MUST TREAT THEM AS FACTS THAT HAVE BEEN PROVEN.

SO THESE TWO FACTS INCLUDE FACT NUMBER 39.

COMENITY CHANGED ITS NAME TO BREAD FINANCIAL DURING THE COURSE OF LITIGATION IN THIS MATTER.

AND FACT NUMBER 40.

EQUIFAX, EXPERIAN, AND TRANS UNION ARE CONSUMER REPORTING

AGENCIES, WHICH ARE SOMETIMES REFERRED TO AS CREDIT BUREAUS.

SORRY, AS CREDIT BUREAUS.

ALL RIGHT.  WITH THAT, MR. LOKER.

MR. LOKER:  THANK YOU, YOUR HONOR.

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT.)**

THE COURT:  ALL OBJECTIONS HAVE BEEN WITHDRAWN IN THIS DEPOSITION.

**(VIDEO DEPOSITION OF PRAGHATHI GOPINATH PLAYED IN OPEN COURT.)**

MR. LOKER:  SORRY.  I DON'T KNOW HOW TO STOP IT. I'M SORRY.  IT'S NOT A "SUITS" ADVERTISEMENT.

THE COURT:  ALL RIGHT.

MR. LOKER:  AND WITH THAT VIDEO, YOUR HONOR, THERE ARE A COUPLE OF EXHIBITS THAT WE WOULD LIKE MOVED INTO EVIDENCE.

THE COURT:  YOU MAY PROCEED, MR. LOKER, BY STATING THEM.

MR. LOKER:  EXHIBIT NUMBER 10, EXHIBIT NUMBER 19, EXHIBIT NUMBER 14, AND, LASTLY, EXHIBIT NUMBER 22.

THE COURT:  LET'S START WITH 19.  WITH 19 THERE WAS NO OBJECTION.  THE COURT ADMITS THAT INTO EVIDENCE.

(PLAINTIFF'S EXHIBIT 19 WAS RECEIVED IN EVIDENCE.)

THE COURT:  SO EXHIBIT 10, THE COURT ADMITS THAT INTO EVIDENCE NOTING THE PREVIOUS OBJECTIONS RAISED AND

OVERRULED.

MR. NARITA:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBIT 10 WAS RECEIVED IN EVIDENCE.)

THE COURT:  WHAT WERE YOUR NEXT?

MR. LOKER:  14 AND -- I'M SORRY.  10, 19, 14, AND 22.  THEY WERE ALL IN OUR STIPULATED FACTS.

THE COURT:  10, 19?

MR. LOKER:  14 AND 22.

THE COURT:  ALL RIGHT.  SO BOTH 19 AND 22 NOW, THERE WAS NO OBJECTION.  THE COURT WILL ADMIT THOSE INTO EVIDENCE.

WITH OBJECTION -- AND AS TO 10 AND 14, THE COURT NOTES THE PREVIOUS OBJECTIONS FOR THE RECORD AND ADMITS THOSE INTO EVIDENCE.

(PLAINTIFF'S EXHIBITS 14 AND 22 WERE RECEIVED IN EVIDENCE.)

MR. NARITA:  THANK YOU, YOUR HONOR.

MR. LOKER:  THANK YOU, YOUR HONOR.

OKAY.  NEXT, IN TERMS OF THE VIDEOS, YOUR HONOR, WE ARE GOING TO MS. PAVITHRA, AND THERE'S REQUESTED STIPULATED FACT NUMBER 26 TO BE READ.

THE COURT:  SO AS PREVIOUSLY MENTIONED, A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE TRIAL.  AS STATED, THIS PERSON IS PLACED UNDER OATH TO TELL THE TRUTH AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.

THE QUESTIONS AND ANSWERS ARE RECORDED, AND WHEN THE

PERSON IS NOT AVAILABLE TO TESTIFY, THE DEPOSITION OF THAT PERSON MAY BE USED AT TRIAL AS YOU HAVE SEEN TODAY AND AS YOU SAW YESTERDAY.

THE DEPOSITION OF PAVITHRA S. WAS TAKEN ON MARCH 12TH, 2025, AND THE STIPULATED FACT IS AS FOLLOWS:

ON JULY 18TH, 2023, PAVITHRA S. PROCESSED AN ACDV WITH NO IMAGE ATTACHMENT, WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 99993179562847013, REGARDING PANCHENKO'S DISPUTE TO EQUIFAX AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE.  TRIAL EXHIBIT 8.

MR. LOKER, THE PLAINTIFF MAY PROCEED.

MR. LOKER:  THANK YOU, YOUR HONOR.

**(VIDEO DEPOSITION OF PAVITHRA S. PLAYED IN OPEN COURT.)**

MR. LOKER:  AND, YOUR HONOR, WITH MS. PAVITHRA'S VIDEO WE WOULD ASK EXHIBIT 8 TO BE ADMITTED INTO EVIDENCE.

THE COURT:  WITH THE PREVIOUS OBJECTION NOTED, NUMBER 8 IS ADMITTED INTO EVIDENCE.

(PLAINTIFF'S EXHIBIT 8 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU, YOUR HONOR.

WE'RE GOING TO MOVE TO MS. ELIZABETH'S VIDEO AND REQUEST THAT STIPULATED FACT NUMBER 17 BE READ.

THE COURT:  ALL RIGHT.  AND THIS IS ELIZABETH RANI?

MR. LOKER:  YES.

THE COURT:  SO AS PREVIOUSLY DISCUSSED, THIS IS A DEPOSITION, THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE

TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE TRUTH AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE QUESTIONS AND ANSWERS ARE RECORDED.  AND WHEN THAT PERSON IS NOT AVAILABLE AT TRIAL, THE DEPOSITION MAY BE USED AT TRIAL.

SO THIS IS THE DEPOSITION OF J. ELIZABETH RANI WHICH WAS TAKEN ON MARCH 17TH, 2025.

STIPULATED FACT 17 IS AS FOLLOWS:

ON MAY 20TH, 2023, J. ELIZABETH RANI PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 99993134511002011, REGARDING PANCHENKO'S DISPUTE TO EQUIFAX AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE. TRIAL EXHIBIT 7.  ELIZABETH RANI'S CONCLUSION FOR ACDV FROM EQUIFAX WITH CONTROL NUMBER, SAME NUMBER ENDING 2011, ARE DOCUMENTED IN HER EASE NOTES AT TRIAL EXHIBIT 16.

MR. LOKER:  THANK YOU, YOUR HONOR.

**(VIDEO DEPOSITION OF J. ELIZABETH RANI PLAYED IN OPEN COURT.)**

MR. LOKER:  THANK YOU, YOUR HONOR.

AND THREE THINGS AFTER THAT VIDEO.  THE FIRST THING I WANTED TO NOTE IS THAT MR. NARITA AND I MET AND CONFERRED BEFORE WE WENT ON THE RECORD THIS MORNING AND AGREED THAT ALL OBJECTIONS IN THE VIDEO WOULD BE WAIVED.  I WASN'T SURE IF I MENTIONED THAT.

THE COURT:  I WAS GOING TO ASK A FOLLOW-UP.  THANK YOU.  SO FOR THE RECORD THAT MEANS ALL OBJECTIONS ARE WAIVED.

WE TALKED ABOUT OBJECTIONS EARLIER AT THE BEGINNING, MEMBERS OF THE JURORS, THE OBJECTIONS IN THESE DEPOSITIONS -- SORRY.  THE OBJECTIONS IN THE DEPOSITIONS MAYBE DISREGARDED.

MR. LOKER:  I'M SORRY.  I'LL STEP AWAY.

THE COURT:  WELL, THIS MAKES ME CLARIFY THE RECORD.  MR. LOKER, ARE THEY BEING WITHDRAWN?

MR. LOKER:  WITHDRAWN, YOUR HONOR.

MR. NARITA:  YES, THAT'S CORRECT, WITHDRAWN, YOUR HONOR.

THE COURT:  OKAY.  LET'S MAKE THAT CLEAR.  SO THE OBJECTIONS YOU'RE HEARING IN THESE DEPOSITIONS ARE WITHDRAWN, SO YOU MAY DISREGARD THEM.  YES.

MR. LOKER:  THANK YOU.  MY APOLOGIES AGAIN.

THE SECOND ISSUE IS THAT WITH PAVITHRA, THE PRIOR DEPOSITION BEFORE MS. ELIZABETH, I FORGOT TO ASK FOR THE COURT TO ADMIT EXHIBIT NUMBER 8, WHICH WAS THE ACDV -- OR I DID.

15 IS THE ONE I FORGOT ACCORDING TO EVERYONE.

THE COURT:  15, THERE WAS NO OBJECTION.  THE COURT WILL ADMIT THAT EXHIBIT.

(PLAINTIFF'S EXHIBIT 15 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU.  I APOLOGIZE.

AND LASTLY, AS IT RELATES TO MS. ELIZABETH, WE ASK THAT EXHIBIT NUMBER 7 BE ADMITTED, WHICH WAS THE ACDV, AS WELL AS EXHIBIT NUMBER 16, THE EASE NOTES.

THE COURT:  SO AS TO EXHIBIT NUMBER 7, THE PRIOR

OBJECTION WILL BE NOTED.  THAT WILL BE ADMITTED.

AS TO EXHIBIT 16, THERE WAS NO OBJECTION, AND THE COURT WILL ADMIT THAT EXHIBIT.

(PLAINTIFF'S EXHIBITS 7 AND 16 WERE RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU, YOUR HONOR.  AND NOW WE'RE GOING TO GO TO THE VIDEO OF MR. ARUL, AND THERE ARE SOME STIPULATED FACTS FOR THAT ONE AS WELL, YOUR HONOR.

THE COURT:  OKAY.  AND ALSO MY RECOLLECTION IS THAT MR. ARUL'S IS ABOUT 18 MINUTES; IS THAT CORRECT?  OR 15?

MR. LOKER:  THAT'S CORRECT.

THE COURT:  SO AFTER THAT, SO THE JURY KNOWS WHAT WE ARE DOING, AFTER THAT WE WILL TAKE OUR MORNING BREAK.

ALL RIGHT.  LET ME TURN TO MR. ARUL'S TESTIMONY.  CAN YOU REMIND ME WHAT THE STIPULATED FACTS WERE FOR THAT ONE.

MR. LOKER:  YES, YOUR HONOR.  NUMBER 31 AS WELL AS NUMBER NUMBER 36.

THE COURT:  THANK YOU.  SO WE'VE DISCUSSED -- I'LL STOP REPEATING THIS, BUT THIS IS ALSO ANOTHER DEPOSITION, WHICH WAS THE SWORN TESTIMONY OF THE WITNESS.  LAWYERS FROM BOTH SIDES MAY ASK QUESTIONS IN THE VIDEOS.  THE QUESTIONS AND ANSWERS ARE RECORDED, AND THE PERSON IS NOT -- IS UNAVAILABLE TO TESTIFY AT TRIAL.

THE PARTIES HAVE ALSO REACHED CERTAIN STIPULATIONS AS TO THIS WITNESS.

STIPULATED FACT 31.  OH, LET ME SAY ONE OTHER THING BEFORE

I GO TO STIPULATED FACTS.

THE DEPOSITION OF ARUL SHANMUGAM, S-H-A-N-M-U-G-A-M, WAS TAKEN ON APRIL 10TH, 2025.

TURNING TO THE STIPULATED FACTS.

STIPULATED FACT 31.

ON AUGUST 13TH, 2023, MR. ARUL PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 99993223543870009, REGARDING PANCHENKO'S DISPUTE TO EQUIFAX AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE.  TRIAL EXHIBIT 11.  SHANMUGAM ARUL'S CONCLUSION FOR ACDV FROM EQUIFAX WITH CONTROL NUMBER, SAME NUMBER ENDING WITH 0009, ARE DOCUMENTED IN HER EASE --

MR. LOKER:  HIS EASE, SORRY.

THE COURT:  -- IN HIS EASE NOTES AT TRIAL EXHIBIT 20.

TURNING TO STIPULATED FACT 36.

ON AUGUST 19TH, 2023, SHANMUGAM ARUL PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 99993227576961008, REGARDING PANCHENKO'S DISPUTE TO EQUIFAX AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE. TRIAL EXHIBIT 12.  MR. ARUL'S CONCLUSION FOR ACDV FROM EQUIFAX WITH CONTROL NUMBER, SAME NUMBER ENDING 1008, ARE DOCUMENTED IN HIS EASE NOTES AT TRIAL EXHIBIT 21.

MR. LOKER:  BLESS YOU.  OKAY.  I'LL GET THIS CUED UP.

THE COURT:  THANK YOU, MR. LOKER.

MR. LOKER:  AND YOU WILL HEAR FROM MR. CUMMINS IN THIS VIDEO, SO THERE'S NOT A SURPRISE FOR EVERYBODY, THERE'S A DIFFERENT VOICE.

**(VIDEO DEPOSITION OF SHANMUGAM ARUL PLAYED IN OPEN COURT.)**

MR. LOKER:  THANK YOU, YOUR HONOR.  THERE ARE FOUR EXHIBITS THAT MR. PANCHENKO ASK TO BE ADMITTED THROUGH THAT VIDEO, AND I'LL GO IN NUMERICAL ORDER.

FIRST, IT'S 11 AND 12.

THE COURT:  THE COURT NOTES THE OBJECTIONS -- THE PREVIOUS OBJECTIONS AND ADMITS EXHIBITS 11 AND 12.

(PLAINTIFF'S EXHIBITS 11 AND 12 WERE RECEIVED IN EVIDENCE.)

MR. LOKER:  AND THE SECOND SET IS 20 AND 21, YOUR HONOR.

THE COURT:  THE COURT NOTES THERE ARE NO PREVIOUS OBJECTIONS, AND THE COURT ADMITS.

MR. LOKER:  THANK YOU, YOUR HONOR.

(PLAINTIFF'S EXHIBITS 20 AND 21 WERE RECEIVED IN EVIDENCE.)

THE COURT:  ALL RIGHT.  WITH THAT, WE ARE READY FOR OUR MORNING BREAK.  THANK YOU VERY MUCH, MEMBERS OF THE JURY. WE'LL TAKE A 15 MINUTE.

COUNSEL, LET'S ALL TAKE A BREAK UNLESS THERE'S ANYTHING FURTHER.

ALL RIGHT.  WE'LL NOW BE IN RECESS.  THANK YOU.

(RECESS FROM 10:40 A.M. UNTIL 10:58 A.M.)

THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT AS WELL AS THE SEVEN JURORS AND ALL OF THE PARTIES.

THANK YOU, COUNSEL.  YOU MAY CONTINUE.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE NEXT VIDEO WE HAVE FROM MS. RAMYA, AND WE REQUEST THAT STIPULATED FACT 25 BE READ.

THE COURT:  ALL RIGHT.  SO THE DEPOSITION OF RAMYA SHASHIDHAR WAS TAKEN ON MARCH 28TH, 2025.  THIS, AGAIN, IS THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE TRIAL, AND AS MENTIONED, LAWYERS FROM EACH PARTY MAY ASK QUESTIONS WHEN THE WITNESS IS UNDER OATH.

THE QUESTIONS AND ANSWERS WERE RECORDED, AND THIS PERSON IS UNAVAILABLE TO TESTIFY AT TRIAL.

ALL RIGHT.  AND COULD YOU REMIND ME WHAT THE STIPULATED FACT WAS AGAIN.

MR. LOKER:  YES, YOUR HONOR.  IT'S NUMBER 25, YOUR HONOR.

THE COURT:  THANK YOU.

STIPULATED FACT NUMBER 25.

ON JULY 5TH, 2023, RAMYA SHASHIDHAR PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 438955551017007, REGARDING PANCHENKO'S DISPUTE TO TRANS UNION AND VERIFIED COMENITY'S

REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE.  TRIAL EXHIBIT 9.  RAMYA SHASHIDHAR'S CONCLUSION FOR ACDV FROM TRANS UNION WITH CONTROL NUMBER, SAME NUMBER ENDING IN 7007, ARE DOCUMENTED IN HER EASE NOTES AT TRIAL EXHIBIT 17.

YOU MAY PROCEED, MR. LOKER, WITH THE VIDEO CLIP.

MR. LOKER:  THANK YOU.

**(VIDEO DEPOSITION OF RAMYA SHASHIDHAR PLAYED IN OPEN COURT.)**

MR. LOKER:  MAY I PAUSE THE VIDEO FOR JUST A SECOND.

THE COURT:  YES, MR. LOKER.

MR. LOKER:  I WAS TOLD SOME TEXT NOTIFICATIONS WERE SHOWING UP ON MY END, SO I WAS GOING TO CLOSE THAT OUT.  MY APOLOGIES.

MR. NARITA:  I WASN'T SURE IF THAT WAS ON THE VIDEO OR NOT.

MR. LOKER:  NO.  I'M SORRY.  I'M TRYING TO CLOSE OUT THAT.

WE'LL RESUME.  MY APOLOGIES.  I'LL GET IT CUED UP AND THEN RESUME IT.

**(VIDEO DEPOSITION OF RAMYA SHASHIDHAR PLAYED IN OPEN COURT.)**

MR. LOKER:  OKAY, YOUR HONOR.  IN TERMS OF THE VIDEOS, MR. PANCHENKO ASKS FOR EXHIBIT NUMBER 9 TO BE ENTERED.

THE COURT:  WITH THE PREVIOUS OBJECTION NOTED, TRIAL EXHIBIT NUMBER 9 IS ADMITTED.

563

(PLAINTIFF'S EXHIBIT 9 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  AND 17 AS WELL, YOUR HONOR.

THE COURT:  THERE'S NO OBJECTION.  TRIAL EXHIBIT 17 IS ADMITTED.

(PLAINTIFF'S EXHIBIT 17 WAS RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU.  AND MS. GIVENTAL HAS SOMETHING FURTHER.

MS. GIVENTAL:  YES, YOUR HONOR.  AT THIS TIME WE WOULD LIKE TO MOVE IN THE EXHIBITS THAT ARE REMAINING THAT ARE REFERENCED IN THE STIPULATION OF FACTS THAT ARE BEING -- THAT WERE FILED YESTERDAY AND WILL BE PROVIDED TO THE JURY AT THE END, THE STIPULATED FACTS, SOME OF WHICH HAVE ALREADY BEEN READ INTO THE RECORD AND SOME OF THE EXHIBITS HAVING ALREADY BEEN ADMITTED.

THERE ARE ADDITIONAL STIPULATED FACTS THAT MAY NOT BE READ, BUT THEY WILL BE PROVIDED, AND THEY REFERENCE CERTAIN EXHIBITS, AND THOSE ARE THE ONES THAT WE WOULD LIKE TO HAVE ADMITTED INTO EVIDENCE.

MR. LOKER:  NO OBJECTION FROM THE HONOR -- I'M SORRY, FROM THE PLAINTIFF.

THE COURT:  CONGRATULATIONS.

MS. GIVENTAL, CAN YOU CLARIFY.  I'M A LITTLE BIT CONFUSED. SO ARE YOU SAYING THE DEFENDANTS ARE NOW MOVING TO ADMIT ALL OF THE STIPULATIONS WHICH HAVE BEEN PREVIOUSLY MENTIONED OR WHICH WILL BE ALL OF THE STIPULATIONS, OR WHICH?  CAN YOU PLEASE

SPECIFY.

MS. GIVENTAL:  YES.  SO YESTERDAY THERE WAS AN ECF 219 FILED THAT HAS A LIST OF STIPULATED FACTS THAT ARE AGREED UPON, AND IT COULD BE READ TO THE JURY FROM THE BEGINNING OF THE CASE, IN THE MIDDLE, AND WE OPTED TO DO IT IN VARIOUS POINTS.

SOME OF THEM MAY NOT BE READ BUT WILL BE PROVIDED.

THE COURT:  YES.

MS. GIVENTAL:  THESE STIPULATED FACTS REFERENCE EXHIBITS THAT THE PARTIES AGREE ARE BEING ADMITTED AS PART OF THE STIPULATED FACTS.

THE COURT:  SO THE PARTIES ARE AGREEING THAT ALL OF THE EXHIBITS CITED IN THE STIPULATIONS CAN NOW BE MOVED, VERY HAVEN'T BEEN, BUT THEY CAN NOW BE MOVED INTO EVIDENCE.

MS. GIVENTAL:  CORRECT.  AND I WAS GOING TO LIST THOSE, THE REMAINING ONES.

MR. LOKER:  THAT'S FINE.  YEAH.

THE COURT:  WHY DON'T YOU PROCEED TO LIST THEM.

MS. GIVENTAL:  EXHIBIT 105, 106, 133, 171 THROUGH 178, 180 THROUGH 188, 190 THROUGH 192.

THE COURT:  OKAY.  MS. GIVENTAL, JUST FOR EASE OF REFERENCE, I MIGHT JUST HAVE YOU SEND ALL OF THE EXHIBIT NUMBERS TO MADAM CLERK TO HELP YOUR SYNC UP LATER.

MS. GIVENTAL:  OKAY.

THE COURT:  SO THOSE WILL BE ADMITTED.

(DEFENDANT'S EXHIBITS 105, 106, 133, 171 THROUGH 178, 180 THROUGH 188, 190 THROUGH 192 WERE RECEIVED IN EVIDENCE.)

THE COURT:  AND LET'S GO AHEAD, SINCE WE'RE REFERRING TO STIPULATIONS IN THE EXHIBITS, IN WHAT WAS FILED IN THE ECF NUMBER 219, LET'S GO AHEAD AND HAVE THAT MARKED AS AN EXHIBIT.

WHAT NUMBER ARE WE ON?

MR. LOKER:  WHERE WE LEFT OFF IN THE STIPULATIONS, NUMBER 40.

THE COURT:  NO.  IN TERMS OF THIS -- BECAUSE WE'RE MOVING THE STIPULATIONS INTO EVIDENCE.

MR. NARITA:  WHAT TRIAL EXHIBIT?

MR. LOKER:  OH, I SEE.

MS. GIVENTAL:  247.

THE COURT:  OKAY.  SO THE STIPULATIONS, WHICH ARE LISTED IN ECF NUMBER 219, WILL BE MOVED INTO -- WILL BE MARKED, THAT DOCUMENT WILL BE MARKED AND MOVED INTO EVIDENCE AS EXHIBIT --

MS. GIVENTAL:  247.

THE COURT:  -- EXHIBIT 247.  SO THIS EXHIBIT WILL BE RECEIVED BY THE JURY LATER, BUT THEY'RE HEARING IT DURING THE COURSE OF TRIAL.

(DEFENDANT'S EXHIBIT NUMBER 247 WAS MARKED AND RECEIVED INTO EVIDENCE.)

MS. GIVENTAL:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

MR. LOKER:  AND THE LAST VIDEO WE HAVE IS FROM MS. POOJITHA, AND THERE'S A STIPULATED FACT NUMBER 16 WHICH WE ALSO REQUESTED BE READ.

THE COURT:  AND THIS IS POOJITHA --

MR. LOKER:  -- KADARESH.

THE COURT:  THANK YOU.  SO THE DEPOSITION OF POOJITHA KADARESH WAS TAKEN ON MARCH 18TH, 2025.

AND THE STIPULATED FACT AGAIN, MR. LOKER?

MR. LOKER:  NUMBER 16, YOUR HONOR.

THE COURT:  I JUST TURNED THE PAGE.

ALL RIGHT.  AND STIPULATED FACT NUMBER 16 IS AS FOLLOWS:

ON MAY 18TH, 2023, POOJITHA KADARESH PROCESSED AN ACDV WITH NO IMAGE ATTACHMENTS, CONTROL NUMBER 3628885909018, REGARDING PANCHENKO'S DISPUTE TO EXPERIAN AND VERIFIED COMENITY'S REPORTING OF THE ACCOUNT INFORMATION AS ACCURATE.  TRIAL EXHIBIT 6.  POOJITHA KADARESH'S CONCLUSION FOR ACDV FROM EXPERIAN WITH CONTROL NUMBER, SAME NUMBER ENDING 9018, ARE DOCUMENTED IN HER EASE NOTES AT TRIAL EXHIBIT 15.

YOU MAY PROCEED.

MR. LOKER:  THANK YOU, YOUR HONOR.

**(VIDEO DEPOSITION OF POOJITHA KADARESH PLAYED IN OPEN COURT.)**

MR. LOKER:  SORRY, YOUR HONOR.  THOSE POPPED UP. THOSE WERE CLOSED DOWN, I THOUGHT.

THE COURT:  THE TECHNOLOGY GREMLINS CONTINUE.

MR. LOKER:  THAT'S RIGHT.

CHARLES, CAN YOU ASSIST ME IN TURNING OFF MY NOTIFICATIONS?

MR. CUMMINS:  I'LL GIVE IT A SHOT.

MR. LOKER:  THANK YOU.  ALL RIGHT.  SORRY ABOUT THAT EVERYBODY.

LET'S TRY TO GET BACK IN.

**(VIDEO DEPOSITION OF POOJITHA KADARESH PLAYED IN OPEN COURT.)**

MR. LOKER:  THANK YOU, YOUR HONOR.  MR. PANCHENKO IS ASKING THAT EXHIBIT 6 BE ADMITTED.

THE COURT:  I THOUGHT THIS HAD --

MR. LOKER:  OH, ALL OF THEM WENT IN, DIDN'T THEY?

THE COURT:  YES, I THINK YOU ADDRESSED ALL OF THE EXHIBITS AT THIS POINT.

MR. LOKER:  MY APOLOGIES.  SO WITH THAT BEING SAID, THE PLAINTIFF RESTS.

MR. NARITA:  YOUR HONOR, THE DEFENDANT WOULD LIKE TO MAKE A MOTION AT THIS TIME.

THE COURT:  ALL RIGHT.  THE MOTION IS NOTED.

IS THERE A COURTESY COPY?

MR. NARITA:  WE CAN PROVIDE THAT TO THE COURT MOMENTARILY.

THE COURT:  THANK YOU.  IT'S NOTED.  WE'LL TAKE THAT

UP DURING A BREAK.  THANK YOU VERY MUCH.

SO IS THE DEFENDANT READY TO PROCEED?

MR. NARITA:  WE'LL HAVE TO LOCATE OUR FIRST WITNESS AND GET THEM OVER TO THE COURTHOUSE, AND WE WILL BE BRINGING MS. FORD.  SHE'S NEARBY.

THE COURT:  OKAY.  LET'S CALL HER.  MR. NARITA, HOW LONG ARE YOU EXPECTING?

MR. NARITA:  I WOULD SAY, YOUR HONOR, JUST A FEW MINUTES.

THE COURT:  OKAY.  SO WE'LL KEEP IT -- IF IT'S GOING TO BE A FEW MINUTES.

MR. NARITA:  THE LENGTH OF A DECENT STRETCH BREAK PERHAPS, YOUR HONOR.

THE COURT:  OKAY.  SO WE'LL KEEP THE CLOCK RUNNING, AND LET'S BE PREPARED.

TO THE JURORS, IF YOU WOULD LIKE TO TAKE A STRETCH BREAK, OR I'M NOT SURE IF A RESTROOM BREAK -- WELL, I MAY NOT ASK YOU THAT IN OPEN COURT.  WHY DON'T WE TAKE A SHORT FIVE MINUTE BREAK, AND IF YOU WOULD LIKE TO GO BACK TO THE JURY, YOU MAY. SO WE'LL EXCUSE THE JURY FOR NOW, AND WE WILL TAKE A VERY SHORT RECESS, FIVE MINUTES.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

(RECESS FROM 11:55 A.M. UNTIL 12:07 P.M.)

THE COURT:  WE'RE BACK IN SESSION.  THE JURY IS

PRESENT.  THE PARTIES AND THEIR COUNSEL ARE PRESENT.

IS THE DEFENDANT PREPARED -- YOU MAY BE SEATED.

IS DEFENDANT PREPARED TO CALL ITS FIRST WITNESS.

MR. NARITA:  WE ARE, YOUR HONOR.

WE WILL CALL SIERRA FORD TO THE STAND, AND MR. SEARLES WILL BE QUESTIONING HER.

THE COURT:  ALL RIGHT.  MS. FORD, GOOD MORNING -- OR I THINK WE MAY BE INTO THE AFTERNOON NOW.

YOU MAY APPROACH THE WITNESS STAND, AND WHEN YOU GET THERE, I WOULD JUST ASK THAT YOU RAISE YOUR RIGHT HAND AND MADAM CLERK WILL SWEAR YOU IN.

**(DEFENDANT'S WITNESS, SIERRA FORD, WAS SWORN.)**

THE WITNESS:  YES.

THE CLERK:  THANK YOU.  IF YOU WOULD STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

THE WITNESS:  SIERRA FORD, F-O-R-D.

THE COURT:  ALL RIGHT.  YOU MAY BE SEATED.

MR. SEARLES, YOUR WITNESS.

MR. SEARLES:  THANK YOU, YOUR HONOR.

**DIRECT EXAMINATION**

BY MR. SEARLES:

Q.   GOOD AFTERNOON.  GOOD AFTERNOON TO THE LADIES AND GENTLEMEN OF THE JURY.

MS. FORD, HAVE YOU BEEN DESIGNATED AS A WITNESS ON BEHALF OF COMENITY CAPITAL BANK?

A.    I HAVE.  CAN YOU HEAR ME OKAY?

          THE COURT:  THERE YOU GO.

BY MR. SEARLES:

Q.    AND, IN FACT, MS. FORD, YOU'VE VERIFIED DISCOVERY RESPONSES AND SIGNED A DECLARATION IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT AND BEEN DEPOSED TWICE IN THIS CASE; CORRECT?

A.    CORRECT.

Q.    OKAY.  AND IF I SAY COMENITY, WILL YOU UNDERSTAND THAT I MEAN DEFENDANT COMENITY CAPITAL BANK?

A.    YES.

Q.    HAVE YOU EVER TESTIFIED IN A TRIAL BEFORE?

A.    NO.

Q.    IN FACT, THE DEPOSITION IN THIS CASE WAS THE FIRST TIME THAT YOU HAD BEEN DEPOSED; IS THAT CORRECT?

A.    YES.

Q.    OKAY.  WELL, THIS IS MY FIRST FEDERAL TRIAL.  THIS IS MY FIRST JURY TRIAL.  SO LET ME BE THE ONE WHO IS NERVOUS BETWEEN US.  AND, YOU KNOW, IT'S OKAY.

A.    I THINK WE CAN SHARE THAT.

Q.    TRULY, ON BEHALF OF COMENITY, YOU KNOW, OUR FIRM, OPPOSING COUNSEL, THE COURT, THE JURY, WE APPRECIATE YOUR TIME.  WE KNOW YOU HAVE WORK RESPONSIBILITIES AND FAMILY OBLIGATIONS THAT YOU'RE AWAY FROM, SO THANK YOU FOR THAT.

      HOW LONG HAVE YOU WORKED FOR COMENITY?

A.    EIGHTEEN YEARS.

Q.   OKAY.  AND WHAT IS YOUR TITLE AT COMENITY CURRENTLY?

A.   OPERATIONS MANAGER FOR FRAUD.

Q.   OKAY.  AND WHAT IS AN OPERATIONS MANAGER FOR FRAUD?

A.   I OVERSEE FRAUD OPERATIONS.  SO CURRENTLY I MANAGE PEOPLE, I OVERSEE THE POLICIES AND PROCEDURES, I SPECIFICALLY SUPPORT CASE INVESTIGATIONS RECOVERY AND AVOIDANCE.

Q.   AND HOW LONG HAVE YOU BEEN IN THIS POSITION?

A.   I'VE BEEN AN OPERATIONS MANAGER SINCE 2022.

Q.   OKAY.  AND PRIOR TO BEING AN OPERATIONS MANAGER, WHAT WAS YOUR POSITION WITH COMENITY?

A.   DEPARTMENT MANAGER ALSO IN FRAUD.

Q.   OKAY.  AND HOW LONG WERE YOU A DEPARTMENT MANAGER?

A.   2015 TO 2022.

Q.   OKAY.  SO YOU'VE BEEN IN FRAUD SINCE 2015; IS THAT CORRECT?

A.   YES.

Q.   OKAY. AND YOU SAID --

A.   I LIED.  I'M SORRY.  2018.

Q.   2018.  AND YOU SAY YOU'VE BEEN WITH COMENITY 18 YEARS?

A.   YES.

Q.   AND WHAT WERE YOUR PRIOR RESPONSIBILITIES FROM 2018 TO PRIOR?

A.   I STARTED WAY BACK IN 2007 IN CUSTOMER CARE.  I HAD VARIOUS ROLES WITHIN CUSTOMER SERVICING.  I ACTUALLY STARTED IN NEW ACCOUNTS PROCESSING.  I WAS A SUPERVISOR, SENIOR SUPERVISOR

FORD DIRECT BY MR. SEARLES

IN CUSTOMER CARE FOR ABOUT TEN YEARS, AND THEN MOVED INTO ACCOUNT PROTECTION, OR FRAUD, IN 2018.

Q.   OKAY.  AND WHEN YOU SAY CUSTOMER CARE, WHAT KIND OF RESPONSIBILITIES WOULD YOU HAVE IN CUSTOMER CARE?

A.   ACCOUNT SERVICING.  LIKE I MENTIONED, I STARTING IN NEW ACCOUNTS, SO I INITIALLY STARTED HELPING ACQUIRE ACCOUNTS; AND THEN MOVED INTO VARIOUS SUPPORT ROLES IN SERVICING, SO SPEAKING TO CUSTOMERS, SUPPORTING ASSOCIATES THAT SPOKE TO CUSTOMERS.

Q.   AND WHEN YOU SAY YOU SPOKE TO CUSTOMERS, I MEAN, OBVIOUSLY I DON'T EXPECT YOU TO SHARE THE DETAILS OF THOSE CONVERSATIONS FROM 7 TO 18 YEARS AGO, BUT WHAT KIND OF INTERACTIONS WOULD YOU HAVE WITH CUSTOMERS THEN?

A.   IT WAS REALLY ACCOUNT SERVICING QUESTIONS.  SO, YOU KNOW, CALLING FOR ADDRESS CHANGE.  ANYTHING YOU WOULD CALL YOUR CREDIT CARD COMPANY FOR:  ADDRESS CHANGES, FEES, PAYMENTS, CARD REQUESTS, REPLACEMENT, JUST ANYTHING, NORMAL SERVICING.

Q.   OKAY. AND WITH YOUR CURRENT POSITION AS AN OPERATIONS MANAGER, WHAT IS KIND OF A DAY IN THE LIFE OF SIERRA FORD?

A.   I MANAGE PEOPLE, SO I HAVE DIRECT REPORTS.  I SUPPORT THE SUPERVISORS THAT HELP THE ASSOCIATES.

MY PRIMARY RESPONSIBILITY AGAIN IS CASE INVESTIGATIONS. SO I MANAGE A TEAM OF ASSOCIATES THAT INVESTIGATE CASES, AND WE WORK TO AVOID AND RECOVER LOSSES.

Q.   OKAY.  AND I THINK WE'VE, WE'VE -- YOU'VE DISCUSSED YOU'RE A MANAGER IN ACCOUNT PROTECTION.  WHAT IS ACCOUNT PROTECTION?

A.   ACCOUNT PROTECTION IS A FANCY WORD FOR FRAUD OPERATIONS. WE HOLISTICALLY AS A DEPARTMENT ARE WORKING REALLY HARD TO TRY TO MITIGATE FRAUD, SO TRY TO AVOID FRAUD HAPPENING TO A CONSUMER.  SOMETIMES IT HAPPENS.  IT HAPPENS FREQUENTLY.

SO MY RESPONSIBILITY IS ONCE THE FRAUD OCCURS, WE INVESTIGATE TO TRY TO DETERMINE IF IT WAS TRULY FRAUD OR NOT FRAUD, AND THEN TRY TO SEE IF WE CAN AVOID OR RECOVER THE LOSS.

Q.   OKAY.  AND ARE YOU AWARE THAT THE ACCOUNT PROTECTION INVESTIGATORS IN THIS MATTER, THEY WERE LOCATED IN BANGALORE, INDIA?

A.   YES.

Q.   AND IF I SAY BANGALORE OR INDIA, DO YOU UNDERSTAND THAT I MEAN THE SAME?

A.   I DO.

Q.   OKAY.  AND THIS ACCOUNT PROTECTION TEAM IN INDIA, IS THAT THE ENTIRE ACCOUNT PROTECTION TEAM FOR COMENITY?

A.   NO.  WE ALSO HAVE ASSOCIATES IN THE U.S. AS WELL.

Q.   OKAY.  AND SO WHAT'S THE -- THERE'S SOME WORK DONE IN INDIA AND THEN SOME IS DONE IN THE UNITED STATES.  CAN YOU DESCRIBE THE DIFFERENTIATION OF THEIR RESPONSIBILITIES?

