UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


OLEKSANDR PANCHENKO,            )
                               )   CV-23-04975 EKL
                 PLAINTIFF,    )
                               )   SAN JOSE, CALIFORNIA
         VS.                   )
                               )   NOVEMBER 6, 2025
COMENITY CAPITAL BANK,         )
                               )   VOLUME 5
                 DEFENDANT.    )
_____    )   PAGES 713 - 819


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EUMI K. LEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      LOKER LAW, APC
                        BY: MATTHEW M. LOKER
                            CHARLES B. CUMMINS
                        132 BRIDGE STREET
                        ARROYO GRANDE, CALIFORNIA 93420

                        RAMOS LAW
                        BY: MATTHEW R. OSBORNE
                        10190 BANNOCK STREET, SUITE 200
                        NORTHGLENN, COLORADO 80260


            (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

714

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT COMENITY: WOMBLE BOND DICKINSON U.S., LLP
                        BY: TOMIO B. NARITA
                            ALISA A. GIVENTAL
                            KRISTINA HOVSEPYAN
                            NATHAN A. SEARLES
                        50 CALIFORNIA STREET, SUITE 2750
                        SAN FRANCISCO, CALIFORNIA 94111

ALSO PRESENT:          COMENITY CAPITAL BANK
                       MIKE GALEANO, IN HOUSE COUNSEL

715

## INDEX OF PROCEEDINGS

PLAINTIFF'S CLOSING ARGUMENT                P. 738

DEFENDANT'S CLOSING ARGUMENT                P. 756

PLAINTIFF'S REBUTTAL ARGUMENT               P. 788

UNITED STATES COURT REPORTERS

SAN JOSE, CALIFORNIA                    NOVEMBER 6, 2025

P R O C E E D I N G S


(COURT CONVENED AT 8:31 A.M.)

(JURY OUT AT 8:31 A.M.)

THE CLERK:  SHALL I CALL?

THE COURT:  YES.

THE CLERK:  OKAY.  LET ME PUT THE SOUND ON.

GOOD MORNING.  WE'RE CALLING CASE NUMBER

5:23-CV-04965 EKL, PANCHENKO -- I DON'T HAVE MY MIC ON --

PANCHENKO VERSUS COMENITY CAPITAL BANK.

COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE RECORD.

MR. LOKER:  YES.  GOOD MORNING, YOUR HONOR.

MATT LOKER ON BEHALF OF THE PLAINTIFF.

MR. SEARLES:  GOOD MORNING, YOUR HONOR.

NATHAN SEARLES ON BEHALF OF THE DEFENDANT.

THE COURT:  ALL RIGHT.  GOOD MORNING EVERYBODY.

I JUST WANT TO TOUCH BASE TO MAKE SURE THERE ARE NO OTHER

NITS OR ANYTHING ELSE WITHIN THE JURY INSTRUCTIONS.

I WAS ALSO GOING TO GIVE YOU A SENSE OF WHAT I'M PLANNING

TO READ FOR THE FINAL INSTRUCTIONS AS WELL, WHERE WE'VE BEEN

AND WHERE WE'RE GOING, BUT IN VERY QUICK ORDER BECAUSE I'M

STILL SHUFFLING PAPERS THIS MORNING MYSELF, AND I SEE THAT

MR. NARITA IS LIKELY AS WELL.

MR. LOKER:  YES.

THE COURT:  SO I SAW MR. LOKER NOD UP AND DOWN THAT HE HAD NO NITS.

MR. LOKER:  ZERO NITS.

THE COURT:  MR. SEARLES?

MR. SEARLES:  CORRECT FROM THE DEFENDANT AS WELL.

THE COURT:  WONDERFUL.  WE DID SUCH A GOOD JOB BETWEEN OUR CONFERENCES AND PRETRIAL CONFERENCES THEN.

MR. LOKER:  YES.

THE COURT:  SO LET ME -- AND YOU'RE WELCOME TO SIT AT COUNSEL TABLE BECAUSE I'M JUST GOING TO READ OUT LOUD WHAT I'M READING IF YOU NEED TO CHECK THEM OFF.

MR. LOKER:  OH, SURE.

MR. SEARLES:  THANK YOU, YOUR HONOR.

THE COURT:  SO THE NUMBERS I'VE ALREADY READ IN THE FLIP INSTRUCTION WERE 1.15, 1.3, 1.5, 1.6, 1.9 THROUGH 1.14.

4.1, 4.2, 1.16 THROUGH 1.21.

SO THAT WAS MY PRELIMINARY INSTRUCTIONS.  I WILL PAUSE.

I JUST WANT TO MAKE SURE THAT THERE'S -- THE REASON I'M DOING THIS IS TO MAKE SURE THAT THERE'S NOTHING THAT WE'RE MISSING BY THE END OF FINAL INSTRUCTIONS.

BUT I'VE DOUBLE AND TRIPLE CHECKED.

YES, MR. LOKER.

MR. LOKER:  I'M SORRY.  I SAID ZERO NITS, BUT WE DID NOTICE THAT 1.7 FOR CLEAR AND CONVINCING EVIDENCE WAS ON THE TABLE OF CONTENTS AND ALSO WITHIN THE JURY INSTRUCTIONS

THEMSELVES.

I DON'T BELIEVE THAT THAT'S APPLICABLE.

THE COURT:  OKAY.  WE -- I WASN'T PLANNING TO INCLUDE THAT.

MR. LOKER:  OKAY.

THE COURT:  SO THAT WAS NOT ON MY LIST, AND IT WASN'T READ IN THE PRELIMINARY INSTRUCTIONS.

MR. LOKER:  RIGHT.

THE COURT:  THAT WAS A TYPO THEN.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU FOR BRINGING THAT UP.

THAT'S THE REASON WE'RE DOING THIS.

ALL RIGHT.  OKAY.  SO DURING, I READ THE FOLLOWING:  1.11, LIMITED PURPOSE; 2.0, CAUTIONARY INSTRUCTIONS; 2.2, STIPULATIONS OF FACTS; AND, 2.4, DEPOSITIONS.

OKAY.  SO NOW THIS IS WHAT I'M DOING PRECLOSING.  SO WE'RE NOW AT THE FINAL INSTRUCTIONS.  THIS IS WHAT I'M DOING BEFORE YOUR CLOSINGS:  1.4, 1.6, 1.9, 1.10 THROUGH 1.12.

I'M NOT PLANNING TO DO 1.13.  IT'S THE OBJECTION ONE, UNLESS PEOPLE CARE, BUT I'M SEEING NOBODY CARE.

1.14, CREDIBILITY OF WITNESS; 4.1 AND 4.2 AGAIN.  SO THESE ARE ALL REPEATS.

THEN 2.2, I'M NOT GOING TO READ ALL OF THE STIPULATIONS, BUT I AM GOING TO SAY -- POINT THOSE OUT AGAIN.  AND PARTICULARLY -- I'M THINKING ABOUT SAYING NOT ALL OF THESE WERE

READ OUT LOUD JUST SO THAT PEOPLE -- SO THEY KNOW THAT THERE ARE OTHER THINGS FOR THEM TO REFERENCE.

MR. SEARLES:  THAT'S AGREED, YOUR HONOR.

THE COURT:  ALL RIGHT.  DO I NEED INSTRUCTION -- WELL, I'M GOING BACK AND FORTH ON 2.4, DO THE DEPOSITIONS AGAIN, WITH JUST THE ONES, BUT I FEEL LIKE THEY HEARD ME SAY THAT A LOT, BUT I'M OPEN TO WHATEVER COUNSEL WOULD PREFER.

MR. LOKER:  I AGREE.  I THINK 2.4 WAS OUT THERE MANY TIMES AND CLEAR TO THE JURY.

MR. SEARLES:  NO ISSUE FROM THE DEFENDANT, YOUR HONOR.

THE COURT:  OKAY.  SO THEN 2.14, YOU TELL ME.  DO I NEED 2.14?  IT'S THE CHARTS AND SUMMARIES.  IT'S A LITTLE FUNKY BECAUSE IT'S ASSUMING COMPILATIONS OF RECORDS VERSUS DEMONSTRATIVES, SO I'M SORT OF INCLINED NOT TO, BUT I'M OPEN EITHER WAY.

MR. LOKER:  PLAINTIFF AGREES, I DON'T THINK WE NEED IT.

THE COURT:  MR. SEARLES.

MR. SEARLES:  MAY I HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES.

(PAUSE IN PROCEEDINGS.)

MR. SEARLES:  WE HAVE NO ISSUE, YOUR HONOR.

THE COURT:  ALL RIGHT.  SO THAT WILL BE PULLED.

SO NOW I'M SWITCHING TO INSTRUCTION NUMBERS.

INSTRUCTION 30, INSTRUCTION 32, INSTRUCTION 33, INSTRUCTION 34.1, INSTRUCTION 34.2.  OH, AND ONE THING I SHOULD HAVE SAID EARLIER WHEN I TALKED ABOUT 11 -- 1.11, THE LIMITED EVIDENCE, I AM GOING TO READ THE SUB LIMITED EVIDENCE.  THERE WAS A .1, .2, .3 WITH THE LIMITING INSTRUCTIONS THAT THE PARTIES ASKED ME TO READ DURING THE TRIAL.  SO I'M GOING TO PUT THOSE BACK IN.

MR. SEARLES:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  SO WHERE WAS I?

SO I SAID 34.1, INSTRUCTION 34.2, INSTRUCTION 35, INSTRUCTION 36, INSTRUCTION 37, INSTRUCTION 38, INSTRUCTION 43, INSTRUCTION 44.

ARE YOU FOLLOWING ME OR SHOULD I READ THE HEADERS WITH THAT?

MR. LOKER:  WE'RE FOLLOWING, YOUR HONOR.  AND THE PLAINTIFF REQUESTS TO HAVE INSTRUCTION NUMBER 31 READ AS WELL, THE DEFINITION OF A FURNISHER.

THE COURT:  YES, THAT WAS A TYPO ON MY LIST.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.  ALL RIGHT.  ANY OTHERS REGARDING THAT?

MR. LOKER:  NOT FOR THE PLAINTIFF, YOUR HONOR.

MR. SEARLES:  NOTHING FOR THE DEFENSE, YOUR HONOR.

THE COURT:  ALL RIGHT.  NOW I'M MOVING TO AFTER CLOSING INSTRUCTIONS.

721

INSTRUCTION 46, THE DUTY TO DELIBERATE; INSTRUCTION 47, CONDUCT OF THE JURY; INSTRUCTION 48, COMMUNICATION WITH THE COURT; INSTRUCTION 50, RETURN OF VERDICT.

MR. LOKER:  THAT SOUNDS GOOD, YOUR HONOR.  THANK YOU.

THE COURT:  OKAY.  MR. SEARLES?

MR. SEARLES:  THAT'S ACCEPTABLE, YOUR HONOR.  THANK YOU.

THE COURT:  AFTER VERDICT, INSTRUCTION 54; AND THEN DURING DELIBERATION, IF NEEDED, INSTRUCTION 49, READ BACK OR PLAY BACK; INSTRUCTION 51, ADDITIONAL INSTRUCTION; INSTRUCTION 52, DEADLOCK JURY; INSTRUCTION 53, CONTINUING DELIBERATION AFTER A JUROR IS DISCHARGED.

MR. LOKER.

MR. LOKER:  THAT'S GOOD FOR THE PLAINTIFF, YOUR HONOR.  THANK YOU.

MR. SEARLES:  AGREED, YOUR HONOR.  THANK YOU SO MUCH.

THE COURT:  ALL RIGHT.  LET'S EVERYONE TAKE A LOOK AT YOUR LISTS AND DOUBLE CHECK ME BECAUSE I'M SHUFFLING PAPERS AFTER THIS, AND IT WILL BE MY LAST AND FINAL.

(PAUSE IN PROCEEDINGS.)

MR. LOKER:  NO OTHER REQUESTS FROM THE PLAINTIFF, YOUR HONOR.

THE COURT:  THANK YOU, MR. LOKER.

MR. SEARLES?

MR. SEARLES:  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

THE COURT:  THANK YOU.  SO WHAT IS YOUR EXPECTED TIME FOR CLOSING?

MR. LOKER:  FOR THE PLAINTIFF, YOUR HONOR, WE'RE ANTICIPATING ABOUT 45 MINUTES AND SAVING 10 TO 15 FOR REBUTTAL, BUT WE'LL SPECIFY THAT.

MR. NARITA:  GOOD MORNING, YOUR HONOR.  TOMIO NARITA.

THE COURT:  GOOD MORNING.

MR. NARITA:  I WOULD HAVE EXPECTED ABOUT AN HOUR TOTAL.

THE COURT:  I SHOULDN'T HAVE GIVEN YOU THAT EXTRA HALF HOUR.

MR. NARITA:  IF YOU WANT IT LESS, I CAN DO IT IN LESS.

THE COURT:  I WOULD JUST SAY BE AWARE OF THE JURY, AND ALL SIDES, YOU HAVE SUFFICIENT TIME AND SOMEWHAT FAIR GAME.  I WOULD JUST BE AWARE OF THE JURY.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  IT'S MORE I'M TRYING TO APPORTION OUT TIMING.

SO IN THAT CASE I'M WONDERING BECAUSE MY INSTRUCTIONS WILL PROBABLY ONLY TAKE 20 TO 30 -- WELL, 30 NOW BECAUSE WE HAVE --

SO LET'S SAY 30 MINUTES.  MAYBE PUSHING IT A LITTLE BIT MORE.

AND THEN I ALSO HAVE INSTRUCTIONS AT THE END WHICH ARE SORT OF LIKE MY UNOFFICIAL INSTRUCTIONS, THIS IS HOW YOU GET IN TOUCH WITH MADAM CLERK, THIS IS IF YOU NEED -- LIKE, BASIC LOGISTICS STUFF.  DON'T PUT ANY SIGNIFICANCE INTO THE NUMBERING OR THE FACTS, THAT EVERYTHING IS ALL SHUFFLED UP, BECAUSE WE'RE KEEPING INSTRUCTION NUMBERS, NOT THE MODEL NUMBERS.  SO THERE ARE JUST THINGS LIKE THAT.  SO TOTAL MY PRESENTATION IS PROBABLY GOING TO TAKE ABOUT 45 MINUTES BUT 30 FOR THE INSTRUCTION PART.

SO MAYBE WE TAKE A BREAK AFTER THE CLOSING OF PLAINTIFF, WE'LL TAKE THE BREAK, AND THEN A SHORTER ONE, BECAUSE I'M ANXIOUS TO GET IT IN THEIR HANDS, I THINK THEY ARE, TOO, AND SO MAYBE TEN MINUTES, AND THEN THE CLOSING AND THE REBUTTAL CLOSING.

MR. LOKER:  THAT SOUNDS GOOD, YOUR HONOR.

MR. NARITA:  THAT'S FINE, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  BE MINDFUL.  YOU KNOW WHEN THEY'RE SLEEPING.

MR. LOKER:  YES.

THE COURT:  SO FOR THE RECORD, OUR JURY HAS NOT BEEN SLEEPING.

MR. LOKER:  IT HAPPENS.

THE COURT:  ANYTHING ELSE?

MR. LOKER:  NOTHING FROM THE PLAINTIFF, YOUR HONOR.

THE COURT:  ANYTHING ELSE?

MR. NARITA:  NOTHING FROM THE DEFENDANT, YOUR HONOR.

THE COURT:  ALL RIGHT.  WELL, I WILL SEE YOU WITH THE JURY FOLKS, SO TAKE CARE.

WE ARE NOW IN RECESS.

(RECESS FROM 8:42 A.M. UNTIL 9:14 A.M.)

THE COURT:  YOU MAY BE SEATED.

WE ARE BACK OUTSIDE OF THE PRESENCE OF THE JURY.  COUNSEL IS PRESENT.  PLAINTIFF AND THE DEFENDANT ARE PRESENT.  WE'RE ABOUT TO CALL OUR JURY IN.

(JURY IN AT 9:15 A.M.)

THE COURT:  YOU MAY BE SEATED.

CONTINUING IN THIS MATTER, COUNSEL IS PRESENT, THE PARTIES ARE PRESENT, AND WE HAVE ALL OF THE SEVEN MEMBERS OF OUR JURY.  GOOD MORNING.

SO AT THE END OF YESTERDAY THE PARTIES RESTED.  AND FOR THE RECORD, I NEED TO CONFIRM THAT THERE WERE NO FURTHER EXHIBITS.

ALL OF THE EXHIBITS HAVE BEEN RESOLVED, CORRECT, WITH MADAM CLERK?

MR. LOKER:  THAT'S CORRECT, YOUR HONOR.

MR. NARITA:  CORRECT, YOUR HONOR.

THE COURT:  OKAY.  SO, LADIES AND GENTLEMEN, YOU'VE NOW HEARD ALL OF THE EVIDENCE, AND SOON IT WILL BE TIME TO HEAR THE ARGUMENTS OF COUNSEL.

YOU WILL RECALL THAT WHAT COUNSEL SAYS IS NOT EVIDENCE. BEFORE YOU HEAR THOSE ARGUMENTS, I'M GOING TO INSTRUCT YOU ON THE LAW THAT WILL BE HELPFUL AT THIS POINT IN THE PROCEEDINGS.

AFTER I INSTRUCT, WHICH WILL GO A LITTLE WAYS, PROBABLY ABOUT 20, 30 MINUTES, YOU WILL HEAR THE CLOSING ARGUMENTS. EACH COUNSEL WILL OUTLINE FOR YOU HIS OR HER INTERPRETATION AS TO WHAT THE EVIDENCE HAS SHOWN.

FIRST, COUNSEL FOR THE PLAINTIFF WILL GIVE A CLOSING ARGUMENT, AND THEN COUNSEL FOR THE DEFENDANT WILL GIVE THEIR CLOSING ARGUMENT. BECAUSE THE PLAINTIFF HAS THE BURDEN OF PROOF, PLAINTIFF WILL BE GIVEN A REBUTTAL, A FINAL CLOSING ARGUMENT, SO TO SPEAK.

SO LET ME BEGIN WITH THE INSTRUCTIONS, AND THESE ARE INSTRUCTIONS WHICH I'M REQUIRED TO GIVE. SO MY FACE IS GOING TO BE BURIED IN THE PAPERS FOR A LITTLE BIT, AND MY APOLOGIES.

MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE EVIDENCE AND ARGUMENTS OF THE ATTORNEYS, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE.

A COPY OF THESE INSTRUCTIONS WILL BE SENT TO THE JURY ROOM FOR YOU TO CONSULT DURING YOUR DELIBERATIONS.

IT IS YOUR DUTY TO FIND THE FACTS FROM ALL OF THE EVIDENCE IN THE CASE. TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO YOU. YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER YOU AGREE WITH IT OR NOT. AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR

SYMPATHY. THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU. YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING I MAY SAY OR DO OR HAVE SAID OR HAVE DONE THAT I HAVE AN OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

WHEN A PARTY HAS A BURDEN OF PROVING ANY CLAIM OR AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, IT MEANS THAT YOU MUST BE PERSUADED BY THE EVIDENCE THAT THE CLAIM OR DEFENSE IS MORE PROBABLY TRUE THAN NOT TRUE. YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE, REGARDLESS OF WHICH PARTY PRESENTED IT.

THE EVIDENCE THAT YOU ARE TO CONSIDER IN DECIDING WHAT THE FACTS ARE CONSISTS OF:

FIRST, THE SWORN TESTIMONY OF ANY WITNESS;

SECOND, THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE;

THIRD, ANY FACTS TO WHICH THE LAWYERS HAVE AGREED; AND,

FOUR, ANY FACTS THAT I MAY INSTRUCT YOU TO ACCEPT AS PROVED.

AS I CONTINUE, ONE THING I'LL NOTE IS SOME OF THE INITIAL INSTRUCTIONS ARE REPETITIVE OF THE ONES THAT YOU HEARD AT THE BEGINNING, AND THAT'S BECAUSE IT'S HELPFUL TO HEAR THEM AGAIN. SO IF YOU'RE WONDERING IF YOU HAVE HEARD THESE, THAT IS WHY.

SO TURNING TO WHAT IS NOT EVIDENCE.

IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE. THE LAWYERS ARE NOT WITNESSES.  WHAT THEY MAY SAY IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU CONSIDER THE EVIDENCE, BUT IT IS NOT EVIDENCE.

IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM CONTROLS.

2.  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE. ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE. YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S RULING ON IT.

3.  TESTIMONY THAT IS STRICKEN -- EXCLUDED OR STRICKEN OR THAT YOU ARE INSTRUCTED TO DISREGARD IS NOT EVIDENCE OR WAS NOT EVIDENCE AND MUST NOT BE CONSIDERED.  IN ADDITION, SOME EVIDENCE MAY HAVE BEEN RECEIVED ONLY FOR A LIMITED PURPOSE. WHEN I INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE ONLY FOR A LIMITED PURPOSE, YOU MUST DO SO, AND YOU MAY NOT CONSIDER THAT EVIDENCE FOR ANY OTHER PURPOSE.

4.  ANYTHING THAT YOU MAY SEE OR HEAR WHEN THE COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

SOME EVIDENCE WAS ADMITTED ONLY FOR A LIMITED PURPOSE. WHEN I INSTRUCTED YOU THAT AN ITEM OF EVIDENCE HAS BEEN ADMITTED ONLY FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT PURPOSE AND NOT ANY OTHER PURPOSE.

THIS ONE INCLUDED EVIDENCE OF DIRECT DISPUTES.  SO IT WAS ONE OF THE EVIDENCE FOR A LIMITED PURPOSES THAT I STATED.

TESTIMONY AND EXHIBITS WERE PRESENTED THAT RELATE TO THE DISPUTES THAT PANCHENKO SUBMITTED DIRECTLY TO COMENITY REFERRED TO DURING TRIAL AS DIRECT DISPUTES AND COMENITY'S HANDLING OF THOSE DISPUTES.  YOU MAY CONSIDER THIS EVIDENCE ONLY TO THE EXTENT THAT YOU BELIEVE THE INFORMATION PANCHENKO PROVIDED COMENITY AS PART OF THE DIRECT DISPUTES WAS RELEVANT TO COMENITY'S INVESTIGATION OF A LATER DISPUTE THAT COMENITY RECEIVED FROM A CREDIT REPORTING AGENCY REFERRED TO DURING TRIAL AS INDIRECT DISPUTES.

OTHER EVIDENCE FOR A LIMITED PURPOSE - POLICE REPORT.

SO TESTIMONY AND EXHIBITS WERE PRESENTED REGARDING THE POLICE REPORT DATED JUNE 13TH, 2023, WHICH REPRESENTED THE FINDINGS OF THE POLICE OFFICER MAKING THE REPORT BASED UPON INFORMATION GATHERED BY HIM DURING HIS INVESTIGATION.  YOU MAY CONSIDER THIS EVIDENCE REGARDING THE POLICE REPORT FOR THE LIMITED PURPOSE OF UNDERSTANDING PANCHENKO'S ALLEGATIONS AS WELL AS FOR THE PURPOSE OF WHAT COMENITY HAD IN ITS POSSESSION.

EVIDENCE FOR A LIMITED PURPOSE - FTC REPORT.

TESTIMONY AND EXHIBITS WERE PRESENTED REGARDING THE

FEDERAL TRADE COMMISSION, FTC, IDENTITY THEFT REPORTS THAT PANCHENKO SUBMITTED TO THE FTC.  THIS EVIDENCE IS TO BE CONSIDERED FOR THE LIMITED PURPOSE OF UNDERSTANDING PANCHENKO'S ALLEGATIONS.  THE FTC REPORT REFLECTS INFORMATION SUBMITTED TO THE FTC BY PANCHENKO.  THE REPORT MAY BE CONSIDERED SOLELY AS A SUMMARY OF THE ALLEGATIONS MADE BY PANCHENKO AND DOES NOT REFLECT THE INDEPENDENT FINDINGS OF THE FTC ITSELF.

SO I'M GOING TO TALK TO YOU A LITTLE BIT ABOUT DIRECT AND CIRCUMSTANTIAL EVIDENCE.

EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THIS WITNESS PERSONALLY SAW OR HEARD OR DID.

CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT IT RAINED DURING THE NIGHT.  HOWEVER, OTHER EVIDENCE SUCH AS A TURNED ON GARDEN HOSE MAY PROVIDE A DIFFERENT EXPLANATION FOR THE PRESENCE OF WATER ON THE SIDEWALK.  THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE EVIDENCE IN THE LIGHT OF REASON,

EXPERIENCE, AND COMMON SENSE.

IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR NONE OF IT.

IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE INTO ACCOUNT:

1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

2.  THE WITNESS'S MEMORY;

3.  THE WITNESS'S MANNER WHILE TESTIFYING;

4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

6.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY;

7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE; AND,

8.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,

BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER TESTIMONY.

HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.

ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY ACCEPT PART -- THE PART YOU THINK IS TRUE AND IGNORE THE REST.

THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY. WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

ALL PARTIES ARE EQUAL BEFORE THE LAW AND THE BANK IS ENTITLED TO THE SAME FAIR AND CONSCIENTIOUS CONSIDERATION BY YOU AS ANY PARTY.

UNDER THE LAW, A BANK IS CONSIDERED TO BE A PERSON.  IT CAN ONLY ACT THROUGH ITS EMPLOYEES, AGENTS, DIRECTORS OR OFFICERS.  THEREFORE, A NATIONAL BANKING ASSOCIATION IS RESPONSIBLE FOR THE ACTS OF ITS EMPLOYEES, AGENTS, DIRECTORS, AND OFFICERS PERFORMED WITHIN THE SCOPE OF AUTHORITY.

