UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

OLEKSANDR PANCHENKO,                   )
                                       )   No.  5:23-CV-04965-EKL
            Plaintiff,                 )
                                       )
v.                                     )   March 3, 2026
                                       )
COMENITY CAPITAL BANK,                 )
                                       )   Courtroom 7, 4th Floor
            Defendant.                 )
_____)   San Francisco, California


TRANSCRIPT OF PROCEEDINGS

(Post-Trial Briefing, Motion to Dismiss)


BEFORE THE HONORABLE EUMI K. LEE, DISTRICT JUDGE


COURT REPORTER:              AMANDA M. LeGORE
                             (Reporting Remotely)
                             RDR, CRR, CRC, FCRR, CACSR
                             U.S. District Court
                             333 West Broadway, Suite 420
                             San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov

Reported by Stenotype:  Transcribed by Computer

2

APPEARANCES:

FOR THE PLAINTIFF:          MATTHEW LOKER
                            CHARLES CUMMINS
                            Loker Law, APC
                            132 Bridge Street
                            Arroyo Grande, CA   93420
                            (805)468-8141
                            matt.loker@loker.law
                            charles.cummins@loker.law


FOR THE DEFENDANT:          TOMIO NARITA
                            (present in person)
                            ALISA GIVENTAL
                            (present via zoom)
                            Womble Bond Dickinson, LLP
                            50 California Street, Suite 2750
                            San Francisco, CA   94111
                            (415)433-1900
                            tomio.narita@wbd-us.com
                            alisa.givental@wbd-us.com


ALSO PRESENT:               MICHAEL GALIANO
                            (Client Representative for Defendant)

(Tuesday, March 3, 2026; 2:03 p.m.)

P R O C E E D I N G S

THE CLERK:  We're calling Case Number 5:23-CV-4965-EKL, Panchenko versus Comenity Capital Bank, post-trial briefing.

Counsel, please come forward.  State your appearances on the record, starting with counsel for the plaintiff.

ATTORNEY LOKER:  Hi.  Good afternoon, your Honor.  Matt Loker, for the plaintiff.  And Charles Cummins, from my office, is present as well.

THE COURT:  Good afternoon to you both.

ATTORNEY NARITA:  Your Honor, good afternoon, Tomio Narita for the defendant.  With me is my client, Mr. Galiano.

THE COURT:  Good afternoon to both of you.  It's good to see everybody again.

Okay.  So we're here today on the post-trial motions in this matter.

The Court's reviewed the papers, and I'm estimating about 20 minutes per side, beginning with the moving party.  And you may reserve time for rebuttal, Mr. Narita, as you so choose.  And just let me know how much.

I -- I'm familiar with many of the issues which have already been raised.  Some have been touched upon or addressed

during different points, whether it's motion in limine or during the course of trial.

I am particularly interested in the remittitur issue, and I'll leave it with that.

Mr. Narita?

ATTORNEY NARITA:  Thank you, your Honor.

May I reserve five minutes.

THE COURT:  Of course.

ATTORNEY NARITA:  Thank you.

So let me start with the remittitur points, since that has the Court's attention.

Obviously, we don't think you get to remittitur, given the standing arguments we've made and the one-satisfaction arguments that we've made.

But should the Court reach the remittitur issue -- I'm assuming you're talking -- the Court's talking about the punitive damages issue?

THE COURT:  I am.

ATTORNEY NARITA:  Okay.  Then we think that that is actually, in many ways, fairly straightforward.

THE COURT:  Can you talk me through the process as you see it, within the Ninth Circuit, in contrast to whether or not you would agree with the Court that what would happen would be should the Court go that path and suggest and propose a number, that basically the Court would be denying the motion to

dismiss with the assumption of if that amount would be -- and stating a number.  And then the option would be either that the plaintiff were to either accept that or that we would move for a new -- or we would proceed with a new trial?

ATTORNEY NARITA:  I think that's correct, your Honor. Mechanically speaking.

THE COURT:  All right.  And then in terms of that new trial, what is the scope, in the defendant's view, of what that new trial would include?

ATTORNEY NARITA:  A new trial, with respect to punitive damages (pause) -- it's -- it's a good question, your Honor.  I hadn't -- I hadn't given it too much thought before the argument.

I -- my first reaction is that we would have to do the whole thing over because -- obviously, you would have to establish everything from standing, to -- you know, to a violation, to damages, to willfulness, and then on to --

THE COURT:  Well, standing would be resolved.

ATTORNEY NARITA:  Standing would be resolved. That's probably right.  But I think you would need to go through the testimony, and the evidence would have to be everything.

THE COURT:  And would you agree with the Court that the evidence would have to be limited to -- in terms of documentary evidence, would have to be limited to what was

presented at trial?  Trial one, we'll just call it.