A.   THE RESPONSIBILITIES ARE VERY SIMILAR BETWEEN THE TWO GROUPS.  I THINK THE REASON WE HAVE SOME IN INDIA AND SOME IN THE U.S. IS JUST BECAUSE OF WORKING HOURS.

SO, WE HAVE, YOU KNOW, ASSOCIATES IN THE UNITED STATES THAT ARE WORKING DAYTIME, REGULAR HOURS.  AND THEN WE ALSO HAVE

THE EFFICIENCY OF HAVING THE BANGALORE TEAM WORKING OVERNIGHT DURING THE HOURS THAT I'M SLEEPING SO.

Q.   OKAY.  AND WHEN YOU SAY THE ASSOCIATES IN INDIA ARE WORKING OVERNIGHT, DO YOU MEAN THAT THEY WORK 24 HOURS STRAIGHT OR DO YOU MEAN THEY'RE WORKING THE U.S. OVERNIGHT, WHICH IS THE INDIA DAYTIME?

A.   LIKE OPPOSITE SHIFTS.  SO WE HAVE OUR ASSOCIATES WORKING U.S. HOURS, AND THEN WE HAVE OUR INDIA ASSOCIATES WORKING OVERNIGHT U.S. HOURS.

Q.   OKAY.  THANK YOU FOR THAT CLARIFICATION.  AND WHAT ARE SOME OF THE FUNCTIONS THAT ARE DONE IN THE INDIA OFFICE?

A.   THEY'RE PRIMARILY BACK OFFICE FUNCTIONS.  SO IT'S A BACK OFFICE ROLE.  IT'S NOT CUSTOMER FACING, WHICH IS PART OF THE REASON WHY WE HAVE IT IN INDIA.  BECAUSE IT'S BACK OFFICE, IT DOESN'T REQUIRE ANY INTERACTION WITH THE CONSUMER OR ANY PHONE CALLS.  SO IT'S PRIMARILY JUST BACK OFFICE WORK.

Q.   OKAY.  AND HOW LONG HAS COMENITY HAD ITS OPERATIONS IN INDIA?

A.   I CAN'T SAY HOW LONG WE HAD BANGALORE ASSOCIATES IN INDIA. I CAN SAY THAT ACCOUNT PROTECTION STARTED WORKING WITH INDIA, OUR BANGALORE OFFICE IN 2022.

Q.   OKAY.  AND THANK YOU FOR CLARIFYING, YES.  JUST LIMITED TO THE ACCOUNT PROTECTION TEAM?

A.   YES, 2022.

Q.   OKAY.  AND YOU WERE INVOLVED WITH MANAGEMENT OF ACCOUNT

PROTECTION IN 2022 IF I REMEMBER YOUR TIMELINE OF YOUR POSITIONS; IS THAT CORRECT?

A.   YES.

Q.   AND HOW WERE YOU INVOLVED WITH THE EXPANSION OF ACCOUNT PROTECTION TO THE BANGALORE OFFICE IN 2022?

A.   WHEN I CAME TO ACCOUNT PROTECTION IN 2018, WE ACTUALLY USED A THIRD PARTY CONTRACTOR TO DO A LOT OF OUR BACK OFFICE WORK.  AND IN 2022 WE MOVED IT IN-HOUSE TO A -- TO OUR BANGALORE ASSOCIATES BECAUSE THEY'RE ACTUAL COMENITY EMPLOYEES. SO I PARTICIPATED IN THE TRAINING AND ONBOARDING TO GET THEM SET UP FOR THIS PROCESS.

Q.   OKAY.  AND WHEN YOU SAY THIRD PARTY CONTRACTOR, YOU MEAN AN ENTITY THAT WAS A COMPLETELY SEPARATE COMPANY FROM COMENITY THAT WAS USED PREVIOUSLY?

A.   CORRECT.

Q.   OKAY. AND YOU DESCRIBED ONBOARDING.  WHAT WAS THE ONBOARDING OR TRAINING PROCESS IN 2022 WHEN THE BANGALORE OFFICES WERE INITIATED?

A.   WE HAD TO GET A LITTLE CREATIVE BECAUSE OF THE TIME DIFFERENCES, SO WE USED ONE OF OUR U.S. TRAINERS THAT KIND OF FLEXED THEIR HOURS, AND THEY FLEXED THEIR HOURS A LITTLE SO WE COULD MEET IN THE MIDDLE.

     ONE OF OUR U.S. TRAINERS WORKED WITH THEM OVER TEAMS OR ZOOM, AND IT WAS A THREE TO FOUR WEEK, LIKE, NEW HIRE ONBOARDING TRAINING THAT MIRRORED THE SAME TRAINING AS OUR U.S.

INVESTIGATORS.

Q.   AND THE TRAINING THAT WAS DONE, WAS THAT -- WERE TRAINERS DONE IN PERSON?  WAS IT DONE VIRTUAL?  HOW WAS THE TRAINING ACTUALLY EXECUTED?

A.   SO OUR U.S. TRAINER WAS ON THE COMPUTER, I THINK TEAMS, AND THEN THERE WAS ALSO A BANGALORE TRAINER IN PERSON THAT ATTENDED THE TRAINING AS WELL WITH THE ASSOCIATES.  SO IT WAS A VIRTUAL TRAINING, BUT THEY HAD A TRAINING RESOURCE IN PERSON AS WELL.

Q.   OKAY.  AND THE TRAINING THAT WAS GIVEN TO THIS ONBOARDING TEAM, IS THAT THE SAME TRAINING THAT WOULD HAVE BEEN PROVIDED TO A U.S. BASED ACCOUNT PROTECTION TEAM THAT DID THE SAME FUNCTIONS?

A.   YES, IT WAS.

Q.   OKAY.

        THE COURT:  MR. SEARLES, WHEN YOU COME TO A NATURAL BREAKING POINT IN THE NEXT FIVE MINUTES OR SO.

        MR. SEARLES:  OKAY.  THANK YOU, YOUR HONOR.

Q.   AND IN YOUR TRAINING OF AND THE ONBOARDING OF THE NEW OPERATIONS, WHO WERE YOU TRAINING SPECIFICALLY?  WERE YOU TRAINING A SUPERVISOR?  A MANAGER?  THE ACTUAL INVESTIGATORS?  WHO WERE YOU TRAINING?

A.   SO IN THE TRAINING WE HAD A TRAINER, AND THEY WERE KIND OF TRAINING THE TRAINER, THE BANGALORE TRAINER, THAT WAS IN THE ROOM WITH THE ASSOCIATES.

THE SUPERVISORS, WHICH WE CALL THEM LEADS IN BANGALORE, WERE PRESENT, AND THE ASSOCIATES WERE PRESENT IN THE ONBOARDING TRAINING.

Q.   OKAY.  SO THE TRAINING THAT THE INVESTIGATORS OR THE ASSOCIATES WERE RECEIVING WAS DIRECT FROM THEIR U.S. COUNTERPARTS DURING THAT ONBOARDING?

A.   THAT'S CORRECT.

Q.   OKAY.  AND IN YOUR CURRENT FUNCTION, YOU MENTIONED HOW YOU MEET WITH SUPERVISORS.

ARE THOSE SUPERVISORS THEN MEETING WITH ANOTHER GROUP OF MANAGERS WHO DISTRIBUTE THEIR INFORMATION TO THE INVESTIGATORS OR WHAT'S THE LAYERING OR THE HIERARCHY OF THE MANAGERS?

A.   I MEET WITH THE BANGALORE LEADS WEEKLY MYSELF PERSONALLY. SO THE MANAGERS, UPPER LEAD LEADERSHIP IN BANGALORE, THEY SOMETIMES ATTEND THE MEETING, THEY OFTEN ATTEND THE MEETING, BUT I MEET WITH THE BANGALORE LEADS DIRECTLY MYSELF EVERY WEEK.

Q.   OKAY.  AND WHEN YOU SAY THE LEADS, ARE THE LEADS THEN IN CHARGE OF SUPERVISING THE INVESTIGATORS OR DO THEY HAVE ANOTHER LAYER OF MANAGEMENT BETWEEN THEM AND THE INVESTIGATORS?

A.   NO, THEY ARE DIRECTLY RESPONSIBLE FOR THE INVESTIGATORS.

Q.   OKAY.  SO IS IT ACCURATE TO SAY, MS. FORD, THAT YOU GIVE INFORMATION TO THE LEAD, THE LEAD GIVES IT TO THE INVESTIGATOR, AND THERE'S NO EXTRA STEP IN THAT PROCESS OF GIVING INFORMATION TO OUR INVESTIGATORS?

A.   THAT'S CORRECT.

Q.   THANK YOU.  YOUR INVESTIGATORS.  I APOLOGIZE.  I FEEL LIKE WE HAVE A GREAT PARTNERSHIP, AND I APPRECIATE THAT.

SO AFTER THE ONBOARDING, HOW DOES THE TRAINING CONTINUE?

A.   I MEAN, I DON'T KNOW ABOUT TRAINING, BUT THE COACHING AND DEVELOPMENT, THAT'S A CONTINUAL PART OF THE ROLE.  SO THEY GET THREE TO FOUR WEEKS OF NEW HIRE TRAINING.

THAT FOURTH WEEK WE CALL LIKE A NESTING PERIOD WHERE THEY ARE DOING THE JOBS, THEY HAVE TRAINING, SUPPORT REAL TIME ALL OF THE TIME.

AND THEN AFTER THAT IT'S JUST CONTINUAL COACHING AND DEVELOPMENT BASED ON QUALITY REVIEWS AND THINGS THAT ARE IDENTIFIED AS A PART OF THE ROLE.

Q.   OKAY.  AND WHAT IS INVOLVED IN YOUR QUALITY REVIEW?

A.   IT'S A SAMPLING OF THE WORK THAT IS PERFORMED BY THE INVESTIGATOR.  SO WE WILL ESSENTIALLY LOOK AT THE WORK THAT THEY PERFORMED, POKE HOLES IN IT, AND IF THERE ARE ANY OPPORTUNITIES OR TRAINING GAPS, THEN WE'LL HAVE A COACHING CONVERSATION WITH THE ASSOCIATE.

Q.   OKAY.  AND HOW OFTEN DO YOU MEET WITH THE LEADS?

A.   I MEET WITH THE LEADS WEEKLY.

Q.   OKAY.  AND YOU MEET WITH THEM -- I MEAN, I GUESS SOMEBODY HAS TO COMPROMISE ON THE HOURS, GIVEN THE TIMING; IS THAT CORRECT?  THEY'RE EITHER STAYING LATE OR YOU'RE STAYING LATE; IS THAT ACCURATE?

A.   WE HAVE A PRETTY GOOD RHYTHM SET UP.  EVERY TUESDAY

MORNING IT'S RIGHT AT THE END OF THEIR SHIFT AND RIGHT AT THE TOP OF MINE.

Q.   OKAY.

YOUR HONOR, IF YOU WANT TO TAKE A BREAK NOW, WE CAN DO IT NOW.

THE COURT:  ALL RIGHT.  SO I WANT TO MAKE SURE THAT THE SOUP DOES NOT GET TOO COLD FOR THE JURORS.  THANK YOU VERY MUCH, MR. SEARLES.

THANK YOU, MS. FORD.  YOU'RE EXCUSED FROM THE STAND NOW. WE'LL RECALL YOU WHEN WE COME BACK AND HEAR YOUR TESTIMONY AFTER LUNCH.

THANK YOU TO THE MEMBERS OF THE JURY.  SO WE WILL NOW TAKE A 45 MINUTE LUNCH BREAK.

(JURY OUT AT 12:21 P.M.)

THE COURT:  WHY DON'T YOU GO AHEAD.  THANK YOU VERY MUCH.

ANYTHING ELSE, COUNSEL?

MS. GIVENTAL:  WE A COPY OF THE STIPULATED FACTS THAT WE WERE GOING TO ENTER AS AN EXHIBIT.  I DON'T KNOW IF THE COURT WANTS A COPY.

THE CLERK:  THIS IS WITH THE STICKER ON THEM?

MS. GIVENTAL:  WE'LL PUT THE STICKER ON AND HAND THEM TO YOU.

THE COURT:  ANYTHING FURTHER?

MR. LOKER:  NOTHING FURTHER.

MR. NARITA:  NOTHING FURTHER.

THE COURT:  ALL RIGHT.  EVERYONE ENJOY THEIR LUNCH BREAK.  WE'RE NOW IN AN HOUR RECESS.

(LUNCH RECESS TAKEN AT 12:22 P.M.)

**AFTERNOON SESSION**

(JURY OUT AT 1:03 P.M.)

THE COURT:  YOU MAY BE SEATED.

BACK ON THE RECORD IN PANCHENKO VERSUS COMENITY CAPITAL BANK TRIAL.

COUNSEL ARE PRESENT, THE PARTIES ARE PRESENT.  WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

WE MIGHT HEAR BRIEF ARGUMENT.  IT'S MORE I HAD A COUPLE OF QUESTIONS IN REVIEWING THE RULE 50 MOTION OVER LUNCH, AND SO I JUST WANTED TO RAISE A COUPLE OF QUESTIONS WITH BOTH SIDES.

SHOULD MS. FORD -- LET'S GO AHEAD AND EXCUSE MS. FORD.

MR. NARITA:  SURE, WE'LL DO THAT.

THE COURT:  MS. FORD, IF YOU WILL WAIT OUTSIDE OF THE COURTROOM.

MR. NARITA:  YOU DON'T HAVE TO ASK MS. FORD.

THE COURT:  ALL RIGHT.  MR. NARITA, ARE YOU --

MR. NARITA:  MS. GIVENTAL WILL ADDRESS THE COURT.

THE COURT:  WONDERFUL.

GOOD AFTERNOON AGAIN, MS. GIVENTAL.

MS. GIVENTAL:  GOOD AFTERNOON.

THE COURT:  ALL RIGHT.  JUST A COUPLE OF QUESTIONS I HAD FOR EACH SIDE.  THIS IS MY VERY QUICK SKIM.  YOU KNOW HOW LONG OUR LUNCH HAS BEEN SO FAR.

SO A COUPLE OF QUESTIONS THAT HAVE COME UP.  LET ME START

WITH YOU, MS. GIVENTAL.

IN LOOKING AT THE FIRST ARGUMENT RAISED BY COMENITY, WHICH IS THAT THERE IS NO EVIDENCE OF ACTUAL DAMAGES RELATED TO DIRECT VERSUS INDIRECT, NO FOR -- STRIKE THAT.  THAT'S ON ME.

THERE HAVE BEEN NO ACTUAL DAMAGES SHOWN RESULTING FROM AN INDIRECT DISPUTE RATHER THAN A DIRECT DISPUTE IS THE ARGUMENT THAT COMENITY IS MAKING; CORRECT?

MS. GIVENTAL:  THAT IS CORRECT, YOUR HONOR.

THE COURT:  LET'S ASSUME THAT -- AND MY QUESTION IS UNDER THE STATUTE, IF THERE ARE NO ACTUAL DAMAGES, BUT THERE'S STILL A WILLFUL VIOLATION FOUND, CAN'T THE JURORS STILL AWARD STATUTORY DAMAGES AND/OR PUNITIVES?

MS. GIVENTAL:  NOT FOR A DIRECT DISPUTE INVESTIGATION.

THE COURT:  BUT IF THEY FIND THAT THERE WAS AN INDIRECT DISPUTE AND THE COURT THINKS THERE WAS, FOR PURPOSES OF A RULE 50 MOTION, SUFFICIENT SHOWING OF AN INDIRECT DISPUTE.

MS. GIVENTAL:  IF THERE'S AN INDIRECT DISPUTE AND THERE'S EVIDENCE SUFFICIENT TO SHOW THAT THERE WAS A FAILURE -- A WILLFUL FAILURE TO INVESTIGATE AN INDIRECT DISPUTE, BUT NO EVIDENCE OF DAMAGES --

THE COURT:  YES.

MS. GIVENTAL:  -- STATUTORY -- 100 TO 1,000.

THE COURT:  CORRECT.

MS. GIVENTAL:  YES.

THE COURT:  I JUST WANT TO MAKE SURE WE'RE ALL ON THE SAME PAGE ABOUT THE STATUTORY SCHEME.  THANK YOU.

MR. LOKER, ONE OF THE POINTS RAISED BY DEFENDANTS IN TERMS OF WALKING THROUGH THE ELEMENTS OF THE FCRA INDIRECT DISPUTE CLAIM WAS THAT PLAINTIFFS HAVE SHOWN NO EVIDENCE THAT -- LET ME TURN TO THAT PAGE -- THAT COMENITY IS A FURNISHER.

SO LET ME HEAR --

MR. LOKER:  OF COURSE, YOUR HONOR.  SORRY.  IN TERMS OF BEING A FURNISHER, THAT SIMPLY MEANS THAT THEY SUBMIT INFORMATION TO THE CREDIT BUREAUS.

WHAT COMENITY IS FOCUSSING ON IS REALLY A DIFFERENCE -- IS DIFFERENT THAN HOW THE STATUTE IS WRITTEN.  WHAT THEY'RE SAYING IS THAT WE HAVE NOT SUBMITTED INFORMATION WITH REGARD TO THIS PARTICULAR CONSUMER SINCE -- YOU KNOW, FOR A NUMBER OF YEARS.

BUT THE STATUTE DOESN'T HAVE THAT QUALIFICATION.  ALL IT SAYS IS THAT YOU ARE A FURNISHER.

IT'S SIMILAR -- I DON'T KNOW IF THIS ANALOGY IS HELPFUL -- TO THE FAIR DEBT COLLECTION PRACTICES ACT WHERE SOMEONE IS EITHER A DEBT COLLECTOR OR THEY ARE NOT.  IT DOESN'T LOOK BEYOND THAT.  IT LOOKS AT THE NATURE OF THEIR BUSINESS.

AND HERE THE NATURE OF COMENITY'S BUSINESS, IN PART AT LEAST, IS TO SUBMIT INFORMATION TO THE CREDIT BUREAU, WHICH IS IN ESSENCE, FOR THAT INITIAL PRONG, MAKES THEM A FURNISHER.

THE COURT:  SO I UNDERSTAND THAT THERE'S A TIME DISTINCTION IN TERMS OF WHICH PLAINTIFFS ARE DRAWING BETWEEN

WHAT DEFENDANT IS ARGUING VERSUS WHAT PLAINTIFF IS ARGUING FOR THE DEFINITION OF A FURNISHER AND WHAT THAT APPLICABLE TIME PERIOD WOULD NEED TO BE, IF AT ALL.

BUT IN TERMS OF ANY EVIDENCE BEING A FURNISHER AT ALL OR AN INFERENCE, WHICH IF THERE IS ANY EVIDENCE WHICH THE JURORS CAN DRAW AN INFERENCE FROM, HAS THERE BEEN ANY OF THAT?

MR. LOKER:  YES, YOUR HONOR, A COUPLE OF THINGS.  SO INITIALLY SIMPLY SEEING THE TRADELINE ON THE VARIOUS CREDIT REPORTS WILL GET THE JURY TO THE CONCLUSION THAT COMENITY IS A FURNISHER BECAUSE NO ONE IS SUBMITTING THAT INFORMATION ON BEHALF OF COMENITY.

BUT ALSO SOMETHING TO KEEP IN MIND DURING THE DISPUTE PROCESS, THE WAY THE TRADELINE WAS REPORTED DID CHANGE.  SO THAT HAS TO HAPPEN BY COMENITY SUBMITTING DIFFERENT INFORMATION TO THE CREDIT BUREAUS, BECAUSE INITIALLY IN MAY OF 2023 WHEN THE TRADELINE IS BEING DISPUTED, IT'S POSITIVE.

AS MR. PANCHENKO IS DISPUTING THE POSITIVE REPORTING OF THE TRADELINE AND IT GOES TO NEGATIVE, AND IT ALSO REFLECTS THE CHARGE OFF BALANCE.

THE COURT:  OKAY.

MR. LOKER:  SO THAT HAD TO BE FURNISHED BY COMENITY.

THE COURT:  OKAY.  SO BASED ON THAT INFERENCE?

MR. LOKER:  CORRECT, YOUR HONOR.

THE COURT:  AND THEN LET ME HEAR FROM MS. GIVENTAL REGARDING THIS ISSUE, LIKE THE TIMING DIFFERENCE, BECAUSE IT

DOES SEEM TO BE THAT PART OF THE ARGUMENT THAT COMENITY IS TRYING TO MAKE IS BASED ON THE TIMING OF THE INFORMATION PROVIDED THROUGH X TIME PERIOD VERSUS X TIME PERIOD.

AS TO THAT FIRST ELEMENT OF FURNISHER UNDER THE STATUTE, TELL ME ABOUT THE DEFINITION IN THE STATUTE THAT COMENITY IS TRYING TO DRAW.

MS. GIVENTAL:  I THINK THAT IT'S CLEAR -- SO, FIRST OF ALL, GOING BACK TO THE FDCPA.

THE COURT:  THAT'S THE FAIR DEBT COLLECTIONS ACT.

MS. GIVENTAL:  THE FAIR DEBT COLLECTIONS ACT.

I THINK THE SAME IS THERE, UNDER THE FCRA, YOU'RE NOT A FURNISHER AS TO A PARTICULAR CONSUMER IF YOU'RE NOT FURNISHING INFORMATION ABOUT THEM.

YOU MAY HAVE FURNISHED INFORMATION ABOUT SOMEONE ELSE, BUT YOU CAN'T VIOLATE A STATUTE AS A FURNISHER AS AGAINST A CONSUMER ABOUT WHOM YOU'VE NEVER FURNISHED ANY INFORMATION.

HERE, THERE WAS NO INFORMATION FURNISHED FOR YEARS AND YEARS AND YEARS, AND SO COMENITY WAS NOT A FURNISHER AT THE TIME OF THE ALLEGED FAILURES TO CONDUCT A REASONABLE INVESTIGATION, AND I DON'T THINK IT'S FAIR TO MAKE THE INFERENCE THAT JUST BECAUSE THERE WAS A CHANGE IN THE CREDIT REPORTING IN RESPONSE TO DISPUTES, THERE HAD TO HAVE BEEN FURNISHING.

COMENITY DIDN'T OWN THE DEBT AT THAT POINT.  IT'S BEEN YEARS AND YEARS SINCE THAT.

SO IT'S STILL ALL IN THE PAST.  I DON'T THINK THERE'S BEEN EVIDENCE DEMONSTRATING FURNISHING.

THE COURT:  OKAY.  WE ARE AT TIME, SO I JUST WANTED TO, AS I REVIEW THE PAPERS AND REVIEW THE RECORD, I JUST WANT TO MAKE SURE THAT I HEARD FROM THOSE TWO POINTS.

SO I THINK WE SHOULD BRING THE JURORS IN.  WE'RE RUNNING TIGHT ON TIME.  I THINK THE CURRENT ESTIMATE IS 6 HOURS AND 29 MINUTES, SO WE CAN REVISIT WHERE WE ARE AT AT THE BREAK.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  SO WHEN WE'RE READY -- I'M GOING TO STAND UP AND STRETCH, BUT I'M GOING TO STAY ON THE BENCH. SO YOU ALL MAY --

(JURY IN AT 1:14 P.M.)

THE COURT:  WE'RE BACK IN SESSION IN PANCHENKO VERSUS COMENITY CAPITAL BANK.

WE HAVE ALL SEVEN JURORS PRESENT, WE HAVE THE PARTIES PRESENT, AS WELL AS COUNSEL.

WE'LL CONTINUE WITH THE DEFENDANT'S EXAMINATION OF MS. FORD.

MR. SEARLES.

AND, MS. FORD, IF YOU WOULD LIKE TO REJOIN US AT THE WITNESS STAND.  YOU'RE STILL UNDER OATH OBVIOUSLY.

YOU MAY CONTINUE.

MR. SEARLES:  THANK YOU, YOUR HONOR.

Q.  WELCOME BACK, MS. FORD.

A.   THANK YOU.

Q.   WHEN WE CONCLUDED EARLIER, YOU TALKED ABOUT YOUR FUNCTION AS A MANAGER WITH ACCOUNT PROTECTION.

A.   YES.

Q.   WAS THERE ANYTHING FURTHER THAT I MIGHT HAVE CUT YOU OFF IN DESCRIBING YOUR POSITION?

A.   I DON'T THINK SO.

Q.   ALL RIGHT.  THANK YOU.

WHEN I SAY "ACCOUNT," WILL YOU UNDERSTAND THAT I MEAN THE VIRGIN AMERICA ACCOUNT OPENED BY COMENITY CAPITAL BANK IN MR. PANCHENKO'S NAME IN DECEMBER 2015?

A.   YES.

Q.   AND ARE YOU FAMILIAR WITH THE ACDV'S IN THIS MATTER?

A.   YES.

Q.   AND WHAT WERE THE ACDV'S IN THIS MATTER?

A.   THERE WERE SEVERAL ACDV'S, I BELIEVE, IF THAT'S WHAT YOU MEAN.

Q.   OKAY.  AND WERE ANY OF THE ACDV A 001 -- NO PROBLEM.  I APOLOGIZE, MADAM REPORTER.

WERE THERE ANY ACDV 001 DISPUTE CODES RECEIVED BY COMENITY?

A.   YES, THERE WAS ONE.

Q.   AND THAT'S IN REGARDS TO THE ACCOUNT?

A.   YES.

Q.   OKAY.  AND WERE THERE ANY DISPUTE CODE 103 ACDV RECEIVED

BY COMENITY?

A.   YES.   THERE WERE, I BELIEVE, EIGHT OF THEM TOTAL.

Q.   OKAY.  AND CAN YOU BRIEFLY DISCUSS WHAT A DISPUTE CODE 001 MEANS?

A.   THE GENERAL LANGUAGE LISTED ON THE ACDV FOR 001 IS JUST NOT MINE, AND IT'S WORKED BY OUR CREDIT REPORTING TEAM JUST TO VALIDATE THE INFORMATION THAT IS BEING REPORTED TO THE CREDIT REPORT AT THE TIME.

Q.   OKAY.  AND IF SOMEONE WORKING A 001 WERE TO RECEIVE FCRA RELEVANT INFORMATION, HOW WOULD THEY PROCESS THAT?

A.   WHAT FCRA RELEVANT INFORMATION WOULD IT SAY?  I THINK IT DEPENDS ON WHAT IT SAYS ON THAT LINE.

Q.   OKAY.  FAIR ENOUGH.

AND IF A REPRESENTATIVE WHO WAS WORKING A DISPUTE CODE 001 RECEIVED AN ACDV WITH IMAGES ATTACHED, HOW WOULD THAT IMPACT THEIR REVIEW?

A.   YEAH, SO THE 001 IS WORKED AS A VALIDATION OF THAT CLAIM. IF IT SPECIFICALLY HAD ANY FRAUD LANGUAGE OR FRAUD ATTACHMENTS IN THE FCRA RELEVANT INFORMATION OR IN THE IMAGES, IT WOULD BE FORWARDED TO MY TEAM, THE ACCOUNT PROTECTION TEAM, FOR REVIEW.

Q.   OKAY.  SO SOMEONE WHO IS WORKING A 001, THEIR SPECIALTY IS NOT IN ACCOUNT PROTECTION?

A.   THAT'S CORRECT, NO.  THEY ARE JUST VALIDATING CREDIT REPORTING AT THAT POINT.

Q.   OKAY.  AND YOU SAID THAT'S IF THEY RECEIVED ANYTHING

THAT'S RELATED TO FRAUD, IDENTITY THEFT, POLICE REPORT; IS THAT CORRECT?

A.   CORRECT.

Q.   OKAY.  AND CAN YOU JUST WALK ME THROUGH WHAT A DISPUTE CODE 103 MEANS?

A.   YES.  IT IS AN IDENTITY THEFT CLAIM.  ACCOUNT PROTECTION WORKS ONLY TWO SPECIFIC TYPES OF DISPUTE CODES FOR ACDV'S, AND SO 103 IS AN IDENTITY THEFT CLAIM OR WHERE SOMEONE IS CLAIMING THAT THE ACCOUNT WAS OPEN FRAUDULENTLY.

Q.   OKAY.  AND HOW IS A DISPUTE CODE 103 ACDV HANDLED?

A.   WHAT DO YOU MEAN?  I'M SORRY.

Q.   THAT'S FAIR.  IF YOU DON'T UNDERSTAND A QUESTION, I APPRECIATE YOU ASKING.

     WHEN I SAY "HANDLED," WHAT IS THE WORK FLOW OF A DISPUTE CODE 103 THAT COMENITY RECEIVES?

A.   I SEE.  IF WE GET A DISPUTE CODE 103 CLAIMING IDENTITY THEFT, OUR JOB IS TO REVIEW ALL OF THE INFORMATION TO DETERMINE IF WE BELIEVE THE ACCOUNT WAS TRULY ESTABLISHED BY WAY OF IDENTITY THEFT.

     SO WE WOULD DO A FULL REVIEW OF THE ACDV, ANYTHING THAT WAS PROVIDED TO US, AND WE HAVE POLICIES AND PROCEDURES IN PLACE TO PERFORM A THOROUGH INVESTIGATION AND THEN RESPOND DIRECTLY BACK TO THE CREDIT BUREAU ON IF WE BELIEVE FRAUD DID OR DID NOT OCCUR.

Q.   OKAY.  AND WHAT TOOLS DO YOU HAVE AVAILABLE TO DO THIS

DISPUTE CODE 103 REVIEW?

A.   MANY.  I CAN LIST THEM FOR YOU IF YOU WOULD LIKE.

Q.   YES, PLEASE.

A.   SO WE USE AN APPLICATION CALLED E-OSCAR TO RECEIVE THE ACTUAL CREDIT BUREAU DISPUTE; WE USE OUR OWN APPLICATION, VCARS, WHICH IS OUR SYSTEM OF RECORD; WE USE SEVERAL THIRD PARTY SERVICES THAT WE PAY FOR TO VALIDATE INFORMATION RECEIVED -- I'M SORRY, TO VALIDATE INFORMATION AND TO COMPARE WHAT WE HAVE TO WHAT WE BELIEVE TO BE CONSUMER'S INFORMATION.

     SO THAT'S HIGH LEVEL.  I'M SURE YOU'LL ASK ME MORE QUESTIONS.

Q.   OKAY.  AND YOU JUST MENTIONED THIRD PARTY.  WHAT ARE THE THIRD PARTY TOOLS YOU USE?

A.   THE TWO BIG ONES ARE ACCURINT.

Q.   CAN YOU SPELL ACCURINT FOR US?

A.   IT'S A-C-C-U-R-I-N-T.

Q.   THANK YOU.

A.   AND A SECOND PRODUCT CALLED EKATA.  IT'S E-K-A-T-A.

Q.   OKAY.  AND WHAT INFORMATION ARE YOU ABLE TO OBTAIN FROM ACCURINT AND EKATA?

A.   SO WE USE THESE TWO RESOURCES TO SEARCH FOR CONSUMER INFORMATION.  SO I CAN PUT IN MY NAME, MY DATE OF BIRTH, MY SOCIAL SECURITY NUMBER, ADDRESSES, EMAIL ADDRESS, PHONE NUMBERS, AND ACCURINT OR EKATA WILL RETURN TO ME INFORMATION ABOUT ANY OF THAT SEARCH CRITERIA.

Q.   OKAY.  AND I BELIEVE YOU SAID THAT THOSE ARE -- YOU SAID THERE ARE SOME PAID SERVICES.  ARE THESE PAID SERVICES, OR ARE THESE A FREE SERVICE?

A.   THEY ARE NOT FREE.  WE PAY FOR EVERY SEARCH FOR ACCURINT AND EKATA.

Q.   THANK YOU.

AND IN THIS MATTER IN PARTICULAR, HAVE YOU REVIEWED THE POLICIES AND PROCEDURES OF COMENITY WITH RESPECT TO DISPUTE CODE 103?

A.   YES.

Q.   OKAY.  AND THAT WOULD BE THE DISPUTE CODE PROCEDURES THAT WERE IN EFFECT FROM MAY OF 2023 UNTIL AUGUST OF 2023?

A.   YES.

Q.   OKAY.  AND WERE THOSE POLICIES AND PROCEDURES THE SAME THROUGHOUT OR WERE THERE ANY REVISIONS?

A.   THERE WERE REVISIONS.

Q.   OKAY.  MS. FORD, I'D LIKE FOR YOU TO REVIEW EXHIBIT 158 HERE.  LET ME GRAB A BINDER FOR YOU.

YOUR HONOR, MAY I APPROACH THE WITNESS WITH THE BINDER?

THE COURT:  YES, YOU MAY.

MR. SEARLES:  THANK YOU.

Q.   IF YOU CAN TURN TO EXHIBIT 158?

A.   I'M SORRY.  IT'S A LITTLE THICK BINDER.

Q.   TAKE YOUR TIME.

A.   OKAY.

FORD DIRECT BY MR. SEARLES

Q.   ARE YOU FAMILIAR WITH THIS DOCUMENT?

A.   I'M SORRY.  I WANT TO MAKE SURE I'M ON THE CORRECT DOCUMENT.  ACCOUNT PROTECTION, INDIRECT CREDIT BUREAU DISPUTES OVERVIEW?  IS THAT THE RIGHT ONE?

Q.   IT IS.  AND WILL YOU JUST CONFIRM THE REVISED DATE IN YOUR EXHIBIT THERE?

A.   8-4-23.

Q.   THANK YOU.

     WHAT IS THIS DOCUMENT, AS YOU REVIEW IT?

A.   THIS IS AN OVERVIEW DOCUMENT THAT WE USE.  IT'S BASICALLY AN INTRODUCTORY DOCUMENT WORKING AN INDIRECT CREDIT BUREAU DISPUTE.

     AND BY "INDIRECT," JUST TO BE CLEAR, THAT MEANS THAT IT WAS DISPUTED WITH THE CREDIT BUREAU AND NOT DIRECTLY WITH US.

Q.   OKAY.  AND IS THIS DOCUMENT SOMETHING THAT YOU WOULD USE IN YOUR NORMAL COURSE OF WORK AS AN ACCOUNT PROTECTION MANAGER?

A.   YES.

Q.   AND ARE YOU ALSO INVOLVED IN THE REVIEW AND DRAFT OF A DOCUMENT SIMILAR TO, INCLUDING THIS DOCUMENT?

A.   YES.

Q.   OKAY.

     YOUR HONOR, AFTER CONFERRING WITH COUNSEL, I WOULD MOVE TO ADMIT, AS CONFIDENTIAL BUSINESS RECORD, EXHIBIT 158.

          MR. LOKER:  NO OBJECTION.

          MR. SEARLES:  I WOULD SAY IF WE NEED TO DISCUSS THE

CONFIDENTIALITY AND HOW THAT'S HANDLED, WE CAN DISCUSS THAT AFTER THE JURY IS EXCUSED.

THE COURT:  WELL, ALL RIGHT.  WE CAN DISCUSS THAT AFTERWARDS.

SO IT IS ADMITTED.  AND EXHIBIT NUMBER 123.

MR. SEARLES:  158.

THE COURT:  158.  AND COUNSEL IS ASKING IT TO BE --

MR. SEARLES:  -- MARKED AS CONFIDENTIAL AT THIS TIME.

THE COURT:  SO ARE YOU ASKING TO CLOSE ANY PART OF THE PROCEEDINGS?

MR. SEARLES:  NO, NOT PROCEEDINGS.  IT'S JUST FOR THE RECORD.

THE COURT:  OKAY.

(DEFENDANT'S EXHIBIT 158 WAS MARKED AS CONFIDENTIAL.)

THE COURT:  YOU MAY PROCEED.

MR. SEARLES:  THANK YOU, YOUR HONOR.

Q.   MS. FORD, IN YOUR REVIEW OF EXHIBIT 158, WHAT IS THIS DOCUMENT LAYING OUT TO YOU?

MS. HOVSEPYAN, WILL YOU SHARE -- OH, YOU HAVE.  THANK YOU.

A.   THIS IS AN OVERVIEW OF, AGAIN, THE INDIRECT CREDIT BUREAU DISPUTE PROCESS.  IT ACTUALLY SPECIFICALLY OUTLINES REQUIREMENTS AROUND THE FCRA, FAIR CREDIT REPORTING ACT.

AND THEN IT TALKS ABOUT SPECIFICALLY TWO DISPUTE CODES THAT ACCOUNT PROTECTION WOULD USE OR, I'M SORRY, THAT ACCOUNT

PROTECTION WOULD INVESTIGATE AND RESPOND TO, WHICH IS DISPUTE

CODE 103 AND 104.