STIPULATED FACTS.  THE PARTIES HAVE AGREED TO CERTAIN FACTS TO BE PLACED IN EVIDENCE, WHICH WILL BE ATTACHED TO YOUR INSTRUCTIONS AS EXHIBIT 247.

AS DISCUSSED, SOME FACTS WERE NOT READ INTO THE RECORD BUT

ARE IN THAT EXHIBIT.  THOSE ARE CONSIDERED FACTS TO BE PLACED IN EVIDENCE.  YOU MUST, THEREFORE, TREAT THESE, ALL OF THE FACTS AND STIPULATIONS AS HAVING BEEN PROVED.

ELEMENTS OF 15 UNITED STATES CODE SECTION 1681S-2(B) CLAIM, PANCHENKO CONTENDS THAT COMENITY VIOLATED SECTION 1681S-2(B) OF THE FAIR CREDIT REPORTING ACT.  TO ESTABLISH A VIOLATION OF THIS LAW, PANCHENKO BEARS THE BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE EACH OF THE FOLLOWING:

1.  COMENITY IS A FURNISHER OF CREDIT INFORMATION;

2.  PANCHENKO NOTIFIED A CONSUMER REPORTING AGENCY THAT HE DISPUTED THE INFORMATION THAT COMENITY FURNISHED ABOUT HIM AS INACCURATE;

3.  A CONSUMER REPORTING AGENCY NOTIFIED COMENITY OF THE ALLEGED INACCURATE INFORMATION THAT PANCHENKO DISPUTED;

4.  THE REPORTING BY COMENITY REGARDING PANCHENKO WAS, IN FACT, INACCURATE; AND,

5.  COMENITY NEGLIGENTLY OR WILLFULLY FAILED TO CONDUCT A REASONABLE INVESTIGATION INTO THE DISPUTE.

DEFINITION OF "FURNISHER" UNDER THE FCRA.

A "FURNISHER" IS AN ENTITY THAT TRANSMITS INFORMATION CONCERNING A PARTICULAR CREDIT OBLIGATION OWED BY A PARTICULAR CONSUMER TO CONSUMER REPORTING AGENCIES.

MEANING OF "INACCURACY."

AN ITEM ON A CREDIT REPORT CAN BE INACCURATE BECAUSE IT IS PATENTLY INCORRECT OR BECAUSE IT IS MISLEADING IN SUCH A WAY

THAT IT CAN BE EXPECTED TO ADVERSELY AFFECT CREDIT DECISIONS.

INVESTIGATION OBLIGATION TRIGGER.

COMENITY'S DUTY UNDER SECTION 1681S-2(B) OF THE FAIR CREDIT REPORTING ACT TO CONDUCT A REASONABLE INVESTIGATION OF INFORMATION DISPUTED BY PANCHENKO IS NOT TRIGGERED UNTIL A CONSUMER REPORTING AGENCY PROVIDES COMENITY WITH NOTICE OF PANCHENKO'S DISPUTE.

REASONABLE INVESTIGATION.

A REASONABLE INVESTIGATION REQUIRES AN INQUIRY LIKELY TO TURN UP INFORMATION ABOUT THE UNDERLYING FACTS AND POSITIONS OF THE PARTIES.  A CURSORY OR SLOPPY REVIEW OF THE DISPUTE, OR MERELY RUBBER STAMPING INFORMATION THAT THE FURNISHER PREVIOUSLY SUBMITTED TO A CONSUMER REPORTING AGENCY IS NOT A REASONABLE INVESTIGATION.  IN DETERMINING WHETHER COMENITY CONDUCTED A REASONABLE INVESTIGATION, YOU MAY CONSIDER WHAT COMENITY LEARNED ABOUT THE DISPUTE FROM THE CONSUMER REPORTING AGENCY.

THE REASONABLENESS OF AN INVESTIGATION TURNS ON THE PROCESS THAT THE FURNISHER EMPLOYED IN LIGHT OF THE CIRCUMSTANCES OF THE DISPUTE.  AN INVESTIGATION IS NOT NECESSARILY UNREASONABLE SOLELY BECAUSE IT RESULTS IN A CONCLUSION THAT TURNS OUT TO BE INACCURATE.

PANCHENKO BEARS THE BURDEN OF PROVING THAT COMENITY FAILED TO CONDUCT A REASONABLE INVESTIGATION AFTER IT WAS NOTIFIED BY A CONSUMER REPORTING AGENCY OF THE DISPUTE.

DIRECT VERSUS INDIRECT DISPUTES.

THE PHRASE DIRECT DISPUTES, THE PHRASE "DIRECT DISPUTE" REFERS TO A DISPUTE SUBMITTED BY PANCHENKO TO COMENITY BY LETTER OR BY PHONE REGARDING ITS CREDIT REPORTING.

THE PHRASE "INDIRECT DISPUTE" REFERS TO A DISPUTE SUBMITTED BY PANCHENKO TO A CONSUMER REPORTING AGENCY REGARDING COMENITY'S CREDIT REPORTING.

YOU MAY ONLY FIND THAT COMENITY VIOLATED THE FCRA, THE FAIR CREDIT REPORTING ACT, IF IT FAILED TO REASONABLY INVESTIGATE ONE OR MORE INDIRECT DISPUTES.

ANY DAMAGES ASSOCIATED WITH PANCHENKO'S DIRECT DISPUTES ARE NOT RECOVERABLE.

NEGLIGENT VIOLATION.

TO PROVE A NEGLIGENT VIOLATION OF SECTION 1681S-2(B) OF THE FAIR CREDIT REPORTING ACT, PANCHENKO MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT COMENITY FAILED TO USE REASONABLE CARE IN INVESTIGATING THE DISPUTE FROM A CONSUMER REPORTING AGENCY.  REASONABLE CARE IS THE DEGREE OF CARE THAT A REASONABLY PRUDENT PERSON WOULD USE UNDER SIMILAR CIRCUMSTANCES.

WILLFUL VIOLATION.

TO PROVE A WILLFUL VIOLATION OF SECTION 1681S-2(B) OF THE FAIR CREDIT REPORTING ACT, PANCHENKO MUST SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT COMENITY ACTED IN KNOWING OR RECKLESS DISREGARD OF ITS OBLIGATIONS UNDER THE LAW.  CONDUCT

IS IN RECKLESS DISREGARD OF THE PLAINTIFF'S RIGHTS IF UNDER THE CIRCUMSTANCES COMENITY RAN A RISK OF VIOLATING THE LAW SUBSTANTIALLY GREATER THAN THE RISK NECESSARY TO MAKE THE CONDUCT NEGLIGENT.

RECOVERY FOR VIOLATION.

IF YOU FIND THAT PANCHENKO HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT COMENITY NEGLIGENTLY FAILED TO CONDUCT A REASONABLE INVESTIGATION OF A DISPUTE IT RECEIVED ABOUT PANCHENKO FROM A CONSUMER REPORTING AGENCY, COMENITY IS LIABLE TO PANCHENKO IN THE AMOUNT OF ANY ACTUAL DAMAGES THAT PANCHENKO SUSTAINED AS A RESULT OF THE FAILURE.

IF YOU FIND PANCHENKO HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT COMENITY WILLFULLY FAILED TO CONDUCT A REASONABLE INVESTIGATION OF A DISPUTE IT RECEIVED ABOUT PANCHENKO FOR A CONSUMER REPORTING AGENCY, COMENITY IS LIABLE TO PANCHENKO IN THE AMOUNT OF ANY ACTUAL DAMAGES THAT PANCHENKO SUSTAINED AS A RESULT OF THE FAILURE OR STATUTORY DAMAGES OF NOT LESS THAN $100 AND NOT MORE THAN $1,000.

A FINDING THAT COMENITY'S VIOLATION WAS WILLFUL ALSO MEANS THAT YOU MAY AWARD PUNITIVE DAMAGES PURSUANT TO JURY INSTRUCTION NUMBER 44.

ACTUAL DAMAGES.

IT IS THE DUTY OF THE COURT TO INSTRUCT YOU ABOUT THE MEASURE OF DAMAGES.  BY INSTRUCTING YOU ON DAMAGES, THE COURT DOES NOT MEAN TO SUGGEST FOR WHICH PARTY YOUR VERDICT SHOULD BE

RENDERED.

IF YOU FIND PANCHENKO ON PANCHENKO'S FCRA CLAIM, IF YOU FIND FOR PANCHENKO ON PANCHENKO'S FCRA CLAIM, YOU MUST DETERMINE PANCHENKO'S DAMAGES.  PANCHENKO HAS THE BURDEN OF PROVING DAMAGES BY A PREPONDERANCE OF THE EVIDENCE.  DAMAGES MEAN THE AMOUNTS OF MONEY THAT WILL REASONABLY AND FAIRLY COMPENSATE PANCHENKO FOR ANY INJURY THAT YOU FIND WAS CAUSED BY COMENITY.  YOU SHOULD CONSIDER THE FOLLOWING:

THE NATURE AND EXTENT OF THE INJURIES; AND,

THE MENTAL, EMOTIONAL PAIN AND SUFFERING EXPERIENCED.

IT IS FOR YOU TO DETERMINE WHAT DAMAGES, IF ANY, HAVE BEEN PROVED.  YOUR AWARD MUST BE BASED UPON EVIDENCE AND NOT UPON SPECULATION, GUESSWORK, OR CONJECTURE.

MITIGATION OF DAMAGES.

PANCHENKO HAS A DUTY TO USE REASONABLE EFFORTS TO MITIGATE DAMAGES.  TO MITIGATE MEANS TO AVOID OR REDUCE DAMAGES.

COMENITY HAS THE BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE THAT:

1.  THAT PANCHENKO FAILED TO USE REASONABLE EFFORTS TO MITIGATE DAMAGES; AND,

2.  THE AMOUNT BY WHICH DAMAGES WOULD HAVE BEEN MITIGATED.

PUNITIVE DAMAGES.

IF YOU FIND FOR PANCHENKO YOU MAY, BUT ARE NOT REQUIRED TO, AWARD PUNITIVE DAMAGES.  THE PURPOSES OF PUNITIVE DAMAGES ARE TO PUNISH A DEFENDANT AND TO DETER SIMILAR ACTS IN THE

FUTURE.  PUNITIVE DAMAGES MAY NOT BE AWARDED TO COMPENSATE A PLAINTIFF.

THE PLAINTIFF HAS THE BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE THAT PUNITIVE DAMAGES SHOULD BE AWARDED AND, IF SO, THE AMOUNT OF ANY SUCH DAMAGES.

YOU MAY AWARD PUNITIVE DAMAGES ONLY IF YOU FIND THAT THE DEFENDANT'S CONDUCT THAT HARMED THE PLAINTIFF WAS MALICIOUS, OPPRESSIVE, OR IN RECKLESS DISREGARD OF THE PLAINTIFF'S RIGHTS. CONDUCT IS MALICIOUS IF IT IS ACCOMPANIED BY ILL-WILL OR SPITE OR IF IT IS FOR THE PURPOSES OF INJURING THE PLAINTIFF.

CONDUCT IS IN RECKLESS DISREGARD OF THE PLAINTIFF'S RIGHTS IF, UNDER THE CIRCUMSTANCES, IT REFLECTS COMPLETE DISREGARD TO THE PLAINTIFF'S SAFETY OR RIGHTS OR IF THE DEFENDANT ACTS IN THE FACE OF A PERCEIVED RISK THAT ITS ACTIONS WILL VIOLATE THE PLAINTIFF'S RIGHTS UNDER FEDERAL LAW.

AN ACT OR OMISSION IS OPPRESSIVE IF THE DEFENDANT INJURES OR DAMAGES OR OTHERWISE VIOLATES THE RIGHTS OF THE PLAINTIFF WITH UNNECESSARY HARSHNESS OR SEVERITY, SUCH AS BY MISUSING OR ABUSING AUTHORITY OR POWER, OR BY TAKING ADVANTAGE OF SOME WEAKNESS OR DISABILITY OR MISFORTUNE OF THE PLAINTIFF.

IF YOU FIND THAT PUNITIVE DAMAGES ARE APPROPRIATE, YOU MUST USE REASON IN SETTING THE AMOUNT.  PUNITIVE DAMAGES, IF ANY, SHOULD BE IN AN AMOUNT SUFFICIENT TO FULFILL THEIR PURPOSES BUT SHOULD NOT REFLECT BIAS, PREJUDICE OR SYMPATHY TOWARDS ANY PARTY.

IN CONSIDERING THE AMOUNT OF ANY PUNITIVE DAMAGES, CONSIDER THE DEGREE OF REPREHENSIBILITY OF THE DEFENDANT'S CONDUCT, INCLUDING WHETHER THE CONDUCT THAT HARMED THE PLAINTIFF WAS PARTICULARLY REPREHENSIBLE BECAUSE IT ALSO CAUSED ACTUAL HARM OR POSED A SUBSTANTIAL RISK OF HARM TO PEOPLE WHO ARE NOT PARTIES TO THIS CASE.

YOU MAY NOT, HOWEVER, SET THE AMOUNT OF ANY PUNITIVE DAMAGES IN ORDER TO PUNISH THE DEFENDANT FOR HARM TO ANYONE OTHER THAN THE PLAINTIFF IN THIS CASE.

PUNITIVE DAMAGES MAY BE AWARDED EVEN IF YOU AWARD PLAINTIFF ONLY NOMINAL AND NOT COMPENSATORY DAMAGES.

SO THOSE ARE MY INSTRUCTIONS PRIOR TO THE CLOSING ARGUMENTS.  AFTER THE CLOSING ARGUMENTS I'LL GIVE YOU FURTHER INSTRUCTIONS ABOUT THE DELIBERATION PROCESS AND THE NEXT STEPS.

ALL RIGHT.  SO WITH THAT, IS PLAINTIFF PREPARED TO GIVE AN OPENING STATEMENT -- I MEAN, ITS CLOSING ARGUMENT?

MR. OSBORNE:  YES, YOUR HONOR.  THANK YOU.

MS. THOMSON, CAN YOU GET THE ELMO WHEN YOU GET A CHANCE.

**(PLAINTIFF'S COUNSEL, MR. OSBORNE, GAVE HIS CLOSING ARGUMENT.)**

MR. OSBORNE:  WELL, GOOD MORNING EVERYBODY.

SO EVERYTHING THAT I TOLD YOU IN OPENING TURNED OUT TO BE TRUE, I GUESS WITH ONE EXCEPTION.  I DID TELL YOU IN OPENING THAT THEY WERE GOING TO HAVE AN EXPERT COME HERE AND TELL YOU THAT THIS MET THE INDUSTRY STANDARD.

AND I'VE GOT TO SAY, WHEN THEY ANNOUNCED YESTERDAY THAT THEY WERE NO LONGER GOING TO CALL THEIR EXPERT, MY JAW ABOUT HIT THE FLOOR.

I WONDER WHY THEY DIDN'T BRING SOMEBODY IN HERE TO SAY THAT THIS IS NORMAL, THAT ALL OF THE BANKS DO IT THIS WAY, THAT YOU SHOULDN'T READ POLICE REPORTS, YOU SHOULD DO 36 DISPUTES IN AN 8-HOUR SHIFT, YOU SHOULDN'T EVEN CONSIDER WHAT PEOPLE SEND YOU?  I GUESS WE'LL NEVER KNOW.

BUT IT WAS PRETTY DISAPPOINTING, BECAUSE I SPENT A LOT OF TIME GETTING READY FOR HIM AND I REALLY WANTED TO CROSS-EXAMINE HIM ON THOSE ISSUES.

NOW, I SEE YOU ALL HAVE DONE A GREAT JOB IN THIS CASE. THANK YOU SO MUCH.  YOU ALL PAID ATTENTION.  YOU HAVE BEEN TAKING NOTES.  AND SO THANK YOU FOR THAT.

THE ONE THING YOU HAVEN'T SEEN YET IS HOW THIS STORY ENDS, AND THAT'S BECAUSE YOU ALL AS THE JURY GET TO WRITE HOW THIS STORY ENDS, AND YOU CAN DECIDE EITHER WE'RE GOING TO HOLD THEM ACCOUNTABLE OR WE'RE GOING TO LET THEM GET AWAY.

I THINK ONE OF THE MOST TELLING THINGS THAT THEY SAID YESTERDAY, MS. FORD WAS ASKED, WHY DOES IT TAKE A FEDERAL LAWSUIT TO GET THIS OFF SOMEBODY'S CREDIT?

AND HER ANSWER WAS, BECAUSE THAT'S WHAT OUR POLICY IS.

IT SHOWS YOU THE POLICY IS BROKEN, AND YOU HAVE THE CHANCE TO FIX IT.

WE'RE NOT SAYING THAT MS. FORD IS A BAD PERSON.  SHE

SEEMED LIKE A NICE LADY.  WE'RE NOT SAYING THAT ANY OF THE PEOPLE WHO WORK IN INDIA AND WORK ON THESE INVESTIGATIONS ARE BAD PEOPLE.  THEY ALL SEEM LIKE PRETTY NICE PEOPLE.  THEY'RE JUST DOING THEIR JOB.

THE PROBLEM IS THE JOB THEY HAVE BEEN GIVEN BY THE BANK IS BROKEN.

SO WE SAY THEY BROKE THE LAW.  SO WHAT IS THE LAW?

IF YOU LOOK AT JURY INSTRUCTION NUMBER 30.

ALL RIGHT.  SO FOR THE FIRST ELEMENT -- THE FIRST ELEMENT IS THAT THEY ARE A FURNISHER.  SO MS. FORD ADMITTED, YES, WE'RE A FURNISHER.

NUMBER 2.  THAT WE NOTIFIED THE CREDIT BUREAUS OF OUR DISPUTE.

SO YOU'VE GOT EXHIBITS 2, 3, AND 4, AND YOU HAVE MR. PANCHENKO TESTIFYING, I CALLED THE CREDIT BUREAUS MULTIPLE TIMES.  SO THAT'S YOUR EVIDENCE OF THAT.

FOR NUMBER 3, THAT A CONSUMER REPORTING AGENCY NOTIFIED COMENITY OF THE DISPUTE.  THAT'S WHAT THOSE ACDV FORMS ARE, SO EXHIBITS 6 ALL OF THE WAY THROUGH EXHIBIT 14.

BY THE WAY, A QUICK THING ABOUT THAT, BECAUSE THERE WAS A LITTLE BIT OF CONFUSION ABOUT THAT.  SO THE ACDV'S, THOSE ARE FORMS THAT THE CREDIT BUREAUS CREATE, NOT MR. PANCHENKO.

SO WHEN YOU CALL THE CREDIT BUREAUS, THEY'RE THE ONES THAT TYPE UP THESE FORMS, OR WHEN YOU MAIL IT IN, THEY'RE THE ONES WHO TYPE UP THESE FORMS.

IT'S REALLY APPARENT FROM THE DOCUMENTS, LIKE, IT WILL HAVE A CONTROL NUMBER, IT WILL SAY E-OSCAR.

MR. PANCHENKO DIDN'T TYPE THOSE UP.

AND THEN FINALLY, THAT THE INFORMATION WAS INACCURATE.  SO IF YOU BELIEVE MR. PANCHENKO'S TESTIMONY THAT HE'S THE VICTIM OF FRAUD, IT WOULD BE INACCURATE TO REPORT THIS AS HIS DEBT.

IF YOU BELIEVE THAT HE COMMITTED PERJURY AND HE TOOK THE STAND AND HE LIED TO YOU AND THAT HE WAS REALLY IN AMERICA THIS WHOLE TIME, THEN, YEAH, YOU COULD SIDE WITH THE BANK ON THAT ISSUE.

AND THEN FINALLY, THEY HAVE TO CONDUCT A REASONABLE INVESTIGATION.  AND I FEEL LIKE THE BANK IS KIND OF OPERATING IN AN ALTERNATIVE REALITY.  SO WHEN I THINK ABOUT INVESTIGATION, I MEAN, THE NORMAL MEANING OF THAT WORD IS THAT YOU REVIEW EVIDENCE, YOU'RE SEARCHING FOR THE TRUTH, YOU WANT TO FIGURE OUT IF SOMETHING IS TRUE, SO YOU LOOK FOR CLUES.  YOU INTERVIEW WITNESSES, YOU REVIEW DOCUMENTS, AND YOU FOLLOW UP BECAUSE YOUR GOAL IS TO FIGURE OUT, OKAY, THIS PERSON SAYS THAT THEY'RE A VICTIM OF FRAUD, ARE THEY TELLING THE TRUTH OR NOT?  AND SO YOU'VE GOT TO LOOK FOR SOME EVIDENCE.

AND THEN WHEN YOU LOOK AT THE BANK'S DEFINITION OF INVESTIGATION, WHAT THEY'RE DOING IS NOT AN INVESTIGATION.  I MEAN, THEY'RE SAYING, WELL, WE MATCH THE SOCIAL AND WE MATCH THE DATE OF BIRTH AND WE MATCH THE NAME, AND THAT'S WHAT THOSE ACDV'S ARE SHOWING.

LIKE, ON THE LEFT SIDE, THAT'S THE CREDIT BUREAU SAYING THIS IS WHAT WE HAVE ON FILE.

AND THEN WHEN YOU LOOK ON THE RIGHT SIDE, THAT'S COMENITY RESPONDING BACK SAYING THIS IS THE CORRECT INFORMATION.

AND THEY KEEP SAYING MULTIPLE TIMES, WELL, THE NAME MATCHED, THE SOCIAL MATCHED, THE DATE OF BIRTH MATCHED.

AND I'M JUST, LIKE, YEAH, SO WHAT?  IT'S IDENTITY THEFT.

BUT LITERALLY THE DEFINITION OF IDENTITY THEFT IS SOMEONE STEALS YOUR SOCIAL, STEALS YOUR NAME, STEALS YOUR DATE OF BIRTH, AND THEY GO AND OPEN AN ACCOUNT IN YOUR NAME.

SO IF YOU'RE JUST MAKING SURE THAT MATCHES, HOW DOES THAT IN ANY WAY DETERMINE WHETHER SOMEBODY IS AN IDENTITY THEFT VICTIM?  IT DOESN'T.

AND THEN THEY'RE BASICALLY SAYING THAT WE TRAIN OUR PEOPLE TO ASSUME THAT IF PAYMENTS ARE MADE, IT'S AUTOMATICALLY NOT FRAUD.  AND I DON'T KNOW WHERE THEY COME UP WITH THAT BECAUSE, AS YOU'VE SEEN, THIEVES MAKE PAYMENTS ALL OF THE TIME.

AND LOOK AT WHAT THEY'VE GAINED IN THIS CASE BY MAKING THOSE PAYMENTS.

SO THINK ABOUT THIS:  MS. FORD SAID A LOT OF TIMES THIEVES WILL DO THE BUST OUT METHOD WHERE YOU OPEN UP A COMENITY CARD, IT'S GOT 15,000, YOU MAX IT OUT, YOU NEVER MAKE A PAYMENT, AND YOU VANISH.

WELL, YEAH, THAT'S ONE WAY.  THAT'S NOT THE ONLY WAY.

WHEN YOU LOOK AT WHAT THESE THIEVES DID, THEY OPENED THE

ACCOUNT IN DECEMBER 2015, THEY DON'T MAX IT OUT, THEY MAKE PAYMENTS, THAT BUILDS THAT CREDIT SCORE UP, AND THEN THEY WERE ABLE TO ACTUALLY TAKE OUT OVER $100,000.

SO BY MAKING PAYMENTS, THEY STOLE OVER $100,000.

IS IT BETTER TO DO IT THAT WAY OR BETTER TO DO THE BUST OUT METHOD?  OBVIOUSLY THEY KNEW WHAT THEY WERE DOING.

BUT HERE'S THE THING:  I MEAN, FRAUD -- YOU SHOULD NOT -- IF YOU'RE THE BANK, YOU SHOULDN'T BE TRAINING YOUR PEOPLE TO VIEW EVERYTHING IN ABSOLUTES, LIKE, EVERYTHING IN BLACK AND WHITE.  YOU KNOW, IT'S LIKE THE OLD SAYING, NEVER SAY NEVER, RIGHT?

WHY ARE THEY TRAINING THEIR PEOPLE TO SAY THAT THIEVES NEVER MAKE PAYMENTS?  BECAUSE IT'S SIMPLY NOT TRUE.  THAT'S THE WHOLE POINT OF THIS IS THAT YOU HAVE TO DO AN INVESTIGATION. THAT'S THE POINT OF THIS LAW IS BECAUSE THIEVES ARE ALWAYS GOING TO COME UP WITH DIFFERENT WAYS TO TRY TO GET TO DO THIS, SO YOU'VE GOT TO LOOK AT THE EVIDENCE.

AND THEN THEIR TESTIMONY ABOUT, YOU KNOW, WE LOOK AT THE DISTANCE.  I MEAN, I JUST THOUGHT THAT THAT WAS REALLY CONFUSING.  LIKE, IF THE CHARGES WERE MADE MORE THAN 40 MILES, THEN WE WOULD CONSIDER IT FRAUD.

I MEAN, LAST TIME I CHECKED, UKRAINE IS MORE THAN 40 MILES FROM WHERE THESE CHARGES WERE MADE, SO THAT WHOLE TESTIMONY DOESN'T MAKE SENSE.

NOT TO MENTION, IF YOU GO OUT OF TOWN AND YOU USE YOUR

CREDIT CARD, THAT DOESN'T MEAN IT'S FRAUD.  SO WHY ARE WE TRAINING PEOPLE TO DO THAT?