ATTORNEY NARITA:  I think that's right.

THE COURT:  Okay.  Okay.

ATTORNEY NARITA:  And so on the point, I -- you know, I think the -- the case law in this area is -- is very clear. That the *TransUnion versus Ramirez* case, the Ninth Circuit case from 2020, really sets out the law in the -- not only in this circuit but in the Fair Credit Reporting Act cases, which says that the absolute constitutional maximum in a case like the one that was presented in that case was a 4:1 ratio between actual damages and punitive damages.

And I think for the reasons we talked about at some length in our brief, we don't think that we're even approaching the level of reprehensibility that was at issue in the *Ramirez* case.  That was at -- that was a case where TransUnion had basically labeled thousands and thousands of consumers as potential terrorists on the very front page of their credit reports.  Not only had they done that as a systematic practice, but they had lost a case -- I believe in New Jersey -- and gone all the way to the Third Circuit.  Court of Appeals in the Third Circuit had told them that they were doing it wrong, and then they continued.

And then, of course, you had about 8,000 people in the class.  That was in the case that was tried here in California, in the Northern District.

So even in -- even with those extreme facts, the Ninth Circuit said, look, 4:1 -- a 4:1 ratio is really the outer limits that the Constitution would permit.

So it would be our position that, of course, no punitive damages, really, are -- are warranted here.  There just -- there just isn't -- there isn't reprehensibility factors at all.  We don't think that they've been met.

But if the Court were to find that some amount of punitive damages were to be awarded, then it would be substantially less than the 4:1 ratio that the -- that the Court found in -- in *Ramirez*.  And I can reserve a little bit on that point when we come back.

As I said, switching back to -- to the other points that we raise, standing, I think, is really where we begin and where we should end.  So -- and it's a very -- it's a very unusual procedural posture to be in, your Honor.  I mean, we absolutely acknowledge that.  To be sitting here, talking to you after a jury trial, after a jury verdict, and to be saying to the Court that the Court lacks jurisdiction.  It's -- it's unusual.  But it's certainly not unprecedented.  And just because it's unusual, doesn't mean that evidence exists to demonstrate standing, traceability.

THE COURT:  Standing is jurisdictional, and it's required.  I don't disagree with approaching the question now. I disagree, perhaps, with what Comenity is urging.  That

there's no traceability.  So --

ATTORNEY NARITA:  Okay.  And just briefly, your Honor.  So the -- so this wasn't a surprise at trial, obviously.  The plaintiff and his counsel were prepared to try and do this.  And they designed a direct examination to try and address the issue.  They -- they asked -- they asked Mr. Panchenko, on direct exam, you know, why does he -- why does he think about Comenity differently?  What is different about Comenity from the other defendants?  Questions like that.

At trial, we got three answers, all of which we went through in some detail --

THE COURT:  Um-hmm.

ATTORNEY NARITA:  -- in the brief.  Right?

One was, well, they're different because they're the only ones who told me they were going to stop investigating.  And we explained why that was evidence, but it's not evidence that's traceable to a 1681s-2(b) violation.  If anything, it might be evidence of an s-2(a) violation.  But, of course, that's not part of the case.  So that can't support traceability; that testimony and the feeling that he had about learning that we had stopped investigating.

Then there was the gateway your Honor's --

THE COURT:  I think that's -- yeah.  Thank you.

ATTORNEY NARITA:  Please.

THE COURT:  I think that that argument -- Comenity

really focused on three -- these three different points.  But I think taking each of those points separately -- you know, there's a "you can't see the forest through the trees" sort of notion behind this --

ATTORNEY NARITA:  (Nods head.)

THE COURT:  -- they missed the bigger picture.

So taking that, for example, isn't it true that, okay, so he didn't find out about what was happening behind the curtain, so to speak.  That what in fact was happening is that they hadn't looked at it at all, this report at all; Comenity had not.

But the fact of the matter is he felt and knew that he had generally -- that there was this trade line, and that it was impacting his credit.  He felt that injury or that harm.

ATTORNEY NARITA:  Right.  I think what you're -- what the Court's describing is the -- sort of the collective harm that he described throughout the trial.  Where there were numerous CRAs that were not responding in the way he wanted them to respond to his disputes.  There were numerous furnishers that were getting his disputes and were not responding in the way he wanted.  And that collective injury that he described that he felt caused him emotional distress.  And that's the distress that he -- you know, he said he wanted to be compensated for.

THE COURT:  But it seems to tie more to the one-satisfaction rule than the traceability.  The traceability standard -- I mean, you agree with me that that's a less demanding standard than, say, what would be a good comparison.  That it's less demanding than, say, proximate cause?