Q.    OKAY.    THANK YOU AGAIN.

COUNSEL, IF THERE'S NO OBJECTION, I'D LIKE TO -- I

APOLOGIZE, MADAM REPORTER.

COUNSEL, IF THERE'S NO OBJECTION, I WOULD LIKE TO PRESENT

THE FOLLOWING CONFIDENTIAL POLICIES AND PROCEDURES AS EXCHANGED

LAST EVENING.

MR. LOKER:  OF COURSE.  WE HAVE NO OBJECTION TO

ANYTHING.  WE'RE HAPPY WITH IT ALL COMING IN.

THE COURT:  WHICH EXHIBIT?

MR. SEARLES:  I'M GOING TO GO IN ORDER NOW THIS

TIME.

THE COURT:  OKAY.

MR. SEARLES:  SO EXHIBIT 151, EXHIBIT 153,

EXHIBIT 155, EXHIBIT 156, EXHIBIT 157, EXHIBIT 159,

EXHIBIT 160, EXHIBIT 161, EXHIBIT 162, EXHIBIT 163,

EXHIBIT 164, EXHIBIT 165, EXHIBIT 166, EXHIBIT 167,

EXHIBIT 168, EXHIBIT 170, EXHIBIT 243, AND EXHIBIT 244.

THE COURT:  SO YOU ARE ASKING TO MOVE ALL OF THOSE

INTO EVIDENCE AT THIS TIME?

MR. SEARLES:  YES, YOUR HONOR.

THE COURT:  THOSE EXHIBITS WILL BE ACCEPTED AND

ADMITTED INTO EVIDENCE.

MR. SEARLES:  THANK YOU, YOUR HONOR.

(DEFENDANT'S EXHIBIT 151, 153, 155, 156, 157, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 170, 243, AND 244 WERE RECEIVED IN EVIDENCE.)

BY MR. SEARLES:

Q.   NOW, MS. FORD, IF YOU COULD NOW TURN TO EXHIBIT 157.

A.   YES.

Q.   CAN YOU PLEASE REVIEW THE EXHIBIT THAT'S 157 AND DESCRIBE TO ME WHAT I'M LOOKING AT HERE?

A.   SURE.  THIS IS THE ACCOUNT PROTECTION INDIRECT CREDIT BUREAU DISPUTES TABLE OF CONTENTS.

THE LAST ITEM WE LOOKED AT WAS JUST AN OVERVIEW.  THIS IS A MORE DETAILED TABLE OF CONTENTS FOR HOW THE ACCOUNT PROTECTION TEAM WOULD INVESTIGATE IN RESPONSE TO THE TWO DISPUTE CODES 103 AND 104 THAT WE'RE RESPONSIBLE FOR.

Q.   OKAY.  AND IN REGARDS TO THE ACCOUNT IN QUESTION TODAY, THAT WAS WITH DISPUTE CODE 103; IS THAT CORRECT?

A.   YES.

Q.   AND THIS TABLE OF CONTENTS IS APPLICABLE TO THE ACCOUNT'S ACDV'S THAT WERE IN QUESTION TODAY; CORRECT?

A.   YES, IT IS.

Q.   OKAY.  AND WHAT IS THE REVISION DATE ON EXHIBIT 157?

A.   MAY 4TH OF 2022.

Q.   OKAY.  THANK YOU.

AND NOW IF I COULD ASK YOU TO TURN YOUR ATTENTION TO EXHIBIT 160.

A.   YES.

Q.   AND COULD YOU PLEASE EXPLAIN, OR DESCRIBE THE DOCUMENT TO MYSELF AND THE JURY?

A.   SURE.   THIS IS A REFERENCE ARTICLE THAT TALKS ABOUT HOW TO ACCESS THE E-OSCAR PROGRAM, AND THE E-OSCAR IS THE APPLICATION THAT WE USE TO INTAKE CREDIT BUREAU DISPUTES FROM THE CREDIT BUREAU.

Q.   OKAY.   SO E-OSCAR, IS THAT A COMENITY TOOL PROCESS OR IS THAT A THIRD PARTY PROCESS?   PLEASE DESCRIBE E-OSCAR TO ME.

A.   IT'S NOT A COMENITY TOOL.   IT'S A PLATFORM USED BY MANY COMPANIES FOR CREDIT BUREAU DISPUTES SPECIFICALLY.

Q.   OKAY.   AND WHEN YOU'RE USING E-OSCAR, THE INFORMATION THAT YOU RECEIVED FROM E-OSCAR, IT'S ELECTRONIC?   IT'S NOT A CONVERSATION?   IT'S NOT A PHONE CALL?   IT'S A FORM IF I UNDERSTAND IT CORRECTLY.

A.   THAT'S CORRECT, IT'S AN ELECTRONIC FORM.   AND, AGAIN, IT'S RECEIVED INDIRECTLY FROM THE CREDIT BUREAU, NOT DIRECTLY FROM THE CONSUMER.

Q.   THANK YOU.

NOW IF I COULD TURN YOUR ATTENTION TO EXHIBIT 168.   AND I APOLOGIZE.   ALL OF THE ACDV'S THAT WERE RECEIVED IN THIS CASE WERE RECEIVED ALL THROUGH E-OSCAR; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   THANK YOU FOR THAT.   SORRY ABOUT THE INTERRUPTION.

AND THIS IS EXHIBIT 168?

A.   YES.  YES, I HAVE IT.

Q.   OKAY.  AND HAVE YOU REVIEWED EXHIBIT 168 BEFORE?

A.   YES, I HAVE.

Q.   AND WHAT IS EXHIBIT 168?

A.   THIS IS THE GENERAL RULES AND GUIDELINES FOR COMPLETING AN ACDV.  THIS IS USED BY BOTH THE ACCOUNT PROTECTION TEAM, AS WELL AS THE CREDIT REPORTING TEAM, FOR GENERAL GUIDELINES ON INVESTIGATING AND RESPONDING TO AN ACDV IN E-OSCAR.

Q.   OKAY.  AND IF I SEE ON THE FIRST PAGE IT'S MARKED AS COMENITY 490?

A.   YES.

Q.   AND THERE IS SOME DESCRIPTION ABOUT RETURN MAIL SCENARIOS?

A.   YES.

Q.   AND WHAT IS THAT REGARDING?

A.   THAT'S A SPECIAL HANDLING THAT THE CREDIT REPORTING TEAM WOULD LEVERAGE WHEN THERE'S A RETURN MAIL SCENARIO ON AN ACDV.

Q.   OKAY.  AND AT THE TOP OF 00491, THAT'S THE SECOND PAGE, I SEE THERE'S A REFERENCE TO 103.  CAN YOU EXPLAIN TO ME WHAT THIS PARAGRAPH IS ALLUDING TO?

A.   SURE.  LET ME READ IT.  ONE SECOND.  I'M SORRY.

YES, THIS IS A PARAGRAPH WITHIN THE GENERAL OVERVIEW REMINDING ASSOCIATES THAT WOULD BE LOOKING AT THIS THAT IF THERE WAS A DISPUTE CODE 103, A DISPUTE CODE 104, OR A FRAUD NOTIFICATION 104, THAT IT MUST BE FORWARDED TO THE FRAUD TEAM TO BE INVESTIGATED.

Q.   OKAY.  AND THE FRAUD TEAM IS THE ACCOUNT PROTECTION TEAM?

A.   YES, IT'S THE SAME.

Q.   SO THIS IS AS YOU WERE DESCRIBING THE 001 DISPUTE CODE AND HOW IT WOULD BE FORWARDED TO ACCOUNT PROTECTION?  IS THIS PART OF THAT FLOW?

A.   YES.  IF THE 001 DISPUTE CODE HAD ANY FCRA RELEVANT INFORMATION REFERENCING FRAUD OR ANY FRAUD ATTACHMENTS, IT WOULD BE SENT TO THE ACCOUNT PROTECTION TEAM FOR INVESTIGATION.

Q.   ALL RIGHT.  THANK YOU.

     MS. FORD, IF I COULD ASK THAT YOU TURN TO EXHIBIT 163.

A.   YES, I HAVE IT.

Q.   OKAY.  AND WHAT IS EXHIBIT 163?

A.   THIS IS OUR PROCEDURE FOR COMPLETING A FRAUD REPORT FOR BALANCES THAT EXCEED $75.

Q.   OKAY.  AND WHAT'S THE REVISION DATE ON THIS DOCUMENT?

A.   JUNE 6TH OF 2022.

Q.   OKAY.  AND WHAT IS THE SIGNIFICANCE OF $75?

A.   WE HAVE A POLICY WHERE, DEPENDING ON THE DOLLAR AMOUNT, HOW TO PROCEED.  SO IF IT'S OVER $75, WE WOULD MOVE FORWARD WITH A FORMAL FRAUD REPORT AND A FORMAL INVESTIGATION.

Q.   OKAY.  AND TO YOUR MEMORY, WAS THE BALANCE THAT WAS THE SUBJECT OF THIS INQUIRY MORE THAN $75?

A.   IT WAS.

Q.   THANK YOU.

     AND I WOULD TURN YOUR ATTENTION TO EXHIBIT 164.

FORD DIRECT BY MR. SEARLES

A.   YES, I HAVE IT.

Q.   AND CAN YOU JUST REVIEW THAT DOCUMENT, PLEASE?

A.   YES.  THIS IS ALSO THE COMPLETING OF FRAUD REPORT FOR BALANCES GREATER THAN $75 ARTICLE.

Q.   OKAY.  THANK YOU.

AND THE REVISION DATE ON THIS DOCUMENT?

A.   AUGUST 2ND OF 2023.

Q.   OKAY.  AND QUICKLY ON TO EXHIBIT 151.

A.   OKAY.  YES, I HAVE IT.

Q.   THIS -- GO AHEAD AND DESCRIBE THIS DOCUMENT, IF YOU WOULDN'T MIND, FOR THE JURY.

A.   SURE.  THIS IS ALSO THE COMPLETING OF FRAUD REPORT FOR BALANCES GREATER THAN $75.

THIS ARTICLE IS A PDF VERSION OF THAT ARTICLE, AND IT APPEARS IT WAS LAST MODIFIED AUGUST 11TH OF 2023.

Q.   OKAY.  AND JUST SIMPLY REVIEWING EXHIBIT 164 AND 151, THEY'RE ROUGHLY -- I APOLOGIZE.

THE REVISION DATE ON EXHIBIT 151, DO YOU HAVE THAT AVAILABLE TO YOU?  I BELIEVE IT'S ON THE SECOND PAGE.

A.   YES.  IT WAS AUGUST 11TH OF 2023.

Q.   OKAY.  AND SO, AGAIN, IF WE COMPARE EXHIBIT 164 AND 151, CAN YOU DESCRIBE THESE TWO DOCUMENTS AND HOW THEY MIGHT RELATE?

A.   YES.  SO THEY'RE THE SAME ARTICLE OVERALL.  164 WAS REVISED ON AUGUST 2ND OF 2023, AND 151 WAS REVISED ON AUGUST 11TH, 2023.

Q.   OKAY.  AND THE EXHIBIT FOR 151, IT APPEARS TO BE IN A DIFFERENT FORMAT.

DO YOU RECOGNIZE THAT?

A.   I DO.  I BELIEVE THIS TO BE A PDF VERSION OF OUR PROCEDURE.  YOU CAN PRINT IT OUT IN A NORMAL WORD DOCUMENT OR A PRETTY PDF LIKE THIS ONE.

Q.   ALL RIGHT.  NOW, TURNING YOUR ATTENTION TO EXHIBIT 243.

A.   WHAT NUMBER DID YOU TELL ME?  I'M SORRY.

Q.   I APOLOGIZE.  IT'S EXHIBIT 243.  I HAVE THE BINDER.

MAY I APPROACH, YOUR HONOR?

THE COURT:  YES, YOU MAY.

THE WITNESS:  IT TOOK ME A WHILE TO REALIZE IT WASN'T IN THERE.

I CAN SEE IT ON THE SCREEN.  I'M ALMOST THERE.

OKAY.  THANK YOU.

BY MR. SEARLES:

Q.   NO PROBLEM.  AND WHAT IS EXHIBIT 243?

A.   THIS IS ONE OF OUR PROCEDURES.  I BELIEVE IT'S OUR INDIRECT DISPUTE INVESTIGATION PROCEDURE.  IT'S MISSING THE TITLE AT THE TOP, BUT --

Q.   AND WHAT WOULD THE TITLE BE, DO YOU EXPECT?

A.   I THINK IT WOULD BE -- I AM SORRY.  THIS WOULD BE OUR COMPLETING YOUR REASONABLE INDIRECT (ACDV) INVESTIGATION.

Q.   I'M APOLOGIZE.  DID YOU SAY DIRECT OR INDIRECT INVESTIGATION?

A.   INDIRECT.

Q.   THANK YOU.

AND IF YOU COULD REVIEW THE BODY OF THIS DOCUMENT BEGINNING AT COMENITY 505, ON THE FIRST PAGE THERE'S A SECTION THAT STARTS WITH "THE FOLLOWING STEPS WILL BE COMPLETED BY THE ACCOUNT PROTECTION ASSOCIATE."

DO YOU SEE WHERE I READ THAT?

A.   YES, I SEE THAT.

Q.   OKAY.  CAN YOU PLEASE EXPLAIN TO US WHAT IS HAPPENING IN THIS DOCUMENT, OR WHAT IS THE ACTIONS?

A.   SO THIS IS OUR ARTICLE THAT IS GOING TO WALK AN ACCOUNT PROTECTION ASSOCIATE THROUGH HOW TO PERFORM A REASONABLE INVESTIGATION.

IT'S OUR PROCEDURE THAT IS GOING TO WALK AN ASSOCIATE THROUGH HOW TO PERFORM A REASONABLE INVESTIGATION.

SO THERE ARE STEPS LISTED HERE, A THROUGH I, THAT KIND OF OUTLINE KEY COMPONENTS OF THEIR INVESTIGATION REQUIREMENTS.

Q.   ARE THESE ALL OF THE STEPS THAT ARE TAKEN TO PERFORM THE REASONABLE CREDIT BUREAU INVESTIGATION OF AN INDIRECT DISPUTE?

A.   THIS IS A MAJORITY OF THEM.  I WOULDN'T SAY IT'S ALL OF THEM, BUT I WOULD THINK -- I WOULD CONFIDENTLY SAY THIS IS WHAT WE WOULD LEVERAGE, YES.

Q.   OKAY.  AND WHAT WOULD BE USED THAT'S NOT IN THIS WRITTEN POLICY?

A.   I DON'T SEE IT ON THIS POLICY, BUT YOU COULD DO A GOOGLE

SEARCH.  YOU COULD USE MAYBE SOCIAL MEDIAS.  I'M NOT SURE IF ANY OF THAT IS ACTUALLY CAPTURED IN HERE.

Q.   OKAY.  AND YOU SAID YOU COULD DO THESE THINGS.  WERE THESE THINGS THAT WERE TRAINED TO THE ACCOUNT PROTECTION INVESTIGATORS?

A.   YES, THEY ARE.

Q.   AND WHEN WERE THEY TRAINED TO PERFORM THOSE ACTIONS?

A.   WE DID THIS SPECIFIC GROUP OF INVESTIGATORS FOR BANGALORE, INDIA.

Q.   YES, PLEASE.

A.   WE ONBOARDED THEM IN JUNE OF 2022.

Q.   SO FROM THE BEGINNING OF JUNE OF 2022, THEY WOULD BE PERFORMING WHAT ADDITIONAL STEPS THAT AREN'T IN THIS POLICY?

A.   I MENTIONED THAT YOU MIGHT USE A GOOGLE SEARCH.  YOU COULD USE SOCIAL MEDIAS.  THIS IS A GENERAL OUTLINE OF THE INVESTIGATION REQUIREMENTS, BUT EVERYTHING MIGHT NOT BE CAPTURED IN HERE.

Q.   OKAY.  YOU SAID "COULD" VERSUS THEY'RE INSTRUCTED TO.  HOW IS THAT DIFFERENT?

A.   THE INVESTIGATORS HAVE KIND OF THESE GUIDELINES TO USE AS PART OF THEIR INVESTIGATION, AND YOU MAY NOT HAVE TO USE THEM ALL.  YOU MAY WANT TO, YOU KNOW, STRETCH OUTSIDE FROM SOME OF THESE THINGS DEPENDING ON HOW COMPLEX THE INVESTIGATION IS.

BUT IT'S JUST A GENERAL OUTLINE.  NONE OF -- NOT ALL OF THIS IS REQUIRED.

Q.   OKAY.  THANK YOU.

AND WHEN WAS THIS DOCUMENT LAST REVISED?

A.   ON THIS PAGE IT WAS MAY 19TH OF 2022.

Q.   OKAY.  THANK YOU.

AND IF I COULD HAVE YOU TURN YOUR ATTENTION TO EXHIBIT 244.

A.   YES, I HAVE IT.

Q.   WHAT IS EXHIBIT 244?

A.   IT IS THE SAME ARTICLE, I BELIEVE, COMPLETING YOUR REASONABLE AND INDIRECT (ACDV) DISPUTE INVESTIGATION.

Q.   OKAY.  AND WHAT IS THE REVISION DATE FOR THIS DOCUMENT?

A.   AUGUST 11TH, 2023.

Q.   IS THIS DOCUMENT A REVISION OF EXHIBIT 243?

A.   I BELIEVE SO, YES.  YES, IT IS.

Q.   IF YOU COULD REVIEW 243 AND 244 SIDE BY SIDE FOR A MOMENT?

A.   OKAY.

Q.   AND YOU DESCRIBED THE STEPS THAT WERE TAKEN IN EXHIBIT 243.  CAN YOU EXPRESS TO ME THOSE STEPS IN EXHIBIT 244 IN A SIMILAR MANNER?

A.   I'M SORRY.  ONE SECOND.

YOU CAN SEE THE -- I THINK IT'S 244.  IT'S GOT SOME ADDITIONAL INFORMATION ON HERE.  I MENTIONED BEFORE THAT ALL OF THE INVESTIGATION REQUIREMENTS DON'T APPEAR TO BE CALLED OUT IN 243.

I CAN SEE SOME ADDITIONS THAT WERE ADDED, IT LOOKS LIKE ON

AUGUST 11TH, 2023, TO THE INVESTIGATION PROCEDURES.

Q.   OKAY.  AND WHAT WERE THOSE ADDITIONS?

A.   LOOKING BACK AND FORTH TO CONFIRM.

Q.   YES.  PLEASE TAKE YOUR TIME.

A.   YEP.

I SEE COMMENTARY OF PULLING ARCHIVE NOTES THAT I DO NOT SEE ON THE FIRST ONE.

I ALSO SEE PULLING PAYMENTS.  IT IS REFERENCED IN THE ORIGINAL ARTICLE, BUT THERE'S SOME ADDITIONAL DETAIL REGARDING PULLING PAYMENTS IN THE SECOND ARTICLE.

I SEE LISTENING TO CALLS OR PULLING CALLS IN NICE, WHICH IS N-I-C-E, IF NEEDED.

I ALSO SEE SEARCHING DOCUWARE OR EASE FOR ANY IMAGES, WHICH IS NOT CALLED OUT IN THE FIRST ARTICLE.

AND ALSO USING THE GOOGLE AND SOCIAL MEDIA SITES THAT I CALLED OUT BEFORE APPEARS TO BE IN THE REVISED VERSION.

Q.   OKAY.  THANK YOU.

AGAIN, YOU SAID THE REVISION DATE FOR THIS WAS AUGUST 11TH, 2023; CORRECT?

A.   YES.

Q.   AND IF I COULD HAVE YOU TURN YOUR ATTENTION TO EXHIBIT 165.

IS THAT IN ANOTHER BINDER?

A.   IT'S IN THE FIRST ONE.  IT'S IN THE BACK.

Q.   OKAY.  THANK YOU.

A.    OKAY.  I HAVE IT, 165.

Q.    OKAY.  WHAT IS EXHIBIT 165?

A.    THIS IS COMPLETING AN ACDV DISPUTE CODE 103 WHEN THERE'S NO INDICATION OF FRAUD.

Q.    OKAY.  AND IF YOU COULD TALK ME THROUGH THE ORDER IN WHICH WE JUST REVIEWED EXHIBITS 243, 244 AND HOW THEY INTERPLAY WITH EXHIBIT 165.

A.    YEAH, YES.

SO THERE'S A COUPLE OF ARTICLES THAT WE HAVE ALREADY REVIEWED, OR PROCEDURES RATHER THAT WE ALREADY REVIEWED.  YOU HAVE ACCESSING THE E-OSCAR ARTICLE THAT TELLS YOU HOW TO GET INTO THE APPLICATION, AND THEN YOU HAVE YOUR REASONABLE INVESTIGATION PROCEDURES FOR ACDV CODE 103 AND 104.

THIS ARTICLE THAT WE'RE LOOKING AT NOW FOR THE ACDV DISPUTE CODE 103, NO INDICATION OF FRAUD, THIS PROCEDURE IS GOING TO BE UTILIZED ONCE YOU'VE ALREADY COMPLETED THE INVESTIGATION REQUIREMENTS THAT WERE ON THE PRIOR ARTICLES.

SO YOU CAN SEE THE VERY FIRST PARAGRAPH TELLS YOU, BEFORE YOU COMPLETE THESE STEPS, YOU'LL NEED TO PERFORM AN INVESTIGATION FIRST.

YOU WOULD THEN USE THIS ARTICLE IF YOUR INVESTIGATION OUTCOME IS THAT THERE WAS NO INDICATION OF FRAUD ACTIVITY.

Q.    I APOLOGIZE.  IF WE COULD LOOK BACK FOR A MOMENT AT EXHIBIT 244.

A.    YES.

Q.   AND AT THE TOP OF COMENITY 508, WHICH IS THE SECOND PAGE.

ARE YOU ABLE TO FIND THAT?

A.   YES.

Q.   YOU HAD MENTIONED PREVIOUSLY ACCURINT AND EKATA.  CAN YOU DESCRIBE HOW THEY'RE BEING USED AT THIS MOMENT WITH THIS POLICY AND PROCEDURE?

A.   YES.  SO WHEN WE GET THE ACDV DISPUTE FROM E-OSCAR, WE ARE PROVIDED INFORMATION FROM THE CREDIT BUREAU AND THE CONSUMER, AND THEN WE LEVERAGE THE INFORMATION PROVIDED TO US, AS WELL AS THE INFORMATION THAT WE HAVE IN OUR SYSTEM OF RECORD, AND WE SEARCH ACCURINT AND EKATA TO VALIDATE CONSUMER INFORMATION.

Q.   OKAY.  AND WHEN YOU SAY "LEVERAGE," HOW DO YOU MEAN LEVERAGE SOMETHING?

A.   WE WOULD SEARCH ACCURINT OR EKATA TO -- I WOULD PUT IN YOUR NAME, NATHAN SEARLES, AND IT WOULD PROVIDE ME DETAILS REGARDING WHO YOU ARE, WHERE YOU LIVE, PHONE NUMBERS, EMAIL ADDRESSES ASSOCIATED WITH YOU.

Q.   OKAY.  AND YOU STATED PREVIOUSLY THAT ACCURINT AND EKATA ARE AN OUTSIDE SERVICE?

A.   YES, THEY ARE A PAID SERVICE THAT WE USE TO VALIDATE CONSUMER INFORMATION.

Q.   OKAY.  THANK YOU.

AND BRIEFLY, WHEN YOU WERE FAMILIARIZING YOURSELF WITH THIS MATTER AND THIS ACCOUNT, DID YOU REVIEW ANY EASE DOCUMENTS THAT RELIED UPON ACCURINT?

A.   I REVIEWED MANY EASE DOCUMENTS FOR THIS, YES.

Q.   THANK YOU.

IF I COULD GET YOU TO TURN TO EXHIBIT 170.

A.   YES, I HAVE IT.

Q.   OKAY.  WHAT IS EXHIBIT 170?

A.   THIS IS WORKING ACDV IMAGES IN DOCUWARE.

Q.   OKAY.  SO WHAT DOES WORKING ACDV IMAGES IN DOCUWARE ENTAIL?

A.   SO EARLIER THERE WAS AN ARTICLE THAT WE TALKED ABOUT THAT MENTIONED IF THERE WERE FRAUD LANGUAGE OR FRAUD ATTACHMENTS, THAT THE INFORMATION WOULD BE FORWARDED TO ACCOUNT PROTECTION.

THIS PROCEDURE IS SPECIFICALLY WALKING AN ASSOCIATE THROUGH HOW TO ACCESS THOSE IMAGES IF THEY WERE FORWARDED TO ACCOUNT PROTECTION IN DOCUWARE.

AND DOCUWARE IS AN IMAGING APPLICATION THAT WE USE FOR ANY IMAGES THAT ARE SCANNED IN TO US.

Q.   AND DOCUWARE, IS THAT HOUSED LOCALLY WITH COMENITY OR IS THIS A SEPARATE ONLINE VENDOR?

A.   I KNOW WE DON'T OWN IT.  I BELIEVE WE PAY TO USE IT, BUT WE DO HAVE INTERNAL RESOURCES THAT SUPPORT IT.

Q.   OKAY.  AND WHEN YOU SAY "SUPPORT IT," DOES THAT MEAN THAT THE IMAGES ARE AVAILABLE TO COMENITY INSTANTLY, OR ARE THEY ARCHIVED ON AN OFFSITE?

A.   NO, THEY ARE ALWAYS AVAILABLE TO US.

Q.   OKAY.  THANK YOU.

IF I COULD GET YOUR ATTENTION TO EXHIBIT 159.

A.   YES, I HAVE IT.

Q.   OKAY.  AND WHAT IS EXHIBIT 159?

A.   THIS IS DOCUMENTING AN ACCOUNT IN VCARS WHEN RESPONDING TO AN ACDV.

VCARS IS OUR SYSTEM OF RECORD.  IT'S OUR SERVICING APPLICATION.

AND SO THIS IS WALKING THROUGH THE DOCUMENTATION REQUIREMENTS WHEN RESPONDING TO AN ACDV.

Q.   OKAY.  AND COULD YOU BRIEFLY DESCRIBE WHAT VCARS IS TO MYSELF AND THE JURY?

A.   YES.  SO VCARS IS OUR SERVICING APPLICATION.  IT'S OUR ENTIRE SYSTEM OF RECORD.

SO IF A CUSTOMER CALLS US AND THEY NEED SERVICING FOR THEIR ACCOUNT, WHETHER IT'S, YOU KNOW, AN ADDRESS CHANGE, A PAYMENT MADE, A CARD REISSUE, A FRAUD REPORT, ALL OF THAT IS DONE WITHIN THE VCARS APPLICATION.

Q.   AND VCARS, IS THAT SOMETHING THAT YOU CAN GO IN AND REVISE AFTER, OR IS IT A PERMANENT RECORD?

A.   IT'S A PERMANENT RECORD.  YOU CAN'T CHANGE IT.

Q.   WHEN WE WERE REVIEWING THESE POLICIES AND PROCEDURES, MS. FORD, WE DISCUSSED THE REVISION DATE.

CAN YOU DESCRIBE FOR ME THE REVISING OF THE POLICIES AND PROCEDURES FOR COMENITY?

A.   THIS SPECIFIC PROCEDURE OR IN GENERAL?

FORD DIRECT BY MR. SEARLES

Q.   IN GENERAL FIRST, PLEASE.

A.   SO WE FREQUENTLY REVISE OUR POLICIES AND PROCEDURES.  IT WOULD BE COULD BE SOMETHING SMALL, LIKE WE'VE IDENTIFIED, YOU KNOW, A SPELLING MISTAKE OR ERROR.

WE ALSO HAVE AN ANNUAL PROCEDURAL REVIEW PROCESS THAT IS REQUIRED.  BUT YOU WILL SEE FREQUENT CHANGES IN OUR ARTICLES BASED ON COACHING, TRAINING GAPS, THINGS THAT WE IDENTIFY MIGHT BE MISSING, WHICH IS WHY YOU'VE SEEN IN A COUPLE OF ARTICLES THAT THE REVISED DATE IS CONSISTENT.

Q.   OKAY.  AND WHAT IS THE PROCESS FOR A REVISION?  FOR EXAMPLE, IS IT A TEAM?  IS IT A SINGULAR INDIVIDUAL?  HOW DOES THE REVISION PROCESS TAKE PLACE?

A.   IT MIGHT ORIGINATE WITH A SINGLE INDIVIDUAL, BUT IT GOES THROUGH SEVERAL STEPS TO GET REVISED.  WE USE A KNOWLEDGE MANAGEMENT APPLICATION CALLED EDUCATION STATION.

SO IF I IDENTIFIED SOMETHING IN AN ARTICLE THAT I WANTED TO CHANGE, I WOULD DOCUMENT THAT USING CHANGES IN A WORD APPLICATION AND I WOULD HAVE TO PASS IT THROUGH COMPLIANCE, AND THEN WE WOULD PASS THAT THROUGH THE EDUCATION STATION PROGRAM TO GET PUBLISHED.

Q.   OKAY.  EARLIER YOU DESCRIBED THAT YOU WORKED WITH LEADS, WHO THEN WORK WITH THE INVESTIGATORS; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND WOULD AN ACCOUNT PROTECTION LEAD BE INVOLVED IN THE REVISION PROCESS?

A.   ABSOLUTELY.  IF THEY RECOMMENDED A CHANGE, THEY WOULD BE INVOLVED IF THEY IDENTIFIED A GAP.

Q.   OKAY.  HOW ABOUT AN INVESTIGATOR?  WOULD THEY POSSIBLY BE INVOLVED IN A CHANGE TO THE REVISION, OR REVISING A POLICY?

A.   THEY COULD BE.  THEY MIGHT TELL US SOMETHING IS MISSING OR SOMETHING NEEDS TO BE ADDED OR MAYBE THERE'S AN ERROR, AND IT WOULD COME TO LEADERSHIP.

BUT, YES, THEY COULD INITIATE A CHANGE.

Q.   OKAY.  AND WHAT ARE THE BARRIERS TO A CHANGE IN POLICY?

A.   WHAT DO YOU MEAN?

Q.   WELL, WHAT WOULD KEEP A POLICY FROM BEING REVISED?

A.   THERE AREN'T A TON OF THINGS THAT WOULD KEEP A POLICY FROM BEING REVISED UNLESS IT'S BAD INFO.  YOU COULD BE DENIED A CHANGE IF COMPLIANCE WERE TO SAY, YOU KNOW, THAT'S NOT ACCURATE.

BUT THERE'S NOT, THERE'S NOT MANY BARRIERS TO CHANGING A POLICY.

Q.   OKAY.  AND DOES COMPLIANCE ENCOURAGE REVISION OF DOCUMENTS?

A.   THEY ENCOURAGE IT AND THEY PARTICIPATE IN IT HEAVILY.  AND, AGAIN, IT'S REQUIRED TO REVIEW AND POTENTIALLY MODIFY AN ARTICLE AT LEAST ONCE A YEAR, IF NOT MORE FREQUENTLY.

Q.   OKAY.  THANK YOU.

AND IF I HEARD, YOU SAID ONCE A YEAR IT'S POLICY OF COMPLIANCE TO REVIEW EVERY POLICY ONCE PER YEAR FOR POSSIBLE

REVISION?

A.   AT MINIMUM, YES.

Q.   THANK YOU.

AND, MS. FORD, RETURNING TO DISPUTE CODE 103 AND THE REVIEWS THAT TAKE PLACE, WHAT ARE THE FACTORS THAT WOULD INDICATE AN ACCOUNT IS NOT SUBJECT TO FRAUD?

A.   SEVERAL FACTORS.  YOU'VE GOT TO LOOK AT THE ACCOUNT HOLISTICALLY.  WE LIKE TO REFER TO THINGS AS GREEN FLAG ACTIVITY AND RED FLAG ACTIVITY.

I THINK THE QUESTION WAS WHAT WOULD I CONSIDER GREEN FLAG ACTIVITY AS NOT AN INDICATOR OF FRAUD ACTIVITY.

Q.   CORRECT, GREEN FLAG I GUESS IS YOUR TERM.

A.   OKAY.  SO WE WOULD LOOK AT SEVERAL THINGS.  WE'RE GOING TO LOOK AT THE ACCOUNT HOLISTICALLY, HOW LONG THE ACCOUNT HAS BEEN OPENED, WHAT TYPE OF ACTIVITY HAS OCCURRED ON THE ACCOUNT, HAS THERE BEEN PAYMENT ACTIVITY, TRANSACTION ACTIVITY, WHERE IT OCCURRED, IF WE'VE RECEIVED RETURN MAIL, IF WE'VE RECEIVED RETURN PAYMENTS.

ALL OF THAT ACTIVITY THAT YOU WOULD, YOU KNOW, EXPECT IN A NORMAL PERFORMING ACCOUNT WOULD BE CONSIDERED GREEN FLAG.

Q.   OKAY.  AND YOU SAY "NORMAL PERFORMING ACCOUNT."  LET ME, I GUESS, ASK YOU, WHAT WOULD BE AN ABNORMAL OR NON-PERFORMING ACCOUNT?

A.   YES.  SO I THINK I COMPARE GREEN FLAG ACTIVITY OR NORMAL PERFORMING ACCOUNT TO AN ACCOUNT OF MY OWN.

SO I HAVE AN ACCOUNT OPEN, I'M MAKING PURCHASES TYPICALLY LOCAL TO ME, I AM MAKING CONSISTENT PAYMENT ACTIVITY, I CARE ABOUT MY CREDIT REPORTING, SO I'M MAKING SURE PAYMENTS ARE ON TIME.

ON THE CONTRARY, AN ACCOUNT THAT MAY BE PERFORMING LIKE A FRAUDULENT ACCOUNT, YOU WOULD SEE LACK OF PAYMENT HISTORY, OR IF PAYMENTS WERE MADE, YOU MIGHT SEE THEM RETURNING; YOU WOULD SEE MAIL ACTIVITY, SO WE'RE NOT ABLE TO DELIVER STATEMENTS TO A CONSUMER; YOU MIGHT SEE LARGE DOLLARS SPENT; YOU COULD SEE BUSTED OUT ACTIVITY, SO A FRAUDSTER IS TRYING TO ATTACK THE CREDIT LIMIT.  IF THERE IS MONEY AVAILABLE, THEY WANT TO GET IT.

SO THOSE ARE SOME RED FLAGS THAT WE WOULD CONSIDER FRAUDULENT BEHAVIOR.

Q.   YOU SAID "BUSTED OUT" AND "ATTACK THE CREDIT LIMIT."  WHAT DO YOU MEAN?  I'M NOT FAMILIAR WITH THOSE TERMS.

A.   SO IF YOU'RE A GOOD FRAUDSTER, YOUR INTENT IS TO TRY TO GET AS MUCH AS YOU CAN FROM AN ACCOUNT THAT YOU OPENED DUE TO IDENTITY THEFT.

SO BY BUST OUT, I MEAN QUICKLY TRYING TO MAKE LARGE DOLLAR PURCHASES THAT MIGHT MAX OUT THE CREDIT LIMIT OR EXCEED THE CREDIT LIMIT; HIGH DOLLAR PURCHASES, MEANING SPEND THAT YOU WOULD BE ABLE TO RESELL.

SO THOSE ARE RED FLAGS TO US.

Q.   AND YOU SAID "RETURNED PAYMENTS."  HOW WOULD A RETURNED

PAYMENT WORK FOR A RED FLAG FRAUD ACCOUNT?

A.    SO A COUPLE OF THINGS, RIGHT?  YOU MIGHT HAVE SOMEONE MAKING, YOU KNOW, SMALL PAYMENTS TO MAKE IT APPEAR LIKE IT'S A GOOD ACCOUNT, AND THEN THOSE PAYMENTS ARE ACTUALLY RETURNED LATER.  THEY'RE OFTEN PAID THROUGH A FRAUDULENT BANK ACCOUNT, AND SO WE DON'T ACTUALLY END UP COLLECTING OR CLEARING THOSE FUNDS.

YOU MIGHT ALSO SEE HIGH DOLLAR PAYMENTS OR EXCESSIVE PAYMENTS IN AN ATTEMPT TO -- CHECK KITE IS WHAT WE CALL IT WHEN THEY'RE TRYING TO ACCESS ADDITIONAL CREDIT LIMIT THAN WHAT IS AVAILABLE.

Q.    OKAY.  THAT LAST TERM, I THINK MADAM REPORTER AND I MIGHT NEED IT SPELLED.  DID YOU SAY CHECK KITE?

A.    CHECK KITE OR CHECK KITING.

Q.    OKAY.  AND HOW DOES THAT WORK?  LIKE IF YOU COULD GIVE ME AN EXAMPLE WITH NUMBERS?

A.    SURE.  SO A FRAUDSTER MIGHT HAVE A CREDIT LIMIT OF $15,000 AND THEY'RE MAKING PURCHASES AND THEY'RE, YOU KNOW, SPENDING A LOT OF MONEY ON THIS $15,000 CREDIT LIMIT.