AND THEN THEY TELL YOU, WELL, WE LOOKED AT THIS GREAT REPORT CALLED AN ACCURINT REPORT.  BUT THEN THEY DON'T ACTUALLY TELL YOU THAT, OH, BY THE WAY, THE FIRST THING THAT IS ON THE REPORT IS A BIG WARNING THAT SAYS DON'T RELY ON THIS.  A LOT OF TIMES THIS STUFF IS INACCURATE.  THERE'S ERRORS.  YOU HAVE TO DO YOUR OWN INVESTIGATION.  THIS IS JUST A TOOL.

AND BY THE WAY -- SO ACCURINT IS SIMPLY REPORTING THE ADDRESS THAT THE THIEVES USED.  HOW DOES THAT CONFIRM THAT IT WAS HIS ADDRESS, NUMBER ONE?

NUMBER TWO, WHERE IS THAT DOCUMENT?  WHY DIDN'T THEY BRING IT TO COURT TO SHOW YOU THE REPORT THAT THEY POSED?  OH, YEAH, HERE'S THE ACCURINT REPORT.

I THINK WE ALL KNOW THE ANSWER, BECAUSE AT THE VERY TOP, IT SAYS, DON'T RELY ON THIS.

AND YET, THEY'RE TRAINING THEIR WHOLE STAFF TO RELY ON IT AS THOUGH IT'S THE GOSPEL.

OKAY.  SO THE VERDICT FORM YOU'RE GOING TO BE ASKED TO FILL OUT.

SO QUESTION NUMBER 1.  DID COMENITY BANK VIOLATE THE FAIR CREDIT REPORTING ACT?

WE ASK THAT YOU SAY YES.

FRANKLY, BASED ON THE RECORD WE HAVE, I DON'T KNOW HOW YOU COULD SAY NO TO THAT.  THERE'S NINE TIMES THEY DIDN'T

INVESTIGATE.

QUESTION NUMBER 2.  DID THE PLAINTIFF SUFFER ANY ACTUAL DAMAGES?

AND THAT'S GOING TO BE JURY INSTRUCTION NUMBER 38 THAT TALKS ABOUT IT.

BUT HERE'S THE THING:  IF YOU THINK THAT MR. PANCHENKO AND HIS WIFE AND HIS FRIEND, IF YOU BELIEVE THAT THEY TOOK THE STAND AND THEY LIED TO YOU, I WANT YOU TO PUT ZERO.  THAT'S WHAT YOU PUT.

BUT IF YOU BELIEVE THAT THEY TOLD THE TRUTH AND THAT HE REALLY DID HAVE EMOTIONAL DISTRESS, YOU HAVE TO AWARD AN AMOUNT.  MUST.

AND, YOU KNOW, YOU HEARD THE EVIDENCE.  HIS WIFE SAID THIS WAS THE ONLY TIME THAT SHE HAS EVER SEEN HIM CRY.  LOSING SLEEP.  WASTING YOUR TIME.  SENDING THESE DISPUTE LETTERS.

YOU KNOW, AND THEN TO HAVE THEM NOT EVEN READ THIS AND HE CAN'T EVEN GET AN APPLE CARD?

I MEAN, YOU ALL HAVE TO DECIDE HOW MUCH THAT IS WORTH. YOU COULD PUT ANY NUMBER IN THAT BOX THAT YOU WANT.

NOW, I FEEL, AS HIS LAWYER, THAT I HAVE A DUTY TO SUGGEST A RANGE, SO THE RANGE THAT I'M GOING TO SUGGEST IS BETWEEN 150,000 AND 500,000.  I THINK THAT'S ABOUT RIGHT FOR THIS CASE.

SO WE'RE GOING TO ASK YOU TO SAY YES TO QUESTION 2.

ALL RIGHT.  QUESTION 3.  THAT'S THAT RANGE THAT I JUST TALKED ABOUT.

QUESTION NUMBER 4.  WAS COMENITY'S VIOLATION WILLFUL?

WE'RE GOING TO ASK YOU TO SAY YES.

NOW, IMPORTANTLY, WILLFUL IS ONE OF THOSE WORDS THAT CAN KIND OF MEAN DIFFERENT THINGS, BUT PAY ATTENTION TO HOW THE COURT HAS DEFINED IT FOR YOU.  WE DON'T HAVE TO PROVE THAT SOMEBODY AT THE BANK SAID, AH, LET'S GET THAT PANCHENKO GUY.  THAT'S NOT WHAT IT MEANS.

IT MEANS RECKLESS.

SO WAS IT RECKLESS TO REQUIRE YOUR AGENTS TO DO 36 DISPUTES EVERY 8 HOURS?

AND I KNOW MOST OF YOU ARE PROBABLY BETTER AT MATH THAN I AM, BUT IN MY MIND, THAT'S ROUGHLY 12 MINUTES PER DISPUTE, GIVE OR TAKE.

AND BY THE WAY, THAT DOESN'T EVEN INCLUDE TIME FOR, LIKE, BATHROOM BREAKS, COFFEE BREAKS, YOU KNOW, YOU HAVE TO LOG INTO THE SYSTEM AND MAKE NOTES OF WHAT YOU'VE DONE.

CAN YOU REALLY DO AN INVESTIGATION IN 12 MINUTES, A REAL ONE?  I DON'T THINK SO.

AND THEN THEY DIDN'T EVEN TRAIN THEIR PEOPLE ON THE RIGHT WAY TO DO IT.  IT'S LIKE THEY HAVE THESE POLICIES, BUT THERE'S A HUGE DISCONNECT THAT THEY PROBABLY ARE JUST COLLECTING DUST ON THE SHELF BECAUSE IT DOESN'T SEEM LIKE ANYBODY HAS EVER READ THEM.

AND WHEN YOU HAVE PEOPLE SAYING THINGS LIKE, WHAT IS A POLICE REPORT?  NO, WE DON'T READ THE IMAGES.  HOW IS THAT

RECKLESS -- HOW IS THAT NOT RECKLESS TO ALLOW YOUR ENTIRE DEPARTMENT TO INVESTIGATE THESE DISPUTES THAT WAY?

THEY'VE HAD NINE CHANCES.  IF THEY JUST DID IT ONCE, MAYBE.  BUT NINE TIMES THEY RESPONDED BACK TO THE CREDIT BUREAUS THAT HE WASN'T A VICTIM OF FRAUD.

AND I ASK THAT YOU PAY REALLY CAREFUL ATTENTION TO THE LAST PAGE OF EVERY ONE OF THOSE ACDV'S, BECAUSE RIGHT BELOW THEIR NAME, IT SAYS, I CERTIFY THAT I'VE REVIEWED ALL OF THE IMAGES AND RELEVANT INFORMATION.  THAT MEANS, LIKE, THEIR OWN FILE.

SO I THINK THEY'RE GOING TO TRY TO TELL YOU THAT, OH, SOME OF THEM DIDN'T HAVE IMAGES, AND THEREFORE, SOMEHOW WHAT WE DID WAS OKAY.

BUT KEEP IN MIND, THE ACDV, THAT JUST TELLS YOU THE NATURE OF THE DISPUTE.  SO IT'S TELLING YOU, HEY, THIS PERSON CLAIMS FRAUD.

YOU THEN HAVE TO GO LOOK AT YOUR OWN FILE AND SEE WHAT IT SAYS.  YOUR OWN FILE HAD THE POLICE REPORT.  YOUR OWN FILE HAD THE FTC UPDATE.  YOUR OWN FILE HAD THE RECORDINGS.

AND IF THEY TRY TO PLAY GAMES ABOUT WHAT THEY HAD AND WHEN, PLEASE LISTEN CAREFULLY TO EXHIBIT 50, STARTING AT 7 MINUTES, BECAUSE YOU'LL HEAR MR. PANCHENKO ON -- THAT CALL THAT TOOK PLACE ON JUNE 30TH, 2023.  YOU'LL HEAR MR. PANCHENKO SAY, I SENT YOU THE POLICE REPORT, I SENT YOU THE FTC AFFIDAVIT.

THE GUY RESPONDS AND SAYS, OH, I SEE WE RECEIVED IT.

THEY HAD IT THE WHOLE TIME.

AND THEN THEY GOT IT AGAIN ON AUGUST 16TH, AND AGAIN THEY DIDN'T LOOK AT IT.

NOW, QUESTION NUMBER 5, WE'RE GOING TO ASK YOU TO JUST REWRITE WHATEVER AMOUNT YOU CAME UP WITH FOR QUESTION 3.

SO IT'S A LITTLE BIT CONFUSING THE WAY THAT THIS PART OF THE LAW WORKS, BUT BASICALLY THAT'S THE STATUTORY DAMAGES OF 100 TO 1,000.  SO THAT ONLY APPLIES IF THE PERSON HAS NO DAMAGES WHATSOEVER.

BUT IF THEY DO HAVE DAMAGES, THEN YOU GIVE THE AMOUNT OF THE DAMAGES, IF THAT MAKES SENSE.

NOW, QUESTION NUMBER 6.  DO YOU FIND THAT PLAINTIFF SHOULD BE AWARDED PUNITIVE DAMAGES?

NOW, I HOPE THAT THE FIRST THING THAT MR. NARITA DOES WHEN HE STANDS UP AND DOES HIS CLOSING ARGUMENT IS I HOPE HE SAYS, LADIES AND GENTLEMEN, ON BEHALF OF THE BANK, WE'RE SORRY FOR VIOLATING THE LAW.  AND I HOPE THEY APOLOGIZE TO MR. PANCHENKO AND SAY, WE'RE SORRY FOR THE WAY THAT WE TREATED YOU, AND WE'RE SORRY THAT WE TRIED TO TRICK YOU AND SHOW YOU EXHIBIT 246 AND GET YOU TO SAY THAT YOU WERE CHECKING YOUR CREDIT REPORTS WHEN YOU WERE LIVING IN THE UKRAINE.  WE'RE SORRY ABOUT THAT.

BUT THEY'RE NOT GOING TO DO THAT.  HE'S GOING TO GET UP HERE AND HE'S GOING TO SAY, OH, LADIES AND GENTLEMEN, WE DIDN'T DO ANYTHING WRONG.  THIS IS HOW EVERYBODY DOES IT.  IT'S ALL

MR. PANCHENKO'S FAULT HE DIDN'T KEEP SENDING US THE IMAGES OVER AND OVER AGAIN, EVEN THOUGH WE HAD THEM ALREADY.

SO THAT'S HOW YOU KNOW THAT SOMEBODY NEEDS TO BE PUNISHED.

BECAUSE IF YOU'RE REALLY SORRY ABOUT SOMETHING -- I MEAN, LOOK, WE ALL MAKE MISTAKES.  NOBODY IS PERFECT.

BUT IF YOU'RE SORRY, YOU SAY YOU'RE SORRY, AND YOU MAKE IT RIGHT.

THEY HAVEN'T DONE THAT.

AND THE WAY OUR SYSTEM WORKS, THE ONLY THING WE CAN ASK YOU FOR IS MONEY.  I CAN'T ASK YOU TO THROW THEM IN JAIL.  I CAN'T ASK YOU TO ORDER THEM TO CHANGE THE POLICIES.  THE ONLY THING THAT I CAN DO IS ASK YOU TO AWARD PUNITIVE DAMAGES TO GET THEM TO CHANGE.

LOOK, THEY'RE A BIG BANK.  THEY KNOW MONEY.  THAT'S WHAT THEY CARE ABOUT.

THE PEOPLE WHO RUN THIS BANK, THEY'RE NOT STUPID.  YOU CAN'T BE STUPID AND RUN ONE OF THE BIGGEST BANKS.  YOU'VE GOT TO BE PRETTY SMART.  THEY KNOW WHERE THE MONEY IS GOING.

IN FACT, THAT'S WHY WE'RE EVEN HERE.  THAT'S WHY THEY'RE IN THE POSITION THAT THEY ARE NOW IS THEY GOT HERE BY BEING CHEAP AND REQUIRING 36 DISPUTES EVERY 8 HOURS, BECAUSE THE TRUTH IS THAT THEY DON'T WANT TO PAY WAGES TO PEOPLE WHO ACTUALLY INVESTIGATE IT BECAUSE THAT WOULD COST THEM MONEY.

SO THE WAY YOU CHANGE THAT BEHAVIOR IS THAT YOU MAKE IT MORE EXPENSIVE TO KEEP DOING BUSINESS THAT WAY.

THEY'RE EVEN -- TO THIS DAY, THEY STILL HAVEN'T LEARNED THEIR LESSON.  THEY'RE STILL TEACHING PEOPLE THAT IF PAYMENTS WERE MADE, IT'S AUTOMATICALLY NOT FRAUD.

THAT'S NOT AN INVESTIGATION.  THAT'S AN ASSUMPTION. YOU'VE GOT TO INVESTIGATE IT.

THE TRUTH IS THAT THE BANK KNOWS BETTER AND THEY HOPE THAT YOU DON'T.

NOW, THEY'RE GOING TO TRY TO CONFUSE BY SUGGESTING THAT, HEY, THERE ARE OTHER BANKS, AND THEY'VE PUT -- THERE'S A LOT OF PIECES OF EVIDENCE.  WHEN YOU LOOK AT THE STIPULATED FACTS, NUMBER 247, AND YOU GET TO THE END, A LOT OF IT IS JUST ABOUT, LIKE, WHAT DID OTHER BANKS DO?  WHAT DID BANK OF AMERICA DO? WHAT DID CHASE DO?  WHAT DID U.S. BANK DO?

AND WE STIPULATED TO IT BECAUSE IT'S ALL TRUE.  YOU KNOW, THE REAL QUESTION IS, OR THE REAL THING TO THINK ABOUT IS THAT COMENITY IS THE ONLY ONE LEFT.  THEY'RE THE ONLY ONES HERE TODAY.  WHY IS THAT?

HERE'S WHY:  COMENITY IS BETTING THAT YOU ALL WILL GET CONFUSED AND THAT YOU ALL WILL THINK, WELL, IF OTHER BANKS DID IT, IT MUST BE REASONABLE, BECAUSE THEY'RE TAKING A BET THAT YOU ALL WON'T HOLD THEM ACCOUNTABLE.

BUT I SAY THAT'S BACKWARDS.  JUST BECAUSE THE OTHER BANKS DID IT, THAT DOESN'T MEAN IT'S REASONABLE.  YOU KNOW WHAT IT MEANS?  IT MEANS IT'S SYSTEMIC.  IT MEANS IT'S AN INDUSTRY-WIDE PROBLEM.

AND IT MAKES IT MORE IMPORTANT -- NOT LESS IMPORTANT -- TO HOLD COMENITY ACCOUNTABLE, BECAUSE THE SIMPLE TRUTH IS THAT IF YOU LET COMENITY GET AWAY WITH THIS, THE OTHER BANKS ARE GOING TO TAKE NOTICE AND THEY'RE GOING TO DO IT, TOO.  AND MAYBE THEY'LL SAY, HEY, WHY DON'T WE PUSH IT UP TO 45?  WE'LL SEE IF WE CAN GET AWAY WITH THAT, 45 DISPUTES A DAY.  WHY DON'T WE DO 100?

BUT IF YOU PUNISH THEM, OTHER BANKS WILL TAKE NOTICE. THAT'S HOW THE INDUSTRY WORKS.

AND THOSE STIPULATED FACTS IN EXHIBIT 247, THAT'S COMENITY'S WAY OF TELLING YOU THAT EVERYBODY DOES THIS.

WELL, WE'VE SEEN SO MANY EXAMPLES THROUGHOUT HISTORY THAT JUST BECAUSE IT'S THE INDUSTRY STANDARD, THAT DOESN'T MAKE IT REASONABLE.

JUST LIKE I SAID BEFORE, THERE WAS A TIME WHEN ALL OF THE TOBACCO COMPANIES SAID THAT CIGARETTES WERE SAFE.  THAT WAS THE INDUSTRY STANDARD.

DOES THAT MEAN THAT THEY WERE RIGHT ABOUT IT?  NO.

THERE WAS A TIME WHEN THE INDUSTRY STANDARDS FOR BANKS WAS TO DO RED LINING SO THAT PEOPLE OF COLOR COULD NOT GET LOANS. THAT WAS THE INDUSTRY STANDARD.

DOES THAT MEAN IT WAS OKAY?  NO.

IT'S LIKE IN BASEBALL.  IF 85 PERCENT OF THE PLAYERS TAKE STEROIDS, DOES THAT MEAN IT'S OKAY?  I DON'T THINK SO.

I HOPE THAT'S NOT THE WORLD THAT YOU WANT TO LIVE IN,

BECAUSE JUST BECAUSE EVERYBODY DOES IT, THAT DOESN'T MAKE IT RIGHT, IT DOESN'T MAKE IT LEGAL, AND IT DOESN'T MAKE IT REASONABLE.

YOU HAVE THE POWER TO CHANGE WHAT THE INDUSTRY STANDARD IS.  YOU HAVE PROBABLY NOTICED, WHENEVER YOU ALL WALK IN OR LEAVE THE ROOM, WE ALL STAND UP FOR YOU.  THAT'S BECAUSE THAT'S THE POWER THAT THE JURY HAS.

AND RIGHT NOW YOU CAN CHANGE THE INDUSTRY STANDARD.

OR YOU CAN TELL THEM, YEAH, KEEP DOING WHAT YOU'RE DOING, SPEND TWO OR THREE MINUTES, CHECK SOME BOXES, MAKE SURE THE SOCIAL MATCHES, DON'T READ THE POLICE REPORTS, DON'T LISTEN TO RECORDINGS, JUST MATCH THE SOCIAL AND RELY ON YOUR ACCURINT REPORT THAT SAYS DON'T FLAG IT.

OR YOU CAN CHANGE THAT.  YOU CAN SAY, NO, THAT'S NOT REASONABLE.  THAT'S NOT GOOD ENOUGH.  THAT'S NOT WHAT THE LAW REQUIRES.

AND YOU CAN TELL THEM THAT WHEN SOMEBODY SENDS IN PROOF, YOU HAVE TO INVESTIGATE, AND YOU'VE GOT TO DO MORE THAN JUST CHECK BOXES.

BUT IF YOU LET COMENITY GET AWAY WITH IT, NOTHING CHANGES. THE INDUSTRY STANDARD STAYS THE SAME.

AND THE NEXT IDENTITY THEFT VICTIM THAT COMES ALONG AND FILES A DISPUTE, THEY'RE GOING TO GET TREATED THE SAME WAY ALEX DID.

OR YOU CAN SEND A MESSAGE TO COMENITY AND THE INDUSTRY

THAT YOU HAVE TO INVESTIGATE, YOU HAVE TO CARE, AND YOU HAVE TO DO BETTER.

COMENITY'S SYSTEM MAKES IT IMPOSSIBLE TO DO WHAT THE LAW REQUIRES.  IT'S A SYSTEM THAT PRIORITIZES SPEED OVER ACCURACY, QUANTITY OVER QUALITY, AND NUMBERS OVER GETTING IT RIGHT.

AND THEY DID THAT KNOWINGLY.  THEY DID THAT WILLFULLY TO SAVE THE BANK MONEY ON WAGES.

KNOWING WHAT YOU'RE SUPPOSED TO DO AND SETTING UP A SYSTEM THAT MAKES IT IMPOSSIBLE TO DO IT, THAT IS THE DEFINITION OF RECKLESS DISREGARD FOR THE FCRA.

QUESTION NUMBER 7.  HOW MUCH TO AWARD?

I WAS THINKING ABOUT THIS LAST NIGHT.  COMENITY'S A BIG COMPANY.  $100,000 PUNITIVE DAMAGES AWARD, THAT MIGHT SOUND LIKE A LOT OF MONEY TO ME AND YOU.

TO COMENITY, THAT'S A ROUNDING ERROR.  THAT'S TIPPING MONEY.  THAT WON'T CHANGE ANYTHING.

IF YOU WANT TO SEND A MESSAGE AND CHANGE HOW COMENITY DOES BUSINESS, THE PUNITIVE DAMAGES AMOUNT HAS TO BE AN AMOUNT TO MAKE THEM FEEL IT.  BECAUSE IF IT'S A SMALL NUMBER, THEY'RE JUST GOING TO BE LIKE, YEAH, WHATEVER, IT'S JUST THE COST OF DOING BUSINESS, JUST KEEP DOING IT THE WAY THAT WE'RE DOING IT.

NOW, WE DIDN'T HEAR THE EXECUTIVES FOR THE BANK TESTIFY, BUT I BET YOU THEY'RE INTERESTED TO SEE WHAT THIS JURY FROM SAN JOSE IS GOING TO DO WITH THIS CASE.  YOU'VE GOT TO MAKE THE NUMBER BIG ENOUGH TO WHERE ONCE YOUR VERDICT IS READ, SOMEBODY

CALLS BACK TO HEADQUARTERS AND AN EXECUTIVE SAYS, WAIT, THEY DID WHAT?  HOW MUCH?  OKAY.  WE NEED TO CHANGE THIS.  WE NEED TO GET OUR SYSTEM FIXED.

I'M NOT GOING TO SUGGEST A NUMBER.  YOU'LL DECIDE WHAT THAT NUMBER IS, AND YOU'LL HAVE TO USE YOUR COMMON SENSE AND YOUR EXPERIENCE TO COME UP WITH WHAT YOU THINK IS FAIR.

AND REMEMBER, AS THE JURY, YOU'RE ESSENTIALLY CONDUCTING AN APPRAISAL OF WHAT IT WOULD TAKE TO PUNISH THEM.

REMEMBER THAT THERE'S A PROCESS AND A JUDGMENT, AND THE JUDGE WILL MAKE IT A JUDGMENT AND THERE'S A PROCESS.

BUT WHATEVER DECISION YOU DECIDE, THAT WILL BE COMMUNICATED TO COMENITY.

AND REMEMBER, THEY HAD NINE CHANCES TO MAKE IT RIGHT, AND THEY'RE STILL FIGHTING IT.  THEY STILL WOULDN'T EVEN ADMIT THAT THIS GUY IS A VICTIM OF FRAUD.  THEY WOULDN'T EVEN SAY THAT.

NOW, I'M GOING TO SAVE THE REST OF MY TIME FOR REBUTTAL BECAUSE MR. NARITA IS GOING TO GO NEXT AND, FRANKLY, I'M VERY SUSPICIOUS OF WHAT HE'S GOING TO TELL YOU BECAUSE NOTHING THAT THEY HAVE SAID SO FAR HAS MADE ANY SENSE, AND I WANT TO BE ABLE TO RESPOND IT BECAUSE I KNOW A LOT OF IT IS GOING TO BE WRONG.  I'M NOT GOING TO RESPOND TO EVERYTHING, BUT I AM -- YOU WILL HEAR FROM ME ONE MORE TIME TODAY.

THE COURT:  SO WE HAVE ANOTHER PROBABLY AN HOUR PLUS OF ARGUMENTS, SO I'M INCLINED TO GIVE YOU ALL A SHORT BREAK NOW JUST SO THAT WE DON'T BREAK UP THE FLOW LATER.

SO HOW ABOUT A 10 MINUTE -- I'M LOOKING AT THE JURORS' FACES, A 10 OR 15 MINUTE BREAK NOW?  OKAY.  I SEE NODS.

LET'S DO THIS, WE'LL TAKE A -- WE'LL DO 12 MINUTES.  I'M LOOKING AT THE TIME.  SO THAT HITS US AT EVEN-STEVEN 10:20, AND WE'LL COME BACK AND WE'LL CONTINUE WITH THE DEFENDANT.

THANK YOU.  THE JURY IS NOW EXCUSED.

THE CLERK:  ALL RISE FOR THE JURY.

(JURY OUT AT 10:09 A.M.)

(RECESS FROM 10:09 A.M. UNTIL 10:21 A.M.)

THE COURT:  WE ARE BACK ON THE RECORD OUTSIDE OF THE PRESENCE OF THE JURY.

THE PARTIES ARE PRESENT.  COUNSEL ARE PRESENT.

SO I THINK WE'RE STILL ON TRACK TIMING-WISE.  I'M GOING TO LET THE JURY IN, SO WE'LL DO CLOSING, REBUTTAL CLOSING, I'LL GIVE FINAL INSTRUCTIONS, AND THEN WE SHOULD BE DONE, MY ESTIMATE IS PROBABLY CLOSE TO 11:40, IF NOT BEFORE.  SO SOMEWHERE IN THERE.

SO THEY'LL HAVE LUNCH AND WE'LL TAKE IT FROM THERE.

AFTER WE'RE WRAPPED UP WITH THE JURY, WE'LL TOUCH BASE VERY BRIEFLY TO SEE IF THERE'S ANY OTHER LOGISTICS, BUT I NEED TO GET THINGS FINALIZED FOR THE JURY, SO YOU'RE NOT GOING TO SEE ME.  IT'S GOING TO BE A VERY BRIEF TOUCH BASE, AND LAURA NEEDS TO GET TO THE JURY AS WELL.

SO WITH THAT, MADAM CLERK, I THINK WE'RE READY TO BRING THE JURY IN.

THE CLERK:  YES, YOUR HONOR.

(JURY IN AT 10:22 A.M.)

THE COURT:  YOU MAY BE SEATED.

CONTINUING WITH THE PROCEEDINGS OF PANCHENKO VERSUS COMENITY CAPITAL BANK.

COUNSEL IS PRESENT, THE PARTIES ARE PRESENT, AND ALL SEVEN MEMBERS OF THE JURY ARE PRESENT.

CONTINUING WITH THE CLOSING ARGUMENT.

MR. NARITA, ARE YOU READY?

MR. NARITA:  YES.  THANK YOU, YOUR HONOR.

**(DEFENDANT'S COUNSEL, MR. NARITA, GAVE HIS CLOSING ARGUMENT.)**

MR. NARITA:  GOOD MORNING EVERYBODY.