ATTORNEY NARITA:  I think -- I think that's a correct statement of law, your Honor.  That it's less demanding than proximate cause.  But that does not mean that it's nonexistent.  It's very much important.  And we've cited to the Court cases stemming from the Supreme Court in *Murthy*; the district -- the D.C. Circuit in the *Delta Construction* case; the *Thompson* case, which was a Michigan case, but that was a Fair Credit Reporting Act case; the Sixth Circuit in the *DuPont* case.  All of those cases threw out claims on the absence of traceability because the plaintiffs were not able to make that tie.  They weren't able to make the connection between the evidence that they offered and harm -- actionable harm that was -- that they sustained.  They just couldn't do it.  It's not -- it's not something that you can just dispense in growth and say, well, lots of people combined to harm this person, so there's standing as to everybody.

You have to go through and -- with each defendant, each cause of action, each claim for relief, and say, is there -- is there traceability as to that defendant?  And when you can't do it, as these cases demonstrate, the -- you know, the verdict

cannot stand.

THE COURT:  So in *Thompson* -- which is -- you had mentioned is the one FCRA case.  Correct?

ATTORNEY NARITA:  Um-hmm.

THE COURT:  And isn't *Thompson* distinguishable?  Because there, I believe -- is this the $489 --

ATTORNEY NARITA:  Trade line -- oh, lay -- late payment, I think, or --

THE COURT:  Right.  And she had actually been late.  Correct?

ATTORNEY NARITA:  Correct.

THE COURT:  Okay.  So -- I mean, this stands in sharp contrast to this case -- correct? -- then?  Just factually?  I mean, saying, okay, well, the alleged harm -- the fact that that trade line was actually -- what was causing the injury was in fact fair game, so to speak.  That that was a correct statement of how much she was -- how much plaintiff owed, versus here, plaintiff did not.  The jury found that the plaintiff -- and, I mean, the plaintiff -- the jury did not believe that the plaintiff owed.

ATTORNEY NARITA:  Correct.  That's correct.

But, I mean, the point we -- we cite *Thompson* for, your Honor, is the traceability point, which is -- and the Court says, like, look, she's got -- she's got testimony where she says she was upset about this portion of her trade line.  But

even if we credit that, that doesn't -- you know, she hasn't presented enough evidence that the harm that she says she suffered is traceable to that portion of her trade line versus something else.  And that's why the claim failed from a standing standpoint.  The same thing with the *DuPont* case.

I mean, the *DuPont* case, the defendant sued ten manufacturers of a chemical that's the -- the -- they referred to it as PFAS.  I don't remember exactly what that stands for.  But they were all manufacturing these PFASs.  All ten of them.  And sued all ten of them.

But unless -- unless you can trace it to any particular one of the ten, it doesn't matter whether you -- you -- you are harmed.  You've got to connect the dots.  And that's what Mr. -- Mr. -- Mr. Panchenko did not do, was --

THE COURT:  I think you're creating a standard which would be higher than proximate cause, by what you're stating.  At least, at minimum, at proximate cause and beginning with my first question, you -- counsel agreed with me that we would not be -- that the traceability standard is less demanding.  So just as a heads-up, you're at 13 minutes right now.  So I want to make -- I want to give you your five-minute warning for rebuttal.  But I just wanted to give you a heads-up.

ATTORNEY NARITA:  Thank you, your Honor.  And so -- again -- I guess the last point on standing is that the fact that a verdict was entered by a jury really doesn't change the

calculus one bit.  And probably the most dramatic example of that is the Supreme Court's decision in *TransUnion versus Ramirez*.  Right?  I mean, that was a six-day jury trial in the Northern District of California.  And after a six-day jury trial, the jury awarded $984 to each class member.  $60,000,000 total with punitive damages.  Four years later, it's in the Supreme Court, and the Supreme Court takes away the jury verdict for 6,300 of those people, saying that they didn't prove standing.  So the fact that a jury came to the conclusion that --

THE COURT:  They didn't take away the named plaintiffs.

ATTORNEY NARITA:  No.  But they took away -- they took away the verdict.  There was a jury verdict in favor of 6,334 class members, which went poof because --

THE COURT:  Which makes sense.  I mean, I don't -- if -- if there was not standing here, the Court would take away this jury verdict.  But I tend to disagree with you in terms of traceability, given the standard on traceability.

ATTORNEY NARITA:  I'll return to that, in case Mr. Loker says something that -- that I want to address.

On the one-satisfaction rule, your Honor, again, this is -- this is a rule that applies in the Ninth Circuit by default.

The entire principle here is a plaintiff is only entitled

to one recovery for a harm, not more than one.  They're not entitled to windfalls.  Right?