THEY MAKE A LARGE PAYMENT FOR MAYBE $5,000.  WE GIVE THEM THAT $5,000 BACK TO SPEND, AND THEN THE $5,000 AFTER THEY SPEND IT THAT THEY PAID IS RETURNED TO US.

SO INSTEAD OF IT BEING A $15,000 BALANCE, IT'S NOW A $20,000 BALANCE AND WE'VE LOST ALL OF IT.

Q.    OKAY.  THANK YOU FOR THAT EXAMPLE.

IF I COULD HAVE YOU REVIEW EXHIBIT 035.  I THINK THIS MIGHT BE IN ANOTHER BINDER, SO JUST GIVE ME A MOMENT.

THE COURT:  MR. SEARLES, YOU MAY PRESENT IT.

MR. SEARLES:  THANK YOU, YOUR HONOR.

THANK YOU, YOUR HONOR.

Q.   MS. FORD, HAVE YOU BEEN ABLE TO LOCATE EXHIBIT 35?

A.   YES, I FOUND IT.

Q.   OKAY.  AND COULD YOU -- ARE YOU FAMILIAR WITH THIS DOCUMENT?

A.   YES.  THIS IS -- I'M SORRY, CAN YOU HEAR ME?

THIS IS OUR VCARS NOTES.

Q.   OKAY.  AND WHAT ARE VCARS NOTES?

A.   SO VCARS IS OUR SYSTEM OF RECORD AND THE NOTES THAT ARE MADE ON THE ACCOUNT.  WHETHER THEY'RE SYSTEMIC NOTES OR MANUAL NOTES BY AN INVESTIGATOR, THEY ARE ALL GOING TO BE HOUSED IN THE VCARS NOTES.

Q.   OKAY.  AND ARE VCARS NOTES MAINTAINED IN THE NORMAL COURSE OF COMENITY'S BUSINESS?  AND IN YOUR WORK AS A PROTECTION ACCOUNT MANAGER, ARE YOU FAMILIAR WITH THEM?

A.   YES.

Q.   OKAY.  AND, AGAIN, I BELIEVE WE DISCUSSED THIS EARLIER.  IS THE USER ABLE TO ALTER OR DELETE ENTIRES IN THE VCARS NOTES?

A.   NO, YOU CANNOT.

MR. SEARLES:  I WOULD MOVE TO HAVE EXHIBIT 35 ADMITTED.

THE COURT:  ADMITTED.

(DEFENDANT'S EXHIBIT 35 WAS RECEIVED IN EVIDENCE.)

MR. SEARLES:  THANK YOU.

Q.  MS. FORD, I WOULD ASK YOU TO TURN TO EXHIBIT 37.

A.  YES, I HAVE IT.

Q.  OKAY.  ARE YOU FAMILIAR WITH EXHIBIT 37?

A.  YES.  THIS IS THE NEW ACCOUNT ARCHIVE, OR SNAP, S-N-A-P, AS WE WOULD CALL IT.

Q.  OKAY.  AND JUST FOR THE RECORD, EXHIBIT 37 HAS ALREADY BEEN ADMITTED.

HOW IS -- HOW ARE YOU FAMILIAR WITH SNAP?  WHAT WOULD YOU SEE HERE THAT YOU COULD DESCRIBE TO THE JURY WHAT THIS DOCUMENT IS?

A.  I'M VERY FAMILIAR WITH SNAP.  I STARTED MY -- 18 YEARS AGO DOING NEW ACCOUNTS, SO THIS IS NEAR AND DEAR TO MY HEART.

BUT THIS IS THE APPLICATION ACQUISITION METHOD.  SO WHEN SOMEONE APPLIES FOR A NEW ACCOUNT, THIS IS THE APPLICATION.

Q.  OKAY.  I'D ASK YOU TO TURN YOUR ATTENTION TO EXHIBIT 39.

ARE YOU FAMILIAR WITH EXHIBIT 39?

A.  YES.

Q.  AND WHAT IS EXHIBIT 39?

A.  THIS APPEARS TO BE A BILLING STATEMENT.

Q.  A BILLING STATEMENT OR -- IS THERE A VOLUME?

A.  IT APPEARS TO BE SEVERAL BILLING STATEMENTS, MANY BILLING STATEMENTS.

Q.   OKAY.  AND ARE THESE BILLING STATEMENTS IN REGARDS TO MR. PANCHENKO'S ACCOUNT?

A.   YES.

Q.   OKAY.

IS THERE ANY OBJECTION TO ADMITTING EXHIBIT 39?

MR. LOKER:  IT'S ALREADY IN.

MR. SEARLES:  I APOLOGIZE.  I HADN'T HAD IT ADMITTED ON MY SIDE.

THANK YOU, YOUR HONOR.

THE COURT:  IT IS ADMITTED.

MR. SEARLES:  THANK YOU.

Q.   MS. FORD, IF YOU COULD GO BACK TO EXHIBIT 35, YOU DESCRIBED THEM AS THE VCARS NOTES?

A.   YES.

Q.   OKAY.  AND -- I APOLOGIZE.

WHEN YOU ARE ABLE TO REVIEW THE VCARS NOTES, ARE YOU ABLE TO SEE IF THERE ARE ENTRIES FOR ACDV OR EASE -- THAT'S E-A-S-E -- NOTES IN VCARS?

A.   YES.  YOU PROBABLY WILL NOT SEE AN EASE ENTRY HERE, BUT YOU WOULD SEE AN ACDV -- LIKE A ONE LINE ACDV RESPONSE WITHIN THE VCARS NOTES.

Q.   OKAY.  AND WHERE WOULD EASE NOTES BE HOUSED?

A.   EASE IS ITS OWN SEPARATE APPLICATION.  IT'S AN IMAGING SYSTEM, SO THEY WOULD BE HOUSED SEPARATELY.

BUT YOU WOULD BE ABLE TO CONNECT THE EASE NOTES TO THE

VCARS NOTES IN A COUPLE OF DIFFERENT WAYS.  PRIMARILY WE USE, LIKE, A CASE NUMBER OR A CONTROL NUMBER TO REFERENCE IT IN THE VCARS NOTES.

Q.   OKAY.  THANK YOU.

AND HAVE YOU REVIEWED ALL OF THE INDIRECT ACDV'S, EASE NOTES, AND DEPOSITION TRANSCRIPTS OF THE INVESTIGATORS WHO WORKED THE DISPUTES IN THIS MATTER?

A.   YES, I HAVE.

Q.   THE ACDV, EASE NOTES, AND DEPOSITION TRANSCRIPTS HAVE ALREADY BEEN RECEIVED BY THE JURY.  I HOPE WE CAN SAVE SOME TIME BY LUMPING THOSE TOGETHER IN THE DISCUSSION.

BUT, MS. FORD, FEEL FREE TO TAKE YOUR TIME.  YOU NEED TO HAVE CONFIDENCE IN YOUR TESTIMONY, AND YOUR TIME IS -- OR OUR TIME IS AVAILABLE TO YOU TO BE CERTAIN OF YOUR REVIEW.

WITH THAT SAID, THE PARTIES HAVE ALREADY STIPULATED TO ACDV'S MARKED AS EXHIBIT 6 THROUGH 14.

MS. FORD, ARE YOU FAMILIAR WITH EXHIBITS 6 THROUGH 14?

A.   ARE THEY IN THIS NOTEBOOK?

Q.   THEY SHOULD BE IN THE ONE BINDER THAT GOES 1 TO 54.

A.   LET ME CHECK.

I'M SORRY, I DON'T SEE 6.

MR. LOKER:  NATHAN, THAT WAS OUR WITNESS BINDER.  I DON'T THINK WE HAVE THE FULL TRIAL BINDER.

MR. SEARLES:  I APOLOGIZE, MS. FORD.  LET ME SEE IF WE CAN GATHER ONE FOR YOU.

MR. LOKER:  MAY I BRING THIS FORWARD?

MR. SEARLES:  NO PROBLEM.

THE COURT:  THANK YOU, MR. LOKER.

MR. LOKER:  (HANDING.)

MR. SEARLES:  THANK YOU.

MR. LOKER:  YOU'RE WELCOME.

THE WITNESS:  I HAVE NUMBER 6.

BY MR. SEARLES:

Q.   OKAY.  SO IN REVIEW OF EXHIBIT 6 THROUGH 14?

A.   YES, THESE APPEAR TO BE ACDV IMAGES.

Q.   OKAY.  AND ARE THESE THE ACDV IMAGES THAT YOU REVIEWED IN PREPARING FOR THIS CASE?

A.   YES, THEY ARE.

Q.   OKAY.  AND SIMILARLY, THE PARTIES HAVE STIPULATED TO THE EASE NOTES THAT WERE USED BY THE INVESTIGATORS IN REVIEW OF THE ACDV AND INDIRECT DISPUTES.

ARE YOU FAMILIAR WITH THOSE EASE NOTES?

A.   YES.

Q.   OKAY.  IF I COULD HAVE YOU TURN YOUR ATTENTION TO EXHIBITS 15 THROUGH 17.

A.   YES, I HAVE IT.

Q.   OKAY.  AND ARE THOSE EASE NOTES SOMETHING THAT YOU'RE FAMILIAR WITH IN YOUR INVESTIGATION OF THIS CASE?

A.   YES, VERY FAMILIAR.

Q.   AND I WOULD ASK YOU TO TURN YOUR ATTENTION TO EXHIBITS 19

TO 23.

A.   YES, THESE APPEAR TO ALSO BE EASE NOTES.

Q.   OKAY.  AND THESE ARE THE EASE NOTES THAT YOU REVIEWED AGAIN FOR THE ACDV'S THAT WERE RECEIVED BY COMENITY IN REGARDS TO THIS ACCOUNT?

A.   YES, THAT'S CORRECT.

Q.   OKAY.  WERE THERE ANY OTHER EASE DOCUMENTS IN THE ACCOUNT RECORDS OF COMENITY?

A.   ASIDE FROM THE ACDV?

Q.   CORRECT.

A.   I BELIEVE SO, YES.

Q.   OKAY.  IF I COULD HAVE YOU TURN YOUR ATTENTION TO EXHIBIT 18.

A.   YES, I HAVE IT.

Q.   AND DO YOU RECOGNIZE EXHIBIT 18?

A.   YES, I DO.

Q.   OKAY.  AND WHAT IS EXHIBIT 18?

A.   THESE ARE ALSO EASE NOTES RELATED TO AN INVESTIGATION THAT WAS PERFORMED.

Q.   OKAY.  AND YOU SAY "AN INVESTIGATION."  WAS IT NOT AN INVESTIGATION DONE PURSUANT TO THE ACDV'S?

A.   I BELIEVE THIS WAS -- I'D HAVE TO CHECK THE DATES TO BE SURE AND COMPARE TO THE VCARS NOTES, BUT I BELIEVE THIS MIGHT HAVE BEEN A SEPARATE INVESTIGATION.  I NEED TO CHECK THE DATES TO BE SURE.

Q.   OKAY.  AND WHAT WOULD ASSIST YOU IN CHECKING THE DATES?

A.   THE DATES THAT THIS WAS SAVED TO EASE COMPARED TO THE VCARS NOTES WOULD HELP ME.

Q.   OKAY.  SO IF YOU WERE TO REVIEW THE VCARS NOTES, I THINK YOU SAID THOSE WERE EXHIBIT 35, YOU WOULD BE ABLE TO FURTHER DESCRIBE EXHIBIT 18?

A.   YES.

Q.   OKAY.  AND I GUESS I WOULD ASK YOU TO TAKE YOUR ATTENTION TO EXHIBIT 35.

A.   OKAY.  THESE MIGHT BE NORMAL EASE NOTES AS WELL FOR AN ACDV.

Q.   OKAY.  THANK YOU.

A.   SORRY TO BE CONFUSING.

Q.   NO.  ALL RIGHT.

SO IF WE COULD TURN OUR ATTENTION TO WHAT WILL BE EXHIBIT 6 AND EXHIBIT 15.  THOSE WERE MARKED AND PREVIOUSLY ADMITTED AS THE ACDV THAT WAS PERFORMED BY POOJITHA KADARESH AND HER EASE NOTES.

CAN YOU TURN TO EXHIBITS 6 AND 15?

A.   YES.  YES, I HAVE THAT.

Q.   OKAY.  COULD YOU WALK THE JURY THROUGH WHAT MS. KADARESH'S REVIEW WOULD BE HERE PURSUANT TO THE ACCOUNT PROTECTION POLICIES AND PROCEDURES?

I APOLOGIZE.

A.   SO EXHIBIT 6 IS THE ACDV IMAGE.  SO THIS IS AN IMAGE OF

WHAT WE RECEIVED THROUGH E-OSCAR AND HOW WE RESPONDED TO THE DISPUTE IN E-OSCAR.

AND EXHIBIT 15, I THINK WAS THE NUMBER, IS A COPY OF ALL OF THE EASE NOTES THAT PERTAIN TO THE INVESTIGATION THAT WAS PERFORMED WITH THAT DISPUTE.

Q.   OKAY.  AND WE'VE ALREADY HAD MANY HOURS OF TESTIMONY FROM THE INVESTIGATORS.

CAN YOU PLEASE EXPLAIN A LITTLE BIT IN EXHIBIT 15 WHAT THE EASE NOTES REFLECT?

A.   YES.  SO I MENTIONED EARLIER, DURING YOUR REASONABLE INVESTIGATION, YOU'RE LOOKING FOR GREEN FLAG ACTIVITY OR RED FLAG ACTIVITY TO HELP DETERMINE IF IDENTITY THEFT OCCURRED.

SO WHAT THE INVESTIGATOR IS DOING HERE IS SHE'S LOOKING AT KEY COMPONENTS OF THE ACCOUNT TO DETERMINE IF SHE SEES ANY GREEN FLAG ACTIVITY OR RED FLAG ACTIVITY, AND SOME OF THE ITEMS I WOULD CALL OUT INCLUDE SCREENSHOTS ON THE EASE NOTES.

SO AT THE TOP, THESE ARE ALL SCREENSHOTS FROM VCARS.  THIS IS HIGHLIGHTING THE ACCOUNT OPEN DATE, WHICH ON THE SCREENSHOT WAS DECEMBER 21ST OF 2015, AND THAT THE ACCOUNT CLOSED ON JANUARY 4TH OF 2018.

YOU CAN ALSO SEE THE WRITE-OFF BALANCE TO THE RIGHT WHICH WAS OVER $5,000.

IN THE SECOND SCREENSHOT, WHICH IS ALSO VCARS, YOU CAN SEE THE PURCHASE AMOUNT END DATE, PAYMENT AMOUNT END DATE.

AND THEN THE THIRD SCREENSHOT IS OF OUR ACCOUNT CENTER

ENROLLMENT.  SO THIS IS SHOWING US THE EMAIL ADDRESS THAT WAS ASSOCIATED WITH THE ACCOUNT AND HOW WE RECEIVED THAT EMAIL ADDRESS, AND IF STATEMENTS WERE SUPPRESSED BY MAIL OR IF THEY WERE GOING TO THE EMAIL ADDRESS ON FILE.

Q.   OKAY.  THANK YOU.

AND IF I COULD HAVE YOU THEN TURN YOUR ATTENTION TO EXHIBIT 13 AND CORRESPONDING EXHIBIT 23.  SO WE'LL START WITH EXHIBIT 13.

A.   YES, THIS IS AN ACDV IMAGE AS WELL.

Q.   OKAY.  AND TO DRAW -- I GUESS IF WE COULD TAKE A MOMENT TO GO BACK TO EXHIBIT 6.

A.   OKAY.

Q.   AND ON THE FIRST PAGE IN THE THIRD BLUE BOX DOWN, IT SAYS, IMAGE INFORMATION.

DO YOU SEE THAT?

A.   YES, I DO.

Q.   AND THE NEXT ROW SAYS ASSOCIATED IMAGES.

DO YOU SEE THAT?

A.   I DO.

Q.   AND WHAT IS THE ENTRY AFTER ASSOCIATED IMAGES?

A.   IT SAYS NO.

Q.   OKAY.  AND WHAT DOES ASSOCIATED IMAGES, NO MEAN?

A.   THAT MEANS THERE WERE NO IMAGES ATTACHED TO THIS DISPUTE THAT WERE PROVIDED TO US BY THE CONSUMER OR THE CREDIT BUREAU.

Q.   OKAY.  I APOLOGIZE FOR GOING BACK.

SO NOW IF WE CAN RETURN TO EXHIBIT 13.

A.    OKAY.

Q.    AND I GUESS FIRST, EXHIBIT 6 AND EXHIBIT 13, THEY HAVE A DIFFERENT LOOK; IS THAT CORRECT?

A.    YES.

Q.    AND WHY IS THAT?

A.    THERE WAS AN E-OSCAR UPGRADE.  I CAN'T RECALL THE EXACT DATE, BUT THERE WAS A CHANGE TO THE E-OSCAR APPLICATION.  SO ALL OF THE INFORMATION IS STILL THE SAME, BUT THE VIEW OF IT LOOKS A LITTLE BIT DIFFERENT.

Q.    OKAY.  THANK YOU.

AND SO IF WE LOOK AT EXHIBIT 13 ON THE FIRST PAGE AT THE TOP RIGHT, I SEE A LINE THAT SAYS IMAGES.

DO YOU SEE THAT?

A.    YES, I SEE IT.

Q.    OKAY.  AND WHAT IS AFTER IT SAYS IMAGES COLON?

A.    1, MEANING THERE WAS ONE IMAGE PROVIDED ON THIS ONE.

Q.    AND YOU SAY AN IMAGE.  HOW WAS AN IMAGE PROVIDED TO THIS ACDV?

A.    IT WAS ATTACHED TO THE ACDV IN E-OSCAR.

Q.    HOW IS IT ATTACHED?  WAS IT PHYSICALLY?  WAS IT ELECTRONICALLY?  HOW WOULD AN IMAGE BE ATTACHED TO AN ACDV?

A.    YEAH.  IT WOULD HAVE BEEN ELECTRONICALLY PROVIDED BY THE CONSUMER OR THE CREDIT BUREAU AND ATTACHED TO THE ACDV WITHIN E-OSCAR.

Q.   OKAY.  AND HOW IS AN IMAGE PROCESSED WHEN AN ACDV IS RECEIVED IN THIS MANNER?

A.   FIRST, THE E-OSCAR APPLICATION REQUIRES THAT YOU OPEN THE IMAGE AND VIEW THE IMAGE BEFORE YOU CAN PROCEED.

BUT WE HAVE IT IN OUR PROCESSES THAT ANYTHING THAT IS PROVIDED TO US THAT COULD BE HELPFUL FOR THE DISPUTE SHOULD BE REVIEWED AS WELL.

Q.   OKAY.  AND WHEN YOU SAY "REVIEWED," DO YOU MEAN REVIEWED AND COPIED AND PASTED SOMEWHERE AND THEN MOVE ON?  DO YOU MEAN THE SUBSTANTIVE DETAIL?

A.   I MEAN REVIEWED -- IF IT WAS PROVIDED TO US AS PART OF THE DISPUTE, IT WOULD BE CONSIDERED PERTINENT INFORMATION AND WE SHOULD OPEN IT, REVIEW IT IN DETAIL, AND DETERMINE IF IT'S HELPFUL TO US TO DETERMINE IF FRAUD DID OR DID NOT OCCUR.

Q.   OKAY.  AND IF YOU WERE TO REVIEW AN IMAGE, AT WHAT STEP IN THE REVIEW OF THE ACDV FOR YOUR REASONABLE INVESTIGATION POLICY DOES REVIEWING AN IMAGE FALL?

A.   IT WOULD BE EARLY IN THE STEPS, PARTLY BECAUSE WE NEED TO SEE WHAT IS PROVIDED TO US IN THE IMAGES.  IF SOMETHING IS PROVIDED TO US IN THE IMAGES, WE NEED THAT TO HELP US DIRECT OUR INVESTIGATION.

Q.   OKAY.  AND IF YOU COULD TURN YOUR ATTENTION TO EXHIBIT 3.

A.   YES, I HAVE IT.

Q.   OKAY.  ARE YOU FAMILIAR WITH EXHIBIT 3?

A.   YES, I AM.

Q.   OKAY.  WHAT IS EXHIBIT 3?

A.   I BELIEVE THIS IS AN EXPORT OF THE IMAGES THAT WERE PROVIDED IN THE ACDV WE JUST LOOKED AT.

Q.   OKAY.  AND IS EXHIBIT 3 THE ENTIRETY OF THE IMAGE THAT YOU BELIEVE WAS ATTACHED TO THE ACDV?

A.   YES.

Q.   OKAY.  AND IF AN IMAGE WAS RECEIVED BY COMENITY AND ATTACHED TO AN ACDV, HOW IS IT SAVED?

A.   THE ASSOCIATE WOULD ACCESS IT WITHIN E-OSCAR, AND THEN WE WOULD EXPORT IT OUT OF E-OSCAR AND SAVE IT INTO OUR EASE APPLICATION.

Q.   AND THIS EXHIBIT THAT WE'RE LOOKING AT, EXHIBIT 3, DID IT COME FROM EASE?

A.   YES.

Q.   DOES COMENITY HAVE ANY OTHER VERSIONS OF EXHIBIT 3 IN ITS DOCUWARE SYSTEM?

A.   NOT THAT I'M AWARE OF.

Q.   DOES IT HAVE ANY OTHER FORM OF EXHIBIT 3 IN ITS EASE SYSTEM?

A.   I'M THINKING.  I KNOW WE RECEIVED THESE IMAGES VIA ACDV. I DO KNOW THAT THERE WAS SOME ADDITIONAL INFORMATION PROVIDED TO US SEPARATELY, BUT I BELIEVE THIS TO BE THE ONLY VERSION OF THIS THAT WE HAVE IN EASE.

Q.   OKAY.  THANK YOU.

AND IF WE COULD TURN YOUR ATTENTION TO EXHIBIT 23.

A.   OKAY.

Q.   ARE THESE THE EASE NOTES THAT GO ALONG WITH THE INVESTIGATION THAT WAS DONE IN REGARDS TO THE ACDV EXHIBIT 13?

A.   YES.

Q.   OKAY.  AND CAN YOU EXPLAIN THE BASIS FOR THE INVESTIGATOR'S DECISION IN EXHIBIT 23?

A.   I CAN EXPLAIN THE CLOSING NOTES THAT SHE LISTS OUT HERE, AND THEN I CAN KIND OF WALK YOU THROUGH SOME OF THE IMAGES THAT ARE SCREENSHOT ONTO THE DOCUMENT IF THAT'S WHAT YOU MEAN.

Q.   YES, PLEASE.

A.   OKAY.  SO THE CLOSING NOTES, AFTER WE PERFORM THE INVESTIGATION THAT WERE LEFT BY THE INVESTIGATOR, WERE THAT THE ADDRESS AND PHONE NUMBER VERIFIED TO AH, WHICH MEANS ACCOUNT HOLDER, ON ACCURINT; ACCOUNT HOLDER IS RECEIVING STATEMENTS TO THEIR ADDRESS; THE ACCOUNT WAS OPENED IN 2015, WITH THE LAST PURCHASE BEING IN 2018; PAYMENTS WERE ALSO MADE UNTIL 2018; PAYMENTS MADE AFTER PURCHASES; NO SIGNS OF FRAUD; HOLDING IP RESPONSIBLE; CFR, WHICH STANDS FOR CUSTOMER FOUND RESPONSIBLE.

AND THEN TO SUPPORT HER CLOSING NOTES, SHE PROVIDES IMAGES UP TOP OF SOME OF THAT SEARCH CRITERIA.  SO THE VERY TOP IMAGE OF ADDRESS AND PHONE IS A PULL FROM THE ACCURINT APPLICATION THAT WE USE SHOWING, YOU KNOW, CONSUMER NAME, ADDRESS, AND PHONE NUMBER THAT ACCURINT REPORTS TO BE BELONGING TO MR. PANCHENKO; THE PAYMENT INFORMATION; OPEN DATE, CLOSE DATE OF THE ACCOUNT; AND THEN ALSO THE EMAIL ADDRESS THAT WAS

VALIDATED AS WELL.

Q.   OKAY.  AND IN YOUR REVIEW OF THESE EASE NOTES AND THE ACCOUNT, DO YOU AGREE OR DISAGREE WITH THE DETERMINATION OF THIS INVESTIGATOR?

A.   I AGREE WITH THE DETERMINATION OF THE INVESTIGATOR.

Q.   OKAY.  THANK YOU.

AND YOU'VE REVIEWED THE EASE NOTES THAT WERE EXHIBIT 15 THROUGH 23; CORRECT?

A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

Q.   EXHIBITS 15 THROUGH 23, WE'VE ADMITTED THAT THOSE ARE EASE NOTES; CORRECT?

A.   YES.

Q.   OKAY.  AND YOU'VE REVIEWED THOSE DOCUMENTS?

A.   YES, I HAVE.

Q.   AND WHAT WERE THE FACTORS THAT THE INVESTIGATORS LISTED AS TO WHY THEY DID NOT FIND THE ACCOUNT TO BE SUBJECT TO FRAUD?

A.   THE FACTORS ARE A HOLISTIC REVIEW OF THE ACCOUNT.  SO I'M SUMMARIZING, I AM NOT READING FROM THE EASE NOTES, BUT THE SUMMARY IS THAT THE ACCOUNT WAS OPENED IN 2015; IT REMAINED OPEN UNTIL 2018 WITH CONSISTENT PURCHASE ACTIVITY; CONSISTENT PAYMENT ACTIVITY WITH NO RETURN PAYMENTS.

THE INFORMATION THAT WE HAVE IN OUR SYSTEM OF RECORD IN VCARS, AS WELL AS SOME OF THE INFORMATION THAT WE HAVE ON THE ACDV DOCUMENTS, VERIFIED BACK TO THE CONSUMER NAME THAT WAS LISTED.

WE HAD ACCURINT INFORMATION TELLING US THAT THE PHONE NUMBERS, THE ADDRESS, THE INFORMATION, INCLUDING THE EMAIL ADDRESS THAT WAS USED TO ACQUIRE THE ACCOUNT, ALL BELONGED TO MR. PANCHENKO.

AND THAT WAS THE BASIS FOR NOT FINDING EVIDENCE OF FRAUD.

Q.   AND YOU SAID HOLISTICALLY THAT WAS HOW YOU FELT.  WERE THERE ANY INDIVIDUAL MOMENTS IN AN EASE REVIEW THAT YOU DISAGREE WITH?

A.   I CAN'T SEE ANYTHING IN THE EASE NOTES THAT I WOULD HAVE DISAGREED WITH.

Q.   OKAY.  THANK YOU.

AND WHEN YOU REVIEWED THE VCARS NOTES IN REGARDS TO THIS MATTER, I APOLOGIZE IF I MISSED IT.  WERE THERE ANY RETURN PAYMENTS ON THIS ACCOUNT?

A.   NOT THAT I RECALL.

Q.   OKAY.  AND HOW WERE PAYMENTS MADE ON THE ACCOUNT?

A.   OFF MEMORY, I BELIEVE MANY OF THE PAYMENTS WERE MADE THROUGH OUR AUTOMATED SYSTEM I THINK BY PAY-BY-PHONE EITHER THROUGH AN AUTOMATED SYSTEM OR WITH AN AGENT.

Q.   OKAY.  AND IF YOU WERE TO REVIEW THE ACDV'S THAT WE'VE GONE THROUGH, THOSE WERE EXHIBITS 6 THROUGH 14, WOULD YOU BE ABLE TO DETERMINE WHICH OF THOSE TOOK PLACE AFTER AUGUST 11TH, 2023?

A.   YES, EACH ACDV HAS A RECEIVE DATE AND A RESPONSE DATE ON IT.

Q.   OKAY.  THANK YOU.

     AND IN YOUR REVIEW OF VCARS, HOW MANY CALLS DID COMENITY

RECEIVE AFTER APRIL 2023?

A.   I'D HAVE TO LOOK AT THE VCARS NOTES AGAIN.

Q.   OKAY.  I BELIEVE THOSE WERE EXHIBIT 35.

A.   OKAY.  I'M SORRY, CAN YOU ASK THE QUESTION AGAIN?  HOW

MANY CALLS DID WE RECEIVE AFTER WHAT DATE?

Q.   APRIL OF 2023.

A.   SORRY.  IT'S HARD TO DETERMINE.  EVERY TIME THE ACCOUNT IS

ACCESSED, IT'S AUTOMATICALLY NOTED IN VCARS, SO I NEED TO -- I

HAVE TO FIGURE OUT WHICH ONES WERE NOTED BASED ON SOMEONE

ACCESSING THE ACCOUNT OR WHICH ONES WERE ACCESSED BASED ON A

PHONE CALL.

Q.   OKAY.  AND IN THIS MATTER, DID YOU SEARCH FOR CALL

RECORDINGS?

A.   YES, WE DID.

Q.   AND DID YOU SEARCH BY ACCOUNT NUMBER FOR THOSE RECORDINGS?

A.   YES, WE DID.

Q.   AND DID YOU SEARCH BY TELEPHONE NUMBER THAT WAS USED BY

THE CALLER CONTACTING COMENITY IN 2017 TO MAKE PAYMENTS?

A.   YES, WE DID.

Q.   AND DID YOU SEARCH USING THE TELEPHONE NUMBER THAT WAS

USED BY THE CALLER TO MAKE PAYMENTS IN 2018?

A.   YES.

Q.   DID YOU SEARCH FOR TELEPHONE CALL RECORDINGS ASSOCIATED

WITH THE TELEPHONE NUMBER OF MR. PANCHENKO?

A.   YES, WE SEARCHED BY ALL MEANS FOR PHONE CALLS.

Q.   OKAY.  AND DID YOU PROVIDE THE PLAINTIFF ALL CALLS COMENITY HAD WHEN SEARCHING BY THESE METHODS?

A.   YES, WE DID.

Q.   OKAY.  THANK YOU.

     AND I BELIEVE YOU SAID COMENITY'S CALL RECORDINGS ARE SAVED ON NICE; IS THAT CORRECT?

A.   YES.

Q.   N-I-C-E?

A.   YES.

Q.   OKAY.  THANK YOU.

     AND IN REGARDS TO -- YOU MENTIONED DOCUWARE.  DID YOU SEARCH DOCUWARE FOR ALL DOCUMENTS IN THIS ACCOUNT?

A.   YES, WE DID.

Q.   AND DID YOU PROVIDE ALL OF THE DOCUMENTS IN DOCUWARE TO PLAINTIFF?

A.   YES, WE DID.

Q.   OKAY.  THANK YOU.

     ARE YOU FAMILIAR WITH AN AUD?

A.   YES.

Q.   AND DO YOU KNOW IF AN AUD WAS SUBMITTED ON THE ACCOUNT?

A.   I DO.

Q.   OKAY.  WHAT WAS THE AUD SUBMITTED ON THE ACCOUNT REGARDING?

A.   AUD STANDS FOR AN AUTOMATED UNIVERSAL DATA FORM, AND IT'S OUR WAY OF COMMUNICATING WITH THE CREDIT BUREAU.

MY UNDERSTANDING IS THAT IN -- I THINK IT'S REDACTED ON HERE, BUT IN OCTOBER I THINK OF 2023, AN AUD WAS PERFORMED TO DELETE THE TRADELINE OF MR. PANCHENKO BY OUR LEGAL TEAM.

Q.   OKAY.  IF I COULD HAVE YOU TURN YOUR ATTENTION TO EXHIBIT 154.

A.   OKAY.

Q.   CAN YOU PLEASE TELL US WHAT EXHIBIT 154 IS?

A.   SORRY.

THE COURT:  ARE YOU OKAY, MS. FORD?

THE WITNESS:  YES, I'M FINE.  THANK YOU.

I JUST LOST ALL OF THE NOTEBOOKS.

THE COURT:  OH, OKAY.  TAKE A MOMENT.  GET YOUR BINDERS SETTLED IN.

THE WITNESS:  I DO HAVE EXHIBIT 154.

BY MR. SEARLES:

Q.   OKAY.  WHAT IS 154?

A.   IT IS A COPY OF THE AUD, THE AUTOMATED UNIVERSAL DATA FORM, THAT WAS SUBMITTED TO DELETE THE TRADELINE.

Q.   ARE YOU ABLE TO REVIEW EXHIBIT 154 AND DETERMINE THE DATE THAT THIS WAS SUBMITTED?

A.   ACTUALLY, I'M SORRY, I DON'T SEE A DATE ON THERE.

OH, WAIT, THERE'S MORE PAGES.  FORGIVE ME.

IT WAS SUBMITTED DECEMBER 21ST OF 2023.

Q.   OKAY.  THANK YOU.

AND WHAT PAGE ARE YOU REFERRING TO TO STATE THAT INFORMATION?

A.   00262.

Q.   ALL RIGHT.  THANK YOU.  THAT'S COMENITY 00262.  THANK YOU.

I'D MOVE TO HAVE EXHIBIT 154 ADMITTED.

MR. LOKER:  NO OBJECTION.

THE COURT:  SO ADMITTED.

MR. SEARLES:  THANK YOU.

(DEFENDANT'S EXHIBIT 154 WAS RECEIVED IN EVIDENCE.)

BY MR. SEARLES:

Q.   MS. FORD, GOING BACK TO I BELIEVE IT WAS EXHIBIT 3, DID THE MOUNTAIN VIEW POLICE DEPARTMENT EVER CONTACT COMENITY REGARDING THIS ACCOUNT?

A.   NO.

Q.   DID COMENITY EVER RECEIVE ANY COMMUNICATION FROM MOUNTAIN VIEW POLICE DEPARTMENT REGARDING AN INVESTIGATION THAT YOU'RE AWARE OF?

A.   NO, WE DID NOT.

Q.   OKAY.  AND DID COMENITY RECEIVE ANY COMMUNICATIONS FROM THE FEDERAL TRADE COMMISSION IN REGARDS TO THE ACCOUNT?

A.   I DO BELIEVE WE RECEIVED AN FTC REPORT, BUT NOT DIRECTLY FROM THEM.

Q.   OKAY.  AND DOES COMENITY RECEIVE INVESTIGATION REQUESTS FROM LAW ENFORCEMENT AGENCIES?

A.   WE DO.

Q.   AND HOW ARE THOSE CORRESPONDENCE BETWEEN LAW ENFORCEMENT ORGANIZATIONS AND COMENITY PROCESSED?

A.   WE HAVE PROCEDURES FOR WORKING WITH LAW ENFORCEMENT DURING FRAUD INVESTIGATIONS.  IT JUST DEPENDS ON HOW THE REQUEST COMES IN.  BUT THEY CAN CALL US, THEY CAN SEND US REQUESTS FOR INFORMATION.

Q.   OKAY.  AND WHY DOES COMENITY WORK WITH LAW ENFORCEMENT ORGANIZATIONS REGARDING FRAUD?

A.   OUR ENTIRE OBJECTIVE IS TO TRY TO PREVENT FRAUD FROM OCCURRING, SO IT'S IN OUR BEST INTEREST TO PARTICIPATE WITH LAW ENFORCEMENT.

     ALSO, WE CAN SOMETIMES LEVERAGE LAW ENFORCEMENT TO POTENTIALLY RECOVER A LOSS IF A SUSPECT IS IDENTIFIED.

Q.   OKAY.  AND IF I COULD HAVE YOU TURN IN EXHIBIT 35 AGAIN, IT'S PREVIOUSLY BEEN ENTERED, THAT ON AUGUST 21ST, 2023, MS. BANU HAD PROCESSED AN ACDV.

     SO IF I COULD HAVE YOU TURN YOUR ATTENTION TO AUGUST 21ST, 2023, ON THE VCARS NOTES.

A.   YES, I SEE THAT.

Q.   OKAY.  AND IN YOUR REVIEW OF THE EASE NOTES FROM AUGUST 21ST, 2023, TO THE MOST RECENT, DO YOU SEE ANY ACTIVITY REGARDING CORRESPONDENCE FROM ANYONE IN REGARDS TO THE ACCOUNT?

A.   IF ANYONE HAS CONTACT ABOUT THE ACCOUNT SINCE AUGUST 21ST, 2023?

Q.   YEAH, THAT'S A BETTER WAY OF SAYING IT.  THANK YOU.

A.   NOT THAT I CAN SEE, NO.

Q.   OKAY.  ALL RIGHT.  THANK YOU.

MS. FORD, YOU STATED EARLIER THAT YOU REVIEWED THE DEPOSITION TRANSCRIPTS OF EACH OF THE INVESTIGATORS; IS THAT CORRECT?