BEFORE I GET STARTED TALKING TO YOU ALL AND THANKING YOU FOR YOUR SERVICE, I WANTED TO TAKE JUST A MINUTE TO SAY A SPECIAL THANKS TO THE COURT AND THE COURTROOM STAFF FOR EVERYTHING THEY HAVE DONE FOR US THIS WEEK.

I -- FOR A LITTLE CONTEXT, I DID MY FIRST FEDERAL COURT JURY TRIAL 34 YEARS AGO, SO I'VE BEEN IN A LOT OF FEDERAL COURTHOUSES IN MY CAREER, AND I CAN HONESTLY SAY THAT I HAVE NEVER SEEN A GROUP OF PEOPLE WORK SO HARD TO SUPPORT THE PARTIES AND THE JURY AND EVERYONE.

AND I DON'T FOLLOW THE NEWS, BUT I'VE HEARD A RUMOR ABOUT SOME SORT OF FEDERAL SHUTDOWN THAT HAS HAPPENED OUT THERE AS WELL, BUT APPARENTLY THE COURT HERE DIDN'T GET THE MEMO,

BECAUSE EVERYONE HERE HAS BEEN WORKING SO HARD FOR US.

SO UNDER THE CIRCUMSTANCES, WE REALLY APPRECIATE THAT, SO THANK YOU.  AND IT'S BEEN A PRIVILEGE WORKING WITH THE COURT AND ITS STAFF.

NOW, WELCOME BACK.  I'M GLAD TO BE BACK CHATTING WITH YOU AGAIN.

I KNOW YOU ALL ALSO HAVE BUSY LIVES AND THINGS THAT YOU HAVE NOT BEEN ABLE TO DO THIS WEEK WHILE YOU'VE BEEN DOING YOUR SERVICE HERE WITH US, AND SO WE REALLY THANK YOU FOR THAT, AND WE THANK YOU FOR ALL OF THE ATTENTION THAT YOU'VE GIVEN TO US AND TO THE WITNESSES THIS WEEK.

AND AS I SAID WHEN WE STARTED THE CASE, THESE TWO PARTIES ARE STUCK.  THEY DON'T AGREE ON THE FACTS, AND THEY ALSO DON'T AGREE ON WHAT THE CONSEQUENCES OF THOSE FACTS ARE.

SO THAT'S THE IMPORTANT ROLE THAT YOU'RE GOING TO FILL FOR US.  YOU'RE GOING TO BE OUR FACT FINDERS.

AND TO DO THAT, YOU'RE GOING TO LOOK AT THE EVIDENCE THAT CAME IN, RIGHT?  WE HAD FOUR LIVE WITNESSES:  MR. PANCHENKO WAS HERE; HIS WIFE, ALLA, CAME; HIS FRIEND, PAVLO, CAME; AND SIERRA FORD CAME FROM COMENITY.  SO WE HAD THOSE FOUR WITNESSES.

WE HAD A LOT OF VIDEO WITNESSES FROM THE INVESTIGATORS AT COMENITY WHO LOOKED AT ALL OF THE ACDV'S AND DID THEIR WORK. SO THEY TESTIFIED.

AND THEN YOU SAW A LOT OF DOCUMENTS.  YOU WERE VERY

PATIENT WITH US.  A LOT OF BINDERS, A LOT OF THINGS ON THE SCREEN.  SOME OF THOSE BINDERS FELL.

AND THAT'S IT.  THE RECORD IS DONE.  THERE'S NO MORE EVIDENCE THAT IS GOING TO COME YOUR WAY.

SO IT'S ALL OF WHAT YOU SAW AND THE EXHIBITS THAT WILL BE PROVIDED TO YOU, AND THERE WILL BE SOME STIPULATED FACTS THAT YOU CAN REFERENCE.

AS HER HONOR SAID, YOU HAVE YOUR OWN MEMORY, YOUR NOTES THAT YOU MIGHT HAVE THAT YOU CAN USE, AND THEN, OF COURSE, WE WANT YOU ALL TO TAKE THIS TIME TO COLLABORATE IN A DISCUSSION OF YOUR OWN IMPRESSIONS OF WHAT YOU SAW IN THE EVIDENCE.

AND THE OTHER THING THAT I THINK IS IMPORTANT IN THIS CASE IS TO THINK ABOUT WHAT EVIDENCE WAS NOT BROUGHT TO YOU.

MR. OSBORNE SAID, OH, MR. NARITA DIDN'T CALL HIS EXPERT TO TESTIFY, AND I WAS VERY DISAPPOINTED ABOUT THAT.

AND I'M SORRY FOR HIS DISAPPOINTMENT ABOUT THAT.

BUT YOU MIGHT ALSO WANT TO THINK ABOUT THE EVIDENCE THAT MR. PANCHENKO COULD HAVE EASILY GOTTEN AND BROUGHT AND SHOWED TO YOU, IF HE HAD IT, OR IF IT HELPED HIM, THAT YOU DIDN'T SEE.

SO I WANT YOU TO CONSIDER SOME OF THAT, TOO, RIGHT?  I MEAN, THIS IS MR. PANCHENKO'S CASE, RIGHT?  HE'S BEEN PURSUING IT WITH HIS TEAM OF LAWYERS VERY DILIGENTLY FOR TWO YEARS.

THIS ISN'T -- THE DAYS THAT WE'VE SPENT TOGETHER WEREN'T A DRESS REHEARSAL FOR HIS TRIAL.  THIS WAS AN ACTUAL FEDERAL COURT TRIAL, WITH A REAL JURY, A REAL COURT, A REAL COURTROOM

DEFENDANT'S CLOSING ARGUMENT

STAFF AND JUDGE.

SO NOW IS THE TIME FOR MR. PANCHENKO TO COME COLLECT AND BRING HIS EVIDENCE, EVERYTHING THAT HE WANTED TO SHOW YOU, TO SUPPORT HIS CLAIMS, RIGHT?

THIS WASN'T AN EPISODE OF "SUITS." I'VE NEVER SEEN THE SHOW. I KNOW IT'S ABOUT LAWYERS.

BUT THIS IS REAL LIFE.

SO LET'S TAKE AN INVENTORY OF THINGS THAT YOU DIDN'T SEE. I TALKED ABOUT SOME OF THEM IN THE OPENING. RIGHT?

HE DIDN'T SEE A PSYCHOLOGIST. HE DIDN'T SEE A DOCTOR. HE DIDN'T SEE AN ECONOMIST WHO COUNTED UP THE DAMAGES. HE DIDN'T SEE AN ACCOUNTANT WHO COUNTED ANYTHING OUT. THERE WERE NO DAMAGES STUDIES OR ANYTHING LIKE THAT. NOTHING ABOUT MEDICATIONS THAT HE TOOK, RIGHT? NO MEDICAL RECORDS.

YOU DIDN'T HEAR FROM MR. PANCHENKO'S EXPERT OFFERED BY HIM THAT SAYS, YOU KNOW WHAT, HIS CREDIT SCORE WENT WAY DOWN BECAUSE OF COMENITY AND THAT'S WHY HE HAD THIS CREDIT HARM OR THAT CREDIT HARM.

YOU DIDN'T HEAR ANY OF THAT, RIGHT? THERE WASN'T ANY OF THAT TESTIMONY.

SO WE TALKED ABOUT THAT ALREADY IN MY OPENING, AND YOU DIDN'T SEE IT IN THE TRIAL.

A COUPLE OF OTHER THINGS STOOD OUT TO ME ABOUT WHAT YOU DIDN'T SEE WITH THE WITNESSES THAT HE DID BRING, RIGHT? SO HE BROUGHT ONE OF HIS CLOSE FRIENDS, PAVLO, WHO CAME ALL OF THE

WAY FROM NEW YORK CITY, ALL OF THE WAY OUT HERE TO SAN JOSE TO TESTIFY FOR HIM, RIGHT?

THIS IS SOMEBODY THAT HE WANTED YOU TO KNOW KNEW SOMETHING ABOUT THIS TREMENDOUS EMOTIONAL DISTRESS THAT HE SUFFERED BECAUSE OF MY CLIENT, AND THAT HE WANTS COMPENSATION, HE WANTS MONEY FOR IT.

SO PAVLO CAME OUT, AND WE ALL SAW HIM ON THE STAND.

AND YOU'LL HAVE TO GO WITH YOUR OWN MEMORY, YOUR OWN NOTES, WHAT YOU DISCUSS WHEN YOU GET BACK INTO THE JURY ROOM, BUT I DIDN'T HEAR HIM SAY ANYTHING SPECIFIC ABOUT COMENITY FOR SURE.  ACTUALLY, I DIDN'T HEAR HIM SAY ANYTHING MUCH AT ALL ABOUT WHAT HE KNEW OR WHAT MR. PANCHENKO WAS GOING THROUGH. THIS WAS SOMEONE WHO WAS SUPPOSED TO BE HIS REAL CLOSE FRIEND, SOMEBODY WHO COULD TELL YOU SOMETHING SPECIFIC.  I DIDN'T HEAR IT.

AND I KNOW THEY DON'T LIVE NEARBY EACH OTHER, RIGHT?  THEY BOTH HAD TO LEAVE THE UKRAINE.  PAVLO WENT TO NEW YORK.  HE ONLY SAW HIM IN THAT FEW WEEKS IN JULY OF 2023, SO THEY'RE NOT HANGING OUT EVERY DAY.

BUT I KNOW THAT THEY COMMUNICATED BY TELEGRAM, RIGHT?  WE SAW A COUPLE OF THEIR MESSAGES, JUST A FEW EXCHANGES. MR. PANCHENKO BROUGHT THAT HERE FOR YOU TO LOOK AT, TO READ. HE HAD THOSE BECAUSE THOSE WERE HIS MESSAGES, TOO, RIGHT?  HE COULD HAVE BROUGHT ANY OF THEM, BUT HE GAVE YOU THE ONES THAT HE THOUGHT WOULD HELP HIM, RIGHT?

SO WHAT DID WE SEE IN THOSE EXCHANGES?  WELL, THE FIRST ONES WERE EXCHANGES WHERE PAVLO WAS SHOWING MR. PANCHENKO AN APPLE CARD THAT PAVLO HAD GOTTEN.

MR. PANCHENKO WROTE BACK AND ASKED IF IT WAS CREDIT.

AND HE SAID HE DIDN'T HAVE A JOB, SO HE DIDN'T FILL OUT AN APPLICATION AT HIS BANK.

IT WASN'T EXACTLY CLEAR WHAT HAPPENED THERE.

BUT WE KNOW THAT PAVLO ENCOURAGED MR. PANCHENKO TO APPLY FOR THE APPLE CARD, RIGHT?  SAY YOU'RE SELF-EMPLOYED.  TELL THEM YOUR HOUSEHOLD INCOME.

SO WE KNOW THAT THEY HAD THAT EXCHANGE, AND THEN MR. PANCHENKO DIDN'T GET THE CARD.  WE SAW THOSE EXCHANGES.

WHAT WAS THE ONE OTHER EXCHANGE WE SAW WITH HIS FRIEND WHO HE BROUGHT TO YOU TO TESTIFY ABOUT HOW UPSET HE WAS?  THAT WAS AFTER HE FILED THE LAWSUIT, HE TEXTED HIS FRIEND IN JANUARY OF 2024, AND HE SAYS, HEY, YOU KNOW, ARE YOU OKAY IF MY LAWYER HAD YOU AS A WITNESS?  AND THERE WAS THE BACK AND FORTH AND THAT'S WHEN WE SAW THE EMOJI AND STUFF.

AND HE SAID, WILL YOU COME OUT AND TESTIFY IN MY CASE?  THESE ARE THE KINDS OF THINGS THAT YOU PROBABLY WILL TESTIFY ABOUT.  SO WE SAW THAT EXCHANGE.

AND NOTHING ELSE, RIGHT?  THERE WAS NO -- THERE WAS NOTHING BACK AND FORTH LIKE, MAN, I KNOW YOU'RE GOING THROUGH A LOT; OR, BOY, WE HAD THAT CALL THE OTHER DAY AND YOU SEEMED REALLY DOWN ABOUT ALL OF THIS.  YOU KNOW, I HOPE YOU'RE HANGING

IN THERE.

THERE WAS NOTHING THERE, RIGHT?

SO WE DIDN'T HEAR IT FROM HIM ON THE STAND, AND WE DIDN'T SEE IT IN HIS MESSAGES.

ALSO, HE TALKED A LOT TO YOU ABOUT HIS PHONE CALLS AND THE FRUSTRATION THAT HE HAD WITH PHONE CALLS, RIGHT?  AND HE TOLD YOU THIS WAS A 9:00 TO 5:00 JOB FOR HIM.  WHEN HE FOUND OUT THIS HAPPENED, IT WAS 9:00 TO 5:00.  HIS WIFE WOULD LEAVE IN THE MORNING AND GO TO GOOGLE AND GO TO WORK AND HE WOULD GET DOWN TO IT AND START CALLING BANKS.  YOU KNOW, HE DID NOTHING ELSE ALL DAY, AND HE -- WHEN SHE CAME HOME, HE WAS JUST GETTING FINISHED.

AND THEN WHEN I ASKED HIM, I SAID -- WELL, I THOUGHT I WAS FAIR WITH HIM ON THE STAND.  YOU GUYS WILL HAVE TO MAKE UP YOUR OWN MIND ON WHETHER I WAS FAIR ON THE WAY I QUESTIONED HIM.  I TRIED TO BE.

I SAID, WE HAVE THESE THREE CALL RECORDINGS.  IT'S A STIPULATED FACT THAT THERE ARE THREE CALLS.  AND MY TEAM COUNTED UP THE NUMBERS OF HOW LONG IT TOOK, AND IT WAS THREE AND A HALF MINUTES.  DO YOU HAVE SOMETHING DIFFERENT?

IT WAS MUCH LONGER THAN THAT.  AND THERE WERE A LOT MORE CALLS THAN THAT.

HE WAS VERY INSISTENT.  VERY INSISTENT.  BUT LIKE, REALLY, IF THERE WERE A LOT MORE CALLS AND FRUSTRATION WITH US, IT'S PROBABLY RIGHT ON YOUR PHONE, RIGHT?  HE'S USING HIS PHONE TO

CALL US.

SO YOU PRINT OUT YOUR PHONE RECORDS AND CALL YOUR PHONE COMPANY, AND THESE ARE ALL REALLY BASIC, EASY THINGS THAT HE COULD HAVE BROUGHT TO YOU ABOUT THAT TO SHOW THAT WE WEREN'T BEING SQUARE WITH YOU, YOU KNOW, WE WERE TRYING TO MISLEAD YOU, THE JURY, ABOUT HOW MANY TIMES HE CALLED US.

HE DIDN'T GIVE YOU THAT.

HE SAID HE WAS KEEPING SOME SORT OF CHART ABOUT ALL OF THE THINGS THAT HE WAS DOING, BUT WE DIDN'T SEE THE CHART.  DO YOU REMEMBER THAT I ASKED HIM ABOUT THE CHART?

THE OTHER THING WE DIDN'T SEE FROM HIM WAS WHAT WAS HAPPENING TO HIS CREDIT SCORE, RIGHT?  SO HE SUED EVERYBODY. WE SAW HIS COMPLAINT.  HE MADE ALL OF THESE ALLEGATIONS ABOUT HARM TO HIS CREDIT, DEPRIVING HIM OF HIS GOOD PAYMENT HISTORY, A LOT OF THINGS ABOUT CREDIT.

BUT I ONLY REMEMBER ONE DOCUMENT IN THE WHOLE CASE -- AND YOU CAN CHECK ME ON THIS, YOU'LL HAVE ALL OF THE EXHIBITS -- I REMEMBER ONE DOCUMENT IN THE WHOLE CASE THAT SAID ANYTHING ABOUT A SCORE, AND THAT WAS THAT -- THAT WAS THAT IMAGE THAT HE TEXTED TO HIS WIFE.  DO YOU REMEMBER THAT?  IT WAS AN IMAGE OF THE EXPERIAN APP THAT HE TEXTED TO HIS WIFE, AND WE BLEW IT UP, AND IT SHOWED THAT HIS CREDIT SCORE IN JANUARY 11TH OF 2023, I THINK IT WAS 587.  IT WAS 587.

AND THEN THERE WAS ALL OF THIS, LIKE, WELL, DID YOU HAVE THE APP ON YOUR PHONE ALREADY?  WELL, WHAT ABOUT ALL OF THESE

INQUIRIES THAT ARE GOING BACK ALL THE WAY TO OCTOBER OF 2020 WHEN YOU AND YOUR WIFE WERE THINKING ABOUT MOVING WEST?

NOPE, THAT WASN'T ME.  I DIDN'T HAVE THE APP.  YOU KNOW, I GOT THIS HISTORICAL SHOT OF WHAT MY -- I GUESS WHAT THE SCORE ASSOCIATED WITH MY NAME WAS BEFORE I EVEN GOT TO THE U.S., AND IT WAS JUST ON THE APP.

OKAY.  LET'S GO WITH THAT.

BUT WHAT HAPPENED TO HIS SCORE AS TIME WENT BY, RIGHT? WAS IT GETTING WORSE AND WORSE BY TIME?  WE DIDN'T SEE THAT.

AND HE HAS THE EXPERIAN APP APPARENTLY, AND YOU CAN SCROLL BACK OR SCROLL FORWARD AND HE CAN GET ALL KINDS OF INFORMATION RIGHT ON HIS PHONE ABOUT WHAT WAS GOING ON WITH HIS SCORE.

WAS HIS SCORE IMPROVING AT THE TIME?  YOU KNOW, SOME OF HIS ACCOUNTS ROLLED OFF.  WHAT WAS HAPPENING?

WE DIDN'T SEE THAT, AND THAT HAD TO BE PRETTY EASY TO SHARE WITH US, RIGHT?

WHAT ABOUT HIS JOB, HIS JOB SEARCH?  I GUESS HE'S SAYING THAT WE HAD SOMETHING TO DO WITH HIS JOB SEARCH, RIGHT?  WE GOT IN THE WAY OF IT.

I'M NOT QUITE SURE HOW WE GET THERE, BUT I ASKED HIM ABOUT THAT.  I ASKED HIM, DID YOU LOOK FOR A JOB IN MAY OR JUNE OR JULY OR AUGUST OR SEPTEMBER?

HE COULDN'T -- HE COULDN'T -- HE BASICALLY SAID HE DIDN'T LOOK AT ALL IN ANY OF THOSE MONTHS, RIGHT?

AND THEN HE SAID THAT WAS BECAUSE HE WAS DEVOTING FULL

TIME, ALL OF THE TIME ON THE PHONE CALLING ALL OF THESE BANKS TO TRY AND FIX THE PROBLEM.

SO WHAT WE DIDN'T SEE ARE THE PHONE RECORDS TO REALLY SUBSTANTIATE THAT, OR ANY OTHER DOCUMENTS TO PROVE THAT, BUT LET'S CREDIT HIM THAT.

WE KNOW HE WAS ONLY ON THE PHONE WITH US THREE TIMES. THAT'S THE ONLY EVIDENCE THAT YOU HAVE.

SO HE HAD THE THREE CALLS WITH US, AND THEN I GUESS A LOT OF CALLS TO A LOT OF OTHER PEOPLE, AND HE'S SAYING THAT PREVENTED HIM FROM GETTING A JOB FOR SOME AMOUNT OF TIME, RIGHT?

I DON'T REMEMBER HEARING -- I COULD HAVE MISSED IT -- BUT I DON'T REMEMBER HEARING WHEN HE GOT HIS JOB WITH NACE.AI. I REMEMBER HIM SAYING HE DID GET ONE.

I DON'T REMEMBER HIM SAYING HOW MUCH IS HE MAKING THERE? I HEARD HIM SAY HE WAS HAPPY WITH HIS COMPENSATION. HIS TOTAL COMPENSATION THERE WAS FINE.

BUT I DIDN'T HEAR HIM SAYING HE MAKES $20 AN HOUR THERE, OR MAYBE HE MAKES $100,000 A MONTH. WE DON'T KNOW. THERE'S NO EVIDENCE OF IT, RIGHT?

SO IF COMENITY SOMEHOW HAD SOMETHING TO DO WITH DELAYING HIS JOB SEARCH, IF THAT'S THE THEORY, THEN WHAT DO YOU DO WITH THAT? HOW ARE YOU GOING TO GO BACK AND SAY, YEAH, THAT'S TRUE, AND THEN THIS IS THE DAY THAT HE WOULD HAVE GOT THE JOB AND HE WOULD HAVE HAD THIS MUCH MORE MONEY SOONER?

HE WOULDN'T EVEN TELL US, RIGHT?  SO I DON'T KNOW WHAT TO DO WITH THAT.  I DON'T KNOW HOW YOU PUT A NUMBER ON THAT.

HE ALSO SAID, I HAD TO DEPLETE MY SAVINGS.  DO YOU REMEMBER THAT?  I HAD TO DEPLETE MY SAVINGS DURING THIS ENTIRE TIME BECAUSE OF NO JOB.  IT'S A FULL-TIME JOB FIXING THIS CREDIT PROBLEM.

WELL, OKAY.  THAT DOESN'T SOUND GOOD AT ALL.

I GUESS HE COULD HAVE SHOWN US THE BANK STATEMENTS OR SOMETHING SHOWING, LIKE, HERE GOES THAT BALANCE, DOWN, DOWN, DOWN, DOWN, DOWN.  THAT WOULD HAVE BEEN REALLY EASY AND MAYBE STRONG EVIDENCE FOR SOMETHING PERSUASIVE FOR YOU.  WHY DIDN'T WE SEE THAT?

SO YOU'VE GOT TO THINK ABOUT THE EVIDENCE THAT CAME IN FOR SURE.

AND THEN MR. OSBORNE CHASTISED ME FOR NOT CALLING OUR EXPERT WITNESS.  OKAY, I'LL TAKE THAT.  WE DIDN'T CALL OUR EXPERT.

BUT I THINK YOU ALSO HAVE, TO BE FAIR, IF WE'RE GOING TO BE FAIR, LIKE, WHAT DID MR. PANCHENKO BRING TO THE PARTY?  THIS IS HIS PARTY.  HE CALLED IT.

LET'S TALK A LITTLE BIT ABOUT THE JURY INSTRUCTIONS.  I'M NOT GOING TO GO THROUGH TOO MANY OF THESE, BUT THERE ARE A COUPLE THAT I THINK ARE WORTH POINTING OUT.

ONE IS A JURY INSTRUCTION THAT I THINK MR. OSBORNE ALREADY POINTED OUT TO YOU, JURY INSTRUCTION NUMBER 30.

DEFENDANT'S CLOSING ARGUMENT

YOU'LL GET ALL OF THESE.  I BELIEVE THEY'LL STILL BE NUMBERED.

AND THAT'S THE ONE THAT JUST LAYS OUT THE ELEMENTS OF WHAT IS REQUIRED TO PROVE A FAIR CREDIT REPORTING ACT VIOLATION.  WE'LL TALK MORE ABOUT THAT.

ANOTHER ONE THAT YOU MIGHT CONSIDER LOOKING AT EARLY IN THE PROCESS -- YOU ALL ARE GOING TO COME UP WITH THE MECHANICS OF HOW YOU GO ABOUT DOING THIS.  I ACTUALLY HAVE NEVER SERVED ON A JURY.  I'VE NEVER DONE IT, SO I DON'T KNOW HOW YOU'RE GOING TO DO IT, BUT YOU'LL FIGURE IT OUT.

I GUESS IF I WAS GOING BACK THERE, ONE OF THE INSTRUCTIONS THAT I WOULD RECOMMEND YOU TAKE A LOOK AT IS NUMBER 34.2, AND HER HONOR READ THAT.  IT WAS THE ONE THAT EXPLAINED THE DIFFERENCE BETWEEN A DIRECT DISPUTE AND AN INDIRECT DISPUTE, AND YOU MIGHT REMEMBER THAT.

OH, IT'S UP ON THE SCREEN.  THANK YOU, KRISTINA.

SO IT'S UP ON THE SCREEN NOW.  YOU CAN READ IT FOR YOURSELF.

BUT OUR FAIR CREDIT REPORTING ACT IS A LITTLE QUIRKY, BUT IT'S WHAT CONGRESS GAVE US, RIGHT?  SO THIS IS SOME OF THE TERMINOLOGY THAT WE USE IN OUR SPACE, RIGHT, DIRECT DISPUTES, INDIRECT DISPUTES?

AND I THINK IT'S COUNTERINTUITIVE, FRANKLY, AND I'VE BEEN DOING THIS FOR A WHILE.

SO A DIRECT DISPUTE IS WHEN SOMEONE LIKE MR. PANCHENKO

GOES DIRECTLY TO THE PERSON OR THE ENTITY THAT IS REPORTING INFORMATION ABOUT HIM THAT HE DOESN'T LIKE OR HE DOESN'T THINK IS ACCURATE, AND HE REACHES OUT TO COMENITY WITH A LETTER OR A PHONE CALL RIGHT DIRECTLY TO THEM AND SAYS, HEY, I THINK THIS IS WRONG, PHONE CALLS.  BUT THAT'S A DIRECT DISPUTE.

AND SOMEWHAT WEIRDLY -- I DIDN'T WRITE THE STATUTE -- THAT, CONGRESS SAID, THAT'S -- YOU CAN'T RECOVER FOR THAT. THAT'S NOT THE KIND OF THING THAT THE STATUTE PROTECTS, AND THAT'S WHY THE COURT GAVE YOU THAT INSTRUCTION THAT SAYS, LOOK, YOU KNOW, YOU CAN'T RECOVER FOR DIRECT DISPUTES.