THE COURT:  Let's assume for sake of argument -- and, also, because I really want to -- that the Court agrees with you that the one-satisfaction rule -- or whether or not I agree or not, let's focus on the -- the divisible.  Whether or not -- why can't I think of the rest of that standard right now?  Single and divisible -- indivisible -- indivisible.  Anyways, the second part of the analysis.

ATTORNEY NARITA:  Right.

THE COURT:  Let's assume, for a moment, that the one-satisfaction rule applies in the context of FCRA cases.  Let's go to whether or not, in terms of -- here, whether or not there is in fact a single, indivisible harm.

ATTORNEY NARITA:  Right.  And, again, this is -- we talked about this at the pretrial stage, with the motion in limine that Mr. Loker brought.  So this was not a surprise.  And the same arguments, really, apply here.  Similar arguments.

They -- they -- they knew that they were going to have this burden.  The Ninth Circuit says, in the *Corder* case, *Corder versus Brown*.  This is actually Mr. Panchenko and Mr. Loker's burden.  It is not our burden to prove that it was -- was or wasn't divisible.  That's his.  So he's got the burden of doing it.

And, again, the way that he did it at trial was three ways.  We addressed those in the briefs.  He tried to say, "They told me that they weren't going to investigate any further."  He tried to say that this was a gateway account. That somehow I'm more hurt by Comenity because this was, like, one of the first accounts, one of the lowest.  Which doesn't work for at least two reasons, one of which is it's just not factually true that we were one of the first and one of the lowest.  And the second one is that even if it were true, the fact that we were duped into opening an account in Mr. Panchenko's name in late 2015 can't possibly, you know, cause any harm in 2023, when we're investigating his disputes. That just doesn't make sense, factually.

And then the last thing he said was, you know, "They didn't review -- I learned -- I learned, after the fact, that they didn't review my documents."  Again, that was all in the context of a direct dispute call that he had with us.  That's not recoverable.  That's not damage that he could independently attribute to us as part of the one-satisfaction rule because it's not compensable.

Then the last thing he tried to throw in, in his briefing, was the Apple credit denial.

There was some testimony about the Apple card.  But as we set out in our brief, there's no -- there was no evidence in the record that could tie that to Comenity.  Right?

They're -- first of all, there's a credit report that was referenced, that TransUnion used to make the decision.  Where is it?  It's not in evidence.  It never made it into evidence.  So we don't know what TransUnion looked at when it made the decision.  Right?  There it fails.  We also don't know anything about their credit criteria.  He admitted that on the stand.

And then -- and then the reasons that were given in the email --

THE COURT:  Mr. Narita, (indiscernible) two minutes.

ATTORNEY NARITA:  Sure.  Those reasons don't connect to Comenity either.

So, again, it was his burden to do it.  He didn't -- he didn't meet his burden at trial.  He did not present any evidence of anything other than a collective malaise that he felt he suffered because of this entire identity theory.

And last thing I'll say on this point -- and then I'll reserve the rest -- is, you know, we're told in his opposition, brief, "Well, Comenity should have done something about this. Comenity should have, you know, proven something about the -- you know, that harm was caused by other people," or that -- that settlement agreements can somehow be allocated in a certain way.  That wasn't -- that wasn't our burden.  That was his burden to do.  And when we were here in October, I said, the solution to this problem, your Honor, is more evidence; not

less evidence.

He moved to exclude the settlement agreements.  He said that -- that they would confuse the jury.  And he said, "I'm going to prove a divisible harm.  Don't worry about it."

Now we went to trial.  He didn't prove divisible harm.  And now we're being told, "Well, I've got all of this other settlement money from all of these other people.  Mr. Narita hasn't proven, you know, how it should be allocated and whether it's compensating with different harms, or whatever."  That's a him problem.  That's what he should have done.  Because *Corder versus Brown* --

THE COURT:  I tend to agree with you regarding the last point, in terms of the use and, like, the -- the use of the -- getting into how the other settlement agreements should be allocated.  I may not agree with the front part of the argument about whether or not there was divisible harm.

So -- but, yes, I -- I agree with you, in terms of the motion --

ATTORNEY NARITA:  Indeed, that was the -- that was the very ruling that the district court made that the Ninth Circuit reversed.  It's not.  It's not the defendant's burden.  And, with that, I'll reserve.  I'll reserve --

THE COURT:  There's nothing left to be reserved, but I will give you two minutes because of my pregnant pause, and just to be kind.  So --

All right.  Mr. Loker, so you now have 22 minutes versus 20.

ATTORNEY LOKER:  Thank you.  And I don't plan on using the 22 minutes, your Honor.

But starting at remittitur, where you began with Mr. Narita.