A.   YES.  I READ THEM AND WATCHED SOME OF THE VIDEOS.

Q.   OKAY.  WHAT WERE YOUR IMPRESSIONS OF THE TESTIMONY -- WHAT WERE YOUR IMPRESSIONS OF THE TESTIMONY OF THE INVESTIGATORS WHO WORKED THE ACDV'S IN THIS MATTER?

A.   SOME OF IT SURPRISED.  I -- THERE WERE A LOT OF REALLY GOOD THINGS THAT THE INVESTIGATORS SHARED THAT ARE A PART OF OUR POLICIES AND A PART OF OUR PROCEDURES.

THERE WERE A FEW THINGS THAT WERE SHARED THAT WERE INCONSISTENT WITH OUR POLICIES.

Q.   OKAY.  WHAT DID THEY SHARE THAT WAS INCONSISTENT?

A.   THERE WAS ONE OR TWO ASSOCIATES THAT MENTIONED THAT THEY DO NOT REVIEW IMAGES, I BELIEVE, THAT ARE ATTACHED TO AN ACDV, WHICH IS INCORRECT.  THAT'S NEVER BEEN OUR POLICY.

AND THEN I THINK THERE WAS ALSO SOME INCONSISTENCIES REGARDING CALL RECORDINGS.

Q.   OKAY.  AND THE INVESTIGATORS THAT WERE DEPOSED, THEY WERE IN INDIA.  THE DEPOSITIONS WERE DONE BY ZOOM.  ARE YOU AWARE OF THAT?

A.   YES.

Q.   OKAY.  DO YOU THINK THAT THE INVESTIGATORS WERE CONFUSED BY THE QUESTIONS AND THE TRANSCRIPTS DON'T REFLECT PROPERLY?

MR. LOKER:  SPECULATION.

THE COURT:  SUSTAINED.

BY MR. SEARLES:

Q.   MS. FORD, IN YOUR REVIEW OF THE TRANSCRIPTS THAT YOU WERE PROVIDED, DO YOU THINK -- WAS THERE ANY DOUBT THAT SOME OF THE INVESTIGATORS DID NOT FOLLOW THEIR POLICY?

A.   NO.  IN THE EASE NOTES THAT I REVIEWED, I FELT THE INVESTIGATORS PERFORMED A THOROUGH INVESTIGATION BASED ON OUR PROCEDURES.

Q.   OKAY.  BUT MY QUESTION WAS, THERE'S NO UNCERTAINTY IN THE VIDEO THAT SOME OF THE INVESTIGATORS DID NOT FOLLOW POLICY; IS THAT CORRECT?

A.   YES, I WOULD AGREE WITH THAT.

Q.   OKAY.  AND THAT IS OUTSIDE OF THE WRITTEN POLICY, THE STATEMENTS THAT THEY DID NOT DO THESE ACTIONS; IS THAT CORRECT?

A.   THAT'S CORRECT.  WE'VE REVIEWED THOSE POLICIES TODAY AND IT SHOWS THAT THEY SHOULD HAVE BEEN FOLLOWING THOSE PROCESSES.

Q.   OKAY.  AND, BIG PICTURE ON THE ACCOUNT OF MR. PANCHENKO, WAS COMENITY TRYING TO RECOVER ON THIS ACCOUNT?

A.   NO, WE WEREN'T.  IT WAS ALREADY CONSIDERED A LOSS BY THE TIME IT WAS DISPUTED.

Q.   OKAY.  AND SO WHY DOES COMENITY CARE ABOUT WHETHER IT JUST SAYS WE'RE NOT GOING TO RECOVER FROM THIS ACCOUNT, SO HE'S A

VICTIM OF FRAUD AND WE MOVE ON?  WHY IS THIS DETERMINATION DIFFERENT FOR AN ACCOUNT THAT THEY HAD ALREADY WRITTEN OFF?

A.   UNFORTUNATELY, WE CAN'T JUST GIVE SOMEONE A DETERMINATION OF FRAUD BECAUSE IT'S A LOSS TO US.  WE HAVE A RESPONSIBILITY TO INVESTIGATE AND RESPOND WITH ACCURATE INFORMATION.

SO REGARDLESS IF WE'RE GOING TO RECOVER ON THE ACCOUNT OR NOT, THEY DISPUTE IT, WE INVESTIGATE IT, WE RESPOND TO WHAT WE BELIEVE TO BE TRUE.

Q.   OKAY.  AND YOU'RE SITTING HERE TODAY, YOUR TESTIMONY IS THAT YOU BELIEVE THE REVIEW OF THE INVESTIGATORS WAS ACCURATE FOR THE INFORMATION THAT WAS PROVIDED AND AVAILABLE TO COMENITY?  IS THAT --

A.   YES, I DO.

Q.   ALL RIGHT.  MS. FORD, THANK YOU.

I BELIEVE MR. PANCHENKO'S ATTORNEY MAY HAVE SOME ADDITIONAL QUESTIONS, BUT I APPRECIATE YOUR TIME.  THANK YOU.

A.   THANK YOU.

THE COURT:  THANK YOU.

WE ARE AT TIME FOR AN AFTERNOON BREAK.  I BELIEVE THAT MAKES SENSE AT THIS POINT.

SO, MEMBERS OF THE JURY, WE'RE GOING TO TAKE OUR 15 MINUTE AFTERNOON BREAK NOW.

COUNSEL, I ASK THAT YOU STAY FOR A MINUTE.

MS. FORD, AFTER THE JURY EXITS, YOU'RE EXCUSED FROM THE WITNESS STAND.

THE WITNESS:  THANK YOU.

THE COURT:  THANK YOU.

(JURY OUT AT 2:30 P.M.)

THE COURT:  MS. FORD, YOU'RE EXCUSED.

COUNSEL, I DON'T BELIEVE THERE'S ANYTHING FOR US TO TALK ABOUT.  KEEP GOING.

I MAY COME IN A COUPLE MINUTES EARLY TO TOUCH BASE.

MR. NARITA:  THANK YOU, YOUR HONOR.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  WE'RE NOW IN RECESS.

(RECESS FROM 2:31 P.M. UNTIL 2:46 P.M.)

(JURY OUT AT 2:46 P.M.)

THE COURT:  WE ARE BACK IN SESSION OUTSIDE OF THE PRESENCE OF THE JURY.

COUNSEL IS PRESENT AND THE PLAINTIFF IS PRESENT.

SO I JUST WANTED TO TOUCH BASE AND DO A QUICK TIME CHECK.

SO THE PARTIES -- THE DEFENDANTS INDICATED THAT THERE WAS GOING TO BE ONE HOUR OF TESTIMONY OF MS. FORD IN TERMS OF THEIR DIRECT AND ONE HOUR WITH THEIR EXPERT.

WE'RE NOW AT AN HOUR AND A HALF WITH MS. FORD JUST IN TERMS OF THE DIRECT.  THE DEFENDANTS ARE AT 7 HOURS AND 30 MINUTES, AND THE TOTAL TIME FOR EACH SIDE IS 8 HOURS, INCLUDING CLOSING.

PLAINTIFF IS AT 8 AND A HALF HOURS -- 6 AND A HALF HOURS, WITH A SMILEY FACE.

MR. LOKER:  THANK YOU.

THE COURT:  I'M NOT TRYING TO --

MR. NARITA:  OBJECTION.

THE COURT:  -- WITH TWO HOURS REMAINING.

I KNOW THERE'S BEEN SOME GLITCHY STUFF FROM THE COURT SIDE AND FROM COUNSEL, THERE'S BEEN A FEW LITTLE TWISTS AND TURNS ALONG THE WAY.

AND I WOULD SAY SOME OF THE EARLIER EXAMINATIONS, LIKE EVERYONE MADE THEIR CHOICES, BUT JUST TO THAT END, AND WE HAVE A LITTLE BIT OF GIVE TOMORROW OF STILL GETTING IT TO THE JURY.

I'M GOING TO PROPOSE THAT EACH SIDE IS GIVEN AN ADDITIONAL HALF AN HOUR, SO 30 MINUTES.

MR. NARITA:  WE APPRECIATE THAT, YOUR HONOR.

THE COURT:  SO THAT WILL INCLUDE THROUGH CLOSING. MR. LOKER.

MR. LOKER:  I DON'T THINK WE NEED IT, YOUR HONOR. WE MADE A PLAN TO STICK WITH 8 AND A HALF, BUT IF THE COURT IS GIVING IT, I GUESS WE'LL TAKE IT.

THE COURT:  BUT FOR THE SAME REASONS, I'M NOT INCLINED TO GIVE ANY MORE.

MR. LOKER:  UNDERSTOOD, YOUR HONOR.

THE COURT:  SO 8 AND A HALF.  AS LONG AS THE PLAINTIFF IS NOT REJECTING THAT TIME.

MR. LOKER:  NO, OF COURSE NOT, YOUR HONOR.  THANK YOU.

MR. NARITA:  YOUR HONOR, THE DEFENDANT WOULD ACCEPT THE PLAINTIFF'S EXTRA HALF HOUR.

THE COURT:  IT'S LIKE A LEDGER SHEET.

MR. LOKER:  MAYBE WE WILL TAKE IT ON ANOTHER CASE IN THE FUTURE.

MR. NARITA:  OKAY.

THE COURT:  SO YOU ALL KNOW YOUR TIMES.

MR. LOKER:  YES.

THE COURT:  YOU KNOW THE REST.

MADAM CLERK IS BEING VERY KIND IN MONITORING THE TIME FOR YOU ALL, BECAUSE THIS IS THE FIRST TIME.  YEAH.  SO IT'S VERY KIND OF HER TO DO THAT FOR YOU ALL.

MR. LOKER:  AGREED, YES.

THE COURT:  BUT YOU ALL NEED TO BE ON TOP OF THE TIME FROM HERE ON OUT FOR THE REST OF THE TIME.

AND THEN -- YEAH.  SO NO MATTER WHAT, I WANT THIS IN THE HANDS OF THE JURY SOMETIME TOMORROW MORNING.

MR. LOKER:  AGREED.

MR. NARITA:  YES, YOUR HONOR.

THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  THAT'S ALL I WANTED TO SAY.

I WANTED YOU ALL TO KNOW THAT IN THE INTEREST OF FAIRNESS THAT IT WAS KNOWN.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

MR. NARITA:  ONE SMALL CLARIFICATION FOR THE RECORD, YOUR HONOR.

MS. GIVENTAL:  THERE'S -- IN THE STIPULATED FACTS, IN THE EXHIBITS THAT GOT INTO EVIDENCE AS A RESULT OF THE STIPULATED FACTS, THERE'S TWO EXHIBIT NUMBERS THAT ARE WRONG.

SO AT SOME POINT, IT COULD BE NOW, IT COULD BE AFTER MR. LOKER IS DONE WITH THE CROSS, WE WANTED TO JUST MAKE THAT CORRECTION ON THE RECORD.

MR. NARITA:  BASICALLY A TYPO.

THE COURT:  YES.  AND THEN YOU SHOULD FILE -- THE ONE WE ACTUALLY ADMIT INTO AN EXHIBIT, WE SHOULD AMEND AND DO A CORRECTED VERSION OF EXHIBIT NUMBER.

THE CLERK:  247.

THE COURT:  247.  THANK YOU, MADAM CLERK.

GO AHEAD AND DO IT NOW, AND THEN WE'LL GO AHEAD AND GET THE JURY.

ACTUALLY, WE SHOULD DO IT IN FRONT OF THE JURY, BECAUSE THEY ACTUALLY MAY BE RELYING ON THE NUMBERS.  IS THIS SOMETHING YOU SAID OUT LOUD?

MS. GIVENTAL:  IT IS, BUT IT'S A LONG LITANY OF NUMBERS, BUT WE CAN DO IT IN FRONT OF THE JURY.

THE COURT:  WE'LL DO THAT MAYBE AFTER MS. FORD'S TESTIMONY.

MS. GIVENTAL:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

(JURY IN AT 2:51 P.M.)

THE COURT:  YOU MAY BE SEATED.

MS. FORD, YOU MAY APPROACH THE WITNESS STAND.

WE'RE BACK ON THE RECORD.  THE JURY IS PRESENT, AND THE PARTIES AND COUNSEL ARE PRESENT.

MS. FORD IS ON THE WITNESS STAND READY FOR CROSS-EXAMINATION.

MR. LOKER, YOUR WITNESS.

MR. LOKER:  YES.  THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION**

BY MR. LOKER:

Q.   MS. FORD, BASED UPON YOUR TESTIMONY EARLIER TODAY, IT SOUNDS LIKE YOU BELIEVE THAT MR. PANCHENKO HERE IS FABRICATING BEING A VICTIM OF IDENTITY THEFT; IS THAT RIGHT?

A.   I DON'T THINK I SAID THAT.

Q.   WELL, YOU TESTIFIED THAT THE REPORTING WAS ACCURATE; IS THAT RIGHT?

A.   I TESTIFIED THAT WE DID AN INVESTIGATION AND DID NOT IDENTIFY FRAUD OCCURRED.

Q.   OKAY.  AND DO YOU HAVE A POSITION AS TO WHETHER MR. PANCHENKO HAS BEEN LYING TO THE JURY THE LAST COUPLE OF DAYS?

A.   I CAN'T SAY THAT HE'S BEEN LYING TO THE JURORS.  I DON'T HAVE A POSITION ON THAT.

I CAN SAY WHAT THE POSITION IS BASED ON THE INVESTIGATION THAT WE DID.

Q.   AND THAT POSITION IS THAT HE'S NOT THE VICTIM; IS THAT RIGHT?

A.   WE DID NOT BELIEVE THAT THE ACCOUNT PERFORMED LIKE A FRAUD ACCOUNT, NO.

Q.   AND WE'LL GET THERE.

DO YOU HAVE A POSITION ABOUT WHETHER HE'S A VICTIM OF IDENTITY THEFT SEPARATE AND APART FROM THE INVESTIGATION?

A.   I CAN'T SAY I DO.

Q.   AND YOU REVIEWED THE RECORDS IN THIS MATTER, BUT YOU DON'T HAVE A POSITION?

A.   I REVIEWED THE INVESTIGATION THAT WE PERFORMED.  I DON'T -- I CAN'T SAY IF HE IS OR IS NOT.

Q.   OKAY.  I BELIEVE YOU HAVE EXHIBIT 168 UP THERE.  IT'S IN ONE OF YOUR BINDERS.

A.   ONE SECOND.

MR. LOKER:  YOUR HONOR, SINCE IT IS ADMITTED, CAN I PUBLISH?

THE COURT:  YES, YOU MAY PUBLISH IT TO THE JURY.

THE WITNESS:  I CAN SEE IT ON THE SCREEN.

BY MR. LOKER:

Q.   I'LL GUIDE YOU ALONG SIMILAR TO WHAT WE'VE DONE IN OTHER MATTERS.

IN EXHIBIT 168, THAT'S A POLICY THAT YOU REVIEWED WITH

YOUR COUNSEL, MR. SEARLES; IS THAT RIGHT?

A.   YES.

Q.   AND THERE'S THIS ONE PIECE THAT I WANTED TO LOOK AT WITH YOU BEFORE YOU SKIP FORWARD, AND THAT'S AT BATES STAMP 493, AND THERE'S A REFERENCE TO OUR BANKS.  LET ME ZOOM IN ON THAT FOR YOU.

IT SAYS, "OUR BANKS DO NOT HAVE ACCOUNTS THAT OFFER A DEFERRED PAYMENT OPTION."

DO YOU SEE WHERE I READ?

A.   YES.

Q.   AND THE POINT OF MY QUESTION IS "OUR BANKS," I BELIEVE THAT REFERS TO COMENITY; IS THAT CORRECT?

A.   YES.

Q.   AND COMENITY IS NOW SOMETIMES -- OR IS NOW REFERRED TO AS BREAD; IS THAT RIGHT?

A.   YES.

Q.   AND SO ANY TIME IN THESE ACCOUNT NOTES, OR SORRY, THESE PROCEDURES WHERE WE SEE "OUR BANKS," THAT'S REFERRING TO COMENITY?

A.   I KNOW WE HAVE TWO BANKS.  I DON'T KNOW IF COMENITY AND COMENITY CAPITAL WOULD BE THE SAME AS BREAD, BUT THAT IS WHO I WORK FOR, YES.

Q.   FAIR ENOUGH.

AND I'LL TAKE YOU BACK TO EXHIBIT 157.  FEEL FREE TO FOLLOW ALONG IN PAPER, OR I'LL SHOW YOU ON THE SCREEN, WHATEVER

YOUR PREFERENCE IS.

A.    SURE.

Q.    AND LET ME ZOOM IN ON THE FIRST PARAGRAPH HERE.

JUST FOR THE SAKE OF TIME, AS WE'RE SENSITIVE TO TIME HERE, "THE FAIR CREDIT REPORTING ACT DICTATES THAT FURNISHERS OF DATA TO CREDIT REPORTING AGENCIES MUST PROVIDE ACCURATE INFORMATION REGARDING THE CONSUMER AND THEIR RELATIONSHIP WITH THE BANKS."

DO YOU SEE WHERE I'VE READ SO FAR?

A.    I DO.

Q.    AND THE NEXT SENTENCE, "AS A FURNISHER OF INFORMATION, THE BANKS MUST BE DILIGENT IN MAINTAINING ACCURATE REPORTING AND HAVE STRONG POLICIES AND PROCEDURES IN PLACE IN ORDER TO CONDUCT A REASONABLE INVESTIGATION INTO ALL CONSUMER DISPUTES REGARDING REPORTING INFORMATION."

NOW, DO YOU SEE THAT SECOND SENTENCE?

A.    YES.

Q.    AND IN TERMS OF HOW THIS FLOWS TOGETHER, THIS IS SAYING THAT THE BANKS ARE FURNISHERS; IS THAT RIGHT?

A.    IT -- YES.

Q.    AND THEN AGAIN WE HAVE A REFERENCE TO FURNISHERS AGAIN. I'LL READ BRIEFLY THE FIRST SENTENCE.  "E-OSCAR, THE ONLINE SOLUTION FOR COMPLETE AND ACCURATE REPORTING, IS USED BY CREDIT REPORTING AGENCIES (CRAS) AND DATA FURNISHERS, SUCH AS OUR BANKS, TO FACILITATE THE RESOLUTION OF DISPUTES," AND IT GOES

ON.

AND THE FURNISHERS SUCH AS OUR BANKS, THAT'S REFERRING TO COMENITY BEING A FURNISHER; IS THAT RIGHT?

A.   YES.

Q.   AND IN TERMS OF YOUR ROLE HERE TODAY, MY UNDERSTANDING IS THAT YOU DID NOT PERSONALLY INVESTIGATE ANY OF THE DISPUTES, DID YOU?

A.   I DID NOT.

Q.   AND IT'S JUST ONE PIECE OF YOUR JOB TO HAVE TO SIT FOR DEPOSITIONS.

IS THAT RIGHT SO FAR?

A.   A RARE OPPORTUNITY, YES.

Q.   AND TESTIFY IN FRONT OF THE JURY; IS THAT RIGHT?

A.   YES.

Q.   YOU AND I ALSO MET AT AN ARBITRATION TRIAL; IS THAT CORRECT?

A.   YES.

Q.   AND THOSE ARE JUST -- THAT'S YOUR ROLE WORKING FOR COMENITY; IS THAT CORRECT?

A.   YES.

Q.   AND THE INVESTIGATORS THAT WE'VE DISCUSSED, THE ONES IN BANGALORE, THEIR ROLE IS TO INVESTIGATE DISPUTES, SPECIFICALLY INDIRECT DISPUTES THROUGH THE CREDIT BUREAUS TO COMENITY REGARDING COMENITY'S REPORTING; IS THAT RIGHT?

A.   YES.

Q.   AND IN PROCESSING THOSE DISPUTES, THEY'RE JUST DOING THEIR JOBS; IS THAT RIGHT?

A.   I WOULD SAY YES.

Q.   AND THEIR JOBS ARE GUIDED BY THE WRITTEN PROCEDURES THAT COMENITY PROVIDES THEM; IS THAT CORRECT?

A.   IN ADDITION TO TRAINING AND COACHING, YES.

Q.   AND THAT TRAINING AND COACHING IS PROVIDED BY COMENITY; IS THAT CORRECT?

A.   YES.

Q.   AND MY UNDERSTANDING IS THAT YOU'RE, IN ESSENCE, A TRAINER OF THE TRAINERS; IS THAT CORRECT?

A.   I WOULD NOT CONSIDER MYSELF A TRAINER AT ALL.

Q.   OKAY.

A.   I DO SUPPORT THE TRAINERS AND MAKE SURE THAT THE INFORMATION THAT THEY'RE TRAINING IS ALIGNED WITH OUR POLICIES, BUT I WOULD NOT CONSIDER MYSELF A TRAINER.

Q.   UNDERSTOOD.  SUPPORTING THE TRAINERS IS HOW YOU LOOK AT IT?

A.   I UNDERSTAND.

Q.   OKAY.  IN TERMS OF THE PRODUCTION NUMBERS FOR INDIA, IT'S A STIPULATED FACT IN THIS PARTICULAR CASE, MEANING THAT COUNSEL AGREE THAT THE INDIAN INVESTIGATORS, THEIR GOAL IS TO INVESTIGATE 36 DISPUTES PER DAY.

     WERE YOU AWARE OF THAT?

A.   YES.

Q.   AND WERE YOU ALSO AWARE -- IT SOUNDS LIKE YOU WATCHED THE VIDEOS -- THAT AT SOME POINT THE PROCESS AND PROCEDURES THAT THESE INVESTIGATORS WERE UTILIZING, AT SOME POINT THEY WEREN'T READING DISPUTES.

     DO YOU RECALL HEARING THAT?

A.   I'M SORRY, COULD YOU SAY THAT AGAIN.  THEY WEREN'T READING DISPUTES?

Q.   THEY WEREN'T READING THE IMAGES ATTACHED TO THE ACDV'S?

A.   I DID HEAR THAT IN SOME OF THE TESTIMONY.

Q.   AND THEN LATER THAT PROCEDURE CHANGED; IS THAT CORRECT?

A.   YES.

Q.   AND DURING THE TWO PIECES OF THAT, SO ON THE ONE HAND WE'RE NOT READING DISPUTES, ON THE OTHER HAND, ONCE IT CHANGES, WE ARE READING DISPUTES, HAS THE TARGET ALWAYS BEEN 36 INVESTIGATIONS PER SHIFT?

A.   I THINK IT'S A STAGGERED TARGET DEPENDING ON TRAINING DATE, HIRE DATE.  I THINK THE PRODUCTIVITY GOAL IS 36 PER NIGHT, BUT THAT'S GOING TO EBB AND FLOW JUST BASED ON THE NATURE OF THE INVESTIGATION.

Q.   DOES IT EBB AND FLOW BASED UPON WHETHER THE INVESTIGATORS ARE ACTUALLY READING THE DISPUTES OR NOT?

A.   IF THEY'RE PERFORMING A THOROUGH INVESTIGATION AND THERE'S DOCUMENTS ATTACHED TO IT, THEN, YES, IT MIGHT TAKE LONGER BASED ON REVIEWING.

Q.   AND IF WE'RE SHOOTING FOR 36 DISPUTES -- I DON'T EXPECT

FORD CROSS BY MR. LOKER

YOU TO DO MATH ON THE STAND RIGHT NOW -- BUT THAT'S ABOUT 10 TO 15 MINUTES PER DISPUTE.

DOES THAT SOUND ABOUT RIGHT?

A.   APPROXIMATELY.

Q.   AND IN THOSE 10 TO 15 MINUTES, YOU KNOW, HOW IS THE INVESTIGATOR SHOOTING TO TURN UP INFORMATION ABOUT THE POSITION OF THE PARTIES, AND HOW IS THAT ENOUGH TIME FOR THE INVESTIGATOR TO SEE IF FRAUD ACTUALLY OCCURRED?

A.   SO IT'S -- BASED ON YOUR MATH, IT'S 10 TO 15 MINUTES PER CASE.  BUT THERE'S NOTHING IN OUR POLICIES THAT SAY THAT YOU COULDN'T SPEND MORE TIME ON A CASE IF YOU NEEDED IT.

Q.   AND IN TERMS OF THE DIRECTION OF THE CASE, AS THEY'RE PROCESSING THE CASE, THAT'S ALSO GUIDED BY THE PROCEDURES; IS THAT CORRECT?

A.   YES.

Q.   AND LET'S LOOK AT ONE OF THOSE PROCEDURES.  WE'LL GO TO 244.

AND I DON'T REMEMBER, MS. FORD, ARE YOU FOLLOWING THE SCREEN OR THE PAPER?

A.   I'M GOING TO DO THE SCREEN IF THAT'S OKAY.

Q.   THAT'S PERFECTLY OKAY.  I JUST WANTED TO KNOW HOW FANCY I NEEDED TO BE.

SO I'M LOOKING AT 243 -- I'M NOT PRESENTING, SO YOU'RE NOT LOOKING AT IT WITH ME, ARE YOU?

NOW WE SHOULD BE LOOKING AT 243.  DO YOU HAVE IT ON YOUR

SCREEN?

A.   YES.

Q.   AND THIS WAS ONE OF THE PROCEDURES THAT YOU LOOKED AT WITH YOUR COUNSEL, MR. SEARLES; IS THAT RIGHT?

A.   YES.

Q.   AND IN TERMS OF THIS PROCEDURE AND WHAT WE'RE LOOKING AT IS 1 ALONG WITH THE SUBSECTIONS, AND THEY HAVE LETTERS ON THEM; IS THAT CORRECT?

A.   YES.

Q.   AND THIS PROCEDURE, THIS IS SOMETHING THAT IS DESIGNED TO HELP THE INVESTIGATORS FIGURE OUT IF MR. PANCHENKO IS TELLING THE TRUTH WHEN HE WAS A VICTIM OF IDENTITY THEFT; IS THAT RIGHT?

A.   I DON'T THINK ANY OF OUR PROCEDURES ARE TRYING TO FIND SOMEONE TO BE A LIAR.  IT'S TO LOOK AT THE ACCOUNT HOLISTICALLY AND CONFIRM IF WE SEE EVIDENCE OF FRAUD OR NOT.

Q.   AND ONE OF THE THINGS THAT THESE PROCEDURES ARE DESIGNED TO DO IS TO AVOID AND RECOVER LOSSES; IS THAT WHAT YOU SAID EARLIER?

A.   YES.

Q.   AND THE BANK LOSES MONEY IF FRAUD OCCURS; IS THAT RIGHT?

A.   WE DO.

Q.   AND THE BANK DOESN'T LIKE TO LOSE MONEY, DOES IT?

A.   WE DON'T LIKE TO LOSE MONEY, BUT WE BUDGET FOR IT EVERY YEAR.

Q.  BECAUSE FRAUD IS PRETTY PREVALENT?

A.  YES.

Q.  AND IN LOOKING AT WHAT WE HAVE HERE, EXHIBIT 243, THE FIRST THING WE SEE, ONE THING THE INVESTIGATORS ARE LOOKING AT IS THE ADDRESS ON THE ACCOUNT; IS THAT RIGHT?

A.  YES.

Q.  AND THE ADDRESS WILL COME FROM SNAP, THE APPLICATION?

A.  IT COULD, YES.

Q.  AND WHERE ELSE COULD IT COME FROM?

A.  IT -- THE SNAP APPLICATION IS JUST GOING TO HOUSE THE ORIGINATING ADDRESS THAT WAS ON THE APPLICATION, OR MAYBE EVEN A PREVIOUS ADDRESS.

IN VCARS YOU COULD SEE ANY ADDITIONAL OR SUBSEQUENT ADDRESSES THAT MIGHT HAVE BEEN CHANGED ON THE ACCOUNT.

Q.  OF COURSE.  THAT'S A FAIR QUALIFICATION.

SO IF SOMEONE CALLS IN AND CHANGES THE ADDRESS, WHEN THE INVESTIGATOR DOES THEIR INVESTIGATION, THEY'LL SEE THAT ADDRESS AS OPPOSED TO WHAT'S WITHIN SNAP?

A.  CORRECT.  WE WOULD, WE WOULD BE LOOKING AT ALL OF THE ADDRESSES.  BUT, YES, THEY COULD SEE MULTIPLE ADDRESSES.

Q.  AND IN TERMS OF A FRAUDSTER SUBMITTING AN APPLICATION, WOULD YOU EXPECT THEM TO PROVIDE THEIR OWN ADDRESS?

A.  PROBABLY NOT.

Q.  WOULD YOU EXPECT THE FRAUDSTER TO PROVIDE AN ADDRESS THAT WOULD LET THE VICTIM KNOW THAT SOMETHING IS HAPPENING?

A.   WE HAVE SEEN SOMETIMES IT GOES TO THE VICTIM'S ADDRESS. WE OFTEN SEE THAT IT GOES TO AN ALTERNATE ADDRESS AS WELL.  WE OFTEN SEE THAT IT GOES TO THE VICTIM'S ADDRESS AND THEN CHANGES LATER.

Q.   RIGHT, BECAUSE THE FRAUDSTER WOULD BE INCENTIVIZED TO KEEP THE CHARADE GOING AND STAY HIDDEN; RIGHT?

A.   AND TRY TO GET A CARD IN THE MAIL.

Q.   EXACTLY.

AND SAME WITH THE PHONE NUMBER.  IT SEEMS OFTENTIMES -- I DON'T WANT TO MISSPEAK, BUT SOMETIMES THE FRAUDSTER WILL UTILIZE THEIR OWN PHONE NUMBER; IS THAT RIGHT?

A.   THEY MIGHT.

Q.   AND THEY COULD PUT THAT INFORMATION WITHIN SNAP, THE APPLICATION?

A.   YES.

Q.   AND WHEN WE'RE DOING THE INVESTIGATION TO SEE IF A FRAUD OCCURRED, THE INVESTIGATORS ARE LOOKING AT INFORMATION THAT WAS PROVIDED BY THE FRAUDSTER, ASSUMING A FRAUD OCCURRED; IS THAT RIGHT?

A.   YES.

Q.   AND SO HOW -- SO FAR -- DOES LOOKING AT THE ADDRESS THAT WOULD COME FROM THE FRAUDSTER, THE PHONE NUMBER THAT COMES FROM THE FRAUDSTER, HOW WOULD THAT TELL US IF A FRAUD ACTUALLY OCCURRED?

A.   WE'RE NOT ONLY RELYING ON THE INFORMATION IN THE SNAP

REVIEW CARDS.  WE'RE ALSO COMPARING THE INFORMATION TO THOSE THIRD PARTY APPLICATIONS THAT I MENTIONED THAT WE SEARCH FOR, AND THOSE THIRD PARTY APPLICATIONS TELL US IF THE INFORMATION LISTED BELONGS TO THE CONSUMER LISTED OR MAYBE A POTENTIAL FRAUDSTER.

Q.   AND ACCURINT IS ONE OF THOSE THIRD PARTY APPLICATIONS; RIGHT?

A.   IT IS.

Q.   AND HAVE YOU SEEN A FULL ACCURINT REPORT?

A.   I'M NOT SURE WHAT YOU MEAN.

Q.   SO WE LOOKED AT SNIPPETS WITHIN THE EASE NOTES; RIGHT?

A.   YES.

Q.   AND A SNIPPET, MY UNDERSTANDING WOULD BE IF SOMEONE TAKES A SCREENSHOT AND TAKES JUST A PORTION OF IT, PUTS IT IN THE EASE NOTES; IS THAT RIGHT?

A.   YES.

Q.   AND HAVE YOU SEEN A FULL REPORT AS OPPOSED TO JUST A SCREENSHOT FROM IT?

A.   I PERSONALLY HAVE USED ACCURINT SO I KNOW WHAT IT LOOKS LIKE WITHOUT THE SCREENSHOT IF THAT'S WHAT YOU MEAN.

Q.   AND WHAT IS THE FIRST THING THAT IS REFLECTED ON AN ACCURINT REPORT WHERE IT SAYS "IMPORTANT" IN BOLD LETTERS?

A.   I'D HAVE TO SEE IT TO SAY FOR SURE.  I'M SORRY.

Q.   OKAY.

COULD I REFRESH HER RECOLLECTION, YOUR HONOR?

THE COURT:  YES, YOU MAY.

MR. LOKER:  (HANDING.)

Q.   CAN YOU READ AFTER THE "IMPORTANT" WHAT IT SAYS THERE?

SORRY.  I GOT A LITTLE EXCITED.

THE COURT:  YES.  COUNSEL, WERE YOU ASKING WHETHER OR NOT IT REFRESHED HER RECOLLECTION?

MR. LOKER:  OH, YES.

Q.   SO SEEING THAT FIRST PORTION -- I THOUGHT WE WERE WAITING FOR MR. NARITA -- SEEING THAT FIRST PORTION, DOES THAT REFRESH YOUR RECOLLECTION ABOUT WHAT AN ACCURINT REPORT SAYS AT THE TOP?

A.   YES, I'VE SEEN THIS VERSION BEFORE.

Q.   OKAY.  AND WHAT DOES IT SAY?

A.   AFTER IMPORTANT?

Q.   YES.

A.   "THE PUBLIC RECORDS IN COMMERCIALLY AVAILABLE DATA SOURCES USED ON REPORTS HAVE ERRORS.  DATA IS SOMETIMES ENTERED POORLY, PROCESSED INCORRECTLY," I THINK IT'S SUPPOSED TO SAY, "AND IS GENERALLY NOT FREE FROM DEFECT."

Q.   I'LL TAKE THAT BACK, OR YOU CAN SET IT ASIDE.

SO IN ESSENCE, THE INFORMATION WITHIN ACCURINT THAT IS RELIED UPON, THERE'S A DISCLAIMER THAT SAYS IT CAN HAVE ERRORS; RIGHT?

A.   YES.

THE COURT:  MS. FORD, CAN YOU JUST GO AHEAD AND TURN

THAT OVER JUST BECAUSE IT WAS FOR THE PURPOSE OF REFRESHING RECOLLECTION.

THE WITNESS:  SURE.

BY MR. LOKER:

Q.   FOR YOUR PREPARATION TODAY, AND ALSO I GUESS WE DEPOSED YOU IN THIS MATTER, DID YOU LISTEN TO RECORDINGS FOR THIS PARTICULAR CASE?

A.   I LISTENED -- DO YOU MEAN THE ADMONITION RECORDINGS?

Q.   NO.  MY APOLOGIES.  I MEANT RECORDINGS THAT WERE WITHIN COMENITY'S RECORDS ON THIS PARTICULAR ACCOUNT?

A.   CALL RECORDINGS?

Q.   EXACTLY.

A.   YES, YES, I DID.

Q.   AND THERE WERE CERTAIN CALL RECORDINGS FROM 2017; IS THAT RIGHT?

A.   YES.

Q.   AND 2018 AS WELL?

A.   YES.

Q.   AND THEN WE HAVE CALL RECORDINGS FROM 2023?

A.   YES.

Q.   AND DO YOU RECALL ANYTHING ABOUT THOSE RECORDINGS?

A.   I'M SORRY, WHAT DO YOU MEAN?

Q.   IN TERMS OF THE VOICES.  SO DID THE VOICES SOUND THE SAME BETWEEN THE EARLIER RECORDINGS AND THE LATER RECORDINGS?

A.   UM, I MEAN, I CAN'T SAY THEY SOUND THE SAME.  I'M NOT

NECESSARILY ABLE TO ANALYZE A VOICE.

I CAN TELL YOU I HEARD A MALE, AND I HEARD AN ACCENT, AND I HEARD SERVICING REQUESTS ON THOSE CALLS.

Q.   BUT YOU HAVE MADE THE DETERMINATION IN OTHER INSTANCES THAT THERE'S TWO DIFFERENT VOICES ON THE RECORDINGS; RIGHT?

A.   I DON'T KNOW WHAT YOU MEAN.  I'M SORRY.

Q.   IN TERMS OF, YOU KNOW, OTHER CONSUMERS WHO DISPUTED FRAUD, DO YOU RECALL TESTIFYING THAT YOU HEARD TWO DIFFERENT VOICES BOTH SAYING THAT THEY'RE THE SAME PERSON?

A.   I FEEL LIKE IF IT'S SIGNIFICANTLY DIFFERENT, I COULD PROBABLY COME UP WITH THAT DETERMINATION.  BUT WE WOULD STILL BE LOOKING AT THE ACCOUNT HOLISTICALLY.

Q.   BUT THE TWO VOICES THAT YOU HAVE HEARD ON THIS PARTICULAR MATTER -- AND I'LL CALL THEM TWO JUST BECAUSE IT'S EASIER -- THEY DIDN'T SOUND SIGNIFICANTLY DIFFERENT TO YOU?