SO WHEN I'M TALKING TO OTHER LAWYERS THAT ARE JUST GETTING USED TO THE ACT, I ALWAYS DO THIS WEIRD THING WITH MY HANDS LIKE A TRIANGLE, RIGHT?  I THINK OF IT AS LIKE A TRIANGLE.

SO IF YOU'RE GOING DIRECTLY ACROSS THE BOTTOM FROM THE CONSUMER TO THE BANK, THAT'S A DIRECT DISPUTE.

BUT AN INDIRECT DISPUTE, WHAT IS THAT?  WELL, IT GOES UP LIKE THIS AND COMES DOWN.

I'M SORRY, I DON'T DRAW AND I'M NOT VERY CREATIVE, BUT THAT'S THE WAY I THINK ABOUT IT.

IF MR. PANCHENKO GOES UP TO ONE OF THE CONSUMER REPORTING AGENCIES AND SAYS SOMETHING THAT HE DOESN'T THINK IS ACCURATE ABOUT WHAT COMENITY IS REPORTING, THEN THEY DROP IT DOWN TO THE BANK, THAT'S WHEN THERE'S THOSE ACDV'S THAT WE'VE TALKED ABOUT AND THAT YOU'VE SEEN EVIDENCE OF.

AND THEN THE RESPONSE, BOOP, IT GOES BACK UP TO THE

CONSUMER REPORTING AGENCIES, AND THEN DOWN BACK TO HIM, AND HE WILL GET A DISPUTE RESULT FROM THE CONSUMER REPORTING AGENCIES.

THAT IS AN INDIRECT DISPUTE, AND THAT IS HIS CLAIM, HIS ONLY CLAIM.  IT'S THE ONLY ONE THAT CONGRESS LET HIM PURSUE.

BOOP, LIKE THAT, AN INDIRECT DISPUTE (INDICATING).

SO NOW -- YOU MIGHT WANT TO TAKE A LOOK AT THAT INSTRUCTION.

SO NOW YOU HAVE TO THINK TO YOURSELF, OKAY, LET'S START TALKING ABOUT THE EVIDENCE.  LIABILITY AND DAMAGE, RIGHT?  WE'RE TALKING ABOUT INDIRECT DISPUTES.  SO WHERE DO WE GO FROM THERE?

I THINK YOU SHOULD FIND THAT HE DIDN'T MEET THE ELEMENTS, RIGHT?

DO WE HAVE -- I THINK WE HAVE INSTRUCTION 32.  IS THAT THE ONE ON INACCURACY?  YEAH.  THERE YOU GO.

SO INSTRUCTION NUMBER 32.  SO THE FIRST THING HE HAS TO SHOW IS AN INACCURACY, RIGHT?  AND SO THAT ALSO HAS A SPECIALIZED MEANING IN THIS AREA, AND HER HONOR GAVE IT TO YOU AS A JURY INSTRUCTION, RIGHT?

IT MEANS THAT IT'S SOMETHING THAT'S INACCURATE EITHER BECAUSE IT'S PATENTLY INCORRECT, RIGHT, IT'S JUST PATENTLY INCORRECT RIGHT ON ITS FACE, OR BECAUSE IT'S MISLEADING IN SOME WAY THAT MIGHT IMPACT CREDIT DECISIONS, MIGHT ADVERSELY AFFECT CREDIT DECISIONS, RIGHT?

IN THIS CASE I THINK YOU'VE HEARD HE'S SAYING THIS IS

PATENTLY INCORRECT.  RIGHT ON THE FACE YOU CAN TELL THIS IS WRONG, RIGHT?

AND I THINK, YOU KNOW, THIS IS ONE OF THE -- I THINK THIS IS ONE OF THE BEST EXAMPLES OF THE PARTIES' SORT OF DISAGREEMENT ABOUT THE CONSEQUENCES OF THE FACTS, RIGHT?

SO DO YOU REMEMBER, LIKE, MR. LOKER, THE FIRST QUESTION OUT OF THE BOX WHEN HE TALKED TO MS. FORD, HE SAID, SO I GUESS YOUR TESTIMONY IS THAT, YOU KNOW, MY CLIENT IS LYING ABOUT WHETHER HE'S HAD IDENTITY THEFT?

AND SHE LOOKED AND SAID, I DIDN'T SAY HE WAS A LIAR.

LET ME BE CLEAR:  WE HAVE NEVER SAID THAT MR. PANCHENKO IS A LIAR.  WE HAVEN'T SAID IT BEFORE AND WE'RE NOT SAYING IT TODAY.

WHAT DID MS. FORD SAY?  SHE SAID, MY TESTIMONY IS THAT HIS ACCOUNT DID NOT PERFORM LIKE A FRAUD ACCOUNT.  THIS ACCOUNT DID NOT PERFORM LIKE A FRAUD ACCOUNT, AND THAT'S WHY I THINK IT'S NOT INACCURATE.

I DON'T EVEN THINK HE GETS PAST THE FIRST PART OF THE TEST, RIGHT, BECAUSE IT HAS TO BE PATENTLY INACCURATE.  IT HAS TO BE SO OBVIOUS THAT HE'S NOT RESPONSIBLE FOR THIS.  LOOK.

SO EVEN NOW, WE'VE HAD A MULTIPLE DAY FEDERAL COURT TRIAL, LIVE WITNESSES, YOU'VE SEEN MR. PANCHENKO TESTIFY, YOU'VE SEEN ALL OF THE DOCUMENTS, MAYBE YOU'RE GOING TO SAY, I BELIEVE HIM.  THIS WASN'T HIM.  HE WASN'T THERE.  HE'S NOT RESPONSIBLE.

SO THEY -- WHAT MR. LOKER AND MR. OSBORNE ARE SAYING TO

YOU IS, LIKE, WELL, THAT'S IT.  I MEAN, YOU THINK HE'S TELLING THE TRUTH, THEN INACCURACY, WE MOVE TO THE NEXT ONE.

NO.  THIS ACCOUNT HAS TO BE PATENTLY INACCURATE, THE INFORMATION HAS TO BE.  AND THERE ARE A LOT OF THINGS ABOUT THIS ACCOUNT AND HOW IT PERFORMED, RIGHT?  YOU HEARD IT OVER AND OVER AGAIN.  IT DOES NOT SUGGEST IT'S A FRAUD ACCOUNT.

I THINK TO BE FAIR, I THINK YOU EVEN HEARD MR. LOKER SAY THINGS LIKE THAT.  MR. OSBORNE, TOO, RIGHT?  THIS IS NOT -- IT'S NOT A BUST OUT, A BUST OUT ACCOUNT.

THIS IS A FRAUDSTER, AND CERTAINLY YOU MAY CONCLUDE THAT, THIS FRAUDSTER IS CULTIVATING A CREDIT HISTORY OVER TWO AND A HALF YEARS MAKING NORMAL CHARGING ACTIVITY, NOT GETTING ANYWHERE NEAR THE CREDIT LIMIT, MAKING CHARGES NEARBY THE ADDRESS WHERE THEY'RE LOCATED, NO STATEMENTS ARE COMING BACK, NO STATEMENTS ARE EVER GETTING RETURNED, RIGHT?

SO THAT'S -- YOU'VE HEARD ALL OF THE TESTIMONY ABOUT RED FLAGS AND GREEN FLAGS, RIGHT?  RED FLAGS ARE FRAUD, AND A LOT OF GREEN FLAGS ARE A NORMALLY PERFORMING ACCOUNT.

SO WE HAD THAT INFORMATION ON WHICH -- IN OUR POSSESSION AND WE DID ALL OF THESE INVESTIGATIONS, AND SO YOU CAN CONSIDER THAT FOR YOURSELF, TOO, WHETHER YOU THINK IT'S PATENTLY INACCURATE.

THE ONLY OTHER THING I REMEMBER A LOT OF TESTIMONY ON ARE THOSE CALL RECORDINGS.  DO YOU REMEMBER, WE HEARD A LOT OF CALLS?

AND THERE WERE SOME CALL RECORDINGS IN 2017, 2018, SOMEONE WAS CALLING IN TO MAKE PAYMENTS, RIGHT?  THEY'RE, LIKE, DELIBERATELY TRYING TO MAKE PAYMENTS ON THE ACCOUNT MULTIPLE TIMES AND WE WERE HEARING MULTIPLE RECORDINGS LIKE THAT.

AND WE HEARD A VOICE ON THE RECORDINGS, AND MR. PANCHENKO LISTENED TO THE VOICE.

AND HE VOLUNTEERED, WELL, NUMBER ONE, IT'S NOT MY VOICE.

BUT HE, HE WASN'T SURE, LIKE, WHERE THE ACCENT WAS FROM.

AND HE SAID, I THINK IT SOUNDS SLAVIC.  MAYBE IT WAS SOME SORT OF A POST-SOVIET COUNTRY, RIGHT?  MAYBE RUSSIA.  HE WASN'T SURE.  LIKE, HE COULDN'T PLACE THE ACCENT.

SO IS THAT A RED FLAG TO HAVE IN YOUR RECORDS, YOU HAVE AN ACCOUNT OPENED IN THE NAME OF SOMEBODY WHO HAS A NAME THAT COULD BE, YOU KNOW, A SLAVIC NAME, AND THEN YOU HAVE SOMEONE CALLING IN MULTIPLE TIMES TO MAKE PAYMENTS AFTER THEY'VE DONE SO FOR TWO YEARS ALREADY?  AND THEY HAVE A SLAVIC SOUNDING VOICE?  IS THAT A RED FLAG?  IS THAT PATENTLY INACCURATE?  I THINK IT'S HARD TO SAY.

I WOULD SUGGEST IT'S NOT.

SO IF YOU FIND THAT THERE'S NO PATENTLY INACCURATE INFORMATION THAT HAS BEEN RECORDED HERE, YOU DON'T EVEN GET TO THE SECOND ELEMENT OF THE CLAIM.  THERE'S ONLY ONE CLAIM HERE, AND THE FIRST THING YOU LOOK AT IS THAT ELEMENT.  RIGHT?

NOW LET'S TALK ABOUT THE INVESTIGATION.  THE SECOND THING HE'S GOT TO PROVE, HE'S GOT TO PROVE THAT WE FAILED TO CONDUCT

DEFENDANT'S CLOSING ARGUMENT

A REASONABLE INVESTIGATION.

I THINK THERE'S AN INSTRUCTION ON THIS, AND IF I HAVE IT RIGHT, IT'S 34.1, BUT I COULD BE WRONG.  YEAH, THERE IT IS. CAN WE GET THAT A LITTLE BIT BETTER ON THE SCREEN SO THAT THE JURY CAN SEE THE WHOLE THING?  YEAH, THERE WE GO.

SO THIS IS THE SECOND ELEMENT, SECOND INSTRUCTION, SECOND THING THAT MR. PANCHENKO HAS THE BURDEN OF PROOF ON, BECAUSE IT'S HIS CLAIM AFTER ALL.  HE HAS TO PROVE TO YOU THAT OUR INVESTIGATION WAS UNREASONABLE.

I THINK -- I WON'T READ THE WHOLE THING FOR YOU.  IT IS YOUR JOB.  YOU CAN DO THIS TOGETHER.

I THINK MY STATEMENT TO YOU, I GUESS, IS THE PROCESS MATTERS, RIGHT?  THE PROCESS MATTERS HERE, AND NOT AS MUCH THE OUTCOME.  YOU'VE GOT TO HAVE -- IF YOU HAVE A PROCESS, AND THE PROCESS IS REASONABLE, YOU MIGHT COME TO THE WRONG OUTCOME AND THAT YOU ACTUALLY ARE STILL REASONABLE, RIGHT?  THAT'S WHAT THE INSTRUCTION TELLS YOU.

SO YOU HAVE TO LOOK AND SAY, DID THE BANK HAVE A PROCESS? DID THEY INVESTIGATE EACH OF THESE DISPUTES OR NOT?  WHAT WAS THE PROCESS THAT THEY USED?  WHAT WAS THE PROCESS THAT THEY USED?

WELL, FIRST OF ALL, DID WE INVESTIGATE AT ALL?  DID WE EVEN LOOK AT THIS STUFF?  YEAH, WE DID.  YOU MET THE PEOPLE WHO DID EACH OF THESE INVESTIGATIONS.  THAT'S WHAT THOSE VIDEOS WERE.  THOSE ARE -- THOSE AREN'T AI GENERATED PEOPLE.  THAT

DEFENDANT'S CLOSING ARGUMENT

WASN'T A BOT.  THOSE ARE PEOPLE.  THEY WORK FOR US AND THEY INVESTIGATED, RIGHT?  SO WE KNOW THESE PEOPLE NOW.  YOU SAW ALL OF THE VIDEOS.  YOU KNOW THEM.  YOU MET THEM.  YOU'RE IN COURT AND YOU MET THEM BY VIDEO.

AND DID THEY INVESTIGATE?  YES, THEY INVESTIGATED.  AND THEY SHOWED THEIR WORK.  THEY SHOWED THEIR WORK.

I PROBABLY WOULD HAVE BEEN A LOT BETTER AT MATH IF I LISTENED TO MY MATH TEACHER WHEN THEY SAID SHOW YOUR WORK.  INSTEAD I BECAME AN ATTORNEY.

BUT THEY SHOWED THEIR WORK IN THE EASE NOTES.  EVERY INVESTIGATION THAT IS CONDUCTED, EVERY INVESTIGATION HAS EASE NOTES.  IT'S THERE.  YOU CAN LOOK AT IT.  THIS WAS DONE, RIGHT?

SO THEY'RE DOING THE INVESTIGATION, AND THEY, THEY TOLD YOU, EACH ONE OF THEM TESTIFIED AT SOME LENGTH -- SOME SHORTER, SOME LONGER -- ABOUT HOW THOSE, WHAT MS. FORD CALLED GREEN FLAG KINDS OF THINGS, THINGS THAT WOULD SUGGEST NORMAL ACCOUNT ACTIVITY, REGULAR PAYMENTS, NO RETURN STATEMENTS, NEVER HIT THE PAYMENT LIMIT, NO DISPUTE FOR A LONG PERIOD OF TIME.  ALL OF THAT KIND OF THING.  THEY WENT THROUGH ALL THAT AND THEY NOTED THAT.

THEY ALSO LEVERAGED OUTSIDE INDEPENDENT THIRD PARTY SOURCES THAT THE BANK PAYS FOR AND PROVIDES TO THEM TO CHECK, ACCURINT AND EKATA.  THEY LOOKED AT THAT.  YOU HEARD THEIR TESTIMONY.

SO WHY WOULD A BANK WHO HAS GOT A BROKEN SYSTEM, THAT ALL

DEFENDANT'S CLOSING ARGUMENT

THEY WANT TO DO IS JUST RUBBER STAMP IT AND MOVE TO THE NEXT ONE, WHY ARE THEY PAYING MONEY FOR TWO INDEPENDENT COMPANIES THAT EVENTUALLY PROVE THEM WRONG?  RIGHT?  THEY DON'T HAVE TO PROVE THEM RIGHT.  IF THEY WANT TO PROVE THEM RIGHT, THEY CAN SAY, WELL, THIS IS WHAT WE'VE GOT IN OUR RECORDS.  YOU DON'T NEED TO CHECK ANY FURTHER.

THEY'RE DOUBLING CHECKING WITH EKATA TO SEE IF IT'S WRONG. THAT'S WHAT THEY'RE DOING.  AND EVERY ONE OF THOSE INVESTIGATORS DID THAT, RIGHT?  SO YOU SAW ALL OF THAT.

NOW LET'S TALK ABOUT MS. BANU.  MS. BANU WAS THE INVESTIGATOR WHO LOOKED AT THE VERY LAST ACDV.  IF YOU LOOK IN THE RECORD AND YOU SEE THE STIPULATED FACTS, THE VERY LAST ACDV WAS PROCESSED BY MS. BANU ON AUGUST 21ST, '23.  THAT'S THE ONLY ONE THAT HAD IMAGES.

YOU MIGHT REMEMBER HER.  SHE LOOKED SUPER NERVOUS AND SHE HAD A WHITE TOP ON, OR SOMETHING LIKE THAT.  AND SHE WAS BEING DEPOSED BY MR. LOKER, RIGHT?

SO WHAT DO WE KNOW OF MS. BANU?

DID SHE INVESTIGATE?  YES.

DID SHE SHOW HER WORK?  YES.  IT'S IN THE EASE NOTES.

DID SHE TELL US WHAT SHE DID?  YES, SHE DID.

DID SHE LOOK AT THE IMAGES THAT WERE ATTACHED?  DID SHE LOOK?  NO.  SHE TOLD US SHE DIDN'T.  SHE WAS HONEST WITH YOU. SHE TOLD US THAT.

IN FACT, SHE TOLD US, LIKE, I DIDN'T THINK WE WERE EVEN

DEFENDANT'S CLOSING ARGUMENT

SUPPOSED TO DO THAT UNTIL LATER.  WE'VE CHANGED IT NOW.  NOW WE'RE LOOKING AT IMAGES.

SHE TOLD US THAT.  SHE DIDN'T TRY TO HIDE THAT FROM YOU.  WE DIDN'T TRY TO HIDE THAT FROM YOU OR TRICK YOU.  SHE TOLD -- SHE CAME AND SAID, I DIDN'T DO IT.

AND THERE WAS A COUPLE OF OTHER FOLKS, I DIDN'T KNOW WE WERE READING THE IMAGES EITHER.

WE DIDN'T HIDE THOSE FOLKS FROM YOU.  THEY ALL TESTIFIED UNDER OATH TRUTHFULLY.  SOME OF THEM DID.  SOME OF THEM DIDN'T.

AND THAT'S WHY, WHEN MS. FORD GOT HERE, YOU KNOW, DID SHE TRY TO COVER IT UP OR PUSH IT UNDER THE RUG OR ANYTHING?

NO.  SHE TOLD YOU, LIKE, I WAS REALLY DISAPPOINTED TO HEAR THAT TESTIMONY.  I WAS DISAPPOINTED.  THAT'S NOT CONSISTENT WITH WHAT WE DO, AND IT'S ALWAYS BEEN OUR POLICY TO REVIEW IMAGES.

OF COURSE YOU HAVE TO DO THAT, RIGHT?

SO YOU SAW HER AND MR. SEARLES GO THROUGH THE AMENDED PROCEDURES, RIGHT?  THIS IS A SYSTEM OF CONTINUOUS IMPROVEMENT, AND NOBODY IS PERFECT AT THIS, BUT IT IS CLEAR THAT, I THINK IN AUGUST, THAT THEY FEEL LIKE WE BETTER BE MORE SPECIFIC AND WE'RE GOING TO PUT MORE THINGS RIGHT IN THE PROCEDURES, AND THEY DID.  YOU SAW ALL OF THOSE.

DOES THAT SOUND LIKE A BANK THAT IS HELLBENT ON NOT INVESTIGATING?

SO YOU MIGHT -- I DON'T KNOW WHAT YOU ALL ARE GOING TO DO.

YOU MIGHT HAVE A DIFFERENT TAKE ON THE EVIDENCE FROM EACH OTHER AND YOU MIGHT HAVE DIFFERENT TAKES ON THE EVIDENCE.

BUT YOU MIGHT GET DOWN TO THAT ONE, THAT LAST ONE, THE ONLY ONE WITH IMAGES THAT WE SAW.  WE HEARD A LOT OF TESTIMONY ABOUT IT, RIGHT?  WE SAW THOSE REALLY LONG EXHIBITS WITH THE POLICE REPORT IN THERE AND THE FTC AFFIDAVIT, PORTIONS OF PASSPORTS, TRAVEL HISTORY.  THERE WERE A LOT OF EMPHASIS ON THE ATTACHMENTS.  THOSE WERE THE IMAGES THAT SHE DIDN'T LOOK AT.

SO YOU MAY SAY, LIKE, WE'VE GOT TO WRESTLE WITH THIS BECAUSE YOU'RE GOING TO HAVE TO DECIDE -- THERE'S ONE MORE THING YOU'RE GOING TO HAVE TO DECIDE, WOULD IT HAVE MADE A DIFFERENCE?  WOULD THAT HAVE MADE A DIFFERENCE IF SHE DID LOOK AT IT?  BUT SHE DIDN'T.  SO THAT'S EASY.

BUT WOULD THERE BE A DIFFERENCE?  LET'S LOOK AT WHAT SHE WOULD HAVE SEEN.  WOULD SHE HAVE SEEN IN THE POLICE REPORT MR. PANCHENKO'S DATE OF BIRTH OR SOCIAL SECURITY NUMBER OR -- YOU KNOW, THAT WAS ALL BLACKED OUT.

WOULD SHE HAVE SEEN ANY SPECIFIC PORTION ON HIS SCREEN ABOUT THE COMENITY ACCOUNT ITSELF?  NO, THAT WAS ALL REDACTED.

WOULD SHE HAVE SEEN WHERE HE WAS IN 2015 WHEN THIS ACCOUNT WAS OPENED AND ALL OF THE CHARGES WERE MADE IN 2016 AND 2017?  WOULD SHE HAVE SEEN THAT?  NO.

THERE'S A PASSPORT IN THERE THAT WAS ISSUED IN MARCH 2018, RIGHT ABOUT THE TIME THAT THE STORY WAS ENDING FOR THIS ACCOUNT, RIGHT?  WHATEVER WAS GOING ON WITH WHOMEVER WAS USING

IT, THEY STOPPED MAKING PAYMENTS.  THEY STOPPED MAKING PAYMENTS.  LIKE, THE LAST ONE WAS APRIL OR SOMETHING.  SO SHE WOULDN'T HAVE SEEN THAT, RIGHT?

SHE WOULD HAVE LOOKED AT -- I THINK THERE WAS A -- WASN'T THERE A BANK ACCOUNT STATEMENT, UKRAINIAN OR SOMETHING, SOME TYPE OF BANK STATEMENT THAT SHOWED THE BEGINNING BALANCES AND ENDING BALANCES FOR SOME YEARS?  I DIDN'T SEE AN ADDRESS IN THERE.  WHAT WOULD SHE HAVE MADE OF THAT?

THAT'S GOING TO BE UP TO YOU ALL, RIGHT?  YOU MIGHT LOOK AND SAY, HEY, YOU KNOW, IF SHE HAD LOOKED AT THIS, I THINK THAT WOULD HAVE MADE THE DIFFERENCE, RIGHT?  SO IF YOU GET -- IF YOU FIND THAT IT'S INACCURATE AND THEN YOU GET TO WHETHER THE INVESTIGATION WAS REASONABLE AND YOU SAY, HEY, THIS WASN'T REASONABLE, THEN MAYBE YOU'LL FIND A VIOLATION, RIGHT?

SO SHOULD WE TALK ABOUT DAMAGES?  IT'S FUNNY, AS A DEFENSE LAWYER -- AND DEFENSE LAWYERS DRIVE THEMSELVES CRAZY ABOUT THIS.  SHOULD WE TALK TO THE JURY ABOUT DAMAGES?  IF WE TALK TO THE JURY ABOUT DAMAGES, MAYBE THEY'RE GOING TO SAY, WELL, HE DESERVES DAMAGES BECAUSE I'M TALKING ABOUT IT, AND WE DRIVE OURSELVES CRAZY.

I SAY, YEAH, LET'S TALK ABOUT DAMAGES.  LET'S TALK ABOUT IT.  OKAY?

MR. PANCHENKO WAS STRANGELY RELUCTANT, I THINK, TO TALK ABOUT DAMAGES.  I FOUND THAT UNUSUAL IN MY EXPERIENCE.

I MEAN, I ASKED HIM IF HE HAD A NUMBER HE WANTED YOU TO

AWARD, AND HE DIDN'T GIVE US ANY NUMBER.  HE DIDN'T HIRE AN EXPERT TO GIVE A NUMBER FOR HIM OR A CALCULATION.

I MEAN, I ASKED HIM, WOULD IT BE OKAY IF THEY GAVE YOU ZERO?  AND I DON'T REMEMBER, BUT HIS ANSWER WAS SOMETHING LIKE, I GUESS SO.

HE REALLY DIDN'T WANT TO, LIKE, PUT A NUMBER ON IT.  IT WAS A LITTLE UNUSUAL.

HE WAS DEFINITELY CLEAR HE WANTED THE BANK PUNISHED.  I THINK THAT PART OF HIS TESTIMONY WAS CLEAR.  HE WANTED THE BANK PUNISHED.  THE BANK SHOULD BE PUNISHED.  NOBODY ELSE SHOULD HAVE THIS HAPPEN TO THEM.

BUT I DON'T KNOW, HE SEEM STRANGELY RELUCTANT, REALLY, TO TALK ABOUT DAMAGES.

HE SAID -- HE ALSO SAID HE WASN'T IN IT FOR THE MONEY.  HE TOLD YOU, I'M NOT IN IT FOR THE MONEY.

OKAY.  YOU'LL HAVE TO DECIDE WHETHER YOU ACCEPT THAT.

KRISTINA, WHERE IS OUR INSTRUCTION -- I THINK WE LOOKED AT IT ONCE ALREADY -- ABOUT THE DAMAGES FOR INDIRECT DISPUTES AND DIRECT DISPUTES?

THERE IT IS.  RIGHT.

SO I'VE TALKED ABOUT THIS ONE VERY BRIEFLY ALREADY, BUT SINCE WE'RE GOING TO TALK ABOUT DAMAGES, LET'S TAKE A LOOK AT IT AGAIN.  LET'S SEE THE LAST, "ANY DAMAGES ASSOCIATED WITH MR. PANCHENKO'S DIRECT DISPUTES ARE NOT RECOVERABLE."