I don't want to presuppose that we would ask for a new trial.  You know, if the Court did reduce the amount of damages.  But I do agree with the Court that if there was a new trial, it would really be based upon the evidence as previously presented, as it relates to the punitive damages claim.

So that would just basically be the 30(b)(1) videos.  You know, how do we get to the reprehensible or the willful conduct.  And I think that would come along --

THE COURT:  So I don't think you all are actually agreeing then.  So I think what he --

ATTORNEY LOKER:  I don't agree with Mr. Narita.  I think the Court would limit that.  (Nods head.)

THE COURT:  I think you -- right.  I think you're not agreeing with Mr. Narita.

ATTORNEY LOKER:  Correct.

THE COURT:  And stating that basically we would only retry the punitive and the amount of punitives, and assume willfulness, and so forth.  So I --

ATTORNEY LOKER:  I think we would get there with

instructions to the jury about this is what this new trial is about, and we're only looking at the question of the punitives; as opposed to a brand new trial on everything, if there is a remittitur.

THE COURT: I think that might be challenging. I think that might be challenging to do. I think it might have to be the whole new. I'm not sure.

I -- none of this was briefed by the parties, in terms of the procedural mechanism of remittitur. Which I was surprised, in terms of looking at *Wright* and *Miller*, that circuits differ.

And then, in terms of really thinking through the scope, have been pondering a little bit on my own. So I wanted to hear from the parties about what their thoughts were on that.

But in terms of the mechanisms before then, you agree with what defense counsel stated in terms of -- that the Court would be conditionally denying the motion for a new trial, contingent on the acceptance of that remittitur amount? And --

ATTORNEY LOKER: (Nods head.)

THE COURT: -- and if you did not -- if plaintiff did not accept, then there would be a new trial.

You agree with the mechanism up to then. You just disagree with the scope of that new trial?

ATTORNEY LOKER: All correct, your Honor.

THE COURT: Okay.

ATTORNEY LOKER: And then moving to one

satisfaction --

THE COURT:  I would -- I would -- let's stay with punitives.  Because I have some questions for you about punitives.

ATTORNEY LOKER:  Okay.  Sure.  Sorry.  My apologies.

THE COURT:  So let's go where Mr. Narita went to next, in terms of that question about remittitur; which is the case law which is cited and whether -- and the due process -- the scope of what I can award or what the Court needs to consider in terms of that due process analysis.

ATTORNEY LOKER:  Yes, your Honor.

THE COURT:  So plaintiff is requesting that the Court maintain the 200:1 ratio.

ATTORNEY LOKER:  (Nods head.)

THE COURT:  And I think I have gone through all of the cases, but I'm not -- maybe we missed a couple.

But are there any cases which plaintiffs cited, which there's -- which there was a ratio of 200:1 or greater?

ATTORNEY LOKER:  No, your Honor.

THE COURT:  Okay.  Were there any which were cited to which was at a scope of a 100:1 and greater?

ATTORNEY LOKER:  A 100:1, I believe -- let's see here.

Yeah, *Saunders* was the closest, that -- 85:1.  And I believe the ones that were at 100:1 were not FCRA matters, if I remember correctly.

THE COURT:  You were saying that -- you were saying there were others which were 100:1, which were nonFCRA matters?

ATTORNEY LOKER:  Correct.

THE COURT:  And what were those cases?

ATTORNEY LOKER:  I would have to find them, your Honor.  I didn't --

THE COURT:  Because I believe that a good number of those may have been class actions.

ATTORNEY LOKER:  Yes.

THE COURT:  Okay.  And in the 100:1 range, are there any which the compensatory or the damages which were awarded were greater than, say, 50,000?

ATTORNEY LOKER:  No, your Honor.

THE COURT:  Okay.  So I am really -- I was -- I know you don't want -- plaintiffs do not want to -- I understand, parties do not want to negotiate against themselves.  I understand that.  But explain to me why I should go greater than 4:1.

ATTORNEY LOKER:  So, number one, in terms of the 4:1, with *Ramirez*, they didn't say that was the mandatory ratio.  They said it was permissive.

THE COURT:  Um-hmm.

ATTORNEY LOKER:  But, here, I think going --

THE COURT:  They said going beyond 4:1 -- I can look up the quote.

ATTORNEY LOKER:  Correct.

THE COURT:  But basically going beyond 4:1 would -- would implicate constitutional concerns.  Correct?

ATTORNEY LOKER:  Correct.

THE COURT:  I'm sure I did not say it as eloquently as the Court.  But, yes.  Okay.