A.   OFF THE TOP OF MY HEAD, I REMEMBER HEARING A MALE AND AN ACCENT.  I'M SORRY.  THAT'S ALL I CAN TELL YOU.

Q.   NO, THAT'S PERFECTLY OKAY.

YOU PROBABLY SPENT A LOT OF TIME LOOKING AT DIFFERENT RECORDS, DIFFERENT RECORDINGS, AND IT GETS A LITTLE JUMBLED. THAT'S NORMAL.

LET'S SEE.  AND THE TRAINING THAT YOU SUPPORT -- AND I'M SORRY TO JUMP AROUND, BUT I'M TRYING TO MOVE FAST.

THE TRAINING THAT YOU SUPPORT, WAS THERE TRAINING TO THE INVESTIGATORS ON INDIRECT DISPUTES REGARDING LISTENING TO THE

RECORDINGS?

A.   WE DO INCLUDE IN THE TRAINING THAT LISTENING TO CALLS IS A RESOURCE AVAILABLE TO THEM, IF NEEDED.

Q.   AND IN EXHIBIT NUMBER 244, ANOTHER ONE YOU LOOKED AT WITH YOUR COUNSEL -- I'LL POP IT UP ON THE SCREEN.  THE FIRST PAGE IS BATES STAMP 507.

A.   YES.

Q.   AND I THINK I HAVE IT ALL THERE FOR YOU.

SO WE'RE PULLING PHONE CALLS IN THE SYSTEM NICE; IS THAT RIGHT?

A.   YES.

Q.   AND IN TERMS OF THE INVESTIGATORS IN THIS PARTICULAR MATTER, THE SEVEN THAT MR. CUMMINS AND I TALKED TO, WHAT WAS YOUR REACTION WHEN THEY WERE SAYING THAT SOME OF THEM SAID IT WAS REQUIRED, SOME OF THEM SAID THEY WOULD DO IT, SOME SAID THEY NEVER DO IT.

WHAT WAS YOUR REACTION TO THE MIXED RESULTS THERE?

A.   I MEAN, BEING A LEADER OF THIS PROCESS, A LITTLE BIT OF DISAPPOINTMENT IN SOME OF THE TESTIMONY THAT I HEARD, JUST BECAUSE IT DOESN'T REFLECT THE POLICIES THAT WE HAVE.

THE SAME WITH THE DISCUSSIONS ABOUT THE IMAGES.

Q.   AND BECAUSE OF THAT DISAPPOINTMENT, WERE ANY OF THE INVESTIGATORS THAT WEREN'T FOLLOWING THE POLICY, WERE ANY OF THEM LET GO?

A.   NO, NOT THAT I'M AWARE OF.

Q.   IN LINE WITH THAT DISAPPOINTMENT, WERE ANY INVESTIGATORS WHO WEREN'T FOLLOWING THE PROCEDURES REPRIMANDED?

A.   I CAN'T SPEAK TO THAT.  WE DON'T TYPICALLY REPRIMAND SOMEONE FOR NOT FOLLOWING A PROCEDURE.  WE DO COACH AND DEVELOP THEM FOR IMPROVEMENT, BUT I WOULDN'T CALL IT REPRIMANDING.

Q.   WHICH ONE OF THE SEVEN RECEIVED ADDITIONAL COACHING?

A.   I CAN'T SAY THAT OFF THE TOP OF MY HEAD.

Q.   IF THEY HAD RECEIVED ADDITIONAL COACHING, WOULD THERE BE A RECORD OF THAT SOMEWHERE?

A.   LIKELY WITHIN THE BANGALORE TEAM, BUT NOT SOMETHING THAT I HAVE READILY AVAILABLE.

Q.   AND NOT SOMETHING THAT YOU'VE VIEWED IN ORDER TO PREPARE FOR YOUR TESTIMONY HERE TODAY; IS THAT RIGHT?

A.   NO.

Q.   STICKING WITH THE TRAINING, DO THE WITNESSES -- THE INDIVIDUALS WHO INVESTIGATE, RECEIVE ANY SORT OF TRAINING ABOUT POLICE REPORTS?

A.   THEY'RE FRAUD INVESTIGATORS, SO THEY ARE FAMILIAR WITH POLICE REPORTS AND OTHER FRAUD RELATED DOCUMENTATION.

Q.   SO WERE YOU SURPRISED WHEN YOU WERE LISTENING TO MS. GOPINATH'S TESTIMONY WHEN SHE SAID SHE DIDN'T KNOW WHAT A POLICE REPORT WAS?

A.   YES, I WAS, ACTUALLY.

Q.   AND SOME OTHERS, INCLUDING YOUR OWN EXPERT, WOULD SAY THAT A POLICE REPORT IS THE GOLD STANDARD IN TERMS OF A FRAUD

INVESTIGATION.  WOULD YOU AGREE?

A.   I DON'T KNOW WHAT THEY MEAN BY "GOLD STANDARD."  I THINK SOMEONE CAN ASSERT A FRAUD CLAIM THROUGH A POLICE REPORT, BUT I DON'T -- I DON'T KNOW WHAT YOU MEAN.

Q.   FAIR ENOUGH.

AND JUST GOING TO EXHIBIT NUMBER 14.  THIS WAS THE ACDV WE REVIEWED WITH MS. GOPINATH.  JUST IT HAD THE REFERENCE TO A POLICE REPORT, BUT IT DOESN'T SOUND LIKE THAT WAS NECESSARY FOR YOUR RECOLLECTION.

FOR MY NEXT QUESTION, MS. GOPINATH ALSO HAD DIFFICULTY RECALLING WHAT AN FTC IDENTITY THEFT REPORT WAS.

DO YOU RECALL HER TESTIMONY THERE?

A.   I DO.

Q.   AND SAME SORT OF -- I DON'T WANT TO USE THE WRONG WORD.  I THINK YOU SAID DISAPPOINTED THAT SHE DIDN'T KNOW WHAT IT WAS?

A.   RIGHT.  I DON'T SEE THE FTC REPORT OR THE POLICE REPORT ATTACHED HERE, SO THAT COULD HAVE BEEN WHAT SHE MEANT, BUT I CAN'T SAY FOR SURE.

Q.   WE DON'T WANT YOU TO SPECULATE, AND THAT WASN'T MY QUESTION.

BUT SHE JUST SAID SHE DIDN'T KNOW WHAT A POLICE REPORT WAS AND SHE DIDN'T KNOW WHAT AN FTC IDENTIFY THEFT REPORT WAS; RIGHT?

A.   I THINK THAT'S WHAT SHE SAID, YES.

Q.   WAS THERE ANY SORT OF TRAINING -- AND I CAN ASSUME THE

FORD CROSS BY MR. LOKER

ANSWER, OF COURSE -- DID THE INVESTIGATORS RECEIVE ANY SORT OF TRAINING ABOUT NOT READING THE DISPUTES?

A.    NO.   IT'S ACTUALLY INCLUDED IN OUR TRAINING THAT THEY SHOULD BE REVIEWING THE DISPUTES IN FULL.

Q.    AND WHEN THOSE TRAININGS AND THE ARTICLES ARE UPDATED, THE INVESTIGATORS RECEIVE THOSE IN REAL TIME; IS THAT RIGHT?

A.    IT'S COMMUNICATED IN MEMOS.   WE HUDDLE WITH THE ASSOCIATES TO PROVIDE THOSE UPDATES, YES.

Q.    WITH THE POLICY CHANGING TO HAVING THE INVESTIGATORS NOW READ THE DISPUTES, DID COMENITY GO BACK IN ITS ARCHIVES AND LOOK AT THOSE DISPUTES THAT WERE NOT PREVIOUSLY READ?

A.    I JUST WANT TO BE CLEAR.   I DON'T KNOW THAT THE POLICY CHANGED TO NOW READ DISPUTES.

I THINK WE FOUND A GAP, POTENTIALLY IN OUR PROCEDURES, NOT OUTLINING THAT IMAGES SHOULD BE REVIEWED, AND THAT WAS UPDATED.

BUT, NO, WE DIDN'T -- IT WAS ALWAYS A PART OF THE PROCESS THAT IMAGES SHOULD BE REVIEWED AS PART OF THE DISPUTE.

AND, NO, WE WOULD NOT DO ANY LOOKBACK ON PRIOR DISPUTES.

Q.    AND IT WAS PART OF THE WRITTEN PROCESS.

BUT DO YOU RECALL MS. BANU'S TESTIMONY, FOR EXAMPLE, WHERE SHE SAID OUR PROCESS WAS TO NOT LOOK AT IMAGES?

A.    I REMEMBER THAT TESTIMONY, YES.

Q.    AND WHEN THAT PROCESS WAS IN LINE, DISPUTES WERE NOT READ? I'M NOT GOING TO TRY TO QUANTIFY HOW MANY DISPUTES, BUT YOU WOULD AGREE THAT WITH THAT PROCESS IN EFFECT, CERTAIN DISPUTES

WERE NOT READ?

A.    I HEARD HER SAY THAT SHE WAS NOT REVIEWING IMAGES.

      I ALSO HEARD HER SAY -- MS. BANU SAID SHE DID NOT REVIEW IMAGES AS A PART OF HER INVESTIGATION, THAT'S CORRECT.

Q.    DID COMENITY EVER GO BACK AND APOLOGIZE TO THE CONSUMERS WHOSE DISPUTES WERE NOT READ?

A.    WE WOULD NOT HAVE.

Q.    AND YOU DIDN'T GO BACK AND LOOK AT THOSE DISPUTES AGAIN?

A.    NO.

Q.    DOES COMENITY -- DID COMENITY DO ANY SORT OF INVESTIGATION TO SEE HOW MANY DISPUTES IT JUST DISREGARDED?

A.    NO.

Q.    I'LL LOOK AT EXHIBIT NUMBER 157 AGAIN.

      I'LL CONTINUE ON THE SECOND -- I'M SORRY, THE LAST SENTENCE.  "INACCURATELY REPORTING CREDIT INFORMATION CAN CAUSE HARM" --

A.    I'M SORRY.  CAN YOU PUT IT ON THE SCREEN?

Q.    I'M SORRY.  THAT WAS THE TAP ON MY ARM THAT I IGNORED. SORRY.

      DO YOU SEE IT NOW?

A.    YES.

Q.    MY APOLOGIES FOR THAT.

      "INACCURATELY REPORTING CREDIT INFORMATION CAN CAUSE HARM TO CONSUMERS AND INCREASE REGULATORY, FINANCIAL, AND REPUTATIONAL RISKS."

DID I READ THAT CORRECT?

A.   YES.

Q.   AND THIS IS COMING FROM COMENITY'S PROCEDURES; RIGHT?

A.   IT IS.

Q.   AND SO WHAT SORT OF HARM DOES COMENITY ACKNOWLEDGE THAT INACCURATE CREDIT REPORTING CAN CAUSE CONSUMERS?

A.   I DON'T REMEMBER THE QUESTION.  I'M SORRY.

Q.   SO, AGAIN, READING THROUGH THIS LAST SENTENCE.

A.   RIGHT.

Q.   "INACCURATELY REPORTING CREDIT INFORMATION CAN CAUSE HARM TO CONSUMERS."

A.   RIGHT.

Q.   AND THIS IS COMING STRAIGHT FROM COMENITY'S PROCEDURES; RIGHT?

A.   RIGHT.

Q.   AND WHAT SORT OF HARM IS COMENITY ACKNOWLEDGING THAT INACCURATE CREDIT REPORTING CAN CAUSE CONSUMERS LIKE MR. PANCHENKO?

A.   IF I UNDERSTAND THE QUESTION, YOU'RE ASKING WHAT HARM COULD WE BE CAUSING A CONSUMER BY REPORTING INCORRECT INFORMATION?

Q.   EXACTLY.

A.   I THINK WE HAVE AN OBLIGATION TO REPORT ACCURATE INFORMATION, OR INFORMATION THAT WE BELIEVE TO BE ACCURATE. IT'S A REQUIREMENT.

SO, YES, IT'S GOING TO HURT A CONSUMER IF WE ARE REPORTING INFORMATION THAT IS INACCURATE.

Q.   OKAY.   BUT YOUR POSITION IS THAT MR. PANCHENKO IS NOT THE VICTIM, SO IT SHOULD REMAIN ON HIS CREDIT?

A.   I DON'T KNOW ALL HIS CREDIT.

BUT I -- AGAIN, I THINK, BASED ON THE INVESTIGATION THAT WE PERFORMED, WE DID NOT SEE FRAUD INDICATORS.

HOW THAT IMPACTED MR. PANCHENKO, I CAN'T SAY.

Q.   AND WHY WAS IT REMOVED FROM HIS CREDIT?

A.   BASED ON THE NOTES THAT I SAW IN THE VCARS, I BELIEVE IT WAS REMOVED BASE ON THIS LITIGATION CASE.

Q.   AND IT WAS REMOVED IN DECEMBER OF 2023; IS THAT RIGHT?

A.   I BELIEVE THAT VAGUELY FROM THE AUD FORM.

Q.   AND MR. PANCHENKO -- YOU MIGHT NOT KNOW THIS -- BUT HE INITIATED THIS CASE IN SEPTEMBER OF 2023.

DOES THAT SOUND RIGHT?

A.   I'M NOT SURE EXACTLY.

Q.   BUT EITHER WAY, WHY DID MR. PANCHENKO HAVE TO RETAIN COUNSEL TO INITIATE A FEDERAL LITIGATION BEFORE THIS ACCOUNT WAS DELETED?

A.   WE FOLLOWED OUR PROCEDURE.   SO WE RECEIVED A CLAIM OF FRAUD AND WE INVESTIGATED THAT CLAIM AND WE DID NOT IDENTIFY FRAUD OCCURRED.

IF WE DON'T SEE FRAUD, THEN WE CAN'T DELETE AN ACCOUNT FROM SOMEONE'S CREDIT REPORT.

MR. LOKER:  AND I'LL MOVE TO STRIKE THE ANSWER, YOUR HONOR.

I'LL JUST RE-ASK IT.

Q.    SO WHY DID MR. PANCHENKO HAVE TO RETAIN COUNSEL TO INITIATE A LAWSUIT IN FEDERAL COURT BEFORE COMENITY DELETED THE ACCOUNT FROM HIS CREDIT REPORT?

A.    OUR INVESTIGATION DID NOT IDENTIFY THAT FRAUD OCCURRED, SO WE DID NOT DELETE THE TRADELINE FROM HIS CREDIT REPORT.

Q.    AND WHAT ADDITIONAL INFORMATION DID YOU RECEIVE FROM THE LAWSUIT THAT MADE COMENITY FEEL COMFORTABLE DELETING THE ACCOUNT FROM HIS CREDIT REPORT?

A.    I CAN'T SAY THAT -- IT WAS DELETED BY OUR LEGAL TEAM, NOT BY THE FRAUD TEAM.

Q.    AND YOU MENTIONED WITH MR. SEARS -- I'M SORRY, SEARLES, THE PHRASE "BUST OUT."  CAN YOU REMIND US WHAT THAT IS AGAIN?

A.    THAT IS WHEN SOMEONE BUSTS OUT THE CREDIT LIMIT.  THERE'S A -- "BUST OUT" IS A PHRASE WHERE SOMEONE IS TRYING TO MAX OUT THE CREDIT LIMIT.

Q.    BECAUSE THE FRAUDSTERS WANT AS MUCH MONEY AS POSSIBLE; IS THAT RIGHT?

A.    CORRECT.

Q.    SO YOU WOULD AGREE THEN THAT IT WOULD BE BETTER FOR A FRAUDSTER TO GET $200,000 AS OPPOSED TO JUST 15,000?

A.    I WOULD AGREE.

MR. LOKER:  I NOTHING FURTHER, YOUR HONOR.

THE COURT:  MR. SEARLES, YOUR WITNESS OR ANY FURTHER QUESTIONS?

MR. SEARLES:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  MS. FORD, THANK YOU FOR YOUR TESTIMONY. YOU ARE EXCUSED.

THE WITNESS:  THANK YOU.

THE COURT:  MS. GIVENTAL, DID YOU HAVE A CORRECTION OF THE EXHIBIT NUMBERS FROM IT A STIPULATION EARLIER?

MS. GIVENTAL:  YES, YOUR HONOR.  THERE WAS STIPULATION OF FACTS ENTERED AS EXHIBIT 247 AND TWO OF THE EXHIBITS REFERENCED AND BROUGHT INTO EVIDENCE -- ADMITTED INTO EVIDENCE AS A RESULT, WHICH WERE IDENTIFIED AS EXHIBITS -- TRIAL EXHIBITS 105 AND 106.  THOSE SHOULD BE STRICKEN, AND IT SHOULD BE EXHIBITS 131 AND 132 THAT SHOULD BE ADMITTED INTO EVIDENCE INSTEAD.

THE COURT:  OKAY.  THANK YOU.

(DEFENDANT'S EXHIBITS 131 AND 132 WERE RECEIVED IN EVIDENCE.)

MR. LOKER:  THANK YOU.

THE COURT:  MR. NARITA, YOUR NEXT WITNESS.

MR. NARITA:  THANK YOU, YOUR HONOR.

COMENITY HAS DECIDED THAT IT'S NOT GOING TO CALL ITS LAST WITNESS, WHO WAS OUR EXPERT WITNESS.

BECAUSE OF THAT, THERE WILL BE NO REBUTTAL CASE EITHER. SO WE'RE TRYING TO MOVE THINGS ALONG QUICKLY, AND SO WE'RE

GOING TO REST.

THE COURT:  OKAY.

MR. LOKER:  WE AGREE, IF THERE'S NO MR. ULZHEIMER, THERE'S NO MR. HOLLON.

THE COURT:  ALL RIGHT.  WELL, THIS WAS A LITTLE BIT UNEXPECTED AS THE JURORS CAN TELL IN TERMS OF NEXT STEPS FOR THIS AFTERNOON.  SO LET'S TAKE A SHORT RECESS JUST TO FIGURE OUT OUR NEXT STEPS.

MEMBERS OF THE JURY, I'M JUST GOING TO -- YOU'RE GOING TO TAKE ABOUT A FIVE MINUTE BREAK, TEN MINUTE BREAK -- LET'S SAY A TEN MINUTE BREAK.

COUNSEL AND I ARE JUST GOING TO DISCUSS WHAT MAKES SENSE FOR THIS AFTERNOON AND GO FROM THERE.  THANK YOU SO MUCH.

(JURY OUT AT 3:20 P.M.)

THE COURT:  ALL RIGHT.  WE'VE BEEN IN SESSION.  THE JURORS HAVE NOW BEEN EXCUSED.  COUNSEL IS HERE, AND THE PARTIES ARE HERE.  EVERYBODY, EXCEPT THOSE WHO ARE SPEAKING, ARE WELCOME TO SIT.

MR. NARITA, YOU COULD HAVE TOLD ME THAT AT SIDE-BAR.  I WAS THROWN OFF A LITTLE.

MR. NARITA:  I'M SO SORRY.  WELL, WE -- I MEAN, WE JUST -- WE WANTED TO WAIT TO SEE.

THE COURT:  IT WOULD HAVE BEEN HELPFUL SO WE COULD FIGURE OUT NEXT STEPS NOT IN FRONT OF THE JURY.

MR. NARITA:  MY APOLOGIES.

THE COURT: SO THAT'S FINE. YOU JUST GOT ME A LITTLE BIT FLATFOOTED THERE.

ALL RIGHT. SO HAVE YOU ALL CONFERRED ABOUT THE REST OF YOUR EXHIBITS AND SUCH AND CHECKING WITH MADAM CLERK REGARDING ALL OF THE EXHIBITS TO DATE? BECAUSE I CAN'T CLOSE THE RECORD UNTIL EVERYTHING HAS BEEN CONFIRMED AND CROSSCHECKED AND SO FORTH.

MR. LOKER: I WOULD LIKE MORE TIME IF THAT'S OKAY, YOUR HONOR.

THE COURT: OKAY. SO WE HAVE TO DO THAT, AND WE NEED TO DO VERDICT FORMS, JURY INSTRUCTIONS.

SO IS THERE ANYTHING ELSE? I DON'T THINK THERE'S ANYTHING ELSE THAT WE NEED FROM THE JURY TODAY, AND I DON'T THINK WITH ALL OF THAT WE'RE GOING TO BE ABLE TO GET TO INSTRUCTIONS.

MR. LOKER: AGREED.

MR. NARITA: ONE MORE THING FOR THE LAUNDRY LIST, YOUR HONOR. WE DID WANT TO BE HEARD BRIEFLY ON OUR RULE 50 MOTION, WHICH WE FILED, BUT WE DIDN'T HAVE ARGUMENT ON.

THE COURT: OKAY. WE'RE GOING TO KEEP IT BRIEF. YOU SUBMITTED A WRITTEN --

MR. NARITA: SURE.

THE COURT: -- BRIEF.

MR. NARITA: IT DOESN'T HAVE TO BE RIGHT NOW, YOUR HONOR.

THE COURT: THE PUNCH LIST IS FINE. I'M GOING TO

SET A TIME LIMIT, THOUGH, JUST SO COUNSEL IS VERY CLEAR ON THAT.

MR. NARITA:  ABSOLUTELY.

THE COURT:  LET ME JUST LOOK AT MY OWN PUNCH LIST AND MAKE SURE WE'RE ALL ON THE SAME.

SO WE HAVE THE RULE 50, WE HAVE INSTRUCTIONS, WE HAVE EXHIBITS.

MR. NARITA:  VERDICT FORM.

THE COURT:  VERDICT FORM.

ANYTHING ELSE WE NEED TO DO THIS AFTERNOON?

MR. LOKER:  NOT FROM THE PLAINTIFF'S PERSPECTIVE, YOUR HONOR.

THE COURT:  THANK YOU.  MR. NARITA.

MR. NARITA:  I CAN'T REMEMBER IF THE LIST THAT YOUR HONOR JUST RECITED WAS -- ALSO INCLUDED HAVING COUNSEL CONNECT WITH EACH OTHER ON EXHIBITS.

WAS THAT ON YOUR LIST?

THE COURT:  IT IS.  ALL RIGHT.  SO WITH THAT WE STILL NEED TO EXCUSE THE JURORS, AND SO I NEED TO EXCUSE THE JURORS FOR THE REST OF THE DAY.

I'M GOING TO HAVE THEM COME BACK IN BECAUSE I HAVE NOT ADMONISHED THEM TODAY REGARDING THE CAUTIONARY INSTRUCTION. I'M GOING TO BRING THEM IN ONE LAST TIME.  SO THEY'RE GOING TO BE RELIEVED BECAUSE I'M GOING TO LET THEM GO.

IF YOU COULD BRING THEM BACK IN, MADAM CLERK.

AND THEN, COUNSEL, YOU'LL HAVE THE OPPORTUNITY TO MEET AND CONFER ABOUT EXHIBITS MAYBE AT THE END OF THE DAY.  WE'LL KEEP THE RECORD OPEN SO THAT WAY I CAN RELEASE MY STAFF EARLIER.

MR. LOKER:  PERFECT.

(JURY IN AT 3:24 P.M.)

THE COURT:  EVERYONE MAYBE SEATED.  AND, JURORS, YOU'RE WELCOME TO SIT AS WELL.

WE HAVE THE JURY PRESENT, AND COUNSEL AND THE PARTIES ARE PRESENT.

THIS IS GOING TO BE VERY SHORT.  TO THE MEMBERS OF THE JURY, YOU ARE BEING EXCUSED FOR THE REST OF THE DAY, AND I'M JUST BRINGING YOU IN JUST TO REMIND YOU OF THE SAME ADMONISHMENT WHICH I'VE BEEN GIVING YOU GENERALLY.  WE'RE STILL NOT AT THE POINT OF DELIBERATIONS, BUT WE ARE GETTING CLOSER.

SO YOU MUST DECIDE THIS CASE BASED SOLELY ON THE EVIDENCE PRESENTED IN THE COURTROOM.  THIS MEANS WHEN YOU LEAVE HERE TONIGHT, YOU MUST NOT CONDUCT ANY INDEPENDENT RESEARCH ABOUT THIS CASE, MATTERS IN THIS CASE, THE LEGAL ISSUES IN THIS CASE, OR THE INDIVIDUALS OR OTHER ENTITIES INVOLVED.

THIS IS IMPORTANT FOR THE SAME REASONS, YOU KNOW, I'VE BEEN INSTRUCTING YOU THROUGHOUT JUST IN TERMS OF NOT BEING EXPOSED TO MEDIA, SOCIAL MEDIA, OR COMMUNICATE WITH ANYONE ELSE.  THIS IS TO ENSURE THE INTEGRITY OF THE PROCESS.

AND YOU STILL MUST NOT COMMUNICATE WITH ANYONE ELSE ABOUT THIS CASE.

YOU WILL BE ABLE TO ONCE WE BEGIN DELIBERATIONS TOMORROW. AND SO OUR EXPECTATION IS THAT TOMORROW YOU'LL COME BACK, AND YOU'LL HEAR MORE INSTRUCTION FROM ME, YOU'LL HEAR CLOSING ARGUMENTS, AND WELL BEFORE LUNCH THE CASE WILL BE IN YOUR HANDS FOR DELIBERATION.

SO WITH THAT, ENJOY THE REST OF YOUR AFTERNOON.  THANK YOU SO MUCH FOR YOUR ATTENTION TODAY.  IT'S VERY MUCH APPRECIATED.

YOU ARE EXCUSED.

(JURY OUT AT 3:26 P.M.)

THE COURT:  COUNSEL, LET'S GO AHEAD AND BE SEATED, OTHER THAN THOSE WHO ARE ADDRESSING VARIOUS ISSUES.

LET'S START WITH INSTRUCTIONS.  AND I WILL DO THE MOTION, BUT I FEEL LIKE SOMETIMES THINGS PERCOLATE FOR A WHILE AND THEN SOMETIMES ISSUES COME UP.  SO IT'S BETTER TO DO INSTRUCTIONS, AND MAYBE WE'LL DO THE MOTION IN THE MIDDLE OR AT THE END.

I JUST WANT TO MAKE SURE THAT WE DON'T MISS ANYTHING.  I WANT TO MAKE SURE THAT WE IDENTIFY ANYTHING THAT WE NEED TO IT.

MR. LOKER:  YES.

MR. NARITA:  ABSOLUTELY, YOUR HONOR.

THE COURT:  SO RIGHT NOW I HAVE THE JURY INSTRUCTIONS IN FRONT OF ME, AND I'M LOOKING AT THE TABLE OF CONTENTS.

WE HAVE ALREADY DISCUSSED AND I'VE ALREADY GIVEN THE WHOLE 1.11, THE 1.0 SERIES, WHICH TAKES US THROUGH INSTRUCTION NUMBER 12.  IT ALSO NOW INCLUDES THE LIMITED PURPOSE INSTRUCTIONS.

ANY COMMENTS REGARDING ANY OF THOSE?

MR. LOKER:  NO COMMENTS FROM THE PLAINTIFFS, YOUR HONOR.

MR. NARITA:  NONE FROM THE DEFENDANT.

THE COURT:  SO LET ME CONTINUE -- I WAS MISTAKEN, IT GOES THROUGH 1.20 AND 1.21.

SO THEN WE HAVE THE CAUTIONARY 2.0.

AND THEN WE BEGIN THE REST OF THE 2.0 SERIES, AND THERE'S A NUMBER OF THESE WHICH WE PROBABLY DON'T NEED AT THIS POINT NOW THAT WE'RE AT THE CLOSE OF EVIDENCE.

MR. LOKER:  AGREED.

THE COURT:  SO I JUST WANT TO MAKE SURE WE TAKE OUT THE ONES THAT WE DON'T NEED.

MR. NARITA:  OKAY.

THE COURT:  SO LET'S DO THAT.  DEPOSITION IN LIEU OF LIVE TESTIMONY WE'RE KEEPING OBVIOUSLY.

INSTRUCTION NUMBER 24 REGARDING IMPEACHMENT EVIDENCE.  SO THAT WAS THE ONE EXHIBIT -- I'M JUST TAKING A LOOK.  I DON'T BELIEVE THAT IT -- SO, MR. NARITA, I'M INCLINED TO STRIKE THAT ONE BECAUSE IT BEGINS WITH AFTER IT WAS INTERPRETED, THE EMAIL, THERE WASN'T AN INCONSISTENT STATEMENT, SO THERE WASN'T IMPEACHMENT, AND THERE'S NO OTHER EXAMPLE THAT I CAN THINK OF IN THE TESTIMONY.

SO I WOULD JUST ASK BOTH THE PARTIES, IS THERE SOMETHING I'M MISSING?

MR. LOKER:  NO.  WE AGREE IT SHOULD BE REMOVED.

MR. NARITA:  NO OBJECTION TO REMOVING IT.

THE COURT:  SO 2.9 IS -- SO INSTRUCTION NUMBER 24, MODEL INSTRUCTION 2.9 WILL BE REMOVED.

SO CONTINUING DOWN.

INSTRUCTION NUMBER 25 REGARDING THE USE OF INTERROGATORIES, REMOVED.

INSTRUCTION NUMBER 26 REGARDING THE USE OF REQUEST FOR ADMISSIONS, REMOVED.

MR. LOKER:  AGREED.

THE COURT:  INSTRUCTION NUMBER 27 REGARDING EXPERT OR OPINION TESTIMONY.  IN LIGHT OF WHAT HAS JUST HAPPENED, IT SEEMS AS THOUGH THAT WILL BE REMOVED.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  CORRECT.

THE COURT:  INSTRUCTION NUMBER 28, CHARTS AND SUMMARIES NOT RECEIVED INTO EVIDENCE AND CHARTS AND SUMMARIES RECEIVED INTO EVIDENCE.

NUMBER 29, RECEIVED INTO EVIDENCE CLEARLY CAN BE STRICKEN.

IS THERE SOMETHING REGARDING 28 THAT I SHOULD BE AWARE OF, CHARTS AND SUMMARIES?  I'M JUST LOOKING IT UP.  IN TERMS OF IS THERE ANYTHING BEING USED IN THE CLOSING?

MR. LOKER:  ACTUALLY, I DON'T KNOW.

THE COURT:  WORK IN PROGRESS.

MR. NARITA:  WE'RE GOING TO GO BACK AND WRITE OUR

CLOSING ARGUMENTS, YOUR HONOR.

MR. LOKER:  RIGHT.

MR. NARITA:  AND WHAT I WAS GOING TO SUGGEST ON THAT IS, AND WHAT I'VE DONE IN THE PAST CASES IS IF AT SOME POINT IN THE WEE HOURS OF THE NIGHT MR. LOKER AND I CAN EXCHANGE ANY DEMONSTRATIVES THAT WE DECIDE THAT WE MIGHT WANT TO OFFER, THEN THE OTHER ONE WOULD HAVE IT.

AND THEN IF I THOUGHT LIKE, OH, MY GOD, HIS DEMONSTRATIVE IS MISLEADING OR SOMETHING LIKE THAT OR RELIES ON SOMETHING THAT WASN'T IN EVIDENCE, THEN WE CAN WORK THAT OUT WITH THE COURT IN THE MORNING.

THAT'S WHAT I'VE TRIED TO DO.

THE COURT:  WELL, I THINK THAT'S TRUE, AND THAT'S SEPARATE AND APART FROM INSTRUCTION NUMBER 28, WHICH IS BASICALLY WHETHER OR NOT IT'S COMING INTO EVIDENCE.  NO MATTER WHAT IT WON'T BE COMING INTO EVIDENCE.

MR. NARITA:  IT WON'T.

MR. LOKER:  RIGHT.

THE COURT:  I'LL KEEP IT THERE IF YOU HAVE CHARTS AND SUMMARIES.  AND IF YOU DON'T HAVE CHARTS AND SUMMARIES, REMIND ME.  I'LL PROBABLY STOP IN THE MIDDLE OF THE INSTRUCTION, BUT WE'LL JUST KEEP THAT IN MIND.

REGARDING CHANGING DEMONSTRATIVES OR POWER POINTS FOR TOMORROW, IF YOU ARE DOING THAT IN THE WEE HOURS, YOU ALSO ARE MEETING AND CONFERRING IN THE WEE HOURS, BECAUSE THERE SHOULD

BE VERY LITTLE OF ANYTHING BROUGHT TO ME TOMORROW MORNING.  SO I'M HOPING THAT THAT IS RESOLVED BY 8:30 IN THE MORNING, BUT IF NOT, WE'LL TAKE IT UP THEN.  SO MEET AND CONFER.

MR. NARITA:  THE LAST TRIAL I HAD, THE ONLY PROBLEM WE HAD WAS MY OPPOSING COUNSEL HAD IMAGES OF MONEY BAGS OR SOMETHING THAT I THOUGHT WAS A LITTLE ARGUMENTATIVE IN HIS CLOSING STATEMENT.

MR. LOKER:  IT WASN'T ME.

MR. NARITA:  IT WAS NOT MR. LOKER.

MR. LOKER:  I HAVE A GOOD IDEA NOW, THOUGH.

MR. NARITA:  IT WASN'T A GOOD IDEA.  AND THE MONEY BAGS GOT STRICKEN.

THE COURT:  AND THERE WILL BE A JOKING REFERENCE TO FLEX, BUT WE WILL JUST LEAVE THAT FOR NOW.

OKAY.  SO 28 WILL STAY FOR NOW.  YOU ALL REMIND ME TOMORROW.

SO THE VERY IMPORTANT INSTRUCTION NUMBER 30, AND THE DEFINITIONS GENERALLY.  THESE ARE THE ELEMENTS.  SO INSTRUCTION NUMBER 30, 31, 32, 33, 34, 35, 36.  I'LL STOP THERE FOR NOW. WE DISCUSSED ALL OF THOSE YESTERDAY.

SO ANY FURTHER -- I MEAN, WE HAVE ALREADY DISCUSSED THEM. THEY'VE ALREADY BEEN -- DO YOU SEE ANY TYPOS OR ANYTHING ELSE THAT THE COURT SHOULD HAVE BEEN AWARE OF IN YOUR FINAL REVIEW?

MR. LOKER:  I HAVE NOT SEEN ANY, YOUR HONOR, BUT I'LL TAKE ANOTHER LOOK.

THE COURT: OKAY.

MR. NARITA: NO. THE ONLY ISSUE, AND I WON'T LET THIS SLOP OVER INTO THE OTHER THING WE HAVE TO DISCUSS, BUT THE ONLY ISSUE IS THAT OBVIOUSLY IF ANY PORTION OF OUR RULE 50 MOTION WAS GRANTED, THEN SOME OF THESE INSTRUCTIONS MIGHT GO BY THE WAYSIDE, YOUR HONOR.

THE COURT: UNDERSTOOD, UNDERSTOOD.

THERE'S ONE THING THAT I DID WANT TO -- I ADDED THE -- TURNING TO REASONABLE INVESTIGATION, I DID INCLUDE THE BURDEN OF PROOF PER COMENITY'S SUGGESTION.

I TOOK OUT -- THERE WAS WEIRD LANGUAGE REGARDING REASONABLE VERSUS UNREASONABLE, AND I KEPT THE STANDARDS THE SAME SO THEY ARE CONSISTENT AND SWITCHED IT BACK TO REASONABLE. IT WAS PLACING A GREATER BURDEN ON -- ANYWAY, I SWITCHED IT TO THE LANGUAGE OF THE STATUTE, SO I THINK WHAT WAS IN INSTRUCTION NUMBER 30.

SO ANY DISCUSSION ABOUT THAT LAST SENTENCE?

MR. LOKER: NO DISCUSSION FOR THE PLAINTIFF, YOUR HONOR.

THE COURT: I MADE IT SO IT COMPORTED WITH INSTRUCTION NUMBER 30.

MR. NARITA: NOTHING FURTHER, YOUR HONOR.

THE COURT: OKAY. SO WE HAVE 35, 36, AND THEN WE HAVE 37 TO 44 GOING TO DAMAGES AND RECOVERY. I DON'T THINK THERE'S ANYTHING WHICH HAS CHANGED OR SURPRISING FROM LAST

NIGHT -- I MEAN, FROM YESTERDAY AFTERNOON WHEN WE MET.

MR. LOKER:  RIGHT.  NOT THAT RANGE, YOUR HONOR.

THE COURT:  NOW, WE'RE TO 45 WHICH I ASKED IS THIS NECESSARY?  I DON'T SEE HOW IT'S NECESSARY.

MR. LOKER:  NOT FROM THE PLAINTIFF'S PERSPECTIVE, YOUR HONOR.

MR. NARITA:  CAN I READ IT?

(PAUSE IN PROCEEDINGS.)

MR. NARITA:  WHAT WAS THE QUESTION THE COURT POSED, YOUR HONOR?