ALL RIGHT.  SO THAT IS REALLY CLEAR.  SO IF YOU, IF YOU --

YOU MAY THINK, LIKE, HEY, THIS IS CRAZY HOW MUCH TIME HE HAD TO SPEND ON THE PHONE WITH THE BANK.  THIS IS NUTS THAT IT TOOK HIM SO LONG TO PUT TOGETHER THIS LETTER TO SEND TO THE BANK.

I ONLY COUNTED ONE.  IT WAS AT THE END OF JUNE.  I ASKED HIM IF THERE WAS MORE, AND HE SAID, OH, YEAH, THERE WAS A LOT MORE, I SENT YOU A LOT MORE.

BUT WE DIDN'T SEE ANOTHER TRIAL EXHIBIT ON THAT, RIGHT?  SO I THINK THERE IS JUST ONE LETTER TO US.  THAT'S ALL I SAW.

BUT ANYWAY, THOSE LETTERS HE SENT DIRECTLY TO US, PHONE CALLS THAT HE HAD DIRECTLY WITH US, IF THOSE DAMAGED HIM IN SOME WAY, THE LAW, AS THE JUDGE INSTRUCTED YOU, YOU NEED TO TAKE THAT OFF THE TABLE.

SO NOW WE GET TO THE INDIRECT DISPUTES.  DO YOU REMEMBER THESE (INDICATING).  GOING UP AND BACK.

AND SO WHAT ARE THOSE DAMAGES?  LET'S SAY THAT YOU FIND THAT, YOU KNOW, YOU DIDN'T LIKE THE WAY THAT MS. BANU HANDLED THAT LAST DISPUTE.

YOU GUYS ARE GOING TO HAVE TO COME UP WITH THAT.  LET'S SAY YOU GET THERE.  SO THAT WAS AUGUST 21ST, 2023?

SMART PEOPLE ARE NODDING AT ME.

AUGUST 21ST, 2023.  SO THAT'S THE DAY, LIKE, WHAT HAPPENED TO HIM AFTER THAT DAY OR AFTER THAT THAT CAUSED ANY DAMAGE THAT WE COULD QUANTIFY?

WELL, THERE WASN'T ANY CREDIT DENIALS.  I MEAN, WE SAW THAT.  WE SAW THAT A COUPLE DAYS EARLIER, ON THE 16TH, HE

DIDN'T GET THAT APPLE CARD THAT PAVLO TEXTED HIM ABOUT, RIGHT? SO WE SAW THAT.

BUT DID YOU HEAR FROM THE WITNESS FROM GOLDMAN SACHS DURING THIS TRIAL?  NO.  DID YOU SEE ANY DOCUMENTS THAT SHOWED WHAT GOLDMAN SACHS LOOKED AT WHEN THEY ASSESSED HIS APPLICATION, WHAT WERE THEY LOOKING AT FOR HIS INCOME, WHAT WERE THEY LOOKING AT FOR ANY OTHER FACTOR THEY MIGHT THINK ABOUT?  DID THEY GET A CREDIT REPORT ON HIM?  WHAT DID THEY SAY?  WHAT WAS HIS SCORE?  WHAT WAS HIS SCORE BY AUGUST 16TH? I MEAN, WHAT WERE THEY LOOKING AT?

YOU DIDN'T SEE ANY OF THAT, SO WE JUST DON'T KNOW.

AND THERE WASN'T AN EXPERT THAT CAME IN AND SAID, OH, YEAH, LOOK AT THAT, LOOK AT THAT, LOOK AT THAT, COMENITY IS TO BLAME.  SO THAT DIDN'T HAPPEN.

BUT EVEN IF IT HAD, THAT WAS BEFORE AUGUST 21ST, RIGHT?

SO WHAT HAPPENED AFTER THAT?  I DIDN'T HEAR ANYTHING.  I TRIED TO BE FAIR WITH MR. PANCHENKO.  I TRIED.

IF YOU THINK I TRIED TO TRICK YOU OR TRICK HIM, THEN I REALLY GOT THIS WRONG, AND MY APOLOGIES.

BUT I TRIED TO BE FAIR WITH HIM AND HIS WIFE AND HIS FRIEND ON THE STAND, AND I GAVE THEM A LOT OF OPPORTUNITIES TO PUT A NUMBER ON THIS.  TELL US SOME SPECIFICS, YOU KNOW, MONTH BY MONTH, WAS THERE ANYTHING THAT YOU REMEMBER FROM AUGUST OR SEPTEMBER?

THE END OF SEPTEMBER HE SUED US AND SAID HE WAS STARTING

TO FEEL A LITTLE BIT BETTER BECAUSE HE HAD HIRED MR. LOKER.

SO I DIDN'T HEAR IT, SO I DON'T SEE THE DAMAGES. I DON'T SEE HOW HE GETS ANY ACTUAL DAMAGES, EVEN IF HE GETS ALL THE WAY THROUGH THE ELEMENTS WITH ALL OF YOU BACK IN THE ROOM.

THERE WAS EVIDENCE ON THIS, AND THERE WAS JUST SORT OF A WHIFF IN THE AIR OF HIS TESTIMONY. HE SAID SOMETHING TO YOU LIKE, COMENITY WAS LIKE A GATEWAY ACCOUNT OR SOMETHING. I TRIED TO WRITE IT DOWN, BUT IT WAS LIKE COMENITY WAS THE FIRST ACCOUNT, AND THAT'S THE ACCOUNT THAT THE FRAUDSTER USED TO BUILD THE CREDIT FILE AND MAKE IT BIGGER AND THAT LED TO ALL OF THESE OTHER ACCOUNTS, I GUESS BY THE SAME FRAUDSTER. I DON'T KNOW, THERE'S NO EVIDENCE OF THAT.

AND THAT CAUSED HIM A BIG PROBLEM BECAUSE THOSE BALANCES WERE WEREN'T VERY GOOD. AND SO COMENITY'S -- THEY HARMED HIM MORE SOMEHOW.

I JUST DON'T UNDERSTAND THAT. I'M GOING CRAZY TRYING TO UNDERSTAND HOW THAT CONNECTS, RIGHT?

SO, FIRST OF ALL, YOU CAN LOOK IN THE RECORD AND SEE IF WE WERE ONE OF THE FIRST OR NOT. I THINK THERE WERE AT LEAST TWO EARLIER THAN US, RIGHT, THAT HAD BEEN OPENED, SO I'M NOT SURE THAT GATEWAY THING WORKS.

BUT EVEN IF IT DID, I THINK WHAT HE'S SAYING IS THAT THERE'S SOME REALLY GOOD FRAUDSTER THAT TRICKED THE BANK, AND LOTS OF OTHER HUGE BANKS IN THIS COUNTRY, INTO ISSUING CREDIT CARDS TO THAT FRAUDSTER, AND BECAUSE COMENITY WAS ONE OF THE

FIRST TO FALL VICTIM TO THAT, THEY SHOULD PAY MORE I GUESS. THEY HURT HIM MORE.

I DON'T SEE HOW YOU CONNECT THE DOTS THERE, BUT I THINK MAYBE MR. OSBORNE WILL TELL YOU MORE ABOUT THAT WHEN HE GETS UP HERE AND YOU'LL HAVE SOMETHING TO GO ON.

AGAIN, WE DON'T KNOW EXACTLY WHEN HE DID GET HIS JOB.  I THINK I TALKED ABOUT THAT ALREADY, HOW THAT INTERRELATES WITH ANY OF THESE ACDV'S THAT WERE PROCESSED.

SO WE WOULDN'T KNOW WHEN HE GOT THE JOB OR HOW MUCH HE WAS MAKING OR WOULD HE HAVE GOTTEN THE JOB EARLIER, WHAT IS THAT NUMBER.  I JUST DON'T KNOW HOW YOU GET THERE.  ALL RIGHT.

HIS LAWYER FOUND A NUMBER, RIGHT?  MR. OSBORNE, HE DIDN'T HESITATE.  HE PULLED UP THE VERDICT FORM.

DO WE HAVE THE VERDICT FORM?

LET'S GO THROUGH IT.

QUESTION 1.  DID WE VIOLATE THE FAIR CREDIT REPORTING ACT?

WELL, THERE ARE MULTIPLE ELEMENTS IN THERE THAT WE HAVE TO GET THROUGH WHETHER WE DID OR DIDN'T, RIGHT?  THOSE ARE IN A SEPARATE INSTRUCTION.  WE TALKED ABOUT THEM.  I'M NOT GOING TO REPEAT THEM.

IF YOU FIND THAT HE DIDN'T MEET ANY OF THOSE MULTIPLE ELEMENTS, YOU CHECK NO AND YOU'RE DONE.  THAT'S IT.  ONE PERSON SIGN AND DATES THE JURY FORM AND YOUR DELIBERATIONS WOULD BE OVER.

BUT LET'S SAY YOU FIND YES.  NOW YOU START STEPPING

THROUGH AND YOU FOLLOW THE COURT'S DIRECTIONS.  UNDERNEATH EACH OF THE QUESTIONS YOU'LL SEE DIRECTIONS, RIGHT?  AND SOMETIMES IT TELLS YOU TO DO TWO THINGS, RIGHT?

I WON'T READ ALL OF THESE, BUT LET'S ANSWER 1.  IF YOUR ANSWER TO QUESTION 1 IS YES, PROCEED TO QUESTION 2.  IF YOUR ANSWER IS NO, STOP HERE, ANSWER NO FURTHER QUESTIONS, AND HAVE THE PRESIDING JUROR SIGN AND DATE THIS FORM.

SO IF YOU CHECK NO, THE PRESIDING JUROR SIGNS AND DATES THE FORM, HANDS IT IN, AND YOU'RE FINISHED.

IF YOU GO YES, THEN WE KEEP STEPPING THROUGH THIS.

SO NOW, DID HE SUFFER ANY ACTUAL DAMAGES FROM THE VIOLATION?  THAT'S WHAT WE JUST TALKED ABOUT.  I'M NOT GOING TO REPEAT WHAT I SAID.  I DON'T KNOW WHERE IT COMES FROM.  I DON'T KNOW WHAT EVENTS IT COMES FROM OR HOW YOU CALCULATE IT, AND HE DIDN'T BRING IN ANY EVIDENCE OR ANYONE TO TRIAL.  SO I THINK THE ANSWER TO THAT IS NO EVEN IF YOU GOT TO THAT ONE.

AND THEN 3 WAS, WHAT ARE HIS ACTUAL DAMAGES FOR VIOLATING THE ACT?  SO THAT'S WHAT, THAT'S WHAT I WAS TRYING TO ASK HIM AND HIS WIFE AND HIS FRIEND, LIKE, TELL US, RIGHT?  IT'S REALLY HIS RESPONSIBILITY TO DO THAT, RIGHT?  IT'S NOT MINE.  IT'S HIS RESPONSIBILITY TO COME FORWARD AND GIVE YOU SOMETHING THAT YOU ALL COULD AGREE ON, YEAH, THIS IS IT, THIS IS THE NUMBER.

BUT WHAT WE GOT INSTEAD WAS A NUMBER FOR THE FIRST TIME IN THE WHOLE TRIAL, RIGHT?  THERE WAS A RANGE, 150,000 TO $500,000.  THAT IS A LOT.  THAT'S A LOT.  THAT'S A BIG, BIG

NUMBER, RIGHT?  THAT'S BIG.

AND WHAT IS IT TETHERED TO, LADIES AND GENTLEMEN?  WHAT IS IT TETHERED TO?  WHAT TRIAL EXHIBIT DID MR. OSBORNE WRITE NEXT TO THAT NUMBER RANGE?  RIGHT?  WHAT TRIAL TESTIMONY DID HE REFERENCE FOR THAT NUMBER?  NOTHING.

YOU DIDN'T HEAR IT FROM ANYBODY.  YOU DIDN'T SEE IT ON ANY EXHIBIT.  IT JUST CAME UP.  I JUST SAW IT FOR THE FIRST TIME. IT WAS IN PENCIL OR PEN.

YOU CAN'T THROW DARTS AT A DART BOARD AND COME UP WITH A NUMBER DURING CLOSING ARGUMENT.  THERE HAD TO BE EVIDENCE. IT'S THE STUFF THAT YOU'RE GOING TO TALK ABOUT AND DISCUSS WHEN YOU GO IN.

SO IF YOU GET ALL THE WAY TO THAT NUMBER 3, I THINK THAT'S GOT TO BE ZERO.

WAS THE VIOLATION WILLFUL, NUMBER 4?

NO.  THAT'S A NO.  ABSOLUTELY NOT.  ABSOLUTELY NOT.

YOU HEARD ALL OF THOSE VIDEOS.  YOU SAW ALL OF THE PEOPLE THAT WORKED, AND THEY TESTIFIED.  SOME OF THEM WERE NERVOUS. SOME OF THEM STRUGGLED.  THEY KEPT DILIGENTLY ASKING MR. LOKER TO REPEAT THE QUESTION AND SO FORTH.

BUT AFTER SOME HICCUPS, WE STEPPED THROUGH ALL OF THEIR WORK, MR. LOKER DID, RIGHT?  AND THEY TALKED ABOUT WHAT THEY DID, THEY TALKED ABOUT WHAT THEY LOOKED AT, THEY TALKED ABOUT THEIR EASE NOTES AND HOW THEY DOCUMENT IT.

THIS IS NOT A WILLFUL VIOLATION, IF THERE EVEN IS ONE.

DEFENDANT'S CLOSING ARGUMENT

THIS IS A COMPANY THAT TAKES THIS STUFF SERIOUSLY.  THAT'S WHY THEY HIRE THESE PEOPLE.  THAT'S WHY THEY TRAIN THEM.  THAT'S WHY THEY GET THESE THIRD PARTY -- THEY PAY PEOPLE TO TELL THEM IF THEY'RE RIGHT.  THEY PAY INDEPENDENT PEOPLE, EKATA AND ACCURINT.

IT'S NOT A WILLFUL VIOLATION.

AND SO MR. OSBORNE WANTS US TO TAKE THE SAME NUMBER THAT YOU WROTE FOR THE FIRST TIME AND THE OTHER ONE AND JUST WRITE IT UNDER THERE FOR THE WILLFUL VIOLATION.

YOU'RE GOING TO -- THIS IS YOUR JOB.  I'M NOT GOING TO GET IN THE WAY OF YOUR JOB.

I DON'T SEE IT.  I DON'T SEE ANY DAMAGES AT ALL, AND I CERTAINLY DON'T SEE THAT YOU CAN SAY THERE'S A WILLFUL VIOLATION AND THEN DECIDE ON NUMBER 2.  THERE'S JUST TOO MANY THINGS FALLING APART HERE.

AND NOW, PUNITIVE DAMAGES.  I MEAN, AT THIS POINT EVEN MR. OSBORNE GOT SHY, RIGHT?  EVEN HE GOT SHY.  HE DIDN'T WANT TO WRITE ANYTHING IN THERE.  HE TALKED A LOT ABOUT IT.  HE TALKED ABOUT SENDING A MESSAGE TO THE EXECUTIVES.  HE WANTED YOU TO SEND A MESSAGE TO THE WHOLE INDUSTRY, THE WHOLE INDUSTRY IS BROKEN.  YOU'RE HERE TO STOP HIM BY SENDING A MESSAGE.

I MEAN, HE WAS -- HE WAS THINKING ABOUT THAT EVEN WHEN HE WAS DOING JURY SELECTION.  DO YOU REMEMBER, HE ASKED A FEW PEOPLE ABOUT PUNITIVE DAMAGES IN JURY SELECTION?  THIS IS WHERE WE'RE GOING WITH THIS CASE, SO WE'VE GOT TO MAKE SURE THAT

EVERYONE IS ON BOARD WITH IT.

THAT'S WHAT THIS WHOLE THING IS, IS LIKE PUNISHING THE INDUSTRY, AND COMENITY HAS GOT TO BE THE POSTER CHILD?

SO I DON'T SEE IT.  THIS IS NOT SOMEONE THAT NEEDS TO BE PUNISHED.

YOU KNOW, MAYBE YOU'RE GOING TO FIND THAT THEY MADE A MISTAKE ABOUT THIS ONE ACCOUNT, YOU KNOW, EVEN THOUGH THERE WAS ALL OF THESE THINGS HAPPENING AND IT LOOKED LIKE IT WAS A REAL ACCOUNT.  OKAY.  MAYBE SOMEBODY DIDN'T READ THE INFORMATION THAT CAME IN.  OR MAYBE THEY SHOULD HAVE LISTENED TO THAT VOICE RECORDING AND SAID, THAT DOESN'T SOUND LIKE THE SAME GUY.  IT SOUNDS LIKE THIS POST-SOVIET COUNTRY ACCENT AND NOT THAT ONE.  WHERE ARE YOU GOING TO FIND THAT?

THIS IS NOT A COMPANY THAT NEEDS TO BE PUNISHED.  YOU HEARD THE TESTIMONY.  YOU SAW MS. FORD HERE, HOW CAREFUL SHE WAS, HER BACKGROUND WITH THE COMPANY, HOW SHE'S BEEN WORKING THERE FOR 18 YEARS, ALL OF THE EFFORTS THEY MADE TO TRAIN PEOPLE.

YOU SAW ALL OF THE TIMES THAT THEY KEPT UPDATING THEIR POLICY, TIMES BEFORE THE SUIT WAS FILED, TIMES AFTER.  THIS IS A CONTINUOUS PROCESS.

NOBODY IS PERFECT.  NOBODY IS PERFECT.  THERE'S NO PUNISHMENT HERE.  THERE'S NO NEED FOR PUNISHMENT HERE.

ANYWAY, I'VE TALKED LONG ENOUGH.  AND I REALLY DO APPRECIATE ALL OF YOU, MY CREW, AND EVERYONE HERE FOR OF YOUR

GREAT ATTENTION.

YOU KNOW, IT'S BEEN A LONG WEEK FOR EVERYONE.  YOU ALL HAVE SACRIFICED TO BE HERE WITH US.  WE APPRECIATE THAT.

AND I WOULD ASK YOU, JUST BASED ON THE RECORD, BASED ON WHAT YOU SAW AND HEARD, WHAT YOU DIDN'T SEE, WHAT YOU DIDN'T HEAR, AND ON THE INSTRUCTIONS THAT HER HONOR HAS GIVEN YOU, TO ENTER A JUDGMENT IN THIS CASE IN FAVOR OF COMENITY.

THANK YOU VERY MUCH FOR YOUR PATIENCE.

THE COURT:  THANK YOU, COUNSEL.

SO BEFORE WE START WITH REBUTTAL, LET'S EVERYBODY JUST STAND UP AND STRETCH FOR A SECOND IN PLACE.

I WILL DO SO AS WELL BECAUSE WE HAVE A LITTLE BIT MORE.

(STRETCHING.)

THE COURT:  OKAY.  WHEN YOU'RE READY, HAVE A SEAT.

MR. OSBORNE, ONE MORE SECOND.  PEOPLE ARE STILL SETTLING IN.  ALL RIGHT.  YOU MAY BEGIN WHEN YOU'RE READY.

MR. OSBORNE:  THANK YOU, YOUR HONOR.

**(PLAINTIFF'S COUNSEL, MR. OSBORNE, GAVE HIS REBUTTAL ARGUMENT.)**

MR. OSBORNE:  I'M REALLY GLAD THAT I SAVED SOME TIME TO RESPOND TO THAT.  I THINK THAT HE JUST ACTUALLY PROVED WHY PUNITIVE DAMAGES ARE NECESSARY, BECAUSE HE SAID THAT WE DIDN'T DO ANYTHING WRONG, AND WE'RE GOING TO KEEP DOING IT.  DID HE -- HE SAID, OH, WE NEVER SAID MR. PANCHENKO WAS A LIAR.

HOW ABOUT ALL OF THE ACDV'S WHERE HE SAID I'M AN IDENTITY

THEFT VICTIM, AND YOU RESPONDED BACK TO THE CREDIT BUREAU AND SAID, NO, YOU'RE NOT, WE VERIFIED IT WAS YOU.  THAT'S WHAT THEY'RE SAYING.

I THINK MR. NARITA HAS AN INTERESTING DEFINITION OF "ACCURATE."  I MEAN, I THINK "ACCURATE" MEANS TRUTH.  HE'S SAYING IT'S TRUE FOR US TO REPORT THAT A VICTIM OF FRAUD OWES MONEY AND WAS A CHARGE OFF.  THAT'S SOMEHOW TRUE?

HE ALSO HAS AN INTERESTING DEFINITION OF INVESTIGATION, WHERE INVESTIGATION MEANS, I GUESS, WE AUTOMATICALLY ASSUME IT'S NOT FRAUD BECAUSE A PAYMENT WAS MADE?  I MEAN, HOW IS THAT AN INVESTIGATION?

OR WE AUTOMATICALLY ASSUME THAT BECAUSE WE PULLED A REPORT THAT SAYS DON'T RELY ON THIS INFORMATION BECAUSE THERE'S ERRORS AND THEN THERE'S A MATCH, THAT SOMEHOW THAT'S AUTOMATICALLY REASONABLE?

HE MAKES A BIG DEAL OUT OF, OH, HE DIDN'T GO TO A DOCTOR. WELL, NOWHERE IN THE COURT'S INSTRUCTIONS DO THEY SAY YOU HAVE TO GO TO A DOCTOR.

AND I WOULD SUGGEST THAT MOST PEOPLE THAT EXPERIENCE THIS WOULDN'T GO TO A DOCTOR.  YOU WOULD JUST SORT OF DEAL WITH IT IN YOUR OWN WAY.

WHEN A BANK REPORTS FALSE INFORMATION ABOUT YOU AND THEN TELLS YOU IN A PHONE CALL WE WILL NEVER INVESTIGATE THIS AGAIN NO MATTER WHAT YOU SEND US, YOU DON'T GO TO A DOCTOR, YOU GO TO A LAWYER, BECAUSE THAT'S WHEN YOU HAVE TO FILE A SUIT, AND

THAT'S WHAT HE DID.

THERE'S NO REQUIREMENT THAT YOU HAVE TO GET AN ECONOMIST OR ANY OF THOSE KINDS OF THINGS. YOU JUST HAVE TO JUDGE, DID HE EXPERIENCE DAMAGES AND WAS HE TELLING THE TRUTH?

AND THINK ABOUT THIS, YOU KNOW, YOU COME TO THIS COUNTRY. IT'S ALREADY STRESSFUL. YOU HAVE ALL OF THIS STUFF THAT YOU HAVE TO DO, AND THEN YOU FIND OUT YOU'RE A VICTIM OF FRAUD.

AND YOU TRY THE BEST THAT YOU CAN. YOU DON'T EVEN REALLY KNOW ANYTHING ABOUT THE CREDIT SYSTEM, BUT YOU TRY. AND HE SENDS THEM ALL OF THE DOCUMENTS THAT HE CAN, AND THEY JUST IGNORE YOU. YOU DON'T THINK THAT'S GOING TO CAUSE SOMEBODY DAMAGES? I JUST DON'T SEE THAT.

THEY LIVE IN A WORLD WHERE WE CAN JUST REPORT FALSE INFORMATION ABOUT YOU, BASICALLY ACCUSE YOU OF LYING, AND THEN JUST SAY, YEAH, NO DAMAGES.

HE CRITICIZES US FOR NOT BRINGING IN A HIRED GUN TO SAY THAT THIS WAS UNREASONABLE BECAUSE IT'S SO OBVIOUS. WHY SHOULD I HAVE TO GO AND SPEND $20,000 TO FLY SOMEBODY IN TO SAY, YEAH, LADIES AND GENTLEMEN, I WORKED IN THE BANKING INDUSTRY FOR 40 YEARS AND, YOU KNOW, YOU'RE SUPPOSED TO READ POLICE REPORTS AND YOU'RE SUPPOSED TO INVESTIGATE.

WE ALL KNOW THAT. IT'S RIGHT IN THE INSTRUCTIONS.

THEY'RE THE ONES SAYING IT'S OKAY TO DO THOSE THINGS. THEY SHOULD HAVE BROUGHT YOU AN EXPERT TO SAY THAT THAT'S THE WAY IT'S SUPPOSED TO WORK.

HE SAYS, OH, THERE WERE NO DOCUMENTS ABOUT A SCORE.  WELL, HE MUST NOT HAVE SEEN EXHIBIT 54, BUT THAT'S THE GOLDMAN DENIAL.  THE SCORE IS RIGHT ON THERE.  THE SCORE IS IN THE 500'S.  THAT'S A HORRIBLE SCORE.

AND, YES, AFTER HE FILES HIS LAWSUIT, HIS CREDIT IS FIXED.  EVERYONE HAS DELETED IT.  HIS CREDIT IS FINE NOW.

AND BY THE WAY, HE ABSOLUTELY TRIED TO TRICK MR. PANCHENKO INTO SAYING THAT SOMEHOW HE PULLED THESE EXPERIAN REPORTS BEFORE HE GOT TO AMERICA, BUT THE FUNNY THING, THE IRONY IS THAT IF YOU LOOK AT COMENITY'S STATEMENTS, EXHIBIT 39, AND YOU GO THROUGH THOSE STATEMENTS AND SEE WHAT THE CHARGES ARE, THE THIEF WAS USING THE COMENITY CARD TO BUY THE EXPERIAN REPORT.  THERE ARE CHARGES EVERY COUPLE OF DAYS SHOWING THEY'RE BUYING AN EXPERIAN REPORT.  THAT WAS IN THEIR OWN FILE, BUT THEY NEVER LOOKED AT.

THEY MAKE A BIG DEAL OF, OH, THE STATEMENTS THAT WE SENT TO THE THIEVES WERE NOT RETURNED.  YEAH, BECAUSE YOU SENT IT TO THE THIEF.  THAT WAS THE THIEF'S ADDRESS, WHY WOULD IT BE RETURNED TO YOU?  THAT'S THE WHOLE POINT OF THE THIEF GIVING YOU THEIR ADDRESS, SO IT GOES TO THEM, NOT THE REAL VICTIM.