ATTORNEY LOKER:  Reducing the punitive damages award, your Honor, would not effectuate the purpose of punitive damages in terms of punishing Comenity and deterring the future conduct.  So if we go down to the 4:1 or the 1:1 that Comenity proposed, in essence that's telling the industry that this type of conduct really isn't being punished.  So it allows them to look for how low can the floor go in terms of what they're doing to investigate these disputes.  You know, a 1:1 or a 4:1 might punish, you know, me, a person.  But Comenity, in terms of their -- their size and the -- the breadth of their business, if we're only going to issue -- award a punitive damages award of a hundred thousand or 400,000, that's not going to change anything.  And we've seen --

Sorry.  Go ahead, your Honor.

THE COURT:  Go ahead.

ATTORNEY LOKER:  We've seen other punitive damages awards in this area of the law be reduced.  You know, *Miller* in particular, which my friend Justin Baxter got in Oregon.  They go from 18,000,000 down to 1.6 million.  And the conduct hasn't

changed.  It hasn't gotten better.

You know, we're here because these types of claims are -- are not -- these types of issues are not being punished.  So if we --

THE COURT:  What was your friend's case?

ATTORNEY LOKER:  Justin -- sorry.  *Miller versus Equifax*.  That was from 2018, I believe.

THE COURT:  Was it the same practice?

ATTORNEY LOKER:  It is.  Yeah.  So that was actually against the credit bureaus.  So FCRA as well.  Just a different subsection.

So that got reduced.  That was previously the largest jury verdict.  But that got reduced down to 1.6 million.  And the issue we have is that with --

THE COURT:  What was -- what was the amount of damages?

ATTORNEY LOKER:  The amount of damages was in the five, maybe six figures.

ATTORNEY NARITA:  I believe it was 180,000.

ATTORNEY LOKER:  Yeah, 180 sounds right.

THE COURT:  Um-hmm.

ATTORNEY NARITA:  Excuse me for interrupting.

THE COURT:  No.

ATTORNEY LOKER:  I appreciate the assistance, Mr. Narita.

So that's the issue we have in the reduction.  Is it will allow this conduct to continue, and it won't serve the purpose of punitive damages.

THE COURT:  Is this supposed to be punishing the whole industry, or is it supposed to be punishing the defendant?

ATTORNEY LOKER:  It's punishing the defendant for the conduct that occurred.  So that's the area that we're focusing on.  So I don't --

THE COURT:  But what you just stated was about punishing the whole industry.

So -- and you -- as you said, this was a different entity.

ATTORNEY LOKER:  Yes.

THE COURT:  In fact it was the FCRA.  Correct?

ATTORNEY LOKER:  Correct.

And, you know, I see your points, your Honor.

So, you know, Comenity is still in its industry.  I really think, to punish them, it needs to be a larger award than the 1:1 proposed or the one that's being discussed.

THE COURT:  So anything other than -- I know that you are relying heavily on a sense of justice and sort of this overarching themes and policy reasons.

But anything else you can ground the Court in, in terms of case law, or otherwise?

ATTORNEY LOKER:  No, you summarized it properly.  It is a policy argument, your Honor.

THE COURT:  Okay.  All right.

ATTORNEY LOKER:  And in standing -- just going the same path that Mr. Narita took -- you know, from our perspective, you know, standing was established for a couple of different reasons.  Number one, in looking at *Ramirez*, where they're talking dissemination of inaccurate information.  You know, that occurred here.  We can look at the inquiry section on the various credit reports.  That dissemination ultimately led to a credit denial.

So it just said, at that point -- in looking at the -- the (indiscernible) denial, as well as the inquiries on the credit reports, our position is that standing is satisfied there.

Then we have the testimony from Mr. Panchenko himself, as well as his wife, Alla and his friend Pavlo.  All of them talking about, you know, what Mr. Panchenko went through in receiving these rejections and how that impacted him.  Where -- you know, another place where we disagree with Mr. Narita and Comenity is that -- you know, those -- those three arguments.  Where Comenity's highlighting, they told me they were stopping investigating, we're the gateway, and didn't review documents.  Those -- those first two arguments were asserted to show, you know, why Comenity stood out to Mr. Panchenko.  It wasn't, you know, the attempt to establish standing through direct disputes.

It's -- you know, we have these group of bad actors, for

lack of a better term.  To Mr. Panchenko, Comenity was elevated and stood out from the others.  You know, the others are just a blur, a blob.  Comenity stood out to him based upon his experience with them.  So when he receives the denials, when he receives the rejections, Comenity is someone that he focuses in on.  And that's the focus of his harm, as a result.  So that's why we believe that standing is established.

And I was going to move to one satisfaction, unless the Court had questions there.

THE COURT:  No.

ATTORNEY LOKER:  Okay.  So in terms of one satisfaction, your Honor, we're looking at the double recovery or unjust enrichment or the single indivisible harm.