THE COURT:  I HAD ASKED ABOUT REMOVING 45 YESTERDAY, INSTRUCTION NUMBER 45.  I BELIEVE IT WAS YESTERDAY.  IT COULD HAVE BEEN THE DAY BEFORE, BECAUSE IT'S NOT REFERENCED ELSEWHERE IN THE INSTRUCTIONS.  IT'S NOT REALLY BEEN REFERENCED IN THE TESTIMONY.

I THINK ANY REFERENCE TO IT MIGHT HAVE BEEN IN THE EXPERT REPORTS, AND I FEEL NOW IT WOULD DEFINITELY LEAVE CONFUSION GIVEN WHERE WE STAND WITH THE EXPERTS AND SO FORTH.

MR. LOKER:  AGREED.  AND AS TO THE DISCUSSION YESTERDAY, SO MS. GIVENTAL SAID SHE WANTED TO LEAVE IT IN CASE MR. ULZHEIMER REFERRED TO IT, AND THAT'S WHY WE DIDN'T STRIKE IT THE OTHER DAY.

THE COURT:  YEP, BECAUSE WE DIDN'T HAVE THE EXPERT TESTIMONY.

MS. GIVENTAL -- OH, MR. NARITA.

MR. NARITA:  I THINK WE HAVE NOTHING FURTHER ON THE POINT, YOUR HONOR.  WE THINK OUR INSTRUCTION IS ACCURATE.

THE COURT:  I THINK IT'S ACCURATE, TOO, BUT WE DISCUSSED IT BEING NECESSARY BECAUSE THE EXPERTS, AND SO WE'RE NOT HAVING THE EXPERTS, SO I JUST -- I DON'T WANT TO CONFUSE, BECAUSE THERE'S SO MANY DIFFERENT TERMS IN THIS CASE, I JUST DON'T WANTED IT TO LEAD TO CONFUSION.

MR. NARITA:  UNDERSTOOD.

THE COURT:  OKAY.  SO GIVEN THAT WE DON'T HAVE EXPERTS PREVIOUSLY MENTIONED, AND SO NOW I WILL REMOVE IT.

SO THEN WE HAVE THE 3.0 SERIES, WHICH IS -- WE WILL DO OBVIOUSLY THROUGH -- I WILL DO THE DUTY TO DELIBERATE, CONSIDERATION OF THE EVIDENCE, COMMUNICATIONS WITH THE COURT, READ BACK OR PLAYBACK, BUT THEN I'M GOING TO STOP.  IT WILL DEPEND ON WHAT HAPPENS, RIGHT?

STIPULATED FACTS.  I WASN'T PLANNING TO REREAD THOSE AND JUST SEND THEM BACK.

DO YOU WANT ME TO REREAD THEM?

MR. LOKER:  I THINK WE SHOULD SEND THEM BACK CONSIDERING THE VOLUME, YOUR HONOR.

MR. NARITA:  I AGREE, YOUR HONOR.

THE COURT:  THANK YOU.  BUT I WILL SAY AT LEAST SAY THE FIRST PART OF IT TO INDICATE THAT THE COURT -- AND IT'S BEEN ATTACHED AS AN EXHIBIT BECAUSE WE NOW HAVE IT AS AN EXHIBIT, SO THAT WAY THEY'LL REMEMBER WHICH EXHIBIT NUMBER IT

677

IS.

MR. LOKER:  YES.  THANK YOU, YOUR HONOR.

THE COURT:  SO I THINK -- LET ME JUST DOUBLE CHECK MY NOTES.

AND MY UNDERSTANDING IS THAT AS TO 50, BOTH PARTIES HAD ASKED, AND I'M REFERRING TO INSTRUCTION NUMBER 50, BOTH PARTIES ASKED THAT THEY EXPLAIN THE FORMS.

MR. LOKER:  CORRECT, YOUR HONOR, FOR THE PLAINTIFF.

MR. NARITA:  CORRECT, YOUR HONOR.

THE COURT:  ALL RIGHT.  I WILL SEE WHAT I AM GOING TO DECIDE REGARDING THAT.  WE WILL -- BECAUSE THERE'S NO PROPOSED LANGUAGE REGARDING THAT.  SO IT WILL PARTIALLY DEPEND WHERE WE SHAKE OUT ON THE FORMS, WHICH I GUESS WE CAN TURN TO NOW, UNLESS THERE'S SOMETHING ELSE THAT THE PARTIES WANTED TO RAISE, WHICH COUNSEL WANTED TO RAISE REGARDING INSTRUCTIONS.

MR. LOKER:  NOTHING FROM THE PLAINTIFF ON THE INSTRUCTIONS, YOUR HONOR.

THE COURT:  EXCEPT THE ONE THAT YOU HAD PROPOSED AND THE VERDICT FORM MODIFICATION THAT COMENITY HAD.

MR. LOKER:  EXACTLY.

MR. NARITA:  AND FOR THE DEFENDANT, I THINK THE ISSUES SORT OF DOVETAIL.

THE COURT:  YEAH, UNDERSTOOD.

SO ONE THING WHICH I WAS NOTING, AND I WAS LOOKING AT THE INSTRUCTIONS AND LOOKING AT THINGS TODAY, WE HAVE SOMETIMES

SAID PLAINTIFF AND WE SOMETIMES SAID PANCHENKO, AND WE GENERALLY SAY COMENITY INSTEAD OF THE DEFENDANT.  WE'VE SAID COMENITY INSTEAD OF DEFENDANT.

MR. LOKER, DO YOU HAVE ANY PREFERENCE REGARDING REFERENCE TO PLAINTIFF OR MR. PANCHENKO?

MR. LOKER:  MY PREFERENCE, YOUR HONOR, IS TO SAY HIS NAME, JUST PANCHENKO WOULD BE FINE, JUST TO AVOID CONFUSION OF WHO'S THE PLAINTIFF, WHAT IS THE PLAINTIFF'S ROLE IN THE CASE.  SO I THINK BY GIVING A NAME, WE'LL ALL KNOW EXACTLY WHO WE ARE TALKING ABOUT.

MR. NARITA:  NO OBJECTION.

THE COURT:  YES, I'M LOOKING.  IT GOES BACK AND FORTH.  INSTRUCTION NUMBER 4 IT SAYS PANCHENKO, BUT THEN LATER ON IT SAYS IN 9.2 WE SAID PLAINTIFF'S ALLEGATION, THAT'S THE LIMITING INSTRUCTION.  SO IT GOES BACK AND FORTH.

SO I ACTUALLY, I THINK THAT WOULD BE -- WE'LL PROBABLY TRY TO MAKE IT MORE CONSISTENT.  I NOTE THAT WITH THE OUTLINE OF THE TRIAL, FOR EXAMPLE, I'LL PROBABLY KEEP IT JUST AS PLAINTIFF AND DEFENDANT BECAUSE IT'S THE MODEL INSTRUCTION AND IT'S REFERRING TO THIS IS HOW TRIALS RUN GENERALLY.

MR. LOKER:  RIGHT.

THE COURT:  BUT WE'LL TAKE A LOOK AT IT WHEN WE'RE GOING THROUGH OUR LAST EDIT.

MR. LOKER:  THANK YOU.

THE COURT:  OKAY.  THIS DOES DOVETAIL, AS MR. NARITA

MENTIONED, INTO DISCUSSION ABOUT THE PROPOSED VERDICT FORMS.

AND MR. PANCHENKO'S LAST -- WELL, I'M GOING TO SAY PLAINTIFF RIGHT NOW, BUT MR. PANCHENKO KEEPS LOOKING AS THE EXPECTATION.

SO WITH PLAINTIFF'S PROPOSED INSTRUCTION AND COMENITY'S PROPOSED CHANGE TO THE VERDICT FORM.  SO LET ME PULL THOSE UP.

(PAUSE IN PROCEEDINGS.)

THE COURT:  ALL RIGHT.  SO LATE LAST NIGHT, OR PERHAPS IN THE WEE HOURS OF THIS MORNING, I HAD RECEIVED FROM THE PARTIES -- I HAD ASKED YESTERDAY FOR THE PARTIES TO PROPOSE A JURY INSTRUCTION REGARDING DIRECT VERSUS INDIRECT.

WE HAD ALSO DISCUSSED THE VERDICT FORMS YESTERDAY.  I INDICATED THAT I WASN'T, WAS NOT INCLINED TO DO SPECIAL INTERROGATORIES OR QUESTION BY QUESTION AS TO EACH ELEMENT, BUT RATHER ASKED THE GENERAL QUESTION AND THEN BREAK DOWN THE ACTUAL, THEN WILLFUL, THE NEGLIGENT AND THEN WILLFUL.

WHAT I RECEIVED BACK FROM THE PARTIES WAS THAT THERE WAS NO JOINT SUBMISSION FOR THE INDIRECT VERSUS DIRECT JURY INSTRUCTION.  RATHER WHAT I RECEIVED WAS PLAINTIFF'S PROPOSED JURY INSTRUCTION AND DEFENDANT'S PROPOSED MODIFICATION TO THE VERDICT FORM THAT I HAD DRAFTED, THE COURT HAD DRAFTED.

IS THAT AN ACCURATE REFLECTION OF WHERE WE STAND RIGHT NOW.

MR. LOKER:  IT IS, YOUR HONOR.

MR. NARITA:  CORRECT, YOUR HONOR.

THE COURT:  SO I'M JUST GOING TO WALK THROUGH EACH AND EXPRESS MY CONCERNS, AND THEN SAY WHAT I'M INCLINED TO DO, AND THEN WE'LL HEAR FROM THE PARTIES BRIEFLY.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  SO BEGINNING WITH THE PROPOSED VERDICT FORM AND COMENITY'S PROPOSAL, MY CONCERN WITH THIS IS THAT IT'S GOING TO RAISE -- FURTHER CONFUSE ISSUES RATHER THAN CLARIFY THEM.  AND I'M ALSO WONDERING -- I HAVE SOME CONCERN ABOUT WHETHER OR NOT SOME OF THIS IS PROPER AS IT INCLUDES WHAT WOULD NORMALLY BE JURY INSTRUCTIONS INTO THE VERDICT FORM.  AND WHAT I MEAN -- INTO THE VERDICT FORM.

AND WHAT I MEAN BY THAT IS PROVIDING DEFINITIONS SUCH AS DAMAGES FROM DIRECT DISPUTE MEANS ANY DAMAGES RESULTING FROM ANY LETTER THAT PLAINTIFF SENT DIRECTLY TO COMENITY AND SO FORTH WITHIN QUESTION 2.

IN ADDITION, I'M ALSO CONCERNED THAT THIS GIVES THE JURY A FALSE CHOICE THAT IF THEY FIND THAT THERE IS NO ACTUAL DAMAGES, THAT THEY CANNOT GIVE -- IF THEY FIND THERE'S NO ACTUAL DAMAGES FROM THE INDIRECT DISPUTE, THAT THEY CANNOT RECEIVE THE REST OF THE REMEDIES FROM THE WILLFUL VIOLATION, AND I DO NOT BELIEVE -- WELL, THAT'S NOT A CORRECT STATEMENT OF THE LAW AS I CONFIRMED EARLIER DURING OUR LAST CONFERENCE DURING THE BREAK.

SO THOSE ARE MY CONCERNS IN TERMS OF THE VERDICT FORM PROPOSED BY COMENITY.

IN TERMS OF WHAT WAS PROPOSED BY PLAINTIFF, THE

DEFINITIONS IN TERMS OF THE PHRASES -- DEFINING THE PHRASE DIRECT DISPUTE AND INDIRECT DISPUTE IS IN LINE OF WHAT I WAS THINKING OF IN TERMS OF PROVIDING DEFINITIONS AND INSTRUCTION FOR THE JURY.

I DID HAVE A PROPOSED CHANGE OF THE THIRD PARAGRAPH, OR I GUESS IT'S THE THIRD SENTENCE, TO MAKE IT PARALLEL WITH WHAT INSTRUCTION NUMBER 30 SETS FORTH IN TERMS OF THE ELEMENTS.

SO RATHER THAN ANY LIABILITY FOR PANCHENKO'S CLAIM AGAINST COMENITY ARE RELATED TO INDIRECT DISPUTES BECAUSE THAT WAS NOT THE VERBIAGE WHICH WAS STATED IN INSTRUCTION 30.

STATING INSTEAD, YOU MAY ONLY FIND THAT COMENITY VIOLATED FCRA IF YOU FAIL -- IF IT FAILS TO REASONABLY INVESTIGATE ONE OR MORE INDIRECT DISPUTES.

SO TYING IN THAT VIOLATION OF FCRA LANGUAGE WAS WHAT I WAS TRYING TO DO FROM THE VERDICT FORM AND FROM INSTRUCTION NUMBER 30.

AND THEN THE LAST SENTENCE JUST CLARIFYING IT, JUST STATING WHAT INFORMATION COMENITY HAD IN ITS POSSESSION DURING ITS INVESTIGATION OF THE DIRECT DISPUTE.

SO YOU NOW HAVE ALL THREE OF DIFFERENT THINGS.  YOU HAVE THE VERDICT FORM AND MY COMMENTS TO COMENITY'S VERDICT FORMS; YOU HAVE MY COMMENTS TO PLAINTIFF'S PROPOSED JURY INSTRUCTIONS.

SO LET'S PROCEED WITH THE PLAINTIFF.

MR. LOKER:  THANK YOU, YOUR HONOR.

IN TERMS OF THE JURY INSTRUCTIONS, REALLY ONLY THE ONES WE

WANTED TO PROPOSE WERE NUMBER 1 AND 2.

I DRAFTED 3, 4, AND 5 TO TRY TO ADDRESS MR. NARITA'S CONCERNS ABOUT THE DISTINCTION BETWEEN DIRECT -- DAMAGES FROM A DIRECT DISPUTE AND DAMAGES FROM AN INDIRECT DISPUTE.  SO THOSE WERE A MATTER OF COMPROMISE.

MY PREFERENCE WOULD BE JUST TO INCLUDE 1 AND 2.  AND WHEN I SENT THESE OVER TO MR. NARITA, WE GOT A REJECTION AND THE VERDICT FORM IN RESPONSE.  SO I DON'T KNOW IF HE WANTED THOSE EITHER, BUT THAT'S WHY WE ADDED 3, 4, AND 5 TO TRY AND COMPROMISE.

THE COURT:  SO PLAINTIFF IS REQUESTING THAT I ONLY GIVE INSTRUCTION FOR 1 AND 2, AND THEN I ASSUME ANY COMMENTS REGARDING THE CONCERNS I RAISED REGARDING COMENITY'S PROPOSED VERDICT FORM?

MR. LOKER:  SAME CONCERNS, BUT ONE ADDITIONAL CONCERN ON TOP OF THAT, YOUR HONOR.

SO, AGAIN, GOING BACK TO MR. NARITA'S DISCUSSION YESTERDAY, HE WAS CONCERNED THAT THE JURY MIGHT BE CONFUSED BY ANY DAMAGES ASSOCIATED WITH DIRECT DISPUTES.

AND THEN QUESTION NUMBER 3 SPECIFICALLY ASKED, WHAT ARE THE PLAINTIFF'S DAMAGES FROM HIS DIRECT DISPUTES WITH COMENITY?

AND I THINK THAT'S MISLEADING AND CONFUSING FOR THE JURY TO ASSIGN AN AMOUNT TO THOSE DAMAGES, AND I THINK THAT WOULD BE COUNTERPRODUCTIVE TO THE GOALS THAT MR. NARITA HAD AND THE CONCERNS THAT HE HAD ABOUT THE COURT'S VERDICT FORM, WHICH THE

PLAINTIFF AGREED TO THE COURT'S VERDICT FORM AS WELL.

THE COURT:  THE COURT SHARES THAT CONCERN.

I LAST LOOKED AT IT THIS MORNING, AND SO THAT WAS THE CONCERN WHICH I ALSO WAS CONCERNED WITH, BUT I HAD FORGOTTEN BY THE TIME WE ARE AT 4:00 O'CLOCK IN THE AFTERNOON.

MR. NARITA, FOR COMENITY?  SAME QUESTIONS.

MR. NARITA:  SURE.  IT MAY BE THAT SOME ADDITIONAL JURY INSTRUCTION IS APPROPRIATE, AND IT MAY BE THAT PORTIONS OF WHAT I PUT INTO THE VERDICT FORM COULD FORM THE BASIS OF AN ADDITIONAL INSTRUCTION.  I ACKNOWLEDGE THAT.

MY MAIN CONCERN IS WHEN I READ THE COURT'S PROPOSED VERDICT FORM, BEFORE I RED LINED IT, THE FIRST QUESTION WAS WHETHER -- AS IT READ WAS DID COMENITY CAPITAL BANK VIOLATE THE FAIR CREDIT REPORTING ACT, YES OR NO?

AND THEN THE NEXT WAS DID PLAINTIFF SUFFER ANY ACTUAL DAMAGES, I BELIEVE IT WAS SOMETHING I CAN'T READ, BUT FROM THE VIOLATION OF THE FAIR CREDIT REPORTING ACT.  MY RED LINES HAVE NOW PUSHED OUT THE COURT'S ORIGINAL LANGUAGE A LITTLE BIT, BUT I THINK IT WAS SOMETHING ALONG THOSE LINES.

AND SO THE PROBLEM I THINK WE HAVE IN THE RECORD OF THIS CASE GOES BACK TO OUR MOTION IN LIMINE, RIGHT?  WE FILED A MOTION IN LIMINE.  WE SAID THERE SHOULD BE NO EVIDENCE AT ALL INTRODUCED IN THIS CASE REGARDING THE PLAINTIFF'S DIRECT DISPUTES.  WE EXPLAINED THAT THERE'S NO PRIVATE RIGHT OF ACTION FOR THAT AND THAT THERE'S LOTS OF NINTH CIRCUIT AUTHORITY ON

THAT.  AND SO WE MOVED TO EXCLUDE IT ALL.

AND MR. LOKER HAD HIS ARGUMENT ABOUT WHY THAT KIND OF EVIDENCE HAD COME IN, AND HOW IT MIGHT TIE SOMEHOW TO WHAT AN INVESTIGATOR OF AN INDIRECT DISPUTE SHOULD HAVE LOOKED AT OR DIDN'T LOOK AT.

AND SO BASED ON THAT, THE COURT OVERRULED OUR MOTION AND WE HAD LOTS OF EVIDENCE COMING IN ON DIRECT DISPUTES.  IN FACT, IT BECAME THE MAIN EVIDENCE PRESENTED FROM MR. PANCHENKO'S DAMAGE.  THE ONLY EVIDENCE OF MR. PANCHENKO'S DAMAGE THAT WAS COMENITY SPECIFIC, THE ONLY THING HE CALLED OUT TO THE JURY, WHICH HIS WIFE THEN ECHOED WHEN SHE CAME IN, WAS COMENITY WAS AWFUL BECAUSE OF ALL OF THESE BANKS, THEY WERE THE ONLY ONES WHO TOLD ME ON THE PHONE WHEN I CALLED IN, WHICH WAS PART OF A DIRECT DISPUTE, THAT THEY WOULDN'T EVEN INVESTIGATE.  AND THAT'S WHAT REALLY SET ME OFF.  THAT HARMED ME IN A UNIQUE WAY. IT WAS DIFFERENT THAN ALL OF THESE OTHER MASSIVE BANKS AND CONSUMER REPORTING AGENCIES THAT I SUED.

HE ALSO SAID THAT I WROTE A LOT OF LETTERS TO COMENITY. WE WENT BACK AND FORTH ON WHETHER IT WAS ONE OR MORE.

HE ALSO SAID THAT I CALLED THEM A LOT.  I SAID IT WAS THREE TIMES.

THE COURT:  COUNSEL FOLLOWED UP WITH MS. FORD ABOUT THAT TODAY, RIGHT, ABOUT WHETHER OR NOT THERE WERE PHONE LOGS AND SO FORTH?

MR. NARITA:  AND SO, YOUR HONOR, THAT WAS HIS

DAMAGE.  I WAS FRUSTRATED BECAUSE I HAD TO CALL THEM DIRECTLY ON THE PHONE, AND THAT FRUSTRATED ME.

I HAD TO SPEND A LOT OF TIME WORKING ON THESE LETTERS, AT LEAST ON ONE OF THEM, BUT HE SAID THERE WERE MORE, AND THAT'S HOW COMENITY HURT ME.  TIME ON THE PHONE WITH THEM DIRECTLY DISPUTING, WRITING LETTERS DIRECTLY DISPUTING, AND PHONE CALLS.

THE COURT:  SO, MR. NARITA, THIS IS THE SAME ARGUMENT THAT YOU RAISED AT THE END OF YESTERDAY.

MR. NARITA:  CORRECT.

THE COURT:  THE COURT GAVE LIMITING INSTRUCTION PER THE PARTIES' INSTRUCTION AND EVEN ADDED MORE.  I BELIEVE THAT -- I CAN'T REMEMBER IF I WAS THE ONE WHO ORIGINALLY DRAFTED THE ADDITIONAL ONE I ADDED TO ENSURE TO ADDRESS THESE CONCERNS, AND I ASKED, AND I DID GIVE THE LIMITING INSTRUCTION, AND I SAID I'M GOING TO DO IT WITH ALL OF THESE PHONE CALLS AND EVERYTHING ELSE.

THAT LIMITING INSTRUCTION HAS BEEN GIVEN.  THERE WAS NO REQUEST OR OBJECTION OR REQUEST FOR ADDITIONAL LIMITING INSTRUCTIONS AGAIN.  THE LIMITING INSTRUCTIONS ARE ALSO NOW PART OF THE RECORD, AND THEY'RE GOING TO BE SENT BACK WITH THE JURY.

MR. NARITA:  CORRECT.

THE COURT:  AND YOU'RE ALSO GOING TO HAVE AN OPPORTUNITY -- TODAY WAS ALL ABOUT INDIRECT DISPUTES FOR THE MOST PART.

COMENITY IS GOING TO HAVE THE OPPORTUNITY TO MAKE THESE ARGUMENTS TOMORROW AS WELL IN TERMS OF THE ACTUAL DAMAGES QUESTION AND SO FORTH.

AND AS WE'VE DISCUSSED NOW, THE ACTUAL DAMAGES CAN BE ZERO AS TO THIS AND STILL THERE IS A POSSIBILITY THAT THERE COULD BE OTHER DAMAGES AWARDED.

SO AT THIS POINT YOU'VE MADE YOUR RECORD.  YOU'VE STATED YOUR POINT.  I JUST, I REALLY -- AND WE'RE GOING TO HEAR MORE ABOUT THIS I KNOW SHORTLY WHEN WE ARGUE THE RULE 50 -- WHEN YOU ARGUE THE RULE 50, I'M JUST GOING TO LISTEN, THANKFULLY, BUT I DO WANT TO MAKE SURE THAT WE DON'T LOSE SIGHT OF THAT BECAUSE WE'RE HEARING WHAT WE HEARD AT THE END OF YESTERDAY, AND WE ALSO STILL HAVE TO GET THROUGH THE JURY INSTRUCTIONS -- I MEAN, THE JURY VERDICT FORM.  AND I WANT TO HEAR YOUR ARGUMENT.

AND I ALSO REALLY NEED TO MAKE SURE THAT YOU ALL, COUNSEL, HAVE FIGURED OUT THE EXHIBITS SO THAT WE CAN VERIFY THAT WITH MADAM CLERK AND RELEASE MY STAFF AT SOME POINT BECAUSE MY INTENTION IS TO WRAP UP THOUGHTS ON THESE AND FOCUSSING ON THE VERDICT FORM OR THE JURY INSTRUCTION.

IF YOU'RE SAYING I DON'T LIKE MR. LOKER'S PROPOSAL FOR THE INSTRUCTIONS, OR WHICHEVER ONES OF THESE YOU LIKE OR DON'T LIKE, I WOULD LOVE TO HEAR THAT.  SO WE'RE GOING TO DO THAT.

I'M GOING TO HEAR THE RULE 50 ARGUMENT.

YOU ALL ARE GOING TO MEET AND CONFER.

I'M GOING TO DOUBLE CHECK MY NOTES.

YOU'RE GOING TO DOUBLE CHECK WITH MADAM CLERK ON THE EXHIBITS.

AND IF I HAVE ANYTHING ELSE THAT I NEED TO TALK TO YOU ABOUT, I WANT TO MAKE SURE THERE'S A LITTLE BIT OF TIME AT THE END OF THE DAY.  SO IF I NEED TO RUSH BACK OUT HERE AT 4:30, I CAN.

SO I MADE A RECORD.

PLEASE TURN TO THE VERDICT FORMS AND ALSO THE QUESTIONS, MR. LOKER'S FIVE, I JUST NUMBERED THEM, 1, 2, 3, 4, 5, OF THE JURY INSTRUCTIONS, AND WHETHER OR NOT COMENITY IS INTERESTED IN 3, 4, AND 5.

MR. NARITA:  SO, YOUR HONOR, THE VERY LAST POINT ON THE VERDICT FORM IS THAT YOUR HONOR RAISED A LIMITING INSTRUCTION THAT WAS GIVEN BY THE COURT.

I BELIEVE THE VERDICT FORM THAT WE HAVE PROPOSED AS RED LINED IS CONSISTENT WITH THE COURT'S LIMITING INSTRUCTION.

ALL WE'RE DOING IS TELLING -- WE'RE -- NOW THAT THE JURY HAS HEARD ALL OF THIS MASSIVE EVIDENCE ABOUT DAMAGE, WE'RE JUST TELLING THEM, PLEASE PUT IT INTO BUCKETS.  DID HE SUFFER ANY DAMAGE REGARDING HIS DIRECT DISPUTES?  THEY MIGHT SAY ZERO.  THEY MIGHT SAY A MILLION DOLLARS.  BUT WE ALL KNOW THAT IF THEY WRITE SOMETHING IN THERE, THAT'S NOT RECOVERABLE.

AND THEN WE ASK THEM, DID HE SUFFER ANY DAMAGES AS A RESULT OF THE INDIRECT DISPUTES?  AGAIN, IT COULD BE ZERO.  IT COULD BE A MILLION DOLLARS.  THAT IS GOING TO BE RECOVERABLE,

RIGHT?

AND SO THIS -- ALL I'M TRYING TO ACHIEVE WITH THE RED LINES OF THE COURT'S VERDICT FORM IS TO HAVE CLARITY ABOUT WHY THIS JURY IS OR IS NOT AWARDING DAMAGES.

I'M NOT SAYING THAT MY PROPOSED LANGUAGE IS NOT SUBJECT TO TINKERING, BUT I THINK THAT TO MAKE A CAREFUL RECORD, TO MAKE SURE THAT WE'RE NOT HAVING A JURY WHO SAYS, OH, YEAH, THERE WAS -- THERE'S A VIOLATION FOR THE INDIRECT DISPUTE. I THINK, YEAH, ONE OF THE ACDV'S, THEY MESSED UP ON THAT. AND THEN THEY JUST TAKE ANYTHING THAT THEY'VE HEARD ABOUT ANY DAMAGE MOST OF WHICH, I THINK ALL OF WHICH, IS NOT RECOVERABLE UNDER NINTH CIRCUIT AUTHORITY, AND THEY PUT THAT DOWN AS THE NUMBER.

THEN WE'VE GOT A REAL PROBLEM. IT'S A PROBLEM, I THINK, THAT STARTED WHEN THE DIRECT DISPUTE EVIDENCE CAME IN, BUT IT IS A PROBLEM THAT MR. LOKER DECIDED TO -- THIS WAS A CASE THAT HE WANTED TO TRY. IT'S HERE.

I'M JUST TRYING TO MAKE SURE THAT WE DON'T GIVE THE JURY SOMETHING AND THEY COME BACK WITH SOMETHING IN A BOX AND WE DON'T KNOW HOW THEY GOT TO IT.

AND UNLESS THE COURT HAS ANYTHING THAT YOU WANT TO ASK ME, I PROBABLY HAVE SAID MORE THAN THE COURT WANTS TO HEAR, BUT I'M GOING TO STOP UNLESS THE COURT WANTS TO FOLLOW UP WITH ME, BECAUSE I FEEL LIKE I'M --

THE COURT:  WELL, YOU'RE MAKING THE SAME POINT. MY CONCERN, WE'RE APPROACHING 4:00 O'CLOCK, IS THAT IF THE COURT

GOES WITH ITS ORIGINAL VERDICT FORM, AND I'LL TAKE ANOTHER LOOK TO SEE WHETHER OR NOT THERE'S SOME WAY -- I'VE ASKED REPEATEDLY NOW, IN LOOKING AT MR. LOKER'S FIVE PROPOSED SENTENCES, DOES COUNSEL HAVE ANY COMMENTS REGARDING SENTENCE 3, 4, OR 5?

MR. NARITA:  I THINK THE COMMENT THAT THOSE SENTENCES COULD BE -- COULD WORK AS LONG AS THERE'S ADDITIONAL LANGUAGE MAKING IT CLEAR THAT ANY DAMAGES RELATING TO DIRECT DISPUTES CANNOT BE RECOVERED.

MR. LOKER:  THAT'S NUMBER 4.

MR. NARITA:  WELL, THE LIGHT HAS GONE OFF ON THIS. YOUR HONOR, I'LL HAVE TO LOOK AT IT AGAIN.

AND I DON'T THINK HE CAPTURED IT, BUT I DON'T HAVE IT IN FRONT OF ME NOW.

THE COURT:  I THINK YOU -- I THINK COMENITY COULD HAVE OFFERED A PROPOSED MODIFICATION OF THAT LANGUAGE WHERE IT STATES ARE NOT RELEVANT.

I THINK IT WOULD ADDRESS THE CONCERN BY SAYING ANY DAMAGES ASSOCIATED WITH DIRECT DISPUTES ARE NOT RECOVERABLE.  LIKE, I MEAN, I THINK -- THAT WAS NOT ARTICULATE, BUT YOU ALL -- THAT'S SOMETHING THAT COULD BE CLEARLY STATED.

MR. NARITA:  WELL, THEN WE HAVE TO DEFINE THAT BY SAYING -- BECAUSE THE RECORD OF THIS CASE IS PRETTY CLEAR. IT'S DAMAGES FROM DIRECT DISPUTES MEANS ANY DAMAGES THAT RESULTED FROM A LETTER THAT THE PLAINTIFF SENT DIRECTLY TO COMENITY.

690

THE COURT:  THERE'S A DEFINITION OF DIRECT DISPUTE ABOVE.

SO, MR. NARITA, IT APPEARS TO ME RIGHT NOW THAT COMENITY IS NOT DISCUSSING AND MEETING AND CONFERRING IN GOOD FAITH, AND THIS IS NOT THE FORM.  IT SHOULD NOT BE A THREE WAY -- LIKE, THIS IS SOMETHING WHICH COUNSEL SHOULD HAVE AND CAN WORK OUT.

SO I'M AMENABLE TO FURTHER INSTRUCTION REGARDING THIS.  I THINK MR. LOKER IS AS WELL, BECAUSE I'M SEEING HIM NOD, TO CLARIFY THAT SENTENCE EVEN THOUGH PLAINTIFF HAS MADE CLEAR THAT THEY ARE NOT HAPPY WITH, LIKE, 3, 4, 5 IS NOT THEIR FAVORITE. UNDERSTOOD.

BUT THEY ARE WILLING TO MEET HALFWAY TO MAKE SURE, IF NECESSARY, AND THE COURT IS ENCOURAGING MR. LOKER, AND PLAINTIFFS ARE WILLING TO TALK ABOUT 3.

BUT THIS --

MR. NARITA:  COMENITY IS WILLING TO -- AS I HEARD THE COURT, WE WILL MEET AND CONFER WITH MR. LOKER.

THE COURT:  WELL, YOU NEED TO DO IT.

MR. NARITA:  IMMEDIATELY.

THE COURT:  YEAH.  IT SHOULD HAVE BEEN LAST NIGHT.

MR. LOKER:  AND, YOUR HONOR, IN THAT REGARD, MR. CUMMINS AND I SAT AT THE TABLE IN THE HOTEL FOR TWO AND A HALF HOURS WAITING TO MEET AND CONFER.  NO ONE FROM COMENITY SHOWED UP TO DISCUSS THESE.

THE COURT:  SO WE'RE GOING TO HAVE THESE DONE, AND

WE'RE GOING TO HAVE THESE DONE NOT ON THE COURT TIME TONIGHT. TODAY.

MR. LOKER:  UNDERSTOOD.

THE COURT:  NOT EVEN TONIGHT.  IT'S GOING TO BE TODAY.

MR. LOKER:  UNDERSTOOD.

THE COURT:  EACH COUNSEL HAVE ABOUT 3 MINUTES TO ARGUE THE RULE 50, 3 TO 4 MINUTES.  YOU'VE ALREADY ARGUED MOST OF IT.  THERE ARE ONLY TWO MAJOR POINTS.

THEN AFTER THAT THE COURT IS GOING TO TAKE A RECESS SO THE PARTIES CAN MEET AND CONFER AND FIGURE OUT THE REST OF THIS.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  MS. GIVENTAL, IT IS COMENITY'S MOTION.

MS. GIVENTAL:  THANK YOU, YOUR HONOR.

ONE CLARIFICATION IS THAT IN ANSWERING YOUR QUESTION IF A WILLFUL VIOLATION IS FOUND, ONLY THE STATUTORY PENALTY OF 100 TO 1,000 IS AVAILABLE.

A CLARIFICATION TO AN EARLIER ANSWER THAT IF A WILLFUL VIOLATION IS FOUND, BUT THE JURY DOES NOT FIND ANY ACTUAL DAMAGES OR IF YOUR HONOR FINDS THAT NO EVIDENCE OF ACTUAL DAMAGES HAS BEEN SUBMITTED OR RELATED TO INDIRECT DISPUTES, WHAT IS RECOVERABLE AT THAT POINT IS NOT PUNITIVE DAMAGES BECAUSE THOSE HAVE TO RELATE IN SOME FORM TO ACTUAL DAMAGES, BUT WHAT IS RECOVERABLE STILL FOR A WILLFUL VIOLATION IS THE STATUTORY PENALTY OF $100 TO $1,000.

THE COURT: SO, MS. GIVENTAL, THIS FEELS A LITTLE BIT LIKE BOBBIN AND WEAVING IN TERMS OF CHANGING OF ARGUMENTS THAT ARE BEING RAISED AT THIS POINT BY COMENITY.

SO THIS ALSO WE CAN DEAL WITH IN POST-TRIAL BRIEFING IF WE NEED TO IN TERMS OF -- BECAUSE IT DOESN'T IMPACT, BUT THIS IS A WHOLE NEW ARGUMENT WHICH IS BEING RAISED.

MS. GIVENTAL: YOUR HONOR, IT'S JUST A CLARIFICATION BECAUSE THE QUESTION WAS -- THE WAY I UNDERSTOOD THE QUESTION WAS WHETHER SOMETHING IS RECOVERABLE, EVEN IF THERE'S NO ACTUAL DAMAGES. AND WHAT I WAS SAYING IS THAT THAT PENALTY, THAT STATUTORY PENALTY IS RECOVERABLE.

IT NOW OCCURRED TO ME BASED ON YOUR HONOR SAYING THAT THERE ARE OTHER THINGS RECOVERABLE, THAT WE MAY NOT BE SAYING THE SAME THING. AND SO I WANTED TO CLARIFY THAT IN ANSWERING YOUR QUESTION, I WAS BEING SPECIFIC AS TO THAT STATUTORY PENALTY, NOT THE PUNITIVE DAMAGES.

THE INTENTION WAS TO CLARIFY, NOT TO CHANGE THE ARGUMENT, AND I THINK THAT IN TERMS OF THE MOTION, WHILE IT'S IMPORTANT TO CLARIFY, I THINK YOUR QUESTION IS, IS THERE SOMETHING STILL LEFT FOR THE JURY TO DECIDE IF THERE'S NO ACTUAL DAMAGES? AND THE ANSWER REMAINS YES.

THE COURT: OKAY.

MS. GIVENTAL: IF THE OTHER ARGUMENTS THAT WE MAKE, RIGHT? IF THERE'S ALSO IS THERE OTHER EVIDENCE OF WILLFUL VIOLATION AND FAILURE TO INVESTIGATE AND FAILURE TO DISPUTE.

THE COURT: OKAY. THANK YOU FOR THAT CLARIFICATION OF COMENITY'S POSITION.

SO YOU HAVE ABOUT TWO MINUTES LEFT IN TERMS OF ARGUMENT.