THEY TALKED TO YOU ABOUT ALL OF THESE GREEN FLAGS.  WHAT I WANT TO KNOW, WHAT ABOUT ALL OF THE YELLOW FLAGS AND THE RED FLAGS THAT YOU IGNORED?  WHAT ABOUT THE YELLOW FLAGS THAT SAID THIS WAS A NEWSPAPER FACILITY?  NOBODY LOOKS INTO THAT.

WHAT ABOUT THE RED FLAGS WHERE HE IS SENDING YOU A

PLAINTIFF'S REBUTTAL ARGUMENT

PASSPORT, AND I WASN'T EVEN IN AMERICA ON THESE DATES.  HOW COULD I HAD MAKE THOSE CHARGES?  NOBODY LOOKS AT THE STATEMENT.

IF YOU'RE REALLY INVESTIGATING, WHY DON'T YOU PICK UP THE PHONE AND CALL HIM AND SAY, HEY, WE JUST GOT YOUR DISPUTE HERE, WE'VE GOT SOME QUESTIONS FOR YOU.  YOU SAY YOU WEREN'T IN THE COUNTRY.  YOU KNOW, INTERVIEW.  THAT'S WHAT YOU DO IN AN INVESTIGATION.

THEY KIND OF SAY, OH, YEAH, ALL OF THE CALLS HAD AN ACCENT, EASTERN EVEN EUROPEAN ACCENT.  SOME OF VOICES ARE DIFFERENT.  THE ACCENT DOESN'T REALLY MATTER.  IT IS THE VOICES.  YOU CAN TELL MR. PANCHENKO IS A SOFT-SPOKEN GUY.  YOU KNOW, HIS BEEF IS LIKE -- HE HAS A DEEP VOICE, AND HE IS LIKE, OH, YEAH, THANK YOU FOR REMINDER CALL, I CALL YOU BACK TO MAKE PAYMENTS.  NO, IT DOESN'T EVEN SOUND THE SAME.

IT'S KIND OF A RED HERRING BECAUSE THEY DIDN'T EVEN LISTEN.  IF SOMEBODY LISTENED AND THEY SAID I THOUGHT IT WAS THE SAME PERSON, THAT WOULD BE ONE THING.  IT WAS COMPANY POLICY.  THEY WEREN'T EVEN LISTENING.  THEY'RE NOT READING ANYTHING.

HE SAYS SOMEHOW THAT THIS WAS A REASONABLE INVESTIGATION. WHEN YOU LOOK AT JURY INSTRUCTION 34.1, IT LITERALLY DESCRIBES WHAT THEY DID.  IT'S LIKE A REASONABLE INVESTIGATION IS NOT A RUBBER STAMP.  THAT'S WHAT THEY DID.  IT'S NOT A CURSORY OR SLOPPY INVESTIGATION.  THAT'S WHAT THEY DID.

THEY SAY, OH, NOW WE'VE MADE ALL OF THESE CHANGES.  NOW

WE'RE ACTUALLY READING THE IMAGES WHEN PEOPLE SEND THEM IN.

WELL, YOU STILL HAVEN'T UPDATED THE 36 DISPUTES PER 8 HOURS.  SO NOW ON TOP OF ALREADY TRYING TO DO A, QUOTE-UNQUOTE, INVESTIGATION IN 12 MINUTES, NOW WE HAVE TO READ DOCUMENTS IN 12 MINUTES?

AND THEN WE'RE PAYING PEOPLE IN INDIA WHO OBVIOUSLY THE REASON THEY'RE DOING THAT IS BECAUSE THE WAGES ARE CHEAPER.  PEOPLE DON'T HAVE A LOT OF MONEY THERE.  AND THEN THEY'RE TELLING THEM, OH, IF YOU'RE THE TOP PERFORMER, YOU DO THE MOST, WE'LL GET YOU A GIFT CARD, AND THEN YOU CAN BUY SOME MORE STUFF FOR YOUR FAMILY.

DO YOU THINK PEOPLE ARE GOING TO TRY TO SPEND AN HOUR ON THE DISPUTE?  THEY'RE GOING TO TRY TO DO AS MUCH AS THEY CAN.  THEY'RE GOING TO TRY TO DO AS MUCH AS THEY CAN.  I CAN'T BLAME THEM.  I PROBABLY WOULD IF I WAS IN THEIR SITUATION.  BUT THAT'S THE SYSTEM THAT THE BANK SET UP BECAUSE IT SAVES MONEY.

I DON'T REALLY UNDERSTAND -- YOU KNOW, HE SAID WOULD IT HAVE MADE A DIFFERENCE IF WE ACTUALLY READ THE STUFF?  YES, IT WOULD HAVE.  YOU WOULD HAVE SEEN A POLICE REPORT.  YOU WOULD HAVE SEEN AN OFFICER THAT SAYS I THINK THIS GUY IS A VICTIM OF FRAUD.  IT HAS A PHONE NUMBER.  YOU COULD CALL THE POLICE AND SAY, HEY, GIVE ME AN UPDATE ON YOUR INVESTIGATION.

THEY SAY, YEAH, SOMETIMES THE POLICE CALL US.  THE QUESTION I HAVE IS WHEN DO YOU GUYS CALL THE POLICE?  THE PHONES WORK BOTH WAYS.  IT'S NOT LIKE YOU HAVE TO SIT THERE AND

DO NOTHING AND HOPE THE POLICE CALL YOU. YOU CAN CALL THEM TOO.

YOU CAN LOOK AT THE TRAVEL HISTORY AND SEE, OH, YEAH, THIS GUY COULDN'T HAVE MADE THESE CHARGES. THAT'S WHY YOU TALK TO PEOPLE. THAT'S WHY YOU INVESTIGATE.

THEY SAY THAT MR. PANCHENKO WAS RELUCTANT TO TALK ABOUT DAMAGES. HE LITERALLY ANSWERED EVERY QUESTION THAT PEOPLE ASKED. HE DOESN'T KNOW. THIS IS THE FIRST TIME THAT HE'S EVER DONE A JURY TRIAL. DO YOU THINK HE KNEW WHEN HE CAME TO AMERICA HE WAS GOING TO BE THE GUY THAT TAKES ON THE BANKING INDUSTRY?

HE DOESN'T KNOW WHAT TO SAY ABOUT DAMAGES. HE SAID I'LL RESPECT WHAT THE JURY DOES, AND HE WILL.

THEY SAY THAT HE'S IN THIS FOR THE MONEY. I'VE GOT AN ALTERNATIVE. THEY'RE IN IT FOR THE MONEY. HE CALLS THIS A WHOPPER. DO YOU WANT TO KNOW WHAT THE REAL WHOPPER IS, LET THEM GET AWAY WITH IT. HOW MANY MILLIONS ARE THEY GOING TO SAVE CONTINUING TO DO THIS? THAT'S THE WHOPPER.

HE PICKS THIS ARBITRARY DATE OF, OH, LET'S START THE DAMAGES ON AUGUST 21ST. WHY AUGUST 21ST? HOW ABOUT WE START IT IN MAY OF 2023 WHEN HE FIRST -- YOU WERE FIRST NOTIFIED BY A CREDIT BUREAU THAT HE WAS CLAIMING TO BE A VICTIM OF FRAUD AND YOU BROKE THE LAW AND DID LITERALLY NOTHING TO INVESTIGATE IT? AND YOU RESPONDED BACK TO THE BUREAUS, OH, YEAH, HE'S MAKING IT UP. HE'S NOT A VICTIM OF FRAUD. HOW ABOUT LET'S START WITH

PLAINTIFF'S REBUTTAL ARGUMENT

THAT?

AND THEN THEY DELETED IN DECEMBER OF 2023. THAT'S THREE MONTHS AFTER HE FILES A LAWSUIT. HE LITERALLY HAS TO FILE A FEDERAL LAWSUIT TO GET THIS OFF.

IF HE DIDN'T FILE THAT LAWSUIT, IT WOULD STILL BE ON HIS CREDIT TODAY. AND YOU KNOW WHAT IS FUNNY ABOUT THAT, TAKE A LOOK AT IT IN EXHIBIT 154, BECAUSE GUESS WHAT, YOU HAVE TO CERTIFY TO THAT, TOO. THEY CERTIFIED THAT IT WAS FRAUD IN THEIR REQUEST. AND WHAT DID THEY HAVE THAT WAS DIFFERENT THAN WHAT THEY HAD THAT HE HAD ALREADY SENT THEM? NOTHING. THE ONLY THING THAT WAS DIFFERENT WAS THAT THIS TIME HE HAD A LAWYER. AND ALL OF A SUDDEN WHEN LAWYERS GET INVOLVED, THEN WE'LL DELETE IT AND DO WHAT WE'RE SUPPOSED TO DO EVEN THOUGH THAT EVEN TAKES THREE MONTHS. I'M NOT SURE WHY IT TAKES SO LONG.

BUT IF YOU DON'T HAVE A LAWYER, IF YOU CAN'T FIGURE OUT HOW TO GET A LAWYER AND FIND A LAWYER, WE'LL JUST SLAP IT ON YOUR CREDIT REPORT FOR THE NEXT SEVEN YEARS AND THEN WHEN YOU CALL US WE'LL SAY, YEAH, WE'VE ALREADY INVESTIGATED IT TWICE. REALLY? THAT'S AN INVESTIGATION?

HE CRITICIZES ME FOR SUGGESTING A NUMBER. THAT'S WHAT LAWYERS DO. THAT'S WHAT WE DO FOR OUR CLIENTS.

BY THE WAY, HE SUGGESTED A NUMBER. ZERO. SO ALL OF THE LAWYERS ARE SUGGESTING NUMBERS. THERE'S NOTHING WRONG WITH THAT.

HE TALKS ABOUT THE BURDEN OF PROOF.  RECALL IN A CIVIL CASE, PREPONDERANCE OF THE EVIDENCE, MORE LIKELY TRUE THAN NOT. NOW, THAT'S A LOWER BURDEN.  IT'S BASICALLY LIKE 51 PERCENT.

I THINK WE'VE PROVED IT WAY MORE THAN THAT.  I THINK WE PROVED IT LIKE 99 PERCENT.

BUT IF YOU'RE BACK THERE IN DELIBERATION AND SOMEBODY SAYS I'M NOT SURE THAT, YOU KNOW, PANCHENKO PROVED THAT, YOU KNOW, REMIND YOUR NEIGHBOR, YOU CAN HAVE 49 PERCENT OUT AND STILL VOTE FOR PANCHENKO.  YOU DON'T HAVE TO BE 100 PERCENT TRUE.  IT DOESN'T HAVE TO BE ABSOLUTELY 100 PERCENT.  YOU CAN STILL HAVE SOME DOUBT.

NOW THEY SAY, OH, YEAH, WE'RE THE POSTER CHILD.

WELL, GUESS WHAT, YOU'RE THE ONE WHO TOOK IT TO TRIAL, RIGHT?  THEY'RE THE ONES WHO SAID, YEP, LET'S MAKE HIM PROVE IT.

I WANT TO LEAVE YOU WITH THIS FINAL THOUGHT.  YOU HAVE POWER, REAL POWER, TO HOLD A CORPORATION RESPONSIBLE, TO TELL COMENITY, WE WON'T LET YOU GET AWAY WITH IT.  YOU HAVE THE POWER TO CHANGE HOW THE INDUSTRY WORKS AND THE POWER TO MAKE SURE THAT THE NEXT I.D. THEFT VICTIM GETS TREATED BETTER.

COMENITY IS HOPING YOU WILL NOT USE THAT POWER.

THEY'RE HOPING THAT YOU'LL GET CONFUSED BY EXHIBIT 247 AND WHAT OTHER BANKS DID;

THEY'RE HOPING THAT YOU'LL THINK THAT IF EVERYBODY DOES IT, IT MUST BE OKAY;

THEY'RE HOPING THAT YOU'LL AWARD DAMAGES THAT ARE TOO SMALL TO MATTER, AND THEY CAN LAUGH ALL OF THE WAY BACK TO THE BANK; AND,

THEY'RE HOPING THAT YOU'LL LET THEM OFF EASILY.

DON'T LET THEM WIN.  DON'T LET THEM CONTINUE TO TREAT PEOPLE LIKE THIS.  HOLD COMENITY ACCOUNTABLE AND DO JUSTICE FOR ALEX.

THANK YOU, LADIES AND GENTLEMEN.

THE COURT:  THANK YOU TO BOTH COUNSEL.

SO TO THE MEMBERS OF THE JURY, I WILL NOW GIVE YOU MY FINAL INSTRUCTIONS BEFORE YOU BEGIN DELIBERATION.

BEFORE YOU BEGIN YOUR DELIBERATION, ELECT ONE MEMBER OF THE JURY AS YOUR PRESIDING JUDGE -- PRESIDING JUROR.  HABIT.  SORRY ABOUT THAT.

SO ELECT ONE MEMBER OF THE JURY AS YOUR PRESIDING JUROR. THE PRESIDING JUROR WILL PRESIDE OVER THE DELIBERATIONS AND SERVE AS THE SPOKESPERSON FOR THE JURY IN COURT.

YOU SHALL DILIGENTLY STRIVE TO REACH AGREEMENT WITH ALL OF THE OTHER JURORS IF YOU CAN DO SO.  YOUR VERDICT MUST BE UNANIMOUS.

EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND LISTENED TO THEIR VIEWS.

IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.

DO NOT BE UNWILLING TO CHANGE YOUR OPINION IF THE DISCUSSION PERSUADES YOU THAT YOU SHOULD, BUT DO NOT COME TO A DECISION SIMPLY BECAUSE THE OTHER JURORS THINK IT IS RIGHT OR CHANGE AN HONEST BELIEF ABOUT THE EFFECT OF THE EVIDENCE SIMPLY TO REACH A VERDICT.

YOU'VE HEARD SOMETHING SIMILAR, BUT THIS IS ALSO A STATEMENT REGARDING THE CONDUCT OF THE JURY DURING DELIBERATION.

BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES.  EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS DURING DELIBERATIONS:

DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, TABLET, COMPUTER, OR ANY OTHER EMAILS, VIA EMAIL, VIA TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, OR APPLICATION, INCLUDING BUT NOT LIMITED TO FACEBOOK, YOUTUBE, TWITTER, INSTAGRAM, LINKEDIN, SNAPCHAT, TIKTOK, OR ANY OTHER FORMS OF SOCIAL MEDIA.

THIS APPLIES TO COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS AND THE PERSON INVOLVED IN

799

THE TRIAL.  IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE CONTACT TO THE COURT.

DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  ALTHOUGH I HAVE NO INFORMATION THAT THERE WILL BE NEWS REPORTS ABOUT THIS CASE, DO NOT DO ANY RESEARCH SUCH AS CONSULTING DICTIONARIES, SEARCHING THE INTERNET OR USING OTHER REFERENCE MATERIALS, AND DO NOT MAKE ANY INVESTIGATION OR IN ANY WAY TRY TO LEARN ABOUT THIS CASE ON YOUR OWN.  DO NOT VISIT OR VIEW ANY PLACES DISCUSSED IN THE CASE AND DO NOT USE INTERNET PROGRAMS OR OTHER DEVICES TO SEARCH FOR OR VIEW ANY PLACE DISCUSSED DURING THE TRIAL.

ALSO, DO NOT DO ANY RESEARCH ABOUT THIS CASE, THE LAW, OR THE PEOPLE INVOLVED, INCLUDING THE PARTIES, THE WITNESSES, OR THE LAWYERS UNTIL YOU HAVE BEEN EXCUSED AS JURORS.  IF YOU HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THIS CASE IN THE MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS POSSIBLE.

THESE RULES PROTECT EACH PARTY'S RIGHT TO HAVE THIS CASE DECIDED ONLY ON THE EVIDENCE THAT HAS BEEN PRESENTED HERE IN THE COURT.  WITNESSES HERE IN COURT TAKE AN OATH TO TELL THE TRUTH AND THE ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE TRIAL PROCESS.

IF YOU DO ANY RESEARCH OR INVESTIGATION OUTSIDE OF THE

COURTROOM OR GAIN ANY INFORMATION THROUGH IMPROPER COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED BY INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS NOT BEEN TESTED BY THE TRIAL PROCESS.  EACH OF THE PARTIES IS ENTITLED TO A FAIR TRIAL BY AN IMPARTIAL JURY, AND IF YOU DECIDE THE CASE BASED ON INFORMATION NOT PRESENTED IN COURT, YOU WILL HAVE DENIED THE PARTIES A FAIR TRIAL.

REMEMBER, YOU HAVE TAKEN AN OATH TO FOLLOW THE RULES, AND IT'S IMPORTANT THAT YOU FOLLOW THESE RULES.

A JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS AND A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL PROCESS TO START OVER.  IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY THE COURT IMMEDIATELY.

COMMUNICATION WITH THE COURT.

IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING. I WILL NOT COMMUNICATE WITH ANY MEMBER OF THE JURY ON ANYTHING CONCERNING THE CASE EXCEPT IN WRITING OR HERE IN OPEN COURT.

IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.

YOU MAY CONTINUE YOUR DELIBERATION WHILE WAITING FOR THE ANSWER TO ANY QUESTION.  REMEMBER THAT YOU ARE NOT TO TELL

ANYONE, INCLUDING THE COURT, HOW THE JURY STANDS, WHETHER IN TERMS OF VOTE COUNT OR OTHERWISE, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN DISCHARGED.

THIS IS VERY IMPORTANT.  PLEASE DO NOT PUT IT IN WRITING WHERE THE VOTE STANDS OR ANY INDICATION.

RETURN OF VERDICT.

A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE REACHED UNANIMOUS AGREEMENT ON YOUR VERDICT, YOUR FOREPERSON, THE PRESIDING JUROR I REFER TO, SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR DELIBERATIONS, SIGN AND DATE IT AND ADVISE THE COURTROOM DEPUTY THAT YOU ARE READY TO RETURN TO THE COURTROOM.

SO THOSE ARE THE JURY INSTRUCTIONS.  THOSE WILL GO BACK WITH YOU TO THE COURTROOM, INCLUDING THE PRELIMINARY INSTRUCTIONS I GAVE YOU DURING THE COURSE OF THE TRIAL.

AFTER HEARING THOSE YOU MAY STILL BE WONDERING, OKAY, WHAT DO WE DO WHEN WE GO TO THE ROOM.

SO OUTSIDE OF THE FORMAL INSTRUCTIONS, I WANTED TO DISCUSS SOME LOGISTICS IF THEY PROVE HELPFUL FOR YOU.

SO MADAM CLERK WILL PROVIDE YOU WITH EXHIBITS, COPIES OF THE JURY INSTRUCTIONS, AND COPIES OF THE VERDICT FORMS, ONE FOR EACH OF YOU IN TERMS OF THE VERDICT FORMS, AND ONE ORIGINAL FOR THE FOREPERSON TO COMPLETE AND SIGN.

THERE WILL ALSO BE A COUPLE -- SEVERAL COPIES OF THE JURY INSTRUCTIONS, BUT NOT ONE FOR EACH OF YOU.  IF YOU WANT MORE,

JUST LET US KNOW.

SO ONCE SHE GETS YOU SET UP, SHE WILL ONLY COME IN BY KNOCKING TO GIVE YOU THE ALERT THAT YOU ARE TO STOP YOUR DELIBERATIONS.

YOU MAY TEXT HER IF YOU NEED ANYTHING.  SHE'LL TALK TO YOU ABOUT THAT.  SHE'LL BE HERE IN THE COURTROOM.

SO NO ONE ELSE CAN ENTER THE ROOM WHILE YOU'RE DELIBERATING, AND THE DOOR MUST REMAIN CLOSED.

WHEN MS. THOMSON IS WITH YOU, YOU'RE NOT TO TALK ABOUT THE CASE AT ALL.

SO YOU CAN ONLY DELIBERATE WHEN ALL SEVEN OF YOU ARE PRESENT, BUT YOU ARE IN CHARGE OF YOUR OWN SCHEDULE.  IF YOU NEED TO TAKE A BREAK, JUST TAKE A BREAK.

BE MINDFUL AND CONSIDERATE OF EACH OTHER, AND THINK ABOUT THE FACT THAT MULTIPLE DELAYS -- I MEAN, MULTIPLE BREAKS WILL CAUSE DELAY, RIGHT, IN TERMS OF HOW LONG YOU END UP DELIBERATING.

SO DEVICES.  DO NOT USE CELL PHONES, TABLETS OR COMPUTERS IN THE JURY ROOM WHILE YOU'RE DELIBERATING.  IF YOU'RE EXPECTING A CALL OR NEED TO LISTEN TO A MESSAGE, TAKE A BREAK. I MEAN, JUST KEEP IN MIND, THIS GOES BACK TO THE BREAK COMMENT, JUST KEEP IN MIND THAT ALL OF THE OTHER JURORS ARE WAITING FOR YOU IN TERMS OF DELIBERATION, SO YOU'LL JUST NEED TO BE MINDFUL OF EACH OTHER.

SO SOME JUDGES TAKE AWAY CELL PHONES.  I DO NOT DO SO.

AND IN THE SEVEN YEARS I'VE BEEN A JUDGE, I HAVEN'T HAD TO TAKE AWAY CELL PHONES.  SO PLEASE DO NOT LOOK AT YOUR CELL PHONES WHILE YOU'RE DELIBERATING.  THEY SHOULD BE OFF.  THEY SHOULD BE TURNED OVER.  THEY SHOULD BE AWAY.

IF CELL PHONES START COMING OUT, LET ME KNOW.  BUT I WOULD REALLY RATHER NOT BABYSIT YOUR CELL PHONES.

ALL RIGHT.  AS MENTIONED, YOU WILL BE RECEIVING A PACKET OF INFORMATION FROM MADAM CLERK WHICH INCLUDES COPIES OF THE JURY INSTRUCTIONS, VERDICT FORMS, AND SLIPS FOR QUESTIONS.  I'M GOING TO DISCUSS EACH OF THOSE THINGS.

SO IN TERMS OF THE JURY INSTRUCTIONS, THERE WAS REFERENCE TO NUMBERING.  THERE'S GOING TO BE NUMBERS ON TOP OF EACH OF THE INSTRUCTIONS.  THIS WAS MERELY FOR THE ATTORNEYS AND I TO REFERENCE AND FOR THE ATTORNEYS TO REFERENCE.  DO NOT PUT ANY IMPORTANCE ON THE NUMBERS THAT ARE THERE.  IN FACT, THEY ARE GOING TO BE SHUFFLED AROUND.  THE NUMBERS ARE NOT GOING TO BE IN ORDER.  THERE MAY BE SOME NUMBERS MISSING BECAUSE WHAT WE NEED TO USE OF DIDN'T NEED TO USE DURING TRIAL.  IGNORE THAT FACT.  THEY'RE MERELY THERE FOR REFERENCE.

NOR SHOULD YOU TAKE ANY SIGNIFICANCE IN THE FACT THAT THERE MIGHT BE A POINT SOMETHING, LIKE SAY LIKE A 1.2 VERSUS A 1 ON SOMETHING.  AGAIN, NO IMPORTANT TERMS OF THAT FACT.  IT JUST -- IT WAS JUST TO HELP US IN TERMS OF THE ORDER THAT WE WERE SHUFFLING AND REFERENCING THING.

AND THEN LASTLY, WHICH I'VE ALREADY REFERENCED, IS THEY'RE

GOING TO BE SHUFFLED BECAUSE I GAVE YOU SOME PRELIMINARY INSTRUCTIONS.  SOME WERE REPEATED AGAIN AT THE END.

SO THEY MAY NOT BE IN THE EXACT ORDER THAT YOU REMEMBER HEARING THEM.

SO NEXT.  THERE ARE GOING TO BE SLIPS OF PAPER FOR QUESTIONS FOR ME.  I MENTIONED IN THE INSTRUCTIONS THAT YOU MIGHT HAVE QUESTIONS FOR ME TO ANSWER.

I CAN ONLY RECEIVE QUESTIONS IN WRITING, SO THERE WILL BE THREE QUESTION FORMS.  NO SIGNIFICANCE.  YOU MAY HAVE ZERO QUESTIONS.  MAYBE YOU HAVE MORE QUESTIONS THAN THREE.  THAT'S OKAY.  WE CAN COPY EXTRA FORMS.

SO DO WHAT YOU NEED TO DO.  AND IF YOU HAVE A QUESTION, YOU MAY ASK IT.  SO THE QUESTIONS INDICATE THAT THE PRESIDING JUROR SHOULD SIGN, BUT THE PRESIDING JUROR CANNOT PREVENT ANYONE ELSE FROM SIGNING IT AND SENDING IN A QUESTION.

WHAT THE PRESIDING JUROR CAN DO IS TO HAVE THE JURY CONTINUE TO DISCUSS THE ISSUE AND TO DEVELOP THE BEST QUESTION. AND IF THE PRESIDING JUROR DOESN'T WANT TO SIGN, IF SOMEONE ELSE WANTS TO SIGN, FEEL FREE.  SO WHOEVER WANTED TO ASK THAT QUESTIONS.

WHEN WE RECEIVE YOUR QUESTIONS, AS MENTIONED, WHAT HAPPENS IS THAT I DISCUSS THEM WITH ATTORNEYS AND THE PARTIES.  WE TALK ABOUT IT.  WE COME TO AN AGREEMENT ABOUT WHAT THE ANSWER WILL BE, AND I WILL SEND IT BACK TO YOU.  SO THIS CAN TAKE A WHILE, SO PLEASE CONTINUE DELIBERATING.