Mr. Panchenko, during trial, limited his testimony, in terms of the harm, to Comenity.  You know, there wasn't discussion about issues with the other defendants because, in essence, they were, you know, blobbed.  So if we're looking at those settlement values to, in essence, reduce the hundred thousand that he was rewarded, we can't -- it's not apples to apples.  So there's different statutes at issue with additional remedies.  Fees and costs were included.

THE COURT:  I think -- I mean, I tend to agree, of getting into the specifics of those and trying to say, "Well, these were allocated to this other claim."  You know, that's a bit of a double-edged sword for plaintiff.  Correct?  In light

of the motion in limine?

ATTORNEY LOKER:  I mean, I don't think that we can look at those amounts and say what went towards the emotional distress that was at issue here.

THE COURT:  Um-hmm.

ATTORNEY LOKER:  Those other amounts that were awarded, you know, were all other factors.  You know, there's nothing within those settlement agreements where these other banks and the credit bureaus would be paying for the harm Comenity caused.

We didn't talk about the harm that the others caused, and we only focused on Comenity.  We intentionally tried not to blur the lines and lump them together.  We intentionally tried to distinguish between, you know, what the others did and what happened here, and exclude that from the testimony.

The rejection of one satisfaction post-trial -- you know, we go to *Scudder*, which was a case in the Middle District of Florida, as well as *Ward*, which was in Colorado.  So no, you know, Ninth Circuit authority.  No California authority.

But those were, really, the two cases that, you know, I came across that addressed the issue, in depth.  And those courts reach the same conclusion that I'm asking the Court to reach here.  Which is, looking at those other settlement agreements -- and this is the FCRA context -- we had other furnishers and other credit bureaus at issue.  The courts

couldn't tell what amount of those settlements would have constituted a double recovery.  Like, there was nothing in those agreements and the testimony of the trial that allowed the Court to reach that.  And, as a result, the Court didn't say -- the Court couldn't say there's double recovery for this single indivisible harm.  And I don't think there's any evidence in the record here to reach the same result.

And I have nothing further, your Honor.

THE COURT:  Okay.  Thank you.

ATTORNEY NARITA:  Thank you, your Honor.  Briefly.

So on Mr. Loker's point about the three different ways that his client tried to establish standing and also tried to establish this divisible harm that Comenity caused him, I'm pretty sure I heard him just -- say just now that the first two were not -- were not attempts to demonstrate standing.

So the first one was the -- the first one was they didn't -- they told me they stopped investigating.  So he said, "Well, that wasn't -- that wasn't trying to prove standing." The second one was the gateway account.  He just said, "Well, we weren't trying to prove standing there."  That leaves us with, "They didn't review my documents.  I found out, after I filed the lawsuit and when discovery started that there were investigators -- there was one investigator, who did not review an image that was attached to the ACDV."

So his testimony was -- at trial was that upset him

differently than other defendants.  And that -- that was supposed to help with standing.  But that's something that happened after the suit was filed.

If you're going to have standing, you have to demonstrate that you had it before you filed --

THE COURT:  There is where I think it's real dangerous.  Danger -- because you're blending now your three -- and briefing read differently about these; these three different examples.  We're going much more to standing versus -- your standing argument -- or in your standing argument versus the one satisfaction.

I mean, the harm, which we're discussing for purposes of establishing traceability under Article III, is different than in terms of division under the one-satisfaction rule and the harm, for purposes of that.  Correct?

ATTORNEY NARITA:  Correct.  But he was talking about standing, in his comments just now, is what I was trying to raise.

THE COURT:  So because -- even if he is -- well, keep going.

ATTORNEY NARITA:  Sure.  And so those -- those are -- the three things he said at trial were the ways that he tried to demonstrate traceability.

Well -- and then, after trial, when we challenged him, he pulls out the apple cart.  And he says, "Oh, no, that gives me

standing too."  And I won't repeat everything he said about the apple cart.  But it's not -- it doesn't connect.

And so -- so, really, that leaves us with no evidence of traceability, here, that keeps him in court.  That -- that's where we are.  There's -- there's nothing specific.  He hasn't said anything specific about why he has traced any particular conduct by Comenity to the harm that he says he suffered.

And I think that's -- that's why the story starts and ends with standing.

THE COURT:  All right.  So, Mr. Narita, you're at three minutes now.

ATTORNEY NARITA:  Oh, if I may add one last point on the punitive damages issue.  I think it's just --

THE COURT:  Mr. Narita, you need to wait until I say yes.

ATTORNEY NARITA:  Thank you.  May I --

THE COURT:  So, yes.

ATTORNEY NARITA:  I appreciate that, your Honor.

With my last 60 seconds, all I will say is Mr. Loker conceded that he's working more on a policy standpoint, rather than the case law.  I think the case law is quite clear that in the Ninth Circuit, you're beyond what the Constitution will bear if you go past the 4:1.