MS. GIVENTAL: I THINK THEN THE NEXT POINT I WANTED TO MAKE WAS ABOUT THE EVIDENCE OF WILLFULNESS. FROM OUR PERSPECTIVE, THE EVIDENCE PRESENTED SO FAR WAS THAT WHEN WE HAVE PLAINTIFF ON THE STAND AND HE -- THERE'S AN OPPORTUNITY TO HEAR FROM HIM IN PERSON, THE JURY MAY VERY WELL FIND HIM CREDIBLE AND DETERMINE THAT HE IS A TRUE VICTIM OF IDENTITY THEFT, BUT BASED ON THE EVIDENCE THAT WAS AVAILABLE TO COMENITY, RIGHT, INFORMATION THAT WAS SUBMITTED TO THE DISPUTES, THE POLICE REPORT, THE TRAVEL HISTORY THAT WENT BACK TO 2018, ONLY THE FTC REPORT THAT WAS VERY, YOU KNOW, NARROW INFORMATION, THAT BASED ON THAT, COMENITY CONDUCTED A REASONABLE INVESTIGATION AND CAME TO A REASONABLE CONCLUSION, BUT CERTAINLY THAT IT WASN'T WILLFULLY VIOLATING ITS RESPONSIBILITIES UNDER THE FAIR CREDIT REPORTING ACT BASED ON THE INFORMATION THAT WAS PUT IN FRONT OF IT. SO NOT TO MIX UP WHAT HAPPENED IF WE PUT ON A FULL TRIAL.

AND THAT ALSO RELATES TO OUR ARGUMENTS ABOUT OBJECTIVELY AND READILY VERIFIABLE FACTS THAT WERE READILY AVAILABLE TO COMENITY AT THE TIME.

THE COURT: ANYTHING ELSE, MS. GIVENTAL? YOU HAVE ANOTHER 30 SECONDS.

MS. GIVENTAL: CAN I SAVE IT FOR REBUTTAL?

THE COURT: YES, ABSOLUTELY.

MS. GIVENTAL: I'LL DO THAT.

MR. LOKER: AND, YOUR HONOR, FOR 1681S-2(B), AND I'LL START FROM THE TOP, AND I'M LOOKING AT THE MOTION THAT COMENITY FILED, IT DOESN'T HAVE PAGE NUMBERS, BUT I'M ON THE SECTION THAT LOOKS AT THE PRIMARY ELEMENTS.

THE FIRST ONE THAT IS MENTIONED, COMENITY IS A FURNISHER OF CREDIT INFORMATION, WE TALKED ABOUT THAT PROBABLY THIS MORNING OR AT SOME POINT EARLIER TODAY.

AND THEN WHEN I WAS SPEAKING WITH MS. FORD, CONFIRMED THROUGH THEIR PROCEDURES THAT THEY THEMSELVES AGREE THAT THEY ARE A FURNISHER OF CREDIT.

IN LOOKING AT THE DEFINITION THAT COMENITY REALIZES AT 20/21 OF THE UNKNOWN PAGE, A FURNISHER IS AN ENTITY THAT TRANSMITS INFORMATION CONCERNING A PARTICULAR CREDIT OBLIGATION OWED BY A PARTICULAR CONSUMER TO CONSUMER REPORTING AGENCIES.

AND OF COURSE THAT'S WHAT WE HAVE HERE. IT WOULDN'T BE ON MR. PANCHENKO'S CREDIT REPORT IF COMENITY DID NOT SUBMIT IT.

SO IN THE FCRA, WHEN THEY WERE ENACTING IT, CONGRESS WANTED TO MAKE SURE THAT WE'RE NOT SUING PEOPLE WHO ARE NOT ENGAGED IN THE CREDIT REPORTING SYSTEM.

SO IN ORDER TO SATISFY THAT THRESHOLD ISSUE, SOMEONE HAD TO SUBMIT INFORMATION AND THAT SOMEONE WOULD BE THE POTENTIAL DEFENDANT.

AS I NOTED EARLIER, THE CREDIT REPORTING CHANGED. SO THE

PERIOD OF TIME THAT COMENITY WAS LOOKING AT DIDN'T LOOK AT THE ACDV WHEN COMENITY CHANGED ITS REPORTING TO NOW MAKE IT NEGATIVE AND FURTHER HARM MR. PANCHENKO.

SO FOR ELEMENT NUMBER 2, WHETHER MR. PANCHENKO NOTIFIED THE CRA THAT HE DISPUTED COMENITY'S INFORMATION AS INACCURATE, THOSE ARE EXHIBITS 2, 3, AND 4.  WE LOOKED AT THOSE DISPUTES.

IN NUMBER 3, THE CRA NOTIFIED COMENITY OF THE ALLEGED INACCURATE INFORMATION, OF THAT PANCHENKO DISPUTED, THAT COMES FROM THE ACDV'S.

SO THE CREDIT BUREAUS RECEIVED THE DISPUTE, TRANSMITTED THE DISPUTES TO THE FURNISHER VIA E-OSCAR UTILIZING THE ACDV PROCESS.

THE REPORTING BY COMENITY REGARDING PANCHENKO IS, IN FACT, INACCURATE.  WE DISCUSSED THE NINTH CIRCUIT AUTHORITY THAT SAYS THAT REPORTING A FRAUDULENT ACCOUNT IS INACCURATE.  INFORMATION SHOULD ONLY BE ON OUR CREDIT REPORTS THAT WE AGREED SHOULD BE ON THERE.  YOU KNOW, IT COMES FROM A CONTRACT.  YOU SIGN UP FOR A CREDIT CARD TO BUY A CAR OR HOUSE, THAT'S GOING TO BE ON THE CREDIT REPORT.

MR. PANCHENKO NEVER SIGNED ANY OF THOSE CONTRACTS.  THIS SHOULD NOT BE ON THE CREDIT REPORTS BECAUSE HE'S A VICTIM OF IDENTITY THEFT.

THEN WE GET TO THE NEGLIGENCE OR THE WILLFULNESS OF THE INVESTIGATION.  OUR POSITION IS THAT IT'S BOTH UNREASONABLE AND RECKLESS AS A MATTER OF LAW FOR COMENITY TO RECEIVE THE

INDIRECT DISPUTES AND NOT READ THEM AND NEVER EVEN TOOK A LOOK AT IT.  AND THAT WAS THEIR POLICY AT THE TIME AS TESTIFIED --

THE COURT:  WHEN YOU SAY NEVER RECEIVED OR LOOKED AT THE INDIRECT DISPUTES, ARE YOU REFERRING TO THE IMAGES OR ARE YOU REFERRING TO --

MR. LOKER:  IMAGES WAS MORE PRECISE, MY APOLOGIES, BECAUSE THEY OF COURSE RECEIVED THE ACDV'S AND WENT THROUGH THEIR FLOW, BUT WHERE THE RECKLESSNESS COMES FROM IS NOT LOOKING AT THE IMAGES ATTACHED TO IT.

THE COURT:  OKAY.

MR. LOKER:  AND THOSE ARE THE DOCUMENTS THAT MR. PANCHENKO TOOK THE TIME TO PUT TOGETHER TO SUBSTANTIATE HIS POSITION AS INVITED TO DO SO BY COMENITY WHEN THEY SAID, HEY, WE'VE GOT YOUR DISPUTE, SEND US INFORMATION THAT SUPPORTS YOUR CLAIM.

HE COMPLIED WITH THAT WRITTEN COMMUNICATION, YET MS. BANU NEVER EVEN LOOKED AT IT BECAUSE SHE'S INCENTIVIZED TO DO AS MANY DISPUTES AS POSSIBLE TO MEET HER TARGETS AND GET THE POINTS SO THAT SHE CAN GO BUY SOME ITEMS, ACCUMULATE THOSE POINTS, MAYBE BUY SOME BIGGER ITEMS.

SO OUR FOCUS IN TERMS OF RECKLESSNESS AND THE UNREASONABLENESS OF THE INVESTIGATION IS THAT THESE INVESTIGATORS AREN'T SEARCHING FOR THE TRUTH.  THEY'RE NOT TRYING TO SEE IF THEIR CREDIT REPORTING IS INACCURATE OR NOT. THEY'RE JUST TRYING TO GET TO THOSE POINTS AND MOVE ALONG AS

QUICKLY AS POSSIBLE.

AND IT'S NOT ROGUE AGENTS THAT WERE DOING THIS.  THIS WAS THE COMPANY POLICY.  SO FOR THAT REASON WE THINK IT'S RECKLESS.

THE COURT:  ALL RIGHT.  REBUTTAL?

WELL, ACTUALLY BEFORE, CAN YOU BRIEFLY RESPOND TO MS. GIVENTAL'S CLARIFICATION?

MR. LOKER:  I DON'T BELIEVE THAT ACCURATELY REFLECTS THE LAW.  EVERYTHING THAT I RECALL SAYS THAT YOU DON'T NEED ACTUAL DAMAGES IN ORDER TO RECEIVE PUNITIVE DAMAGES.  THAT'S ALL ALWAYS BEEN MY UNDERSTANDING.  I DON'T HAVE A CASE CITE FOR YOU BECAUSE I PERSONALLY HAVE NEVER LOOKED INTO IT BUT FROM WHAT I RECALL ABOUT READING THE CASES, THAT'S WHAT IT IS.

SAUNDERS IN THE FOURTH CIRCUIT -- DO YOU HAVE THE CITE?

MR. OSBORNE:  I CAN GET IT.

MR. LOKER:  YES.  SO IN THAT PARTICULAR CASE THERE WERE ZERO DOLLARS AWARDED FOR ACTUAL DAMAGES AND PUNITIVE DAMAGES WERE 80,000 -- 81,000, I'M SORRY.  IT'S USUALLY IN MY BRIEFING, BUT I JUST DON'T REMEMBER THE EXACT NATURE, BUT I DO KNOW IT WAS A ZERO FOR THE ACTUAL DAMAGES.

THE COURT:  OKAY.  ALL RIGHT.  MS. GIVENTAL, YOU HAVE A BONUS OF I BELIEVE --

THE CLERK:  -- A MINUTE AND A HALF.

THE COURT:  VERSUS 30 SECONDS.

MR. NARITA:  TIME IS GETTING DOLED OUT ALL OVER THE PLACE, YOUR HONOR.

MS. GIVENTAL:  IN RESPONSE TO THAT THERE WAS TESTIMONY FROM MS. SIERRA FORD ABOUT FURNISHER.  THAT WAS AFTER, AFTER WE MADE THE MOTION.

THE COURT:  I KNOW THAT.

MR. LOKER:  TRUE, YEAH.

MS. GIVENTAL:  IN TERMS OF IN -- THAT INFORMATION THAT WAS PROVIDED TO COMENITY IN RESPONSE TO A LETTER THAT COMENITY SENT TO MR. MR. PANCHENKO, THAT WAS, AGAIN, THAT WAS ALL DIRECT DISPUTE STUFF.  SO I DON'T THINK THAT THAT'S RELEVANT.

BUT THERE WAS A PROCESS HAPPENING ON THE SITE, BUT IT WAS A DIRECT DISPUTE PROCESS, BUT NONE OF THAT, YOU KNOW, IMPACTS THE QUESTION THAT I THINK MR. LOKER IS RAISING, WHICH IS WAS IT A WILLFUL VIOLATION NOT TO LOOK AT THE ATTACHMENTS TO THE ONE DISPUTE THAT HAD ATTACHMENTS?  SO THERE'S ONLY ONE INDIRECT DISPUTE OUT OF NINE THAT HAD ATTACHMENTS.

AND THE EVIDENCE, WHEN WE'RE REFERENCING EXHIBITS 2, 3, AND 4, ONLY ONE OF THEM IS ACTUALLY -- THOSE DISPUTE LETTERS HAD ATTACHMENTS, BUT ONLY ONE OF THEM ACTUALLY EVER ENDED UP GETTING TO COMENITY, AND IT WAS THE TRANS UNION ONE.

I THINK THAT BASED ON THE EVIDENCE IN THE RECORD, THE OUTCOME OF THE INVESTIGATION WASN'T IMPACTED BY MS. BANU'S FAILURE TO LOOK AT THOSE ATTACHMENTS, AND WE EXPLAIN WHY THOSE ATTACHMENTS DID NOT PROVIDE DISPOSITIVE INFORMATION PROBATIVE ENOUGH SUCH THAT COMENITY COULD BE CHARGED WITH, HEY, IT WAS

PATENTLY INCORRECT TO COME TO THE CONCLUSION THAT THERE WAS NO FRAUD OR THAT IT'S SO OBVIOUS BASED ON THOSE DOCUMENTS THAT THE OPPOSITE CONCLUSION SHOULD HAVE BEEN REACHED AND NOT REACHING THAT CONCLUSION IS A WILLFUL VIOLATION.

MR. LOKER:  I HAVE A CITATION FOR YOU IF YOU WOULD LIKE.

THE COURT:  I THINK MS. GIVENTAL HAS --

MS. GIVENTAL:  IS IT SAUNDERS?

MR. LOKER:  IT IS AND JUST BECAUSE I MENTIONED IT, AND I DIDN'T HAVE THE CITE HANDY.

THE COURT:  MS. GIVENTAL, ANYTHING FURTHER?

MS. GIVENTAL:  SAUNDERS, I'LL PREEMPTIVELY ADDRESS THAT.  MY UNDERSTANDING OF THE CASE LAW IS THAT YOU DON'T NEED ACTUAL DAMAGES TO RECOVER STATUTORY PENALTIES BUT THAT TO RECOVER PUNITIVE DAMAGES, YOU DO.

NOW, IF SAUNDERS SAYS OTHERWISE, I THINK WE HAVE TO LOOK AT WAS THAT ISSUE RAISED DIRECTLY AND ALSO HOW IS THAT ISSUE DECIDED IN THE NINTH CIRCUIT RATHER THAN THE FOURTH, WHICH IS WHERE I BELIEVE SAUNDERS COMES FROM.

THE COURT:  MS. GIVENTAL, DO YOU HAVE A CITATION FOR YOUR ARGUMENT?

MS. GIVENTAL:  NOT AT THIS TIME, BUT I COULD FIND ONE.

THE COURT:  ALL RIGHT.  SEE, OUT OF THAT YOU GOT AN EXTRA 30 SECONDS.

MR. LOKER, PLEASE PROVIDE THE CITATION FOR THE RECORD. I'M PRETTY SURE I'VE READ SAUNDERS.

MR. LOKER: YES, IT'S S-A-U-N-D-E-R-S. THE CITATION THAT WE HAVE IS 526 F. 3D 142.

THE COURT: ALL RIGHT. AS TO THE RULE 50 MOTION, THE COURT FINDS THAT A REASONABLE JURY WOULD HAVE A LEGALLY SUFFICIENT EVIDENTIARY BASIS TO FIND FOR THE PLAINTIFF, AND THAT PLAINTIFF HAS SUBMITTED SUFFICIENT EVIDENCE AS TO EACH ELEMENT AT THIS TIME, INCLUDING THE FURNISHER BASED OFF OF THE INFERENCE. I AGREE WITH MS. GIVENTAL THAT THE OTHER EVIDENCE AS RECITED BY MR. LOKER WAS INSUFFICIENT.

THIS DENIAL IS WITHOUT PREJUDICE FOR DEFENDANT TO RENEW ITS MOTION AT THE END OF TRIAL.

MS. GIVENTAL: THANK YOU, YOUR HONOR.

THE COURT: THANK YOU. ALL RIGHT. SO IT IS 4:15. MR. LOKER, SO THERE WAS THE ARGUMENT YESTERDAY THAT WAS RAISED IN TERMS OF THE ACTUAL EVIDENCE, THIS WHOLE ACTUAL DAMAGE ARGUMENT WHICH MR. NARITA RAISED YESTERDAY, HAS RAISED AGAIN TODAY, AND WHEN WE WERE GOING THROUGH THE RULE 50, AND I WAS WATCHING THE TIME, I REALIZED I NEVER GAVE YOU THE OPPORTUNITY TO RESPOND, WHICH SEEMS INAPPROPRIATE.

I'M HAPPY TO HEAR FROM PLAINTIFF FOR TWO OR THREE MINUTES ON THIS POINT JUST IN LIGHT OF THE FACT THAT THERE NOW HAS BEEN ALL OF THIS DISCUSSED ON THE RECORD BOTH YESTERDAY AND TODAY.

MR. LOKER: WE CAN SAVE IT FOR CLOSING, YOUR HONOR.

THE COURT:  OKAY.  ALL RIGHT.

SO WITH THAT, I'M GOING TO TAKE A RECESS.

LAURA, MADAM CLERK WILL BE HERE.  IF I NEED TO TALK TO YOU ALL, I'LL LET YOU KNOW THROUGH LAURA.

IF YOU NEED TO TALK TO ME, YOU'LL LET ME KNOW.

AND, MADAM CLERK, WHAT TIME ARE YOU -- WHEN ARE YOU LEAVING THE COURTROOM THIS AFTERNOON?

THE CLERK:  WHENEVER WE'RE DONE.

MR. NARITA:  DANGEROUS ANSWER.

THE COURT:  SOMEWHERE BETWEEN 4:45 OR SO, MAYBE 5:00 IF THERE'S SOMETHING FOR ME TO SEE, LET ME KNOW, I WILL DOUBLE CHECK AND CONFIRM TIMES WITH EVERYTHING ELSE.

AND DEPENDING ON STAFF AVAILABILITY, IF WE NEED TO PUT SOMETHING ON THE RECORD TOMORROW MORNING, WE CAN.

MR. LOKER:  THANK YOU, YOUR HONOR.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.  WE'RE IN RECESS OR POSSIBLY ADJOURNED FOR TODAY.  WE'LL SEE.

(RECESS FROM 4:17 P.M. UNTIL 4:48 P.M.)

THE COURT:  WE ARE BACK ON THE RECORD IN THE MATTER OF PANCHENKO VERSUS COMENITY CAPITAL BANK.

COUNSEL ARE PRESENT, AND WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

AT LEAST SOME OF THE PARTIES ARE PRESENT AS WELL.  BOTH OF THE PARTIES ARE PRESENT.

COUNSEL, MY UNDERSTANDING IS THAT THE PARTIES HAVE REACHED A STIPULATION AS TO SOME STIPULATIONS?

MR. LOKER:  CORRECT, YOUR HONOR.

MATT LOKER ON BEHALF OF THE PLAINTIFF.

WITH REGARD TO THE JURY INSTRUCTIONS THAT THE PLAINTIFF INITIALLY PROPOSED, MR. NARITA MADE SOME EDITS TO NUMBERS 1 AND 2, TOOK OUT NUMBER 3, MADE SOME EDITS TO NUMBER 4, AND TOOK OUT NUMBER 5.

THE EDITS AND REMOVALS ARE ACCEPTABLE TO THE PLAINTIFF, SO WHAT I PROPOSE WE DO IS THAT -- THEY'RE ALL HANDWRITTEN, YOUR HONOR, SO WHAT I PROPOSE IS THAT WE WILL TYPE THEM OUT AND SUBMIT THEM TO THE COURT, LIKE, RIGHT AWAY WHEN WE'RE DONE HERE.

BUT THOSE WERE -- THAT'S AGREEMENT NUMBER 1.

THE COURT:  OKAY.  CAN YOU TELL ME -- CAN YOU READ THEM TO ME ACTUALLY SO I CAN TAKE THEM INTO ACCOUNT?

MR. LOKER:  YES, YOUR HONOR.

NUMBER 1, THE PHRASE "DIRECT DISPUTE" REFERS TO A DISPUTE SUBMITTED BY PANCHENKO TO COMENITY BY LETTER OR BY PHONE REGARDING ITS CREDIT REPORTING.

AND THEN, NUMBER 2, THE PHRASE "INDIRECT DISPUTE" REFERS TO A DISPUTE SUBMITTED BY PANCHENKO TO A CONSUMER REPORTING AGENCY REGARDING COMENITY'S CREDIT REPORTING.

NUMBER 3 WAS REMOVED BY COMENITY.

NUMBER 4.  ANY DAMAGES ASSOCIATED WITH PANCHENKO'S DIRECT

DISPUTES ARE NOT RECOVERABLE.

NUMBER 5 WE TOOK OUT.

THE COURT:  CAN YOU RE-READ NUMBER 2 FOR ME?

MR. LOKER:  YES, YOUR HONOR.

THE PHRASE "INDIRECT DISPUTE" REFERS TO A DISPUTE SUBMITTED BY PANCHENKO TO A CONSUMER REPORTING AGENCY REGARDING COMENITY'S CREDIT REPORTING.

THE COURT:  I'M STILL GOING TO ASK THAT COUNSEL TYPES IT OUT AS WELL.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  I'M LOOKING AT THIS IN THE SCOPE OF THE OTHER INSTRUCTIONS AND I'M JUST TRYING TO DECIDE WHETHER OR NOT THERE SHOULD BE A FOLLOW-UP TO THIS WHICH SAYS BASICALLY SOMETHING CLOSE TO WHAT WAS NUMBER 3, JUST SORT OF DEFINING THAT THE DAMAGES WE ARE LOOKING AT HERE ARE TO -- WITH THE LIABILITY THAT WE'RE LOOKING AT HERE RISES FROM THE INDIRECT DISPUTE, IF ANY.  IF THERE'S ANY LIABILITY, IT WOULD BE FROM THE INDIRECT DISPUTE.

I'M JUST TRYING TO DECIDE WHETHER OR NOT -- WITH WHAT WE JUST TEED UP, WHETHER OR NOT THAT IS FULLY COVERED NOW OR WHETHER IT'S MORE CONFUSING LOOKING AT THE OTHER 30.

MR. LOKER:  THERE'S PROPOSED LANGUAGE THAT THE COURT OFFERED TO SUPPLEMENT PLAINTIFF'S DRAFT OF NUMBER 3.  THAT'S ACCEPTABLE TO US, WHAT THE COURT PROPOSED, AND WE WROTE IT DOWN.

BUT AS A MATTER OF COMPROMISE, WE AGREED TO DROP IT UPON COMENITY'S REQUEST.

THE COURT: WELL, THEN THEY'RE LIKE, OKAY, WELL, WHAT ARE WE SUPPOSED TO LOOK TO? ARE WE SUPPOSED TO -- NOT LOOK TOWARDS DIRECT, THEN WHAT ARE WE TO DO WITH INDIRECT?

AND THEN I JUST NEED TO LOOK TO SEE WHETHER OR NOT IT'S COVERED OTHERWISE.

MR. LOKER: THAT MAKES SENSE.

MR. NARITA: YOUR HONOR, I CAN TELL YOU WHAT MY THINKING WAS, AND WHETHER MY THINKING TURNS OUT TO BE CORRECT IS ANOTHER THING.

MY THINKING WAS THAT WHEN I SAW WHAT WAS NUMBER 3 ON MR. LOKER'S WAS THAT WAS ALREADY COVERED BY THE INSTRUCTIONS THAT ADDRESS THE ELEMENTS OF A 1692(B) CLAIM. YOU HAVE TO DO THIS, YOU HAVE TO DO THAT.

AND SO -- AND THESE ARE MORE DEFINITIONAL INSTRUCTIONS, LIKE, HEY, YOU'VE HEARD ABOUT INDIRECT DISPUTES, YOU'VE HEARD ABOUT DIRECT DISPUTES, WE DEFINE THEM, AND THEN WE MAKE IT CLEAR THAT YOU CAN'T GET DAMAGES FOR WHAT WE'VE NOW DEFINED AS A DIRECT DISPUTE.

THAT'S WHY I WASN'T SURE THAT THE THIRD, THE THIRD BULLET POINT IN MR. LOKER'S LIST FROM LAST NIGHT WAS NEEDED.

(PAUSE IN PROCEEDINGS.)

THE COURT: I'M WONDERING -- BECAUSE I'M NOT SEEING INDIRECT IN THE 30'S OTHERWISE -- AND WHEN I SAY THE 30'S, I

MEAN THE STIPULATED -- THE 30 SERIES OF THE JURY INSTRUCTIONS.

SO I'M JUST WONDERING IF THAT -- IF WE NEED THE SENTENCE, OR SOME VERSION OF THE SENTENCE, OR IF IT'S TWEAKING STIPULATION INSTRUCTION NUMBER 30, WHICH I'M TRYING REALLY HARD NOT TO DO.

BUT I FEEL LIKE IT NEEDS TO BE IN ONE OF THOSE TWO PLACES.

MR. LOKER:  WITH THAT INPUT, YOUR HONOR, PLAINTIFF'S PREFERENCE WOULD BE TO INCLUDE THE LANGUAGE THAT THE COURT INITIALLY PROPOSED TO SUPPLEMENT OUR NUMBER 3.

AGAIN, I WROTE IT DOWN, OR MR. CUMMINS WROTE IT DOWN, AND I CAN READ IT BACK FOR THE COURT IF YOU WOULD LIKE.

THE COURT:  COULD YOU READ IT BACK TO ME?

MR. LOKER:  OKAY.  YOU MAY ONLY FIND THAT COMENITY VIOLATED THE FCRA IF IT FAILED TO REASONABLY INVESTIGATE ONE OR MORE INDIRECT DISPUTES.

THAT WAS A PORTION THAT YOU ADDED.

AND THEN OURS FLOWED FROM THERE.

ANY LIABILITY FOR PANCHENKO'S CLAIMS AGAINST COMENITY ARE LIMITED TO INDIRECT DISPUTES.

SO MAYBE ANY RECOVERY.

THE COURT:  I ACTUALLY THINK THAT SENTENCE, THE SENTENCE WHICH THE COURT WAS PROPOSING, IS PROBABLY SUFFICIENT.

I JUST THINK, LIKE, SAYING THAT THE INDIRECT DISPUTES IS WHAT IS IMPORTANT HERE.

MR. LOKER:  RIGHT.

THE COURT: JUST TO EMPHASIZE, LIKE, THAT'S WHAT YOU'RE LOOKING AT FOR LIABILITY.

MR. LOKER: YES.

THE COURT: SO THE SENTENCE I PROPOSED, I ACTUALLY THINK IT ADDRESSES THAT, AND THAT TIES BACK TO 33.

MR. LOKER: YES.

THE COURT: YOU MAY ONLY FIND THAT COMENITY VIOLATED THE FCRA, FCRA, IF IT FAILED TO REASONABLY INVESTIGATE ONE OR MORE OF THE INDIRECT DISPUTES.

MR. LOKER: YES.

THE COURT: SO, MR. NARITA, YOUR ISSUE WITH THIS?

MR. NARITA: IS THAT IT REMAINS A DAMAGES ISSUE.

SO LET ME MAKE IT MORE CONCRETE SO YOUR HONOR CAN SEE HOW I'M THINKING ABOUT IT.

LET'S SAY THAT THE JURY GOES BACK AND SAYS, YOU KNOW WHAT, ALL THOSE ACDV'S WERE FINE, BUT THAT LAST ONE, I DON'T LIKE THAT ONE. IT HAD ALL OF THE ATTACHMENTS. THE WOMAN WHO REVIEWED IT SAID SHE DIDN'T LOOK AT THEM. I THINK THAT'S A VIOLATION OF THE STATUTE.

NOW, THERE'S NOTHING WHERE THEY'VE BEEN TOLD THAT THEY CAN'T -- THAT MR. PANCHENKO CANNOT RECOVER ANY DAMAGES THAT THEY HAVE HEARD ABOUT, RIGHT?

THIS IS A -- YOUR HONOR --

THE COURT: IT SAYS ANY DAMAGES ASSOCIATED -- YOUR LANGUAGE, WHICH THE COURT IS ADOPTING, IS, "ANY DAMAGES

ASSOCIATED WITH PANCHENKO'S DIRECT DISPUTES ARE NOT RECOVERABLE."

THAT'S --

MR. NARITA:  I DIDN'T -- I'M GETTING TIRED, YOUR HONOR, SO MY APOLOGIES.

I DIDN'T UNDERSTAND THAT THE COURT WAS ALSO ADOPTING --

THE COURT:  OH, YEAH, I'M KEEPING THAT.  I ACTUALLY TRIED TO MAKE IT MORE POINTED, AND MY SUGGESTION WHICH WAS WHAT YOU ALL ARE CURRENTLY PROPOSING.  AND I SAID, PLEASE MAKE IT MORE ELOQUENT, AND THAT'S FINE, YOU CAN BE POIGNANT.

BUT I AM SAYING THERE'S NOTHING IN THE INSTRUCTION HERE THAT TELLS THEM WHAT TO DO ABOUT INDIRECT.

SO I WOULD GO BACK TO MY PROPOSED LANGUAGE OF "YOU MAY ONLY FIND THAT COMENITY VIOLATED FCRA IF IT FAILED TO REASONABLY INVESTIGATE ONE OR MORE INDIRECT DISPUTES."

SO THAT TIES BACK TO INSTRUCTION 30 AND 33.

AND THEN THE LAST ONE WOULD BE ANY DAMAGES ASSOCIATED WITH THE DIRECT DISPUTES ARE NOT RECOVERABLE, WHICH IS SQUARELY --

MR. NARITA:  CORRECT.  I THINK THE COMBINATION OF ALL OF THE THINGS THAT YOUR HONOR JUST DESCRIBED.

THE COURT:  BUT THAT'S WHAT I PROPOSED EARLIER.

MR. NARITA:  THEN I WASN'T UNDERSTANDING.

THE COURT:  OKAY.

MR. NARITA:  BUT ARE WE GOING TO DO IT AS MODIFIED ON THE RECORD BY MR. LOKER'S EARLIER COMMENTS?

THE COURT:  I THINK MR. LOKER AND I ARE --

MR. LOKER:  I AGREE, ON THE SAME PAGE.

THE COURT:  -- ON THE SAME PAGE.

I'D LIKE TO LOOK AT YOURS IN WRITING.  I THINK I'M OKAY WITH IT ALL.  I'LL LET YOU KNOW WHETHER THERE'S ANY OTHER TWEAKS.  THE PARTIES AND COUNSEL ARE EMAILING THE LANGUAGE JUST TO MAKE SURE AND TRIPLE CHECK.

BUT AT THIS POINT IT WOULD BE MY HOPE.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  SO THE COURT ACCEPTS -- SO HERE'S WHAT I AM LOOKING AT -- HERE'S WHAT I HAVE AS THE SUMMARY.

"THE PHRASE 'DIRECT DISPUTE' REFERS TO A DISPUTE SUBMITTED BY PANCHENKO TO COMENITY BY LETTER OR BY PHONE REGARDING ITS CREDIT REPORTING.

"THE PHRASE 'INDIRECT DISPUTE' REFERS TO A DISPUTE SUBMITTED BY PANCHENKO BY A CONSUMER REPORTING AGENCY REGARDING COMENITY'S CREDIT REPORTING.

"YOU MAY ONLY FIND THAT COMENITY VIOLATED THE FCRA IF IT FAILED TO REASONABLY INVESTIGATE ONE OR MORE INDIRECT DISPUTES.

"ANY DAMAGES ASSOCIATED WITH PANCHENKO'S DIRECT DISPUTES ARE NOT RECOVERABLE."

MR. NARITA:  THAT'S FINE, YOUR HONOR.

THE COURT:  GREAT.

MR. LOKER:  YES, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.

TWO HOUSEKEEPING THINGS, WHICH WE MAY FINISH UP WITH TOMORROW.  WE'LL SEE IF IT'S A BIGGER ISSUE.

DURING MR. SEARLES'S EXAMINATION, THERE WAS A CONFIDENTIAL -- I GOT A LITTLE CONFUSED ABOUT THE CONFIDENTIAL DOCUMENT.

SO WHAT EXACTLY IS THE -- MR. SEARLES, WHAT ARE YOU ASKING ME TO DO?  OR, MR. NARITA, WHAT IS MR. SEARLES ASKING ME TO DO?

MR. NARITA:  SURE.  I'LL TRY TO READ HIS MIND AS BEST I CAN.

I THINK WHAT OUR OBLIGATION IS, YOUR HONOR, AS THE PROFFERING PARTY, IS TO DECIDE WHETHER OR NOT WE WOULD LIKE TO MAKE A SEALING REQUEST AND WHETHER, YOU KNOW, WHETHER THAT MEETS THE STANDARD FOR A SEALING REQUEST.  THAT'S MY UNDERSTANDING.

THE COURT:  IT IS.  IT IS.

MR. NARITA:  HE WAS BOOKMARKING IT FOR THE RECORD, AND THEN WE'RE ALL GOING TO HAVE TO CIRCLE AND DISCUSS, AND IF WE DO, THEN WE'LL FOLLOW WHAT THE COURT'S RULE REQUIRES ON THAT.

THE COURT:  PERFECT.  THAT'S ALL I WANT TO HEAR.  I WASN'T SURE IF YOU WERE ASKING ME FOR A DETERMINATION ON THE RECORD, AND THERE WAS NOTHING BEFORE ME.

REMIND ME OF THAT EXHIBIT NUMBER.  WAS IT 53?

MR. LOKER:  153.

MR. SEARLES:  IT'S A SET, YOUR HONOR.  IT'S A

SEQUENCE OF POLICIES AND PROCEDURES.

THE COURT:  OKAY.  SO ALL OF THOSE?

MR. SEARLES:  YES.

THE COURT:  OKAY.  SO WITH THOSE POLICIES AND PROCEDURES, YOU NEED TO -- I WOULD SAY YOU NEED TO FILE YOUR MOTION IMMEDIATELY.

SO DURING -- WHILE THE JURY IS DELIBERATING, LET'S GET THAT ON FILE, BECAUSE TAKING INTO ACCOUNT WE'RE NOW TO THE STANDARD OF TRIAL, WHICH IS A HIGHER STANDARD.  IT'S NOT -- SO IN TERMS OF THE PUBLIC'S INTEREST TO REVIEW.

SO COUNSEL HAS TO PUT THAT ON FILE BY FRIDAY SO WE CAN FIGURE OUT OUR COURT RECORD ON THAT.

MR. NARITA:  ABSOLUTELY, YOUR HONOR.

THE COURT:  ALL RIGHT.

AND THEN THERE WAS ALSO FLASHING UP -- AND THIS GOES TO PLAINTIFF -- FLASHING UP ON THE SCREEN DURING THE VIDEO CLIPS WAS MR. PANCHENKO'S SOCIAL SECURITY NUMBER AND SO FORTH.

MR. LOKER:  YES.

THE COURT:  IT'S HARD TO REDACT AND POSSIBLY -- I COULDN'T DO IT.

MR. LOKER:  I DON'T KNOW HOW TO DO IT.

THE COURT:  AND SO IS THERE ANY REQUEST, OR IS PLAINTIFF MAKING ANY REQUEST REGARDING THAT?

MR. LOKER:  NO, YOUR HONOR, BECAUSE THE VIDEOS AREN'T GOING BACK AND I DON'T KNOW HOW WE COULD FIX ANYTHING

ANYWAY.

THE COURT:  OKAY.  ALL RIGHT.  I JUST WANTED TO -- WHEN THEY WERE UP, I NOTICED.

MR. LOKER:  I NOTICED, YOU NOTICED.

THE COURT:  ANY OTHER HOUSEKEEPING?

MR. LOKER:  ONE MORE.

THE COURT:  YES.

MR. LOKER:  SO MR. NARITA AND I DISCUSSED IT.

MR. NARITA:  YES.

MR. LOKER:  IN TERMS OF THE PROPOSED VERDICT FORM FROM COMENITY, SINCE IT WAS DISCUSSED SO MUCH ON THE RECORD, I THOUGHT IT WOULD MAKE SENSE IF COMENITY FILES IT WITH THE COURT SO THAT THE RECORD IS COMPLETE.

AND MR. NARITA AGREED TO DO SO.

MR. NARITA:  AND JUST SO IT'S -- I DID AGREE TO THAT, JUST SO WE HAVE A COMPLETE RECORD.

LAST NIGHT, YOUR HONOR, I CIRCULATED A RED LINE OF A PROPOSED VERDICT FORM TO -- AND THE COURT WAS COPIED ON IT.

THIS AFTERNOON I WAS ACTUALLY REFERRING TO MY RED LINE, AND --

THE COURT:  THAT'S FINE.

MR. NARITA:  AND SO WE JUST THOUGHT IT PROBABLY SHOULD BE SUBMITTED AS PART OF THE RECORD.

THE COURT:  I THINK IT MAKES SENSE.

THANK YOU FOR THE SUGGESTION, COUNSEL.  PLEASE DO SO.

MR. NARITA:  OKAY.

MR. LOKER:  WE'LL DO SO.

THE COURT:  ALL RIGHT.  THANK YOU.  WITH THAT, I'LL SEE YOU TOMORROW SAME TIME, SAME PLACE, COUNSEL.

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE ARE ADJOURNED.  MANY THANKS AGAIN TO MY COURT STAFF.

MR. LOKER:  YES, YES.

(COURT ADJOURNED AT 5:03 P.M.)

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____

LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  NOVEMBER 5, 2025