IN ADDITION, SOMETIMES YOU ASK FOR TESTIMONY TO BE READ BACK, AND THAT'S COMPLETELY FINE.  IF YOU'RE GOING TO DO SO, IT'S HELPFUL IF YOU SPECIFY THE WITNESS AND SOME KEY WORDS. THAT WILL TELL US WHAT PLACE IN THE TESTIMONY THAT YOU'RE LOOKING FOR.

SO SOMETIMES YOU MAY ONLY WANT PART OF THE DIRECT OR ONLY WANT SOME PART OF THE CROSS.  ANYTHING YOU CAN DO TO HELP DIRECT US TO ISOLATE WHAT YOU NEED IS VERY HELPFUL.

SOMETIMES IT'S VERY RARE, IT'S ONLY HAPPENED A FEW TIMES WHEN I'VE PRESIDED OVER A FEW TRIALS, THE REQUEST IS SO EXPANSIVE, THAT I SEND YOU BACK A QUESTION SAYING, HEY, CAN WE NARROW THIS FURTHER.  WE DON'T WANT THE TRIAL OR THE READ BACK TO TAKE LONGER THAN THE TRIAL.  SO THAT'S THE ONLY REASON I WOULD DO SO IS JUST CONCERN ABOUT THE LENGTH.  BUT I'LL LET YOU KNOW IF I NEED YOU TO NARROW IT.

OKAY.  I ALSO MENTIONED THERE'S GOING TO BE A VERDICT FORM, A COPY FOR EACH OF YOU.

THE OFFICIAL VERDICT FORM IS THE ONE THE PRESIDING JUROR HAS AND IS THE ONE -- THERE'S AN OFFICIAL VERDICT FORM, BUT THE REST YOU ALL WILL HAVE COPIES.

I WOULD ASK WHEN YOU REACH A VERDICT, GO AHEAD AND FILL IT OUT FOR YOURSELF.  SOMETIMES THE PARTIES WILL ASK FOR THE JURY TO BE POLLED AND SOMETIMES IT'S HELPFUL, YOU'RE NERVOUS, YOU'RE HAVING TO ANSWER.

AND WHAT POLLING MEANS IS BASICALLY WE JUST ASK EACH OF

YOU, WAS THAT YOUR VERDICT, THE ONE THAT WAS JUST ANNOUNCED? SO A LOT OF TIMES JURORS, WHEN THEY GET A LITTLE NERVOUS, THEY LIKE TO HAVE, THEY LIKE TO HAVE THEIR OWN VERSION OF THE FORM.

ALL RIGHT. PRESIDING JUROR. SO THE JURORS -- THE INSTRUCTIONS INDICATED THAT ONE OF THE FIRST THINGS THAT YOU SHOULD DO BEFORE BEGINNING DELIBERATIONS IS TO SELECT A PRESIDING JUROR. SO THERE ARE NO RULES ABOUT THIS. EVERY ONE OF YOU IS QUALIFIED.

A COUPLE THOUGHTS FOR YOU TO CONSIDER OR DISREGARD. SO THE JOB OF THE PRESIDING JUROR IS TO ORGANIZE YOUR DISCUSSION AND TO FILL OUT THE OFFICIAL VERDICT FORM. SO WE'VE ALL SEEN GOOD MEETING LEADERS AND BAD MEETING LEADERS.

YOU WANT TO PICK SOMEBODY WHO WILL DO A GOOD JOB, RIGHT? SOMEONE WHO WILL ORGANIZE YOUR DISCUSSION AND, IMPORTANTLY, MAKE SURE THAT EVERY JUROR WHO WANTS TO SPEAK ON THE ISSUE MAY SPEAK ON THE ISSUE.

THE OTHER THING THAT IS IMPORTANT FOR YOU TO DO AND TO START WITH AND MAYBE DO THIS FIRST, ACTUALLY BEFORE THE PRESIDING JUROR, EITHER WAY, BOTH IS FINE, BUT I'M GOING TO ASK THAT YOU TALK WITH EACH OTHER ABOUT SETTING YOUR GENERAL SCHEDULE FOR TODAY AND FOR DELIBERATIONS, SO WHEN YOU EXPECT YOUR BEGINNING TIME TO BE AND YOUR END TIME TO BE EACH DAY. YOU KNOW, WE HAVE BEEN GOING FROM 9:00 TO 4:30. I'VE ASKED YOU TO COME HERE BEFORE THEN BY AT LEAST 15 MINUTES. YOU CAN BEGIN EARLIER IF YOU WISH. YOU CAN ALSO END EARLIER, LIKE, SAY,

4:00, OR END LATER, SAY, 5:00.

I RECOMMEND THAT YOU TRY TO DO A BUSINESS DAY TO AVOID DELAY BEING -- AGAIN, TO AVOID DELAY.

BUT I LIKE -- OH, AND ALSO, WHEN YOU GENERALLY WOULD LIKE YOUR LUNCH BREAK.

SO I ASK THIS ALL BECAUSE WHEN YOU'RE HERE, WE'RE HERE. SO IT'S TO MAKE SURE WE HAVE A SENSE OF SCHEDULE, TO MAKE SURE YOU GET YOUR LUNCH ON TIME.  TODAY WE HAVE ALREADY ORDERED YOUR LUNCH, SO IT WILL BE HERE WHEN IT'S HERE.

BUT WHEN MADAM CLERK COMES IN AND YOU SEE THOSE MATERIALS, SHE'S GOING TO ASK YOU ALL IF YOU HAVE DECIDED ON A SCHEDULE, AND SO IF YOU CAN JUST LET HER KNOW.  AND IF YOU NEED A LITTLE EARLIER OR LATER, OR IF IT ENDS UP BEING EARLY OR SO FORTH, JUST LET US KNOW.  IT'S NOT FULLY BINDING.  WE JUST NEED YOUR SENSE OF WHAT YOUR EXPECTATIONS WILL BE.

VERY ADMINISTRATIVE.  SO TOMORROW WILL JUST BE LUNCH.  FOR EXAMPLE, IF THERE'S SOMETHING THAT YOU SAW IN THE JURY ASSEMBLY ROOM THAT YOU WANT -- YOU'RE LIMITED TO WATER HERE IN THE COURTROOM, BUT IN THE JURY ROOM, FEEL FREE TO -- YOU CAN BRING IN WHATEVER FOOD THAT YOU NEED.

SO I THINK THOSE ARE MY LOGISTICS OR WORDS OF ADVICE, IF HELPFUL, FOR YOUR DELIBERATION PROCESS.

SO, COUNSEL, WILL YOU STIPULATE THAT YOU NEED NOT BE PRESENT WHEN THE JURY IS EXCUSED FOR LUNCH?  I MEAN, THEY'RE GOING TO BE HERE FOR LUNCH, BUT EXCUSED FOR THE DAY?

MR. LOKER:  YES, YOUR HONOR.

MR. NARITA:  SO STIPULATED, YOUR HONOR.

THE COURT:  ALL RIGHT.  COUNSEL, IS THERE ANY REASON I SHOULD NOT SEND THE JURY BACK TO DELIBERATE?

MR. LOKER:  NO, YOUR HONOR.

MR. NARITA:  NO, YOUR HONOR.

THE COURT:  SO WITH THAT, MADAM CLERK, I CHARGE YOU WITH OUR JURY AND IF YOU COULD BRING THEM TO THE JURY ASSEMBLY ROOM.

THE CLERK:  YES, YOUR HONOR.

(JURY OUT AT 11:54 A.M.)

THE COURT:  THE JURY HAS BEEN EXCUSED.  COUNSEL, YOU MAY BE SEATED.  THIS IS THE SECOND CHECK IN, WHICH I PROMISED, JUST BECAUSE I NEED TO MAKE SURE THAT THE JURY INSTRUCTIONS REPRESENT EVERYTHING THAT I SAID TODAY HERE IN COURT AS WELL AS THE PREVIOUS INSTRUCTIONS.

ONE THING I DID WANT TO PUT ON THE RECORD WAS THAT AN AMENDED VERSION OF EXHIBIT 247, WHICH IS ATTACHED TO -- I ONLY KNOW IT BY THE MODEL INSTRUCTION 2.2, THAT EITHER YESTERDAY OR EARLIER THIS MORNING COUNSEL MET AND CONFERRED AND PROVIDED THE AMENDED VERSION OF EXHIBIT 247 TO MADAM CLERK.  THAT IS THE VERSION WHICH WILL BE GOING BACK WITH THE JURY.

AND THE AMENDED VERSION IS ECF NUMBER 219.

MS. GIVENTAL:  I THINK IT WAS 219 BEFORE.

THE COURT:  OH.  LET'S GET THE ECF NUMBERS JUST TO

MAKE IT CLEAN.

I'LL PULL UP THE DOCKET.

THANK YOU, MS. GIVENTAL.  IT IS ECF NUMBER 223 IS THE AMENDED VERSION.

EVERYBODY IS NODDING.

MR. LOKER:  YES, YOUR HONOR.

THE COURT:  THANK YOU, MS. GIVENTAL.

KEEPING OUR RECORD CLEAN.

ANYTHING ELSE?

MR. LOKER:  NOT FOR THE PLAINTIFF, YOUR HONOR.

MR. NARITA:  UM, YOUR HONOR, MY APOLOGIES.  I MAY HAVE LOST TRACK OF A FEW THINGS IN THE BLUR.

WERE THE LIMITING INSTRUCTIONS THAT YOUR HONOR GAVE THROUGHOUT THE TRIAL, WERE THOSE ALSO PART OF THE INSTRUCTIONS THAT GO BACK TO THE JURY, OR NOT?

THE COURT:  THE ONES?

MR. NARITA:  THE ONES THAT YOU READ A NUMBER OF TIMES.

THE COURT:  THE THREE WHICH I READ?

MR. NARITA:  CORRECT.

THE COURT:  THE THREE WHICH I READ TODAY, THEY DID.

MR. NARITA:  OKAY.  THANK YOU.

THE COURT:  WHICH WERE THE THREE WHICH WERE STIPULATED TO BY THE PARTIES.

MR. NARITA:  OKAY.  OKAY.

THE COURT:  ANYTHING ELSE?

MR. LOKER:  NOT FROM THE PLAINTIFF.

MR. NARITA:  NOTHING ELSE FOR THE DEFENSE, YOUR HONOR.

THE COURT:  OKAY.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

SO I'M ABOUT TO GO INTO RECESS.  MADAM CLERK HAS COUNSEL'S CONTACT INFORMATION AND EVERYTHING ELSE.  SO WE'LL LET YOU KNOW WHEN WE HEAR ANYTHING.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. NARITA:  THANK YOU, YOUR HONOR.

THE COURT:  I'M NOW IN RECESS.

(LUNCH RECESS TAKEN AT 11:57 A.M. PENDING THE DELIBERATIONS OF THE JURY.)

(JURY OUT AT 4:18 P.M.)

THE COURT:  YOU MAY BE SEATED.

WE'RE BACK ON THE RECORD IN PANCHENKO VERSUS COMENITY CAPITAL BANK.

COUNSEL ARE PRESENT, AND THE PARTIES ARE PRESENT.

WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

COUNSEL, AS MADAM CLERK HAS INFORMED YOU, WE'VE BEEN INFORMED THAT THE JURY HAS REACHED A VERDICT.

I'M INTENDING TO HAVE THE JURORS COME INTO THE COURTROOM

IN A MINUTE.

A COUPLE OF QUICK QUESTIONS.

I OFFER TO COUNSEL WHETHER THEY WOULD LIKE TO MEET WITH THE JURORS AFTERWARDS.  I ALSO WILL TOUCH BASE WITH THEM SINCE THIS IS THE FIRST TIME WE'VE USED THIS SPACE, AND I WANT THEIR FEEDBACK.  WE'LL KEEP OURS SHORT.  BUT I'LL INVITE THEM, AND YOU'RE WELCOME TO STAY IN THE COURTROOM, AND I CAN INVITE THEM BACK INTO THE COURTROOM.

OKAY.  OUTSIDE OF THAT, IS THERE ANYTHING ELSE?

MR. LOKER:  NOTHING FROM THE PLAINTIFF, YOUR HONOR.

MR. NARITA:  NOTHING FROM THE DEFENDANT, YOUR HONOR.

THE COURT:  THANK YOU.  MADAM CLERK, IF YOU COULD SUMMON THE JURY?

THE CLERK:  YES, YOUR HONOR.

(JURY IN AT 4:19 P.M.)

THE COURT:  YOU MAY BE SEATED.

WE ARE CONTINUING IN THE MATTER OF PANCHENKO VERSUS COMENITY CAPITAL BANK.

ALL SEVEN JURORS ARE PRESENT.  THE PARTIES ARE PRESENT AS WELL AS THEIR COUNSEL.

WE ARE HERE FOR THE READING OF THE VERDICT.

LET ME BEGIN WITH ASKING THE JURY, HAS THE JURY SELECTED A PRESIDING JUROR?

JUROR:  YES.

THE COURT:  AND I SEE -- MY UNDERSTANDING -- CAN

THAT JUROR IDENTIFY HIMSELF EITHER BY NAME OR NUMBER.

JUROR:  ERNESTO NASSAU, JUROR NUMBER 6.

THE COURT:  THANK YOU, MR. NASSAU.

SO I'M GOING TO ASK YOU TO PROVIDE THE VERDICT TO MADAM CLERK.  JUST PASS IT DOWN.

MADAM CLERK, IF YOU COULD TAKE THE VERDICT.

LET ME ASK, HAS THE JURY REACHED A VERDICT, MR. NASSAU?

JUROR:  YES, WE HAVE.

THE COURT:  THANK YOU.  IF YOU COULD PASS THE VERDICT FORM DOWN TO MADAM CLERK?

JUROR:  THANK YOU.  (HANDING.)

THE CLERK:  (HANDING.)

THE COURT:  HAVING REVIEWED THE VERDICT AND FINDING NO IRREGULARITIES, I'M GOING TO ASK MADAM CLERK TO READ THE VERDICT.

MADAM CLERK, WILL YOU READ THE VERDICT.

THE CLERK:  LADIES AND GENTLEMEN OF THE JURY, LISTEN TO YOUR VERDICT AS IT WILL STAND RECORDED.

WE THE JURY IN THE ABOVE-CAPTIONED MATTER ANSWER AS FOLLOWS:

QUESTION 1.

DID COMENITY CAPITAL BANK ("COMENITY") VIOLATE THE FAIR CREDIT REPORTING ACT?

ANSWER:  YES.

QUESTION 2.

DID PLAINTIFF SUFFER ANY ACTUAL DAMAGES FROM COMENITY'S VIOLATION OF THE FAIR CREDIT REPORTING ACT?

ANSWER:  YES.

QUESTION 3.

WHAT ARE PLAINTIFF'S ACTUAL DAMAGES FROM COMENITY'S VIOLATION OF THE FAIR CREDIT REPORTING ACT?

ANSWER:  $100,000.

QUESTION 4.

WAS COMENITY'S VIOLATION OF THE FAIR CREDIT REPORTING ACT WILLFUL?

ANSWER:  YES.

QUESTION 5.

WHAT ARE PLAINTIFF'S ACTUAL OR STATUTORY DAMAGES FROM COMENITY'S WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT?

ANSWER:  100,000.

QUESTION 6.

DO YOU FIND THAT PLAINTIFF SHOULD BE AWARDED PUNITIVE DAMAGES?

ANSWER:  YES.

QUESTION 7.

WHAT PUNITIVE DAMAGES DO YOU AWARD AGAINST COMENITY FOR ITS WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT?

ANSWER:  $20 MILLION.

IT IS SIGNED AND DATED.

THE COURT:  THANK YOU, MADAM CLERK.

WOULD ANY PARTY LIKE THE JURY POLLED?

MR. NARITA:  THE DEFENDANT WOULD, YOUR HONOR.

MR. LOKER:  THE PLAINTIFF AS WELL, YOUR HONOR.

THE COURT:  MADAM CLERK, YOU MAY POLL THE JURY.

THE CLERK:  YES.

JUROR NUMBER 1, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  JUROR NUMBER 2, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  JUROR NUMBER 3, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  JUROR NUMBER 4, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  JUROR NUMBER 5, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  JUROR NUMBER 6, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  JUROR NUMBER 7, IS THIS YOUR VERDICT?

JUROR:  YES.

THE CLERK:  YOUR HONOR, THAT COMPLETES THE POLLING OF THE JURY.

THE COURT:  THANK YOU.  ANYTHING FURTHER FROM THE PARTIES BEFORE I DIRECT THE CLERK TO FILE AND RECORD THE VERDICT?

MR. NARITA:  NOTHING FROM THE DEFENDANT, YOUR HONOR.

MR. LOKER:  NOTHING FROM THE PLAINTIFF, YOUR HONOR.

THE COURT:  MADAM CLERK, PLEASE RECORD THE VERDICT.

AND TO THE MEMBERS OF THE JURY, I WANT TO THANK YOU FOR YOUR SERVICE.  WE STARTED THIS ALL WITH ME DISCUSSING THE IMPORTANCE OF JURY SERVICE, AND YOU HAVE FULFILLED YOUR DUTY WITH DILIGENCE, ATTENTION, AND CARE.  THANK YOU FOR SERVING TODAY.  WE ALL ARE MUCH APPRECIATIVE.

AS MY LAST AND FINAL INSTRUCTION, I AM GOING TO READ ONE LAST, WHICH I'M REQUIRED TO READ, AND THEN I WILL EXCUSE YOU.

I WILL NOTE THAT AFTER -- WELL, LET ME READ THIS INSTRUCTION FIRST.

NOW THAT THE CASE HAS BEEN CONCLUDED, SOME OF YOU MAY HAVE QUESTIONS ABOUT THE CONFIDENTIALITY OF THE PROCEEDINGS.  NOW THAT THE CASE IS OVER, YOU ARE FREE TO DISCUSS IT WITH ANY PERSON YOU CHOOSE.

BY THE SAME TOKEN, HOWEVER, I WOULD ADVISE YOU THAT YOU ARE UNDER NO OBLIGATION WHATSOEVER TO DISCUSS THIS CASE WITH ANY PERSON.

IF YOU WOULD PREFER NOT TO TALK TO -- TO DISCUSS THE CASE WITH ANYONE, BUT ARE FEELING UNDUE PRESSURE TO DO SO, PLEASE FEEL FREE TO CONTACT THE COURTROOM DEPUTY WHO WOULD NOTIFY ME, AND I WOULD ASSIST.

I DON'T EXPECT THAT TO HAPPEN, BUT IT IS PART OF THE INSTRUCTIONS, AND WE JUST WANT TO MAKE SURE THAT YOU KNOW THAT YOU HAVE THE OPTION TO DO AS YOU SO CHOOSE.

ONE OR TWO OTHER THINGS.

MY STAFF AND I, THIS IS THE FIRST TIME WE HAVE USED THIS COURTROOM SPACE AND THE JURY ROOM.  WE WOULD LOVE TO HEAR ANY FEEDBACK YOU HAVE.  WHILE YOU'RE GATHERING YOUR THINGS IN THE JURY ROOM, WE WOULD LOVE TO HEAR THAT FEEDBACK.

SO YOU'RE WELCOME TO SPEAK TO US FOR A FEW MINUTES.  IF YOU WOULD RATHER NOT, YOU DON'T NEED TO.

AND THEN AFTERWARDS, THE COUNSEL, AND THIS OFTEN HAPPENS, AND THE COUNSEL WOULD LIKE TO SPEAK TO YOU, AGAIN, COMPLETELY YOUR CHOICE, FOR ANY THOUGHTS, FEEDBACK, OR WHATSOEVER.

AND SOMETIMES JURORS REALLY WANT TO TALK TO COUNSEL AT THAT POINT.  SO I AM LEAVING IT UP TO YOU.

I'VE TOLD COUNSEL THAT THEY MAY STAY IN THE COURTROOM IF THEY WISH TO SPEAK TO YOU.  THEY BOTH INDICATED THAT THEY WOULD.

FOR ME AND MYSELF AND MY STAFF, WE'RE JUST CURIOUS ABOUT FEEDBACK ABOUT ANYTHING THAT WE CAN DO TO MAKE YOUR EXPERIENCE BETTER AS JURORS, SO I EXPECT OURS WILL BE VERY SHORT, AND IF YOU HAVE ANY QUESTIONS FOR US.

SO I'M EXPECTING, COUNSEL, FIVE TO TEN MINUTES MAX, OF US, AND THEN AFTERWARDS I WOULD LEAVE THEM TO SPEAK TO YOU.

MR. LOKER:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  ALL RIGHT.  SO MEMBERS OF THE JURY, YOU ARE NOW EXCUSED.  I'M GOING TO HAVE ONE OF MY STAFF WALK YOU BACK TO THE JURY ROOM.

IF YOU WOULD LIKE TO SPEAK TO ME, PLEASE STAY THERE FOR JUST TWO MINUTES, AND WE'LL JOIN YOU IN A MINUTE, IN A COUPLE OF MINUTES, AND COUNSEL WILL SPEAK FOR A MINUTE.

OKAY.  THANK YOU.

(JURY OUT AT 4:29 P.M.)

THE COURT:  ALL RIGHT.  SO, COUNSEL, POST-TRIAL -- SO I'M TRYING TO DECIDE BEST NEXT STEPS OR ANYTHING THAT WE NEED TO DISCUSS NOW?

SO LET ME HEAR FROM PLAINTIFF AND DEFENDANT.  YOU MAY BE SEATED.  WE CAN ALSO SET A -- WELL, THERE ARE PROBABLY CERTAIN THINGS.

IS THERE ANYTHING FURTHER RIGHT NOW?

MR. NARITA:  NOT RIGHT NOW THAT I WOULD THINK WOULD HAVE TO BE ADDRESSED THIS AFTERNOON, YOUR HONOR.  WE OBVIOUSLY HAVE TO SPEAK AS A TEAM, AND I'M SURE WE'LL BE FILING A MOTION UNDER RULE 59 AND RULE 60 I WOULD ANTICIPATE, BUT OTHER THAN THAT, NOTHING COMES TO MIND.

THE COURT:  OKAY.

MR. LOKER:  I CAN'T THINK OF ANYTHING EITHER, YOUR HONOR.

THE COURT:  SO LET'S DO THIS, I WOULD EXPECT THAT THAT MAY BE HAPPENING.

MR. NARITA, WHY DON'T YOU ALL MEET AND CONFER IF THAT DOES INDEED -- WILL BE HAPPENING, BUT LET'S PLAN TO CONTACT MADAM CLERK.  WE'LL SET A -- WE'LL SET -- AND WE'LL PROBABLY HAVE A

STATUS CONFERENCE JUST TO SET ANY BRIEFING SCHEDULES OR SUCH THAT NEED TO BE HAD AT THAT POINT.

MR. NARITA:  THE OTHER THING THAT COMES TO MIND IS THE COURT GRANTED THE PLAINTIFF'S MOTION IN LIMINE WITH RESPECT TO THE AMOUNT OF THE SETTLEMENT FROM THE OTHER SETTLING DEFENDANTS AND RULED THAT SHOULD THE ISSUE NEED TO BE RESOLVED, IT WOULD BE DONE POST-TRIAL.

AND SO I'M NOT SURE WHETHER ANYONE HAS GIVEN ANY THOUGHTS TO THE MECHANICS OF HOW THAT WOULD WORK, BUT CERTAINLY GIVEN THE RECORD OF WHAT CAME INTO THE CASE, YOU KNOW, WE CERTAINLY THINK THAT'S GOING TO BE AN ISSUE WITH WHAT HAS HAPPENED HERE. SO I DON'T KNOW IF WE NEED A STATUS CONFERENCE OR --

THE COURT:  SO WHY DON'T WE DO THIS.  WHY DON'T THE PARTIES MEET AND CONFER.  I HAD A COUPLE OF TRO'S AND A PRELIMINARY INJUNCTION COME IN DURING THIS TRIAL.

MR. NARITA:  OF COURSE.

THE COURT:  LET'S PLAN ON HAVING A STATUS CONFERENCE AFTER YOU ALL MEET AND CONFER.  NEXT WEEK IS FINE WITH ME.  WE CAN SQUEEZE IN A DATE PROBABLY CLOSER TO THE END OF THE WEEK. IF YOU NEED IT EARLIER, WE CAN DO IT EARLIER.  I HAVEN'T THOUGHT THROUGH THE TIMING OF THINGS AS WELL.

CONTACT MADAM CLERK.  TUESDAY IS A FEDERAL HOLIDAY.  WE, UNFORTUNATELY, MAY BE WORKING, BUT WE'RE NOT GOING TO BE ON THE RECORD.  SO WHY DON'T WE TAKE IT FROM THERE.

MR. NARITA:  OKAY.  THANK YOU, YOUR HONOR.

THE COURT:  YOU'RE WELCOME.

COUNSEL, WE'VE SPENT A LOT OF TIME TOGETHER IN THE PAST WEEK AND BEFORE THEN, SO THANK YOU FOR YOUR ATTENTION TO THIS MATTER, AND THANK YOU FOR THE KIND WORDS WHICH YOU SAID TO MY STAFF THROUGHOUT.

MR. LOKER:  THANK YOU, YOUR HONOR.  I APPRECIATE IT.

MR. NARITA:  THANK YOU AND TO THE STAFF, TOO.

THE COURT:  SO WE ARE ADJOURNED.  THANK YOU.  YOU'RE WELCOME TO STAY AND I WILL -- WE'RE GOING TO GO SPEAK TO THEM.

(COURT CONCLUDED AT 4:32 P.M.)

CERTIFICATE OF REPORTERS


          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

                              _____
                              IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8076


                              _____
                              LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595


                              DATED:  NOVEMBER 6, 2025