THE COURT:  I do not think they drew it as a bright-line rule.  In fact, they clearly didn't.  But they

made it as -- they gave a clear indication.  And they made it pretty -- so -- and the Court made your point for you, I think, to a large extent, already, in terms of questioning. So --

ATTORNEY NARITA:  Unless the Court has questions, your Honor --

THE COURT:  I do not.  I do not.

Mr. Loker, you looked like you wanted to write something down and say something.

Was there something further, given that the time difference between the two sides is 11 minutes?

ATTORNEY LOKER:  No, no.  I just -- I've been having trouble hearing lately.  So I just want to apologize to the Court for talking --

THE COURT:  Oh, well, thank you.

All right.  And so, with that, the Court will take this under submission.

Thank you for your flexibility regarding moving the time. I was supposed to be in trial.  The case settled, as these things often do.  And so I appreciate you accommodating; both sides.  And for you -- for you all accommodating the Court's -- making it work.

So one question which I had asked you all at the end of trial, after the verdict -- and which I will repeat now -- given where I am at, this is going to take some time.  And if

the Court were to do a remittitur, there's 30 days attached to that as well.  But I was wondering, given where I'm at right now, it is unlikely that this is going to come out for -- 30 days, at least.

So is there any interest in a magistrate judge settlement conference?

ATTORNEY NARITA:  Plaintiff -- plaintiff can go first on that, your Honor.

ATTORNEY LOKER:  We're always open to it.  You know, Mr. Narita and I talked quite a bit.  We might be having another trial together soon.  So I'm not -- we're open to it, your Honor.  But I also think we can have a conversation.  I have no preference, I guess.

THE COURT:  I'm asking just because -- let's say it's 60 days till this decision comes out.  And if you can save the Court's time --

ATTORNEY LOKER:  I see.

THE COURT:  -- it's always appreciated; if there's going to be resolution one way or another.

I've given you both pretty clear indications of sort of where I am generally thinking, or where my thinking is at right now.

ATTORNEY NARITA:  May I, your Honor?

THE COURT:  Yes, absolutely.

ATTORNEY NARITA:  Thank you.

33

So I would say that, you know, the message is received loud and clear.  And, you know, I think what Mr. Loker and I should do is talk to each other.  Because he's correct.  We have a very good communication interaction.  And -- in light of the Court's comments today.  And we should talk.

And then we can get back to the Court quickly to see whether we think that a magistrate -- that we should basically divert the resources of a magistrate judge, and that would be productive.  Or whether we don't think that would be productive.  Or whether, maybe, we can resolve the matter ourselves.  I think we could do that, if we -- if we -- maybe we should be given a deadline to get back to you on that.

THE COURT:  That sounds good.

Let's say -- how much time do you realistically need?

So -- well, I was thinking somewhere in the lines of 15 to 30 days.  So if that helps give frameworks, what do you all think?

ATTORNEY LOKER:  And just to clarify, your Honor, that's 15 to 30 days to do the settlement conference?

THE COURT:  15 -- maybe 15 -- maybe two weeks to decide whether or not the assistance of a magistrate would be helpful.

And I'm hoping that you all will meet and confer in good faith and try to negotiate.  I mean, there have been very clear indications about where -- where the Court is thinking about

going with this.  And you know your exposure.  You know your risk.  You know how much it would cost to retry.  You know how much it would cost to appeal.  Whatever I issue, you know the costs.  So -- better than I do, at this point.

ATTORNEY LOKER:  Understood, your Honor.  So two weeks?

THE COURT:  Two weeks to tell me whether or not you would like a magistrate judge involved.

ATTORNEY NARITA:  We'll do that.

THE COURT:  And I will be frank.  We're right at the beginning of March.  I'm guessing that this decision would not come out -- in terms of the earliest -- 60 days.  So that gives you time frames --

ATTORNEY LOKER:  Yes.

THE COURT:  -- for both your negotiations, as well as in terms of magistrate judge involvement.

And the Court's always appreciative of conserving my resources, because they are few.

ATTORNEY LOKER:  Yes, your Honor.  Understood.

THE COURT:  All right.  Well, thank you to you both.  Thank you for coming up.  So --

CLIENT REPRESENTATIVE GALIANO:  All good.

THE COURT:  And -- and with that everybody take care.  Enjoy the beautiful weather.

ATTORNEY LOKER:  Yes, it is nice.

THE COURT:  Yes.

And the court is now adjourned for today.

ATTORNEY LOKER:  Thank you, your Honor.

ATTORNEY NARITA:  Thank you

(Conclusion of proceedings at 2:46 p.m.)

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 4th day of March, 2026.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore

_____

AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290